## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA, | : | No. 3:02 CR 264 (AWT) |
| | : | |
| v. | : | |
| | : | |
| WALTER A. FORBES, and | : | March 7, 2005 |
| E. KIRK SHELTON. | : | |
| | : | |

### MOTION OF DEFENDANT E. KIRK SHELTON FOR A JUDGMENT OF ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29 OR FOR A NEW TRIAL PURSUANT TO FED. R. CRIM. P. 33

Defendant E. Kirk Shelton, through undersigned counsel, respectfully moves, pursuant to Fed. R. Crim. P. 29, for a judgment of acquittal with respect to each count in the superseding indictment. In the alternative, Mr. Shelton alternatively moves, pursuant to Fed. R. Crim. P. 33, for the vacatur of the jury's verdict and the granting of a new trial in the interests of justice.

On January 5, 2005, the Court granted Mr. Shelton's request for a 60-day period after the jury's verdict in which to make post-trial motions pursuant to Rules 29 and 33. Pursuant to Fed. R. Crim. P. 45, the sixtieth day after the jury's verdict is computed to be Monday, March 7, 2005. On January 25, 2005, the Court granted Mr. Shelton's request for an additional 30 days (for a total of 90 days after the jury verdict) in which to file post-trial motions. The ninetieth day, as computed by Rule 45, is Monday, April 4, 2005.

Both Rule 29 and Rule 33 provide that a defendant must file any post-trial motions for a judgment of acquittal and a new trial within the time period set by the court during the seven-day period after the guilty verdict. The Court granted Mr. Shelton's request for a 60-day period in which to file post-trial motions within seven days of the guilty verdict. Because the Court's order extending the filing deadline to 90 days after the jury verdict occurred within the 60-day

period, we submit that Mr. Shelton has until April 4, 2005, in which to file his post-trial motions. *See United States v. Castro*, 00 Cr. 549 (LMM), 2004 U.S. Dist. LEXIS 9095 (S.D.N.Y. May 19, 2004) (finding no prohibition against second extension to file Rule 33 motion that court granted within time period set by initial extension). Nevertheless, we have submitted this motion within 60 days of the jury's verdict out of an abundance of caution to remove any question about whether Mr. Shelton's post-trial motions have been timely filed. Mr. Shelton will submit a memorandum of points and authorities in support of his motion on or before April 4, 2005, in accordance with the briefing schedule established by the Court, and will submit a reply memorandum on the schedule that has previously been set in response to the government's opposition to the motion.

The grounds for this motion are set forth below. Those grounds, both individually and in combination with one another, warrant the entry of a judgment of acquittal or, in the alternative, the granting of a new trial in the interests of justice.

1.    The government failed to present sufficient evidence from which a reasonable juror could conclude beyond a reasonable doubt that Mr. Shelton is guilty of any of the counts charged in the Superseding Indictment (the "Indictment"). Specifically, the government failed to present sufficient evidence that Mr. Shelton knowingly or willfully participated in a conspiracy to misstate CUC's financial results, that he knowingly or willfully caused CUC or Cendant to file any false SEC filings, that he knowingly or willfully engaged in any fraud relating to the stock of CUC or Cendant, or that he acted with the requisite intent to defraud or deceive the holders of CUC or Cendant securities. *See* Tr. 15449-16006.[1]

---

[1] Defendant Shelton incorporates all arguments and evidence referred to in his summation as support for his post-trial motions.

In the alternative, to the extent that the Court rules that the government presented legally sufficient evidence to support the jury's guilty verdict, the Court should grant a new trial in the interests of justice because the evidence adduced at trial, especially the testimony of the government's main cooperating witnesses, was of such dubious quality that the verdict should be overturned in the interests of justice. *See Unites States v. Autuori*, 121 F.3d 105, 120 (2d Cir. 2000).

As summarized at length in the summation of Mr. Shelton's counsel, the testimony of Cosmo Corigliano and Anne Pember, the government's main witnesses, was riddled with inconsistencies and often contradictory. *See, e.g.,* Tr. 15519-96, 15657-94. The remaining evidence at trial – both testimony and documents – was insufficient to meet the government's burden of proof against Mr. Shelton. Examples of the deficiencies in the government's proof and the weakness of the evidence against Mr. Shelton are as follows:

>   (a)    Mr. Corigliano gave false testimony concerning numerous matters, including: (i) his decisions to sell CUC and Cendant stock, which he claimed were divorced from his knowledge that the stock price was inflated as a result of the fraud, *see* Tr. 7588-90, 7984; (ii) the circumstances surrounding the creation of GX 613, a March 4, 1998 memo from Walter Forbes to Michael Monaco and Henry Silverman, which Mr. Corigliano testified that Mr. Shelton handed to him, even though the document was electronically stored on Mr. Corigliano's computer, *compare* Tr. 7428, 7432-33, 9243-4 *with* Tr. 11312-13; (iii) Mr. Shelton's alleged suggestion to Mr. Corigliano that he should destroy documents, which was contradicted by notes of Mr. Corigliano's

interviews with the government, *compare* Tr. 7553, 9246-50 *with* Tr. 11553-56; (iv) Mr. Corigliano's testimony that he attended a conspiratorial meeting with Mr. Walter Forbes and Mr. Shelton in Mr. Shelton's office in Stamford when travel records establish that, in fact, Mr. Walter Forbes was thousands of miles away, *see* Tr. 9634-54; (v) Mr. Corigliano's contention, contradicted by documents, that in or about November 1997, Mr. Walter Forbes purportedly had the CUC offices swept for listening devices because he was allegedly concerned that Henry Silverman had bugged the building, *compare* Tr. 7344-50, 8145-46 *with* GX 430; DX 1083; DX 1084; DX 1085; Tr. 9661-64; (vi) Mr. Corigliano's testimony about the purported "well is dry" conversation, which is materially inconsistent with the account of the conversation Mr. Corigliano provided to the government for the first time in 2003, more than six and one-half years after its alleged occurrence, *compare* Tr. 6957, 8064-64 *with* DX 2268 at 3 (attached hereto as Exhibit A); (vii) Mr. Corigliano's claim that the Essex reserve contained an improper cushion even though government witness Thomas Albright testified that the Essex reserve was legitimate, *compare* Tr. 6574 *with* Tr. 3963; (viii) Mr. Corigliano's claim that the Getko reserve purposefully included an illegitimate cushion even though Joel Zychick and Chris McLeod testified that the establishment was proper, *compare* Tr. 6533-58 *with* Tr. 11170-80; (ix) Mr. Corigliano's supposed lack of direct involvement in the topside adjustment process, which is contradicted by the testimony of Casper Sabatino and Kevin

Kearney, *compare* Tr. 7087-88, 8513, 8518 *with* Tr. 9922-23, 4057-60,

4677-78; (x) Mr. Corigliano's contention that he did not directly tell Mr.

Speaks to improperly inflate the Comp-U-Card budget by $200 million in

preparation for the December 11, 1997 controllers' meeting, despite

Mr. Speaks' testimony to the contrary, *see* GX 133; GX 134; *compare*

Tr. 8919-21 *with* Tr. 684-84, 690, 987-88; (xi) various aspects of his deal

with the SEC, including the value of his residence and the $1.8 million

retainer that he was allowed to use for legal fees, *see* Tr. 7504, 7986,

8154, 8156, 8158-60, 8113-14, 8166-73, 9347-56, 9370-72, 9461; DX 49;

DX 1060 ¶¶ 3(vi), 6, 12; (xii) his application for a bank loan in the Spring

of 2004 to supposedly finance a home renovation, in which he failed to

mention that he was a convicted felon whose assets were to be imminently

disgorged, *see* Tr. 9670-75.

(b)     Ms. Pember also provided false testimony about numerous material

matters, including the following:  (i) Ms. Pember testified that despite her

involvement in a multi-year fraud that overstated CUC's earnings by more

than a hundred million dollars, she did not believe that CUC's stock price

was inflated, *see* Tr. 3096-97, 3135, 3153-54, 3158; (ii) Ms. Pember lied

about having given GX 530 to Mr. Shelton in mid-December 1997 in

order to obtain Mr. Shelton's permission for her to provide the 1998 CUC

budget to HFS; conclusive evidence, not refuted by the government,

established that GX 530 was not created until mid-January 1998, weeks

after Ms. Pember provided the budget information to HFS, *compare*

Tr. 2840-42, 3046, 3365, 3772-73; GX 530 *with* Tr. 3355-60, 3365-67, 3850, 11306-09; GX 1773 at KS00024; DX 1038, DX 1039; DX 1438, DX 1853; (iii) the government compounded the false testimony of Ms. Pember regarding the date she created GX 530 by cross-examining Mr. Shelton's computer expert on this issue, even though the testimony of Mr. Shelton's computer expert was consistent with the opinion of the government's own expert (whom the government did not call) and was consistent with documents introduced by the defense showing GX 530 could not have been created before January 13, 1998; (iv) on at least three occasions, Ms. Pember testified that she showed GX 493 – the final version of the so-called "cushion" document – to Mr. Shelton, only to admit on cross-examination that she did not recall if she had given Mr. Shelton GX 493 and then to testify twice on re-cross examination that, in fact, she had not given Mr. Shelton GX 493, *compare* Tr. 2567-74, 3008-09, 3012-13, 3017-18 *with* Tr. 3387-88, 3841, 3844; (v) Ms. Pember's testimony that Mr. Shelton had attended meetings with her and the three auditors from E&Y to discuss the establishment of the Cendant merger reserve was directly contradicted by each of the three E&Y auditors, who testified they had never met with Mr. Shelton regarding the Cendant merger reserve prior to March 9, 1998, *compare* Tr. 2573-74, 3012-13, 3017-18 *with* Tr. 11142, 11147, 11153; and (vi) Ms. Pember's testimony that, in late 1997 or in January 1998, she discussed the cancellation reserve, the rejects-in-transit issue, and the

proposed usage of the Cendant merger reserve with Mr. Shelton was contradicted by Steven Speaks, who testified that throughout March 1998, he voiced his concerns about these accounting issues with Ms. Pember and on several occasions asked that she raise them with Mr. Shelton, *compare* Tr. 2903 *with* Tr. 791-92, 1015-17, 3863; DX 904.

(c)    None of the government's witnesses, including Mr. Corigliano, Ms. Pember or Mr. Sabatino, testified that Mr. Shelton was ever told that CUC or Cendant was engaged in accounting that was fraudulent or violative of GAAP.  *See, e.g.,* Tr. 9660 (Corigliano's testimony that he never told Shelton it was not proper accounting to use merger reserves to make the numbers).

(d)    Mr. Sabatino testified that he did not believe that Mr. Shelton was a member of any criminal conspiracy or that Mr. Shelton was aware of the topside adjustments.  *See* Tr. 4489 (Sabatino testimony that he never told Shelton about the topside adjustments), 4580-81 (Sabatino testimony that he told USAO that he did not include Shelton in the list of participants in the alleged fraud), 4644-45 (Sabatino testimony that Shelton was not involved in unsupported topside adjustments), 4913 (Sabatino testimony that to his knowledge improper use of merger reserves was successfully concealed from Shelton); *see also* Tr. 15717-720 (summation argument reviewing Sabatino's testimony that he did not believe Shelton was member of conspiracy).

(e)     Mr. Sabatino's testimony that in early 1998 Mr. Shelton attended a

meeting at which he tore up GX 530 or a similar type of document was

contradicted by Mr. Sabatino's statement to the Audit Committee in July

1998 that he had never seen GX 530 and his failure to have mentioned the

supposed "tear-up" incident in any of his first 11 interviews with the Audit

Committee or the government.  *See* Tr. 4567-70, 4589-90, 4592-93,

10499; *see also* 15724-736 (summation argument reviewing Sabatino's

testimony of "tear-up" incident and evidence of his denial of ever having

seen GX 530).

(f)     Mr. Sabatino's testimony concerning the "pop-in" meeting – a 15 second

conversation in which Mr. Corigliano asked Mr. Shelton whether the

earnings for that quarter should be "x" or "y" – lacked any probative value

where the difference between the two figures was a single penny and

where other evidence in the trial established that companies often have

discretion about whether to report earnings at one level or another.  *See*

Tr. 4616-17 (Sabatino testimony confirming that immaterial change in

earnings could have one penny effect on EPS), Tr. 5629-30 (Robert

Davidson testimony that an EPS figure may vary by several pennies

depending on legitimate discretionary judgments made by accountants),

Tr. 15720-15724 (summation argument reviewing "pop-in" meeting).

(g)     The so-called "cheat sheets", *see, e.g.*, GX 58; GX 58(a); GX 62(b); GX

1774; GX 1777, do not reflect the use of topside adjustments or any

improper accounting concerning allocations or cancellation reserves or

rejects-in-transit; to the extent the cheat sheets refer to the adjustment of reserves, nothing on the documents showed that those adjustments were improper.

(h)     Although various government witnesses testified about Mr. Shelton's awareness of certain reserve adjustments at CUC and Cendant, none of those witnesses, including Mr. Albright, Mr. Monaco, and Mr. Scott Forbes, testified that Mr. Shelton ever indicated that he believed such reserve adjustments were fraudulent, violative of GAAP or otherwise improper.  *See, e.g.,* Tr. 3966 (Thomas Albright confirming that Mr. Shelton never indicated that reserve adjustments were improper).

(i)     The government failed to offer any evidence that Mr. Shelton knew that in early 1998 Mr. Corigliano, Ms. Pember or Mr. Speaks were creating false journal entries reflecting bogus sales in order to support the reversal of reserves into revenue.

(j)     The evidence established that experienced accountants, including Mr. Monaco and Mr. Scott Forbes, determined in Mr. Shelton's presence that CUC's reversal of a substantial amount of reserves in 1996 and 1997 were proper, lawful and consistent with GAAP, and that CUC's outside auditing firm, Ernst & Young, had reviewed and were comfortable with those reserve reversals.  *See, e.g.,* Tr. 1849-70, 2136-83, 5896-98, 6075-79, 6128-47; DX 1288; DX 1303; *see also* Tr. 15831-45 (summation argument that Henry Silverman, Michael Monaco and Scott Forbes thoroughly reviewed CUC's reserve reversals for 1996 and 1997).

(k)    There was overwhelming evidence of Mr. Shelton's consciousness of innocence, including his attendance at the March 6 meeting with Mr. Scott Forbes, his willingness to be interviewed by the Cendant Audit Committee on four occasions, his willingness to be interviewed by the government on two occasions, and his voluntary production of documents from his files that the government later argued provided clues to the existence of fraudulent accounting at CUC and Cendant.  *See, e.g.,* Tr. 15952-957 (summation argument reviewing Mr. Shelton's cooperation after fraud was disclosed).

(l)    Unlike Mr. Corigliano and Ms. Pember, Mr. Shelton did not sell any CUC or Cendant shares in the prior period leading up to the revelation of the fraud at CUC and Cendant.  *See, e.g.,* Tr. 15958-75 (summation argument comparing Pember and Corigliano's insider trading with McLeod and Shelton's lack of stock sales).

(m)    Mr. Shelton had a reputation for being an honest and good person  among his colleagues and employees at CUC, as well as business and community leaders outside the company.  *See, e.g.* Tr. 15912-934 (summation argument reviewing evidence and testimony regarding Shelton's reputation for honesty).

2.    The conscious avoidance instruction was improper.

<u>First</u>, the instruction constituted a constructive amendment of the Indictment.  A constructive amendment takes place when the government seeks a conviction on a basis that did not appear in the indictment.  *See, e.g., United States v. Leichtnam*, 948 F.2d 370, 377 (7th Cir.

1991) ("Any broadening of the possible bases for conviction from that which appeared in the indictment is fatal.  It is reversible per se.") (quotations omitted); *United States v. Keller*, 916 F.2d 628, 634-36 (11th Cir. 1990) (finding constructive amendment, and reversing conviction, where indictment alleged that defendant conspired with one person, but court instructed jury that he could be convicted if he conspired with others); *United States v. Yeo*, 739 F.2d 385, 387 (8th Cir. 1984) (finding constructive amendment, and reversing conviction, where indictment referred to extortion of specific individual but government offered evidence of extortion of others as alternative basis of conviction); *United States v. Figueroa*, 666 F.2d 1375, 1378-80 (11th Cir. 1982) (finding constructive amendment, and reversing conviction, where indictment charged attempted hijacking by force and violence, but government proved attempted hijacking by threats and intimidation); *United States v. Cusmano*, 659 F.2d 714, 715, 719 (6th Cir. 1981) (finding constructive amendment, and reversing conviction, where indictment charged extortion by means of threatened economic loss but government introduced evidence of threatened physical violence as alternative means of extortion).

The Indictment unequivocally alleged that the defendants *directed* the alleged fraud and *directed* the improper accounting that constituted the alleged fraud.  *See, e.g.,* Indictment, Count 1, ¶ 24; *id.,* ¶ 27.  The Indictment also alleged that Mr. Shelton had actual knowledge of improper accounting and actively participated in improper accounting.  See, e.g., Indictment, Count 1, ¶ 47; *id.,* ¶ 51; *id.,* ¶ 52; *id.,* ¶ 59.  A charge that allowed the jury to base criminal culpability on willful blindness was fundamentally irreconcilable with the Indictment's allegations of actual knowledge and intentional participation.

Furthermore, the government did not argue conscious avoidance in either its principal or rebuttal summation arguments.  To the contrary, the government repeatedly argued that

Mr. Shelton *directed* the alleged fraud and actively and intentionally participated in it.  *See, e.g.,* Tr. 14824, 14827, 14835, 14843, 14845, 14856, 14894-94, 14929, 14936-37, 14950, 14959, 14962, 14983, 14991, 15010, 15013, 15015, 15027, 15044, 15045, 15051, 15058, 15118, 16017, 16070, 16071.  The government did not contend that Mr. Shelton was aware only of a high probability of the fraud and thereafter purposefully contrived to avoid confirming that fact.

Second, the effect of this instruction was to lower the government's burden of proof and allow the government to convict Mr. Shelton on a negligence standard.  Having asked the grand jury to return an indictment based on a theory that Mr. Shelton had directed the alleged fraud, thus presupposing that Mr. Shelton was aware of the fraud he was directing, the government then invited the jury to convict Mr. Shelton on a theory that he consciously avoided learning the facts underlying the fraud.

Third, there also was an insufficient evidentiary basis for the conscious avoidance instruction, which may be given only where (i) the defendant asserts the lack of some specific aspect of knowledge required for conviction, and (ii) the appropriate factual predicate for the charge exists.  *United States v. Svoboda*, 347 F.3d 471, 480 (2d Cir. 2003).  The second prong is satisfied if there is "evidence such that a rational juror may reach the conclusion beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact."  *Id.* at 480.  The government failed to present any evidence that Mr. Shelton was aware of a high probability that CUC's or Cendant's accounting was fraudulent or violative of GAAP and that he thereafter purposely contrived to avoid confirming the fact of the fraud.  *See United States v. Ferrarini*, 219 F.3d 145 (2d Cir. 2000) ("If conscious avoidance could be found whenever there was evidence of actual knowledge, a jury could be given a conscious avoidance instruction in a case where there was only equivocal

evidence that the defendant had actual knowledge and where there was no evidence that the

defendant deliberately avoided learning the truth.  Under those circumstances, a jury might

conclude that no actual knowledge existed but might nonetheless convict, if it believed that the

defendant had not tried hard enough to learn the truth. . . . [S]uch a result might constitute

reversible error.").

      3.     The Court improperly allowed Mr. Corigliano and Ms. Pember to offer expert

testimony on technical accounting issues.  *See* Memo. In Supp. of Mot. of Def. Walter A. Forbes

to Preclude the Government from Presenting Improper Lay Opinion Testimony at Trial (Forbes

Mot. In Limine No. 1, filed April 1, 2004) (adopted by Def. Shelton in Shelton Mot. No. 32, filed

April 29, 2004).

      Mr. Corigliano opined as to the propriety of numerous alleged accounting decisions and

purported to quantify the impact of these accounting decisions on CUC's financial results[2].

---

[2]  *See, e.g.*, Tr. 6206-08 (opining that reserves for fiscal year 1997 had no "basis in fact");  Tr. (6256
(opining that GX 667 was a "more accurate analysis to calculate what the membership cancellation
reserve should be at 1/31/91"); Tr. 6272 (opining that membership cancellation reserves on general ledger
were "$9 million short" for fiscal year 1991); Tr. 6277-78 (opining that membership cancellation reserves
were "understated" in years 1991 to 1997); Tr. 6308-18 (opining that accounting information in 1991
CUC annual report was "inaccurate"); Tr. 6322-24 (opining that there was "no basis in fact" for including
$2 million of general reserves in CUC earnings in fiscal year 1991); Tr. 6344-47 (opining that accounting
adjustments in fiscal year 1991 were not "legitimate" and that earnings of company were manipulated);
Tr. 6355-56 (opining that calculation of profit sharing receivable was not "based upon a good faith
analysis of the facts"); Tr. 6363 (opining that topside adjustment had "no basis in fact" and that there are
"legitimate" and "illegitimate" topside adjustments); Tr. 6367-68 (opining that reporting of membership
rejects was "wrong" and opining on resulting impact on operating earnings); Tr. 6270-74 (opining that
there was no "basis" to move deferred revenue recognition members to immediate revenue recognition
categories and opining on resulting impact on operating earnings); Tr. 6377 (opining that final numbers
for fiscal year 1994 included adjustments that were not "[l]egitimate"); Tr. 6388-95 (opining that
adjustments had "no basis" resulted in $6 million increase in gross profits for fiscal year 1994); Tr. 6536-
41 (opining that some reserves in connection with Getko acquisition were "legitimate" and others were
not); Tr. 6572-73 (opining that there was no "basis in fact" for Welcome Wagon reserve); Tr. 6574-75
(opining that there was no "basis in fact" for Essex reserve); Tr. 6576-77 (opining that there was no "basis
in fact" for CUC Europe reserve); Tr. 6579 (opining that there was no "basis in fact" for International
Sentinel reserve); Tr. 6616 (defining accounting concepts of "pooling of interests" and "purchase-price
accounting"); Tr. 6712 (opining that there was no "basis in fact" for line items); Tr. 6722 (opining that
there was no "basis" for profit sharing adjustments); Tr. 6752 (opining that operating earnings of CUC

Ms. Pember also opined as to the propriety of numerous alleged accounting decisions and purported to quantify the impact of those decisions on CUC's financial results[3].

Mr. Corigliano's and Ms. Pember's testimony concerning the legitimacy of CUC's and Cendant's accounting techniques and their purported impact on CUC's financial statements was expert testimony governed by Fed. R. Evid. 702. The government did not comply with the disclosure requirements of Rule 702 and Fed. R. Crim. P. 16(a)(1)(G) by presenting expert testimony through Mr. Corigliano and Ms. Pember.

4.    The government improperly relied upon false testimony by Mr. Corigliano and Ms. Pember concerning material matters. *See, supra*, Paragraphs 1(a), (b); *see also* Memo. In Supp. of Mot. of Def. Walter A. Forbes for a Mistrial Due to Improper Closing Argument (Forbes Trial Mot. No. 49, filed Oct. 19, 2004) (adopted by Def. Shelton in Shelton Mot. No. 61,

---

were never "correct" during his tenure as CFO); Tr. 6783 (opining that Ideon reserve was overstated by $40-50 million); Tr. 6825 (opining that $20 million increase in software reserve had no "basis in fact"); Tr. 6830-34 (opining that accounting information in CUC 10-Q for the third quarter of 1997 is "false"); Tr. 6942 (opining that operating earnings provided to analysts were "false"); Tr. 7115 (opining that reported CUC earnings were not "legitimate"); Tr. 7258 (opining that one-time gain on sale of Interval business would not be "looked at by Wall Street"); Tr. 7307-11 (opining that financial information in 1997 CUC annual report is "false"); Tr. 7325-26 (opining that alleged allocation of expenses between months of November and December 1996 and January 1997 was "illegitimate" and overstated results by approximately $30 million); Tr. 7328 (opining that budgeted reserves had no "basis in fact"); Tr. 7332-33 (opining that accounting adjustments had no "basis in fact"; Tr. 7380-81 (opining on impact of alleged charge of T&E expense against merger reserve); Tr. 7395 (opining that CUC did not "legitimately" make its numbers); Tr. 7405 (opining that BCI CNA contract termination adjustment was "illegitimate"); Tr. 7419 (opining that alleged plan to use reserves to improve operating earnings had no "basis in fact"); Tr. 7421 (opining that alleged plan to use reserves was "arbitrary"); Tr. 7495 (opining that Cendant's most recent financial statements were "false"); Tr. (07/14/04) at 7495-96 (opining that earnings announcement for year ended 12/31/97 were "false"); Tr. 7538-39 (opining that accounting policy concerning commissions payable was not "legitimate"); Tr. 7544-45 (opining that there was "no basis for not recording" rejects, and that this "favorably impacted our operating earnings"); Tr. 7553-61, 7566-67 (opining that various SEC filings were "false").

[3]    *See, e.g.,* Tr. 2332-33 (testimony that the company's use of reserves was "inappropriate"); Tr. 2349-50 (testimony as to how, in general, a company needs to reserve for future cancellations and rejects); Tr. 2435-37 (opining as to how Comp-U-Card should have treated excess balances in accrued liability accounts); Tr. 2469 (testimony about the proper usage of a membership cancellation reserve); Tr. 2815-16 (testimony that Pember did not believe that the financial statements that the company had provided to the auditors were fairly presented in conformity with GAAP); Tr. 2819 (opining as to what counts as a "material transaction").

filed Oct. 20, 2004).  The government failed to correct this false testimony.  To the contrary, in

its summation, the government relied heavily upon the testimony of Mr. Corigliano and Ms.

Pember, sought to bolster their credibility by arguing that false testimony would jeopardize their

cooperation agreements, and expressly urged the jury to find that they were credible witnesses.

*See* Tr. 14860-65.  The government's breach of its obligation to alert the jury about evidence that

it knew, or should have known, was false requires that the verdict be set aside.  *See United States*

*v. Wallach*, 935 F.2d 445, 458 (2d Cir. 1991).

      5.      The Court should grant a judgment of acquittal as to Mr. Shelton with respect to

Counts 2 through 4 of the Indictment, and the mail fraud and wire fraud objects of Count 1.  The

government failed to present sufficient evidence from which a reasonable juror could conclude

beyond a reasonable doubt that Mr. Shelton sought to obtain, or obtained, money from any of the

alleged victims, as charged in the Indictment.  In the alternative, the Court should dismiss Counts

2 through 4, and the mail and wire fraud objects of Count 1 because, to the extent these counts

charged Mr. Shelton with falsifying corporate earnings in order to cause his compensation to

increase, there was a divergence between the persons against whom the fraudulent scheme

allegedly was directed and the entities from whom the defendants were alleged to have received

compensation.  *See* Memo. of Law in Supp. of Mot. of Def. E. Kirk Shelton to Dismiss Counts

Three, Four, and Five (Shelton Pretrial Motion No. 1, filed Dec. 14, 2001); Memo. of Walter A.

Forbes in Supp. of Mot. to Dismiss Counts 3-5 For Failure to Charge a Mail or Wire Fraud

Offense and Count 1 for Failure to Allege Legally-Sufficient Mail or Wire Fraud Objects

(Transfer of Money from Alleged Victim) (Forbes Pretrial Mot. No. 4, filed Dec. 14, 2001).

      6.      The Court should set aside the verdict because the government improperly

introduced evidence of accounting misconduct during the pre-1995 time period.  The

government did not provide any particulars regarding the pre-1995 time period, and its pretrial disclosures failed to identify the allegedly fraudulent accounting conduct during that period. *See* Memo. in Supp. of Mot. for a Mistrial Due to the Constructive Amendment And/Or Prejudicial Variance, And Notice Violations Caused by the Testimony of Cosmo Corigliano (Forbes Trial Mot. No. 20, filed July 21, 2004) (Adopted by Def. Shelton in Shelton Mot. No. 48, filed July 29, 2004).

7.    The requirements of the Due Process Clause required the government to confer immunity on Stuart Bell in light of the following extraordinary circumstances:

<u>First</u>, Mr. Bell's testimony was material, exculpatory, and not cumulative. Had he been immunized, Mr. Bell would have denied any participation in the alleged fraud at CUC. Thus, Mr. Bell's testimony would have undermined the government's claim that the alleged fraud began in the late 1980's under Mr. Bell and continued throughout Mr. Bell's tenure as CFO of CUC. Mr. Bell's testimony also would have undermined Mr. Corigliano's testimony that Mr. Corigliano learned how to commit accounting fraud from Mr. Bell and that Mr. Corigliano was not the architect of CUC's improper accounting. In addition, Mr. Bell would be able to explain that the documents introduced into evidence by the government concerning the pre-1995 period do not reflect improper accounting, and that the accounting done under Mr. Bell's tenure as CFO was proper and in compliance with GAAP.

<u>Second</u>, Mr. Shelton did not have any other meaningful way of presenting the testimony that Mr. Bell could have offered. Mr. Bell was the CFO of CUC prior to 1995, and he was the only person who could have refuted Mr. Corigliano's testimony concerning allegedly improper accounting during Mr. Bell's tenure as CFO. Much of Mr. Corigliano's testimony concerning Mr. Bell involved purported conversations in which only Mr. Corigliano and Mr. Bell were

present.  Moreover, as the former CFO and a CPA, Mr. Bell was qualified to explain the propriety of CUC's accounting during the pre-1995 period and refute Mr. Corigliano's claims that documents from that period reflect accounting that intentionally violates GAAP.

Third, the government presented extensive testimony from other witnesses concerning Mr. Bell's purported statements and actions, including numerous hearsay statements purportedly made by Mr. Bell.  It was unfair for the government to feature Mr. Bell's alleged misconduct prominently in its case-in-chief, and to claim that Mr. Bell initiated the accounting fraud and taught Mr. Corigliano how to commit the fraud, while denying Mr. Shelton the testimony of the key witness who would have denied these claims.  See Reply Memo. In Supp. of Mot. of Def. Walter A. Forbes For (1) An Order Requiring the Government to Confer Immunity on Stuart Bell or (2) A Missing Witness Instruction Relating to Stuart Bell (Forbes Trial Mot. No. 36, filed Sept. 27, 2004) (filed under seal) (Adopted by Def. Shelton in Shelton Mot. No. 58, filed Sept. 29, 2004) at pp. 3-11; see also Tr. 6245, 6251, 6282-95, 6303, 6318, 6344-51, 6354, 6356, 6361, 6365, 6367, 6372, 6401, 6411-18, 6423-24.

Fourth, the Court should set aside the verdict because the Court failed to give the jury a missing witness instruction for Mr. Bell.  It was peculiarly within the power of the government to produce Mr. Bell as a witness.  In light of the government's failure to immunize Mr. Bell and call him as a witness, the jury should have been instructed that Mr. Bell's testimony would have been unfavorable to the government.

8.    The Court improperly responded to the jury's note requesting the read back of certain testimony of Casper Sabatino.  On November 23, 2004, the jury requested the read back of the direct and re-direct examination regarding two subjects: (i) the alleged "pop-in" conversation and (ii) the alleged meeting involving GX 530.  See Court Exhibit No. 39.  At the

request of the defense, the Court asked the jury whether it wished to hear testimony elicited on cross-examination of Mr. Sabatino pertaining to these subjects. *See* Court Exhibit No. 40. The jury thereafter confirmed that it wanted the testimony on cross-examination included in the read back of the transcript. *See* Court Exhibit No. 41. The Court, we respectfully submit, abused its discretion when it rejected a portion of Mr. Shelton's requested read back concerning testimony elicited on Mr. Sabatino's cross-examination and redirect examination directly pertaining to the topic of GX 530 (*e.g.,* Tr. 4567-70, 5205-19).

9.     The Court improperly admitted the testimony of John Oller regarding excerpts of two memoranda of statements Mr. Shelton allegedly made at interviews with representatives of the Cendant Audit Committee. *See* Memo. of Def. E. Kirk Shelton in Opp'n to Mot. of the United States Seeking to Admit the Defs.' Statements That Exist as Past Recollection Recorded Pursuant to Fed. R. Evid. 803(5) (filed Aug. 2, 2004). The memoranda should not have been admitted on three grounds. First, the memoranda did not satisfy the admissibility requirements of Fed. R. Evid. 803(5). The government failed to establish that Mr. Oller once had knowledge of all of the statements attributed to Mr. Shelton in the memoranda; that Mr. Oller made or adopted the statements in the memoranda when they were fresh in his mind; and that the memoranda accurately reflected Mr. Oller's knowledge. Second, the admission of these hearsay declarations abridged Mr. Shelton's rights under the Confrontation Clause of the Sixth Amendment of the United States Constitution. Mr. Oller's lack of first-hand knowledge of all of the statements attributed to Mr. Shelton in the memoranda demonstrates that Mr. Shelton did not have an opportunity to confront the individuals who had accused Mr. Shelton of making those statements. Third, the government failed to establish that the memoranda satisfied the admissibility requirements set forth in *United States v. Almonte*, 956 F.2d 27 (2nd Cir. 1992),

which held that a document reflecting a third party's record of a witness's statement is not admissible unless the record is a substantially verbatim transcript of the witness's own words or the witness subscribes to the third party's characterization of this statement. *Id.* at 29.

   10. The Court improperly admitted evidence relating to the plane expense charge. *See* Memo. In Supp. of Mot. of Def. Walter A. Forbes to Preclude the Government from Presenting Evidence Relating to the Charging of Airplane Expenses to the Cendant Merger Reserve (Forbes Mot. *In Limine* No. 4, filed Apr. 21, 2004) (adopted by Def. Shelton in Shelton Mot. No. 32, filed Apr. 29, 2004); Reply Memo. of Def. E. Kirk Shelton in Supp. of Mot. to Preclude the Government from Presenting Evidence Relating to the Charging of Airplane Expenses to the Cendant Merger Reserve (filed May 3, 2004).  Over Mr. Shelton's objection, the government introduced GX 388, a document that included the travel and entertainment voucher showing airplane expenses incurred by Mr. Forbes in 1995 and 1996.  The government introduced evidence that Mr. Corigliano and Mr. Shelton participated in a discussion in which it was decided to charge the airplane expense to the Cendant merger reserve.  The government failed to introduce any evidence, however, that this accounting treatment of the airplane expenses was improper.  Neither of the government's expert witnesses opined on this issue, and Mr. Shelton's accounting expert, Professor Roman Weil, provided unrebutted testimony that the accounting treatment for the airplane expense was appropriate.  *See* Tr. 11275-77.

   This evidence was inadmissible as relevant evidence of the alleged fraud because the government failed to prove that the accounting of the plane expense charges was in any way improper.  To the extent that the Court found this evidence marginally relevant, it should have been precluded under Fed. R. Evid. 403 as overly prejudicial and confusing.  Furthermore, the

government's proof regarding the plane expense charge varied with, and was outside the scope of, the Indictment.

This evidence was also not admissible under Fed. R. Evid. 404(b) because the government failed to meet its burden of proving by a preponderance of the evidence that this alleged "other" act was wrongful or illegal. *See Huddleston v. United States*, 485 U.S. 681, 690 (1988). In any event, the government provided insufficient notice regarding its intent to admit this evidence under Fed. R. Evid. 404(b).

DATED: March 7, 2005

Respectfully submitted,

DAY, BERRY & HOWARD LLP


By: _____
     Gary H. Collins (CT 22119)
     Stanley A. Twardy, Jr. (CT 05096)
     City Place 1, 185 Asylum Street
     Hartford, CT  06103
     Tel.: (860) 275-0314
     Fax: (860) 275-0343

     MILBANK, TWEED, HADLEY & McCLOY, LLP
     Scott A. Edelman (CT 25268)
     Thomas A. Arena (CT 25269)
     1 Chase Manhattan Plaza
     New York, NY  10005-1413
     Tel.: (212) 530-5000
     Fax: (212) 530-5219

     LAW OFFICES OF THOMAS P. PUCCIO
     Thomas P. Puccio (CT 22983)
     230 Park Avenue, Suite 301
     New York, NY  10172
     Tel.: (212) 883-6383
     Fax: (212) 883-6388

     SANTOS & SEELEY, P.C.
     Hope C. Seeley (CT 4863)
     51 Russ Street
     Hartford, CT 06106
     Tel: (860) 249-6548
     Fax:(860) 724-5533

     Attorneys for Defendant E. Kirk Shelton

## <u>CERTIFICATION</u>

I hereby certify that on this 7th day of March, 2005, a copy of the foregoing was served on the following parties via hand-delivery:

        John J. Carney, Esq.
        James McMahon, Esq.
        Richard J. Schechter, Esq.
        Norman Gross, Esq.
        United States Attorney's Office
        District of New Jersey
        970 Broad Street, Suite 700
        Newark, NJ  07101

_____
Gary H. Collins