# EXHIBIT A



**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

---

970 Broad Street, Suite 700     (973) 645-2700
Newark, New Jersey 07102

July 28, 2003

**VIA FEDERAL EXPRESS**

Thomas P. Puccio, Esq.
230 Park Avenue, Suite 301
New York, NY 10169

Barry S. Simon, Esq.
Williams & Connolly, LLP
725 Twelfth Street, N.W.
Washington, DC 20005

      Re: United States v. Forbes, et al.
           No. 3:02CR264 (AWT)

Dear Counsel:

    We write to inform you that the persons listed below have informed the United States of the following:

<u>Corigliano</u>

    In or about early 1998, after the merger was completed between CUC and HFS, while sitting in Shelton's office, Walter Forbes congratulated Shelton and Corigliano on their achievements stating, in substance, that they were great financial engineers. This comment was made in the context of the three men having been clever enough to maximize the earnings of CUC. In another meeting, Walter Forbes, stated in substance, to Shelton and Corigliano that we did a great job in fooling Wall Street and in fooling Silverman.

    At or about the time of the negotiations of the Ideon merger, Walter Forbes and Corigliano attended a meeting with analysts. During a break in the meeting, Walter Forbes called Shelton and Chris McLeod to check on the status of the Ideon merger. Walter Forbes stated over the phone to Shelton and/or McLeod, in substance, that I don't care if we have to pay another $10 million for the deal – we need this acquisition to make the year – don't over negotiate the deal. This comment related to the Company's need to build merger reserves for

DEFENDANT'S EXHIBIT 2268

future periods.

In a meeting in New York City with analysts, Corigliano mistakenly left his briefcase behind. Realizing this during the ride home to Connecticut, Corigliano informed Walter Forbes that he had forgotten the briefcase and that the briefcase contained a copy of the Cheat Sheet. Walter Forbes was concerned and instructed Corigliano to get it and admonished him, in substance, that this is how "wars are lost." Corigliano later instructed one of the secretaries at CUC to retrieve the briefcase from the office of the analyst.[1]

At some point after the signing of the merger agreement with HFS, Walter Forbes ordered that his office at CUC be swept for listening devices. Walter Forbes stated, in substance, that we don't want Silverman listening to any conversations about the merger.

With respect to the HFS merger, during the period after the signing of the merger agreement, Walter Forbes stated to Corigliano, in substance, that we want the merger reserve to be as big as possible. Walter Forbes stated that Silverman is on board with this concept. After the signing of the merger agreement with HFS but before the close of the deal, Walter Forbes approached Corigliano in his office. Walter Forbes stated to Corigliano, in substance, that it would be nice not to have to tell Silverman that we rely so much on the merger reserves to make our numbers. Walter Forbes was concerned and serious in making this statement.

After the March 6, 1998 meeting, Walter Forbes, Shelton, Amy Lipton and Corigliano all gathered in a room. During the gathering, Walter Forbes said, in substance, see we were worried so much about it and now it is over. The group then realized that once Silverman finds out about what we had communicated that it could still be a problem. Shelton and Walter Forbes expressed the position that they would be worried until Silverman filed the 10K, because once Silverman signed the 10K, it would be his problem too. Walter Forbes stated, in substance, to Corigliano that he did not want to personally meet with Silverman to discuss the problems that were disclosed on March 6 until after Silverman signed the 10K.

---

[1]   Please be advised that the Government has been unable to locate a secretary who could confirm Corigliano's account concerning the lost briefcase.

2

A few days after the meeting, on or about March 9, 1998, Walter Forbes called Corigliano and informed him, in substance, it looks like Silverman is going to let this issue go. Corigliano acknowledged the message and was further advised by Walter Forbes to just lay low and to not bring up any more issues with the HFS people. At the March 9 meeting, Silverman told Corigliano, Shelton and Walter Forbes, in substance, if they did something wrong, they should be men about it. Walter Forbes did not make eye contact with Silverman but kept his head down looking at the floor trying to distance himself from the whole situation. Later Corigliano shared this account with Amy Lipton stating that it was his belief that Walter Forbes was going to jump ship. Lipton responded, in substance, well yeah, that is Walter Forbes.

At or about the time of the Halmos settlement, Walter Forbes entered Shelton's office and stated, in substance, gee Halmos was such a pain - who would have thought that it would bring such good things for the reserve. In 1997, while Shelton, Walter Forbes and Corigliano were going through one version of the Cheat Sheet, Walter Forbes was informed that they were going to be short on their earnings even after using all of the reserves. Walter Forbes responded, in substance, gee we used them all up? Shelton responded, in substance, yes because of software.

In or about the late summer, 1997, when it was unclear if the Company's merger with HFS would close by December 31, 1997, Walter Forbes questioned Corigliano on an almost daily basis on whether CUC would have enough reserves to make its numbers for the year end without using the HFS reserves. Walter Forbes expressed concern that if they did not close that the huge merger reserve created could not be used in that period.

During 1997, Walter Forbes inquired about the status of the Ideon reserve. Shelton replied, in substance, the well is dry. Walter Forbes responded, in substance, that it was ok because we are going to refill the well with the merger reserves to be created with the merger with HFS.

In or about the Spring of 1996, Ken Wilchfort, the audit partner from Ernst & Young, informed Corigliano that he would have to rotate off the account. Wilchfort stated, in substance, don't worry, I still will be there, but cannot sign off on the engagement. In or about late March 1998, Corigliano had lunch with Wilchfort where the two men discussed the wisdom of having merged with HFS. Wilchfort asked Corigliano, would you have merged again. Corigliano replied, in substance, well the

3

growth rate would have stopped. To which Wilchfort replied, in substance, the growth rate stopped a long time ago.

With respect to the establishment of the CUC portion of the Cendant reserve, Corigliano believed that Ernst & Young knew that they were working towards a bottom line, especially in the legal side of the merger reserve. Amy Lipton wrote a letter based upon input, a wish list, by auditor Mark Rabinowitz. Based upon the many changes made in establishing the CUC portion of the Cendant reserve, Ernst & Young should have known that they were building it up.

In or about March 1998, Corigliano received a telephone call from Wilchfort and possibly Simon Wood wherein Ernst & Young communicated that they had a problem regarding the movement of the integration and litigation portion of the Ideon reserve. In particular, they were concerned about how this movement was reported in CUC's quarterly filings because Corigliano communicated to Wilchfort that CUC kept no records of the transfer. As a result, it was determined that a memorandum should be prepared to document the changes. Simon Wood E-mailed a memo to Corigliano for him to sign. Corigliano had his secretary prepare a memo to Ernst & Young. Wood and Wilchfort changed some wording and amounts and sent it back to the secretary. At some point, Wood worked directly with the secretary in finalizing the memorandum.

In or about April 1998, Shelton, Lipton and Corigliano met in Corigliano's office to review the Steven Speak's March 31, 1998 E-mail. Shelton was concerned about the contents of the memo, stating, in substance, we all know how bad this can be. A few days thereafter, while at home, Corigliano received a phone call from Shelton. Shelton informed Corigliano, in substance, that Cendant wants my computer - they probably will want yours. Shelton also stated in substance I thought that it would be important that you should know that. Thereafter, Corigliano deleted less than a dozen files from his laptop computer including possibly a file called 1.31.98.pro which may have been an Excel document located in the "My Documents" section of the computer's C drive.

On or about March 6, 1998, after the meeting in the large conference room, Scott Forbes spoke with Shelton. At some point thereafter, Shelton informed Corigliano, in substance, Scott wants to think about the format of the presentation.

**Pember**

4

According to Pember, on or about January 15, 1998, she sent an E-mail to Shelton regarding accounting issues including the need to make reserve adjustments. This E-mail followed a discussion between Pember and Shelton about the need to use the merger reserves to make the numbers. Shelton understood what the reference to "reserve" meant. With respect to Exhibit 41 to the Audit Committee Report, this document was prepared because the numbers were so big that Pember and Sabatino wanted to talk to Shelton about it. The schedule was specifically prepared to summarize these issues for Shelton. Pember went to Sabatino the next week and discussed the issue. This schedule was then shown to Shelton because Corigliano was out of the office. The term "reserve to revenue" represented the budgeted amount of the reserve that was to be reversed into revenue. The "managed to meet" was used to let Shelton know the reserves would be reversed quarter by quarter to hit the numbers. It was clear that Shelton knew that the reserves were going into revenue.

Sabatino and Pember met with Shelton and handed him Exhibit 41. Shelton thought about it, looked up and said, in substance, ok, give the HFS people the budget, not Exhibit 41 specifically but the bottom number. In a very dramatic fashion, Shelton ripped up Exhibit 41 into many pieces and put it into the garbage, not recycling. Shelton, otherwise would have recycled.

During a meeting in or about early 1998, wherein key indicators were addressed, it became a concern that a number of the companies including North American Outdoor Groups and NUMA, revealed a significant variance over the year. Pember told Shelton about this and explained that the variances are due to reserve usage. Shelton acknowledged this and changed his presentation to the HFS people to move away from this area. Shelton received on a monthly basis the projection model and understood the model. Shelton was a demon for details.

The auditors were satisfied too easily and went along with company management. With respect to the year ending January 31, 1997, at the end of the audit, Pember and Sabatino were asked by auditor Joe Caparelli about a $20 million undocumented Ideon reserve usage. Caparelli asked them if they used it for operational costs. Pember explicitly lied to him. A truthful answer would have exposed the fraud.

In 1998, Corigliano informed Pember that with respect to rejects in transit, that Walter Forbes understood that there was an excess in the membership reserve.

5

Pember created what has been marked as Exhibit 88 to the Audit Committee Report. Shelton had particular input on several of the line items on Exhibit 88. Several times Pember handed the schedule directly to Shelton. The term cushion on the schedule refers to excess over real expenses. This document was created in or about the fall of 1997, but was changed regularly. Pember specifically recalls a discussion with Shelton regarding the cushion for litigation. Shelton was in a meeting where only the first column of the schedule was shown to the auditors. Shelton clearly knew the total cushion equaled the amount of merger reserves available to manipulate the earnings of the company.

In or about February 1998, with respect to the close of the first month's results for the month ending January 1998, Corigliano told Pember to book the budgeted amount of reserve reversal. Pember called Shelton who directed her to use just enough of the reserve to hit the budgeted number.

Pember prepared the schedule used in the March 6, 1998 meeting with Scott Forbes. During the actual meeting, Shelton walked Scott Forbes through the schedule and addressed, in substance, reserve opportunities, the need to work together, and that if we don't do this, we are not going to make our numbers.

With respect to the booking of the plane expenses of Walter Forbes through the HFS reserve, Shelton called Pember and instructed her specifically to charge the more than half-million dollars of plane expenses to the HFS merger reserve.

At some point in the Spring of 1998, Pember overheard Mark Rabinowitz say to Corigliano, we need to go out on your boat and you can tell me what is really going on.

According to Pember it was a general goal to push the auditors back as far as you could so that the auditors would not have enough time to really look at the numbers before they had to sign off on the engagement. With respect to the audit for December 1997, it seemed to Pember that E&Y was not crossing the "t's" and dotting the "i's" on the lower level stuff, but rather just took representations from the client on the big things without doing any audit work.

Because CUC had failed to adequately document the use of Ideon reserve in previous years, Rabinowitz repeated to Pember four or five times, in substance, that you are going to need to have more support for usage of the reserve for year ending

6

December 31, 1997. During the audit for year ending 1997, Rabinowitz reviewed the usage of the Ideon reserve. While reviewing a schedule of the Ideon reserve, he stated in substance, "oh shit," when he realized that the $45 million of reserve usage which came from the Halmos settlement, was not documented in the schedule. Rabinowitz seemed distressed, angry and surprised and was expecting an answer from Pember on why the $45 million usage was not documented. Later Rabinowitz called to speak with Corigliano and Pember wherein Corigliano asked Rabinowitz, in substance, what do you need to see. Rabinowitz responded that it has to be appropriate merger costs, not operating costs. Thereafter, Corigliano went through a list of costs, asking Rabinowitz what about this, how about that, in order to support the reserve usage. This process seemed backwards to Pember.

In Pember's opinion, E&Y knew that CUC was just picking numbers and then trying to support the numbers for the buildup of Cendant Reserve, versus the methodology employed by Scott Forbes and HFS who did an analysis to build a solid number. Rabinowitz was not pleased on how freely Ken Wilchfort allowed the establishment of the reserve. Rabinowitz complained in front of Pember that Wilchfort had left him with a mess.

Pember was not in the meeting between Rabinowitz and HFS personnel which occurred on or about March 9, 1998, however, at some point after the meeting, Shelton called Pember and informed Pember, in substance, you missed a great performance, Rabinowitz deserved an Oscar.

### Sabatino

Sabatino recalled at one point he and Corigliano were working on the quarterly financial results for CUC when Shelton entered the room. Corigliano asked Shelton what the earnings levels should be, for example 18 cents or should they make it 19 cents. Shelton did not seem shocked but simply answered and left the room.

Sabatino stated that with respect to what has been marked as Exhibit 41 to the Audit Committee Report, that this document was prepared by Anne Pember. Pember was concerned about being the only member of the accounting department left as Corigliano was leaving. Therefore, Pember wanted to be sure that Shelton was aware of what the budgeting earnings numbers would be. After the document was prepared, Sabatino and Pember met in Shelton's office where he was handed Exhibit 41. There was no doubt that Shelton understood the importance and the meaning of

7

the schedule. Shelton reviewed the document, and then affirmatively ripped it up and commented, in substance, that I have never seen this.

Wilchfort, the audit partner, stayed around at CUC even after rotating off as the engagement partner. He created problems by giving advice to Corigliano. Corigliano felt too comfortable with Wilchfort. Wilchfort was willfully blind. Joe Caparelli, the audit manager, was suspicious about what was going on at CUC. Sabatino believed he had to have said something to Rabinowitz about what was going on. Caparelli appeared to be frustrated about the merger reserves because he could not get the information he required.

### Dodge

Arthur Dodge has some recollection that in or about 1998, Walter Forbes needed the money from Cendant stock sales because he was building a house in Connecticut. There had been a big gap in between the 1998 trades and the previous trades by Walter Forbes. At some point after the disclosure of the fraud in April 15, 1998, Dodge had a conversation with Walter Forbes, wherein Walter Forbes conjectured that maybe Corigliano shoved a penny into one quarter and in some quarters two pennies into the earnings per share. Walter Forbes was not a big detail guy, but was married to the company.

### Fernandes

Fernandes has indicated that at the time the Audit Committee Report was released, Stu Bell seemed mad and said, in substance, fuck'en Cosmo. With respect to the reversal of reserves at Spark for year ending December 31, 1997, Fernandes indicated that he was aware at some point that an adjustment had been made to Spark's financial statements. Because his bonus was tied to performance of Spark for that year, he asked Kevin Kearney for financial statements without the merger reserve adjustments in it. Fernandes remembers meetings where Shelton would be very focused about the company's numbers and would tell him and other individuals inside the company to cut expenses in order to hit the numbers. Shelton would say that Wall Street is saying X for a number, so we had to hit that number.

Fernandes had conversations with Shelton regarding what happened at the company after April 15, 1998. In general, Shelton told him it was a political conspiracy and his initial reaction that it was by Silverman. Fernandes stated that

Shelton said, in substance, that reimbursing Walter Forbes' airplane expense was only fair because Silverman also charged his plane expenses. After Corigliano pled guilty to felony charges, Shelton stated, in substance, that he could not believe what Corigliano did.

Rabinowitz recalled conversations with Stu Bell wherein Bell stated, in substance, I did not do anything and it all happened years ago and that the statute of limitations on his conduct has run.

### Freimour

Freimour has indicated that she never saw the tee shirt that read "a full trough is good for shareholder value," but she would sometimes order tee shirts for Walter Forbes. Feimour stated that she has no reason to believe or not to believe that Walter Forbes was aware of the fraud. Freimour believed that Walter Forbes was upset about the fraud. She has no basis for this opinion, but attributed it to a feeling or to a vibe.

### Fullmer

After the disclosure of the fraud on or about April 15, 1998, Fullmer had conversations with Stu Bell, wherein Bell stated, in substance, that he could not understand how Corigliano would do it. Bell was generally critical of both Corigliano and Walter Forbes.

### Gershowitz

Gershowitz stated that in his capacity as an attorney for the company, he wanted to flush out more disclosure in the public filings, but the financial people resisted his efforts.

### McLeod

McLeod does not recall a meeting at the Westchester Country Club in the end of 1996 or early 1997, but stated that he could have been zoning out or been out of the meeting taking a call. In CUC's offices, around April 1998, before Shelton left the office, Shelton stated, in substance, to McLeod that given the way that he had been instructed to be aggressive with the reserve by Silverman, the fact that CUC was being aggressive with the reserve was no different. Shelton recounted that Silverman wanted them to put everything into the reserve.

9

### Speaks

Speaks informed the Government that it was his position that Ernst & Young knew that CUC was not matching revenue and expenses in its membership programs. It is also the practice not to give the auditors the trial balance until very near the end of the audit. Ernst & Young never tested the cancel rates and basically just took what CUC told them as the truth. The auditors never got the projection model. Speaks was unaware whether they knew of its existence.

### Sarkie

Sarkie witnessed Walter Forbes fall asleep in several meetings.

At some point after the merger, Walter Forbes complained that he was getting complaints from Silverman that the CUC side was slow in getting the numbers to corporate headquarters in New Jersey. Walter Forbes openly instructed them to speed up the process of getting the information to New Jersey.

### Witness Counsel Fees and Expenses

With respect to former and current CUC employees, it is the Government's understanding that Cendant is paying for counsel fees and is reimbursing other incidental expenses such as lodging.

Very truly yours,

CHRISTOPHER J. CHRISTIE
Special Attorney
U.S. Department of Justice

By: JOHN J. CARNEY
Special Attorney
U.S. Department of Justice

By: JAMES MCMAHON
Special Attorney
U.S. Department of Justice

10