**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA, | : | No. 3:02 CR 264 (AWT) |
| | : | |
| v. | : | |
| | : | |
| WALTER A. FORBES, and | : | April 4, 2005 |
| E. KIRK SHELTON. | : | |
| | : | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF**
**DEFENDANT E. KIRK SHELTON FOR A JUDGMENT OF**
**ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29 OR**
**FOR A NEW TRIAL PURSUANT TO FED. R. CRIM. P. 33**

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES.................................................................................... vi

PRELIMINARY STATEMENT .................................................................................1

STATEMENT OF FACTS........................................................................................7

I.  THE TOPSIDE ADJUSTMENTS ...............................................................7

II. THE MISUSE OF MERGER RESERVES .................................................10

    A.  The Establishment Of The Ideon Reserve ......................................11

    B.  The Misuse Of The Ideon Reserve In Fiscal Year 1997...................12

    C.  The Establishment Of The Cendant Reserve ...................................13

    D.  The Misuse Of The Ideon And Cendant Reserves In Calendar 1997.................14

III. THE MANIPULATION OF THE CANCELLATION RESERVE..............16

    A.  The Purpose Of The Cancellation Reserve ......................................16

    B.  Improper Manipulations Involving The Cancellation Reserve ..........17

    C.  Shelton Did Not Know About Or Participate In The Improper Manipulations Involving The Cancellation Reserve ..........................19

        1.  Shelton Did Not Know About The Under-Funding Of The Reserve.......19

        2.  Shelton Did Not Know The Three Month Delay Was Improper.............20

            a.  Speaks' Testimony ..................................................20

            b.  Pember's Testimony ...............................................23

            c.  Corigliano's Testimony ..........................................23

IV. THE ALLOCATION OF REVENUE FROM DEFERRED REVENUE RECOGNITION TO IMMEDIATE REVENUE RECOGNITION MEMBERSHIP PROGRAMS.......................................................................24

    A.  Revenue Recognition Practices Within The Comp-U-Card Division .................24

        1.  Comp-U-Card's Policy Of Matching Revenue With Expenses...............24

        2.  The Projection Model...........................................................25

    B.  The Fraud Involving Allocations....................................................26

    C.  Shelton Did Not Know About And Did Not Participate In The Allocations.......26

        1.  Shelton Did Not Receive The Projection Models With The Allocation Column. ................................................................26

        2.  The CUC Executives Who Received The Projection Model Did Not Understand The Allocations To Be Fraudulent ...............27

i

      3.     Shelton Did Not Receive Other Documents That Showed The Effect Of The Allocations...................................................................27

      4.     The Alleged Conspiratorial Discussions Regarding The Allocations. ......................................................................................29

V.     THE MARCH 6 MEETING ...................................................................31

VI.    THE AFTERMATH OF THE MARCH 6 MEETING ...................................32

    A.    Corigliano's Preparation Of DX 1288 ...............................................32

    B.    The March 9 Meeting......................................................................33

    C.    Silverman, Monaco, And Scott Forbes Did Not Believe That Shelton Had Invited Them To Participate In A Fraud On March 6, 1998..............35

    D.    The Alleged Cover Story Regarding The $165 Million In Reserves .................37

VII.   THE DOCUMENTARY EVIDENCE DID NOT ESTABLISH SHELTON'S KNOWLEDGE OF OR PARTICIPATION IN THE FRAUD.......................38

    A.    "The Blow Our Own Horn" Email ...................................................38

    B.    The Good News/Bad News Email ...................................................40

    C.    The Forecasts Or "Cheat Sheets" ...................................................44

VIII.  THERE WAS OTHER OVERWHELMING EVIDENCE OF SHELTON'S INNOCENCE ......................................................................................46

    A.    The Evidence Of Shelton's Character For Honesty ...........................46

    B.    Shelton Did Not Engage In Any Deception Of E&Y .........................48

    C.    The Decision To Merge CUC Into HFS Made No Sense If Shelton Knew About The Fraud............................................................................48

    D.    Shelton's Consciousness Of Innocence ...........................................50

IX.   SABATINO'S TESTIMONY WAS INSUFFICIENT EVIDENCE OF SHELTON'S GUILT ...............................................................................51

    A.    The Alleged "Pop-In" Meeting ......................................................51

    B.    The Alleged Meeting Regarding GX 530 .........................................51

X.    THE OVERWHELMING EVIDENCE ESTABLISHED THAT PEMBER GAVE FALSE TESTIMONY ON MATERIAL MATTERS....................................53

    A.    Pember Was A Practiced Liar ...........................................................53

    B.    Pember's Motive To Lie ...................................................................53

    C.    Pember's False Testimony Concerning Her Stock Sales....................54

    D.    Pember's False Testimony Concerning The Establishment Of The Cendant Merger Reserve ............................................................................55

    E.    Pember's False Testimony Concerning Her Meeting With Shelton To Obtain His Approval To Give The Inflated Budget To HFS ..............57

F.     Pember's False Testimony About Discussions With Shelton Regarding Improper Accounting At CUC ...................................................... 60

G.     Pember's False Testimony Concerning The Usage Of The Ideon Reserve ......... 61

H.     Pember's False Testimony Concerning The Amount Of Excess In The Cendant Reserve .................................................................................. 61

XI.    THE OVERWHELMING EVIDENCE ESTABLISHED THAT CORIGLIANO GAVE FALSE TESTIMONY ON MATERIAL MATTERS ...................................... 62

A.     Corigliano's Initial Interviews With The Government ........................................ 62

B.     Corigliano's False Testimony Concerning His Stock Sales ............................... 63

C.     Corigliano's False Testimony Concerning His Role In Making The Topside Adjustments ........................................................................... 63

D.     Corigliano's False Testimony Concerning GX 613 ............................................ 64

E.     Corigliano's False Testimony Concerning His Destruction Of Documents ........ 65

F.     Corigliano's False Testimony Concerning The Sweeping For Electronic Listening Devices At CUC's Offices ................................................ 66

G.     Corigliano's False Testimony Concerning His Meeting With Speaks Before The December 11, 1997 Divisional Controllers' Meeting ..................... 67

H.     Corigliano's False Testimony Concerning The January 1997 Board Meeting ......................................................................................... 67

I.     Corigliano's False Testimony Concerning The Establishment Of Excess Reserves At Essex ............................................................................ 68

J.     Corigliano's False Testimony Concerning The Establishment Of Excess Reserves At GETKO ....................................................................... 68

K.     Corigliano's False Testimony Concerning His Meeting With Walter Forbes After March 9, 1998 ........................................................... 70

L.     Corigliano's False Testimony Concerning The Alleged "Well Is Dry" Conversation ................................................................................ 71

M.     Corigliano's False Testimony Concerning "Soft Closes" ................................... 72

N.     Corigliano's False Testimony Concerning The Retention Of A Consultant To Evaluate CUC's Exposure On The Ideon Litigation ..................... 72

O.     Corigliano's False Testimony Concerning The Third Page Of GX 1288 .......... 73

P.     Corigliano's False Testimony Concerning Appraisals On His Residence .......... 73

Q.     Corigliano's False Testimony Concerning His Application For A Bank Loan ........................................................................................... 74

R.     Corigliano's False Testimony Concerning The Disgorgement Of His Assets ......................................................................................... 74

S.    Corigliano's False Testimony Concerning His And His Wife's Law Firm Retainers ...................................................................................... 75

XII.    NUMEROUS WITNESSES CONTRADICTED CORIGLIANO'S TESTIMONY ON KEY ISSUES ................................................................................ 76

A.    Corigliano's Contradicted Testimony On The Ideon Merger ............................ 76

B.    Corigliano's Contradicted Testimony Concerning The Westchester Country Club Meeting ...................................................................... 77

C.    Corigliano's Contradicted Testimony Concerning The March 6 Meeting .......... 77

D.    Corigliano's Contradicted Testimony Concerning The Morton's Dinner ........... 77

E.    Corigliano's Contradicted Testimony Concerning A Meeting With Sarkie And Menchaca ................................................................................. 77

F.    Corigliano's Contradicted Testimony Concerning Lipton's Purported Gesture Covering Her Ears ...................................................................... 78

G.    Corigliano's Contradicted Testimony Concerning Shelton's Purported Instruction To Inflate Software Earnings By $25 Million ................................. 78

XIII.    CORIGLIANO AND PEMBER GAVE TESTIMONY CONTRADICTORY OF ONE ANOTHER ................................................................................ 78

A.    The Meeting At Which Corigliano Misled Shelton About The Propriety Of CUC's Accounting Practices ................................................................. 79

B.    Corigliano's Involvement In The Events Leading To The March 6 Meeting With Scott Forbes ................................................................... 80

C.    Corigliano's Involvement In Falsifying CUC's Budget Before The December 11, 1997 Divisional Controllers' Meeting ..................................... 80

ARGUMENT ................................................................................................... 82

I.    THE COURT SHOULD GRANT SHELTON A NEW TRIAL IN THE INTERESTS OF JUSTICE ................................................................... 82

A.    Corigliano's False Testimony ........................................................... 83

B.    Pember's False Testimony ................................................................ 85

C.    The Absence Of Other Evidence Establishing Shelton's Knowing And Willful Participation In The Alleged Fraud .............................................. 86

II.    THE GOVERNMENT INTRODUCED AND FAILED TO CORRECT FALSE AND MISLEADING EVIDENCE .............................................................. 90

III.    THE CONSCIOUS AVOIDANCE CHARGE WAS IMPROPER ............................. 94

A.    The Conscious Avoidance Charge Effected A Constructive Amendment Of The Indictment .............................................................................. 95

B.    There Was An Insufficient Evidentiary Predicate For The Charge ..................... 98

1.    The Applicable Legal Standards .......................................... 98

2.  Shelton's Position As Chief Operating Officer Does Not Provide A Basis For A Conscious Avoidance Charge...........................................100

3.  There Is Insufficient Evidence That Shelton Was Aware Of A High Probability That CUC Was Committing Accounting Fraud. ................101

    a.  Shelton's Receipt Of GX 160 (The March 6 Document) ..........101

    b.  Shelton's Creation Of GX 606 ................................................102

    c.  The Good News, Bad News Email (GX 519): The Variances in the Segment Reporting .......................................103

    d.  The Good News, Bad News Email: The Footnotes...................104

    e.  GX 506 and Shelton's Knowledge Of Reserve Adjustments ....105

    f.  Shelton's Receipt Of The "Cheat Sheets"................................105

    g.  Pember's Whisper To Shelton That The Differences In NUMA's And  NOAG's 1997 Actual Results And Their 1998 Budgeted Results Was Due To The Use Of Merger Reserves ..................................................................................107

    h.  The $20 Million Increase To The Software Reserve.................108

    i.  Shelton's Failure To Notice That The Sum Of The Subsidiary Reporting Packages Did Not Equal The Earnings Reported In The Form 10-Qs.....................................109

C.  Shelton Did Not Purposefully Contrive To Avoid Knowledge Of The Fraud ...........................................................................................................110

D.  The Conscious Avoidance Charge Was Not Harmless.....................................110

IV.  THE COURT IMPROPERLY ADMITTED EVIDENCE RELATING TO WALTER FORBES' PLANE EXPENSE CHARGE ....................................................111

A.  Evidence Relating To Walter Forbes' Plane Expenses Was Not Probative Of The Charged Conspiracy.............................................................................112

B.  Evidence Relating To Walter Forbes' Plane Expenses Was Not Admissible As Similar Act Evidence ...........................................................114

C.  The Introduction Of This Evidence Was Unfairly Prejudicial.........................115

V.  THE COURT IMPROPERLY ADMITTED THE TESTIMONY OF JOHN OLLER ....................................................................................................................116

A.  Background ....................................................................................................116

B.  The Memoranda Did Not Satisfy the Admissibility Requirements of Fed. R. Evid. 803(5) ...............................................................................................118

C.  THE MEMORANDA DID NOT SATISFY THE ADMISSIBILITY REQUIREMENTS ESTABLISHED IN *UNITED STATES V. ALMONTE* ......120

VI.     THE INTRODUCTION OF EVIDENCE CONCERNING ALLEGED
        MISCONDUCT PRIOR TO 1995 CONSTITUTED A CONSTRUCTIVE
        AMENDMENT OF AND A PREJUDICIAL VARIANCE TO THE
        INDICTMENT........................................................................................................122

        A.      The Specific Charges of the Indictment..........................................................122

        B.      The Introduction Of Pre-1995 Conduct Was Beyond The Scope Of The
                Indictment........................................................................................................123

        C.      The New Charges Effected A Constructive Amendment And A Prejudicial
                Variance ...........................................................................................................125

VII.    THE COURT IMPROPERLY ALLOWED CORIGLIANO AND PEMBER TO
        OFFER EXPERT TESTIMONY ON TECHNICAL ACCOUNTING ISSUES...........129

        A.      Legal Standards Established By Fed. R. Evid. 701 & 702 ...............................129

        B.      The Improper Opinion Testimony Of Corigliano And Pember ........................130

        C.      The Government Violated Its Disclosure Obligations And Circumvented
                Fed. R. Evid. 702 By Presenting Undisclosed Expert Testimony Through
                Corigliano........................................................................................................133

VIII.   THE COURT IMPROPERLY DECLINED TO REQUIRE THE
        GOVERNMENT TO IMMUNIZE STUART BELL...................................................133

        A.      Legal Standards ...............................................................................................134

        B.      Discussion ........................................................................................................135

IX.     THE COURT IMPROPERLY DECLINED TO GIVE THE JURY A MISSING
        WITNESS INSTRUCTION ......................................................................................138

CONCLUSION ...................................................................................................................140

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*,
  168 F. Supp. 2d 57 (S.D.N.Y. 2001)...............................................................121

*Blissett v. LeFevre*,
  924 F.2d 434 (2d Cir. 1991) ........................................................................134

*Crawford v. Washington*,
  541 U.S. 36 (2004)........................................................................................135

*Danis v. USN Communications, Inc.*,
  121 F. Supp. 2d 1183 (N.D. Ill. 2000) ..................................................114, 133

*Du Bose v. Lefevre*,
  619 F.2d 973 (2d Cir. 1980) ..........................................................................92

*In re Campbell Soup Co. Sec. Litig.*,
  145 F. Supp. 2d 574 (D.N.J. 2001) .............................................................113

*Jenkins v. Artuz*,
  294 F.3d 284 (2d Cir. 2002) ....................................................................91, 92

*Napue v. Illinois*,
  360 U.S. 264 (1959).................................................................................91, 92

*Russell v. United States*,
  369 U.S. 749 (1982) .....................................................................................128

*Su v. Filion*,
  335 F.3d 119 (2d Cir. 2003) ..........................................................................92

*United States v. Afjehei*,
  869 F.2d 670 (2d Cir. 1989) .........................................................................114

*United States v. Aina-Marshall*,
  336 F.3d 167 (2d Cir. 2003) ..........................................................................99

*United States v. Almonte*,
  956 F.2d 27 (2d Cir. 1992) ...................................................................120, 121

*United States v. Autuori*,
  212 F.3d 105 (2d Cir. 2000) .................................................................passim

*United States v. Bortnovsky*,
  820 F.2d 572 (2d Cir. 1987) .........................................................................128

*United States v. Davidoff*,
  845 F.2d 1151 (2d Cir. 1988) .......................................................................128

*United States v. Dolah*,
  245 F.3d 98 (2d Cir. 2001) ...........................................................................135

*United States v. Ferrarini*,
  219 F.3d 145 (2d Cir. 2000) .....................................................................98, 99

*United States v. Gilan*,
  967 F.2d 776 (2d Cir. 1992) .........................................................................114

*United States v. Glenn*,
    312 F.3d 58 (2d Cir. 2002) ...................................................130

*United States v. Leonardi*,
    623 F.2d 746 (2d Cir. 1980) .................................................120

*United States v. Milstein*,
    ___ F.3d ___, 2005 U.S. App. LEXIS 4009 (2d Cir. 2005)...........................95

*United States v. Myerson*,
    18 F.3d 153 (2d Cir. 1994) ...................................................138

*United States v. Pacific Hide & Fur Depot, Inc.*,
    768 F.2d 1096 (9th Cir. 1985) ...............................................100

*United States v. Peoples*,
    250 F.3d 630 (8th Cir. 2001) .................................................133

*United States v. Peterson*,
    808 F.2d 969 (2d Cir. 1987) .................................................114

*United States v. Pirro*,
    212 F.3d 86 (2d Cir. 2000) ...................................................128

*United States v. Roshko*,
    969 F.2d 1 (2d Cir. 1992) .....................................................95

*United States v. Sanchez*,
    969 F.2d 1409 (2d Cir. 1992) ..................................................82

*United States v. Sanfilippo*,
    564 F.2d 176 (5th Cir. 1977) ..................................................91

*United States v. Schoenborn*,
    4 F.3d 1424 (7th Cir. 1993) .................................................120

*United States v. Svoboda*,
    347 F.3d 471 (2d Cir. 2003) ...................................................98

*United States v. Thomas*,
    274 F.3d 655 (2d Cir. 2001) .................................................125

*United States v. Vozzella*,
    124 F.3d 389 (2d Cir. 1997) ...................................................91

*United States v. Wallach*,
    935 F.2d 445 (2d Cir. 1991) ...............................................91, 92

*United States v. Westerdahl*,
    945 F.2d 1083 (9th Cir. 1991) .........................................137, 138

*United States v. Wozniak*,
    126 F.3d 105 (2d Cir. 1997) ......................................95, 98, 125

*United States v. Zingaro*,
    858 F.2d 94 (2d Cir. 1988) ..............................................98, 127

*Wechsler v. Hunt Health Sys. Ltd.*,
    198 F. Supp. 2d 528 (S.D.N.Y. 2002)...................................113, 130

## OTHER AUTHORITIES

17 C.F.R. § 210.4-01(a)(1)...................................................132

Advisory Committee Notes to Fed. R. Evid. 803 ................................119

Fed. R. Crim. P. 16 ..................................................................................................133

Fed. R. Crim. P. 16(a)(1)(G) ...................................................................................133

Fed. R. Crim. P. 26 ..................................................................................................133

Fed. R. Crim. P. 29 ..............................................................................................6, 82

Fed. R. Crim. P. 33 ........................................................................................6, 82, 83

Fed. R. Evid. 104(b) ................................................................................................121

Fed. R. Evid. 401 ....................................................................................................115

Fed. R. Evid. 403 ....................................................................................................115

Fed. R. Evid. 404(b) .........................................................................................114, 115

Fed. R. Evid. 602 ....................................................................................................119

Fed. R. Evid. 608(b) .................................................................................................93

Fed. R. Evid. 702 .............................................................................................129, 133

Fed. R. Evid. 801(d)(2)(A) ......................................................................................122

Fed. R. Evid. 801(d)(2)(C) ......................................................................................121

Fed. R. Evid. 803(5) ...................................................................................117, 118, 119

Fed. R. Evid. 901(a) ................................................................................................121

Fed. R. Evid. Rule 801(d)(2) ...................................................................................121

U.S.C. § 371 (1988) ..................................................................................................95

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |  |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA, | : | No. 3:02 CR 264 (AWT) |
| | : | |
| v. | : | |
| | : | |
| WALTER A. FORBES, and | : | April 4, 2005 |
| E. KIRK SHELTON. | : | |
| | : | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF**
**DEFENDANT E. KIRK SHELTON FOR A JUDGMENT OF**
**ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29 OR**
**FOR A NEW TRIAL PURSUANT TO FED. R. CRIM. P. 33**

Defendant E. Kirk Shelton, through undersigned counsel, respectfully submits this memorandum of law in support of his motion for the vacatur of the jury's verdict and the granting of a new trial in the interests of justice, pursuant to Fed. R. Crim. P. 29 and 33.

**PRELIMINARY STATEMENT**

The government opened its case by telling the jury that the case was not really about accounting: "it's about making earnings up, about lying about CUC's earnings." Consistent with the Indictment's allegations that Kirk Shelton had directed the fraud, the government promised evidence that he instructed junior accountants to make up revenue and arbitrarily reduce expenses. There were no grey areas in the government's opening. Kirk Shelton stood accused of actively directing a fraud in which numbers were arbitrarily created out of thin air.

Over the course of almost six months of evidence, the case on which the government opened (and the case the grand jury indicted) failed to materialize. Contrary to the

Indictment's allegations and the statements in its opening that Shelton directed junior accountants to make up numbers, the evidence established Shelton had no involvement in the topside adjustments at the heart of the CUC fraud.

The government's two principal witnesses – Cosmo Corigliano and Anne Pember – withered under cross-examination. Unable to identify a single conversation in which they had told Shelton that CUC's accounting was fraudulent or violative of GAAP, Corigliano and Pember were exposed in cross-examination (and through the testimony of other witnesses) as having lied about material aspects of their testimony in their respective efforts to inculpate Shelton in their own criminal activities.

Rather than concede Corigliano's and Pember's lies, the government stuck by them to the end and sought to explain away their false and misleading testimony. Indeed, the government vouched for Corigliano and Pember in closing argument by telling the jury that it could rest assured that had they lied, the government would have thrown their cooperation agreements "out the window." The government's failure to correct the testimony of these witnesses is, in and of itself, a basis for an order granting a new trial.

Recognizing the lack of credible evidence to support its case, the government actively sought to lower its burden of proof. The government was not content to have the jury consider the evidence based on the theory that Shelton directed the fraud. Instead, the government sought and obtained a charge that allowed the jury to convict based on a finding that although Shelton had not directed the fraud, he had consciously avoided becoming aware of it. Aside from the lack of a factual foundation for such a charge against Shelton, this constructive amendment of the charges was again, in and of itself, a basis for an order granting a new trial.

In endeavoring to lower its burden of proof on one of the most contested issue at

trial – Shelton's knowledge – the government twisted innocent concepts and facts, through sarcastic arguments and cross-examination, to make them appear sinister. Thus, the government repeatedly sought to brand Shelton a criminal based on his knowledge that CUC had used reserves to increase its income, notwithstanding that, by March 1998, HFS accountants and auditors from Ernst & Young were indisputably aware of that same fact, and had collectively determined in Shelton's presence that CUC's accounting was correct. Likewise, the government sought to convict Shelton based on his knowledge that reserves were being adjusted, notwithstanding testimony from its own expert witnesses that good accounting practices require the adjustment of reserves on a periodic basis.

Aided by the fact that Corigliano (who unquestionably perpetrated a massive fraud) reported to Shelton from 1995 through 1997, the government sought to ignore the lack of evidence of Shelton's knowledge of and participation in the fraud, and instead appealed to the jury to convict him based on his failure to notice the fraud. None of the government's rhetoric better reflects this shift in approach than its decision to open its cross-examination of Shelton by writing the words: "No Hint, No Clue, No Suggestion, No Indication" on the white board in front of the jury box. The government's recasting of the theory of its case and the legal standards for conviction denied Shelton his right to be tried on the Indictment with which he was charged.

The "interests of justice" require that Shelton's motion for a new trial be granted. The government's case rested on testimony from two individuals that were demonstrated to be wholly incredible. Just as was the case in *United States v. Autuori*, 121 F.3d 105, 120 (2d Cir. 2000), in which the Second Circuit affirmed a decision by Judge Burns to grant a new trial because of contradictory and inconsistent testimony of two of the government's cooperating

witnesses, a new trial should be granted here.

Far from supporting a conviction, the remainder of the evidence supports Shelton's claim of innocence:

- Casper Sabatino's testimony that he did not view Shelton to be a member of the conspiracy and that the improper use of merger reserves was concealed from Shelton;

- Shelton's lack of involvement with E&Y;

- the failure of Corigliano, Pember and Sabatino to provide Shelton with documents that would have disclosed the fraud to him, even when, in the case of Pember, Steven Speaks repeatedly urged her to apprise Shelton of accounting issues;

- Pember's decision in the "good news, bad news" email (GX 519) to lie to Shelton, telling him that CUC had made its numbers;

- Testimony from government witnesses Scott Forbes and Anthony Menchaca that they did not believe that anything proposed at the March 6 meeting was fraudulent or violative of GAAP, much less that Shelton requested that the company undertake any illegal or improper conduct;

- Shelton's failure to sell any CUC or Cendant stock during a period when Corigliano and Pember, with knowledge of the fraud, were selling millions of dollars of their shares;

- Shelton's decision to cooperate with Cendant's Audit Committee and the United States Attorney's Office; and

- Shelton's unimpeachable character for honesty, truthfulness and good works.

Other trial errors warrant the vacatur of the conviction and the granting of a new trial. The government introduced substantial evidence, including a day and a half of testimony by Corigliano, regarding alleged accounting improprieties that pre-dated 1995, despite the facts that (i) the Indictment did not make any allegations regarding specific conduct that pre-dated 1995; (ii) the government did not provide any pre-trial disclosure regarding pre-1995 events, notwithstanding numerous requests for a bill of particulars regarding such conduct; (iii) neither of the government's expert witnesses provided any testimony concerning pre-1995 conduct; (iv) there was no credible evidence that Shelton had any involvement in any accounting improprieties prior to 1995; and (v) the government failed to immunize Stuart Bell, the one witness who could have meaningfully rebutted Corigliano's testimony concerning pre-1995 events. Compounding each of these trial errors was that Corigliano improperly provided expert testimony regarding various aspects of the pre-1995 accounting, including opinions that CUC improperly accounted for "general reserves," "profit sharing receivables," the Essex and GETKO reserves, and other matters.

The government introduced other evidence that was improper. The government offered evidence that Shelton had prepared an expense voucher charging plane expenses incurred by Walter Forbes in 1995 and 1996 to the Cendant merger reserve account. Shelton approved these plane expenses after reducing the amount to be reimbursed to Walter Forbes by more than $500,000 below the amount authorized by the Compensation Committee of the Cendant Board of Directors. In contrast to the clandestine manner in which Corigliano and Pember sought to hide improper charges to the merger reserve, Shelton wrote "charge to merger reserve" on the

voucher, which he sent to Anthony Menchaca for a counter-signature and made available to the company's auditors.  Although the only expert testimony on this issue established that Cendant properly accounted for this expense on its income statement, the government seized on this evidence to argue that Shelton knew that non-merger related expenses had improperly been charged to the Cendant merger reserve.  The Court also should have precluded evidence of Shelton's statements to the Cendant Audit Committee through the purported past recollection recorded of a witness whose testimony failed to establish the threshold requirements of Fed. R. Evid. 803(5).  This evidence also was inadmissible because the excerpts of the interview memoranda read into the record did not contain the verbatim statements of Shelton, as required by established Second Circuit authority.

For the reasons stated below, Shelton's motion for a new trial pursuant to Rule 33 should be granted.[1]

---

[1]    Shelton focuses his arguments in this memorandum on only some of the grounds that he has made previously.  In doing so, Shelton does not waive any arguments or motions he previously made at trial. Nor does Shelton waive any arguments or motions set forth in his Motion For A Judgment Of Acquittal Pursuant to Fed. R. Crim. P. 29 Or For A New Trial Pursuant To Fed. R. Crim. P. 33, filed on March 7, 2005.

## STATEMENT OF FACTS

### I.    THE TOPSIDE ADJUSTMENTS

In its opening, the government made the topside adjustments the linchpin of its case.  Telling the jury that the "defendants and their conspirators" instructed junior accountants to "add in fake revenue and arbitrarily reduce expenses in what they called topside adjustments," the government explained that "[t]hese topside adjustments are why this case really isn't about accounting; it's about making earnings up, about lying about CUC's earnings."  Tr. 36-37.

In each of the first three quarters of fiscal 1996, fiscal 1997, and calendar year 1997, the company made unsupported topside adjustments to its consolidated financial statements.  The size of the topside adjustments mushroomed over time.  For the first three quarters of fiscal 1996, the total amount of the topside adjustments was a reduction of revenue of $15,833,000 and a reduction of expenses of $46,333,000.  GX 9500.  For the first three quarters of fiscal 1997, the total amount of the topside adjustments was an addition to revenue of $13,793,000 and a reduction of expenses of $73,157,000.  GX 9600.  And, for the first three quarters of calendar 1997, the total amount of the topside adjustments was an addition to revenue of $149,000,000 and a reduction of expenses of $27,000,000.  GX 9700.

In stark contrast to the bold claims in its opening, however, the government failed to present any evidence that Shelton knew CUC was making unsupported topside adjustments.  None.  The topside adjustments were the exclusive province of three people -- Corigliano, Sabatino and Kearney – and the junior accountants who worked for them.  Shelton was not involved in the process by which the accountants determined what the amount of the topside adjustments should be.  Nor was Shelton involved in the process by which Corigliano and the junior accountants actually made the topside adjustments.

Each quarter, Sabatino and Kearney brought Corigliano the unadjusted,

consolidated financial statements showing the actual quarterly performance of CUC's various divisions. Corigliano made changes, in writing, to the revenue, expenses and earnings categories on the unadjusted, consolidated financial statements. Tr. 4060, 9950. Corigliano gave explicit instructions to Sabatino and Kearney on how much to add to revenue and to subtract from expenses. Tr. 4516, 4697, 9714-15, 9950. Sabatino and Kearney were "basically an audience", following Corigliano's orders. Tr. 9951. **Shelton was never given a copy of the unadjusted, consolidated financial statements, either with or without Corigliano's handwritten revisions. Tr. 4491-93.**

Based on Corigliano's instructions, Sabatino created handwritten schedules showing exactly what accounts to debit or credit in order to make the adjustments called for by Corigliano. GX 502, 9723, 9733. Sabatino and Kearney also created documents called "P&L Reconciliation Spreadsheets," which directly showed the impact of the topside adjustments on the quarterly revenue, expense and earnings figures. Tr. 4038; GX 9522, 9532, 9612, 9622, 9712, 9722, 9732. **Neither Sabatino nor Kearney ever provided Shelton with any of these documents. Tr. 4501-07.**

Nor did any of Corigliano, Sabatino, Kearney, Pember or any other CUC accountant ever seek Shelton's authorization for the topside adjustments. Tr. 4580-81, 4489. **Sabatino never told Shelton that the accounting department was making unsupported topside adjustments.** As far as Sabatino was aware, the only people involved in the topside adjustments were Corigliano, Kearney, himself, and two junior accounts – Mary Sattler and Kathy Mills. Tr. 4644. **Corigliano also did not tell Shelton about the unsupported topside adjustments. Tr. 8288-89, 8441-42. Similarly, Kearney never spoke to Shelton about the topside adjustments, and he did not include Shelton among the supervisors who directed**

**him to make topside adjustments. Tr. 9714-15.**

   The only incident in which Shelton's name was even mentioned in connection with the topside adjustments was an alleged conversation among Corigliano, Sabatino and Kearney. According to Kearney, at the close of one of the quarters in fiscal year 1996, Sabatino and Kearney expressed their concern to Corigliano about the magnitude of the topside adjustments. Tr. 9743-44; 9957-60. According to Kearney, Corigliano responded by saying that he had informed Shelton "about the amount of <u>reserves</u> that we needed to use this quarter." Tr. 9744. (emphasis added)[2]

   But, as the evidence overwhelmingly showed, the topside adjustments were undertaken without regard to the amount of reserves CUC had available. Indeed, at Corigliano's direction, Kearney prepared analyses showing the excess amounts of reserves maintained by CUC. Tr. 9961-62; GX 114. The topside adjustments made by Corigliano had no relationship to the reserve analyses performed by Kearney. Tr. 9953, 9962. Corigliano did not draw upon the reserves at the end of the quarters to make the topside adjustments. Corigliano only reversed reserves into income at the end of the fiscal year when the topside adjustments were removed from the consolidation spreadsheet. Tr. 2754-55, 8525. Thus, it would have been a non-sequitor, or extremely misleading, for Corigliano to respond to an inquiry by Sabatino about the size of the topside adjustments by referring to the "amount of reserves" they needed to use.

   Moreover, Corigliano conceded that the amount of the topsides at the end of the quarters in 1995 was often much higher than the amount of available reserves. For the first and second quarters of 1995, the topside adjustments totaled more than $30 million, even though the forecasts prepared by Corigliano showed that there were just $8.5 million of reserves available

---

[2] Kearney provided the only testimony concerning this alleged conversations. The government did not ask either Corigliano or Sabatino about this conversation, which was inconsistent with their general testimony that they did not discuss the topside adjustments with Shelton.

for that entire year.  Tr. 8444-64.  *Compare* GX 9500 (showing topside adjustments) *with* GX 58

(showing $8.5 million in available reserves).  Thus, Corigliano's supposed statement about the

amount of "reserves" to Kearney, even if actually made by Corigliano and even if truthful on

Corigliano's part, had nothing to do with the quarterly topside adjustments that were much larger

than the total reserves available for the year.

## II.    THE MISUSE OF MERGER RESERVES

        A merger reserve is a liability account established at the time of a merger or

acquisition that is intended to account for all one-time costs that the acquirer will incur as a result

of the merger.  Tr. 443-48.  A company establishes this type of liability account by recording a

one-time charge to its income statement at the time of acquisition.  *Id.*  Thereafter, all merger-

related costs are paid out of this accrued liability account; accordingly, upon such payment, there

is no additional effect upon the income statement.  *Id.*  Although the establishment of a merger

reserve should reflect a good-faith estimate of the non-recurring, merger-related expenses the

company expects to incur, that process is necessarily subjective and involves some amount of

conjecture.  *Id.*  For example, government witness Robert Davidson testified that there was

always a range of reasonableness within which a reserve could be established and that he

deferred to his accountants' judgment on this issue.  Tr. 5625-27.

        In some cases, merger reserves can be used properly with the effect of increasing

operating income.  For example, if a company does not adequately track its merger-related costs,

and as a consequence charges those costs in the first instance to operating expense accounts,

those operating expenses will be over-stated (and operating income will be understated).  Tr.

529.  When the company later corrects this accounting entry by reversing the merger costs out of

the operating expense accounts and charging them against the merger reserve, the effect is a

reduction in the operating expense accounts (and hence an increase to operating income) by the

amount of those merger costs.  *See, e.g,* Tr. 2166-67; 10690-91.

   At the end of each fiscal year, CUC's accounting staff reversed the topside adjustments it had made the prior three quarters.  To make up the difference between CUC's actual results and the quarterly earnings figures CUC reported to the public, Corigliano, Pember, Sabatino and others engaged in a scheme to reverse excess merger reserves into revenue accounts and to charge ordinary, operating expenses against the reserve.  The reversal of these merger reserves had the effect of artificially inflating CUC's operating income.

   The government's proof regarding the misuse of merger reserves principally focused on two reserves:  the Ideon reserve and the Cendant reserve.

**A.  THE ESTABLISHMENT OF THE IDEON RESERVE**

   CUC established a reserve (the "Ideon reserve") in the amount of $179.9 million in connection with its 1996 acquisition of three companies, Ideon, Davidson & Associates, and Sierra On-Line.  The portion of the reserve associated with the Ideon acquisition was approximately $127 million, of which $90 million was earmarked as settlement funds for Ideon's litigation with Ideon's founder, Peter Halmos.

   Corigliano testified that the Ideon reserve was established with excess reserves. Tr. 6729.  He claimed that Ideon's ongoing litigation against Halmos was estimated to cost only $65 to $70 million, but that CUC nevertheless reserved a total of $90 million for this litigation in order to create excess reserves.  Tr. 6778, 8578-79.

   The record evidence contradicted Corigliano's testimony about the expected settlement cost of the Halmos litigation.  Gregory Danilow, a partner at the law firm of CUC's former counsel Weil, Gotschal & Manges, testified that he had told Shelton and others that CUC should plan on paying up to $100 million to settle the Ideon litigations.  Tr. 1132.  Chris McLeod led the due diligence on the Ideon acquisition and, as the head of the Comp-U-Card division, was

in the best position to anticipate the merger related costs that would arise from CUC's acquisition of Ideon.  McLeod told Corigliano and Shelton that any settlement of the Ideon litigation would cost in the range of $70 to $90 million, up to $25 million higher than the estimate Corigliano volunteered in his trial testimony.  Tr. 10897-98.

McLeod also was in a unique position to assess the reasonableness of the size of the component of the Ideon reserve associated with the Davidson and Sierra acquisitions. Beginning in January 1997, McLeod was responsible for running the CUC Software division.  In that capacity, he was responsible for integrating Davidson and Sierra into CUC's Software division.  McLeod explained that there was "significant duplication between" the Davidson and Sierra operations and that their integration would involve significant costs.  Tr. 10902.  McLeod believed that the entire size of the Ideon merger reserve, which included the merger reserve for the software acquisitions, was reasonable.  Tr. 10899-904.  Similarly, E&Y had also reviewed the size of the Ideon merger reserve and had not raised any objections.  Tr. 8637, 8725, 10900.

### B.    THE MISUSE OF THE IDEON RESERVE IN FISCAL YEAR 1997

At the end of fiscal year 1997, the accounting staff, led by Corigliano and Pember, reversed tens of millions of dollars of the Ideon reserve.  Pember created various analyses of the excess in the Ideon reserve, which guided Corigliano in determining how much to reverse in the reserves.  GX 476, a document prepared by Pember in November 1996, reflects that there was an excess in the Ideon reserve of approximately $39 million.  In February 1997, Pember created two additional analyses of the excess amount in the Ideon reserve.  GX 1758, GX 478.  These analyses showed that the Ideon reserve's excess was approximately $50 million. **None of these documents was ever shown to Shelton.  Tr. 2361, 2382-83.**

In February 1997, Pember received a call from Corigliano and Sabatino, directing her to make journal entries charging approximately $45 million in operating expenses to the

Ideon reserve.  Tr. 2402-03.  With the assistance of Corigliano, Pember decided which expense categories to charge against the reserve.  Tr. 2506-07.  Pember and her staff then created phony journal entries, which purported to show that certain expenses being charged to the merger reserve were merger-related, when in fact the charges were ordinary, operating expenses.  *See* GX 479, 480, 481, 482; 484; Tr. 2455-56, 2460, 2503.  **There was no evidence that any of these documents reflecting the fraudulent use of merger reserves were ever provided to Shelton, or that Corigliano or Pember ever consulted Shelton on these reserve reversals.**

### C.    THE ESTABLISHMENT OF THE CENDANT RESERVE

As discussed in more detail below, Shelton's participation in the decision to merge CUC with HFS is evidence of his innocence.  Corigliano's insinuation that Shelton sought the merger with HFS to build large reserves (Tr. 7227-28) is rebutted by the fact that CUC had a plethora of acquisition opportunities available to it that could have provided for the creation of substantial merger reserves, without requiring (as did the HFS merger) the alleged conspirators to forego control of the company's accounting.

Pember was the accountant primarily responsible for establishing the CUC side of the Cendant merger reserve.  Tr. 5932-33, 9204.  Corigliano occasionally joined conference calls during which Pember and auditors from Ernst & Young reviewed the Cendant reserve.  Tr. 9204.  Corigliano remembered attending only one in-person meeting with E&Y auditors to discuss the Cendant reserve.  That meeting was also attended by Pember, Scott Forbes and Michael Monaco.  Shelton did not participate in any meetings with E&Y regarding the establishment of the Cendant reserve.  *Id.*[3]

---

[3]  No witness except Pember testified that Shelton met with E&Y auditors with respect to the establishment of the reserve or was otherwise involved in the details.  As discussed below, Pember's testimony was contradicted by every other witness who had knowledge of those meetings.

Pember and Corigliano worked closely with the former HFS executives to establish the Cendant reserve. Tr. 2194-95, 5932-34, DX 1515. Monaco and Scott Forbes met with Pember and Corigliano at least once a month to review their estimates of anticipated merger costs. *Id.* Monaco advised Pember and Corigliano that Henry Silverman wanted the reserve to be as big as possible. Tr. 1964-65, 9193-94. Corigliano understood that Silverman wanted HFS and CUC to build a cushion into the reserve that they could use to inflate future earnings. *Id.* There was no evidence that Corigliano thought Silverman, Monaco or Scott Forbes wanted the accounting to be improper.

Scott Forbes and Monaco understood that E&Y had audited, and was comfortable with, CUC's estimates of the merger-related costs it would incur in connection with the merger. Tr. 5937-38. Nothing about the size of the $844 million reserve gave Scott Forbes any reason for concern. Tr. 5940. Indeed, Scott Forbes, Monaco and Silverman signed the 1997 Form 10-K that disclosed the $844 million Cendant reserve charge. Tr. 2196-98; DX 1288 p. F24.

### D.   THE MISUSE OF THE IDEON AND CENDANT RESERVES IN CALENDAR 1997

On December 11, 1997, just minutes before the start of a divisional controllers' meeting between CUC and HFS, Corigliano and Pember met privately with Steven Speaks, the controller of Comp-U-Card, to review a one-page spreadsheet Speaks had prepared. Tr. 684-88. The spreadsheet showed the revenues and earnings for the Comp U Card division for 1997, as well as projected revenues and earnings for the 1998 budget. GX 133. On Speaks' spreadsheet, Corigliano and Pember hand-wrote large adjustments to the Comp-U-Card division's 1997 results and 1998 budget. GX 134. Pember told Speaks that the reason for the changes was "merger related activity." Tr. 688. Corigliano and Pember directed Speaks to present these falsified numbers to HFS at the controllers' meeting. **Shelton did not attend this meeting or**

**receive either GX 133 or GX 134.  Nor did Shelton attend the December 11 divisional controllers' meeting.  Tr. 990.**

In January 1998, Pember attended a meeting with Corigliano, Sabatino and Mary Sattler.  Pember brought with her a copy of GX 508, a one-page forecast for calendar year 1997, which showed, among other things, the planned usage of $87.6 million in merger reserves.  Tr. 2691-94, 2704; GX 508.  Following instructions from Corigliano on how to allocate these excess merger reserves among various revenue and expense accounts, Pember prepared a one-page handwritten schedule (GX 136) setting forth certain adjustments the accounting staff needed to make to utilize these excess reserves.

Pember subsequently gave GX 136 to Speaks and instructed him to create false journal entries purporting to justify the drawdown of significant amounts of the Ideon and Cendant reserves.  Tr. 714-15, 2715-16.  Specifically, Pember told Speaks to reverse tens of millions of dollars of the Ideon and Cendant reserves into specific CUC accounts, including those for its Comp-U-Card, NUMA, and NAOG divisions.  Pember also instructed Speaks to increase the amount of the allocations from deferred to immediate revenue recognition programs.  Pember told Speaks to make these journal entries in small, uneven numbers in order to hide them from the auditors.  Tr. 750; GX 1731.  On January 17, 1998, Speaks stayed up late at night preparing false journal entries (GX 137) to effectuate the various instructions set forth in GX 136.  This was the first time that Speaks thought he was engaging in illegal conduct.  Tr. 992.  **Shelton neither attended the meeting at which Corigliano, Pember and others discussed the need to draw down the Ideon and Cendant reserves for calendar year 1997, nor received any of the documents evidencing the misuse of these reserves.**

Also at Pember's instruction, Speaks adjusted the revenue and earnings line items

on the income statement for the Comp-U-Card division to comport with the false journal entries he had made. Tr. 698; GX 1784. **Shelton did not receive either the initial income statement for the Comp-U-Card division, which reflected its actual performance, or the revised income statement Speaks prepared in which he incorporated the false journal entries.**

Several days later, Pember gave Speaks additional handwritten instructions (GX 511) to increase CUC's income by utilizing excess Ideon and Cendant merger reserves, *see* Tr. 760-61; GX 511, and told Speaks to make corresponding journal entries purporting to support the use of these merger reserves. Tr. 760, 2718. The journal entries Speaks created reflected phony sales made by the NUMA and NAOG divisions. Tr. 767-78, GX 144, GX 145. **Shelton did not receive GX 511, GX 144 or GX 145.**

At trial, the defense established through the unrebutted testimony of a computer forensic expert that Pember had maintained a seven-page schedule on her computer showing, in great detail, exactly how she allocated the Ideon and Cendant merger reserves to inflate earnings for calendar year 1997. *See* DX 31298, Tr. 11324. The seven-page schedule was a step-by-step summary of how Pember had gone about cooking the books. **There was no evidence that Pember ever gave a copy of this seven-page schedule to Shelton.**

## III.    THE MANIPULATION OF THE CANCELLATION RESERVE

### A.    THE PURPOSE OF THE CANCELLATION RESERVE

Each membership club offered a money-back guarantee that entitled a customer to demand a full refund at any point during the lifetime of the membership. Tr. 1003, 2345. In addition to refunds, Comp-U-Card also incurred billing rejects, otherwise known as "rejects-in-transit." Tr. 904. A reject-in-transit was a customer credit card payment that Comp-U-Card's bank could not credit to its cash account, usually because the credit card was over its limit or was otherwise inactive. Tr. 904, 1005, 2346. Based on past experience and industry trends, Comp-

U-Card anticipated that a proportion of its new and renewed memberships would eventually cancel or result in a reject.[4]

Comp-U-Card established a cancellation reserve for refunds and other types of membership cancellation. Tr. 1003, 1074. The company used a fraction of every new or renewed membership fee to fund the reserve, which was intended to cover future cancellations, refunds, and rejects-in-transit. Tr. 905, 1075, 2351, 2345. Comp-U-Card's accounting department attempted to estimate the required reserve funds by looking to historical rates of cancellation. Tr. 2347-48. Nevertheless, this estimate was necessarily very subjective, and was really just "a big guess" since it was also based on predictions of many future variables. Tr. 1075.

**B.    IMPROPER MANIPULATIONS INVOLVING THE CANCELLATION RESERVE**

Accountants within the Comp-U-Card division inflated the company's earnings through several improper manipulations of the cancellation reserve.

<u>First</u>, the accountants purposefully under-funded the cancellation reserve, which had the effect of overstating revenue. Tr. 2476-83. To hide this under-funding, the accountants provided the auditors with false historical cancellation rates and other false data. Tr. 2476-83; GX 1755.

---

[4] Under GAAP, a company is not entitled to recognize revenue that it reasonably anticipates it will not actually realize as cash in the long run. Tr. 460. Accordingly, when a company records cash payments or accounts receivable for services rendered, it must also establish a liability on its balance sheet in recognition of the fact that a percentage of those assets will not materialize as cash in the long run. Tr. 461. This type of liability is known as a "cancellation reserve," and it represents a reasonable estimate of all future refunds and uncollectible receivables. *Id.* GAAP requires that the cancellation reserve be based upon reasonable estimates of future refunds and defaults, usually with reference to historical data, so that the balance sheet and the income statement accurately reflect a company's present income and future refund obligations. *See* Tr. 463-64. A company that does not sufficiently fund its cancellation reserve will overstate its income in the current period, but with the consequence that its income will likely be reduced in future periods when the reserve cannot cover the refunds and defaults. *Id.*. Part of an auditor's responsibility is to evaluate a company's cancellation reserve to ensure it is properly funded. Tr. 546-47.

Second, the accounting department improperly manipulated the cancellation reserve by not recording (otherwise referred to as "booking") the rejects-in-transit during the last three months of each fiscal year.  *See* Tr. 904, 2351-52.  The department subsequently recorded these unbooked rejects during the first three months of the following fiscal year.  Tr. 905; 1069.  During this three month lag period, the unrecorded rejects "sat in limbo," which had the effect of overstating the company's assets on its balance sheet.  Tr. 905, 1005, 1069.  Nevertheless, the company always booked twelve months of rejects each year.  Tr. 1070.

This practice had the *potential* to increase a current year's earnings in the following manner: if the amount of rejects that the company did not book in the last quarter outweighed the amount of extra rejects (left over from the previous year's final quarter) that were booked in the first quarter, then earnings would be increased by the net difference between these two bundles of rejects.  This practice also had the potential to *decrease* a current year's earnings if the extra rejects from the prior year that were booked in the first quarter outweighed the rejects from the last quarter which were not booked.  In addition, if Comp-U-Card had wanted to terminate this practice and catch up in its recording of the rejects, then, for a single three-month period, it would have been necessary to record both the delayed and the current rejects.  As of December 1997, this corrective measure would have resulted in a one-time reduction to Comp-U-Card's earnings by over $100 million.  Tr. 9166.

Third, during the final quarter of the fiscal year, the cancellation reserve was overstated because the accounting department elected not to record any rejects.  Comp-U-Card's accountants fraudulently used these excess reserve funds to reduce the company's operational expenses or increase its revenue.  *See* Tr. 2469-73, 2485, 2351; GX 482.

C.    **SHELTON DID NOT KNOW ABOUT OR PARTICIPATE IN THE IMPROPER MANIPULATIONS INVOLVING THE CANCELLATION RESERVE**

1.    **Shelton Did Not Know About The Under-Funding Of The Reserve**

The accounting department's manipulation of the cancellation reserve was concealed from Shelton and other non-accountants at CUC. Anthony Menchaca, the president of the Comp-U-Card division in 1997 and 1998, continually reviewed the cancellation rates used to establish the cancel reserve. Menchaca never suspected fraud within the Comp-U-Card division. Tr. 1004, 1076, 10117-18.

Speaks had many conversations with Menchaca about the cancellation rates. Tr. 1007; 1076. Speaks, like Menchaca, never thought there was anything wrong with the cancel rates that the accountants used to determine the size of the cancellation reserve. Tr. 1076, 1085. Indeed, on several occasions, Pember asked Speaks to help her locate the most favorable cancel rates that would justify to the auditors the establishment of the cancellation reserve. *See* Tr. 1082-85; DX 1766. On December 16, 1997, Speaks forwarded to Menchaca an email in which Pember made such a request. Menchaca did not review the request or the email as problematic. *See* DX 1766; Tr. 1082-85. Speaks was fully aware of the process by which the cancellation reserve was funded and thought that the process was proper. Tr. 1008.

McLeod also never suspected that the cancellation reserve was under-funded. McLeod once questioned Corigliano about the seemingly low balance in the cancellation reserve. Tr. 10879. Corigliano explained to McLeod that the accounting department was behind on doing some of the bank reconciliations and that as a result the reserve appeared low. Tr. 10879. McLeod accepted this explanation as truthful and never suspected any improper accounting in the Comp-U-Card division. *See* Tr. 10879.

**There is no evidence that Shelton knew that the cancellation reserve was purposefully under-funded, nor is there any evidence that Shelton knew that CUC's accountants were providing the auditors with false cancellation rate data and other misleading information regarding the establishment of the reserve. Shelton did not receive internal documents, such as GX 1755, that showed how the company derived its cancel rates for use in establishing the cancel reserve.**

### 2. Shelton Did Not Know The Three Month Delay Was Improper

#### a. Speaks' Testimony

The genesis of the three-month delay policy was benign. In the 1980s the company had to wait several months before it could obtain the bank records that determined the amount of rejects the company needed to record to its books. Tr. 10880. As a consequence, the company maintained a "lag-time" in its recognition of rejects. Tr. 10881. Neither McLeod nor Menchaca ever suspected that there was anything improper about how the company recorded its rejects. Tr. 10117-18.

Speaks did not suspect anything improper about the three-month lag in the recording of rejects until September 1997, when he approached Pember about the subject. Tr. 1006. Pember reassured Speaks that the company had always recorded the rejects in that manner. Speaks left that conversation believing that the three-month lag in recording rejects did not have a material impact upon the company's earnings. Tr. 1006-07.

In late 1997 or early 1998, Speaks re-approached Pember about the company's policy in maintaining a three-month delay in recording rejects. Pember told Speaks that she would talk to Corigliano and Shelton about the issue. Tr. 1015-16. Speaks thereafter prodded Pember several times to inform her supervisors about this practice, **but as far as Speaks knew, Pember never spoke to Shelton about it.** *See id.***; Tr. 1073. Speaks never raised this issue**

**directly with Shelton.  Tr. 1008; 1014-16.**

In January 1998, Speaks informed an E&Y auditor about the policy of delaying the booking of the rejects.  Tr. 1008.  The auditor saw the amount of the rejects not being booked from her review of Comp-U-Card's bank reconciliation statements.  The E&Y auditor never said there was anything improper with this practice.  Tr. 1009.

On March 4, 1998, Speaks sent Pember an email (GX 534), in which he asked Pember if she had any concerns about Speaks providing financial information to HFS.  Speaks testified that he had specifically spoken to Pember about the need to disclose CUC's accounting issues before he sent this email and Pember had not raised these issues with Corigliano.  In her email response, Pember wrote that "I need to get a game plan with Kirk and Cosmo to deal with the numbers issues," making clear that as of March 4 she had not yet discussed these issues with Shelton.  GX 534; Tr. 791.

On March 31, 1998, Speaks sent Pember an email entitled "audit stuff" in which he outlined his concerns regarding several accounting issues, including the cancellation reserve.  GX 537.  Speaks informed Pember that the amount of rejects CUC had not booked in the last three months of calendar year 1997 was $120 million.  *See id*; Tr. 904-5.  Speaks also told Pember that he believed CUC was not accurately calculating the cancel rates and, therefore, the cancellation reserve was under-funded by approximately $20 million.  *See* GX 537; Tr. 906.  Speaks asked Pember to make sure that Corigliano and Shelton were made aware of these issues:

> Anne – not be paranoid [sic], but I want to put all of the potential issues on the table for discussion so that Cosmo and Kirk are aware of the importance of keeping E&Y in Trumbull.

GX 537.  Pember did not reply to Speaks, but the next day she forwarded Speaks's email to Corigliano – and not Shelton – with the query, "Cosmo – how should we proceed?"  GX 31.

Pember admitted that it would have taken only a matter of seconds to forward the email to Shelton the same way she had sent it to Corigliano. Tr. 3863. **There is no evidence that Shelton received this email, and as far as Speaks is aware, Shelton was never made aware of these issues. Tr. 791-92; 1015-16; 1073. Neither Pember nor Speaks testified that Pember had indicated to Speaks in response to his email that she had informed Shelton about any problem with the rejects.**

Until April 1998, Speaks had the impression that Corigliano and Menchaca were aware of, and thought there was nothing improper about, the three-month lag in the booking of the rejects. *See* Tr. 1010-11. On April 9, 1998, when Speaks told them that he was about to inform Cendant management in Parsippany about this and other accounting practices, Corigliano calmly replied, "tell them what you need to tell them," Tr. 1010, and noted that the three-month lag "was the historical practice at the company." Tr. 1013. With Menchaca listening, Corigliano explained to Speaks why the company delayed the booking of its rejects. *See* Tr. 10205. Corigliano's explanation provided both Speaks and Menchaca peace of mind, and Corigliano reiterated that Speaks "should say whatever [he] needed to say" to senior management. Tr. 1013-14; 10205.

Speaks testified that there is nothing improper per se with waiting three months to record rejects. Tr. 1071-72. When asked whether "it would be okay . . . to not book . . . the last three months . . . but to double book January, February [and] March . . . ," Speaks replied: "As far as I'm concerned, that's not really the issue. Yes, that would be okay." Tr. 1070-71. According to Speaks, the real problem was that this practice, in conjunction with Comp-U-Card's other accounting practices, temporarily overstated Comp-U-Card's assets during the final quarter of each fiscal year. *See* Tr. 1071-72.

22

### b.    Pember's Testimony

Pember testified that in late 1997 she told Shelton about the policy of delaying the recognition of the last three months' of rejects and the amount of the outstanding rejects the company needed to book in the first three months of the new fiscal year.  Tr. 2906, 3472-73. Even accepting Pember's testimony, however, she did not tell Shelton that this policy materially affected CUC's earnings in the current year or that it was improper.  *See* Tr. 2906.  Because the company always recognized twelve months of rejects in each fiscal year, it was not self-evident that this practice affected earnings.  Tr. 3467-71.

In a subsequent meeting in early 1998, Corigliano told Shelton in Pember's presence that this practice was completely acceptable and had "been happening for a long time." Tr. 2913.  **Although Pember claims to have interjected that she thought the membership reserve was under-funded by $10 million, no one informed Shelton that the rejects policy was improper, that it materially affected CUC's earnings, that it was necessary for the company to take a "one-time hit" to catch-up its booking of rejects, or that any of the accounting generally with respect to the cancellation reserve was fraudulent.  Tr. 2913.**  In fact, at the time, even Pember did not believe that this practice was illegal or fraudulent.  Tr. 3442.

### c.    Corigliano's Testimony

Until April 1998, Corigliano did not believe that the rejects had a material impact on CUC's earnings.  Tr. 7540, 8297-98.  Corigliano never documented the income effect from the delayed booking of rejects because he did not think there was any way the rejects could have such an effect.  *See* Tr. 8306-07, 8334-35.

Corigliano provided Shelton with inaccurate information in April 1998 when he told Shelton that the rejects policy had no impact upon current earnings.  *See* Tr. 9165-67.  Amy

Lipton, CUC's general counsel, corroborated this account, testifying that she recalled a conversation in mid-April 1998 in which Corigliano told Shelton that E&Y had always been aware of the way in which the company handled its rejects-in-transit. Tr. 11487-88. Although termination of the practice would have required the company to recognize a large one-time reduction to earnings, Corigliano never indicated to Shelton any reason to change it. Tr. 9165-97.[5]

## IV.    THE ALLOCATION OF REVENUE FROM DEFERRED REVENUE RECOGNITION TO IMMEDIATE REVENUE RECOGNITION MEMBERSHIP PROGRAMS

### A.    REVENUE RECOGNITION PRACTICES WITHIN THE COMP-U-CARD DIVISION

#### 1.    Comp-U-Card's Policy Of Matching Revenue With Expenses

Comp-U-Card was in the business of selling memberships to clubs that guaranteed discounts and support services in a particular consumer industry. *See* Tr. 612; 621-22; 626-27; 6370. For example, the Travel Club provided its members with discounts and support services related to the purchase of travel or vacation packages. *See* Tr. 626-27. Comp-U-Card offered several membership programs that covered numerous consumer product types. *See Id.* These clubs offered their services over a fixed period, such as twelve, thirteen, fifteen, or thirty-six months. Tr. 956.

Because each membership club offered unique services, each also incurred distinct operating expenses. *See* Tr. 722-23; 6370-72. For some membership programs, Comp-U-Card incurred the operating cost of rendering the services almost entirely in the first month

---

[5] Corigliano claimed that he had made his statement to Shelton, not knowing that the reject policy impacted earnings. Accordingly, as set forth below, Corigliano's testimony that he told Shelton as early as February 1995 that CUC's accounting practices with respect to the rejects and the cancellation reserve were fraudulent and a "smoking gun" is flatly contradicted by his and other witnesses' testimony. *Compare* Tr. 2913; 8297-98; 8306-07; 8334-45; 9165-67; 11487-88 *with* Tr. 6458; 7341-42.

that the membership was made effective.  Other membership programs, however, had a more

even spread of operating costs over the life of the membership period.

   To ensure accurate reporting of Comp-U-Card's profitability, it was necessary to

match, in any given time period, the revenue obtained from a membership program with the

expenses incurred from its operations.  *See* Tr. 458-60; 868-72.  For example, if a twelve-month

program incurred all of its operating expense in the first month of the membership period, but

only recognized one-twelfth of the revenue each month, the revenue and expense ratio would be

off-balance in each month.  *See* Tr. 460.  To address that imbalance, Comp-U-Card implemented

the "matching" policy whereby the division would recognize revenue from a membership

program in the same manner the division incurred the operating expenses associated with it.

This policy ensured that the division accurately reported its earnings as required under GAAP.

*See* Tr. 957-58.

   To facilitate the implementation of the matching policy, Comp-U-Card

categorized its membership programs into immediate revenue recognition and deferred revenue

recognition programs.  Tr. 719-20.  Immediate revenue recognition programs were those that

immediately recognized all of the revenue for a membership in the month it was sold, because all

or almost all of the operating expenses associated with that membership were incurred at that

point in time.  Conversely, the deferred revenue recognition programs spread the recognition of

revenue and expenses over the life of the membership period.

   **2.**   **The Projection Model**

   In addition, Comp-U-Card's accounting was done in the first instance on a cash

basis.  *See* Tr. 607; 636; 639;649-50; GX 163.  The cash basis method of accounting measures

revenue and expenses from the cash that has flowed into and out of the company's bank account.

*See* Tr. 476-78.  The division's cash basis reports would not accurately reflect its revenue and

expense recognition programs that were recorded on an accrual basis. To aid in the proper implementation of the matching policy, CUC prepared a document called a "projection model" that converted the Comp-U-Card division's accounting from a cash to an accrual basis. *See* Tr. 636-37; 674; 678; 2908; GX 151, at 4.

### B.    THE FRAUD INVOLVING ALLOCATIONS

Starting in the early 1990s, in the last quarter of each year, the accounting department improperly reallocated revenue from deferred to immediate revenue recognition programs. *See* Tr. 6372-77. In essence, the Comp-U-Card division "borrowed" revenue from future periods for the current reporting period. Accordingly, the net effect was an inflation of the division's income in the current reporting period, contrary to the matching policy that was designed to report income accurately in accordance with GAAP. On a non-cumulative, per-year basis, the allocations artificially inflated income by $3 million in fiscal year 1996, *see* Tr. 10638, $10 million in fiscal year 1997, *see id.,* and $17 million in calendar year 1997. *See id.*

These revenue adjustments were implemented by a series of entries within a column of the projection model entitled "allocations." Tr. 875; 2909. The entries would cause an increase to the revenue of an immediate revenue recognition program and a corresponding decrease in the revenue of a deferred revenue recognition programs. The projection model did not provide any explanation for the allocations column or the entries contained therein.

### C.    SHELTON DID NOT KNOW ABOUT AND DID NOT PARTICIPATE IN THE ALLOCATIONS

#### 1.    Shelton Did Not Receive The Projection Models With The Allocation Column.

**Shelton did not receive any of the projection models that contained an allocations column.** *See* **Tr. 972.** *See* **DX 1734; DX 1738; DX 1739; DX 1740; DX 1741; DX 1742; DX 1743; DX 1789.**

2.    **The CUC Executives Who Received The Projection Model Did Not Understand The Allocations To Be Fraudulent**

McLeod, the president of the Comp-U-Card division from the early 1990s to the beginning of 1997, received projection models that reflected the allocations. Tr. 10872-74; DX 30,157. On one occasion, McLeod asked Corigliano about the significance of the allocations column. Tr. 6379; 10874. Corigliano lied in response: he told McLeod that Comp-U-Card had begun marketing combined memberships where the customer would receive a membership in a bundle of programs; Corigliano falsely explained that the allocations column was his method of allocating the revenue among the different membership programs in that bundle. Tr. 10874-75. McLeod accepted what he believed was a plausible explanation. *Id.* There is no reason to believe that Corigliano would have told Shelton the truth while lying to McLeod.

Menchaca, who succeeded McLeod as the president of the Comp-U-Card division, also received projection models which included the allocation column. Tr. 974. Prior to the disclosure of the fraud in April 1998, Menchaca did not know or suspect that Comp-U-Card was improperly reallocating revenue from deferred to immediate revenue programs. Tr. 10117.

Nothing about the term "allocations" indicates fraudulent conduct. Scott Forbes explained that "allocations, in accounting speak, would be shared expenses between businesses." Tr. 5734. When Scott Forbes questioned Corigliano about the variances in the segment reporting as reflected on GX 376, Corigliano responded that the variance was caused in part by "allocations." Tr. 5733-34. Scott Forbes did not think that there was anything fraudulent about Corigliano's explanation. *See id.*

3.    **Shelton Did Not Receive Other Documents That Showed The Effect Of The Allocations**

Speaks prepared several analyses documenting the cumulative effect of the

allocations.  *See* GX 150; DX 904 at 3.  Speaks prepared the first analysis on December 5, 1997;

this analysis showed that the cumulative amount of the allocations as of October 31, 1997 was

$41 million.  *See* GX 150; Tr. 879-80.  Speaks provided this analysis to Corigliano and Pember,

but not to Shelton.  Tr. 984.

   On March 31, 1998, Speaks prepared a second analysis, which calculated that the

cumulative amount of the allocations as of year end 1997 was $47.6 million.  *See* DX 904 at 3.

Speaks sent his second analysis by email to Anne Pember on March 31, 1998, in which he stated

that he wanted Corigliano and Shelton to be made aware of the situation.  *See* DX 904 at 1.

Despite Speaks' plea, Pember forwarded the email (including Speaks' analysis) only to

Corigliano, notwithstanding that she claimed to be reporting to Shelton at this point, adding her

own question, "Cosmo - how should we proceed?"  *Id.*  Although Corigliano testified that he

discussed the email with Shelton on or about April 6, 1998, *see* Tr. 7535-41, neither Corigliano

nor Pember forwarded the email to Shelton, which would have taken only a few seconds to do.

Tr. 3863.  Pember had no cogent explanation for her failure to have forwarded the email to

Shelton.

   Just days later, on April 9, 1998, Speaks sent an email to Corigliano, Menchaca,

Mark Metcalfe, John Fullmer, Sabatino and Sattler to which he attached two schedules that

respectively documented the effect of the allocations in the 1997 and 1998 years.  *See* DX 1514.

In the text of his email, Speaks underscored that these schedules reflected the impact of the

allocations.  *See* DX 1514, at 1.  Speaks also advised that Scott Forbes had specifically requested

these schedules and that he (Speaks) would be reviewing them with Scott Forbes that afternoon.

*See id.*  **Speaks did not send this email to Shelton; nor did any of the recipients forward it to**

**Shelton.  *See id.***  The schedules attached to the email reflect that the accounting staff had

budgeted more than $41 million of allocations for 1998, and that they had implemented more than $50 million in 1997. *See* DX 1514, at 2, 4. The allocations are reflected in a line-item entitled "Revenue Allocations – Deferred to Current." *See id.* No one, including Menchaca, replied that this was improper or fraudulent accounting. Moreover, none of the conspirators purportedly involved in the fraudulent scheme replied to Speaks' email in an attempt to convince him not to discuss the allocations with Scott Forbes.

### 4.    The Alleged Conspiratorial Discussions Regarding The Allocations.

In April 1997, in order to reduce operating income, Pember, Sabatino and Kearney instructed Speaks to allocate a small amount of revenue from immediate to deferred programs. *See* Tr. 974-76. They explained to Speaks that the company was recognizing revenue too quickly, and that they needed to delay the recognition of some revenue earmarked for immediate recognition. At that point in time, Speaks did not think these allocations were material or improper. **Speaks never told Shelton about these allocations.** *See id.*

In early 1998, Anne Pember instructed Steven Speaks to make additional adjustments to the allocations, which had the net effect of increasing earnings by $9.5 million for the year ended December 31, 1997. *See* Tr. 716-24. These instructions were set forth on a handwritten document Pember prepared in mid-January 1998. *See* GX 136. In accordance with Pember's instructions, Speaks allocated $6.5 million from deferred to immediate revenue programs. He also deferred the recognition of $3 million of solicitation costs that should have been recognized immediately. Speaks made these adjustments by adding entries to the allocations column of the projection model. **As noted above, Shelton did not receive GX 136, and there is no evidence that he otherwise knew about the $9.5 million of revenue recognition adjustments described therein.**

Corigliano testified that he discussed the allocations with Shelton on two occasions. Corigliano claimed that in February 1995, shortly after his promotion to the position of CFO, he walked into Shelton's office and disclosed his longstanding practice of making the allocations, among other accounting improprieties. Shelton denied that this conversation took place and his testimony is corroborated by other credible evidence. Tr. 11916. First, it defies reason that Corigliano would disclose his involvement in longstanding fraudulent conduct soon after his promotion. Second, Corigliano testified that he believed the allocations were immaterial, casting doubt on his claim that he flagged as problematic or improper the allocations practice. *Compare* Tr. 8334-35 *with* Tr. 6458. And, third, around this same time period, Corigliano fabricated false explanations to convince Chris McLeod that the allocations were appropriate. *See* Tr. 10874-75.

Corigliano also testified that in mid-December 1997 he told Walter Forbes and Shelton about the allocations in response to Walter Forbes's inquiry about whether there were any "smoking guns" regarding CUC's accounting. *See* Tr. 7341-42. This alleged conversation look place while Walter Forbes, Corigliano and Shelton were driving to New York City to meet with Henry Silverman to review the 1998 budget. Despite the fact that Corigliano, just several days prior on December 11, 1997, had fraudulently inflated CUC's budgeted 1998 income by $200 million – a budget which he had provided to Monaco and Scott Forbes – Corigliano purportedly focused on the allocations and other accounting adjustments that, at the time, he did not believe had a material impact on CUC's income. *See* Tr. 687-89; GX 133; GX 134. Both Kirk Shelton and Walter Forbes denied that this conversation took place. Tr. 12287, 13705.

Pember testified that in very late December 1997 or January 1998, she had a conversation with Corigliano and Shelton during which Corigliano repeatedly provided a false

explanation for the allocations. *See* Tr. 2912–14. According to Pember, Corigliano reiterated several times to Shelton that the allocations were appropriate since they were necessary for the proper implementation of Comp-U-Card's matching policy. Tr. 2913-14. Although Pember testified that during this conversation she told Shelton, over Corigliano's objections, that Corigliano's explanation was wrong, she did not testify that she told Shelton that the allocations were improper or that they had been implemented fraudulently. *See* Tr. 2914. In addition, she did not indicate whether Shelton accepted her explanation over the objections of her boss; indeed, she did not remember Shelton saying anything in this conversation. Tr. 2914-15. Corigliano denied that this conversation ever occurred. *See* Tr. 9152-53.

## V.    THE MARCH 6 MEETING

On March 6, 1998, Shelton, Corigliano, Pember, and Speaks met with Scott Forbes to discuss the 1998 budget for the former CUC side of Cendant. Menchaca attended part of the meeting but left sometime after it started to attend to other matters. Pember brought copies of GX 160 to the meeting. Tr. 2931. This two-page spreadsheet reflected the proposed reversal of reserves on a monthly basis throughout 1998. At the beginning of the meeting with Scott Forbes, Pember handed GX 160 to Shelton, who distributed the document to the others present at the meeting. Tr. 3248.

Shelton did not participate in any advance planning with Corigliano, Pember or Speaks to discuss what they were going to say to Scott Forbes regarding the anticipated use of reserves to increase earnings during 1998. Pember did not recall discussing GX 160 with Shelton prior to the meeting with Scott Forbes, *see* Tr. 3247; Corigliano recalled that he, Shelton, and Pember spoke very briefly before the March 6 meeting. Tr. 8983. Corigliano did not tell Shelton that the accounting reflected on GX 160 was improper or constituted a violation of GAAP. Nor did Corigliano, by his own admission, warn Shelton that Scott Forbes was likely to

31

view the proposed use of reserves shown in GX 160 as improper or as part of a fraudulent scheme.

At the March 6 meeting, Shelton told Scott Forbes that of the $165 million in revenues projected for 1998, $80 to $90 million consisted of anticipated gains from the Interval transaction. Tr. 7527. Speaks recalled that Shelton mentioned the fact that revenue from the deferred gain of Interval had a value of $107 million. Tr. 1163-64. Speaks recommended to Scott Forbes that E&Y should continue to audit the books and records of the Comp-U-Card division. Tr. 895-96. Corigliano and Speaks also discussed the need to hire someone to track merger expenses, Tr. 1148, given that CUC did not have a process in place by which to do so. Tr. 3493. There was nothing improper about recommending the hiring of someone to perform this task. Tr. 8983. Indeed, Speaks acknowledged that CUC's failure to charge costs to the merger reserve as they were incurred incorrectly inflated CUC's operating expenses and thereby reduced its operating income. Tr. 1148.

There was no credible evidence that Shelton attempted to recruit Scott Forbes into the alleged conspiracy. Scott Forbes was not surprised by the concept that reserves were expected to increase earnings in 1998, although he had been unaware that the amount of cost saves were greater than the $50 million he had anticipated. Tr. 6060. Speaks did not think that anyone at the meeting was asking anyone else to commit a crime. Tr. 1145. Menchaca, who received a copy of GX 160, did not understand that there was anything improper described at the meeting. Tr. 10054, 10204. Scott Forbes was confused by some of Shelton's explanations about GX 160, but after the meeting, he exchanged pleasantries with Shelton. Tr. 5781.

## VI.    THE AFTERMATH OF THE MARCH 6 MEETING

### A.    CORIGLIANO'S PREPARATION OF DX 1288

On March 7, 1998, Scott Forbes sent a fax to Michael Monaco and Henry

Silverman, attaching GX 160.  In his message to Silverman and Monaco on the fax cover page,

Scott Forbes advised that the succeeding pages had been circulated at the March 6 meeting and

formed the basis of the discussion at that meeting.  He further explained that the second page of

the attachment (GX 160) detailed how the $165 million of adjustments was budgeted into

specific revenue and expense categories.  Nothing in Scott Forbes' fax or his description of

GX 160 or the March 6 meeting sounded the alarm that the document or the meeting was an

invitation to join a fraud.

Later on that day, Scott Forbes sent a second fax to Monaco and Silverman,

attaching his summary of $45 million in "known reserve reversal[s]."  GX 380.  GX 380 reflects

that Scott Forbes already expected that a substantial amount of the 1998 earnings from the

former CUC divisions would consist of reserve reversals.  Scott Forbes was surprised only by the

amount of the reversals, which he expected to be closer to $50 million.  Tr. 6060.

After he received Scott Forbes' faxes, Monaco called Shelton and Corigliano over

the weekend of March 7 and 8 to discuss CUC's historical earnings figures for 1996 and 1997,

and the budgeted adjustments for 1998.  Tr. 1606-13.  Corigliano assured Monaco that there

were legitimate explanations for CUC's non-operating income in prior years.  Tr. 1611-12.

Corigliano told Monaco that he would create a schedule that would detail the amounts and

sources of non-operating income for 1996 and 1997, as well as for the 1998 budget.  Tr. 1613-

15.  Monaco relayed this information to Silverman, and the senior executive team agreed to meet

early Monday, March 9 to further discuss this issue.  Tr. 1614-16.

## B.     THE MARCH 9 MEETING

On the morning of March 9, 1998, Shelton, Corigliano and Walter Forbes met

with Silverman, Monaco and Scott Forbes at the Sheraton Hotel in New York City.  In the

presence of Shelton and Walter Forbes, Corigliano told Silverman, Monaco and Scott Forbes that

he had explanations for the non-operating income in the 1996 and 1997 CUC financials. Tr. 1617. Silverman directed Monaco, Scott Forbes and Corigliano to go to Stamford to review the accounting for CUC's 1996 and 1997 financial statements. Specifically, Silverman told Monaco and Scott Forbes to verify that the 1996 and 1997 restructuring reserves had not been improperly reversed into operating income. Tr. 5806. Shelton offered to accompany the group to Stamford.

At the meeting in Stamford later that day, Corigliano presented Monaco and Scott Forbes with a three-page schedule providing a detailed breakdown of the non-operating items included in the 1996 and 1997 financial statements and the 1998 budget. DX 1288. Corigliano told Monaco and Scott Forbes that the accounting for the 1996 and 1997 financial statements was appropriate, and that E&Y had approved, and was comfortable with, the accounting. Tr. 1617.

Far from hiding the reversal of reserves and other accounting items in CUC's numbers, DX 1288 showed that CUC had $112 million in non-operating income in 1996, and $144 million in non-operating income in 1997. The schedule further showed that there had been $54 million and $75 million in non-operating income from "Ideon consolidation activity" for 1996 and 1997, respectively. Corigliano told Monaco and Scott Forbes that "Ideon consolidation activity" represented ordinary expenses that had been recharacterized as merger-related expenses and charged to the reserve. Tr. 9009. The March 9 schedule also reflected that there had been $11 million of reserve adjustments for Spark Services and NUMA, as well as a $30 million increase in earnings resulting from the recalendarization of the most recent fiscal year from January 31, 1998 to December 31, 1997. Monaco and Scott Forbes were also told that approximately $50 million of the Ideon reserves had been reallocated from legal expenses to integration expenses, sometime after the favorable settlement of the Halmos litigation. Tr. 2177.

In Shelton's presence, the accountants had a vigorous discussion. Monaco and Scott Forbes vetted the use of the Ideon reserve and questioned Corigliano and Pember for hours. Pember brought in a stack of documents that showed merger-related expenses that had been charged to the Ideon reserve. Monaco and Scott Forbes determined that the use of the Ideon reserve – the charging to the reserve of merger related expenses that had initially been treated as operating expenses – had a positive $99 million P&L effect for 1996 and 1997. DX 1303; Tr. 2157, 2167, 2179.

Later, at the request of Monaco, Marc Rabinowitz of E&Y joined the meeting. Rabinowitz was the E&Y partner in charge of the CUC engagement. Monaco and Scott Forbes also examined Rabinowitz about the usage of the Ideon reserve in 1996 and 1997. Tr. 2184-85. Rabinowitz provided them with satisfactory answers regarding the usage of that reserve. Tr. 2185-88.

Monaco and Scott Forbes are not timid men. They asked all the questions they thought they had to ask, and they received answers to all of their questions. Tr. 2146-47. Monaco "got exactly what [he] was asking for." Tr. 2148. Monaco and Scott Forbes satisfied themselves, and they later satisfied Silverman, that CUC's use of reserves and its reporting of non-operating income was appropriate and comported with applicable accounting rules and regulations. Tr. 2161. Apprised of the more than $100 million in non-operating income that CUC earned in each of 1996 and 1997, Scott Forbes did not see any cause for concern: "Most companies have non-operating income, so it's not a surprise." Tr. 6133.

## C.  SILVERMAN, MONACO, AND SCOTT FORBES DID NOT BELIEVE THAT SHELTON HAD INVITED THEM TO PARTICIPATE IN A FRAUD ON MARCH 6, 1998

Although the government contended at trial that GX 160 reflected a fraudulent intention on the part of the alleged conspirators to improperly reverse $165 million into earnings,

Cendant did not tell the public in the aftermath of the March 9 meeting that its 1998 earnings would fall below expectations because CUC's previously budgeted earnings included $165 million in improper reserve reversals.  Just the opposite occurred.  Cendant did not change the budget, which maintained the same earnings projections as had appeared in GX 160.  GX 1772; Tr. 13440.  As late as April 9, 1998, Silverman advised Wall Street analysts that Cendant expected to accomplish its financial goals for 1998 – words that would not have been true had Cendant lowered its earnings estimates after March 9, 1998.  Tr. 2254.  Indeed, during the April 9 conference call with analysts, Silverman announced that Cendant was on target, not only to meet analyst expectations, but perhaps to exceed those expectations for the quarter and the year.  Tr. 13439.

Any suggestion that Cendant's senior officials had concluded that at the March 6 meeting Shelton had invited Scott Forbes or anyone else at Cendant to participate in a conspiracy is further refuted by other undisputed facts.

First, on March 30, 1998, Cendant sent a management representation letter to its outside auditors, Deloitte & Touche.  The letter, signed by each of Silverman, Monaco and Scott Forbes, confirmed that "[t]here has been no fraud involving management or employees who have significant roles in internal control."  DX 1222.  In a second letter to E&Y signed by the same three officers, Cendant wrote that there is nothing of "such significance in relation to the affairs of CMS [the former CUC] to require mention in a note to the audited consolidated financial statements in order to make them not misleading regarding the financial position, results of operations, or cash flows of CMS."  DX 1223.

Second, Silverman, Monaco and Scott Forbes each signed (and recommended that the entire Cendant board sign) Cendant's Form 10-K for the year ending December 31, 1997,

which disclosed pooled earnings for the 1996 and 1997 years and therefore included all of the

non-operating income that was reflected on DX 1288.  See DX 1283, at F-24.

Third, in the immediate aftermath of the March 6 meeting, Scott Forbes sold

60,000 shares of Cendant stock generating approximately $2.4 million in proceeds.  Tr. 5898-99.

Surely, had Scott Forbes known or believed that CUC's financial statements for 1996 or 1997

were fraudulent or that its 1998 budget included the improper reversal of reserves, he would not

have sold his stock in derogation of federal securities laws and his fiduciary duty to stockholders.

Also illustrative of the fact that no one understood Shelton to have invited the

former HFS officials to engage in a fraud is that Silverman did not fire Shelton for cause soon

after the March 6 meeting.  Had Shelton asked Scott Forbes to engage in fraudulent conduct

involving hundreds of millions of reserves, Silverman would have certainly terminated Shelton

for cause, thereby saving the company tens of millions of dollars in severance payments and

discharging his own fiduciary duty to immediately remove any officers known to be engaged in

criminal activity.  See GX 549 pp. 7-8 (terms of Shelton's employment contract); Tr. 13421-22.

Instead, even though Silverman had already made up his mind to fire Shelton several months

earlier, Shelton remained at the company until April 9 and negotiated a lucrative severance

arrangement.

### D.     THE ALLEGED COVER STORY REGARDING THE $165 MILLION IN RESERVES

Corigliano testified that in early April 1998, after Silverman had advised Walter

Forbes that he planned to terminate Shelton and Corigliano, Shelton and he came up with a cover

story regarding the plan to reverse $165 million in reserves into revenue for 1998.  Corigliano

claimed that he told Shelton they should explain that part of the $165 million was the anticipated

$80 to $90 million gain relating to Interval.  Corigliano described this explanation as a "cover

story", and said that he was "trying to give Kirk some excuses, some cover, to explain away the $165 million." Tr. 7527. Corigliano testified that at this time he sent Shelton GX 387, another version of the March 6 schedule, which contains his handwritten note in the margin: "includes $80-90 million of deferred revenue relating to servicing of [Interval] members."

Corigliano's testimony on this issue was demonstrably false. Corigliano admitted on direct examination that Shelton had already mentioned at the March 6 meeting that the $165 million included $80 to 90 million of deferred revenue and gain from the Interval transaction. Tr. 7527. Speaks also testified that Shelton mentioned the $107 million in deferred gain from Interval at the March 6 meeting. Tr. 1163-64. Moreover, Corigliano's testimony was facially implausible. If, as Corigliano testified, he and Shelton concocted this cover story in early April 1998 at the same time that Corigliano sent Shelton another copy of the March 6 schedule, there was no reason to write a notation on the schedule that the $165 million "includes $80-90 million of deferred revenue relating to servicing of [Interval] members." GX 387. Surely, Shelton would not have needed to be reminded of the cover story he and Corigliano fabricated moments earlier.

## VII.    THE DOCUMENTARY EVIDENCE DID NOT ESTABLISH SHELTON'S KNOWLEDGE OF OR PARTICIPATION IN THE FRAUD

The government contended that Pember sent Shelton emails in which she openly discussed the fraud. But those emails established that Pember never disclosed the fraud to Shelton.

### A.    "THE BLOW OUR OWN HORN" EMAIL

The government introduced a January 14, 1998 email from Pember to Shelton, entitled "Blow our own horn—I needed to vent." GX 506. In that email, Pember advised Shelton: "We have ONE person who has been doing the year end consolidation for 22

companies. (Mary). We do them manually, on excel, and deal with 22 different financial formats (As you well know). With the exception of our 'reserve adjustments', Mary is virtually done today." GX 506.

Although the government insinuated and argued that the use of the term "reserve adjustments" was nefarious, the evidence was to the contrary. Robert Sack, one of the government's accounting experts, testified that in some instances reserve adjustments were proper and could have the effect of increasing operating income. Tr. 514, 517. Robert Davidson, another government witness, also testified that reserves could be appropriately adjusted on a quarterly basis. Tr. 5625.

Pember testified that the reference to "reserve adjustments" in the email related to the use of merger reserves to increase operating income. Tr. 2681-82. But nothing in the email suggests that the reserve adjustments were improper. Indeed, Sabatino testified that if a company incorrectly recorded a merger-related expense as an operating expense, the company could properly make an adjustment to charge that expense against the merger reserve and thereby increase operating income. Tr. 5024-25.

Nor does the fact that Pember placed the term "reserve adjustments" in quotations support an argument that she was indicating to Shelton that she and her staff were engaged in improper accounting. Pember routinely used quotations in many documents, without regard to grammatical convention, for reasons wholly unrelated to the communication of illegal activity. *See, e.g.*, GX 506, DX 1445, DX 1446, DX 1447, DX 1448, DX 1449, DX 1450, DX 1451, DX 1452, DX 1453.

Pember's January 14, 1998 email also states that like CUC, HFS was conducting its own consolidations, but had an advantage over CUC because HFS's consolidation process

was "automated," whereby CUC's consolidations were done "manually."  GX 506.  Again, if Pember had intended to communicate in this email that by finalizing the consolidations the accounting staff was engaged in the final strokes of fraudulent accounting, she would not have suggested that HFS's accountants were engaged in the same process.

Shelton's response evidenced his view of Pember's email as innocuous.  Shelton replied the following day, advising Pember that he and Corigliano were "well aware of the situation and appreciate the job you guys are doing."  GX 506.  Shelton then invited Pember to "feel free to vent frequently because a) it is relatively inexpensive, b) email make it easy, c) it's more fund than consolidations, and d) no one will do it for you."  GX 506.  Had Shelton believed that Pember sent him a document disclosing fraudulent conduct, it is unfathomable that he would have responded in a chatty style, inviting her to send him more emails to report other facts about the fraud whenever she wanted.

### B.    THE GOOD NEWS/BAD NEWS EMAIL

A centerpiece of the government's case was a January 20, 1998 email (GX 519) from Pember to Shelton and Corigliano, which contained a one-page attachment setting forth financial data for various CUC business segments for the 1997 fourth quarter and year-end.  The attachment includes five footnotes that purport to explain the discrepancy between the actual fourth quarter results and the forecasted figures that had already been provided to HFS.

The subject line of the email was called "The good news and the bad news."  In the very first sentence of this email, Pember falsely told Shelton that the CUC divisions had made their numbers as a group:  "The good news is we made the numbers for the 4th quarter as indicated to NJ."  GX 519  "NJ" was a reference to the Cendant executives located in New Jersey who were the former executives of HFS.  As Pember conceded, this sentence was a lie. Tr. 3220.  Thus, in a document the government contended was a conspiratorial communication

about the fraud, it is undisputed that Pember lied to Shelton and told him that CUC as a whole had met its earnings forecasts. Pember did not recall discussing the email with Shelton, Tr. 2759, and Shelton did not recall ever receiving or reading it. Tr. 12434-35.

Despite having lied to Shelton about the company's financial performance, Pember suggested that other aspects of her email and the one-page attachment disclosed fraud to Shelton. Pember testified that the footnotes in the attachment set forth bogus explanations for the variances between the actual and forecasted earnings for certain business segments in the fourth quarter. According to Pember, footnote 1's explanation that the variance in the numbers for the membership businesses occurred as a result of "reversal of prior period reserves" was a reference to the topside adjustments. Putting aside that no reader would understand the phrase "reversal of prior period reserves," without more, to refer to topside adjustments, Pember did not understand that the reversal of prior period reserves was fraudulent. Tr. 3231-32. Nor could Pember recall why she did not just use the word "topsides" in an email she portrayed at trial as her effort to put Shelton on notice of certain accounting issues. Tr. 3226-27.

The conclusion that the "good news/bad news" email did not put Shelton on notice of fraudulent conduct is bolstered by the response of Scott Forbes and Monaco to a very similar document sent by Pember one day later. In a January 21, 1998 facsimile to Scott Forbes, Pember forwarded the same data regarding the fourth quarter earnings and forecast figures, which showed the same variances as appeared on GX 519. *See* GX 546. Scott Forbes, thereafter forwarded this document to Monaco. These discrepancies were not a red flag to Scott Forbes and Monaco who had responsibility for Cendant's financial reporting and therefore paid close attention to Cendant's earnings and forecast figures. As discussed below, Scott Forbes and Monaco were disappointed in CUC's ability to forecast its divisions' performance, but they did

not suspect a fraud. Accordingly, those same discrepancies cannot support a finding that Shelton, who was not directly responsible for Cendant's financial reporting, was aware of Pember's fraudulent activities.

Although the government has observed that the footnotes in GX 519 were different in some respects from those in GX 546, it was Corigliano, not Shelton, who suggested that Pember edit the footnotes in the facsimile she sent to Scott Forbes. Shelton, by all accounts, had nothing to do with editing the footnotes or any other part of GX 519. Tr. 2764. In any event, the footnotes in GX 546, like those in GX 519, made express reference to the use of reserves as the reason for the variance in the fourth quarter figures. Specifically, footnote 1 to GX 546 states as follows: "During the fourth quarter, any standard cost adjustments, membership reserve adjustments as well as other reserves are made on a YTD basis. The forecast for the period did not reflect these one time adjustments." GX 546.

Far from identifying a difference in substance between the footnotes in the two documents, at trial Pember was almost surprised to rediscover that the facsimile sent to Scott Forbes mentioned "membership reserve adjustments" and then, "interestingly enough, it says 'as well as other reserves are made on a year-to-day basis.'" Tr. 2764. The best Pember could say about the change in the text of the footnotes was that footnote 1 in GX 546 "was sort of vague." Tr. 2764.

Scott Forbes testified that shortly after he received the January 21, 1998 facsimile from Pember showing variances in the budget, he called Monaco, Shelton, and Corigliano. Tr. 6013. Scott Forbes and Monaco emphasized the need for the company to have accurate forecasts. Scott Forbes understood footnote 1 in GX 546 to refer to what he understood to be a "soft close," which he did not believe was illegal. Tr. 6023. Nor did the use of the term

42

"reserves" in footnote 1 cause him any concern, although he recognized that the reference could be to merger reserves. Tr. 6024-25. Based on their review and discussion of GX 546, Scott Forbes and Monaco did not form any belief that a fraud was being committed. Tr. 6025.

Nor did Monaco or Scott Forbes believe that Pember and Corigliano were involved in fraudulent conduct when on February 2, 1998, just two weeks later, Corigliano (unknown to Shelton) sent Scott Forbes a facsimile that contained substantially different revenue and EBIDTA numbers for the CUC businesses for the fourth quarter and full year of 1997. GX 376b. Scott Forbes noticed that the quarterly information for individual business segments on GX 376b differed substantially from those on GX 546, provided to him two weeks earlier on January 21, 1998. Tr. 5719. Indeed, the fourth quarter earnings figure for the Software division was approximately $30 million lower than had been previously shown on GX 546; and the fourth quarter earnings figure for the membership business unit was approximately $53 million higher. Tr. 6038-39. Monaco brought the discrepancies to the attention of Monaco and Silverman, both of whom questioned Corigliano about the changes. Corigliano told them that the discrepancies were due to the recalendarization and to the allocation of expenses among businesses  Tr. 5732-34. After Scott Forbes and a team of accountants reviewed the information provided by Corigliano, they accepted the changed numbers and permitted Silverman to issue the press release announcing Cendant's fourth quarter and year-end revenue and earnings. Tr. 5837-38.

Thus, Scott Forbes and Monaco knew that the earnings figures for CUC had changed twice – once from the forecasted numbers to those supplied by Pember on January 21, 1998 (GX 546) and then again two weeks later (GX 376b). Neither Scott Forbes nor Monaco suspected any fraud based on these changes. That Shelton was aware of the first of those changes cannot justify a finding that he knew about the fraud.

### C.    THE FORECASTS OR "CHEAT SHEETS"

Until late 1996 or early 1997, Shelton regularly received financial forecasts from Corigliano (described by Corigliano as "cheat sheets") that projected the company's earnings for current and future years.  *See* Tr. 11745-46.  Although the government argued that the so-called "cheat sheets" tracked the fraud, Corigliano omitted any mention of unsupported topside adjustments, improper accounting for cancellation reserves, improper accounting for rejects-in-transit, and the improper allocations.  Tr. 8333-34.  Nor did the forecasts document the effect on income from the allocations.  *See* Tr. 8334-35; GX 58; GX 58(a); GX 62(b); GX 1774; GX 1777.

Notably, in 1995 and 1996, the majority of the fraud came from the under-funding of the cancellation reserve and the allocation of revenue from deferred to immediate recognition programs, as established by the government's accounting expert Brian Heckler.  *See* GX 10110.  Thus, Corigliano omitted any discussion of items that comprised the majority of his fraudulent accounting practices.

Corigliano sought to justify his failure to put those items on the cheat sheet by claiming, in inherently implausible testimony, that he did not know that those items had any effect on CUC's income from 1995 to 1997.  Tr. 7544, 8335.  In Corigliano's incredible testimony, "my assumption was that we weren't getting much P&L impact in the current year."  Tr. 8335.  Thus, Corigliano testified that the majority of the fraud happened by accident or as a result of actions taken by his subordinates without his knowledge.

Yet, Corigliano testified at other points, when he thought it to his benefit, that he knew CUC was making its numbers only as a result of these accounting practices.  Tr. 6458.  Corigliano claimed that as soon as he became CFO in early 1995, he sought out a meeting with Shelton at which he purportedly told Shelton the litany of accounting misdeeds he had been perpetrating for the past several years:

I remember listing for Kirk the different membership accounting areas that were wrong, were at issue. And I remember saying, "Kirk, the membership cancellation reserve is too low, the membership – rejects-in-transit, we don't record them, some portion of it at the end of the year, and immediate revenue recognition, we move members from deferred to immediate to help us meet the numbers. Tr. 6458.

The only item of significance reflected on the cheat sheets was a line item labeled "reserves." The government argued that the cheat sheets reflected fraudulent conduct because they showed the use of reserves to increase earnings. But the evidence established use of reserves can properly increase earnings in appropriate circumstances. Specifically, reserves can increase earnings where the company had initially treated a merger related expense as an operating expense and then, at year end, appropriately charged the merger related expense against the reserve. *See, e.g*, Tr. 2166-67; 10690-91.

McLeod testified that he regularly received the forecasts. Tr. 10895. He understood the "reserve" line "to capture merger-related expenses that were being reflected in the business, the operating business units above and that should be appropriately charged to a previously established merger reserve." *Id.*

Heckler testified that McLeod's explanation made sense. Tr. 10690-91. Wall Street analysts understood that reserves could be used to increase earnings. DX 30773. Even Corigliano acknowledged that there are both proper and improper uses of reserves. Tr. 8306. Significantly, none of the forecasts ever stated that the reserves were being used improperly.

Corigliano's repeated reference to the "reserve" line on the forecasts as a "plug" further evidenced his overreaching testimony. Not only do the forecasts not use the word "plug," review of the documents establish that the "reserve" line was not a plug because its inclusion did not (as would a plug number) cause CUC to hit its earning target. *See, e.g.*, GX 58 (analysts expect 86 cents; forecast with reserves are 83.6 cents).

## VIII.    THERE WAS OTHER OVERWHELMING EVIDENCE OF SHELTON'S INNOCENCE

### A.    THE EVIDENCE OF SHELTON'S CHARACTER FOR HONESTY

The defense introduced character testimony from several prominent business and community leaders who attested to Shelton's lifelong character for honesty, truthfulness and law abidingness.  Once the defense opened the door to Shelton's character and reputation, the government was free to introduce evidence that would rebut the defense's portrayal of Shelton.  The government, however, failed to produce a scintilla of evidence that could cast doubt upon this testimony regarding Shelton's character and reputation for honesty and integrity.

Jack Skydell, a childhood friend of Shelton's for over 35 years, testified that "[t]he guy's the one guy that I can think of that I would trust with anything.  Anything about my life."  Tr. 11461.  Skydell had been a prominent investment banker at Lehman Brothers for fifteen years, and had often proposed deals to CUC.  During the years in which CUC rapidly acquired new companies, Shelton did not once accept an acquisition proposal from Skydell, even though such a transaction would have materially benefited his close friend, because Shelton did not believe the proposals were in the shareholders' best interests.

Shelton also found time in his hectic schedule to volunteer as a Board member for the Stamford YMCA.  Chuck Ainsworth, the CEO of the Stamford YMCA, testified that "[e]very experience I've had with him, he demonstrated great character and I believe him to be a very truthful human being."  Tr. 11353-54.

Ron Davis, a former CEO of Perrier and founder of the Guardian Scholars, a not-for-profit organization that raises money to enable foster children to attend college, testified that Shelton was his "moral compass" (Tr. 11432), that Shelton is "a Boy Scout" who "is honest and thoughtful and caring" (Tr. 11435), and that "I'd trust him with my last penny." (*Id.*).

Shelton's reputation within CUC was just as impressive.  Kelly Green, who had reported to Shelton for over ten years and who at various times during his CUC career managed Comp-U-Card's sales force, the EPUB division, and the company's acquisition strategy, testified Shelton "was the most truthful and honest person that I knew [at CUC].  I mean, period."  Tr. 11203.  Green's opinion was shared by McLeod who testified that Shelton "is a hard worker; very smart, a man of integrity and someone who values the company's assets as if they were his own."  Tr. 10844.  Even Corigliano admitted that Shelton had a good reputation within the company for being nice, smart and very fair.  Tr. 8839.

Historical documents corroborate these witnesses' testimony regarding Shelton's reputation for honesty and integrity.  In 1992, Shelton was offered a free room at a Walt Disney World hotel due to his position at CUC and his influence in the travel industry.  Upon his return to the office, Shelton wrote a check to CUC for $1200, the amount of the hotel room, because Shelton did not think it was right that he should receive free gifts as a result of his position at CUC.  He gave this check to Corigliano and explained his reasons for doing so.  DX 30,180; Tr. 11917-18.  No one other than Corigliano witnessed this event, and obviously Shelton was not attempting to impress anyone.  Shelton also conducted training workshops attended by hundreds of CUC employees over the years; the manuals he wrote and distributed at these workshops admonished employees to "[a]lways present honest, accurate information.  Even if it's controversial, it's important."  DX 31,000; DX 31,001; DX 31,002.  Shelton even reproved the senior management team for using the company driver for personal trips and not reimbursing the cost back to the company.  DX 427.

Even the IRS had nothing on Shelton in two audits they conducted of his personal returns.  DX 30,187; DX 30,188; DX 30,189.  In one audit, Shelton did not owe the IRS a penny

beyond what he had already paid; in the other audit, the IRS determined that Shelton had

overpaid his taxes and was entitled to a refund.

Shelton's proven character for honesty and integrity thus casts serious doubt upon

the government's allegations that he masterminded a grand fraud.  As Ron Davis explained,

Shelton "would not do anything wrong.  That's just the way he's wired."  Tr. 11435.

### B.    SHELTON DID NOT ENGAGE IN ANY DECEPTION OF E&Y

To perpetrate the fraud, the conspirators needed to deceive the auditors.

Corigliano, Pember, Kearney and Speaks worked hard to fool E&Y.  Tr. 9986-87.  They

provided E&Y with phony documents; they made up excuses for not giving other documents to

E&Y, Tr. 9986-87; and they gave E&Y phony explanations for their accounting practices.

There was no evidence that Shelton took **any** steps to deceive E&Y.  He did not

meet with the auditors on substantive accounting issues.  He did not monitor how Corigliano,

Pember, Kearney or Speaks was deceiving E&Y.  Surely, had Shelton been involved in the

fraud, he would have had a natural curiosity – if not an urgent need – to know how the

conspirators were hiding from E&Y the topside adjustments, the fraudulent use of merger

reserves, the under-funded cancel reserve, and the allocations, if each of those accounting

practices was known by Shelton to be fraudulent.  Yet, Shelton had nothing at all to do with that

process and there is no evidence that he took any steps to understand the audit process.

### C.    THE DECISION TO MERGE CUC INTO HFS MADE NO SENSE IF SHELTON KNEW ABOUT THE FRAUD

Shelton's willingness to merge CUC with HFS is directly at odds with the

suggestion that he had fraudulent knowledge.  Had Shelton been participating in the fraud, the

last thing he would have wanted was to merge with HFS and cede control over CUC's financial

and accounting function to Silverman, Monaco and Scott Forbes.  Yet, Walter Forbes and

Shelton agreed to put Silverman in complete control of the combined company. They allowed Silverman to choose the CFO, the Chief Accounting Officer, the general counsel, and the outside law firm. Of special note is that Shelton allowed Silverman to pick the outside auditor for the new company. Walter Forbes and Shelton did not oppose any of Silverman's choices.

CUC did not have to agree to the merger to perpetuate the fraud. In January 1997 and again in April 1997, Silverman made clear to Shelton that Silverman was willing to sell HFS to CUC. Had Shelton agreed to pay Silverman's price, CUC could have acquired HFS and taken control of the accounting and financial functions of the combined entity. Tr. 12222; Tr. 307-09. Certainly, if the merger had been necessary to perpetrate the fraud, Shelton and Walter Forbes would not have thought twice to use stockholder money to purchase HFS and retain control.

Nor was a merger with HFS necessary to keep the fraud going. Corigliano's suggestion that CUC needed to merge with another company to build yet additional merger reserves does not explain why Shelton agreed to merge with HFS and cede control of CUC's accounting to Silverman. As was demonstrated at trial, CUC had received overtures from numerous companies looking for a merger or acquisition. DX 30594, 30654, 30656, 30661, 30663, 30666, 30667, 30672, 30673, 30675, 30676, 30678, 30679, 30680, 30684, 30687, 30689, 30692, 30693, 30694, 30719, 30734, 30755, 30862, 30863, 30869, 30888, 30890.

The absence of any urgency to merge with HFS is also evidenced by an April 15, 1997 memo Shelton sent to CUC's senior management team. DX 31024. In his memo, Shelton sought to schedule a two-day "acquisition meeting" in Vail for July 24 and 25. The lack of any urgency was also confirmed by Kelly Green, the former executive responsible for evaluating potential acquisitions, who testified that he never felt pressured to make an acquisition. Tr. 11211.

### D.     SHELTON'S CONSCIOUSNESS OF INNOCENCE

There was substantial evidence of Shelton's consciousness of innocence.  First, Shelton voluntarily produced all of the relevant documents in his possession to the Audit Committee investigators.  Tr. 12517.  Shelton also produced his laptop computer to the Audit Committee investigators.  Tr. 12515.  There was no evidence, in stark contrast to Corigliano, that Shelton deleted any files in his laptop before turning it over.  Tr. 12515.

Second, many of the materials the government used on cross-examination were documents that Shelton had willingly turned over to the government.  The government confronted Shelton with various copies of documents handed out on March 6 and March 9, *see* GX 382, 382(a), 387, DX 1289; budget documents that showed the anticipated earnings for some of the CUC divisions, *see* GX 523, 554, 1733, 1737; and employee reviews that discussed estimated earnings for some of the divisions, *see* GX 1734, 1735.

Third, unlike Pember and Corigliano, Shelton was voluntarily interviewed by the Audit Committee investigators on four separate occasions.  Tr. 12529.  The total time he spent with the investigators was in the range of 15 to 20 hours.  *Id.*  Shelton answered all of the questions the investigators posed to him.

Fourth, Shelton voluntarily met with representatives of the U.S. Attorney's Office for two full days.  Tr. 12531-32.  Although the government sought to suggest that, at his second meeting with the government, Shelton left early to avoid answering questions, in fact Shelton stayed all day and left only on the advice of his counsel and after he missed his flight.  Tr. 13288-89.

IX.    **SABATINO'S TESTIMONY WAS INSUFFICIENT EVIDENCE OF SHELTON'S GUILT**

A.    **THE ALLEGED "POP-IN" MEETING**

Sabatino testified about one occasion during which he and Corigliano discussed making topside adjustments for a particular quarter.  Shelton "popped in" for about 15 seconds. Corigliano immediately looked up and asked Shelton whether he wanted earnings to be X or Y, where the difference between the two numbers was one penny.  Tr. 4076-77.  Sabatino did not say that Shelton heard or was even present for any portion of his conversation with Corigliano about making unsupported topside adjustments.

Nothing was said during this alleged 15 second conversation that would have alerted Shelton to Corigliano and Sabatino's fraudulent conduct.  Accountants have a large degree of discretion within the applicable accounting rules at the end of a reporting period about how much to report in earnings.  Sabatino explained that a reserve adjustment as small as $50,000 could affect earnings by a penny.  Tr. 4616.  Professor Sack and Davidson both testified that public companies have legitimate flexibility in establishing reserves.  Tr. 503-04, 508-12, 5631.  Davidson specifically testified that adjustments made to reserves could affect earnings per share by two or three cents over the course of a year.  Tr. 5629-30.

B.    **THE ALLEGED MEETING REGARDING GX 530**

Sabatino testified that he was present at a meeting at which Shelton was given a copy of GX 530, a one-page document that itemizes $223 million of adjustments that were added to CUC's budgeted earnings of $586.5 million for 1998.  The document indicates one of the adjustments was an anticipated transfer of $110 million of reserves to revenue.  The document also reflects that, subsequent to the mid-December 1997 budget meeting, the total budgeted earnings for 1998 had been reduced by $25 million as a result of a downward adjustment to the

Software division's earnings.

Sabatino testified that toward the end of the meeting, Shelton tore up a document, although Sabatino did not know whether the document Shelton tore up was GX 530 or a different document. Tr. 4589-90. Sabatino testified that after the meeting, Pember told him that she did not think that Shelton was taking her seriously. In contrast to Pember and Corigliano, Sabatino claimed that Corigliano was present at this meeting.

Sabatino's trial testimony occurred some six and a half years after the supposed incident. When Sabatino was interviewed by the Audit Committee over the summer of 1998, although he had already begun cooperating with the government, he told the Audit Committee's counsel that he had never seen GX 530 before. He also told the Audit Committee's counsel that he had never heard the phrase "reserves are being managed to meet quarterly targets," a phrase which appears on the face of GX 530. Tr. 10499.

Sabatino, in fact, did not tell anyone that he recognized GX 530 or that he had attended a meeting at which Shelton tore up a document either at his two Audit Committee meetings or at his first five meetings with the government. Tr. 4564-87. The first time Sabatino mentioned the "tear-up" meeting was at his sixth meeting with the government on October 4, 1999, more than a year and a half after the supposed event. The only significant intervening event between Sabatino's fifth meeting with the government (on September 15, 1999), where he did not mention the alleged incident, and his sixth meeting with the government (on October 4, 1999), where he first disclosed the incident, was Pember's agreement to cooperate with the government. Pember signed her plea agreement on September 23, 1999. GX 1759.

## X.    THE OVERWHELMING EVIDENCE ESTABLISHED THAT PEMBER GAVE FALSE TESTIMONY ON MATERIAL MATTERS

### A.    PEMBER WAS A PRACTICED LIAR

In 1989, Pember was hired as the controller of the Comp-U-Card division.  In the summer of 1997, she was promoted to the position of controller for all of CUC.  Along with Corigliano, she had been deeply involved in accounting manipulations for years.  At least as early as 1990, Pember had used bogus cancellation rates to justify the maintenance of an under-funded cancellation reserve and had participated in the improper allocation of revenue from deferred recognition programs to immediate recognition programs.  Pember routinely lied to E&Y about CUC's accounting practices, including its manipulation of reserves.  Tr. 2516, 2529; GX 484.  She also hid false and deceptive accounting documents from E&Y.  Tr. 2994, 2998. GX 136, 484, 512.

### B.    PEMBER'S MOTIVE TO LIE

Pember had powerful motives to falsify her testimony.

First, she received substantial benefits from her plea agreement.  The government charged Pember with only a single count of conspiracy to commit mail and wire fraud, exposing Pember to a maximum possible sentence of just five years' imprisonment.  Tr. 3113.  The government stipulated that a loss amount in excess of $80 million overstated the seriousness of her involvement in the alleged fraud.  Tr. 3267; GX 1759.  The government also stipulated that Pember did not participate in the fraud for her own personal financial gain, *see* GX 1759, even though Pember sold millions of dollars worth of CUC stock in the year before the disclosure of the fraud.  The government further agreed that an order of restitution would be inappropriate against Pember.

Pember agreed in her plea agreement to use "her best efforts" to settle any claims

brought by the SEC to disgorge proceeds she received from her sales of CUC and Cendant stock. GX 1759.  Although the SEC later brought a disgorgement suit against Pember (Tr. 3160), Pember had not settled that lawsuit by the time of her trial testimony more than four years later, asserting in the face of a mountain of evidence to the contrary that she had not knowingly engaged in any wrongful activity by selling her CUC and Cendant stock.  Tr. 3135, 3160.

Second, Pember has an incentive to do whatever she can to stay out of prison. Aside from the normal human desire to avoid incarceration, for years Pember has provided the principal financial support for her family.  She and her husband Carlton have three children, aged 12, 15 and 17.  Tr. 3080.  Her husband has survived both cancer and heart surgery.  Tr. 3080. Pember acknowledged her concern that, if she were incarcerated, her husband might not be able to support the family.  Tr. 3080.

## C.    PEMBER'S FALSE TESTIMONY CONCERNING HER STOCK SALES

Pember sold over $3.6 million of CUC stock during the period that she worked at CUC.  She sold more than $2 million of CUC stock in the period between May 1997 and April 1998, before the disclosure of the fraud.  Tr. 3153.  Although Pember admitted to lying to the auditors, creating false accounting documents, and inflating CUC's earnings from 1990 to 1998, she testified that she "did not, in my head, think that the things that I was doing was criminal." Tr. 3097.  She further testified that despite her role in overstating CUC's earnings, she "didn't believe that the stock was overstated" and did not think that she had affected the stock price by her improper conduct.  Tr. 3135.  Compounding her already incredible testimony, Pember stated under oath that her role in the undisclosed fraud did not give her "inside information" or an advantage the rest of the investing public did not have.  Tr. 3154.

Thus, one of the government's two principal witnesses of supposed conspiratorial

conversations with Kirk Shelton maintained that she herself did not believe she was committing

a crime at CUC and that she did not believe CUC's stock price was overstated.  Pember's

desperation to aid the government in its case against Kirk Shelton was evidenced by her various

lies regarding supposed conversations with Shelton in which they discussed fraudulent

accounting, all the while trying to maintain that she had been unaware of her own criminality.[6]

### D.    PEMBER'S FALSE TESTIMONY CONCERNING THE ESTABLISHMENT OF THE CENDANT MERGER RESERVE

Pember gave false testimony about the so-called "cushion document" (GX 493), a

three-page schedule that broke down CUC's merger-related costs in connection with the HFS

transaction.  Pember testified that a column on the schedule called "Total Cushion" reflected that

part of the Cendant merger reserve that was "excess" and could be used to inflate earnings.  The

total amount listed in the "Total Cushion" column was $364.6 million.

Pember claimed that she created schedule reflected on GX 493 for the first time in

the fall of 1997.  Tr. 2567.  She testified that she prepared numerous iterations of this schedule,

adjusting the entries over time, each time saving the document over the previous version of the

schedule.  *Id*.  On direct examination, Pember testified on three separate occasions that she

showed to Shelton the exact version of the cushion document that was GX 493.  Tr. 2568, 2569,

2571.  She also testified that she showed Shelton prior versions of GX 493, none of which had

been admitted into evidence.  Tr. 2569.  Pember claimed that she reviewed various versions of

the cushion document with Shelton and Corigliano after they met with Kenneth Wilchfort, Marc

Rabinowitz and Simon Wood of E&Y to discuss the establishment of the Cendant merger

reserve.  Tr. 2572.

---

[6] The SEC sued Pember for unjust enrichment based on gains she made on the sale of her CUC stock before the price plummeted after the disclosure of the fraud.  On cross examination, Pember admitted that the SEC's suit sought the disgorgement of gains she made on the sale of her CUC stock.  Tr. 3156, 3836.

Pember testified that she had a clear recollection of her and Shelton attending four or five meetings with the E&Y auditors to discuss the size of the Cendant merger reserve.  Tr. 3008-09, 3012.  Pember claimed that at each of these meetings, she handed out a copy of a prior version of GX 493 that did not contain the column "Total Cushion", thus hiding from the E&Y auditors the large amount of "excess" in the Cendant merger reserve.  Tr. 2573-74.  Pember claimed that after the meetings with the auditors, she handed out to Corigliano and Shelton the predecessor version of GX 493 that contained the "Total Cushion" column.  *Id*.  Asked if she would change her testimony if she learned that Wilchfort, Rabinowitz, and Wood testified under oath that they had never attended a meeting with Shelton to discuss the Cendant merger reserve, Pember testified that she would not.  Tr. 3012-13, 3017-18.

The defense thereafter called the three E&Y auditors:  Wilchfort, Rabinowitz, and Wood.  Each testified that he had never attended any meetings with Shelton, Corigliano and Pember where they reviewed a schedule relating to the establishment of the Cendant merger reserve.  Tr. 11142, 11147, 11153.  The government refused to acknowledge Pember's false testimony.  The government later cross-examined each of these witnesses and sought to establish that it was possible, during a phone call with Corigliano and Pember, that Shelton may have been in the room unbeknownst to the auditors.  Tr. 11144-45, 11149-50, 11154-55.  Pember's testimony that she and Shelton had attended, in person, four or five meetings with the E&Y auditors to discuss the Cendant merger reserve was false and should have been so acknowledged by the government.

Pember also changed her story about when she had given GX 493 to Shelton, and what version of the schedule she showed him.  On direct examination, Pember unequivocally testified that she had given Shelton GX 493, the version of the cushion document the government

admitted into evidence.  Tr. 2568.  On cross examination, Pember admitted that she did not know

if she had given Shelton GX 493, because that document contained a column "Used at 12/31/97"

and she was not sure Shelton had ever received this version.  Tr. 3387-88.  On recross-

examination, Pember twice confirmed that she did not recall whether she had given Shelton the

final version of the cushion document, which was GX 493.  Tr. 3841, 3844-45.  Nor did the

government introduce any prior versions of GX 493, which Pember claimed she had handed out

to Shelton and Corigliano.  Pember had no explanation as to what had happened to the prior

versions of GX 493 she claimed she had given to Shelton on at least four or five prior occasions.

Tr. 3844-45.

Pember also lied when she testified that she had general discussions with Shelton

about a purported "cushion" in the Cendant reserve.  She testified that she spoke to Shelton about

the cushion in the Cendant reserve on a "couple" of occasions between October 1997 and

January 1998.  Tr. 2600-01.  But, on cross examination, Pember admitted that she did not believe

that she and Shelton had ever used the word "cushion" in any of their conversations.  Tr. 3842.

### E.  PEMBER'S FALSE TESTIMONY CONCERNING HER MEETING WITH SHELTON TO OBTAIN HIS APPROVAL TO GIVE THE INFLATED BUDGET TO HFS

Pember lied when she concocted an elaborate story about how she had given

Shelton GX 530, the one-page spreadsheet showing the budgeted earnings for the former CUC

divisions in calendar year 1998.  Pember contended that she showed GX 530 to Shelton to get his

permission for her to disclose false budget information to HFS.  Tr. 2840.  Pember claimed that

she and Sabatino were concerned about making the adjustments to CUC's 1998 budgeted

earnings reflected on GX 530, which had the effect of inflating the amount of CUC's expected

income by nearly $200 million.  Tr. 2840.  Pember testified that she wanted to make sure that

Shelton was aware of the adjustments before they were sent to HFS.  *Id.*  She contended that she

prepared GX 530 in mid-December and gave it to Shelton a few days later.  Tr. 2841-42.

Pember's testimony was full of holes.  First, Pember had already arranged for the revised budgeted numbers reflected on GX 530 to be given to HFS at the December 11, 1997 division controllers' meeting.  Tr. 3046.  Shelton was not consulted before Speaks, at the direction of Corigliano and Pember, presented CUC's budgeted earnings figures at this meeting.  *Id*.  Confronted with Speaks' testimony, Pember conceded on cross examination that when she went to Shelton for his authorization to present the forecasted earnings figures in GX 530 to HFS, those same numbers had already been presented to HFS several days earlier.  *Id*.

Second, Pember admitted that by January 1998, there was no point in asking Shelton for his permission to give the budget information to HFS.  Tr. 3365.  As Pember explained on redirect examination, "The budget with the adjustments had already been given to HFS.  So going to Shelton as late as January or the third week in January would have seemed pointless because HFS already had the adjusted budget, so why would I be asking Shelton his okay, or providing him information that HFS had had for at least several weeks at that point."  Tr. 3772-73.

The evidence conclusively demonstrated that Pember could not have met with Shelton regarding GX 530 in December 1997, when she claims to have sought and obtained his permission to provide bogus earnings figures to HFS.  Rather, GX 530 had not been created until January 1998, a point in time when Pember conceded it would have made no sense to give Shelton the document.  The evidence establishing that GX 530 was not created until January 1998 is overwhelming.  For starters, at the bottom of GX 530 is a footnote that states that "all these items were communicated to HFS in mid-December."  Had GX 530 been prepared in mid-December, as Pember claims, she would not have referred to something that had just taken place

as having occurred "in mid-December."  The author may have written that the information "was communicated" to HFS "last week," "several days ago," or "yesterday."  It is implausible that Pember would have used the phrase "mid-December" to refer to an event a few days prior.

In addition, GX 530 reflects a negative $25 million "Software adjustment" that lowered the total forecasted earnings from $833,500 to $808,500.  The evidence was uncontradicted that this adjustment was not made until sometime in the third week of January.  GX 1733, a page from the Cendant business plan for 1998, shows that the earnings forecast for the Software division was adjusted from $115 million to $90 million on January 16, 1998.  The defense also introduced DX 1853, a one-page document bearing Pember's handwriting, showing that the software budget was reduced from $115 million to $90 million as of "1/21/98."  DX 1853; Tr. 3358-60.  Finally, the defense introduced the very document by which Pember was put on notice that the software budget was being reduced from $115 million to $90 million:  a January 19, 1998 email from Sabatino to Pember and others showing a budget of "$90,682,000" for Cendant Software's divisions, for fiscal year ending 12/31/98.  Plainly, if the Software budget had not been negatively adjusted until January 1998, Pember could not have created GX 530 and given it to Shelton in December 1997 as she claimed.

Confronted with overwhelming evidence that Pember had not learned about the Software adjustment until January 19, 1998, Pember continued to prevaricate.  She changed her testimony to say that even if the Software adjustment did not formally take place until January 1998, then she must have known ahead of time that a negative adjustment in the precise amount of $25 million was being contemplated.  Tr. 3855-56.  When asked from whom she could have learned in mid-December about a potential adjustment not made until January 1998, Pember had no explanation and simply said: "potentially Corigliano."  Tr. 3856-57.

Thus, implausible as it was, Pember stuck to her story that GX 530 was created in December 1997 because she recognized that it would have been pointless to give Kirk Shelton that document in January 1998. Pember gave that testimony unaware Shelton would introduce forensic evidence establishing that GX 530 was created on January 13, 1998 and that it was last modified on her computer on January 21, 1998. Tr. 11306-09; DX 31298 (last page identical to GX 530).

Pember compounded her lies still further when she disclaimed knowledge of the first six pages of DX 31298. The first six pages were replete with examples of the fraudulent accounting machinations in which Pember was engaged. Those pages showed how Pember planned on "spread[ing]" the Ideon reserve among "various div[isions] & areas" and "leav[ing] nothing remaining." They reflected how she planned to move $6 million from deferred recognition programs to "CUC immediate revenue." And they indicated how Pember planned on using "[e]xisting reserves" to add $19 million to the Comp-U-Card division, $20 million to the NAOG and NUMA divisions, and $9.5 million to Spark. Notwithstanding that this document was retrieved from Pember's computer, she claimed that she did not recognize the document and therefore it is plain that she never gave it to Shelton. Tr. 3365-67.[7]

### F.    PEMBER'S FALSE TESTIMONY ABOUT DISCUSSIONS WITH SHELTON REGARDING IMPROPER ACCOUNTING AT CUC

As set forth above, Pember falsely testified that at the end of 1997 or the beginning of 1998, she had several conversations with Shelton about the cancellation reserve and the rejects-in-transit.

---

[7] The overwhelming evidence that GX 530 was not created until mid-January 1998 not only undermines Pember's testimony on this issue, it also contradicts Corigliano's testimony concerning GX 530. Corigliano claimed that he gave Pember information regarding the 1998 budget on or about December 16, 1997, and that Pember prepared GX 530 shortly thereafter. Tr. 7403-04. That version of events cannot be squared with the facts.

In stark contrast to Pember's claim, Speaks testified that from late 1997 until late March 1998, he repeatedly raised with Pember the impropriety of CUC's accounting practices and that in each instance Pember replied that she needed to talk with Shelton and Corigliano about these issues. Tr. 1015-17. Speaks testified that as far as he knew, Pember never spoke to Shelton about any of these accounting issues. Tr. 1015. The documentary evidence, including Speaks' emails to Pember of March 4, 1998 (GX 534) and March 31, 1998 (GX 537) supports Speaks' testimony.

Left unanswered by the government was why, if Pember had already raised these accounting issues with Shelton in December 1997 or January 1998 as she claimed, she did not simply tell Speaks of this fact to quell his oft-raised concerns that Shelton be told of these issues. Nor does the government have an explanation as to why Pember did not forward either of Speaks' emails to Shelton given her claim that she had already put Shelton on notice of these issues.

### G.    PEMBER'S FALSE TESTIMONY CONCERNING THE USAGE OF THE IDEON RESERVE

Around March 1997, Pember created GX 484, a one-page summary that described for the auditors the current state of the Ideon reserve. During an interview with the government, Pember told the government that, with the lone exception of the line item entitled "operation integration charges not detailed above" in the amount of $21,139,668, the schedule represented her good-faith estimates of actual merger-related costs that were to be charged against the Ideon reserve. Tr. 11406. In contrast, Pember testified at trial that as much as $61 million of the reserve usage on this schedule was inaccurate. Tr. 2511-13.

### H.    PEMBER'S FALSE TESTIMONY CONCERNING THE AMOUNT OF EXCESS IN THE CENDANT RESERVE

When reviewing GX 493, the "cushion document," Pember testified that an

example of the "cushion" in the Cendant reserve was an anticipated $15 million expense for public relations relating to the change of the company's name from CUC to "Cendant."  Tr. 2587.  Pember claimed that $14 million of the $15 million reserve for this expenses was "excess."  Tr. 2587-88.

Scott Forbes, however, testified that it was appropriate to include $15 million in the Cendant reserve for costs associated with the company's name change.  Tr. 5977.  Indeed, as evidenced by a memorandum Scott Forbes prepared by March 20, 1998, Cendant had incurred at least $12 million of expenses related to the company's name change, all of which had been charged to the Cendant merger reserves.  DX 2184; Tr. 5980-81.

## XI. THE OVERWHELMING EVIDENCE ESTABLISHED THAT CORIGLIANO GAVE FALSE TESTIMONY ON MATERIAL MATTERS

Corigliano has never stopped lying.  He lied in his initial interviews with the government before he began cooperating; he lied in his interviews with the government after he began cooperating; and he lied repeatedly at trial.  His testimony should be rejected in its entirety.

### A. CORIGLIANO'S INITIAL INTERVIEWS WITH THE GOVERNMENT

Corigliano lied in his initial interviews with the government in January 1999.  At that time, he told the government that he did not know about unsupported topside adjustments.  Tr. 7642.  He sought to place blame on Sabatino, his friend and work colleague for 14 years.  Tr. 7628-29.  He also claimed that he was not involved in the creation of phony journal entries, seeking to push responsibility entirely on Pember, his friend of 19 years.  Tr. 7627, 7660.

At the time Corigliano began to provide the government with inculpatory information concerning Shelton, he knew that the government disbelieved his claims of innocence at the January 1999 proffer session.  He also knew that Sabatino, Speaks and Pember

had already agreed to cooperate against him. He knew that he faced a long prison sentence if he were convicted of charges relating to the fraud that he had perpetrated for the better part of a decade. Corigliano had every reason to conclude that his usefulness as a cooperating witness depended on whether he could inculpate persons above him, not below him, at CUC. That left two people for him to principally target: Shelton and Walter Forbes.

### B. CORIGLIANO'S FALSE TESTIMONY CONCERNING HIS STOCK SALES

Corigliano provided facially incredible testimony about his sale of more than $23 million in CUC and Cendant stock between 1995 and 1998. He testified that his decision to sell his CUC stock was completely divorced from the decade-long scheme to defraud the investing public. Corigliano claimed that he did not "connect" in his own mind the fact that the CUC stock price might be inflated by his own misconduct at the time he sold his stock. Tr. 7588-90. In Corigliano's memorable phrase: "I didn't do the fraud to get rich, but I got rich doing the fraud." Tr. 7984.

### C. CORIGLIANO'S FALSE TESTIMONY CONCERNING HIS ROLE IN MAKING THE TOPSIDE ADJUSTMENTS

In the face of substantial testimony and documentary evidence to the contrary, Corigliano testified that he had only limited involvement in the topside adjustments. According to Corigliano, he simply gave the quarterly earnings figure that he wanted CUC to meet and Sabatino did the rest, deciding which bogus accounting entries to make in order to achieve that result. Tr. 7087-88. In Corigliano's words: "I don't know exactly what he was doing. I knew he was making adjustments and I knew I saw income statements that had the number that I was expecting it to be." Tr. 7088. Corigliano claimed that he did not remember Sabatino ever showing him the actual quarterly financial results before Corigliano decided what the targeted EPS should be. Tr. 8513, 8518.

Sabatino and Kearney placed Corigliano squarely in the center of the topside process. Sabatino testified that he had "numerous" meetings, at least once each quarter, where Corigliano directed him to make unsupported topside adjustments. Tr. 4058. According to Sabatino, Corigliano took the consolidation spreadsheet, with the actual financial results, and he would "start adjusting line items with a regular pen right next to each line item." Tr. 4060. Corigliano was so specific that he gave Sabatino exact numbers to add or subtract to the actual results. Tr. 4677. Kearney similarly received instructions directly from Corigliano regarding unsupported topside adjustments. Tr. 9726.

### D.    CORIGLIANO'S FALSE TESTIMONY CONCERNING GX 613

GX 613, a March 4, 1998 memorandum from Walter Forbes to Monaco and Silverman. On direct examination, Corigliano testified that the first time he saw he memo was when "Kirk came into my office" with a copy. Tr. 7428. Corigliano then explained why the memo concerned him and how it conflicted with another memo that he had provided to Walter Forbes. Tr. 7429-32. He proceeded to testify about an alleged conversation that he and Shelton had about the memo. Tr. 7433. On cross-examination, Corigliano denied that he had drafted the memo and denied that a copy of the memo was on his computer. Tr. 9244.

On his direct case, Shelton called David Stenhouse, a forensic computer expert, who testified that after performing a forensic analysis of the hard drive on Corigliano's computer, he had retrieved a copy of GX 613, a file that had been created on Corigliano's computer before March 4, 1998 and was last edited in the early morning of March 4, 1998. *See* Tr. 11314-17. The government offered no explanation for how a document that Shelton allegedly "handed" to Corigliano on March 4, 1998 came to be first saved on Corigliano's computer before that date.

64

### E.    CORIGLIANO'S FALSE TESTIMONY CONCERNING HIS DESTRUCTION OF DOCUMENTS

On direct examination, the government elicited false testimony from Corigliano about his decision to destroy documents.  Consistent with his pattern of blaming Kirk Shelton for his own actions, Corigliano claimed that on April 15, 1998, he deleted "cheat sheets" in response to a conversation with Shelton.  Tr. 7553.  Corigliano denied that he destroyed his files after talking to Lipton.  Tr. 9247.

Special Agent Mark Gerber, a witness called by the defense, contradicted Corigliano on this issue.  Gerber testified that at a February 10, 2000 interview with the government, Corigliano gave a different version of the events surrounding the destruction of his computer files.  Corigliano advised government representatives that sometime in March 1998 he had walked into Amy Lipton's office and saw her doing some housecleaning.  Lipton told Corigliano that she was concerned that Silverman might lock them out of their offices.  After thinking about what Lipton told him, Corigliano went back to his office and packed up some of his personal effects.  He also threw out some cheat sheets and deleted some computer files.  Tr. 11553-56.

By February 10, 2000, Corigliano was actively seeking to cooperate against Shelton. Yet Corigliano made no mention of Shelton at that interview when he told the government about his destruction of his files.  In February 2000, the document destruction had been based on an innocuous conversation with Amy Lipton.  By the time of trial, Corigliano had created a new explanation to allow Corigliano's document destruction to incriminate Kirk Shelton.

**F.    CORIGLIANO'S FALSE TESTIMONY CONCERNING THE
        SWEEPING FOR ELECTRONIC LISTENING DEVICES AT
        CUC'S OFFICES**

Corigliano testified that in or about October 1997, Walter Forbes told him that he wanted to have the CUC offices swept for "bugs" -- electronic listening devices – because he did not want Silverman listening to any of their conversations.  Tr. 7344, 7347.  Corigliano testified that he made arrangements for the E.E.D. company to sweep for bugs after regular business hours, and Corigliano identified an invoice signed by Rainer Melucci of E.E.D., which Corigliano testified bore the date of November 17, 1997.  Tr. 7348.

On cross examination, however, Corigliano was shown other pages of this invoice, which reflected that the date E.E.D. performed the bug sweeping was not November 17, 1997, but exactly one year earlier on November 17, 1996.  GX 430.  The defense thereafter introduced a page from Corigliano's personal calendar showing that he had met with a person named "Melucci" on November 16, 1996.  The defense also introduced CUC books and records showing that CUC had paid a $2500 invoice to E.E.D. on November 17, 1996.  DX 1083, 1084.

After being confronted with the overwhelming evidence that the bug sweeping incident occurred in November 1996, not November 1997, Corigliano admitted that he was mistaken about the date of the bug sweeping, and retracted his testimony about the precise date of the incident.  Tr. 9662.  Corigliano sought to minimize his false testimony, testifying that it "[t]urned out that I had my dates wrong," Tr. 9663, and contending for the first time that "I was never sure of the times" of the bug sweeping.  Tr. 9661.  Try as he might, Corigliano could not minimize the significance of the change of dates.  Because the bug sweeping took place in November 1996, it could not have been done in connection with any concern Walter Forbes or anyone else had about Silverman.

The bug sweeping anecdote reveals the manner in which Corigliano approached

66

his testimony. Corigliano took a couple of pieces of paper about bug sweeping and molded his

testimony to make the paper look like corroboration for his story. Corigliano then created out of

whole cloth a nefarious explanation for the bug sweeping, which was completely fictitious.

### G.    CORIGLIANO'S FALSE TESTIMONY CONCERNING HIS MEETING WITH SPEAKS BEFORE THE DECEMBER 11, 1997 DIVISIONAL CONTROLLERS' MEETING

Corigliano testified that he had nothing to do with increasing the 1998 budget for

the Comp-U-Card division in advance of the December 11, 1997 divisional controllers' meeting.

Tr. 8919. He denied taking the original schedule prepared by Speaks (GX 133) and deciding

with Pember what specific changes to make to the revenue and earnings figures for the Comp-U-

Card division. Tr. 8919-20. According to Corigliano, when he met with Pember and Speaks on

this issue, they already had made the bogus adjustments to Comp-U-Card's revenues and

earnings. Corigliano claimed that Pember told him that she was going to have Speaks present

the revised schedule at the divisional controllers' meeting. *Id.*

Speaks left no doubt about Corigliano's much more central role in the process.

Speaks testified that when he met with Corigliano and Pember immediately before the divisional

controllers' meeting, Corigliano himself revised GX 133 and came up with the numbers to plug

into the revised schedule. Tr. 684-85. Contrary to Corigliano's testimony that it was Pember

alone who instructed Speaks to present the revised schedule (GX 134) at the divisional

controllers' meeting, Speaks recalled that the instruction came from both Pember and Corigliano.

Tr. 690.

### H.    CORIGLIANO'S FALSE TESTIMONY CONCERNING THE JANUARY 1997 BOARD MEETING

Corigliano claimed that at the January 1997 board meeting, Shelton directed him

to remove the EPS figure and the reserve information from the January 1997 budget document

67

because Shelton did not want the board to see that operating earnings (before the reserve adjustments) would fall short of the earnings estimates the company was providing Wall Street. Tr. 6886-87. At trial, the defense introduced the January 1996 budget presented to the board of directors. That budget did not contain an EPS figure. DX 31273 (page stamped CKM 21011).

Thus, Corigliano's testimony about the need to remove an EPS figure from the budget shown to the board makes no sense. It had not been CUC's (or Corigliano's) practice to include an EPS figure on the budget. Accordingly, Corigliano would have had no reason to insert that figure into the 1997 budget presentation to the extent he claims to have been concerned about sharing that information with the board. Given that the prior year's budget also did not contain an EPS figure, there is no reason to conclude that CUC even included such a figure in the budgets presented to the board.

## I.    CORIGLIANO'S FALSE TESTIMONY CONCERNING THE ESTABLISHMENT OF EXCESS RESERVES AT ESSEX

Corigliano testified that in connection with CUC's acquisition of Essex, he and Stu Bell instructed Thomas Albright to increase Essex's reserves by more than $1 million. Tr. 6401. Corigliano testified that there was "no basis in fact" for these reserves. Tr. 6401-02. Corigliano claimed that the vast majority of these reserves were "cushion" and that Albright knew it. Tr. 8855-56. But Albright, a government witness, did not think that this level of reserves was improper. Tr. 3963. Nor did Albright believe that the items against which Essex took reserves were inappropriate expenses for which to establish reserves. Tr. 3963.

## J.    CORIGLIANO'S FALSE TESTIMONY CONCERNING THE ESTABLISHMENT OF EXCESS RESERVES AT GETKO

Corigliano lied about GX 55, a one-page spreadsheet related to reserves for Getting to Know You ("GETKO"). Corigliano testified that the columns on GX 55 labeled "CUC Cushion" represented improper, excess reserves. Tr. 6536. Corigliano testified that

"[t]his is an example of creating reserves, creating excess reserves so that at some future time we could take these reserves in, these monies in and increase our operating earnings." Tr. 6538. Based on the presence of Shelton's handwriting on the document, the government contended that Shelton knew that the GETKO reserve was inflated and would be used to inflate earnings improperly.

Joel Zychick, the former CFO of GETKO, was responsible for the establishment of these reserves at GETKO. An experienced businessman and lawyer, Zychick explained that he and Corigliano discussed the establishment of reserves for the GETKO merger and that there was never any suggestion that Corigliano was asking him to do something improper. Tr. 11170. Zychick sent to Corigliano a range of reserves to take for various expense items, and Corigliano expressed the view that GETKO should take the high end of the ranges proposed by Zychick. Tr. 11171-72. Zychick thought that the reserves they ultimately established were "conservative" and "appropriate." Tr. 11173. In setting up these reserves, Zychick also consulted Michael Acampora, the CFO of GETKO. According to Zychick, Acampora thought that the "high end of the range was where I should have started. He thought that I was being not conservative enough by choosing the numbers I chose." Tr. 11174.

Zychick specifically refuted Corigliano's testimony that there was anything nefarious about the columns labeled "CUC Cushion" in GX 55. Zychick received a copy of GX 55 from Corigliano at a meeting attended by Shelton and others. Tr. 11177. At the meeting, Corigliano explained that these columns represented the changes to the initial reserve estimates Zychick had made based on conversations with Corigliano. Similarly, McLeod, who also reviewed GX 55, did not believe that anything contained in that document reflected improper accounting of any sort. Tr. 10885-86.

As Zychick explained, none of the GETKO reserves were improperly used: "Most of them were used or left on the books." Tr. 11179. When Zychick left GETKO, the only reserve that had not been used was a small amount of bad debt reserve. Tr. 11179. Deloitte & Touche, the auditors selected by Silverman and Monaco to replace E&Y, later arranged for the bad debt reserve to be increased, not decreased. Tr. 11179-80.

Moreover, the evidence established that the term "cushion", without more, does not evidence fraud. CUC's auditors E&Y used the word cushion in various audit documents. See DX 30895; DX 30896. Menchaca used the term "cushion" in connection with CUC's cash balance, see DX 30896, and agreed that having a cushion was perceived in the business world as being a good thing. Tr. 10101. Monaco explained that there was nothing wrong with the term "cushion," which he defined as a "placeholder for other times that, given the passage of time, would be known." Tr. 2121. Kearney confirmed that there was nothing wrong with the term "cushion," when it was used in the sense of a placeholder for unknown items that could arise. Tr. 9969-70. Even Corigliano conceded that the term "cushion" could be appropriately used in the accounting context. Tr. 8623.

## K. CORIGLIANO'S FALSE TESTIMONY CONCERNING HIS MEETING WITH WALTER FORBES AFTER MARCH 9, 1998

Corigliano testified that on March 11 or 12 -- a few days after March 9 -- he had a meeting with Shelton and Walter Forbes in Shelton's office. Tr. 7488-89. According to Corigliano, Walter Forbes told Corigliano that Silverman was not going to do anything about the 1998 budget, even though it was a "penny or two off," but that Silverman had "management issues" with Shelton and wanted to meet with Walter Forbes about that issue. Tr. 7488.

The evidence was overwhelming that no such meeting took place. On the morning of March 9, 1998, Forbes boarded a commercial airplane and flew, first, to the west

coast and, then, to Hawaii.  DX 500.  He remained in Hawaii with his family until March 22,

1998, when he returned to Connecticut.  DX 500.  Walter Forbes therefore could not have met

with Corigliano in Shelton's office or anywhere else in Connecticut in the aftermath of the

March 9 meeting.

   In the face of clear evidence that Corigliano had provided false testimony, the

government sought to cross-examine Walter Forbes about whether, after leaving for the west

coast and Hawaii on March 9, 1998, it was possible for him to have boarded another plane,

returned to Connecticut, attended a meeting with Corigliano in Shelton's office, and then

returned to Hawaii to resume his family vacation.

   Although the government's cross examination was far-fetched and demonstrated

nothing but its stubborn refusal to admit that any part of Corigliano's testimony was false, the

defense showed that even this theory, as implausible as it was, had no merit.  Counsel for Walter

Forbes called Jamie Fisher, a golf pro, who had given Walter Forbes a lesson on the morning of

March 11 in LaQuinta, California, and had written a memorandum of their golf lesson.  The

meeting was memorable to Fisher because she had taken a job at a golf course on Nantucket and

she considered her meeting with Walter Forbes to have been an "important event."  Tr. 14496.

Fisher had no motive to lie about her meeting with Walter Forbes, whom she never saw again

until the day of her trial testimony.  Tr. 14498.

## L. CORIGLIANO'S FALSE TESTIMONY CONCERNING THE ALLEGED "WELL IS DRY" CONVERSATION

   Corigliano claimed that in late 1996 he told Shelton that CUC needed to use $100

million of reserves to meet its earnings targets for fiscal 1997.  Tr. 6232.  Corigliano testified that

he gave Shelton a copy of a "cheat sheet" showing the usage of $100 million in reserves (GX

62b).  That prompted Shelton to walk into Walter Forbes's office and advise Walter Forbes that

the company needed to use "literally all the reserves" to make their forecasted numbers. Tr. 6236. Shelton told Walter Forbes that after the usage of CUC's existing reserves, "the well will be dry." Tr. 6236.

The foundation for this colorful story erodes in light of the testimony of the government's own accounting expert, Brian Heckler, that there was only $21 million of improper reserve usage for fiscal 1997. GX 10110. If, as of early 1997, the so-called "well" included $100 million of reserves – as per Corigliano's "cheat sheet" – then clearly the well was not depleted by the use of just $21 million.

## M.   CORIGLIANO'S FALSE TESTIMONY CONCERNING "SOFT CLOSES"

Corigliano continued to lie in an obvious effort to minimize his role in conducting the fraud. He testified that he did not remember ever using the term "soft close." Tr. 9147-48. Corigliano professed to be unable to explain what a "soft close" meant. Tr. 9149. Scott Forbes, however, recalled that Corigliano talked about soft closes on more than one occasion. Tr. 6020-21. Sabatino similarly recalled that there were instances in which Corigliano told him at the end of a quarter that they would do a "soft close" to take into account that there were items that would not be recorded until year end. Tr. 4547-48.

## N.   CORIGLIANO'S FALSE TESTIMONY CONCERNING THE RETENTION OF A CONSULTANT TO EVALUATE CUC'S EXPOSURE ON THE IDEON LITIGATION

After testifying on direct examination that the Ideon reserve was inflated, Corigliano claimed on cross-examination that he never knew that CUC had hired a consultant to evaluate the cost of resolving, by settlement or trial, Ideon's ongoing litigation, much less that the consultant came back with a range of hundreds of millions of dollars. Tr. 8562-63. When pushed on the subject, Corigliano testified that he recalled that CUC's lawyers had given a very

big range of what it would cost to settle Ideon's ongoing litigation and that "the high number was

over $100, $200 million." Tr. 8564.

        The defense called Paul Weissman, a former Assistant United States Attorney

who participated in numerous interviews with Corigliano. Weissman read into the record a

portion of his interview notes of Corigliano, in which Corigliano told the government that CUC's

lawyers hired a "consultant to do a damages study" and "came back with [a] very wide range up

to hundreds of millions, so it wasn't very helpful." Tr. 11410.

### O.    CORIGLIANO'S FALSE TESTIMONY CONCERNING THE THIRD PAGE OF GX 1288

        Corigliano claimed that at the instruction of Shelton, he did not give the third

page of the March 9, 1998 operating / non-operating income schedule (DX 1288) to Monaco.

Tr. 9092. But Monaco's copy of the March 9 schedule, which contained his handwriting and

was admitted into evidence, included the third page. Monaco testified that he received the entire

document. Tr. 1846, 2136.

### P.    CORIGLIANO'S FALSE TESTIMONY CONCERNING APPRAISALS ON HIS RESIDENCE

        In the Spring of 2004, Corigliano applied for a $750,000 personal equity line of

credit at People's Bank. Tr. 9670-71. Corigliano lied about the appraisal of his home that had

been performed in connection with this application. Corigliano applied for the loan in early

2004, at a time when he knew that he would be disgorging all of his assets, including millions of

dollars in proceeds from his stock sales that he had effected six to ten years earlier. Corigliano

claimed that he had no information about the value of his residence that he offered as collateral

for his loan, and that he never saw the appraisal performed by the bank on his property. Tr.

8161-62. Corigliano also disclaimed having any information about the appraisal performed by

the Town of Old Saybrook, which showed that his residence was worth over $3 million.

Although the Town of Old Saybrook had sent to Corigliano's home a notice showing that his residence had a valuation of $3.2 million, Corigliano claimed that he did not see the notice and "didn't hear about it" from his wife.  Tr. 8163.

### Q.    CORIGLIANO'S FALSE TESTIMONY CONCERNING HIS APPLICATION FOR A BANK LOAN

Corigliano falsely testified that the only reason he did not tell People's Bank about his criminal conviction was that the loan officer he met with did not ask.  Tr. 9674-75.  He claimed that he "didn't know [] at all" whether People's Bank would have extended the loan to him if he had told the bank that he had pleaded guilty to a felony and was slated to turn over virtually all of his assets to the government in the near future.  Tr. 9674-75.

Corigliano compounded his lies when he claimed that he did not mislead People's Bank about the purpose of his loan.  On the application form for the loan, under the heading "Purpose of loan," the box "make home improvements" was checked.  Tr. 9672.  Corigliano testified that he did not remember ever being asked by the loan officer what he intended to do with the loan proceeds.  Tr. 9673.  Although Corigliano denied ever telling People's Bank that he needed the loan for home improvements, he lacked any explanation for why this box on the loan application had been checked.

### R.    CORIGLIANO'S FALSE TESTIMONY CONCERNING THE DISGORGEMENT OF HIS ASSETS

Corigliano provided false testimony when he claimed that he and his wife had agreed to disgorge all of their assets, except for certain enumerated items.  Tr. 7504.  Specifically, Corigliano did not disgorge a three acre parcel of land adjacent to his home that was valued by the Town of Old Saybrook at more than $400,000.  In mid-1999, when Corigliano was facing pending criminal investigations, he purchased his home, in his wife's name, and an adjacent parcel of land on a separate buildable lot.  The two lots are distinct, with separate tax

bills and separate addresses.  Tr. 8166-68.  The quarterly asset schedules Corigliano provided to

the SEC did not reference the second lot and the settlement agreement provides that Corigliano

may retain "their residence at 38 Watrous Point Road," DX 1060, ¶ 6(i), with no reference to the

second parcel at 36 Watrous Point Road.

   The defense asked Corigliano whether he had hidden from the government that in

addition to the lot on which his house was located, he also owned an adjoining lot, which he

could have separately disgorged to the government without giving up his residence.  Corigliano's

responses were evasive; he claimed that the existence of this lot "was always disclosed" and that

"there was no hiding the fact that there were two lots that the Town of Old Saybrook maintained

for recordkeeping."  Tr. 8171-73.  In its redirect examination of Corigliano, the government

elicited testimony from Corigliano that he never hid anything from the SEC or the receiver and

that he had turned over the assets he was supposed to.  Tr. 8461.  Yet in communications with

the court, the government indicated that the SEC did not know that Corigliano's property

consisted of two separate lots.  Gov't Resp. to Forbes Supplemental Mem. Compel Production of

Impeachment Material, at 5.

### S. CORIGLIANO'S FALSE TESTIMONY CONCERNING HIS AND HIS WIFE'S LAW FIRM RETAINERS

   Corigliano also lied about his representations to the SEC about his retainer

agreements with the law firms representing him and his wife.  The testimony elicited by the

government left the jury with the false impression that Corigliano had disclosed everything to the

SEC and that he and his wife did not have a deal with the SEC concerning their ability to

continue to draw down on retainers with their respective lawyers.  Tr. 7504.  Corigliano testified

on direct examination that he and his wife "gave back everything" except for their house, two

cars, $100,000 in each of their children's trusts, and his father's residence.  *Id.*; *see also* Tr.

8154-60.  On cross-examination, Corigliano disclosed for the first time that there were

substantial sums on retainer with the law firms representing him and his wife.  He testified that

there was "a little over a million" in his lawyer's retainer account.  Tr. 8113.  In fact, evidence

showed that there was approximately $1.6 million remaining in his account and $400,000

remaining in his wife's account, for a grand total of $2 million in retainers.  Tr. 13512-20.

Moreover, Corigliano did not admit the existence of a secret deal with the SEC

that allowed him to retain these funds and use them to continue to pay his legal expenses.

Corigliano claimed that he did not bother to disclose the existence of these retainers to the

government because the money was no longer his and he had no expectation of ever getting any

of that money back.  Tr. 8114.  The government, for its part, acknowledged that it had known

about Corigliano's retainer prior to its settlement with him, and that it had agreed to allow

Corigliano and his wife to use the retainers for their legal expenses.  Although the written

settlement agreement with the SEC supports the suggestion that the retainers were subject to

disgorgement, *see* DX 1060 ¶ 3(vi) (requiring Corigliano and wife to disgorge all "assets of a

value of $1000 or more in which [they] had any direct or indirect ownership interest"), it says

nothing to permit Corigliano and his wife to continue to use those retainers until they are

depleted.

## XII.    NUMEROUS WITNESSES CONTRADICTED CORIGLIANO'S TESTIMONY ON KEY ISSUES

### A.    CORIGLIANO'S CONTRADICTED TESTIMONY ON THE IDEON MERGER

Corigliano testified that Walter Forbes instructed Shelton and McLeod to effect

the Ideon merger in order to create excess reserves the company could later use to inflate

earnings.  Tr. 6788-89.  McLeod denied that such a conversation ever happened.  Tr. 10900.

**B.    CORIGLIANO'S CONTRADICTED TESTIMONY CONCERNING
THE WESTCHESTER COUNTRY CLUB MEETING**

Corigliano testified that Shelton talked about the misuse of merger reserves at the

Westchester Country Club meeting in the presence of Lipton, McLeod and others.  Tr. 6979.

The government failed to present a single witness to corroborate Corigliano on this point.

McLeod testified that at the meeting Shelton did not say, in words or substance, that CUC was

using merger reserves improperly to increase operating income.  Tr. 10912.  Lipton also testified

that Shelton never made such a remark.  Tr. 11486-87, 11545.

**C.    CORIGLIANO'S CONTRADICTED TESTIMONY CONCERNING
THE MARCH 6 MEETING**

Corigliano testified that after the March 6 meeting with Scott Forbes, there was a

post-meeting in Lipton's office with Lipton, McLeod, Shelton and Walter Forbes.  Tr. 7453.

According to Corigliano, at the post-meeting, Forbes said, "You see, we were worried for

nothing.  There's nothing to worry about."  Tr. 7454.  McLeod and Lipton both testified that this

meeting never happened.  Tr. 10924, 11487.

**D.    CORIGLIANO'S CONTRADICTED TESTIMONY CONCERNING
THE MORTON'S DINNER**

Corigliano testified that in late March 1998, a number of CUC executives had

dinner at Morton's, at which McLeod raised the issue of the size of Pember's severance package,

and Walter Forbes purportedly responded, "Well, doesn't she have things to say?  Don't we want

to keep her happy?"  Tr. 7516.  Corigliano's testimony was uncorroborated.  Once again,

McLeod and Lipton denied that any such conversation took place.  Tr. 10924, 11486-87.

**E.    CORIGLIANO'S CONTRADICTED TESTIMONY CONCERNING
A MEETING WITH SARKIE AND MENCHACA**

Corigliano claimed that at a meeting with Shelton, Corigliano, Robert Sarkie and

Menchaca, Shelton asked for suggestions about how the company could increase operating

earnings.  Tr. 6988.  Corigliano testified that in response to Shelton's request, he suggested that

the company could take in more reserves.  Corigliano claimed that Shelton made a stern face and

"sort of hissed a little bit."  Tr. 6989.  Although the government called Menchaca as a witness, it

did not ask him about Corigliano's suggestion or Shelton's response at this meeting.  Nor did the

government call Sarkie as a witness to corroborate Corigliano.

### F.  CORIGLIANO'S CONTRADICTED TESTIMONY CONCERNING LIPTON'S PURPORTED GESTURE COVERING HER EARS

Corigliano testified that on one occasion Lipton walked in on a conversation he

was having with Shelton about manipulating CUC's financial results.  According to Corigliano,

Lipton covered her ears and said, "I don't want to hear this."  Tr. 7372-73.  Lipton said that this

incident "absolutely" did not happen.  Tr. 11486.

### G.  CORIGLIANO'S CONTRADICTED TESTIMONY CONCERNING SHELTON'S PURPORTED INSTRUCTION TO INFLATE SOFTWARE EARNINGS BY $25 MILLION

Corigliano claimed that in advance of a meeting with HFS, Shelton instructed

Corigliano to inflate the earnings forecast for the Software division by $20 to $25 million.  Tr.

7133.  Corigliano testified that Shelton later informed McLeod of his instruction to Corigliano as

the three of them were traveling by car to the HFS meeting.  Tr. 7137.  McLeod testified that this

conversation never happened.  Tr. 10917-18.  To the contrary, McLeod testified that the

Software division's budget of $125 million, which he presented to HFS, was an appropriate

forecast of the division's anticipated operating earnings for 1998.  Tr. 11120.  As the head of the

Software division, McLeod was in a much better position than Corigliano to know what the

appropriate earnings target should be for the Software division.  *Id.*

## XIII.  CORIGLIANO AND PEMBER GAVE TESTIMONY CONTRADICTORY OF ONE ANOTHER

This was also a case in which Corigliano and Pember, the government's two

principal cooperating witnesses, in addition to having been proven liars, also directly

contradicted one another.

### A.    THE MEETING AT WHICH CORIGLIANO MISLED SHELTON ABOUT THE PROPRIETY OF CUC'S ACCOUNTING PRACTICES

Pember testified that she was present for a discussion in late 1997 or early 1998 at

which Corigliano affirmatively misled Shelton about the accounting for rejects in transit and the

membership cancellation reserves.  Tr. 2912-13.  According to Pember, far from updating

Shelton about their ongoing fraudulent conduct, Corigliano was attempting to mislead Shelton

into believing that their accounting practices were proper:

> Corigliano was discussing the fact that the $100 million and the rejects-in-transit was a practice that the Comp-U-Card division had done for years and therefore, it was an acceptable practice and indicated that sort of, in so many words, it's okay, because it's been happening for a long time. . .
>
> I interjected because I was concerned that he was misleading Shelton and indicated that regardless of whether that was a practice or not, that ultimately, in so many words, I explained that the membership cancellation reserve was understated by that $10 million. . .
>
> In the conversation we also talked about the allocation from immediate – I'm sorry – from deferred to immediate revenue.  Corigliano explained that it related to some calculation of something called average member months. . . . Corigliano indicated that as long as that calculation stayed around 12 months or so, that it didn't matter that this allocation happened. . . .
>
> I was as concerned about that as I was about the membership cancellation reserve, that Shelton was not going to be misled by what Corigliano told him.  And I indicated that it was my understanding that that $40 million wasn't being done for the average member months.  It was taking revenue out of one category and putting it into immediate.  I wanted to make sure that Shelton knew what was going on. . . .
>
> Eventually Corigliano gave up his explanations of these two things and we finished the conversation and/or we may have talked about something else.  I don't remember. . .

Tr. 2913-14.

When confronted with this testimony, Corigliano denied that it ever happened. He claimed he had never misled Shelton about the rejects-in-transit or the allocations.

## B.    CORIGLIANO'S INVOLVEMENT IN THE EVENTS LEADING TO THE MARCH 6 MEETING WITH SCOTT FORBES

Pember and Corigliano gave contradictory testimony regarding the events leading up the March 6 meeting.  Pember testified that she and Corigliano discussed the reserve adjustments reflected in the March 6 schedule (GX 160) with Shelton on March 4 or March 5. Pember claimed that she told Shelton, at a meeting with Corigliano, that the reserves issue needed to be discussed with Scott Forbes and that the March 6 meeting was scheduled as a result of this conversation.  Tr. 2929.

Corigliano claimed that the March 6 meeting had been scheduled without his knowledge.  *Id.*  He testified that the first time he heard that there would be a meeting on March 6 meeting was the day of the meeting itself, when he happened to wander into an ongoing meeting between Shelton and Pember.  Tr. 7436-37.

## C.    CORIGLIANO'S INVOLVEMENT IN FALSIFYING CUC'S BUDGET BEFORE THE DECEMBER 11, 1997 DIVISIONAL CONTROLLERS' MEETING

Pember testified that prior to the December 11, 1997 meeting, she met with Corigliano to review GX 133, a one-page document prepared by Speaks showing, among other financial categories, revenue and operating income for 1997 and the 1998 budget.  Pember claimed that Corigliano decided to change the revenue and operating income figures and "quantified how much this budget had to be adjusted."  Tr. 2834.  The revised revenue and operating income figures were set forth in a new schedule with an identical format, although the revenue figures for 1997 and the 1998 budget, without any justification, were made approximately $200 million higher, and the operating income figures for the same periods were

made approximately $80 to $100 million higher.  GX 134.

Corigliano gave a different explanation.  He testified that when Pember came to him with the new schedule, GX 134, she had already made the adjustments to the revenue and operating income figures in GX 133.  According to Corigliano, Pember told him that she was going to give the new, adjusted schedule to Speaks, who would present the numbers at the December 11, 1997 divisional controllers meeting.  Corigliano claimed to have no recollection of going through the numbers or of sitting down with Pember and changing the numbers on GX 133.  Tr. 8919-20.

## ARGUMENT

### I.    THE COURT SHOULD GRANT SHELTON A NEW TRIAL IN THE INTERESTS OF JUSTICE

The Court should grant a new trial in the interests of justice because the evidence adduced by the government, especially the testimony of the government's main cooperating witnesses, was of such dubious quality as to cast grave doubt on the soundness of the jury's verdict. *See United States v. Autuori*, 212 F.3d 105, 120-21 (2d Cir. 2000).

Rule 33 provides that "the court may grant a new trial to [a] defendant if the interests of justice so require." Fed. R. Crim. P. 33. The rule by its terms gives the trial court "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992). Although the court must strike a balance between weighing the evidence and credibility of witnesses and not "wholly usurping" the role of the jury, *see Autuori*, 212 F.3d at 120, in exceptional circumstances, "the trial judge may intrude upon the jury function of credibility assessment." *Sanchez*, 969 F.2d at 1414. Exceptional circumstances exist where the testimony is "patently incredible" *Id*. The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation. *See id*. The trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29. *Id*.

In *Autuori*, the Second Circuit affirmed the district court's grant of a new trial based on the "dubious testimony" of two of the government's main witnesses which was "riddled with inconsistencies." 212 F.3d at 120. The Second Circuit described one government cooperating witness as an "artful and commercially successful liar." *Id.* This cooperating witness had testified to the defendant's presence at a particular meeting in which the fraudulent scheme was furthered, in contrast to all of the other witnesses who addressed this subject, each of

whom testified that the defendant was not present. *Id*. The Second Circuit also noted that the government's own representations to the district court had contradicted the testimony of a second cooperating witness. This second cooperating witness testified that, before trial, he had given to the government a spreadsheet allegedly prepared by the defendant; the government later advised the court that it could not locate the spreadsheet and did not recall the cooperating witness ever mentioning it. *Id*. at 121. In affirming the grant of a new trial under Rule 33, the Second Circuit held that the district court appropriately had determined that the credibility of these witnesses was weak and that the soundness of the verdict was highly doubtful. *Id*.

This case presents exceptional circumstances that warrant the vacatur of the verdict. Every facet of the testimony of Corigliano and Pember – from their deal with the government, to their own role in the charged offenses, to Shelton's alleged participation in the fraud – was shown to be unreliable. Neither this court nor the parties can have any confidence that the jury did not rely on the testimony of Corigliano and Pember -- which was false, mutually inconsistent, and fundamentally implausible – in returning its verdict against Shelton.

## A. CORIGLIANO'S FALSE TESTIMONY

The evidence at trial established that Corigliano gave false testimony concerning numerous material matters, including the following:

(i)    Corigliano's decision to sell CUC and Cendant stock immediately before the disclosure of the fraud; Corigliano incredibly claimed that his decision to sell company stock was divorced from his knowledge that the stock price was inflated as a result of the fraud he had perpetrated for almost 10 years, *see* Tr. 7588-90, 7984;

(ii)   the circumstances surrounding the creation of GX 613, a March 4, 1998 memo from Walter Forbes to Michael Monaco and Henry Silverman; Corigliano testified that Shelton handed GX 613 to him, even though the document was electronically stored on Corigliano's computer and all available evidence suggests that the document had been prepared by Corigliano, *compare* Tr. 7428, 7432-33, 9243-4 *with* Tr. 11312-13;

(iii)    Shelton's alleged suggestion to Corigliano that he should destroy his computer files and "cheat sheets," which was contradicted by notes of Corigliano's interviews with the government in which he made no mention of Shelton's directive, *compare* Tr. 7553, 9246-50 *with* Tr. 11553-56;

(iv)    Corigliano's testimony that in March 1998 he had attended a conspiratorial meeting with Walter Forbes and Shelton in Shelton's office in Stamford when travel records establish that, in fact, Walter Forbes was thousands of miles away in Hawaii, *see* Tr. 9634-54;

(v)    Corigliano's contention, contradicted by documents, that in or about November 1997, Walter Forbes purportedly had the CUC offices swept for listening devices because he was allegedly concerned that Henry Silverman had bugged the building, *compare* Tr. 7344-50, 8145-46 *with* GX 430; DX 1083; DX 1084; DX 1085; Tr. 9661-64;

(vi)    Corigliano's claim that the initial Essex merger reserve contained an improper cushion even though government witness Thomas Albright testified that the Essex reserve, as initially established, was reasonable and not inflated, *compare* Tr. 6574 *with* Tr. 3963;

(vii)    Corigliano's claim that the GETKO merger reserve purposefully included an illegitimate cushion even though Joel Zychick and Chris McLeod testified that the establishment was proper, *compare* Tr. 6533-58 *with* Tr. 11170-80;

(viii)    Corigliano's supposed lack of direct involvement in the making of topside adjustments, which is contradicted by the testimony of Casper Sabatino and Kevin Kearney, both of whom testified that Corigliano provided intricate directions about the size of the topside adjustments to make each quarter, *compare* Tr. 7087-88, 8513, 8518 *with* Tr. 9922-23, 4057-60, 4677-78;

(ix)    Corigliano's contention that he did not directly tell Speaks to improperly inflate the Comp-U-Card budget by $200 million in preparation for the December 11, 1997 controllers' meeting, despite Speaks' explicit testimony to the contrary, *see* GX 133; GX 134; *compare* Tr. 8919-21 *with* Tr. 684-84, 690, 987-88;

(x)    various aspects of Corigliano's deal with the SEC, including the value of his residence and the $1.8 million retainer that he was allowed to use for legal fees, *see* Tr. 7504, 7986, 8154, 8156, 8158-60, 8113-14, 8166-73, 9347-56, 9370-72, 9461; DX 49; DX 1060 ¶¶ 3(vi), 6, 12; and

(xi)    Corigliano's application for a bank loan in the Spring of 2004 to supposedly finance a home renovation, in which he failed to mention that he was a convicted felon whose assets were to be imminently disgorged, *see* Tr. 9670-75.

B.    **PEMBER'S FALSE TESTIMONY**

The evidence also showed that Pember provided false testimony about numerous

material matters, including the following:

(i)    Pember's testimony that despite her involvement in a multi-year fraud that overstated CUC's earnings by more than a hundred million dollars, she did not believe that CUC's stock price was inflated when she sold millions of dollars worth of such stock in the year before the disclosure of the fraud, *see* Tr. 3096-97, 3135, 3153-54, 3158;

(ii)    Pember's testimony about having given GX 530 to Shelton in mid-December 1997 in order to obtain Shelton's permission for her to provide the 1998 CUC budget to HFS; conclusive evidence, not refuted by the government, established that GX 530 was not created until mid-January 1998, weeks after Pember provided the budget information to HFS, *compare* Tr. 2840-42, 3046, 3365, 3772-73; GX 530 *with* Tr. 3355-60, 3365-67, 3850, 11306-09; GX 1773 at KS00024; DX 1038, DX 1039; DX 1438, DX 1853;

(iii)    Pember's testimony, on at least three occasions during her direct examination, that she showed GX 493 – the final version of the so-called "cushion" document – to Shelton, which was contradicted by her admissions on cross-examination that she did not recall if she had given Shelton GX 493, and her testimony on re-cross examination that, in fact, she had not given Shelton GX 493, *compare* Tr. 2567-74, 3008-09, 3012-13, 3017-18 *with* Tr. 3387-88, 3841, 3844;

(iv)    Pember's testimony that Shelton had attended meetings with her and E&Y's three principal auditors on the CUC account to discuss the establishment of the Cendant merger reserve, which  was directly contradicted by each of the three E&Y auditors, who testified they had never met with Shelton regarding the Cendant merger reserve prior to March 9, 1998, *compare* Tr. 2573-74, 3012-13, 3017-18 *with* Tr. 11142, 11147, 11153; and

(v)    Pember's testimony that, in late 1997 or in January 1998, she discussed the cancellation reserve, the rejects-in-transit issue, and the proposed usage of the Cendant merger reserve with Shelton; this testimony was refuted by Steven Speaks, who testified that throughout all of March 1998, he voiced his concerns about these accounting issues with Pember and on several occasions asked that she raise them with Shelton, *compare* Tr. 2903 *with* Tr. 791-92, 1015-17, 3863; DX 904.

C.    **THE ABSENCE OF OTHER EVIDENCE ESTABLISHING SHELTON'S KNOWING AND WILLFUL PARTICIPATION IN THE ALLEGED FRAUD**

The impact of Corigliano's and Pember's false testimony, which we submit is alone sufficient to warrant the vacatur of the verdict, was heightened by the absence of any credible evidence that Shelton knowingly and willfully participated in a conspiracy to misstate CUC's financial results or to commit any of the substantive offenses with which he was charged. The government failed to introduce any credible evidence that Shelton had any knowledge of the unsupported topside adjustments, the improper recording of the rejects-in-transit, or the improper allocation of revenue from deferred recognition programs to immediate recognition programs. And, to the extent the government offered evidence that Shelton knew that in some instances CUC's merger reserves had the effect of increasing its reported earnings, many of the government's witnesses shared this very same knowledge.

We ask the Court to take note of the following:

1.    None of the government's witnesses, including Corigliano, Pember or Sabatino, testified that Shelton was ever told that CUC or Cendant was engaged in accounting that was fraudulent or violative of GAAP. *See, e.g.,* Tr. 9660 (Corigliano's testimony that he never told Shelton it was not proper accounting to use merger reserves to make the numbers).

2.    Although various government witnesses testified about Shelton's awareness of certain reserve adjustments at CUC and Cendant, none of those witnesses, including Albright, Monaco, and Scott Forbes, testified that Shelton ever indicated that he believed such reserve adjustments were fraudulent, violative of GAAP or otherwise improper. *See, e.g.,* Tr. 3966 (Thomas Albright confirming that Shelton never indicated that reserve adjustments were improper).

3.    Experienced accountants, including Monaco and Scott Forbes, determined

in Shelton's presence that CUC's use of reserves in 1996 and 1997 was proper, lawful and

consistent with GAAP, and E&Y reviewed and was comfortable with CUC's reserve usage in

those years. *See, e.g.,* Tr. 1849-70, 2136-83, 5896-98, 6075-79, 6128-47; DX 1288; DX 1303;

*see also* Tr. 15831-45 (summation argument that Silverman, Monaco and Scott Forbes

thoroughly reviewed CUC's reserve usage in for 1996 and 1997).

       4.     Nothing on the so-called "cheat sheets", *see, e.g.*, GX 58; GX 58(a); GX

62(b); GX 1774; GX 1777, indicated that the proposed reserve adjustments were improper.

Corigliano prepared the documents in a way that did not reflect the use of topside adjustments or

any improper accounting concerning allocations or cancellation reserves or rejects-in-transit.

Nor did Corigliano put any indication on the "cheat sheets" that he was using reserves in a way

that was fraudulent or violative of GAAP.

       5.     The government failed to offer any evidence that Shelton knew that in

early 1998 that Corigliano, Pember and Speaks were creating false journal entries reflecting

bogus sales in order to support the reversal of reserves into revenue.

       6.     There was no evidence that Shelton ever participated in any deception of

E&Y.

       7.     Sabatino did not believe that Shelton was a member of any criminal

conspiracy or that Shelton was aware of the topside adjustments. *See* Tr. 4489 (Sabatino

testimony that he never told Shelton about the topside adjustments), 4580-81 (Sabatino

testimony that he told USAO that he did not include Shelton in the list of participants in the

alleged fraud), 4644-45 (Sabatino testimony that Shelton was not involved in unsupported

topside adjustments), 4913 (Sabatino testimony that to his knowledge improper use of merger

reserves was successfully concealed from Shelton); *see also* Tr. 15717-720 (summation

argument reviewing Sabatino's testimony that he did not believe Shelton was member of conspiracy).

        8.     Sabatino's testimony concerning the "pop-in" meeting – a 15 second conversation in which Corigliano asked Shelton whether the earnings for that quarter should be "x" or "y" – lacked any probative value where the difference between the two figures was a single penny and where other evidence in the trial established that accountants often have discretion in making judgments that could affect earnings by a penny.  *See* Tr. 4616-17 (Sabatino testimony confirming that immaterial change in earnings could have one penny effect on EPS), Tr. 5629-30 (Robert Davidson testimony that an EPS figure may vary by several pennies depending on legitimate discretionary judgments made by accountants), Tr. 15720-24 (summation argument reviewing "pop-in" meeting).

        9.     Shelton's willingness to merge CUC and HFS and to cede virtually total control to HFS made no sense if Shelton was hiding an accounting fraud, given that (i) CUC could have purchased HFS outright and maintained control over the combined company and (ii) CUC had its pick of many other acquisition targets, any one of which would have enabled CUC to build substantial merger reserves.

        10.    Sabatino's testimony that in early 1998 Shelton attended a meeting at which he tore up GX 530 or a similar type of document was contradicted by Sabatino's statement to the Audit Committee in July 1998 that he had never seen GX 530 and his failure to have mentioned the supposed "tear-up" incident in his two meetings with the Audit Committee or his first five meetings with the government.  *See* Tr. 4567-70, 4589-90, 4592-93, 10499; *see also* 15724-736 (summation argument reviewing Sabatino's testimony of "tear-up" incident and evidence of his denial of ever having seen GX 530).

11.     There was overwhelming evidence of Shelton's consciousness of innocence, including his willingness to be interviewed by the Cendant Audit Committee on four occasions, his willingness to be interviewed by the government on two occasions, and his voluntary production of documents from his files that the government later argued provided clues to the existence of fraudulent accounting at CUC and Cendant.  *See, e.g.,* Tr. 15952-957 (summation argument reviewing Shelton's cooperation after fraud was disclosed).

12.     Unlike Corigliano and Pember, Shelton did not sell any CUC or Cendant shares in the prior period leading up to the revelation of the fraud at CUC and Cendant.  *See, e.g.,* Tr. 15958-75 (summation argument comparing Pember and Corigliano's insider trading with McLeod and Shelton's lack of stock sales).

13.     Shelton had a reputation for honesty and integrity among his colleagues at CUC, as well as business and community leaders outside the company.  *See, e.g.* Tr. 15912-934 (summation argument reviewing evidence and testimony regarding Shelton's reputation for honesty).

14.     The fraud was only disclosed when Sabatino and Speaks told HFS about unsupported topside adjustments and the improper allocation of revenue.  There was no credible evidence that Sabatino or Speaks had ever told Shelton about the topside adjustments or the improper allocation of revenue from deferred recognition membership programs to immediate recognition membership programs.

*    *    *

The similarities between this case and *Autuori* are startling.  In both cases, there was substantial evidence that the testimony of the government's principal cooperating witnesses was false.

As in *Autuori*, the cooperating witnesses testified to events that they had not mentioned in many sessions with the government. *Compare, e.g., Autuori*, 1998 WL 774232, at *11 (in contrast to trial testimony, cooperating witness failed to tell FBI that he disclosed payment of bribe to defendant) *with* Tr. 4564-87, 10499 (in contrast to trial testimony, Sabatino told Audit Committee he did not recognize GX 530 and he did not mention Shelton's tear up of GX 530 in first five meetings with government) *and* Tr. 11553-56 (in contrast to trial testimony, Corigliano did not tell government that he destroyed documents and deleted cheat sheets at instruction of Shelton).

And as in *Autuori*, cooperating witnesses placed Shelton at meetings with persons that he could not have attended. *Compare, e.g., Autuori*, 1998 WL 774232, at *12-13 (D. Conn. Aug. 28, 1998) (cooperating witness testified that defendant attended a number of meetings in furtherance of fraud, in face of substantial evidence to the contrary) *with* Tr. 3008-09, 3012, 11144-55 (Pember's testimony that Shelton attended four or five meetings with E&Y contradicted by testimony of all three E&Y auditors) *and* Tr. 7488 (Corigliano's testimony that he met with Shelton and Walter Forbes in Shelton's office shortly after March 9 contradicted by Forbes' plane records).

In light of the unreliable, inconsistent, and contradictory testimony of Corigliano, Pember and Sabatino, and the substantial evidence of Shelton's innocence, this Court should vacate the verdict and grant a new trial.

## II.    THE GOVERNMENT INTRODUCED AND FAILED TO CORRECT FALSE AND MISLEADING EVIDENCE

The Court should also vacate the conviction because the government knew or should have known that, as set forth above, its two principal cooperating witnesses gave false and misleading testimony on numerous material matters.

The government violates due process "when the prosecutor, although not soliciting false evidence from a Government witness, allows it to stand uncorrected when it appears." *United States v. Sanfilippo*, 564 F.2d 176, 178 (5th Cir. 1977). The Supreme Court has unanimously held that a prosecutor's inaction, after evidence has been presented that the prosecutor knows is false, is as much a denial of due process as is the deliberate presentation of false evidence.

> [I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.

*Napue v. Illinois,* 360 U.S. 264, 269 (1959) (citations omitted). The prosecutor therefore has a "duty to correct the false testimony of a Government witness," and "[t]hat duty arises when (the false evidence) appears." *Sanfilippo*, 564 F.2d at 178 (quotation omitted); *see also Napue*, 360 U.S. at 269-70 ("A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth." (quotation omitted)). The *Napue* rule is implicated when the prosecutor "knew or should have known" that the evidence was false. *See United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991)

These well-established principles apply not only to perjurious testimony and false evidence, but also to testimony and other evidence that, even if not technically perjurious or false, would be misleading to the jury. *See Jenkins v. Artuz*, 294 F.3d 284, 294 (2d Cir. 2002) ("That a statement standing alone is factually correct obviously does not mean that it cannot mislead based on the natural and reasonable inferences it invites."); *United States v. Vozzella*, 124 F.3d 389, 393 (2d Cir. 1997) (reversing convictions when government "should have known that introduction of the records with [the witness's] unqualified testimony concerning their

significance conveyed a message so misleading as to amount to falsity").

Indeed, the *Napue* rule applies with equal force to false testimony that relates only to the credibility of a witness.

> The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes *only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.*

*Napue*, 360 U.S. at 269 (emphasis added); *accord Su v. Filion*, 335 F.3d 119, 129 (2d Cir. 2003) ("The additional evidence that Tom had a deal with prosecutors and with his sentencing judge was certainly material to assessing Tom's credibility, and that credibility could not help but be central to the deliberations of any reasonable jury sorting through the facts of the case."); *Jenkins*, 294 F.3d at 295 (finding reasonable likelihood that false testimony affected the judgment of the jury because it implicated "Morgan's credibility, a vital issue in a trial with only two substantive witnesses and no physical evidence linking the petitioner to the crime"); *Wallach*, 935 F.2d at 456 ("The taint of (the) false testimony is not erased because his untruthfulness affects only his credibility as a witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence." (quotations omitted)); *Du Bose v. Lefevre*, 619 F.2d 973, 978 (2d Cir. 1980) ("It makes no difference that the materially false testimony goes only to the credibility of a witness.").

The mere revelation to the jury that a key witness lied on the stand may be enough to convince the jury to acquit. In *Wallach*, for example, the government's primary witness admitted on cross-examination that he signed gambling markers, but denied that he gambled on those occasions. 935 F.2d at 456. The defendants sought to admit testimony and documents to

impeach this testimony.  "The government objected to the testimony . . . and the introduction of

the records under Fed. R. Evid. 608(b), arguing that the records and testimony were extrinsic

evidence offered to impeach Guariglia's credibility and therefore subject to exclusion.  The

district court sustained the government's objection."  *Id.*  The Second Circuit reversed because:

> Guariglia was the centerpiece of the government's case.  *Had it been
> brought to the attention of the jury that Guariglia was lying after he had
> purportedly undergone a moral transformation and decided to change his
> ways, his entire testimony may have been rejected by the jury.*  It was one
> thing for the jury to learn that Guariglia had a history of improprieties; *it
> would have been an entirely different matter for them to learn that after
> having taken an oath to speak the truth he made a conscious decision to
> lie . . . .*  Accordingly, because we are convinced that the government
> should have known that Guariglia was committing perjury, all the
> convictions must be reversed.

*Id.* at 457 (emphasis added).

As set forth above, there is overwhelming evidence that Corigliano and Pember

gave false testimony on many material matters.  Corigliano provided false and misleading

testimony about (i) his understanding of the effect of the fraud on CUC's stock price when he

sold tens of millions of dollars of stock; (ii) his involvement in the topside adjustments; (iii) the

circumstances surrounding CUC's decision to hire an electronic surveillance company; (iv) the

circumstances under which he came into possession of GX 613, a March 4, 1998 memo

purportedly from Walter Forbes to Henry Silverman; (v) his assertion that he did not direct

Speaks to increase CUC's projected 1998 revenue by $200 million before the December 11,

1997 controllers' meeting; (vi) his claim that the Essex reserve was established with an improper

cushion; (vii) his contention that the GETKO reserve was established with an improper cushion;

(viii) his testimony that in March 1998 he had attended a conspiratorial meeting with Walter

Forbes when travel records establish that Forbes was thousands of miles away in Hawaii; (ix) the

circumstances under which he obtained a loan from People's Bank; and (x) his understanding of

the value of his residence and his knowledge of the appraisals on that property.

Pember, too, gave false and misleading testimony about numerous matters, including (i) Shelton's involvement in establishing the Cendant merger reserve; (ii) Shelton's purported receipt of GX 493, the Cendant merger reserve schedule; (iii) her understanding of the effect of the fraud on CUC's and Cendant's stock price when she sold millions of dollars of that stock; (iv) her alleged meeting with Shelton in mid-December 1997 to obtain permission to provide false budget information to HFS; and (v) her testimony that she told Shelton about improprieties relating to the allocations and rejects-in-transit in December 1997 or January 1998.

Despite this long list of known lies, the government in its summation portrayed Corigliano and Pember as truth tellers, as persons who had lied in the past, but who had reformed themselves. The government argued Corigliano and Pember's false testimony to the jury, and sought to bolster their credibility during summation. The government argued that Corigliano's and Pember's cooperation agreements and their ability to obtain a 5K1.1 letter was contingent on their giving truthful testimony. Tr. 14859-65. Not only did the government not correct Corigliano or Pember's false testimony, the government made a point of telling the jury that "the [cooperation] agreements also say if they lie, if they testify falsely, in essence, the agreement gets thrown out the window." *Id.* at 14860. Because the government made clear to the jury that it had decided not to "throw" Corigliano and Pember's cooperation agreements "out the window," the government vouched for its witnesses, leaving the jury with the impression that the government had not terminated the cooperation agreements because their testimony was accurate.

## III.    THE CONSCIOUS AVOIDANCE CHARGE WAS IMPROPER

Shelton also moves for vacatur of the conviction because the conscious avoidance charge was improper. First, the conscious avoidance instruction constituted a constructive

amendment of the indictment and a prejudicial variance. Second, the government did not

establish a sufficient evidentiary basis for the charge.

A.    **THE CONSCIOUS AVOIDANCE CHARGE EFFECTED A CONSTRUCTIVE AMENDMENT OF THE INDICTMENT**

"[A] defendant has the right to be tried only on charges contained in an indictment

returned by a grand jury." *United States v. Wozniak*, 126 F.3d 105, 109 (2d Cir. 1997). "When

the trial evidence or the jury charge operates to broaden the possible bases for conviction from

that which appeared in the indictment, the indictment has been constructively amended." *United*

*States v. Milstein*, ___ F.3d ___, 2005 U.S. App. LEXIS 4009, *23 (2d Cir. 2005) (internal

citation, quotation marks and brackets omitted). "A constructive amendment of an indictment is

a per se violation of the Grand Jury Clause of the Fifth Amendment that requires reversal even

without a showing of prejudice to the defendant." *Wozniak*, 126 F.3d at 109 (internal citation

and quotation marks omitted).

The risk of constructive amendment is acute is cases that involve charges of

conspiracy and fraud. The Second Circuit has admonished:

> prosecutors to be especially careful in drafting indictments under 18
> U.S.C. § 371 (1988). For example, . . . we explicitly warned the
> government that it can avoid fifth amendment violations in fraud cases by
> thinking through the nature of the crime it wishes to allege and then
> spelling out the offense in a carefully drafted indictment, instead of
> confronting the defendant with its theory of criminality for the first time at
> trial . . . We also noted that because the fraud statutes target a broad range
> of conduct, it is even more critical that reviewing courts be vigilant to
> ensure that the government does not attempt to broaden the already
> pervasive and widesweeping nets of conspiracy prosecutions.

*United States v. Roshko*, 969 F.2d 1, 5 (2d Cir. 1992).

Since the return of the original Indictment, the government proceeded on a theory

that Shelton had actual knowledge of the fraud. The Superseding Indictment, like the initial

Indictment, unequivocally alleges that Shelton directed the alleged fraud and had actual

knowledge of the improper accounting that constituted the alleged fraud.  *See* Super. Indictment

Count 1 ¶ 24 ("defendant[] Shelton . . _directed_ other conspirators to increase the earnings figure

so that it met or exceeded that target"); *id*. Count 1 ¶ 29 "defendant[] Shelton . . . _used_ fraudulent

accounting machinations . . ."); *id*. Count 1 ¶ 30 ("defendant[] Shelton . . . _established_ excessive

merger reserves and then drew upon them to fraudulently inflate the reported operating income

of CUC and Cendant");  *id*. Count 1 ¶ 51 ("defendant[] Shelton . . . _deliberately_ _misallocated_

revenue generated from deferred recognition programs to immediate recognition programs"); *id*.

Count 1 ¶ 63(g) ("defendant Shelton _approved_ the release of the fraudulently inflated operating

income figure contained in the schedule . . . to Cendant's corporate headquarters in New

Jersey"); *id*. Count 2 ¶ 3 ("as defendant[] Shelton[] _knew,_ that income figure was substantially

inflated and had not been arrived at through legitimate accounting procedures  . . ."; *id*. Count 3 ¶

2 ("as defendant[] Shelton _knew,_ the figure of $.17 per share was substantially inflated, was not

based in fact, and had not been arrived at through legitimate accounting procedure or in

accordance with GAAP . . ."). Because conscious avoidance is irreconcilable with such knowing

direction of the alleged fraud, the Grand Jury could not have based its indictment of Shelton on a

theory of willful blindness.

        Consistent with the allegations in the Superseding Indictment, the government

opened on a theory that Shelton had actual knowledge of the alleged fraud.  *See* Tr. 62 ("You'll

hear that they were in on it.  You'll hear that they knew about it.  You'll hear that they directed

it."); *see also* Tr. 28 ("they both ran a criminal conspiracy to lie about CUC's earnings."), Tr. 30

("these defendants . . . lied about how much money CUC made."), Tr. 49 ("And the evidence in

this case will show that Defendants Forbes and Shelton lied to the shareholders and the investing

public"), Tr. 50 ("they both knew there was millions of dollars extra in the Ideon merger reserve,

that $179 million, that they could use to inflate CUC's earnings going forward."), Tr. 54

("[Pember] will tell you that she was directed by Kirk Shelton and Cosmo Corigliano to inflate

[the Cendant reserve]."), Tr. 58-59 ("Defendant Shelton made one last-ditch effort to keep this

fraud going.  He decided he would try to recruit the former HFS people into the conspiracy to lie

about earnings."), Tr. 64 ("Corigliano also met regularly with Shelton to discuss the fraud."), Tr.

65 ("[Pember will] be able to tell you that she regularly met with Shelton to discuss this fraud."),

Tr. 67 ("[Pember] doesn't bother to hide the fraud from Kirk Shelton because he was in on it and

he directed it.")

   Nor did the government argue in its summation that Shelton was aware of only a

high probability of fraudulent conduct and consciously avoided learning the truth about the

fraud.  To the contrary, the government repeatedly contended that Shelton had knowingly and

intentionally directed the alleged fraud.  *See, e.g.,* Tr. 14824 ("the fraudulent earnings machine

that Shelton, Forbes built"), Tr. 14827 ("the knowledge, involvement and direction of the two

defendants in the fraud"), Tr. 14929 ("There was a fake layer of earnings with this company,

ladies and gentlemen, and Kirk Shelton knew about it. . . . He knew very well, fully well,

because he was a member, a director of this conspiracy.").[8]

   The inclusion of the conscious avoidance charge impermissibly broadened the

---

[8] *See also* Tr. 14856 ("[Corigliano] tells you, he gives them the cheat sheets.  He goes over how they're cooking the books, in essence.  Meeting after meeting."), Tr. 14936-27 ("This cushion, one of the setups for the fraud, was built by hand with the hands of Pember, the hands of Shelton, and the hands of Forbes, all working together to build this cushion, to continue the fraud"), Tr. 14959 ("Kirk Shelton's directing the fraud"), Tr. 14962 ("[Shelton] was running the fraud along with Forbes and Corigliano"), Tr. 14983 ("what was done here was on purpose, what was done here was expressly directed by the defendants down the chain of the conspiracy"), Tr. 15010 ("Shelton and Forbes directed this fraud, were in on this fraud, pushed this fraud along"), Tr. 15015 ("the knowledge, involvement and direction of these two men in this fraud"), Tr. 15027 ("Anne Pember told you time and time again that this man, Shelton, was in on the fraud, directed the fraud, told her what to do."), Tr. 15044 ("They were doing what their boss wanted them to do.  They were doing what Shelton instructed Corigliano to do."), Tr. 15058 ("This is one example of Kirk Shelton affirmatively involved in cooking the books."), Tr. 15118 ("they ran a fraud").

possible bases for conviction from those in the Indictment.  *See Milstein*, 2005 U.S. App. LEXIS 4009, at \*20-29 (constructive amendment where indictment alleged misbranding of prescription drugs resulting from deceptive repackaging, and jury was permitted to find misbranding resulting from false assertions of drug sterility printed on instruction insert); *Wozniak*, 126 F.3d at 111 (constructive amendment where indictment charged only possession of cocaine but jury was permitted to convict on possession of marijuana); *United States v. Zingaro*, 858 F.2d 94, 98-103 (2d Cir. 1988) (constructive amendment where indictment alleged defendant extended extortionate loans to gamblers at Yonkers' social clubs, but jury could find defendant made illegal loans to Bronx diner owner).  Here, the conscious avoidance charge allowed the jury to convict on a theory of knowledge that was different from – and indeed, was inconsistent with – the theory alleged in the Superseding Indictment and argued by the government.

## B.    THERE WAS AN INSUFFICIENT EVIDENTIARY PREDICATE FOR THE CHARGE.

### 1.    The Applicable Legal Standards

A conscious avoidance instruction "may only be given if (1) the defendant asserts the lack of some specific aspect of knowledge required for conviction, . . . and (2) the appropriate factual predicate for the charge exists, i.e., 'the evidence is such that a rational juror may reach [the] conclusion beyond a reasonable doubt . . . that [the defendant] was aware of a high probability [of the fact in dispute] and consciously avoided confirming that fact[.]'"  *United States v. Ferrarini*, 219 F.3d 145, 154 (2d Cir. 2000) (internal citations omitted).  "The second prong of this test thus has two components -- there must be evidence that the defendant (1) was aware of a high probability of the disputed fact and (2) deliberately avoided confirming that fact."  *United States v. Svoboda*, 347 F.3d 471, 480 (2d Cir. 2003) (citations omitted).

Where "the government's evidence showed the defendant's direct participation in

acts that could not have been undertaken without guilty knowledge," *United States v. Aina-Marshall*, 336 F.3d 167, 172 (2d Cir. 2003), it is error to give a conscious avoidance instruction. A conscious avoidance charge is proper only where the participation element of the offense is separable from the knowledge element. *Id.* at 171-72. Thus, if the defendant could not have undertaken the conduct alleged of him without actual knowledge, the court should not instruct the jury on conscious avoidance.

The Second Circuit has cautioned against giving a conscious avoidance instruction in cases such as this where the government has purported to introduce direct evidence of the defendant's actual knowledge – however weak – but no evidence of the defendant's constructive knowledge. In *Ferrarini*, the evidence sufficed to show that the defendant Vieira had embezzled more than $100 million from clients of his insurance brokerage business. Among the evidence offered by the government was proof that Vieira had attended meetings in his apartment at which the conspirators discussed how to deceive the premium finance companies they were embezzling. The district court charged the jury to consider whether the defendant consciously avoided learning that the premium finance loans were fraudulent. The Second Circuit held that the conscious avoidance charge was improper:

> We conclude that the evidence does not establish the requisite factual predicate for the charge. The evidence shows that Vieira actually knew of the frauds; it is not sufficient to permit a finding that he consciously avoided them. The fact that a jury can – on the evidence – find actual knowledge does not mean that it can also find conscious avoidance. **If conscious avoidance could be found whenever there was evidence of actual knowledge, a jury could be given a conscious avoidance instruction in a case where there was only equivocal evidence that the defendant had actual knowledge and where there was no evidence that the defendant deliberately avoided learning the truth. Under those circumstances, a jury might conclude that no actual knowledge existed but might nonetheless convict, if it believed that the defendant had not tried hard enough to learn the truth.** . . . [S]uch a result might constitute reversible error.

219 F.3d at 157 (emphasis added).

The same holds true of Shelton's alleged involvement in CUC's accounting fraud. The government principally relied on testimony from Corigliano and Pember that they had direct conversations with Shelton about the use of merger reserves, the allocation of revenue from deferred to immediate recognition programs, and the delay in recording rejects-in-transit. The government contended that to further the scheme, Shelton engaged in specific acts with actual knowledge of the fraud. Although we submit that this evidence of actual knowledge was at best equivocal given the unreliability of Corigliano and Pember and the lack of credible evidence that Shelton knew CUC's accounting was improper or false, the government offered no proof of Shelton's conscious avoidance.

### 2. Shelton's Position As Chief Operating Officer Does Not Provide A Basis For A Conscious Avoidance Charge

In seeking a conscious avoidance instruction at trial, the government argued that such an instruction was "virtually compelled" because Shelton and Walter Forbes "were the two highest ranking executives" at the company and "they both had ready access to the information that would have revealed the fraud and *could have* directed any of their subordinates who were involved in the fraud to disclose that information to them . . . " Gov't Memo in Support of Conscious Avoidance Charge (filed Nov. 4, 2004) (hereinafter Gov't Memo) at 2-3 (emphasis added). The government's argument misconstrues the type of evidence necessary to show conscious avoidance. The test is not whether a defendant "could have" or "should have" directed subordinates involved in the fraud to disclose certain information to them. *See United States v. Pacific Hide & Fur Depot, Inc.*, 768 F.2d 1096, 1098 (9th Cir. 1985) ("[i]t is not enough that defendant was mistaken, recklessly disregarded the truth, or negligently failed to inquire") (A. Kennedy, J.). The test, rather, is whether the defendant was aware of a high probability that a

fraud was underway and purposely avoided learning the truth.  *See id.*

### 3.    There Is Insufficient Evidence That Shelton Was Aware Of A High Probability That CUC Was Committing Accounting Fraud.

The evidence upon which the government relies to establish Shelton's awareness of a high probability that CUC was engaged in fraudulent accounting fails for two reasons.  First, the so-called "red flags" the government argues put Shelton on notice of a high probability of fraudulent conduct were also known by numerous persons – many of them government witnesses – whom the government has alleged were not participants in the fraud.  The government has to be consistent: if the "red flags" did not put Silverman, Monaco, Scott Forbes, Menchaca, McLeod and others on notice, the same evidence was insufficient to put Shelton on notice. Second, putting aside the evidence of Corigliano's and Pember's direct conversations with Shelton – which the government argued established Shelton's actual knowledge – the handful of episodes the government points to as raising "red flags" of the fraud are insufficient, in and of themselves, to establish Shelton's conscious avoidance.

### a.    Shelton's Receipt Of GX 160 (The March 6 Document)

The government contends that Shelton's receipt of GX 160 – the March 6, 1998 schedule -- supports a conscious avoidance charge (Gov't Memo at 4).  The government, however, cannot overcome the fact that Scott Forbes, Monaco, and Menchaca, each of whom was called as a government witness, also received this document at or near the same time Shelton received it.  All three testified that prior to April 1998 they did not have any suspicions that CUC was engaged in fraudulent accounting.  Similarly, although not called as a witness, Silverman also received GX 160.  Not only did GX 160 not alert Silverman, whom the government portrayed as a victim, to the accounting fraud, but in early April 1998, Silverman told the financial community that Cendant was on target to meet or exceed its 1998 forecast.  Tr.

2254, 2932, 10204, 13439; DX 1216.

Nothing on the face of GX 160 would have alerted a reader that the company was likely engaged in fraudulent conduct. Although the government has suggested that the inclusion of the $165 million of cost saves in the revenue line on the first page of GX 160 would have put a reader on notice of the probability of fraudulent activity, *see* Gov't Memo at 4, this contention is belied by the second page of GX 160 which disaggregates the $165 million of costs saves into revenue increases and expense reductions.

Moreover, the evidence established that there is nothing nefarious about the concept of cost saves. Scott Forbes testified that his concern with GX 160 was not that it reflected cost saves, but that it showed more cost saves than had been budgeted as of December 15, 1997. Tr. 5783-86, 5950-54. As Scott Forbes and Monaco explained, the amount of cost saves included in the 1998 budget indicated that the core operations of CUC's business units were not performing as well as anticipated. *See id.*, Tr. 1607. Moreover, on March 30, 1998, Scott Forbes and Monaco disclaimed any suspicion of fraud when they signed a management representation letter stating that "[t]here has been no fraud involving management or employees who have significant roles in internal control." DX 1222, Tr. 1877-78.

### b.    Shelton's Creation Of GX 606

The government contends that this GX 606 – a graph charting the earnings of each of the CUC divisions for fiscal year 1997 -- supports a conscious avoidance charge because the sum of the divisions' earnings was $100 million less than the amount reported on CUC's Form 10-k for that period. Gov't Memo. at 5. The government cannot contend that GX 606 evidenced Shelton's conscious avoidance of fraudulent accounting at CUC without conceding that numerous other CUC and HFS executives, whom it has not alleged to have been participants in the conspiracy, also had knowledge of the fraud. Specifically, everyone who attended the

meeting at the Westchester Country Club in March 1997 was put on notice of facts that indicated that the operating earnings of CUC's various divisions were approximately $100 million less than was reported in the company's SEC filings. Similarly, Scott Forbes and Monaco, who attended the series of meetings on March 9, 1998, learned of the approximately $100 million difference in operating and reported earnings for fiscal year 1997. DX 1288; Tr. 1614, 2136-38, 2156-57, 5898, 6087-91.

c.    **The Good News, Bad News Email (GX 519): The Variances in the Segment Reporting**

The government argues that the "wide variances between forecasted and actual results for some of CMS' largest divisions" in GX 519 evidenced that Shelton was made aware that CUC was likely engaged in fraudulent accounting. Again, however, the government's own witnesses learned of the discrepancy between the forecasted and actual results for certain of CUC's business segments. In fact, the day after Pember claimed that she sent GX 519 to Shelton, she sent a slightly revised email, showing the same variances between forecasted and actual results, to Scott Forbes. *See* GX 546.

Moreover, after their receipt of GX 546, Monaco and Scott Forbes participated in a conference call with Shelton and Corigliano to discuss the variances. Tr. 5702-06. After hearing Corigliano's explanation, Scott Forbes and Monaco determined that the variances resulted from poor forecasting. Tr. 6013, 6025-26. The government cannot contend, on the one hand, that the variances were insufficient to put Scott Forbes or Monaco on notice of the likelihood of fraudulent accounting, but were sufficient to make Shelton aware of the probability of that fact.

The government's position becomes even more untenable given that just two weeks after their receipt of GX 546, Scott Forbes and Monaco became aware of additional

variances in the reporting for CUC's business segments.  In early February 1998, Corigliano

changed the reported figures for CUC's Individual and Software business segments to more

closely match the forecasts, and sent the revised figures to Scott Forbes.  GX 376b; Tr. 5719,

5732-34, 5838, 5846, 6028-29.

### d.      The Good News, Bad News Email: The Footnotes

Contrary to the government's contention, nothing in the footnotes to GX 519

placed Shelton on notice that the accounting department was likely committing a fraud.  *See*

Gov't Memo at 5.

First, Pember began the email with the false pronouncement that CUC "has made

the numbers."  Besides Shelton, Corigliano was the only other recipient of this email, and

Corigliano obviously knew the truth about whether the company had actually made its numbers.

The inescapable conclusion is that Pember intended to mislead Shelton about the company's

results.

Second, the footnotes may be grammatically incoherent and obtuse, but they do

not evidence a fraud.  The first footnote begins, "Entire variance flows thru 12/97."  There is no

explanation about how a variance "flows" throughout a year, or even what it means for a

variance to "flow."  The footnote continues: "Results from reversal of prior period reserves

throughout the year we use the 'individual' area as a catch all quarter to quarter, so any

'corrections' are forced thru the 4th quarter."  Pember testified that the phrase "reversal of prior

period reserves" was a reference, however infelicitous, to the reversal of the topside adjustments

done at year end.  Tr. 2754-55.  But there was no evidence, from Pember or Corigliano or anyone

else, that Shelton knew about the topside adjustments.

Third, to the extent the footnotes conveyed any notion that the company was

using reserves to increase earnings and that this practice somehow caused the variances, Pember

communicated that same message in the email she sent to Scott Forbes the next day, employing

far greater clarity than she had in her email to Shelton. *Compare* GX 519 *with* GX 546.

Pember's email to Scott Forbes disclosed that CUC's use of reserves affected its income (and

thus caused the variances): "[d]uring the fourth quarter, any standard cost adjustments,

**membership reserve adjustments** as well as other **reserves** are made on a **YTD basis**. The

forecast for the period did not reflect **these one time adjustments**." GX 546 p.2 n.1 (emphasis

added). To the same effect, the third footnote of GX 546 disclosed that "software reserves are

reviewed at year end and an excess was brought in 12/97."

> **e.    GX 506 and Shelton's Knowledge Of Reserve
>         Adjustments**

The government argued that Shelton's receipt of a January 14, 1998 email (GX

506) in which Pember wrote that "with the exception of our 'reserve' adjustments, Mary [Sattler]

is virtually done [with the year-end consolidation] today" is evidence that Shelton was aware of a

high probability that CUC's accounting was fraudulent. *See* Gov't Memo at 5. The evidence

was overwhelming, however, that there is nothing improper with adjusting reserve accounts for a

variety of reasons. *See, e.g.,* Tr. 511-14, 529. The government's own expert witnesses conceded

that reserve adjustments can properly have the effect of increasing income, and that there is

nothing inherently suspicious about such adjustments. Tr. 517 (Professor Robert Sack), 10690-

91 (Brian Heckler); *see* DX 30773 p.4 (H&Q analyst report indicating that CUC could increase

its income through the use of reserves).

> **f.    Shelton's Receipt Of The "Cheat Sheets"**

The government also pointed to Shelton's receipt of the "cheat sheets" as a basis

for the conscious avoidance charge. These documents would not have led an observer to

conclude that CUC was likely committing fraud.

First, although the government has focused on the fact that the forecasts show certain amounts from a line item called "reserves" being included in income, that concept by itself does not establish the probability of fraudulent conduct. All but one of the cheat sheets show that the reserves contribute just a small fractional increase to income. *See* GX 58, GX 58a, GX 1774, GX 1777.

Second, as discussed above, there is nothing suspicious about the use of reserves having a positive impact on earnings, Tr. 517, 1636, and even Corigliano admitted that these forecasts did not indicate that CUC's reserve usage was improper. Tr. 8307.

Third, contrary to Corigliano's testimony, the reserves number on the forecasts was not a "plug" that bridged the gap between CUC's actual and targeted earnings. *Compare* Tr. 6457, 8354-65 *with* GX 58, GX 58a, GX 1774.

Fourth, there is nothing sinister about the phrase "cheat sheet." This term is pervasive in our culture, and it refers to a shorthand summary of information. Tr. 11109-10.

Fifth, McLeod, whom the government did not allege to be a participant in the fraud, also received various iterations of the forecasts. McLeod testified that, based on conversations with Corigliano, he understood the reserves line item to represent the income effect that resulted when the company charged against the merger reserve a legitimate merger-related cost that the company had initially accounted for as an operating expense. Tr. 10895.

Sixth, to the extent the government suggests that a conscious avoidance charge was warranted based on the lone forecast showing $100 million reserves being used to increase income, it bears emphasis that Scott Forbes, Monaco and Silverman were made aware of virtually identical information on March 9, 1998, when they received the three-page schedule showing CUC's non-operating income based on merger reserve usage for 1996 and 1997. *See*

DX 1288.  After hearing Corigliano and Pember's explanations for these adjustments, neither

Scott Forbes nor Monaco suspected anything wrong with CUC's use of Ideon reserves to

increase income.  Tr. 2159-83, 5886-96; *see* DX 1288; DX 1303.

        Finally, the government argued that the "sudden" absence of the forecasts would

have alerted Shelton to the fact that CUC was likely committing fraud.  The cessation of

Corigliano's periodic practice of circulating a one-page forecast a few times a year, even

assuming anyone noticed, can plausibly be explained by any number of innocent explanations,

any one of which is more likely than a conclusion that the company's accounting staff had

undertaken fraudulent conduct.

        **g.**     **Pember's Whisper To Shelton That The Differences In NUMA's And NOAG's 1997 Actual Results And Their 1998 Budgeted Results Was Due To The Use Of Merger Reserves**

        The government next points to a meeting in late January 1998 that Shelton and

Pember attended with Scott Forbes and Monaco as warranting a conscious avoidance charge.

The government notes that when Shelton was questioned by former HFS personnel about wide

discrepancies between NUMA's and NAOG's 1997 results and their budgeted results for 1998,

Shelton was unaware of the reason for the discrepancy and Pember told Shelton quietly that the

differences were due to the use of merger reserves.  Gov't Memo at 5-6.  This event, assuming

the veracity of Pember's testimony, does not support a willful blindness charge.

        To begin with the most obvious point, Shelton did not know the reason for the

discrepancy between the actual and forecasted numbers.  He had to be told the reason by Pember.

He was not consciously avoiding knowledge; his conduct confirmed that he lacked knowledge of

the fraud.  Second, what Pember claims she told Shelton did not put him on notice of fraudulent

conduct.  There is no testimony that Pember ever indicated to Shelton that this use of reserves

was improper or that it violated GAAP. Third, on March 9, 1998, Scott Forbes, Monaco and

Silverman received a copy of DX 1288, which showed that the earnings for Spark Services and

NUMA included a $11 million reserve adjustment. *See* DX 1288 p.2. Thus, they were put on

notice of the same facts that Pember asserts she whispered to Shelton at the meeting in late

January 1998.

The government cannot have it both ways. If the information was not sufficient

to alert the government's friendly witnesses to the probability of a fraud, it was not sufficient to

put Shelton on notice.

### h.    The $20 Million Increase To The Software Reserve

The government's own experts confirmed that the prudent approach to

establishing a merger reserve is to ensure that the reserve covers all probable expenses in

connection with the merger. Tr. 503-04, 508-12.

At some point in 1996, Corigliano increased the size of the software component

of the Ideon reserve by $20 million.

There was not anything suspicious about Shelton's explanation that he believed

the $20 million increase related to an increase in the returns reserve. Although the government

sought to impeach Shelton's testimony about the increase in the restructuring reserve relating to

returns, in a letter to Walter Forbes, Scott Forbes explained that among the reasons for a $60

million increase to the Cendant *restructuring* charge was that the company had established "[a]

$10 million reserve for Software returns." This letter was copied to Silverman, Monaco,

Corigliano and Pember. Moreover, the evidence demonstrated that CUC's Software division

was experiencing a higher than anticipated rate of returns during this time period, which was

consistent with Shelton's believe that the reserve for returns should be increased. *See* DX

31,305; DX 31,306; DX 31,120; Tr. 12137-51.

i.    **Shelton's Failure To Notice That The Sum Of The Subsidiary Reporting Packages Did Not Equal The Earnings Reported In The Form 10-Qs**

The government argues that Shelton's failure to notice the difference between (i) the sum of the subsidiaries' reporting packages and (ii) the earnings reported in the company's Form 10-Qs is evidence that Shelton knew that a fraud was likely taking place.

Shelton's *failure* to notice a discrepancy cannot be evidence that he *consciously suspected* fraud. Contrary to the government's repeated assertions, evidence that a defendant "could have" or "should have" noticed an important fact is not, and cannot be, evidence that the defendant harbored suspicions about that fact. Moreover, Shelton's failure to have noticed this discrepancy is far from negligent given that he did not receive all of the subsidiary reporting packages.

Moreover, *even if* Shelton had noticed this discrepancy, it still would not be evidence of conscious avoidance. Comparing the subsidiary reporting packages to the Forms 10-Qs is comparing apples with oranges. The financial data in the quarterly reports was presented on an accrual basis, whereas some of the subsidiaries reported their earnings on a cash, or a mixed cash-accrual, basis. The subsidiary reporting packages also would not have reflected legitimate topside and other adjustments that were made at corporate headquarters to the consolidated financials. And, most importantly, the subsidiary reporting packages did not include any of the non-operating income realized by CUC in 1996 and 1997. As was shown to Monaco and Scott Forbes, CUC had more than $100 million in non-operating income in 1996 and 1997.

Finally, this discrepancy was not hidden from many senior managers at CUC whom the government has not alleged to have been involved in the fraud. If the discrepancy did not put those executives on notice of the fraud, it is insufficient to have put Shelton on such

notice.

### C.     SHELTON DID NOT PURPOSEFULLY CONTRIVE TO AVOID KNOWLEDGE OF THE FRAUD

There was also insufficient evidence that Shelton purposefully contrived to avoid confirming the fact that CUC's accountants were engaged in fraudulent accounting. The question is not whether to credit Corigliano's and Pember's testimony that they had direct conversations with Shelton in which they discussed improper accounting. That testimony, if credited, might support a theory that Shelton had actual knowledge. It does not support a theory that Shelton deliberately closed his eyes to facts that he suspected were true, but did not want to confirm.

Far from supporting a theory that Shelton contrived to avoid confirming evidence of the fraud, the evidence showed precisely the opposite. Shelton attended the meeting with Scott Forbes on March 6. He gave Scott Forbes a copy of GX 160, which showed the contemplated reversal of $165 million in reserves in 1998. Shelton also attended the March 9 meeting where, like Monaco and Scott Forbes, (i) he heard Pember and Corigliano provide legitimate explanations for CUC's non-operating income in 1996 and 1997, (ii) he saw Pember produce a stack of invoices which she represented constituted merger-related charges to the Ideon reserve, and (iii) he heard Rabinowitz of E&Y say that he had reviewed the usage of the Ideon reserve and was satisfied with CUC's accounting.

### D.     THE CONSCIOUS AVOIDANCE CHARGE WAS NOT HARMLESS

The inclusion of the conscious avoidance charge unfairly prejudiced Shelton. The instruction created an intolerable risk that the jury reasonably believed that it could convict Shelton based only on its finding that Shelton suspected fraudulent activity *and did not act*. Indeed, the government unfairly invited the jury to convict on precisely this basis when it made

Shelton's possible negligence or recklessness a central focus of its cross examination. At the outset of its cross examination of Shelton, the government framed the operative issue as whether Shelton had "a hint, a clue, a suggestion, or an indication" about the fraud. Tr. 12537 *et seq.* The government even wrote the words, "No Hint, No Clue, No Suggestion, No Indication" on an easel in front of the jury box for the jury to stare at while cross-examination continued. Neither hints nor clues nor suggestions nor indications, however, are sufficient to prove Shelton's actual knowledge or his conscious avoidance of the fraud. In a case where the jury deliberated for more than 30 days and failed to reach a verdict on Shelton's co-defendant, the jury should not have been given the option of concluding that Shelton knew of the alleged fraud based on a theory for which there was insufficient evidence in the record.

In view of the foregoing, the conscious avoidance instruction was error, and the Court should vacate the conviction and grant Shelton a new trial.

## IV.   THE COURT IMPROPERLY ADMITTED EVIDENCE RELATING TO WALTER FORBES' PLANE EXPENSE CHARGE

Over Shelton's objection, the government introduced evidence that in September 1997, Corigliano raised with Shelton the idea of whether to charge to the Cendant merger reserve certain airplane expenses incurred by Walter Forbes in 1995 and 1996. Tr. 7378; GX 388. At that time, the CUC Compensation Committee had approved the reimbursement of $1.1 million in plane expenses that Walter Forbes had incurred in 1995 and 1996. After Corigliano recommended to Shelton that CUC charge the plane expenses to the merger reserve, Shelton undertook to review the total amount of plane expenses to which Walter Forbes was entitled. Shelton determined that CUC should reimburse Forbes for less than $600,000 of the $1.1 million previously approved by the Compensation Committee. Shelton thereafter put all relevant information relating to Forbes' plane expenses on a voucher, including the fact that the expenses

related to prior years and that the expenses should be charged to the Cendant merger reserve.

DX 1776

A.    **EVIDENCE RELATING TO WALTER FORBES' PLANE EXPENSES WAS NOT PROBATIVE OF THE CHARGED CONSPIRACY**

The government failed to offer any evidence that CUC's accounting for the plane expense charge was improper.  The only expert testimony offered on this subject was introduced by Shelton, who called Roman Weil, a distinguished professor of accounting at the University of Chicago, who has been retained by the Securities and Exchange Commission as its own expert on accounting in other cases.  Professor Weil provided unrebutted testimony that the accounting treatment for the airplane expense was appropriate and in accordance with GAAP.  *See* Tr. 11275-77.  Professor Weil concluded that Cendant appropriately included the plane expense charge as an "other unusual charge" in the line item "Merger Related Costs and Other Unusual Charges" on the income statement in its 1997 Form 10-K.  DX 1283.  Professor Weil testified that the plane expenses belonged on this line item, irrespective of whether the charge was a merger-related expense.  Tr. 11275-77.

Neither of the government's expert witnesses opined on the appropriateness of charging the plane expense to the Cendant merger reserve account.  Indeed, far from challenging the propriety of charging this expense against the merger reserve account, the government's accounting expert, Professor Robert Sack, provided testimony that was supportive of the conclusions reached by Professor Weil.  Professor Sack confirmed that the term "Other Unusual Charges" on the Income Statement is not precise and is a matter of judgment.  Tr. 542.  Moreover, Professor Sack testified that in certain circumstances, expenses relating to activity that occurred prior to the merger *can* be properly charged to a reserve established for that merger.  Tr. 544-45.

The admission of evidence relating to the charging of the plane expense was extremely prejudicial to Shelton. This evidence was the only example – flawed as it was – that the government could cite as showing Shelton as having been involved in purportedly charging ordinary, operating expenses to the merger reserve.

Without the benefit of any expert testimony supporting its position, the government contended in its main and rebuttal summation that Walter Forbes' plane expenses, having been incurred in 1995 and 1996, were inappropriately charged to the Cendant merger reserve account because those expenses could not have borne any relation to a merger that became effective in December 1997. Tr. 16058-70. Moreover, the government argued, without testimony or evidence to support the argument, that the jury should reject Professor Weil's testimony regarding the proper treatment of the plane expense on Cendant's income statement. The government contended that because Cendant's Form 10-K defined a "Merger-Related Costs and Other Unusual Charges" as a merger-related cost or an "other unusual charge associated with and coincident to the Cendant merger", the plane expense still had to be "associated with and coincident to" the Cendant merger in order to qualify as an "other unusual expense."

The government's argument was both legally and factually erroneous. To begin with, the government was obliged to rely on expert testimony to establish the purported impropriety of this charge to this line item in the Cendant Form 10-K. Courts have made clear that the issue of whether an accounting practice falls within the standards set by GAAP is a question of fact best addressed through expert testimony. *See In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 593 (D.N.J. 2001); *see also Wechsler v. Hunt Health Sys. Ltd.*, 198 F. Supp. 2d 528, 529 (S.D.N.Y. 2002) (opinion regarding accounting practices held to be "clearly an opinion based upon his expert knowledge"); *Danis v. USN Communications, Inc.*,

121 F. Supp. 2d 1183, 1192 (N.D. Ill. 2000) ("Violations of GAAP and GAAS standards are established through expert testimony.").

In any event, the government's contention that the plane expense was not an "other unusual charge" because it did not relate to the Cendant merger reserve was patently incorrect. Accounting Principles Bulletin Number 30 requires ordinary expenses that are infrequent and non-recurring to be classified as an "other unusual charge" on an income statement. Tr. 11272. The line item "merger related and other unusual costs" signaled to a reader of the Cendant financial statement that in addition to merger-related expenses, there were other expense of an infrequent or unusual nature that were non-recurring. Tr. 11273. The government never offered any rebuttal to this proposition of accounting that was explained in Professor Weil's testimony.

### B.   EVIDENCE RELATING TO WALTER FORBES' PLANE EXPENSES WAS NOT ADMISSIBLE AS SIMILAR ACT EVIDENCE

Nor was the evidence relating to the plane expense admissible under Fed. R. Evid. 404(b). The Second Circuit has reversed convictions where the government failed to demonstrate by a preponderance of the evidence that the alleged "other acts" it sought to introduce were wrongful or illegal. *See United States v. Gilan*, 967 F.2d 776, 776-82 (2d Cir. 1992) (reversing conviction based on erroneous admission of Rule 404(b) evidence); *United States v. Afjehei*, 869 F.2d 670, 671 (2d Cir. 1989) (reversing on the ground that "the value of [the government's purported Rule 404(b) evidence] to show knowledge was nonexistent and the likely prejudice . . . was great"); *United States v. Peterson*, 808 F.2d 969, 975-76 (2d Cir. 1987) (concluding that the jury was "forced to speculate as to the existence of crucial unproven facts" in order to "make reasonable use of th[e] evidence").

As set forth above, the government failed to meet its burden of proving by a

preponderance that the evidence relating to the charging of the plane expense to the Cendant

merger reserve account was wrongful or illegal.  Professor Weil offered unrebutted testimony

that Cendant appropriately reported this expense on the line item on the 1997 income statement

for "merger expenses and other unusual charges."  The government failed to present any

evidence that Cendant should have accounted for the plane expense in any other manner.

Indeed, despite having called two expert witnesses to opine on a variety of accounting issues, the

government declined to ask either of its witnesses how CUC should have accounted for the plane

expense incurred by Walter Forbes.

### C.    THE INTRODUCTION OF THIS EVIDENCE WAS UNFAIRLY PREJUDICIAL

Even assuming that this evidence was relevant evidence pursuant to Rule 401 or

Rule 404(b), the Court should have precluded this evidence under Fed. R. Evid. 403 because its

probative value was outweighed by unfair prejudice.  The conspiracy charged by the government

involved the contemplated misuse of hundreds of millions of dollars in merger reserves to reduce

ordinary expenses unrelated to the merger.  In contrast to the clandestine process undertaken by

Corigliano, Pember, Speaks and others to create phony invoices and journal entries to conceal

their misuse of merger reserves, Shelton signed the plane expense voucher in which he correctly

identified the nature of the charges, indicated that the expenses had been incurred in 1995 and

1996, and directed that the expenses be charged to the Cendant merger reserve.  In addition,

Shelton signed the expense voucher only after reducing the amount to be reimbursed to Walter

Forbes by $500,000 below the sum authorized by the Compensation Committee.  Shelton then

forwarded the voucher to Menchaca, whom the government did not allege was a participant in

the fraud, understanding that Menchaca would have an opportunity to review the voucher form

and its note that the expense should be charged to the merger reserve.  Menchaca signed the

expense voucher and did not raise any questions about the accounting treatment of this charge. Significantly, Menchaca understood that the purpose for preparing an expense voucher was to enable CUC's outside auditors to review the expense and the account to which the expense had been charged. Tr. 10183-85.

In view of the foregoing, we respectfully submit that the Court abused its discretion in admitting the evidence of the Walter Forbes' plane expense and that the admission of this evidence unfairly prejudiced Shelton. Accordingly, we request that the Court vacate the verdict and grant Shelton a new trial.

## V.    THE COURT IMPROPERLY ADMITTED THE TESTIMONY OF JOHN OLLER

### A.    BACKGROUND

On April 14, 1998, Cendant announced that it had discovered accounting irregularities at the predecessor company of CUC and that it would likely need to restate earnings for prior years. Immediately thereafter, the Audit Committee of Cendant's Board of Directors retained the law firm of Willkie, Farr & Gallagher and the professional services firm of Arthur Andersen to conduct an extensive investigation into the accounting practices at CUC. During the Audit Committee investigation, counsel from Willkie Farr interviewed Shelton on four separate occasions.

The government called John Oller, a Willkie Farr partner, to testify concerning statements allegedly made by Shelton during two of his Audit Committee interviews. Oller attended the interviews of Shelton on June 10, 1998, and July 24, 1998. Oller testified, however, that he did not remember what Shelton said during these interviews and that his recollection was not refreshed by the memoranda of those interviews. Tr. 10360-63, 10418.

The government thereafter sought to establish a basis by which Oller could read

into the record excerpts from memoranda of Shelton's interviews on June 10, 1998, and July 24, 1998, as past recollection recorded pursuant to Fed. R. Evid. 803(5). Oller testified that although he attended Shelton's interviews on those days, he could not confirm that he was present during every moment of those interview sessions. Tr. 10366-67. Steven Greiner, one of Oller's partners at Willkie Farr, asked most of the questions at the Shelton interviews. Oller may have asked one or two questions. Tr. 10485-86. Willkie Farr designated an associate to be the principal note-taker at each interview. Tr. 10351, 10485-86. Members of the Audit Committee were present during at least one of Shelton's interviews. Tr. 10359. To the extent Oller took notes of these interviews, his notes would have been much less comprehensive than those taken by the Willkie Farr associate. Tr. 10374.

Willkie Farr elected to destroy all drafts of the memoranda of the dozens of interviews it conducted during the investigation, due to Cendant's concern that such recordings or drafts could be used in future litigation. Tr. 10351-52, 10358. Whatever contemporaneous notes Oller took at Shelton's interviews were destroyed. Tr. 10367.

After each interview of Shelton, the Willkie Farr associate who was the principal note-taker prepared an initial draft of the interview memorandum. Tr. 10351. The associate thereafter circulated his or her draft to the other attorneys who attended the Shelton interview, each of whom was free to make changes or offer comments based on his or her notes and/or personal recollection. *Id.* The memoranda were also circulated to any Arthur Andersen accountants and Audit Committee members who attended the interview. Willkie Farr generally received any comments from Arthur Anderson or Audit Committee members approximately two weeks after the circulation of the initial draft. Tr. 10353. "[A]t the end of the day, there would be a final sort of official memo, if you will, typewritten, which reflected the collective comments

of everyone, including Arthur Andersen." *Id.* at 10351.

Although Oller was sure that he reviewed drafts of the Shelton interview memoranda, he had no specific recollection of doing so. Tr. 10351, 10374. The final interview memoranda were the investigators' characterizations of what Shelton said at the sessions, as opposed to a verbatim transcript. Tr. 10356. Neither Shelton nor his counsel was given any opportunity to review and comment on the draft interview memoranda. *See* Tr. 10374-75.

Oller did not dispute that the memoranda of the Shelton interviews attributed statements to Shelton which, at the time the memoranda were finalized, he did not remember Shelton having made. Tr. 10378. Oller confirmed that the final version of a memorandum reflected more than just what he recalled being said at the interview; the final memorandum was also "the product of the memory of other people as well." *Id.*

Over defendant Shelton's objection (Tr. 10384), the Court permitted Oller to read into the record excerpts of the June 10 and July 24, 1998 interview memoranda as past recollection recorded. Tr. 10391-417, 10467-83. These excerpts purportedly described Shelton's interview statements regarding, among other matters, (i) his involvement in the creation of the 1998 budget and the documents that he received during that process, (ii) the accounting in connection with the sale of Interval, (iii) the March 6, 1998 meeting; (iv) his intention to exercise stock options in or about April 1998; and (v) the travel and entertainment reimbursement voucher for Walter Forbes's plane expenses in 1995 and 1996.

### B.    THE MEMORANDA DID NOT SATISFY THE ADMISSIBILITY REQUIREMENTS OF FED. R. EVID. 803(5)

Under Fed. R. Evid. 803(5), a proponent seeking to read a memorandum into evidence as past recollection recorded must establish that (i) the memorandum concerns a matter about which the witness once had knowledge, (ii) the witness now has insufficient recollection to

testify fully and accurately, (iii) the memorandum was made or adopted by the witness when the matter was fresh in the witness' memory, and (iv) the memorandum must accurately reflect the witness' knowledge.  Like all exceptions to the hearsay rule, Rule 803(5) "proceeds upon the theory that under appropriate circumstances a hearsay statement may possess circumstantial guarantees of trustworthiness," such that the availability of the declarant is not relevant.  *See* Advisory Committee Notes to Fed. R. Evid. 803.

The evidence shows that the memoranda were not authored by Oller and do not reflect *only* Oller's *personal* recollection of Shelton's interviews, as Rule 803(5) requires. Rather, they reflect the *collective* recollection of the interview participants.  Oller was not the principal note-taker at the interview, he did not examine Shelton (except for one or two questions), he cannot confirm that he was present for the entire interview, he did not write the initial drafts of the interview memoranda, and he did not dispute that the final memoranda attribute statements to Shelton which, at the time the memoranda were finalized, he did not remember Shelton having made.

Had Oller been called to testify at the time that he was preparing or reviewing the interview memoranda, his testimony would have been limited to matters as to which he had personal knowledge.  In other words, he could have testified only to matters as to which he had a distinct recollection under Fed. R. Evid. 602.  Because Oller acknowledged that he could not be sure that any particular statement in the report was based on his own personal knowledge or recollection at the time that he reviewed the memoranda, the memoranda should have been deemed inadmissible pursuant to Rule 803(5).[9]

---

[9] Moreover, the memorandum regarding Shelton's July 24, 1998 interview contains a material misstatement about Shelton's intention to sell his stock.  Contrary to the memorandum, Shelton never told the interviewers that on April 13, 1998 he intended to sell his CUC stock.  Rather, he told them only that he considered exercising his stock options.  *See* Auerbach Decl. at ¶ 3; Schaeffer Decl. at ¶ 4 (filed with

C. **THE MEMORANDA DID NOT SATISFY THE ADMISSIBILITY REQUIREMENTS ESTABLISHED IN** *UNITED STATES V. ALMONTE*

The Second Circuit has held that a "third party's characterization of a witness's statement does not constitute a prior statement of that witness unless the witness has subscribed to that characterization" or the third party characterization is a substantially "verbatim transcript of the witness's own words." *United States v. Almonte*, 956 F.2d 27, 29 (2d Cir. 1992); *see also United States v. Leonardi*, 623 F.2d 746, 757 (2d Cir. 1980) ("We have only recently reiterated the rule that a witness may not be charged with a third party's characterization of his statements unless the witness has subscribed to them."); *see also United States v. Schoenborn*, 4 F.3d 1424, 1427-29 (7th Cir. 1993) (notes of witness's prior statements may not be admitted unless they are verbatim transcript or were adopted by witness). The burden of proving that the notes reflect "the witness's own words rather than the note-taker's characterization falls on the party seeking to introduce the notes." *Almonte*, 956 F.2d at 29.

In *Almonte*, the defendant sought to admit notes made by an AUSA to show that a DEA agent previously made a statement to the AUSA inconsistent with the agent's in-court testimony. Affirming the trial court's holding, the Second Circuit held that the AUSA's notes characterizing the DEA agent's out-of-court statement were inadmissible as the agent's prior inconsistent statement because (i) the notes were a summary of the DEA agent's statements, not

---

Shelton Memo. In Further Opposition to Motion of United States Seeking to Admit Defendants' Statements As Past Recollection Recorded (filed Aug. 9, 2004)). At the time the interview memorandum was prepared, Oller construed Shelton's statement as expressing an intention to sell stock because Oller inaccurately assumed one would sell securities obtained from an option exercise when those securities were trading at a high price. *See* Tr. 10487-94. On cross-examination, Oller admitted that he did not recall whether Shelton had said during his interview that he intended to sell the underlying securities or just hold them. Tr. 10488. Nor did Oller know whether there were any favorable tax consequences to exercising and holding stock if one expected the value of the stock to continue rising. *Id.* The result of Oller's patently incorrect conclusion was to link Shelton with the two cooperating witnesses, Corigliano and Pember, who each sold millions of dollars of stock before the disclosure of the fraud, when in fact Shelton's conduct could not have been more different and was exculpatory.

a memorialization of his words, and (ii) the agent had not subscribed to the characterization of his statement in the AUSA's notes. *See id.* at 30.

In reaching its holding, the Second Circuit noted that the threshold issue is one of relevance and authentication under Fed. R. Evid. 104(b) and 901(a). That is, for the notes to be relevant as a prior inconsistent statement of the DEA agent, the notes must first be shown to contain the DEA agent's statement, as opposed to the notetaker's characterization thereof. The *Almonte* Court reasoned that "[i]f a third party's notes reflect only that note-taker's summary characterization of a witness's prior statement, then the notes are irrelevant as an impeaching prior inconsistent statement, and thus inadmissible." *Id.* at 29.

*Almonte's* threshold requirements for prior inconsistent statements apply with equal force to party admissions under Fed. R. Evid. 801(d)(2). In *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 168 F. Supp. 2d 57 (S.D.N.Y. 2001), the plaintiffs sought to offer a non-verbatim transcript of an interview with a party-opponent as an admission pursuant to Fed. R. Evid. 801(d)(2)(C). *Id.* at 58. Although the interviewer admitted that he had edited the transcript to make it easy to read, he asserted that it was accurate as to the "essence" and "gist" of what the interviewee said. *Id.* at 59. The interviewee was not asked to review and correct the transcript during its preparation. *Id.* Following *Almonte*, the district court in *Bank Brussels* held that the plaintiffs had the burden of showing the transcript reflected the party-opponent's own words. Finding that the plaintiffs had not made this threshold showing, the court held the transcript had not been authenticated and could not be admitted. *Id.* at 60-61.

Here, Oller conceded that the interview memoranda did not represent a verbatim transcript of Shelton's statements. Tr. 10356. Accordingly, the interview memoranda did not satisfy the requirements of *Almonte* or *Bank Brussels* and should not have been admitted under

Rule 801(d)(2)(A).[10]

## VI.  THE INTRODUCTION OF EVIDENCE CONCERNING ALLEGED MISCONDUCT PRIOR TO 1995 CONSTITUTED A CONSTRUCTIVE AMENDMENT OF AND A PREJUDICIAL VARIANCE TO THE INDICTMENT

### A.  THE SPECIFIC CHARGES OF THE INDICTMENT

The forty-seven page Indictment specifically alleges a scheme by which the defendants and their coconspirators fraudulently misapplied merger reserves that were established in connection with the Ideon and Cendant mergers.  Indict. Count 1 ¶¶ 30-43. Although paragraph 30 of the Indictment contains the general allegation that "[f]rom at least as early as the late 1980's to in or about 1998, defendants WALTER A. FORBES and E. KIRK SHELTON and their co-conspirators established excessive merger reserves and then drew upon them to fraudulently inflate the reported operating income of CUC and Cendant," the specific allegations which follow allege only that defendants misused the Ideon and Cendant merger reserves in connection with CUC's financial statements for fiscal 1997 and calendar 1997.

The Indictment contains allegations concerning several other specific accounting practices.  It alleges that the defendants knowingly caused the company's membership cancellation reserve to be under funded (¶¶ 44-48), and knowingly skewed the recognition of revenues and expenses in Comp-U-Card membership programs to inflate present earnings (¶¶ 49-53).  The Indictment also alleges that the defendants knowingly participated in "Other Fraudulent Accounting Entries", including: (i) manipulation of membership solicitation costs (¶ 55); (ii) manipulation of the commissions payable liability (¶ 56); (iii) the improper recording of

---

[10]  The government repeatedly invoked Shelton's purported statements during his Audit Committee interviews in its main and rebuttal summations.  The government argued that these alleged statements constituted *false* denials of Shelton's involvement in the charged scheme.  The government also referred to portions of the memoranda to establish Shelton's purported knowledge of certain facts and to demonstrate facts purportedly relevant about Shelton's state of mind.

a $2.6 million tax benefit for Sierra (¶ 57); and (iv) the improper increase of $33 million to calendar 1997 earnings as a result of the re-calendarization process (¶ 58). The only specific allegations of improper accounting with respect to these practices relate to the financial statements filed by CUC for fiscal 1996, fiscal 1997, and calendar 1997.

### B.    THE INTRODUCTION OF PRE-1995 CONDUCT WAS BEYOND THE SCOPE OF THE INDICTMENT.

Corigliano testified at length regarding improper accounting at CUC that was not alleged in the Indictment.

Corigliano offered extensive testimony concerning the alleged misuse of "general reserves" in the pre-1995 time period. *See, e.g.,* Tr. 6298-99 (testifying that "general reserves" were like a "cookie jar" allegedly used to meet analyst expectations in fiscal year 1991); Tr. 6303-07 (testifying about "cheat sheet" allegedly identifying reversals of general reserves into operating earnings at CUC in fiscal year 1991); Tr. 6322-25 (testifying that in 1991, he allegedly had conversations regarding the use of general reserves to inflate performance on a quarterly basis); 6327-28 (testifying that it was his alleged understanding that he needed to hide the use of general reserves during the quarters because the auditors would review changes in general reserves). The Indictment does not allege any improper manipulations involving general reserves.

Similarly, Corigliano testified about purportedly fraudulent accounting in the pre-1995 time period in connection with profit sharing receivables. *See, e.g.,* Tr. 6292 (testifying that "profit sharing receivables on FISI's and BCI's books could be adjusted to increase the receivable and increase operating earnings"; "[a]nother potential adjustment to be used as a plug to get to operating earnings"); Tr. 6301-02 (testifying that profit sharing receivable was listed as a potential adjustment in document used to manipulate financial statements); Tr. 6354 ("And

each quarter, if the company fell short from meeting the operating earnings, he frequently had me increase the profit sharing receivable, use it as a plug number, in a sense, to get to the desired results, get to the desired operating results."); Tr. 6355-56 (opining that calculation of profit sharing receivable was not "based upon a good faith analysis of the facts," but rather "on the need to find more operating income" and "hit the operating numbers"); Tr. 6357-59 (testifying that $2.4 million from potential profit sharing receivable adjustments is included in year to date operating earnings number or EBIT); Tr. 6721-22 (testifying about allegedly taking $500,000 into Q4 1996 from FISI division for profit sharing). The Indictment contains no allegations regarding the improper manipulation of the profit sharing receivables.

Corigliano also testified about the alleged misuse of the GETKO and Essex merger reserves. *See, e.g.*, Tr. 6532-62 (testimony regarding GETKO reserve); Tr. 6536-41 (testifying about alleged establishment of excess merger reserves in connection with the GETKO acquisition to be used to increase operating earnings); Tr. 6542-48 (testifying about alleged discussion of these issues with Shelton); Tr. 6549 (testifying that he and Shelton allegedly performed calculations concerning adjustments to EBIT); Tr. 6396-6402 (testifying that a $1 million increase to Essex's reserves had no basis in fact and was illegitimate); Tr. 6574 (testifying that the entire $2 million increase to Essex's reserves, comprised of increases over a twelve month period, was illegitimate); Tr. 6623-37 (testifying about a meeting at which Corigliano allegedly reminded Shelton about the improper use of Essex merger reserves to inflate income). The government introduced exhibits in an attempt to corroborate this testimony (*e.g.*, GX 30b, GX 55, GX 57) and called Albright, the former CFO of Essex, to provide additional evidence concerning the establishment and use of the Essex reserve. Although the Indictment alleges manipulations involving the Ideon and Cendant merger reserves, there are no

allegations of any wrongdoing in connection with the GETKO and Essex merger reserves.

During its summation, the government invited the jury to convict Shelton based on these facts, none of which are alleged in the Indictment. The government argued that the fraud was "raging" in the early 1990s when the conspirators were improperly using general reserves to inflate earnings. Tr. 14830-31. The government argued at length that the evidence relating to the misuse of the Essex merger reserve, which the government claimed was corroborated by Albright's testimony, clearly demonstrated that Shelton was involved in fraudulent activity. Tr. 14882-87. The government also suggested that Shelton praised Corigliano's "cooking the books" in connection with the GETKO acquisition. Tr. 14887-88.

### C. THE NEW CHARGES EFFECTED A CONSTRUCTIVE AMENDMENT AND A PREJUDICIAL VARIANCE

As discussed above, a constructive amendment occurs "[w]hen the trial evidence or the jury charge operates to broaden the possible bases for conviction from that which appeared in the indictment." *Unites States v. Milstein*, 2005 U.S. App. LEXIS 4009, at *23. "A constructive amendment of an indictment is a *per se* violation of the Grand Jury Clause of the Fifth Amendment that requires reversal even without a showing of prejudice to the defendant." *United States v. Wozniak*, 126 F.3d at 109 (quotation omitted). Similarly, when the evidence offered by the government at trial establishes "facts materially different from those alleged in the indictment," and a defendant is thereby prejudiced in his ability to defend himself, the variance constitutes reversible error. *United States v. Thomas*, 274 F.3d 655, 670 (2d Cir. 2001) (quotation omitted).

Here, the evidence and the government's arguments regarding the conspirators' alleged misuse of general reserves, profit-sharing receivables, and the Essex and GETKO merger reserves presented new bases of conviction not alleged by the Indictment. *See id.* at *20-29. The

Indictment's broad allegation that the alleged conspiracy began at least as early as the late 1980s is insufficient to cure this error. *See* Indict. Count 1 ¶ 30.

First, general reserves and profit-sharing receivables are accounting concepts wholly unrelated to merger reserves, cancellation reserves, or any of the other accounting concepts described in the Indictment. None of the allegations in the Indictment would have provided defendants with notice that the government intended to charge them with fraudulent conduct relating to these distinct accounting practices.

Second, the Indictment's detailed specification of the alleged scheme involving the misuse of the Ideon and Cendant merger reserves precluded the government from charging Shelton with the misuse of the Essex and GETKO merger reserves, notwithstanding the government's vague, conclusory allegation that the conspiracy commenced in the late 1980s. The Second Circuit has held that where an Indictment alleges a criminal scheme with specificity, the government cannot present evidence and arguments that charge the defendant with acts beyond that scheme, even if the Indictment includes more general allegations of wrongdoing. *See, e.g, Milstein*, 2005 U.S. App. LEXIS 4009, at *20-29; *United States v. Zingaro*, 858 F.2d at 99.

The recent Second Circuit case of *Milstein*, decided just weeks ago, is directly analogous. In that case, the government charged the defendant with, among other counts, distributing misbranded drugs in interstate commerce with fraudulent intent. The indictment contained the general allegations that the defendant participated in the "forgery or falsification of any part of the packaging material, including the instructional inserts, lot numbers or expiration dates, renders the drug misbranded under federal law." 2005 U.S. App. LEXIS 4009 at *21. The indictment proceeded to specifically allege a scheme whereby the defendant and others

purchased prescription drugs from pharmaceutical laboratories overseas and repackaged them

using the brand packaging and trademarks of licensed U.S. manufacturers.  The indictment

alleged that the defendant and others "sold these re-packaged drugs as if they were the original

product from the licensed manufacturers, thus distributing misbranded drugs."  *Id.*  At trial,

however, the government introduced evidence not specifically set forth in the indictment which

tended to show that the drugs were not sterile, contrary to the claims of sterility found in the

instructional inserts.  The government argued that this was *additional* evidence that could

support a conviction for misbranding prescription drugs.

On appeal, the government argued that the introduction of this evidence did not

constitute a constructive amendment because the Indictment generally alleged the defendant's

role in misbranding drugs.  The Second Circuit rejected this contention and explained that:

> we are persuaded that the indictment, charging Milstein with
> misbranding due to his repackaging of the drugs, was
> constructively amended when the Government alleged that the
> drugs were misbranded because they were not sterile. . . . Alleging,
> as the Government did in the second superseding indictment, that
> Milstein was charged with misbranding because he 're-packaged
> drugs as if they were the original product from the licensed
> manufacturers' would not necessarily place Milstein on notice that
> the Government would also attempt to prove that the drugs were
> not sterile.

*Milstein,* 2005 U.S. App. LEXIS 4009, *24-25; *see also Zingaro*, 858 F.2d at 96-102 (reversing

extortion conviction where proof of loansharking did not relate to extortion scheme specifically

alleged in indictment).

In this case, the Indictment's specific allegations regarding the misuse of the

Ideon and Cendant merger reserves were captioned "Fraudulent Use of Merger Reserves."

Indict. Count 1 ¶ 41.  The introductory, general allegations regarding the duration of the

conspiracy did not provide the government carte blanche to introduce new charges of merger

reserve misuse which were not considered by the Grand Jury and of which the defendants had no notice. The ambit of the government's proof was circumscribed by the Indictment's extensive and particularized allegations regarding the nature of the fraudulent scheme. The introduction of evidence and arguments related to the GETKO and Essex merger reserves, as well as other accounting topics not mentioned in the Indictment, effected an impermissible constructive amendment of the Indictment.

In addition, the introduction of this surprise testimony, documents and arguments violated Shelton's Sixth Amendment right to notice of the charges against him. The Sixth Amendment requires that a defendant be afforded sufficient notice of the charges against him to permit him to plead former jeopardy upon prosecution and to enable him to prepare a defense. *Russell v. United States*, 369 U.S. 749, 763-64 (1982). To satisfy the notice requirement, "the indictment must state some fact specific enough to describe a particular criminal act, rather than a type of crime." *United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000) (Gibson, J., separate opinion).

Nothing in the Indictment would have placed Shelton on notice that the government would seek to hold him responsible for allegedly fraudulent conduct in connection with the GETKO and Essex merger reserves, general reserves or profit-sharing receivables. The notice violation was exacerbated by the government's refusal to provide any particulars regarding pre-1995 conduct. *See, e.g., United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987) ("The relevance of key events was shrouded in mystery at the commencement of and throughout the trial. The Government did not fulfill its obligation merely by providing mountains of documents to defense counsel . . . "); *see also United States v. Davidoff*, 845 F.2d 1151 (2d Cir. 1988) (reversing convictions in RICO conspiracy case involving conduct over

seven years when indictment alleged extortionate predicate act directed at one company, district

court denied particulars, and government offered evidence at trial of extortions aimed at several

companies).

## VII.  THE COURT IMPROPERLY ALLOWED CORIGLIANO AND PEMBER TO OFFER EXPERT TESTIMONY ON TECHNICAL ACCOUNTING ISSUES

### A.  LEGAL STANDARDS ESTABLISHED BY FED. R. EVID. 701 & 702

Testimony based on scientific, technical or other specialized knowledge is expert

testimony.  Such testimony may not be offered under the guise of lay opinion testimony under

Fed. R. Evid. 701.  Testimony by a fact or percipient witness concerning the witness's

conclusions or opinions is strictly limited by the 2000 amendment to Fed. R. Evid. 701.  Rule

701, as amended, provides:

> If the witness is not testifying as an expert, the witness' testimony in the
> form of opinions or inferences is limited to those opinions or inferences
> which are (a) rationally based on the perception of the witness, and (b)
> helpful to a clear understanding of the witness' testimony or the
> determination of a fact in issue, *and (c) not based on scientific, technical,
> or other specialized knowledge within the scope of Rule 702.*

*Id.* (emphasis added).

Testimony involving specialized knowledge, governed by Rule 702, can be

distinguished from lay opinion testimony, admissible under Rule 701, by asking whether the

testimony is based on everyday experiences that any person could have or specialized knowledge

not available to the general public.  *See, e.g.*, Fed. R. Evid. 701 advisory committee note to the

2000 amendment (explaining that Rule 701 would permit lay opinion testimony on subjects such

as "the appearance of persons or things, identity, the manner of conduct, competency of a person,

degrees of light or darkness, sound, size, weight, [and] distance" and would *not* permit lay

opinion testimony on subjects such as "how a narcotic was manufactured," or whether "bruising

around the eyes is indicative of skull trauma").

      Courts applying Rule 701, as amended, have consistently concluded that the Rule precludes opinion testimony, even from witnesses with firsthand knowledge of events, to the extent that the testimony is based on the witness's specialized knowledge or training.  *See, e.g. United States v. Glenn*, 312 F.3d 58, 66-67 (2d Cir. 2002) (district court abused its discretion in allowing drug dealer's lay opinion testimony about manner in which drug dealers carry handguns, notwithstanding fact that drug dealer witnessed event).  Faced with circumstances similar to this case, the court in *Wechsler v. Hunt Health Sys., Ltd.*, 198 F. Supp. 2d 508, 529 (S.D.N.Y. 2002), held that a CPA who was "personally involved with the financial statements" of the defendant could not opine on whether the defendant's accounting was proper because he had not been offered as an expert.  Specifically, the plaintiffs complained about a paragraph in the accountant's affidavit that read:  "[t]t was entirely proper for [the defendant] to account this way for the healthcare receivables that [the defendant] sold to [the plaintiff]."  *Id.*  The court struck this portion of the affidavit because "it was clearly an opinion based upon his expert knowledge."  *Id.*

### B.    THE IMPROPER OPINION TESTIMONY OF CORIGLIANO AND PEMBER

      Corigliano opined as to the propriety of numerous, alleged accounting decisions, and opined on and purported to quantify the impact of these accounting decisions on CUC's financial results.  For example, Corigliano opined:

      (i.)     that the reporting of the membership rejects was wrong and had an impact on earnings, Tr. 6367-68;

      (ii.)    that some reserves in connection with the GETKO acquisition were legitimate and others were not, Tr. 6536-41;

      (iii.)   that there was no basis in fact for the Welcome Wagon reserve, Tr. 6572-73;

(iv.)      that there was no basis in fact for the Essex reserve, Tr. 6574-75;

(v.)      that there was no basis in fact for profit sharing adjustments, Tr. 6722;

(vi.)      that the Ideon reserve was overstated by $40-50 million, Tr. 6783;

(vii.)      that the one-time gain on sale of Interval business would not be "looked at by Wall Street", Tr. 7258;

(viii.)      that the alleged allocation of expenses between months of November and December 1996 and January 1997 was illegitimate and overstated results by approximately $30 million; Tr. 7325-26;

(ix.)      that the earnings announcement for year ended 12/31/97 was false, Tr. 7495-96; and

(x.)      and that the accounting policy concerning commissions payable was not legitimate, Tr. 7538-39[11].

In many instances, Corigliano offered an expert opinion relating to pre-1995 accounting practices which had not been specifically alleged in the Indictment. Corigliano gave expert testimony on the following topics:

(i.)      that GX 667 was a "more accurate analysis to calculate what the membership cancellation reserve should be at 1/31/91", Tr. 6256;

(ii.)      that the membership cancellation reserves on CUC's general ledger

---

[11] *See also* Tr. 6206-08 (opining that reserves for fiscal year 1997 had no "basis in fact"); Tr. 6576-77 (opining that there was no "basis in fact" for CUC Europe reserve); Tr. 6579 (opining that there was no "basis in fact" for International Sentinel reserve); Tr. 6616 (defining accounting concepts of "pooling of interests" and "purchase-price accounting"); Tr. 6712 (opining that there was no "basis in fact" for line items); Tr. 6825 (opining that $20 million increase in software reserve had no "basis in fact"); Tr. 6830-34 (opining that accounting information in CUC 10-Q for the third quarter of 1997 is "false"); Tr. 6942 (opining that operating earnings provided to analysts were "false"); Tr. 7115 (opining that reported CUC earnings were not "legitimate"); Tr. 7307-11 (opining that financial information in 1997 CUC annual report is "false"); Tr. 7328 (opining that budgeted reserves had no "basis in fact"); Tr. 7332-33 (opining that accounting adjustments had no "basis in fact"); Tr. 7380-81 (opining on impact of alleged charge of T&E expense against merger reserve); Tr. 7395 (opining that CUC did not "legitimately" make its numbers); Tr. 7405 (opining that BCI-CNA contract termination adjustment was "illegitimate"); Tr. 7419 (opining that alleged plan to use reserves to improve operating earnings had no "basis in fact"); Tr. 7421 (opining that alleged plan to use reserves was "arbitrary"); Tr. 7495 (opining that Cendant's most recent financial statements were "false"); Tr. 7544-45 (opining that there was "no basis for not recording" rejects and that practice of deferring recordation of rejects "favorably impacted our operating earnings"); Tr. 7553-61, 7566-67 (opining that various SEC filings were "false").

were "$9 million short" for fiscal year 1991, Tr. 6272;

    (iii.)    that CUC's membership cancellation reserves were "understated" for the years 1991 to 1997, Tr. 6277-78;

    (iv.)    that there was "no basis in fact" for including $2 million of general reserves in CUC's earnings in fiscal year 1991, Tr. 6322-24;

    (v.)    that calculation of the BCI profit sharing receivable was not "based upon a good faith analysis of the facts", Tr. 6355-56;

    (vi.)    that the reported numbers for fiscal year 1994 included adjustments that were not "[l]legitimate", Tr. 6377; and

    (vii.)    that adjustments resulting in a $6 million increase in gross profits for fiscal year 1994 had no basis in fact, Tr. 6388-95.

Similarly, Pember provided expert opinions that were based upon her specialized knowledge of GAAP. She opined:

    (i.)    that the company's use of reserves was inappropriate, Tr. 2332-33;

    (ii.)    that, in general, a company needs to reserve for future cancellations and rejects, Tr. 2349-50;

    (iii.)    as to how Comp-U-Card should have treated excess balances in accrued liability accounts, Tr. 2435-37;

    (iv.)    about the way in which a membership cancellation reserve is properly used, Tr. 2469;

    (v.)    that the financial statements the company had provided to auditors were fairly presented in conformity with GAAP, Tr. 2815-16; and

    (vi.)    about what comprises a material transaction, Tr. 2819.

Corigliano's and Pember's opinions were necessarily predicated upon the GAAP rules which regulate these accounting subjects. Indeed, federal law mandates that GAAP is the standard by which the accuracy of a financial statement is measured. *See* 17 C.F.R. § 210.4-01(a)(1). Laypersons are unfamiliar with GAAP and are unable to make the types of technical

judgments about which Corigliano and Pember opined. *See Danis v. USN Commun., Inc.*, 121 F. Supp. 2d 1183, 1192 (N.D. Ill. 2000) ("Violations of GAAP . . . are established through expert testimony.").

      C.      **THE GOVERNMENT VIOLATED ITS DISCLOSURE OBLIGATIONS AND CIRCUMVENTED FED. R. EVID. 702 BY PRESENTING UNDISCLOSED EXPERT TESTIMONY THROUGH CORIGLIANO.**

      Because Corigliano and Pember offered expert accounting testimony, the government was required to comply with the pretrial disclosure requirements of Fed. R. Crim. P. 16(a)(1)(G), and to satisfy the admissibility requirements of Fed. R. Evid. 702. It failed to do either. The 2000 amendment to Rule 701 that added limitation (c) was intended to "eliminate the risk that the reliability requirements set forth in Rule 702 [concerning expert testimony] will be evaded through the simple expedient of proffering an expert in lay witness clothing." Fed. R. Evid. 701 advisory committee note to 2000 amendment; *see also United States v. Peoples*, 250 F.3d 630, 641 (8th Cir. 2001) ("What is essentially expert testimony, however, may not be admitted under the guise of lay opinions. Such a substitution subverts the disclosure and discovery requirements of Fed. R. Crim. P. 26 and 16 and the reliability requirements for expert testimony as set forth in *Daubert* . . . .") (citations omitted). The sheer volume and prejudicial nature of this improper expert testimony, which the government introduced without adhering to the disclosure and gate-keeping functions of the Federal Rules of Evidence and Criminal Procedure, requires a mistrial. *See id.* at 641-42 (reversing conviction).

**VIII.  THE COURT IMPROPERLY DECLINED TO REQUIRE THE GOVERNMENT TO IMMUNIZE STUART BELL**

      At trial, the defense presented the affidavits of two members of Walter Forbes' trial team who attested to conversations in which counsel for Bell indicated that, if immunized and called to testimony, Bell would present exculpatory evidence that would contradict the

testimony of Cosmo Corigliano, the government's key witness. Specifically, Bell's counsel advised that if called to testimony under a grant of immunity, Bell would deny committing any fraud at CUC; he would testify that he did not engage in financial wrongdoing at CUC; Corigliano's testimony about Bell's alleged involvement in unlawful conduct at CUC was inaccurate; and there are legitimate explanations for the accounting done at CUC during Bell's tenure as CFO. The government did not present any evidence to suggest that Bell would provide inculpatory evidence.

At the time the defense requested that the Court order the government to immunize Bell, it was transparent that the government had no intention of pursuing any criminal action against Bell. It had been more than six years after accounting irregularities at CUC were disclosed to the public, and more than nine years after Bell stepped down as CFO of CUC. The government had been on notice of Bell's purported wrongdoing since at least the year 2000, when Corigliano began cooperating with the government. Although the government relied on the claims of Corigliano when it indicted Shelton and Walter Forbes, it did not indict Bell.

A.    **LEGAL STANDARDS**

A court may order the government to immunize a potential witness who has invoked the Fifth Amendment privilege against self-incrimination where extraordinary circumstances are present. *See Blissett v. LeFevre*, 924 F.2d 434, 441 (2d Cir. 1991). The Second Circuit has determined that extraordinary circumstances are present where (i) the government has deliberately denied a witness immunity while conferring immunity on other witnesses "for the purpose of withholding exculpatory evidence and gaining a tactical advantage through such manipulation;" (ii) the unimmunized witnesses' testimony is "material, exculpatory, and not cumulative" and (iii) "the defendant has no other way to obtain the evidence." *Id.* at 442. The Second Circuit also has left open the possibility that extraordinary

circumstances could be present even where the first prong of the three-part test is not satisfied. *See United States v. Dolah*, 245 F.3d 98, 106 (2d Cir. 2001) ("If no discriminatory use of immunity for Government witnesses has occurred, *i.e.*, the Government has not immunized any of its own witnesses, we have explicitly left open the issues of whether under extraordinary circumstances, due process may require that the government confer use immunity on a witness for the defendant") (quotations omitted), *overruled on other grounds*, *Crawford v. Washington*, 541 U.S. 36 (2004).

## B.    DISCUSSION

This case presented extraordinary circumstances requiring the government to confer immunity on Bell.

First, Bell's testimony was material, exculpatory, and not cumulative.  If Bell testified, he would have denied any participation in any fraud at CUC.  Such testimony would have undermined the government's claim that the alleged fraud began in the late 1980's under Bell and continued throughout Bell's tenure as CFO of CUC.  Bell's testimony also would have undermined Corigliano's testimony that Corigliano learned how to commit accounting fraud from Bell and that Corigliano was not the architect of CUC's improper accounting.  In addition, Bell would be able to explain that the documents introduced into evidence by the government concerning the pre-1995 period do not reflect improper accounting, and that the accounting done under Bell was proper and in compliance with GAAP.  This testimony would have been exculpatory and would have helped to undermine the testimony of Corigliano and, to a lesser extent, Pember and Kearney.

It bears emphasis that much of Corigliano's testimony concerned alleged conversations or meetings that he had with Shelton and/or Walter Forbes at which no one else was present.  Corigliano also testified to similar one-on-one conversations with Bell.  If Bell had

been allowed to testify under a grant of immunity and refute Corigliano's uncorroborated

testimony about their meetings, the jury would have further reason to conclude that Corigliano

was a liar and that testimony about conspiratorial meetings with Shelton were equally false.  The

significance of Bell's potentially exculpatory testimony is highlighted by the fact that the Court

received two juror notes inquiring about Bell.

Second, Shelton did not have any other meaningful way of presenting the

testimony that Bell could have offered.  Bell was the CFO of CUC prior to 1995, and he was the

only person who could have refuted Corigliano's testimony concerning allegedly improper

accounting during Bell's tenure as CFO.  Much of Corigliano's testimony concerning Bell

involved purported conversations in which only Corigliano and Bell were present.  Only Bell

could have contradicted Corigliano's testimony concerning those conversations.

Moreover, as the former CFO and a CPA, Bell was qualified to testify to his

belief regarding the propriety of CUC's accounting during the pre-1995 period and thereby

refute Corigliano's claims that documents from that period reflect accounting that intentionally

violated GAAP.  No other witness could have addressed the range of issues raised by Corigliano

concerning pre-1995 accounting at CUC, including rejects in transit, the cancellation reserve, the

allocations, the topside adjustments, the so called "general reserve", the GETKO reserve, the

Essex reserve, and the BCI profit sharing receivable, among other accounting issues.

Third, the government presented extensive testimony from other witnesses

concerning Bell's purported statements and actions, including numerous hearsay statements

purportedly made by Bell.  It was patently unfair for the government to feature Bell's alleged

misconduct prominently in its case-in-chief, and to claim that Bell initiated the accounting fraud

and taught Corigliano how to commit the fraud, while denying Shelton the testimony of the key

witness who could have directly refuted these allegations.

It is no answer for the government to contend, as it did before, that Bell would not be in a position to establish that the fraud did not occur during the period after he resigned as CFO. The government has alleged a single conspiracy from the late 1980s to 1998 and the defendants are alleged to be responsible for all fraudulent acts taken in furtherance of that conspiracy. If Bell contradicted the government's main cooperating witness on issues as central to the government's case as the origin, the duration, and the scope of the conspiracy, the defense would have been able to undermine a significant part of the government's case.

Not only did the government not have a valid reason for denying immunity to Bell, it plainly sought and obtained a tactical advantage by refusing to immunize him. In *United States v. Westerdahl*, 945 F.2d 1083 (9th Cir. 1991), the Ninth Circuit reversed a judgment of conviction where the government had refused to grant immunity to a witness who possessed information exculpatory of the defendant. In that case, the government obtained a robbery conviction by relying heavily on circumstantial evidence provided by the testimony of two witnesses who had been granted immunity by the government and one witness who testified as part of a plea agreement. *Id.* at 1087. The government refused to grant immunity to a fourth witness, however, who was ready to testify that the defendant has not participated in the robbery. *Id.* at 1086. The Ninth Circuit held that the government's use of the three witnesses' testimony, "while effectively denying Westerdahl the right to contradict it with [his own witness's] testimony, may have distorted the fact-finding process, and an evidentiary hearing should have been held to determine whether the denial of use immunity for [the witness] denied Westerdahl his due process rights." *Id.* at 1087.

The facts in this case are comparable to those in *Westerdahl*. Here, each of the

government's three key witnesses has entered into a plea agreement under which his or her potential time of incarceration has been substantially reduced.  And each of the witnesses' agreements was contingent upon cooperating with the government by providing testimony on its behalf.  By having obtained the testimony of any alleged coconspirator whom the government convinced to testify against the defendants, but having denied immunity to a witness who was in an unique position to provide exculpatory evidence regarding numerous core issues raised by Corigliano, the government engaged in precisely the type of misconduct condemned in *Westerdahl*.

## IX.    THE COURT IMPROPERLY DECLINED TO GIVE THE JURY A MISSING WITNESS INSTRUCTION

"[W]hen a party has it peculiarly within its power to produce witnesses and fails to do so, the jury may infer that the testimony, if produced, would have been unfavorable to that party."  *United States v. Myerson*, 18 F.3d 153, 158 (2d Cir. 1994) (quotation omitted) (collecting cases).  Ordinarily, when a witness asserts the Fifth Amendment privilege against self-incrimination, he is considered unavailable to all of the parties to the case, and there is no basis for an instruction that the missing witness's testimony would have been adverse to one party.  In a criminal case, however, the government has the power to immunize a witness who asserts the Fifth Amendment; the defendant does not.  As a result, "in circumstances that indicate the government has failed to immunize an exculpatory witness," *id.* at 160, a district court may abuse its discretion "by refusing to give a missing witness charge."  *Id.*

There was no dispute that Bell would have asserted his Fifth Amendment privilege if called to testify.  Shelton did not have any ability to overcome Bell's assertion of his Fifth Amendment privilege.  The government, armed with the power to grant immunity, could have compelled Bell's testimony.  It chose not to do so.  Under these circumstances, the Court

should have given the jury a missing witness instruction with respect to Bell.

## CONCLUSION

For the foregoing reasons and those set forth in Motion For A Judgment Of Acquittal Pursuant To Fed. R. Crim. P. 29 Or For A New Trial Pursuant To Fed. R. Crim. P. 33 (filed on March 7, 2005), E. Kirk Shelton respectfully requests that the Court vacate the jury verdict and order a new trial in the interests of justice.

DATED:  April 4, 2005

Respectfully submitted,

DAY, BERRY & HOWARD LLP

By: _____
Gary H. Collins (CT 22119)
Stanley A. Twardy, Jr. (CT 05096)
City Place 1, 185 Asylum Street
Hartford, CT  06103
Tel.: (860) 275-0314
Fax: (860) 275-0343

MILBANK, TWEED, HADLEY & McCLOY, LLP
Scott A. Edelman (CT 25268)
Thomas A. Arena (CT 25269)
1 Chase Manhattan Plaza
New York, NY  10005-1413
Tel.: (212) 530-5000
Fax: (212) 530-5219

LAW OFFICES OF THOMAS P. PUCCIO
Thomas P. Puccio (CT 22983)
230 Park Avenue, Suite 301
New York, NY  10172
Tel.: (212) 883-6383
Fax: (212) 883-6388

Attorneys for Defendant E. Kirk Shelton

## <u>CERTIFICATION</u>

I hereby certify that on  a copy of the foregoing was served on the following parties via Federal Express:

          John J. Carney, Esq.
          Christopher J. Christie, Esq.
          James McMahon, Esq.
          Richard J. Schechter, Esq.
          Norman Gross, Esq.
          United States Attorney's Office
          District of New Jersey
          970 Broad Street, Suite 700
          Newark, NJ  07101

                                      Gary H. Collins