UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:02CR00264 (AWT) |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | May 19, 2005 |
| | : | |
| | : | |
| WALTER A. FORBES and | : | |
| E. KIRK SHELTON | : | |

MEMORANDUM OF THE UNITED STATES IN OPPOSITION
TO SHELTON'S MOTION FOR A JUDGMENT OF ACQUITTAL
PURSUANT TO RULE 29 AND FOR A NEW TRIAL PURSUANT TO RULE 33

CHRISTOPHER J. CHRISTIE
JOHN J. CARNEY
NORMAN GROSS
JAMES MCMAHON
RICHARD J. SCHECHTER
Special Attorneys
U.S. Department of Justice
970 Broad Street, Room 700
Newark, NJ 07102
Tel: (973) 645-2700
Fax: (973) 645-2702

## TABLE OF CONTENTS

Page

Table of Authorities . . . . . . . . . . . . . . . . . . . vii

Preliminary Statement . . . . . . . . . . . . . . . . . . . 1

Section 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . 2

1.  Unsupported Topside Adjustments . . . . . . . . . . . . 4

2.  Merger Reserves . . . . . . . . . . . . . . . . . . . . 6

3.  Revenue Recognition . . . . . . . . . . . . . . . . . . 10

4.  Cancellation Reserve . . . . . . . . . . . . . . . . . 12

    A.   The Evidence of Shelton's Guilt was Overwhelming . 14

    B.   Evidence Provided by Corigliano Strongly
         Implicated Shelton . . . . . . . . . . . . . . . . 15

         1.   Corigliano Followed the Directions of His
              Superiors . . . . . . . . . . . . . . . . . . 15

         2.   Shelton's Involvement in the Fraud Began
              No Later Than 1995 . . . . . . . . . . . . . . 17

         3.   Shelton Had Knowledge of the Essex Fraud . . . 17

         4.   Shelton Was Fully Involved in the Overstatement
              and Fraudulent Misuse of the Merger Reserves . 18

         5.   Shelton Directed Corigliano to Mislead CUC's
              Board of Directors . . . . . . . . . . . . . . 21

         6.   Shelton Fought to Keep Pember in Place So She
              Could Continue to Commit the Fraud . . . . . . 22

         7.   Shelton Charged Forbes' Unrelated Plane
              Expenses Against the Cendant Reserve . . . . . 24

8.    Shelton's Direct Management of the Fraud
       Intensifies After Corigliano is Removed
       from the CFO Position . . . . . . . . . . . .  25

C.   Evidence Provided by Pember Directly Implicated
     Shelton . . . . . . . . . . . . . . . . . . . . . .  26

     1.    Shelton Gives Pember a Generous Stay Bonus
           to Continue in the Conspiracy . . . . . . . .  27

     2.    Shelton and Pember Build a Large Cushion
           into the Cendant Merger Reserve . . . . . . .  30

     3.    A Senior CUC Employee Questions Shelton About
           Differences in the Financial Numbers . . . . .  32

     4.    Pember Complains to Shelton About Confusion
           Arising From False Sets of Financial Numbers .  32

     5.    Pember Notifies Shelton of Upcoming Reserve
           Adjustments . . . . . . . . . . . . . . . . .  33

     6.    Pember Reports CUC's Year-End Numbers to
           Shelton and Corigliano . . . . . . . . . . .  35

     7.    Pember Reminds Shelton That Inflated Earnings
           at Subsidiaries Resulted from Fraud . . . . .  39

     8.    Shelton Approves the Use of $110 Million of
           Merger Reserves to Inflate Revenue in the 1998
           Budget . . . . . . . . . . . . . . . . . . . .  40

     9.    Shelton Approves A New Method of Transferring
           Merger Reserves to Revenue Accounts . . . . .  42

     10.   Shelton Approved the First Monthly Transfer
           From the Cendant Merger Reserve to Revenue . .  42

     11A.  Shelton and Pember Discuss the Fraud Involving
           the Cancellation Reserve . . . . . . . . . . .  43

     11B.  Shelton and Pember Discuss CUC's Fraudulent
           Revenue Recognition Practices . . . . . . . .  43

12.   Shelton Attempts to Recruit the Former HFS
      Personnel into the Conspiracy . . . . . . . .  45

13.   Pember Helps Shelton and Corigliano Mislead
      HFS Personnel About CUC's Use of the Ideon
      Reserve . . . . . . . . . . . . . . . . . . .  48

D.   Evidence Provided by Other Witnesses Incriminated
     Shelton . . . . . . . . . . . . . . . . . . . . . .  50

     1.   Testimony by Menchaca Corroborated Pember . . .  50

     2.   Monaco's Testimony Incriminated Shelton . . . .  51

     3.   Sabatino's Credible Testimony Hurt Shelton  . .  52

     4.   Albright's Testimony Corroborated Corigliano .   53

     5.   Kearney Implicated Shelton and Corroborated
          Corigliano . . . . . . . . . . . . . . . . . .  54

     6.   Testimony by Speaks and Scott Forbes Implicated
          Shelton . . . . . . . . . . . . . . . . . . . .  55

     7.   Shelton's Own Testimony Proved Incriminating .   56

E.   It was Shelton who Committed Perjury at Trial . . .  57

     1.   Shelton Lied About His Involvement in the
          Interval Cover Story . . . . . . . . . . . . .  57

     2.   Shelton Destroyed GX 530 and then Lied About
          Doing So . . . . . . . . . . . . . . . . . . .  61

     3.   Shelton Invented a False Explanation at Trial
          to Explain Away His Role in Approving the Plane
          Expense . . . . . . . . . . . . . . . . . . . .  63

     4.   Shelton Lied About the Cheat Sheets
          Disappearing . . . . . . . . . . . . . . . . .  65

SECTION 2

ARGUMENT

POINT I – SHELTON HAS FAILED TO SUSTAIN HIS HEAVY BURDEN OF
DEMONSTRATING THAT THE VERY CONSCIENTIOUS JURY IN THIS CASE
CONVICTED AN INNOCENT MAN . . . . . . . . . . . . . . . . . . 66

     A.    Any Absence of Proof that Shelton Carried Out
         the Day to Day Execution of the Accounting Fraud
         Cannot Show that He Did Not Direct His Subordinates
         to Do So . . . . . . . . . . . . . . . . . . . . . 73

     B.    Shelton's Attacks on Corigliano's Testimony
         Cannot Show that the Jury Convicted an
         Innocent Man . . . . . . . . . . . . . . . . . . . 75

     C.    Shelton Has Failed to Demonstrate that Corigliano
         Committed Perjury, or that the Jury Could Not
         Rationally Credit Any of His Testimony Which
         Inculpated Shelton . . . . . . . . . . . . . . . . 80

     D.    Shelton's Challenges to Pember's Credibility
         Fail to Demonstrate that the Jury Convicted
         an Innocent Man . . . . . . . . . . . . . . . . . . 93

     E.    The Jury Reasonably Declined to Accord Substantial
         or Any Weight to Shelton's Evidence, or to Draw
         Shelton's Proposed Exculpatory Inferences from the
         Evidence . . . . . . . . . . . . . . . . . . . . . 100

POINT II - THE GOVERNMENT DID NOT INTRODUCE FALSE TESTIMONY
AT TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . 115

     A.    Shelton Has Failed to Sustain His Heavy Burden of
         Demonstrating a Due Process Violation . . . . . . 115

     B.    Shelton Has Failed to Show that the Bases for His
         Attacks on Corigliano's and Pember's Testimony were
         Hidden from the Jury . . . . . . . . . . . . . . . 118

     C.    The Government Did Not Vouch For Corigliano's or
         Pember's Credibility . . . . . . . . . . . . . . . 121

POINT III - THE COURT PROPERLY INSTRUCTED THE JURY ON
CONSCIOUS AVOIDANCE . . . . . . . . . . . . . . . . . . . . . 123

    A.    The Conscious Avoidance Instruction Did not
           Constructively Amend the Indictment . . . . . . . . 123

    B.    There was Ample Evidentiary Support for the
           Conscious Avoidance Instruction . . . . . . . . . 128

    C.    There was Evidence that Shelton Avoided Knowledge of
           the Fraud . . . . . . . . . . . . . . . . . . . . 143

    D.    Shelton has Failed to Demonstrate Reversible Error  145

POINT IV - THE COURT PROPERLY ADMITTED EVIDENCE RELATING TO
SHELTON'S PARTICIPATION IN CHARGING 1995 AND 1996 PLANE EXPENSES
AGAINST THE 1997 CENDANT MERGER RESERVE . . . . . . . . . . . 149

    A.    The Plane Expense Evidence was Highly Probative
           of the Crimes Charged in the Indictment   . . . . . 150

    B.    The Plane Expense Evidence was Admissible Pursuant
           to Fed. R. Evid. 404(b) . . . . . . . . . . . . . 153

    C.    The Evidence was Properly Admitted Over A Rule 403
           Objection . . . . . . . . . . . . . . . . . . . . 154

POINT V - THE COURT PROPERLY ADMITTED THE TESTIMONY OF
JOHN OLLER  . . . . . . . . . . . . . . . . . . . . . . . . . 156

POINT VI - EVIDENCE OF PRE 1995 MISCONDUCT WAS PROPERLY
ADMITTED  . . . . . . . . . . . . . . . . . . . . . . . . . . 167

    A.    Shelton has Failed to Demonstrate a Constructive
           Amendment of the Indictment . . . . . . . . . . . 168

    B.    Shelton Has Failed to Demonstrate a Violation of His
           Sixth Amendment Right to Notice of the Charges  . . 182

POINT VII - CORIGLIANO'S AND PEMBER'S TESTIMONY WAS PROPER AND
ADMISSIBLE  . . . . . . . . . . . . . . . . . . . . . . . . . 186

POINT VIII - THE COURT PROPERLY DENIED SHELTON'S BLEATED REQUEST
TO FORCE THE GOVERNMENT TO IMMUNIZE A DEFENSE WITNESS . . . . 197

A.    The Government Was Not Required to Confer Immunity
      on a Defense Witness Absent Extraordinary
      Circumstances and The Court Was Not Empowered
      to Grant Judicial Immunity . . . . . . . . . . . 199

B.    Shelton's Reliance on the Westerdahl Case is
      Misplaced . . . . . . . . . . . . . . . . . . . 200

POINT IX - THE COURT PROPERLY DENIED SHELTON'S REQUEST FOR A
MISSING WITNESS INSTRUCTION . . . . . . . . . . . . . . . . 204

POINT X - SHELTON IS NOT ENTITLED TO A JUDGMENT OF ACQUITTAL  205

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . 207

vi

## TABLE OF AUTHORITIES

**FEDERAL CASES**                                                    **PAGE**

Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.,
   168 F. Supp. 2d 57 (S.D.N.Y. 2001) . . . . . . 163, 164

Berger v. United States,
   295 U.S. 78 (1935) . . . . . . . . . . . . . . . . 167

Bronshtein v. Horn,
   404 F.3d 700 (3rd Cir. 2005) . . . . . . . . . . . 147

Crawford v. Washington,
   541 U.S. 36 (2004) . . . . . . . . . . . . . . 85, 198

DIJO, Inc. v. Hilton Hotels Corp.,
   351 F.3d 679 (5th Cir. 2003) . . . . . . . . . . . 192

Lightning Lube, Inc. v. Witco Corp.,
   4 F.3d 1153 (3d Cir. 1993) . . . . . . . . . 190, 191

Lithuanian Commerce Corp., Ltd. v. Sara Lee Hosiery,
   214 F. Supp. 2d 453 (D.N.J. 2002) . . . . . . . 190, 191

Mason v. Phillips,
   548 F. Supp. 674 (S.D.N.Y. 1982) . . . . . . . . . 120

In re Merritt Logan, Inc.,
   901 F.2d 349 (3d Cir. 1990) . . . . . . . . . 189, 192

Neder v. United States,
   527 U.S. 1 (1999) . . . . . . . . . . . . . . . . . 193

Palermo v. United States,
   360 U.S. 343 (1959) . . . . . . . . . . . . . 162, 163

Parker v. Reda,
   327 F.3d 211 (2d Cir. 2003) . . . . . . . . . 159, 167

Securitron Magnalock Corp. v. Schnabolk,
   65 F.3d 256 (2d Cir. 1995) . . . . . . . . . . . . 191

Shasteen v. Saver,
   252 F.3d 929 (7th Cir. 2001) . . . . . . . . . . . 120

Simental v. Matrisciano,
   363 F.3d 607 (7th Cir. 2004) . . . . . . . . . . . 116

Soden v. Freightliner Corp.,
    714 F.2d 498 (5th Cir. 1983) . . . . . . . . . . . . 189

Teen-Ed, Inc. v. Kimball International, Inc.,
    620 F.2d 399 (3d Cir. 1980) . . . . . . . . . 189, 192

United States v. 0.59 Acres of Land,
    109 F.3d 1493 (9th Cir. 1997) . . . . . . . . . . . 189

United States v. Abel,
    469 U.S. 45 (1984) . . . . . . . . . . . . . 107, 108

United States v. Abreu,
    342 F.3d 183 (2d Cir. 2003) . . . . . . . 128, 142, 148

United States v. Adenji,
    31 F.3d 58 (2d Cir. 1994) . . . . . . . . . . 124, 148

United States v. Aina-Marshall,
    336 F.3d 167 (2d Cir. 2003) . . . . . 129, 133, 134, 143

United States v. Aleskerova,
    300 F.3d 286 (2d Cir. 2002) . . . . . . . . . . . . 161

United States v. Alfonso,
    143 F.3d 772 (2d Cir. 1998) . . . . . . . . . . . . 184

United States v. Almonte,
    956 F.2d 27 (2d Cir. 1992) . . . . . . . . . 161, 162

United States v. Alvarez,
    358 F.3d 1194 (9th Cir. 2004) . . . . . . . . . . . 202

United States v. Aminy,
    15 F.3d 258 (2d Cir. 1994) . . . . . . . . . . . . 154

United States v. Anglin,
    169 F.3d 154 (2d Cir. 1999) . . . . . . . . . . . . 161

United States v. Ansaldi,
    372 F.3d 118 (2d Cir. 2004) . . . . . . . . . . . . 169

United States v. Aulicino,
    44 F.3d 1102 (2d Cir. 1995) . . . . . . . . . . . . 128

United States v. Autouri,
    212 F.3d 105 (2d Cir. 2000) . . . . . . . . . . 72, 79

viii

United States v. Bahadar,
    954 F.2d 821 (2d Cir. 1992) . . . . . . . . . . 199, 201

United States v. Bautista,
    252 F.3d 141 (2d Cir. 2001) . . . . . . . . . . . . 124

United States v. Beech-Nut Nutrition Corp.,
    871 F.2d 1181 (2d Cir. 1989) . . . . . . . . . . . 128

United  States v. Bernstein,
    533 F.2d 775 (2d Cir. 1976) . . . . . . . . . . . . 183

United States v. Blair,
    958 F.2d 26 (2d Cir. 1992) . . . . . . . . . . . . 120

United States v. Boone,
    2004 WL 187151(S.D.N.Y. 2004)..........................87

United States v. Bortnovsky,
    820 F.2d 572 (2d Cir. 1987) . . . . . . . . . . . . 185

United States v. Bradstreet,
    135 F.3d 46 (1st Cir. 1998) . . . . . . . . . . . . 127

United States v. Brennan,
    326 F.3d 176 (3d Cir. 2003) . . . . . . . . 85, 97, 122

United States v. Brodie,
    403 F.3d 123 (3d Cir. 2005) . 89, 90, 103, 104, 114, 125,
    ................................................. 144

United States v. Brozyna,
    571 F.2d 742 (2d Cir. 1978) . . . . . . . . . . . . 182

United States v. Campbell,
    292 F. Supp. 2d 1159 (N.D.Iowa 2003) . . . . . . 74, 75

United States v. Caramandi,
    415 F. Supp. 443 (E.D.Pa. 1976) . . . . . . . . . . 72

United States v. Carboni,
    204 F.3d 39 (2d Cir. 2000) . . . . . . . . . . . . 153

United States v. Clemente,
    22 F.3d 477 (2d Cir. 1994) . . . . . . . . . 126, 168

United States v. Clemons,
    658 F. Supp. 1116 (W.D.Pa. 1987)........................72

ix

United States v. Cohen,
    518 F.2d 727 (2d Cir. 1975) . . . . . . . . . 170, 171, 172

United States v. Covington,
    133 F.3d 639 (8th Cir. 1998) . . . . . . . . . . . 147

United States v. Danielson,
    199 F.3d 666 (2d Cir. 1999) . . . . . . . . . . 127, 169

United States v. Davis,
    397 F.3d 173 (3d Cir. 2005) . . . . . . . . . . . . 205

United States v. Davis,
    780 F.2d 838 (10th Cir. 1985) . . . . . . . . . . . 161

United States v. Delano,
    55 F.3d 720 (2d Cir. 1995) . . . . . . . . . . . . 169

United States v. Dolah,
    245 F.3d 98 (2d Cir. 2001) . . . . . . . . . 198, 199

United States v. Edmonds,
    765 F. Supp. 1112 (D.D.C. 1991) . . . . . . . . . . . 72

United States v. Edwards,
    342 F.3d 168 (2d Cir. 2003) . . . . . . . . . . . . 193

United States v. Fasciana,
    226 F. Supp. 2d 445 (S.D.N.Y. 2002) . . . . . . . . 153

United States v. Fawaz,
    881 F.2d 259 (6th Cir. 1989) . . . . . . . . . . . 190

United States v. Ferrarini,
    219 F.3d 145 (2d Cir. 2000) . . . . . . . . . . . 143

United States v. Fletcher,
    928 F.2d 495 (2d Cir. 1991) . . . . . 128, 129, 133, 141

United States v. Frank,
    156 F.3d 332 (2d Cir. 1998) . . . . . . . . . . . 175

United States v. Gambino,
    59 F.3d 353 (2d Cir. 1995) . . . . . . . . . 69, 80, 86

United States v. George,
    363 F.3d 666 (7th Cir. 2004) . . . . . . . . . . . 201

United States v. Glover,
    588 F.2d 876 (2d Cir. 1978) . . . . . . . . . . . . . . 116

United States v. Gold,
    743 F.2d 800 (11th Cir. 1984) . . . . . . . . . . . . 137

United States v. Goldstein,
    2003 WL 1961577 (S.D.N.Y 2003)........................77

United States v. Gonzales,
    90 F.3d 1363 (8th Cir. 1996) . . . . . . . . . . . 141

United States v. Gonzalez,
    933 F.2d 417 (7th Cir. 1991) . . . . . . . . . . . 134

United States v. Gray,
    292 F. Supp. 2d 71 (D.D.C. 2003) . . . . . . . . . . 72

United States v. Green,
    258 F.3d 683 (7th Cir. 2001) . . . . . . . . . . . 166

United States v. Gurary,
    860 F.2d 521 (2d Cir. 1988) . . . . . . . . . . . . 130

United States v Helmsley,
    985 F.2d 1202 (2d Cir. 1993) . . . . . . . . . 117, 118

United States v. Hopkins,
    53 F.3d 533 (2d Cir. 1995) . . . . . . . . . 124, 144

United States v. Hussein,
    351 F.3d 9 (1st Cir. 2003) . . . . . . . . . . . . 132

United States v. Inserra,
    34 F.3d 83 (2d Cir. 1994) . . . . . . . . . . . . . 154

United States v. Jackson,
    876 F. Supp. 1188 (D.Kan. 1994) . . . . . . . . . . 169

United States v. Jacobs,
    117 F.3d 82 (2d Cir. 1997) . . . . . . . . . . . . 124

United States v. Janati,
    374 F.3d 263 (4th Cir. 2004) . . . . . . . 175, 176, 184

United States v. Joines,
    327 F. Supp. 253 (D.Del. 1971) . . . . . . . . . . 72

United States v. Joyner,
    201 F.3d 61 (2d Cir. 2000) . . . . . . . . 118, 168, 173

United States v. Kelly,
    349 F.2d 720 (2d Cir. 1965) . . . . . . . . . . . . 159

United States v. Kermidas,
    332 F. Supp. 1312 (M.D. Pa. 1971) . . . . . . . . .  72

United States v. Kuzniar,
    881 F.2d 466 (7th Cir. 1989) . . . . . . . . . . 81, 82

United States v. LaSpina,
    299 F.3d 165 (2d Cir. 2002) . . . . . . . . . . . . 175

United States v. Lanza,
    790 F.2d 1015 (2d Cir. 1986) . . . . . . . . . . . 128

United States v. Leonardi,
    623 F.2d 746 (2d Cir. 1980) . . . . . . . . . 162, 199

United States v. Lewis,
    235 F. Supp. 220 (E.D.Tenn. 1964) . . . . . . . . .  72

United States v. Lewis,
    954 F.2d 1386 (7th Cir. 1992) . . . . . . . . . . . 166

United States v. Littlefield,
    840 F.2d 143 (1st Cir. 1988) . . . . . . . . . . . 148

United States v. Livoti,
    25 F. Supp. 2d 390 (S.D.N.Y. 1998) . . . . . . . .  72

United States v. Lochmondy,
    890 F.2d 817 (6th Cir. 1989) . . . . . . . . . . . 121

United States v. Lohm,
    1993 WL 488635, (N.D.N.Y. 1993). . . . . . . . . . .71, 85, 88, 95

United States v. Malpeso,
    115 F.3d 155 (2d Cir. 1997) . . . . . . . . . . . .  79

United States v. Mancini,
    396 F. Supp. 75 (E.D.Pa. 1975) . . . . . . . . . .  72

United States v. Mang Sun Wong,
    884 F.2d 1537 (2d Cir. 1989) . . . . . . . 124, 135, 144

United States v. Mansker,
    240 F. Supp. 2d 902 (N.D. Iowa 2003) . . . . . . . .  96

United States v. Marrero-Ortiz,
    160 F.3d 768 (1st Cir. 1998) . . . . . . . . . . . . 183

United States v. Martinez,
    844 F. Supp. 975 (S.D.N.Y. 1994) . . . . . . . . . .  72

United States v. Matos,
    905 F.2d 30 (2d Cir. 1990) . . . . . . . . . . . . . 143

United States v. McCarthy,
    271 F.3d 387 (2d Cir. 2001) . . . . .  115, 116, 118, 119

United States v. McGuire,
    744 F.2d 1197 (6th Cir. 1984) . . . . . . . . . . . 155

United States v. Milikowsky,
    896 F. Supp. 1285 (D.Conn. 1994) . . .  71, 90, 117, 205

United States v. Miller,
    573 F.2d 388 (7th Cir. 1978) . . . . . . . . . . . . 155

United States v. Milstein,
    401 F.3d 53 (2d Cir. 2005) . . . . . . . . 177, 179, 182

United States v. Misle Business & Equipment Co.,
    967 F.2d 1227 (8th Cir. 1992) . . . . . . . . . . . 187

United States v. Monteleone,
    257 F.3d 210 (2d Cir. 2001) . . . . . . . . . . . 77, 80

United States v. Montgomery,
    384 F.3d 1050 (9th Cir. 2004) . . . . . . . . . . . 174

United States v. Moreno,
    181 F.3d 206 (2d Cir. 1999) . . . . . . . . . . . . . 77

United States v. Morris,
    308 F. Supp. 1348 (E.D.Pa. 1970) . . . . . . . . . .  72

United States v. Mucciante,
    21 F.3d 1228 (2d Cir. 1994) . . . . . . . . 127, 168, 173

United States v. Muniz,
    60 F.3d 65 (2d Cir. 1995) . . . . . . . . . . . . . 154

United States v. Murgas,
    177 F.R.D. 97 (N.D.N.Y. 1998) . . . . . . . . . . . .  72

United States v. Murray,
    618 F.2d 892 (2d Cir. 1980) . . . . . . . . . . . . 183

United States v. Myerson,
   18 F.3d 153 (2d Cir. 1994) . . . . . . . . . . . . . 204

United States v. Nersesian,
   824 F.2d 1294 (2d Cir. 1987) . . . . . . . . . . . 68

United States v. Newton,
   369 F.3d 659 (2d Cir. 2004) . . . . . . . . . . . . 121

United States v. Oberman,
   318 F.2d 877 (4th Cir. 1963) . . . . . . . . . 167, 168

United States v. Parker,
   165 F. Supp. 2d 431 (W.D.N.Y. 2001) . . . . . . . . 184

United States v. Pascarella,
   84 F.3d 61 (2d Cir. 1996) . . . . . . . . . . . . . 140

United States v. Patino,
   962 F.2d 263 (2d Cir. 1992) . . . . . . . . . . . . 175

United States v. Pena,
   949 F.2d 751 (5th Cir. 1991) . . . . . . . . . 134, 138

United States v. Pepe,
   209 F. Supp. 592 (D.Del. 1962) . . . . . . . . . 72, 73

United States v. Peterson,
   190 F. Supp. 2d 343 (E.D.N.Y. 2002) . . . . . . . 76, 95

United States v. Petrillo,
   237 F.3d 119 (2d Cir. 2000) . . . . . . . . . . . . 85

United States v. Picciandra,
   788 F.2d 39 (1st Cir. 1986) . . . . . . . . . . . . 166

United States v. Pitre,
   960 F.2d 1112 (2d Cir. 1992) . . . . . . . . . 154, 155

United States v. Pujana-Mena,
   949 F.2d 24 (2d Cir. 1991) . . . . . . . . . . . . . 106

United States v. Ragen,
   314 U.S. 513 (1942) . . . . . . . . . . . . . . . . 167

United States v. Ramerez,
   313 F. Supp. 2d 276 (S.D.N.Y. 2004) . . . . . . . . 71

United States v. Ramirez,
   297 F.3d 185 (2d Cir. 2002) . . . . . . . . . . . . 79

United States v. Ramirez,
    894 F.2d 565 (2d Cir. 1990) . . . . . . . . . . . . . 154

United States v. Reinhold,
    20 F. Supp. 2d 541 (S.D.N.Y. 1998)  . . .  68, 86, 87, 99

United States v. Reyes,
    49 F.3d 63 (2d Cir. 1995) . . . . . . . . . . . . . . 78

United States v. Reyes,
    302 F.3d 48 (2d Cir. 2002) . . . . . . . . . 128, 142

United States v. Rittweger,
    259 F. Supp. 2d 275 (S.D.N.Y. 2003) . . . . . . . . 184

United States v. Rittweger,
    2003 WL 22290228, 9 (S.D.N.Y. 2003)  . . . . . . 68, 101

United States v. Rivera,
    971 F.2d 876 (2d Cir. 1992) . . . . . . . . . . . . 122

United States v. Rodriquez,
    356 F.3d 254 (2d Cir. 2004) . . . . . . . . . . . . 196

United States v. Roman,
    870 F.2d 65 (2d Cir. 1989) . . . . . . . . . . . . . 67

United States v. Saada,
    212 F.3d 210 (3d Cir. 2000) . . . . . . . . . . . 78, 79

United States v. Sabbeth,
    262 F.3d 207 (2d Cir. 2001) . . . . . . . . . . . . 184

United States v. Salmonese,
    352 F.3d 608 (2nd Cir. 2003) . . . . . . . 127, 167, 169

United States v. Sampson,
    332 F. Supp. 2d 325 (D.Mass. 2004) . . . . . . . . . 72

United States v. Sanchez,
    969 F.2d 1409 (2d Cir. 1992) . . 69, 70, 76, 81, 83, 85,
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88, 89, 90, 95

United States v. Sasso,
    59 F.3d 341 (2d Cir. 1995) . . . . . . . . . . . . . 69

United States v. Sawyer,
    607 F.2d 1190 (7th Cir. 1979) . . . . . . . . . . . 166

xv

United States v. Schall,
    371 F. Supp. 912 (W.D.Pa. 1974) . . . . . . . . . . .  72

United States v. Schnabel,
    939 F.2d 197 (4th Cir. 1991) . . . . . . . . . . . . 155

United States v. Shkolir,
    17 F. Supp. 2d 263 (S.D.N.Y. 1998) . . . . . . . . .  72

United States v. Silverman,
    449 F.2d 1341 (2d Cir. 1971) . . . . . . . . . . . . 167

United States v. Spencer,
    4 F.3d 115 (2d Cir. 1993) . . . . . . . . . . . . 93, 94

United States v. Stavroulakis,
    952 F.2d 686 (2d Cir. 1992) . . . . . . . . . . . . 184

United States v. Steele,
    685 F.2d 793 (3d Cir. 1982) . . . . . . . . . . . . 160

United States v. Stewart,
    325 F. Supp. 2d 474 (D.Del. 2004) . . . . . . . . . .  72

United States v. Strother,
    49 F.3d 869 (2d Cir. 1995) . . . . . . . . . . . . . 162

United States v. Sullivan,
    2004 WL 253316 (S.D.N.Y. 2004).......................184

United States v. Svoboda,
    347 F.3d 471 (2d Cir. 2003)  128, 129, 135, 138, 142, 144

United States v. Taylor,
    253 F.3d 1115 (8th Cir. 2001) . . . . . . . . . . . 196

United States v. Teitler,
    802 F.2d 606 (2d Cir. 1986) . . . . . . . . . . . . 169

United States v. Thomas,
    54 F.3d 73 (2d Cir. 1995) . . . . . . . . . . . . . 154

United States v. Thomas,
    274 F.3d 655 (2d Cir. 2001) . . . . . . . . . . . . 180

United States v. Torres,
    503 F.2d 1120 (2d Cir. 1974) . . . . . . . . . . . . 122

United States v. Upton,
    856 F. Supp. 727 (E.D.N.Y. 1994) . . . . . . . . . . 184

United States v. Vebeliunas,
   76 F.3d 1283 (2d Cir. 1996) . . . . . . . . . . 126, 168

United States v. Walker,
   191 F.3d 326 (2d Cir. 1999) . . . . . . . . . . . . . 130

United States v. Wallach,
   935 F.2d 445 (2d Cir. 1991) . . . . . . . . . . . . . 119

United States v. Ward,
   190 F.3d 483 (6th Cir. 1999) . . . . . . . . . . . . 119

United States v. Washington,
   398 F.3d 306 (4th Cir. 2005) . . . . . . . . . . . . 200

United States v. Weiss,
   752 F.2d 777 (2d Cir. 1985) . . . . . . . . . . . . . 168

United States v. Wert-Ruiz,
   228 F.3d 250 (3d Cir. 2000) . . . . . . . . 126, 136, 139

United States v. Westerdahl,
   945 F.2d 1083 (9th Cir. 1991) . . . . . . . . . . . . 200

United States v. White,
   972 F.2d 16 (2d Cir. 1992) . . . . . . . . . . . . . . 77

United States v. Whiteside,
   404 F. Supp. 261 (D.Del. 1975) . . . . . . . . . . . 72

United States v. Williams,
   571 F.2d 344 (6th Cir. 1978) . . . . . . . . . . . . 160

United States v. Wong,
   78 F.3d 73 (2d Cir. 1996) . . . . . . . . . . . . 69, 93

United States v. Wozniak,
   126 F.3d 105 (2d Cir. 1997) . . . . . . . . . . . . . 180

United States v. Yousef,
   327 F.3d 56 (2d Cir. 2003) . . . . . . . . . . . . . 196

United States v. Zane,
   507 F.2d 346 (2d Cir. 1974) . . . . . . . . . . . . . 96

United States v. Zedner,
   401 F.3d 36 (2d Cir. 2005) . . . . . . . . 123, 132, 134

United States v. Zingaro,
   858 F.2d 94 (2d Cir. 1988) . . . . . . . . . . . . . 180

<u>Wactor v. Spartan Transport Corp.</u>,
    27 F.3d 347 (8th Cir. 1994) . . . . . . . . . . . . . 191

<u>Williams Entersprises, Inc. v. Sherman R. Smoot Co.</u>,
    938 F.2d 230 (D.C.Cir. 1991) . . . . . . . . . . . 192

<u>United States v. Zichetello</u>,
    208 F.3d 72 (2d Cir. 2000) . . . . . . . . . . . 120


**<u>STATE CASES</u>**

<u>State v. Brown</u>,
    836 S.W.2d 530 (Tenn. 1992) . . . . . . . . . . . . 187


**<u>FEDERAL STATUTES AND RULES</u>**

21 U.S.C. §§ 331(a) and 333(a)(2) . . . . . . . . . . 177

Fed. R. Crim. P. 12(b)(3)(B)  . . . . . . . . . . . . 183

Fed. R. Crim. P. 29 . . . . . . . . . . . . . . 3, 70, 102

Fed. R. Crim. P. 33 . . . . . . . . . . . . . . 3, 70, 103

Fed. R. Evid. 701 . . . . . . . . . . . . 188, 190, 191

Fed. R. Evid. 801(d)(2)(A)  . . . . . . . . 161, 164, 165

Fed. R. Evid. 803(5)  . . . . . . . . . . . . . . . . 158

Fed. R. Evid. Rule 404(b) . . . . . . . . . . . 149, 153

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA  :   No. 3:02CR00264 (AWT)
                          :
                          :
                          :
          v.              :
                          :   May 19, 2005
                          :
                          :
WALTER A. FORBES and      :
E. KIRK SHELTON           :


MEMORANDUM OF THE UNITED STATES IN OPPOSITION
TO SHELTON'S MOTION FOR A JUDGMENT OF ACQUITTAL
PURSUANT TO RULE 29 AND FOR A NEW TRIAL PURSUANT TO RULE 33

### Preliminary Statement

On January 4, 2005, after 33 working days of deliberations, a jury convicted defendant E. Kirk Shelton on each of the twelve counts of the Superseding Indictment (hereafter "indictment") in which he was named.  Sentencing is scheduled for the week of July 18-22, 2005 -- more than seven years after defendant Shelton and his coconspirators engaged in a financial fraud costing their victims more than $14 billion.  The Government intends to seek a sentence within the applicable Sentencing Guidelines range, which it anticipates will be 151 to 188 months.  In yet his latest effort to delay his day of judgment, Shelton now moves post-trial for a judgment of acquittal[1] and a new trial.

_____

[1] Although Shelton has filed what he styles a "Motion for a Judgement of Acquittal Pursuant to Fed. R. Crim. P. 29 or for a
(continued...)

The crux of Shelton's latest motion is that the jury was somehow fooled by the purportedly false testimony of two of Shelton's coconspirators -- Cosmo Corigliano and Anne Pember -- two witnesses who were cross-examined by skillful counsel for approximately 15 days and were repeatedly called liars by defense counsel over six days of closing arguments.  An old hand at inflating CUC's earnings, Shelton now attempts to sell his inflated claims of error to this Court.  He is asking this Court to ignore the efforts and conclusions of the jury that devoted nine months of their lives to rendering a just and fair verdict in this case.  The Court should decline to invest in Shelton's latest offering.

### SECTION 1

### <u>STATEMENT OF FACTS</u>

#### <u>Background</u>

CUC International ("CUC") was formed in the early 1970's by Walter Forbes.  Before it merged with HFS Inc. ("HFS") in 1997 to form Cendant, CUC's headquarters was in Stamford.  CUC went public in 1983.  Its stock was traded on the over the counter market until August 1989, when it was first listed for trading on the New York Stock Exchange.  Throughout the

---

[1](...continued)
New Trial Pursuant to Fed. R. Crim. P. 33," he declines to present any argument in his 140 page supporting memorandum of law ("Shelton Mem.") under Rule 29 that would justify the entry of a judgment of acquittal. <u>See</u> Section 2, Point X, <u>infra</u>.  Indeed, his prayer for relief is limited to a new trial.  Shelton Mem. 140 (Conclusion).

conspiracy period of the late 1980s to April 1998, defendant Shelton was the second ranking corporate officer at CUC, and upon the merger of CUC and HFS he became Vice Chairman of the Board of Directors of Cendant.  Tr. 11624, 12650.

CUC's principal business was selling memberships in its buying clubs, which included programs for home shoppers, travelers, restaurant patrons and automobile purchasers, among others.  CUC marketed these membership programs primarily through its Comp-U-Card Division, which was its single largest business unit.  Comp-U-Card maintained separate offices in Trumbull.

By the mid 1990's, CUC had created the appearance of consistent financial performance because it met its publicly stated earnings goals quarter after quarter. As a result, its stock was highly recommended by stock analysts and other investment professionals and was widely held.  Given the nature of membership programs, which produce a steady and predictable stream of income, CUC's stock was seen as relatively safe and its earnings (or "operating income" or "profit") were perceived as relatively predictable.

CUC's publicly reported earnings figures, however, were fabricated.  From at least as early as the late 1980's through the first quarter of 1998, CUC rarely met its earnings targets. Instead, CUC reported fraudulently inflated earnings figures to the SEC and to the investing public in order to create the appearance that CUC was steadily growing and that it always  met

3

its earnings targets.  To put it simply, defendant Shelton and
his conspirators made up CUC's earnings figures for almost ten
years.  Over a three year period from 1995 through the end of
1997, Shelton and his conspirators reported to the SEC and the
investing public earnings that were hundreds of millions dollars
higher than they actually were.  Tr. 10662-66; <u>see</u> Government
Exhibit ("GX") 10110 at 49.  As explained in a memorandum written
by Shelton and sent to Corigliano upon Corigliano becoming CFO,
Corigliano was directed to "<u>[m]anage the numbers</u>:  Keep track of
overall revenues, profits and balance sheet <u>to meet Wall Street</u>
<u>expectations</u> . . ."  GX 3 (emphasis added).

        The fraud was discovered in April 1998, a few months
after CUC merged with HFS to form Cendant.  Cendant announced its
discovery of the fraud to the public on April 15, 1998.  The
price of Cendant's stock dropped from $35.62 to $19.06 the next
day.  GX 3058; Tr. 1461.  This drop represented a total loss of
$14 billion to Cendant's shareholders, which represented close to
half of Cendant's total market capitalization.  The stock has
never fully recovered.

        Shelton and his conspirators used a variety of methods
to inflate CUC's (and later Cendant's) earnings.  The first, and
simplest method, was unsupported topside adjustments.

    1.    **Unsupported Topside Adjustments**

        Prior to its merger with HFS, CUC consisted of 22
separate divisions or companies located throughout the United

States and Europe, with Comp-U-Card being the largest. Every month, each division would report its monthly revenue and expense figures to CUC's Stamford headquarters. A staff accountant in Stamford would combine those sets of figures in an Excel spreadsheet program to produce revenue, expense and income figures for CUC as a whole, which process CUC's employees called "consolidation."[2] At the end of each quarter, the staff accountant would also calculate consolidated revenue, expense and income figures for CUC as a whole for the quarter.

In all but one of each of the first three quarters in the years 1995 through 1997, CUC's consolidated earnings were lower than the company's earnings target for that quarter. In order to close the gap between what CUC had really earned that quarter and what it had publicly predicted it would earn, the conspirators simply changed the consolidated revenue, expense and earnings figures so that the earnings would be within the range of CUC's earnings targets. The conspirators called these fabricated adjustments "topside adjustments."

For example, in the quarter ending April 30, 1997, the conspirators found that CUC's actual quarterly earnings were $60

---

[2] Shelton's counsel conceded in his opening statement that Shelton routinely received the consolidations after the topside adjustments were made. Tr. 141. During his testimony, Shelton abandoned this concession and claimed he did not even see consolidations until after the fraud was discovered in April 1998, when he was preparing for trial. Tr. 11972-76, 13101. Such testimony was likely rejected by the jury given that an email from Sheton to Pember on January 15, 1998 made express reference to the term, "consolidations." GX 506.

million less than the analysts' earnings prediction.  The conspirators simply told the staff accountant who did the consolidations to add $47 million to revenue and to lower expenses by $14 million on her Excel spreadsheet.  As a result -- at least on the staff accountant's spreadsheet -- it appeared that CUC earned $61 million more that quarter than it really did. Although the extra $61 million in earnings was just a fabrication, it was included on CUC's Form 10-Q that was sent to the SEC for that quarter and was reported to the investing public.  In this manner, the conspirators were simply following Shelton's written directive to "[m]anage the numbers . . . to meet Wall Street expectations." GX 3.

2.  **Merger Reserves**

The unsupported topside adjustments were made only to the staff accountant's Excel spreadsheet at CUC's Stamford headquarters.  At the end of the fiscal year, the conspirators faced a problem.  Since CUC was a publicly held company, federal law required that certified public accountants conduct an audit of CUC's annual financial statements.  While the auditors did not check every accounting entry on CUC's or its divisions' books, the conspirators knew that it was possible that the auditors would discover the topside adjustments.  As a result, the conspirators had to establish a different and less obvious way to inflate revenue and reduce expenses.  To do that, the conspirators would reverse out the first three quarters'

unsupported topside adjustments at the end of each year.  In order to fill the resulting gap between CUC's actual earnings and its reported earnings, the conspirators relied on a number of fraudulent accounting practices, including the fraudulent use of merger reserves.

When two companies merge, they incur a variety of costs that arise solely from the merger, including professional fees and employee severance payments.  Under generally accepted accounting principles ("GAAP"), these unusual, non-recurring expenses arising from the merger are treated differently from the company's regular operating expenses.  If a company included one-time merger related expenses as part of its regular operating expenses, the financial statements would be distorted because the company's expenses would be unusually high for the period in which the merger occurs.  Instead, GAAP provides that merger-related expenses be broken out onto a separate line on the company's income statement.

This practice allows the reader of the financial statements to ignore the company's one-time merger related expenses and to see how well the company did in its regular business during that period.  Accordingly, investors generally ignore merger-related costs -- reflected as a merger reserve on an income statement -- because they do not indicate how well the company is doing in its regular business and, more importantly, how well the company might do in the future.

In order to break out merger-related costs, GAAP provides that the company set up a merger reserve and include the merger reserve as a separate expense item on its income statement for the period in which the merger occurs. To set up a merger reserve, GAAP requires that the company make a good faith estimate of the total costs arising out of the merger ahead of time.

Once the merger reserve is set up as a separate account on the company's books and as a separate expense item on the company's income statement, the company can then pay merger related expenses out of the merger reserve as those expenses arise. As a result, those expenses are not subtracted from the company's revenue figure -- as ordinary operating expenses are -- to arrive at the company's income, or earnings, figure. Instead, they are charged against the merger reserve and, if the company's good faith estimate of merger-related costs is accurate, the merger reserve will be reduced to zero when all of the merger-related costs are paid. The company's operating income -- which is its income from its regular business -- is not affected by costs charged to a merger reserve.

CUC had several merger reserves on its books during the period of the conspiracy. The two largest -- which were also the subjects of a great deal of the fraud -- were the Ideon reserve and the Cendant reserve. The Ideon reserve of $180 million was set up in 1996 to cover costs arising from CUC's essentially

simultaneous mergers with the Ideon Group and two software manufacturing companies, Davidson & Associates and Sierra On-Line, Inc.  The Cendant reserve of $556 million was set up to cover costs arising from CUC's merger with HFS to form Cendant in December 1997.

Shelton and his conspirators did not establish or use these two merger reserves -- or other merger reserves on CUC's books -- in accordance with GAAP.  Instead, they used these merger reserves to fraudulently inflate CUC's earnings.  To do that, the conspirators first established merger reserves that were much higher than needed to pay for merger related expenses. The conspirators fraudulently added approximately $200 million to the Cendant merger reserve above their good faith estimate of the costs arising out of that merger.  They also added tens of millions of dollars to the Ideon reserve in excess of their good faith estimate of the costs arising out of the three Ideon mergers.

The conspirators then used those excess funds in the merger reserves in two different ways to fraudulently inflate CUC's earnings.  First, the conspirators charged ordinary operating expenses to the merger reserve.  This reduced CUC's reported operating expenses and fraudulently increased CUC's operating income.  Second, the conspirators made direct transfers from merger reserve accounts to revenue accounts without any basis whatsoever.  By doing so, the conspirators fraudulently and

9

arbitrarily increased CUC's revenue and, ultimately, its earnings.  The conspirators generally made these fraudulent adjustments on Comp-U-Card's books because Comp-U-Card was CUC's largest division and, therefore, any fraudulent adjustments would be relatively more difficult to detect.

The conspirators used merger reserves in this way to fraudulently inflate CUC's operating income by at least $143 million in the three years from 1995 through 1997 alone, with the majority of that inflation -- $110 million -- occurring in Cendant's fiscal year ending December 31, 1997.  GX 10100 at 49.

### 3.  __Revenue Recognition__

The conspirators fraudulently manipulated Comp-U-Card's recognition of the revenue the divisions received from their members in order to fraudulently inflate CUC's earnings.  The Comp-U-Card division had several different membership clubs. Under GAAP, CUC could recognize as revenue the fees that it received from its club members only after CUC had performed all of the services required under the membership agreement for the defined membership period, usually one year.

Because different clubs provided different services, and provided those services at different times during the membership period, CUC had to recognize the membership fees differently.  Two different membership clubs offered by Comp-U-Card can serve as examples of different ways Comp-U-Card recognized membership fees revenue.  First, Comp-U-Card had a

10

dining club which provided its members with discounts on meals at participating restaurants. Members paid an annual fee to join the club and, in return, the dining club provided the members with a card that they could use for one year to obtain the discounts at the participating restaurants in their area. All Comp-U-Card had to do for its members was provide them with the discount card once a year. Thus, Comp-U-Card was able to recognize the entire fee once it sent the card to the member. This type of club was known at CUC as an "immediate recognition program." Tr. 2909

Comp-U-Card's shopping club was different. The shopping club negotiated low prices on about 250,000 items that its members could buy over the telephone. In exchange for the fees it received from its members, the shopping club had to keep a staff available to negotiate low prices on various items and to take telephone calls from members who wanted to buy merchandise. Since the shopping club had to provide services to its members throughout the entire membership period, it had to recognize members' fees throughout that period as well, as it earned those fees. Generally, Comp-U-Card would recognize equal portions of a member's fee each month over the life of the membership. These types of programs were known at CUC as "deferred recognition programs." Tr. 2909.

The conspirators kept track of Comp-U-Card's recognition of membership fee revenue on a computer program they

called the projection model.  The conspirators could program the
projection model to recognize different types of fees over
different periods of time.  From as early as the late 1980's
through 1997, the conspirators arbitrarily shifted revenue from
deferred recognition programs to immediate recognition programs
on the projection model, thus recognizing revenue immediately
that Comp-U-Card should not have recognized until later.  This
acceleration of Comp-U-Card's recognition of those fees as
revenue made it appear as if Comp-U-Card had made more revenue in
the current period than it really did.  Essentially, the
conspirators took revenue from the future to pump up Comp-U-
Card's current revenue.  Tr. 2908-10.  By doing so, the
conspirators caused CUC's reported earnings for the fiscal year
ending January 31, 1997 to be inflated by about $10 million and
the earnings Cendant reported for the fiscal year ending December
31, 1997 to be inflated by about $17 million.  GX 10100 at 49.

**4.    Cancellation Reserve**

The conspirators also fraudulently manipulated CUC's
membership cancellation reserve in order to inflate CUC's
earnings.  CUC offered a money back guarantee to its members.  A
member could get a full refund of his membership fee at any point
during the life of the membership -- even on the last day of the
membership.  In order to pay these refunds, CUC allocated a
portion of each membership fee it received to a membership
cancellation reserve.  The amount of the fees it set aside was

12

based on CUC's historical cancellation rate for a particular membership club.  For example, if the shopping club historically had a cancellation rate of 20%, CUC would set aside 20% of each dollar it received in fees from shopping club members into the membership cancellation reserve.  When CUC paid a refund, it charged the amount of the refund to the membership cancellation reserve.

The conspirators, however, used the membership cancellation reserve to inflate CUC's earnings by improperly using the reserve to reduce operating expense accounts.  To do this, the conspirators fraudulently created the appearance that the cancellation reserve was larger than it needed to be.  They created that appearance by preparing an analysis of the reserve that used historical cancellation rates that were too low.  The conspirators provided this flawed analysis to CUC's auditors to justify transfers out of the reserve account to reduce CUC's operating expenses.  The conspirators reduced CUC's operating expenses -- and thus increased CUC's earnings -- by $15 million for the fiscal year ending January 31, 1997 by manipulating the cancellation reserve in this way.

The conspirators also inflated CUC's earnings by its treatment of "rejects in transit."  Rejects occurred when CUC billed renewal membership fees to a member's credit card and the billing was rejected because, for example, the credit card had been cancelled or because the member was over his credit limit.

13

CUC would often rebill the credit card after receiving a reject with the hope that the rebilling would result in a payment.

Depending on whether the member joined an immediate recognition or a deferred recognition program, CUC recognized at least part of the membership fee as revenue as soon as it billed the credit card. As a result, if a member's credit card company continued to reject a billing, the amount of the rejected fee was supposed to be subtracted from the membership cancellation reserve when it became apparent that the fee would not be paid. In the meantime, the reject was called a reject in transit.

The conspirators, however, failed to charge the rejects in transit to the membership cancellation reserve in a timely manner. The amount of the uncharged rejects in transit grew over time until it reached $100 million by the spring of 1998. This meant that, as of the spring of 1998, the membership cancellation reserve was understated by $100 million. That $100 million should have been charged by CUC as an operating expense. As a result, the failure to charge rejects in transit to the cancellation reserve in a timely manner fraudulently inflated CUC's earnings by $100 million over the life of the conspiracy.[3]

A.    **The Evidence of Shelton's Guilt was Overwhelming**.

Unable to contest the overwhelming evidence documenting

---

[3] The trial evidence demonstrated that the conspirators used other fraudulent accounting practices to inflate CUC's and Cendant's earnings, but the quantitative effect of those practices were lower than the practices described above. The Government will not describe those other practices here.

one the largest accounting frauds in this nation's history,
Shelton's only hope was to run from the evidence tying him to the
fraud.  This desperate retreat, that began at trial and now
continues in his post-trial motions, requires Shelton to disavow
both evidence and logic, to misleadingly "cherry pick" selected
facts and hope that the damning testimony of his top lieutenant,
Corigliano, and his key subordinate, Pember, be rejected in its
entirety.  As an accurate review of the record plainly
demonstrates, Corigliano's and Pember's voluminous testimony
concerning Shelton's guilt was not only credible, but it was
corroborated by corporate records, other witnesses and common
sense.

**B.    Evidence Provided by Corigliano Strongly Implicated Shelton.**

Corigliano joined CUC's accounting department in 1983
as the assistant controller reporting to the then CFO, Stuart
Bell.  Corigliano later served as corporate controller and CFO
after Bell resigned the position in early 1995.  Upon becoming
CFO, Corigliano reported directly to Shelton until CUC merged
with HFS on December 17, 1997.  Thereafter, Corigliano reported
to Walter A. Forbes, the Chairman of the Board of Cendant.

**1.    Corigliano Followed the Directions of His Superiors.**

Corigliano's involvement in the fraud began in or about
1990 where, under the direction of Bell, he began to manipulate
the reported results of CUC in order to meet predetermined
financial targets.  Following Bell's instructions, Corigliano

15

regularly created a document known internally as the "cheat
sheet," which was a one page summary that tracked the company's
fraudulent inflation of its financial results.  The fraudulent
methods directed by Bell, and executed by Corigliano, included
the baseless inflation and misuse of merger reserves, failure to
write off rejects in transit, the manipulation of revenue
recognition to accelerate revenue, and unsupported topside
adjustments.  Corigliano's responsibilities also included
reviewing SEC filings and press releases and acting as the
primary contact with CUC's outside auditors from Ernst and Young
("E&Y").

         Once he was promoted to CFO, Corigliano took direction
directly from Shelton and Walter Forbes.  During this same period
of time, Corigliano, who was directly supervised by Shelton,
received substantial economic inducements from Shelton.  Because
of this close relationship, Corigliano, more than any other
witness, was able to describe and explain Shelton's detailed
knowledge and involvement in the fraud.

         On a periodic basis, Corigliano met with Shelton and
Walter Forbes to review the cheat sheet and to take direction on
how much to inflate the company's earnings in any given period.
See, e.g., Tr. 6196, 6455-56, 6494-95, 6520-21, 6572, 6588-90,
6593-94.  After meeting with his superiors, Corigliano would
instruct Pember and Casper Sabatino to carry out the necessary
mechanics to effect the manipulation.  In short, Corigliano

carried out the orders of his superiors to fraudulently manipulate the company's financial results by hundreds of millions of dollars.

### 2. Shelton's Involvement in the Fraud Began No Later Than 1995.

While Corigliano testified that the fraud began in the 1990's, he had little contact with Shelton prior to 1995. Once Corigliano was promoted to CFO, he gave Shelton a copy of the cheat sheet and met with him to discuss the fraud. Tr. 6494-95. During these meetings, Corigliano and Shelton discussed Wall Street expectations ("targets") for CUC's future earnings; how CUC's earnings were doing in relation to those targets; and how the reserves were going to make up the difference between CUC's actual operating earnings and the Wall Street estimates. Tr. 6505.

Far from incredible, Corigliano's testimony that Shelton directed him to continue the fraud is corroborated by Shelton himself. Shelton confirmed that the primary goal of the conspiracy was to "[m]anage the numbers . . . to meet Wall Street expectations" in his April 19, 1995 memorandum. GX 3 (emphasis added); Tr. 6502.

### 3. Shelton Had Knowledge of the Essex Fraud.

One of the last fraudulent acts taken by Bell was to direct Corigliano to overstate the size of the reserves on the books of Essex, one of CUC's acquisitions, so that the reserves could later be used to inflate CUC's earnings. Tr. 6400-02.

17

Having created the improper reserves, Corigliano drew down upon them the next year to inflate CUC's income.  In doing so however, the reserve reversal created a negative number on one of the expense lines of Essex's income statement.  <u>See</u> GX 57.

Corigliano testified that around December 1995, the Essex financials were reviewed in a meeting in Stamford attended by Kevin Crowe, the Essex President, Thomas Albright, the Essex CFO, Shelton and Corigliano.  During the meeting Shelton asked, "Why is there a negative number in the expense in fiscal '96?  It looks weird. What's going on?"  Albright replied, "Well, that's the adjustment that Corporate made us report."  Corigliano then leaned over to Shelton, and whispered, "Kirk, that's [from] taking down the reserves here."  Shelton nodded to Corigliano that he understood, and did not ask any additional questions about the matter.  Tr. 6632-36.[4]

### 4.  **Shelton Was Fully Involved in the Overstatement and Fraudulent Misuse of the Merger Reserves.**

Corigliano testified at length that Shelton was well aware that CUC had been intentionally overstating its merger reserves so that they could be improperly utilized later on.  Corigliano explained that one of the ways he kept Shelton informed was by periodically updating and distributing the cheat sheet to him.  Tr. 6588, 6592, 6605; GXs 58 and 58a.  Perhaps the

---

[4] Contrary to Shelton's assertion, Albright's testimony does not contradict, but rather corroborates, Corigliano's testimony.  <u>See</u> Section 1.D.4., <u>infra</u>.

18

most damning of all the cheat sheets was GX 62b, which clearly
revealed how the conspirators used $100 million in reserves as a
"plug number" to hit the company's earnings targets.  Corigliano
testified that he gave Shelton a copy of GX 62b and explained to
him the dire situation the company was facing.  Tr. 6231.
Thereafter, Corigliano and Shelton broke the news to Forbes:

> A.   I gave another copy to Walter and Kirk
> said, "You know, Walter, because Sierra
> missed their numbers, in order for us to make
> the number, we've got to use literally all
> the reserves, almost all of the reserves, you
> know.  Understand, Walter, if we use this,
> the well will be dry."
>
> Q.   Who is saying that?
>
> A.   Kirk.
>
> Q.   Kirk Shelton?
>
> A.   Yes.
>
> Q.   To Mr. Forbes?
>
> A.   Yes.
>
> Q.   Okay.  And what, if anything, does Mr.
> Forbes say in  response?
>
> A.   Walter says, "Let's worry about this
> year this year.  Next year is a lifetime
> away."
>
> Q.   What did you understand that to mean?
>
> A.   Take in the reserves.  Use reserves to make
> the numbers.

Tr. 6235.

Unable to explain how GX 62b could be anything other

than clear documentary evidence of the fraud and corroboration of Corigliano's testimony, Shelton attempted to mislead the jury by juxtaposing the $100 million reserve plug with the testimony of the Government's accounting expert, Brian Heckler, CPA, that there was "only" a $21 million misuse for the year ended January 31, 1997.  Shelton Mem. 72.  However, Heckler never testified that the amount was "only" $21 million.  Rather, as the evidence showed, the amount of merger reserve related overstatement was "at least" $23 million.  GX 10110 at 49.[5]

Faced with the highly incriminating testimony of both Corigliano and McLeod (Tr. 11055-58) that cheat sheets were given to him, Shelton could not deny that he received these documents from Corigliano.  Rather, the best explanation that Shelton could contrive was that he received the more innocuous versions in 1995, but the later cheat sheets, including GX 62b, "kind of disappeared, they stopped coming."  Tr. 11991.  The patent falsity of Shelton's denial that he received GX 62b becomes even more clear when the information on the cheat sheet is compared to GX 606, a document that Shelton admitted he not only possessed, but actually created to track the financial performance of CUC's individual subsidiaries.  Tr. 12883-89.  The information on GX

---

[5] Shelton also argues, contrary to the evidence, that the misuse of merger reserves was not related to the topside adjustments. Shelton Mem. 9.  See, e.g., Sabatino testimony (Tr. 5261) ("Utilization of merger reserve and topside adjustments are the same thing").

606 closely tracks the information on GX 62b with the exception
of the $100 million reserve "plug" number that was necessary to
bring CUC's financial performance in line with Wall Street
expectations. Compare GX 606 with 62b; Tr. 14901-10 (Government
summation). The fact that Shelton signed the publicly filed
financial statements that reported results approximately $100
million higher than what Shelton could legitimately account for
in his own analysis on GX 606 is independent corroboration of
Corigliano's testimony concerning Shelton's involvement in the
fraud.

**5.    Shelton Directed Corigliano to Mislead CUC's Board of
       Directors.**

In January 1997, Shelton directed Corigliano to provide
the company's Board of Directors with false information
concerning the budget for the upcoming fiscal year.  Tr. 6888;
see GX 18.  Because of the effect of the fraudulent misuse of the
merger reserves, a truthful year-to-year comparison of financial
results would have likely revealed the fraud.  Following
Shelton's directive, Corigliano created a new budget that
excluded the effect of merger costs.  Shelton also had Corigliano
prepare the budget as an overhead transparency so that no one
would have a copy of the fraudulent budget.

As a final act of deception towards the Board, Shelton
urged Corigliano to rush the presentation: "Just before dinner
started, Kirk walked over to me and he said, 'You're to do your

21

presentation over dinner.'  The overhead projector was there.  He
said, 'Just go through the numbers quickly, something to the
effect of dance on and dance off . . .'"  Tr. 6899.  Corigliano's
account is corroborated by the fact that the package of materials
given to the Board for the January 1997 meeting did not contain a
budget while the previous years included a written budget.
Defense Exhibit ("DX") 31273.

### 6. Shelton Fought to Keep Pember in Place So She Could Continue to Commit the Fraud.

        The conspirators knew from the HFS/CUC merger agreement
that Corigliano would not become the CFO of the new company at
its inception.  This development elevated Pember's importance in
maintaining and continuing the fraud.  Around early October 1997,
Pember told Corigliano that she did not want to report to Scott
Forbes, who was scheduled to become the chief accounting officer
for Cendant, and that she wanted to leave the company.  Tr. 7289.
Corigliano immediately informed Shelton about this negative
development and sought his assistance.

> Well, . . . after hearing that Anne wanted to leave, I
> went and talked to Kirk before I met with Anne, and I
> told Kirk that Anne wanted to leave.  If she leaves,
> you're not going to be able to use the reserves.  And
> Kirk said, "Yeah, we don't want that.  We don't want
> Anne to leave."  And he suggested that I offer her a
> stay bonus.  And so we talked about the amount.  We
> also talked about accelerating her options at the time
> the merger was done.

Tr. 7290.

        Shelton's lavish financial offer to induce Pember to

stay was ultimately reduced to a new contact, GX 498, that was
signed by both Shelton and Forbes.  Tr. 2619.  Michael Monaco,
the new CFO of Cendant, was neither consulted nor informed about
Pember's new contract.  Tr. 1583.

In addition to offering Pember financial inducements to
continue the fraud, Shelton also lobbied Henry Silverman, the HFS
CEO and later Cendant CEO, to retain Pember in her capacity as
the controller for the CUC entities.  Corigliano testified that
Shelton personally prepared a memorandum to Silverman hoping to
keep Pember in the consolidation process, thereby continuing
their control over the fraud.  As Corigliano explained:

> Kirk walked into my office with a copy of this memo and
> asked me what I thought of his recommendation . . .  We
> discussed that this setup, the way Kirk was suggesting
> it, would achieve what we wanted it to, which was keep
> the consolidation in Stamford, keep Anne over managing
> the consolidation and the reserves.  And that's
> something we needed to do.

Tr. 7294.

Shelton then wrote a memorandum to Silverman which
provided in pertinent part:

> Henry, I owed you follow-up on two organizational
> issues from last week -- the proposed org charts and
> Anne Pember's reporting relationship.  Attached are two
> org charts that reflect what Walter and I think will
> work best.  In addition, we also believe that keeping
> Anne Pember in the accounting loop for the old CUC
> businesses make sense for the following reasons . . .
> If she reports to Cosmo, she can continue to review the
> CUC businesses and use her experience to add value to
> the review process.  Since we propose that Cosmo has a
> dotted line to Mike Monaco, there should be no problem
> [with] information flow . . .  This structure may not

23

be the first choice from a purely logical perspective, but we feel that the intangible benefits make it a winner, at least for the next year.

GX 616.

### 7.    Shelton Charged Forbes' Unrelated Plane Expenses Against the Cendant Reserve.

During the fall of 1997, Corigliano testified that Shelton approached him with an expense voucher for Walter Forbes' use of a private jet for alleged business purposes.  See GX 158. The voucher sought reimbursement for more than $500,000 in non-merger related expenses incurred in 1995 and 1996.  During a conversation between Corigliano and Shelton about the expenses, Corigliano stated: "Well, don't forget about the merger reserve . . . He [Shelton] looks up and goes, 'Aha,' an expression on his face, like, 'Ah, good idea.'"  Tr. 7378.

As can be seen on the face of GX 158, there is a total lack of any connection between the 1995 and 1996 plane expenses and the Cendant merger.  Nevertheless, to further the fraud, Shelton agreed with Corigliano's suggestion and directed that the expenses be charged to the Cendant merger reserve.  See Section 2 Point IV, infra (describing why this evidence was properly admitted by the Court); see also Section 1.E.3., infra (describing how Shelton perjured himself concerning Walter Forbes' plane

24

**8.    Shelton's Direct Management of the Fraud Intensifies
After Corigliano is Removed from the CFO Position.**

On December 17, 1997, the day that the merger of CUC
and HFS became effective, Corigliano relinquished his position as
CFO.  While still responsible for helping close the books on the
year ended December 31, 1997, the responsibility for preparing
the next year's financial statements for the former CUC entities
was transferred to Pember and her new direct supervisor, Shelton.
While no longer officially involved in the budget for December
31, 1998, Corigliano was privy to several conversations, emails,
and meetings that corroborate Pember's testimony (see Section
1.C.6. - 10., infra) and further implicates Shelton.

Specifically, Corigliano testified that he and Shelton
received Pember's January 14, 1998 email, GX 506, concerning the
"reserve" adjustments that needed to be made on their books.  Tr.
7381.  As Corigliano explained, the reserve adjustments were
"[m]erger reserves, the cushions that we were taking in to make
our operating numbers."  Tr. 7388.  Before Pember sent this
e-mail, Corigliano had discussed with Shelton the misallocation
of reserves for the year ending December 31, 1997.  Id.

Corigliano also explained that Shelton was actively
involved in determining how much of the Cendant merger reserve to
use in January 1998.  Consistent with Pember's testimony (see
Section 1.C.10., infra), Corigliano described how the actual
results for January were approximately $5 million better than

25

expected, thereby raising the question of whether to stick with
the budgeted amount of improper reserve reversals or to use a
lower number.  Tr. 7414-15.  Shelton consulted with Corigliano
about how large the improper merger reserve reversal should be
for January 1998.  <u>Id</u>.

Corigliano was also present during the meeting with
Scott Forbes on March 6, 1998 and testified to Shelton's highly
inculpatory conduct in seeking Scott Forbes' help in reversing
$165 million of reserves into earnings.  Tr. 7437.  Corroborating
the accounts of both Pember, Scott Forbes and Steven Speaks,
Corigliano testified that Kirk said "Scott, we need your help in
finding a home for the $165 million."  Tr. 7443.  Shelton also
lobbied Scott Forbes to keep E&Y as the company's auditors: "Kirk
made a point to Scott saying, this is one of the reasons why we
want to keep Ernst & Young.  This kind of stuff typically isn't a
problem with them."  Tr. 7444.

**C.    <u>Evidence Provided by Pember Directly Implicated Shelton.</u>**

While Pember was controller of CUC's Comp-U-Card
division, she worked with Corigliano, Sabatino and other
conspirators to fraudulently inflate CUC's income through the
improper use of the Ideon and Cendant merger reserves; the
fraudulent acceleration of CUC's recognition of revenue from
deferred recognition membership programs; and the manipulation of
the membership cancellation reserve.  Pember had little contact

with Shelton while she was Comp-U-Card's divisional controller.
Tr. 2622.  Pember was promoted to the position of controller of
CUC as a whole in the summer of 1997.  Id.  This position gave
Pember direct access to, and interaction with, Shelton.  Id.

### 1.   Shelton Gives Pember a Generous Stay Bonus to Continue in the Conspiracy.

On the Friday before Columbus Day weekend in 1997,
Corigliano told Pember that, after CUC's merger with HFS became
effective in December 1997, she would be reporting to Scott
Forbes, who was then the controller of HFS.  Tr. 2604.  Pember
was "extremely unhappy" because she did not get along with Scott
Forbes.  Tr. 2605.  Over the weekend, Pember decided she would
leave CUC rather than work for Scott Forbes.  She called
Corigliano at home and asked to meet with him on Columbus Day so
that she could tell him her decision.  Id.

When Pember went to Corigliano's office that Monday
morning, she found Shelton there as well.  Tr. 2607.  Shelton and
Corigliano began to discuss different ways Pember could avoid
having to report to Scott Forbes.  Id.  Shelton suggested that
Pember become the controller of all the CUC companies that had
reserves on their books so that she could manage those reserves.
Id.  When Pember rejected that idea as impractical, Shelton
raised the idea of Pember reporting directly to him once the
merger took place.  Tr. 2608.  No final decision was reached
about this matter during this conversation.

27

Once Shelton left the room, Pember told Corigliano she
wanted to leave CUC and asked him to prepare a severance package
for her.  Tr. 2609.  Corigliano became upset and asked Pember if
there was anything he could do to convince her to stay.  Pember
repeated her request that Corigliano prepare a severance package
for her.  Id.

Corigliano came back to Pember the next day.  He said
that Shelton had authorized him to offer Pember a bonus of
$125,000 if she stayed at CUC for six months.  Tr. 2611.  Given
that Pember's salary at that time was $145,000, with an
additional bonus of $50,000, this stay bonus represented a
substantial amount of money for Pember.  Id.  Corigliano also
urged Pember to speak with Shelton.  Id.

Pember spoke with Shelton later that day.  Shelton told
her that he had "to peel Cosmo off the ceiling because he was so
upset" that Pember was leaving.  Tr. 2612.  Shelton said that he
wanted to make sure that Pember knew about the stay bonus and the
amount.  Id.  He also stated that he wanted to make sure that
Pember stayed at CUC.  Id.

Pember decided to stay at CUC.  Over the next several
weeks, she, Shelton and Corigliano discussed arrangements by
which she would report to Shelton, instead of Scott Forbes, once
the merger took place.  Shelton and Corigliano told Pember that
the people at HFS were not happy about having Pember report to

28

Shelton.  Tr. 2613.  Regardless, it was ultimately decided that
Pember would report to Shelton after the merger.  Id.

        At the same time Shelton, Corigliano and Pember were
discussing the issue of her reporting to Shelton, the three were
also discussing the details of Pember's new employment agreement
-- including the stay bonus -- and were reducing the new
agreement to writing.  Tr. 2614.  Among other things, this new
agreement provided that:

> *    all of Pember's unvested stock options would vest
>      at the time of the merger with HFS;
>
> *    Pember would receive a bonus of $125,000 if she
>      stayed at CUC for six additional months;
>
> *    Pember would receive a $20,000 salary raise on
>      January 1, 1998.  This provision accelerated by
>      three months the date on which Pember normally
>      received her annual raise;
>
> *    Pember's new "target" bonus would be 40 per cent
>      of her new salary, or approximately $65,000 to
>      $70,000; and
>
> *    Pember would receive an additional 40,000 options
>      in CUC stock.

Tr. 2615-19; GX 498.  Although Corigliano had signed Pember's
previous 1996 employment agreement, both defendants Walter Forbes
and Shelton signed her new 1997 employment agreement.  Tr. 2619.
The fact that Shelton was willing to pay $125,000 to keep Pember
for a mere six months demonstrates that Shelton knew Pember was
no ordinary accountant.

**2.    Shelton and Pember Build a Large Cushion into the
       Cendant Merger Reserve.**

At the same time Shelton was offering Pember the stay
bonus and enhanced employment package described above, he was
also working with her to build a substantial cushion into the
Cendant merger reserve.  Tr. 2622.  From approximately October
1997 through approximately January 1998, Shelton, Corigliano and
Pember met to discuss the components of the reserve.  They
discussed the actual expenses arising from the merger and added
excess, or cushion, into the reserve.  Tr. 2588.  As part of this
process, Pember created a schedule showing both the components of
the reserve and how much of the reserve was "cushion."  Tr. 2566-
68; see GX 493.  Between October 1997 and January 1998, Pember
shared with Shelton four or five versions of this schedule that
she created.  Tr. 2569; 2575-76.

This schedule clearly showed on its face that the
Cendant merger reserve contained a substantial cushion of more
than $360 million.  Tr. 2596.  The schedule listed the components
of the reserve, which consisted of merger related expenses.  For
each such expense, the schedule identified how much cushion was
built into each estimate of each expense.  The cushion was
tracked in a column on the schedule labeled "Total Cushion."  GX
493.

The conspirators built this cushion into the merger
reserve so that they could use it later to manage the earnings of

30

the former CUC companies.  Tr. 2580-81.  Later versions of this schedule, which Pember gave to Shelton, showed that $40 million of the cushion had been used to manage CUC's earnings in the year ending December 31, 1997.[6]  Tr. 2596; GX 493 (column labeled "Used @ 12/31/97").

Shelton had no difficulty understanding the schedule or the intended use of the substantial cushion shown in the schedule.  During one meeting he had with Corigliano and Pember to discuss the schedule, either Shelton or Corigliano remarked that "even Walter [Forbes] gets it" with regard to the cushion and its intended use.  Tr. 2603.  Pember had every reason to believe that Shelton knew how the cushion had been used.  A few months earlier, Corigliano had given Pember a copy of his "cheat sheet," which showed that CUC would have to use approximately $76 million in reserves to fraudulently inflate its earnings in order to meet its forecasts for that year.  Corigliano told Pember that only he and Shelton had copies of the cheat sheet.  Tr. 2563-64.

The various versions of the cushion schedule that Pember gave to Shelton also included information on Interval.  Interval was a time share company that CUC was required to sell as part of its merger with HFS.  Tr. 2593.  Although CUC planned

---

[6] This $40 million figure represents the amount of the Cendant reserve that was fraudulently used to manipulate Cendant's earnings for the year ending December 31, 1997.  It does not include amounts of the Ideon merger reserve that the conspirators misused at the same time.

to sell Interval, it intended to continue providing free services in some of CUC's other membership programs, such as Shopping or Travel, to Interval's members.  The cushion schedule shows that the cost to CUC of providing those services would be $50 million over three years.  Tr. 2593-95; GX 493.

### 3. A Senior CUC Employee Questions Shelton About Differences in the Financial Numbers.

In late 1997, Bob Sarkie, the President of EPub, questioned Shelton in Pember's presence about financial data for EPub that had been given to HFS.  Sarkie stated that the numbers were higher than they should have been and expressed concern about giving those numbers to HFS.  Tr. 2673.  Shelton responded by telling Sarkie that they would discuss it later and that Sarkie should not worry about it.  Id.

### 4. Pember Complains to Shelton About Confusion Arising From False Sets of Financial Numbers.

As a result of the merger and the regular year-end activity, January 1998 was a very busy time in the former CUC Accounting Department.  At one point, Pember became overwhelmed "because we had so many made-up numbers, it was impossible to keep track of them all."  Tr. 2671.  She expressed her frustration to Shelton when he called her that month to ask for information that Silverman had requested from Shelton.  Pember told Shelton that she could not answer his question and explained further that it wasn't easy to give him the answer because there

32

were so many sets of numbers that they

> had been providing information to HFS, which was a
> different set of numbers than we had provided in the
> consolidation, that there was the board reports that
> were being done that were different, and I was feeling
> extremely overwhelmed because I didn't know what set of
> numbers was going to provide the answer for Mr. Shelton
> to give to Mr. Silverman.

Tr. 2670-71.  Shelton never asked Pember what she meant by her

reference to different sets of numbers.  Tr. 2671.

**5.    Pember Notifies Shelton of Upcoming Reserve
       Adjustments.**

Pember's expression of frustration to Shelton about all

the different sets of financial numbers at CUC was not the only

time she complained to Shelton.  On January 14, 1998, Pember sent

Shelton an email, with copies to Corigliano, Sabatino and Sattler

(all conspirators), in which she complained about her work load:

> I spoke to Scott Forbes tonight (because Mary got a HOT
> "Henry" request for weighted average shares-DROP
> everything kinda call...It turned out not so HOT and it
> can wait) but I think I need to vent...
>
> We have ONE person who has been doing the year-end
> consolidation for 22 companies. (Mary).  We do them
> manually, on excel, and deal with 22 different
> financial formats (As you well know).

GX 506.  Pember's reference to "Henry" was to Henry Silverman,

the Cendant CEO.  Her reference to "the year-end consolidation

for 22 companies" was to the process by which CUC collected

financial information from each of its 22 business units each

quarter and consolidated them into one financial statement for

CUC as a whole.  See Section 1, "Factual Background."  Pember's

statement that Shelton "well [knew]" about the 22 different
formats of the business units' financial statement was based on
her knowledge that Shelton routinely received copies of the
financial statements for the various business units.  Tr. 2678-
82.

> Pember continued in her email by stating that:

> With the exception of our "reserve" adjustments, Mary
> is virtually done today.

> . . .

> I told Scott we were shooting for end of day Thursday
> with the year end numbers . . .

GX 506.  The "reserve" adjustments referred to the conspirators'
year end practice of fraudulently inflating CUC's annual earnings
by backing out the topside adjustments made in the first three
quarters of the fiscal year and filling the resulting gap in
earnings by improperly reversing merger reserves to revenue
accounts and by improperly charging operating expenses to the
merger reserve.  Tr. 2681-82.  Thus, the "year end numbers" would
not be complete until Mary made her "'reserve' adjustments."

> Shelton received and read Pember's email.  He responded
by stating:

> Anne, Cos and I are well aware of the situation and
> appreciate the job you guys are doing.  Having said
> that, you can feel free to vent frequently because
>
> a. it is relatively inexpensive
> b. email makes it easy
> c. it is more fun than consolidations!
> d. no one will do it for you

34

Kirk

GX 506. Shelton never asked Pember what she meant by "'reserve' adjustments" and never challenged her assertion that he "well [knew]" that the financials for the former CUC business units came in 22 different financial formats. Regardless, the real significance of GX 506 was not that Shelton understood it. It was the fact that Pember did not hesitate to send her boss an email in which she referred to the "reserve" adjustments with no fear that she might reveal the fraud to him. Pember had no such fear because, by January 1998, she well knew that Shelton was fully aware of the conspiracy and the conspirators' practice of using merger reserves to inflate CUC's earnings.

**6.     Pember Reports CUC's Year-End Numbers to Shelton and Corigliano.**

By late January 1998, the former CUC accountants had sent their fraudulently inflated earnings results for the former CUC companies to the former HFS accountants in New Jersey. Shortly thereafter, Pember received a fax from Scott Forbes in which he asked Pember to explain large differences in the actual results of various CUC business units as compared to an earlier forecast for those units that Corigliano had sent to Scott Forbes.  Tr. 2739.

Pember began the process of responding to Scott Forbes' request by sending an email to Shelton and Corigliano to get information regarding, and their approval of, her proposed

35

response.  She stated in part that:

> I need to summarize our collective input on the
> reasons we will use for explanations to New Jersey.
> Why??  Because
>
>> Kirk needs to know the answers when Henry calls,
>> which I think he may...
>
> And
>
>> We all need to be on the same page as to why
>> things are the way they are.

GX 519.

Pember gave her portion of the "collective input" in a
one page file attached to the email, GX 519.  She stated that
"software and individual [were] the biggest challenge to explain
logically."  The variance for Individual was a $43 million
difference between the forecasted and actual results for the
former CUC's Individual (membership) and Corporate segments
combined.  Pember noted that the "[e]ntire variance flows through
12/97," meaning that all of the variance occurred in December,
the last month of that quarter.  Tr. 2754.  She continued that
this "[r]esults from reversal of prior period reserves throughout
the year," which referred to the conspirators' practice of
reversing out the first three quarters' unsupported topside
adjustments at the end of each fiscal year.  Tr. 2754.  Pember
continued by noting that "[w]e use the 'individual' area as a
catch all quarter to quarter so any 'corrections' are forced
through the 4th quarter," meaning that the unsupported quarterly

topside adjustments were made in the Individual segment, which consisted primarily of the Comp-U-Card division.  Tr. 2755.

Pember proposed that "[p]erhaps we indicate various accrual adjustments and inter-company allocations all flow through the 4th quarter, and we plan to manage this monthly next year?"  This proposed explanation was not true.  The difference in the forecasted and actual results arose because both the forecasted and "actual" results were simply made up.  There were no accrual adjustments or inter-company allocations that explained the difference.  Tr. 2756-57.

Pember also proposed a false explanation for a $33 million variance between actual and forecasted results for the Software segment for the fourth quarter.  She first explained to Shelton and Corigliano that "YTD [year to date] results were inaccurate in the HFS management report due to inability to close books, and reserves assumed," meaning that the results included fraudulent reversals of merger reserves.  Pember continued by stating that "[t]o 'make' year, 4th Q had to be this high," meaning that the fourth quarter results for the Software segment were a plug to ensure that the former CUC entities met its annual earnings target.  Tr. 2758.  To explain this large variance to the former HFS personnel, Pember proposed that the conspirators "indicate that software had been doing P&L estimates through out the year and we had all accumulated adjustments in the 4th

37

quarter?"  GX 519.

Pember sent her email to Shelton and Corigliano during
the evening of January 20.  Although Shelton never spoke to
Pember about the email (Tr. 2759), the evidence showed that he
received it.  A substantial portion of the one page file attached
to the email, which file contained Pember's admissions and
proposed false explanations regarding the variances, was found on
Shelton's computer, as Shelton himself admitted at trial.  Tr.
13311-13.  In addition, Corigliano received the email, which
indicates that Shelton, to whom the email was also addressed,
must have received it as well.  Tr. 2760.

Corigliano proposed changes to Pember's explanations
for the variances.  Pember made those changes and faxed the new
document to both Shelton and Corigliano.  GX 520; Tr. 2760-61.
Corigliano replaced Pember's explanation that the topside
adjustments accounted for the $43 million variance in "Individual
& Corp" with a statement that:

> During the fourth quarter, any standard cost
> adjustments, membership reserve adjustments as well as
> other reserves are made on a YTD basis.  The forecast
> for the period did not reflect these one time
> adjustments.  The 1998 budget and forecast will reflect
> the analysis of these on a monthly basis throughout the
> year versus periodically.

GX 520; Tr. 2764.  Except for the vague reference to "other
reserves," this explanation was not true.  Tr. 2764.  With
respect to the Software segment variance, Corigliano replaced

Pember's proposed explanation with a statement that "Software overall came in better than expected as compared to forecast. In addition, software reserves are reviewed at year end and an excess was brought in in 12/97." GX 520. Pember noted that both Shelton and Sabatino were copied on GX 520. She sent this document to Corigliano as well but omitted his name because she wanted to hide his continued involvement in the financial affairs of the former CUC companies from the former HFS personnel. Tr. 2767. Pember also sent a copy of the revised document to Scott Forbes. GX 546.

While the January 20 email to Shelton (GX 519) was even more incriminating on its face, its primary significance is the same as that of Pember's January 14 email (GX 506) -- that Pember freely sent this email, with its explicit references to the conspirators' fraudulent accounting, to her boss (Shelton) without fear that he would question or object to it. Pember freely sent this email to Shelton because she well knew that Shelton was fully aware of the fraudulent accounting at CUC.

## 7.  Pember Reminds Shelton That Inflated Earnings at Subsidiaries Resulted from Fraud.

In late January 1998, Pember attended a meeting with Shelton and former HFS personnel. Tr. 2769. During the meeting, the participants reviewed financial results for various former CUC subsidiaries, including NUMA and NAOG. The results for those subsidiaries included the fraudulent merger reserve adjustments

the conspirators made at year end 1997.  Tr. 2771.  These
adjustments increased revenue and earnings for these companies by
$10 million, which was a relatively large number for those
subsidiaries.  Id.  One of the former HFS personnel at the
meeting asked about the relatively large numbers for those
subsidiaries.  When Shelton began to respond, Pember leaned over
to him and whispered that the numbers were impacted by the use of
reserves.  Tr. 2772.  Shelton acknowledged Pember's statement to
him and gave an innocuous explanation for the relatively large
numbers.  Id.

> **8.    Shelton Approves the Use of $110 Million of Merger
>         Reserves to Inflate Revenue in the 1998 Budget.**

In December 1997, Corigliano, Pember and Sabatino met
and calculated that the sum of the budgets of the former CUC
companies was approximately $150 million short of the
expectations of the former HFS personnel.  Tr. 2839.  Corigliano
directed that Sabatino add specific amounts to the budgets of the
various subsidiaries before the budget was furnished to the
former HFS personnel.  Id.  These additions included $110 million
to be added to Comp-U-Card division revenue accounts from merger
reserve accounts.  GX 530.

Pember prepared a summary schedule which identified
each of the adjustments discussed above.  This schedule, which
was admitted as GX 530, noted that the "unadjusted budget
operating income" for the former CUC companies for 1998 was

40

$586,552,000. This figure represented the sum of the actual operating revenues of the various former CUC subsidiaries. Tr. 2842. The schedule noted that the total operating income for those companies for 1998 was $809,552,000. The difference was made up with several accounting adjustments, of which most had been reported to HFS. GX 530. One unreported adjustment, which was also by far the largest, was "reserves to revenue" "[t]o be added to Comp-u-card" of $110 million. The schedule also noted that "reserves are being managed to meet quarterly targets." Id.

Pember prepared this schedule to show it to Shelton. She was concerned about the way Corigliano, who was no longer involved in accounting for the former CUC companies, had casually added such large amounts to the 1998 budget and she wanted to be sure that Shelton was aware of these additions. Tr. 2877. She and Sabatino went to Shelton's office and showed him GX 530. Tr. 2878. Shelton read the document and asked whether reserves could go to revenue. Tr. 2879. Pember told him that CUC would be doing that in its 1997 numbers and would be doing it in 1998 as well. Id. Shelton approved the budget and ripped the document up.[7] Tr. 2878-81.

_____

[7] See also Section 1.D.3., infra (Sabatino's description of Shelton ripping up a budget schedule); Section 1.E.2., infra (Shelton provided false testimony concerning GX 530).

41

### 9. Shelton Approves A New Method of Transferring Merger Reserves to Revenue Accounts.

Starting in January 1998, the conspirators planned to make monthly transfers from the Cendant merger reserve to revenue accounts at Comp-U-Card instead of making topside adjustments in the first three quarters, reversing the topsides in the fourth quarter, and replacing the reversed topsides with transfers from merger reserves. Tr. 2883. The monthly journal entry would be made in a new department at Comp-U-Card that would be established solely for this purpose. Id. The conspirators planned to create this new department in response to an upcoming change in Cendant's consolidation process by which the consolidation would be made automatically by Hyperion computer software. Tr. 2885-86. Pember explained this new process to Shelton, who approved it. Tr. 2889.

### 10. Shelton Approved the First Monthly Transfer From the Cendant Merger Reserve to Revenue.

Corigliano, Pember and Sabatino calculated that the first monthly transfer from the Cendant merger reserve to revenue accounts at Comp-U-Card, which would take place in January 1998, would have to be $25 million in order for the former CUC companies to meet its earnings targets. Tr. 2893. When that division's books closed for the month of January, the conspirators determined that Comp-U-Card had made $5 million more than expected in that month. The divisional controller, Steven

42

Speaks, asked Pember whether the monthly transfer from the
Cendant reserve to revenue should be $20 million or $25 million
as planned.  Tr. 2896.  Corigliano told Pember that Speaks should
book the entire $25 million.  Id.  Pember spoke with Shelton by
telephone, who directed that Speaks book $20 million from the
Cendant reserve to revenue for January.  Tr. 2897.

### 11A. Shelton and Pember Discuss the Fraud Involving the Cancellation Reserve.

As of the spring of 1998, CUC had approximately $100
million in rejects in transit.  Had CUC handled these rejects
properly, the company's earnings would have been reduced by
approximately $100 million in the period in which the correction
was made.  Since the balance of the cancellation reserve was
approximately $30 million, the recognition of the $100 million in
rejects in transit would have reduced the balance of the
cancellation reserve to a negative $70 million.  The company
would then have had to recognize a $100 million expense to bring
the cancellation reserve back to $30 million.  Tr. 2904-05.

In late December 1997 or early January 1998, Pember
discussed the rejects in transit with Shelton.  She told him that
the outstanding rejects in transit were $100 million.  Tr. 2906.

### 11B. Shelton and Pember Discuss CUC's Fraudulent Revenue Recognition Practices.

Pember also discussed the impact of CUC's fraudulent
revenue recognition practices with Shelton in this conversation.

43

Tr. 2908-11.  When Pember discussed this issue with Shelton in late December 1997 or early January 1998, she told him that $40 million in revenue had been shifted from deferred recognition programs to immediate recognition programs.  Tr. 2911.

Shelton responded to Pember's discussion of CUC's fraudulent cancellation reserve and revenue recognition practices by saying something such as "hold that thought," and walking out of his office in the direction of Walter Forbes' office.  <u>Id</u>.  He returned a few minutes later to his office and asked Pember if she had anything else to say.  Pember responded in the negative. Shelton asked her no questions and said nothing further.  Tr. 2907.

Shortly after this conversation, Pember had a second conversation with Shelton about the cancellation reserve, the rejects in transit and the fraudulent revenue recognition practices.  Corigliano was present for this conversation. Corigliano acknowledged that the balance of the outstanding rejects in transit was $100 million.  Tr. 2913.  Corigliano also stated that the practice of delaying the booking of the rejects was acceptable because Comp-U-Card had done it for years.  Pember interrupted and said that, regardless of how long Comp-U-Card had been delaying the booking of the rejects, its cancellation

44

reserve was still understated by $100 million.  Id.[8]  Corigliano
also attempted to justify CUC's fraudulent revenue recognition
practices, but Pember pointed out that his justification was
irrelevant and that Comp-U-Card had transferred $40 million from
deferred to immediate programs without justification.  Tr. 2914.
Corigliano gave up his attempt to justify Comp-U-Card's
fraudulent accounting with respect to the cancellation reserve
and revenue recognition.  Shelton never asked any questions about
either practice in this conversation.  Id.

### 12. Shelton Attempts to Recruit the Former HFS Personnel into the Conspiracy.

On Tuesday, March 3, 1998, Chris Annese, of the former
HFS accounting department in New Jersey, came to the former CUC
offices in Stamford.  His purpose was to obtain monthly financial
information on the former CUC subsidiaries to use in developing
the Hyperion software that would automatically consolidate
financial information from all of Cendant's subsidiaries and
divisions.  He asked junior accountant Mary Sattler for this
information.  Sattler sought Pember's advice because, as she and
Pember both knew, the information Annese sought would reveal the
fraud to the former HFS accountants.  Tr. 2915-18.  Pember

---

[8] According to the transcript, Pember testified that she said at
this point that the cancellation reserve was understated by $10
million instead of $100 million.  Tr. 2913.  Given her other
testimony on this subject, it is clear Pember said, or meant to
say, $100 million.

instructed Sattler to hide and not to give the information to
Annese when he arrived in Stamford.  Tr. 2919-20.

Annese, however, had a chance meeting with Comp-U-Card
controller Speaks while he was waiting to see Sattler that day in
Stamford.  Annese made an appointment to meet with Speaks the
next week and asked Speaks to provide him with the monthly
financial statements.  Speaks sent an email to Pember in which he
told her of Annese's request and asked if she "had any concerns
with this."  GX 534; Tr. 2921-22.  Pember obviously did have
concerns with Annese's request.  She responded to Speaks by
saying "Need to discuss with Cosmo and Kirk.  I would not have
had you make an official appointment, but now that that is done,
I need to get a game plan with Kirk and Cosmo to deal with the
numbers issues."  GX 534; Tr. 2922.

Corigliano took Pember aside the next day (March 4,
1998) and told her that Cendant CEO Silverman was livid with her
for withholding information from Annese and that he wanted Pember
"the hell out of there."  Tr. 2920.  Later that day, or on March
5, Pember had a conversation with Shelton and Corigliano about
the impact her absence from the Stamford accounting process would
have.  Tr. 2929.  Pember explained to Shelton and Corigliano her
concern that Comp-U-Card controller Speaks would now have to be
the point person for making the fraudulent reserve adjustments
each month.  Pember suggested that it might make sense to discuss

46

these reserve adjustments with the accounting staff in New Jersey
if they were going to continue.  <u>Id</u>.  Pember also indicated that
it would be more difficult for Speaks to make the fraudulent
reserve entries each month once the Hyperion system, which would
take financial results from each division's books and consolidate
them, went into effect.  Tr. 2930.

Corigliano opposed the idea of telling New Jersey about
the reserve adjustments but, after some conversation, Shelton
said that he did not have any choice in the matter.  <u>Id</u>.  Since
Scott Forbes, the Cendant controller, was scheduled to come from
New Jersey to meet with the Stamford accountants on that Friday,
March 6, Shelton decided to tell Scott Forbes about the reserve
adjustments at that time.  <u>Id</u>.  In short, the meeting was
necessary because: (a) Pember had been removed from her position;
(b) Anthony Menchaca repeatedly asked Shelton why Menchaca's
Comp-U-Card division results were inflated; and (c)Hyperion was
about to be installed by the Cendant accounting department.

Shelton, Corigliano, Pember, Speaks and, for a few
minutes, Comp-U-Card president Menchaca met with Scott Forbes on
March 6.  Pember brought with her to the meeting a document that
was admitted at trial as the second page of GX 160.  This
document showed that Comp-U-Card planned to add $25 million in
reserves to revenue accounts in each month of the first quarter;
$19 million in each month of the second quarter; $16 million in

47

each month of the third quarter; and subtract $6 million from
revenue accounts back to the merger reserve in each month of the
fourth quarter.  GX 160.  The document also showed that Comp-U-
Card had added only $20 million from merger reserves to revenue
accounts in January 1998 because its "actual results" were $5
million better than expected.  All told, this document showed
that Comp-U-Card was budgeted to reverse a total of $165 million
in merger reserves to revenue accounts for 1998.  Id.; Tr. 2933-
38.  This document also showed that $38 million was going to come
into revenue accounts as a result of Comp-U-Card's continuing to
provide services to Interval members in 1998.  Tr. 2940.

        Shelton distributed this document to everyone at the
meeting.  Tr. 2944.  He referred to the $20 million reserve
reversal in January and said that the former HFS and CUC
personnel would have to work together if these reversals were
going to continue throughout the year.  Tr. 2944-45.  Speaks
indicated that he planned to hire someone to handle the merger
reserves and expressed his hope that E&Y would continue to audit
Comp-U-Card, as they would be easier to deal with.  Tr.  2946.
Scott Forbes listened most of the time and asked a few questions.
 Tr. 2947.  Pember then left for the day.    Tr. 2948.

   **13.   Pember Helps Shelton and Corigliano Mislead HFS
           Personnel About CUC's Use of the Ideon Reserve.**

        Pember planned to take Monday, March 9 off.  She
received a call that day from Corigliano, who told her that he,

48

Shelton and Sabatino were meeting in Stamford with Cendant CFO Michael Monaco and Scott Forbes regarding CUC's use of the Ideon merger reserve.  Corigliano asked Pember where he could find a schedule she had provided to the auditors about the Ideon reserve.  Pember went into the Stamford office to find the schedule.  Tr. 2949-51.  Pember had prepared this schedule months before as part of the conspirators' efforts to cover up their fraudulent use of the Ideon reserve.  Tr. 2951-53.

        Pember met with Shelton outside the conference room and told him she had the schedule.  Shelton reacted by saying words similar to "thank God, I didn't know something like that existed."  Tr. 2953.  She and Shelton went into the meeting and Pember presented the schedule to Monaco and Scott Forbes.  Pember also showed Monaco and Scott Forbes support for some of Comp-U-Card's use of the Ideon reserve.  Pember had provided "support" to the auditors in the form of lease agreements, invoices, and other documents, which did not accurately reflect the charges to the Ideon merger reserve account.  Tr. 2955.  Effectively, Pember, Shelton and Corigliano misled Monaco and Scott Forbes into believing that Comp-U-Card had used the Ideon reserve properly.

        Monaco and Scott Forbes said that they wanted to hear from E&Y with respect to Comp-U-Card's past handling of the Ideon reserve.  Corigliano arranged for E&Y auditor Mark Rabinowitz to

49

attend the meeting.  Pember left the meeting to go back to her office.  Tr. 2955-58.

Later that day, Shelton called Pember in an attempt to find Corigliano.  He told Pember that it was a shame that she had not attended the meeting when Rabinowitz had been there and that Rabinowitz "deserved an Academy Award" for his performance.  Tr. 2959-60.

D.    **Evidence Provided by Other Witnesses Incriminated Shelton.**

1.    **Testimony by Menchaca Corroborated Pember.**

Anthony Menchaca corroborated Pember's testimony concerning the $20 million merger reserve manipulation in the January 1998 CUC numbers.  Menchaca's testimony (Tr. 10046-52) that Shelton had told him before March 6, 1998 that the $20 million discrepancy in the earnings was due to the use of merger reserves demonstrated that Shelton had this knowledge before the meeting that day.  This highly incriminating testimony, that Shelton does not even attempt to claim was perjured, demonstrates that Shelton knew that merger reserves were being used to inflate CUC's and therefore, Cendant's income, at a time when Scott Forbes, who was in charge of Cendant's accounting, had no idea that the earnings included creative accounting machinations.[9]

---

[9] During his six days of direct examination, Shelton conveniently ignored Menchaca's testimony concerning what Shelton told him about how merger reserves had been used to increase CUC's earnings for January 1998.

Menchaca's testimony also corroborates Pember's testimony (Tr. 2896-97) that she and Shelton discussed using $20 million of merger reserves to inflate the January 1998 numbers. Surely, if Pember was hiding the fraud from Shelton as he claimed (Tr. 12538), Pember never would have discussed with Shelton (the "world's smartest human") (Tr. 12293-96, 12557) anything about this $20 million manipulation. The fact that Shelton was able to tell Menchaca and then describe for Scott Forbes the $20 million January manipulation at the March 6, 1998 meeting demonstrates conclusively that Shelton knew and understood that CUC's earnings had been inflated by merger reserves. Tr. 5772-73 (Scott Forbes' testimony); Tr. 1427-28 (Speaks' testimony); Tr. 2944 (Pember's testimony).

**2.    Monaco's Testimony Incriminated Shelton.**

Michael Monaco also provided testimony that corroborated the testimony of Corigliano and Pember. Monaco's testimony also undermined Shelton's trial defense that he had no "hint" that Pember and Corigliano, Shelton's coconspirators, were engaging in improper accounting. On March 7, 1998, after Monaco learned from Scott Forbes what Shelton had proposed at the March 6, 1998 meeting, Monaco advised Shelton that Cendant would not participate in any "wrong accounting." Tr. 1609-10. Moreover, it was Shelton who advised Monaco, the Cendant CFO, that CUC had used "non-operating items" to increase CUC earnings in earlier

51

years.  Tr. 1610-11.  The fact that Shelton knew this fact but

had never disclosed it to Monaco or HFS during the due diligence

phase or in the first three months after the merger was

consummated demonstrates Shelton's knowledge that CUC's earnings

had been fraudulently manipulated.  This testimony by Monaco of

what Shelton told him long after the merger had taken place also

serves to corroborate Corigliano's testimony that HFS was kept in

the dark about how CUC was inflating its earnings.  Tr. 7131,

7139-42. Monaco also confirmed the fact that Shelton fought to

keep Pember in her position as the Controller of the former CUC

entities.  Tr. 1571-72; <u>see</u> <u>also</u> GX 616.

**3.  <u>Sabatino's Credible Testimony Hurt Shelton.</u>**

Sabatino's testimony also provided the jury with

evidence that Shelton had participated in the charged fraud.

Sabatino saw Shelton destroy a budget document (Ex. 530 or one

similar to it).  Tr. 4235-36, 5217-18.  This testimony

corroborated Pember's and Corigliano's testimony that Shelton had

ripped up the budget schedule.  Tr. 2880, 3773-74 (Pember), Tr.

7413 (Corigliano).  In addition, Sabatino's testimony that

Shelton ripped up the document while saying "I guess I never saw

this document before" (Tr. 4236)[10] demonstrates that Shelton knew

---

[10] Sabatino's testimony that Pember was upset after witnessing
Shelton rip up the document because Shelton was not taking the
budget schedule seriously (Tr. 5219) corroborated Pember's
testimony that she and Sabatino left Shelton's office after he
(continued...)

that the document was incriminating enough not to keep around.

Sabatino also heard Shelton direct Corigliano to make quarterly EPS a certain number even though Shelton had no basis for such a directive.  Tr. 4075-4078.  After Shelton instructed Corigliano what the EPS should be, Corigliano told Sabatino to make the earnings come out to the figure that Shelton wanted.  Tr. 4078, 5165.  Adding to Sabatino's credibility was the fact that he did not claim any other knowledge of Shelton's involvement in the fraud.  Hence, his testimony about Shelton's acts and words is highly credible evidence that the jury properly relied upon to corroborate the testimony of Corigliano and Pember and to conclude that Shelton was a knowing participant in the fraud.

### 4.    **Albright's Testimony Corroborated Corigliano.**

Thomas Albright, who served as the "effective CFO" of Essex, also provided evidence that corroborated Corigliano's testimony about Shelton's role in the fraud.  Albright's description of the meeting at which Shelton discovered the negative expense (caused by reversing merger reserves against ordinary expenses) and Corigliano whispered to Shelton the explanation for the negative expense (Tr. 3948-52) corroborated Corigliano's testimony about that meeting.  Tr. 6632-36.  The

---

[10](...continued)
ripped up the document feeling uncomfortable.  Tr. 2881.

fact that Shelton and Corigliano needed to whisper to prevent a
company employee from hearing information demonstrates that
Shelton and Corigliano had something to hide from Albright.
Albright also provided the jury with significant evidence that
Bell had created excess reserves at Essex (Tr. 3890-98),
testimony that demonstrated Bell's role in the fraud and
corroborated Corigliano's testimony that the fraud had been
ongoing before Corigliano became CFO.  Tr. 6400.  Finally, the
fact that Shelton uncovered anything about Essex's financials,
which division Albright described as a "nit on a elephant's tush"
(Tr. 3965), demonstrated convincingly that Shelton was a detailed
oriented micro-manager who did not miss the massive fraud at CUC
as he claimed.

     **5.**    **<u>Kearney Implicated Shelton and Corroborated Corigliano.</u>**

       Kevin Kearney also provided credible testimony about
Shelton's knowledge of the fraud.  Kearney testified that during
a discussion of the size of the unsupported topside adjustments,
Corigliano told Kearney that Shelton was aware of the reserves
that were needed to make the quarter.  Tr. 9743.  This testimony
corroborated Corigliano's testimony that he and Shelton would
discuss how earnings were being adjusted to meet expectations.
Tr. 6505-06.  Shelton's attempt to explain away this evidence by
suggesting that the unsupported topside adjustments were not
related to the use of reserves is contradicted by the evidence at

54

trial that showed that the use of merger reserves at year end was directly related to the unsupported topside adjustments made during the first three quarters.[11]

Kearney also corroborated Corigliano's testimony that Bell was deeply involved in the fraud.  Tr. 9715-16, 9727, 9733-34, 9747, 9963.  Finally, Kearney corroborated Pember's testimony regarding the $9.5 million reserve reversal at a CUC subsidiary, Sparks, in January 1998.  Tr. 2725 (Pember), Tr. 9829 (Kearney).  When this January 1998 action (adding $9.5 million of reserves to Sparks' income), is tied together with Pember advising Shelton by email dated January 14, 1998 that reserve adjustments are taking place (GX 506), the jury could correctly conclude that Pember was not hiding the fraud from Shelton as he claimed.  Tr. 12538.

6. **Testimony by Speaks and Scott Forbes Implicated Shelton.**

Steven Speaks and Scott Forbes both corroborated Corigliano's and Pember's testimony about Shelton's role in the fraud.  Both Speaks and Scott Forbes explained that Shelton asked for Scott Forbes' help at the March 6, 1998 meeting.  Tr. 809 (Speaks), Tr. 5766-69 (S. Forbes).  Both testified that Shelton described that $20 million of merger reserves had been used to

---

[11] See, e.g., Sabatino testimony Tr. 5261 ("Utilization of merger reserve and topside adjustments are the same thing").

increase the January 1998 earnings.  Tr. 1427-28 (Speaks), Tr.
5772-73 (S. Forbes).  This testimony corroborated Pember's
testimony that Shelton determined that $20 million of merger
reserves, rather than $25 million, would be used in January (Tr.
2895-96) and that Shelton had no choice but to tell HFS about the
use of merger reserves once Pember was removed from the
accounting loop.  Tr. 2930.  If Shelton did not tell Scott Forbes
about the monthly adjustments, the CUC earnings would fall
significantly short of the budgeted earnings CUC had projected to
HFS.  This was necessarily the case since Pember would not be in
a position to manipulate the earnings and the CUC divisions'
unadjusted results would be sent by the Hyperion computer system
directly to Scott Forbes in New Jersey.

   7.   **Shelton's Own Testimony Proved Incriminating.**

        Shelton's own testimony also corroborated some of the
damaging testimony provided by Corigliano and Pember.  For
example, Shelton could not dispute Corigliano's testimony (Tr.
6524-30) that Shelton refused to permit Jeff Epstein, the CFO in
waiting who had CFO experience, to review financial information.
Tr. 13090-13101.  Given that Shelton was such a big proponent of
company employees asking questions and seeking to learn all they
could about the company in which they worked, Shelton's refusal
to permit Epstein to review financial information was additional
evidence of his concealment of the fraud.

Similarly, Shelton's testimony that he did not see "consolidations" until after he left Cendant in April 1998 (Tr. 11972-76, 13101) was squarely contradicted by Shelton's counsel's opening statement to the jury (Tr. 141) and by Shelton's reference to the term "consolidations" in his January 15, 1998 email to Pember.  Gov. Ex. 506.

**E.    It was Shelton who Committed Perjury at Trial.**

While Shelton now claims, as he did in summation, that Corigliano and Pember perjured themselves at trial, the jury's verdict leaves no doubt that the jury determined that it was Shelton who repeatedly perjured himself at trial.  Shelton repeatedly lied about his knowledge and role in the fraud by testifying that he had "no hint," "no clue," "no indication," and thus, no knowledge that any fraud had been committed at CUC and later Cendant.  Tr. 12537-38.   The jury's verdicts demonstrates that it found Shelton's claims of ignorance to be false.  Some of the specific false testimony is described below.

**1.    Shelton Lied About His Involvement in the Interval Cover Story.**

The schedule (GX 160) provided to Scott Forbes at the March 6 meeting showed that approximately $40 million of the $165 million came from CUC's sale of Interval, a company that sold time share interests in vacation properties.  Most of the remaining funds, $110 million of the $165 million, derived from the fraudulent use of merger reserves to increase revenue.  This

57

$110 million figure had been furnished to Shelton by Pember around January 1998.  See GX 530 (the computer printout that Shelton received from Pember and which Shelton destroyed in the presence of Pember and Sabatino).

Corigliano and Pember both testified that before the March 6 meeting, Shelton was aware of, and had approved, the use of merger reserves to meet the 1998 budget numbers for the former CUC companies.  Tr. 2877-81, 7414-15.  Once Pember was removed from the accounting loop, however, Shelton understood that he had no choice but to enlist Scott Forbes to assist in the fraud, or else the CUC company's earnings would not meet the previously furnished budget numbers supplied to HFS personnel.  Tr. 7430-33.  Thus, Shelton used the March 6 meeting to further the fraud.

The reaction to the March 6 proposal was swift and furious.  The former HFS personnel did not agree to join the conspiracy.  Silverman and Monaco advised Shelton and others that the proposed use of merger reserves discussed at the March 6 meeting would not be tolerated.

By the beginning of April 1998, Silverman had informed Walter Forbes that Silverman no longer wanted Shelton and Corigliano to remain at Cendant.  Tr. 13413.  On April 4, 1998, Shelton, who was in Houston, called Corigliano, who was in Connecticut, and requested that Corigliano fax Shelton a copy of the March 6 schedule.  Tr. 13415.  Corigliano and Shelton

58

discussed using a cover story to explain away the use of merger reserves depicted on the schedule.  Shelton and Corigliano agreed to explain away the $165 million dollar figure by falsely claiming that $80 to $90 million of the $165 million came from the Interval sale.  Tr. 7527.  Corigliano then wrote on the March 6, 1998 schedule the $80 to $90 million figure to ensure that Shelton "would be on the same page" with the cover story and at Shelton's request, faxed the schedule to Shelton in Houston.  Tr. 7528; GX 387.  While Shelton knew by April 4, 1998 that he would be leaving the company, his severance had not been finalized. Shelton's contract provided that he was not entitled to a severance if he engaged in fraud.  Tr. 12630; GX 549.  Thus, to make certain that he had some explanation, albeit a false one, for the March 6 schedule, and to make sure that Silverman had no reason to withhold his severance, Shelton conspired with Corigliano to tell a false cover story.  Shelton never received his severance, a severance that would have been worth approximately $20 million.[12]

The cover story explanation was clearly false.  The accounting on the Interval sale represented no more than $40 million in the 1998 budget.  The problem for Shelton was that

---

[12] While Shelton now claims that his so called cooperation during the internal investigation reflects his consciousness of innocence, Shelton Mem. 89, ¶ 11, his true motivation for speaking with the internal investigators was his hope that by doing so he would be able to obtain his $20 million severance.

after Corigliano agreed to cooperate with the United States, Corigliano abandoned the cover story.  At trial, Corigliano testified that the cover story was an after the fact agreement between him and Shelton.  Tr. 7527.  Participants in the March 6 meeting testified that no one said anything at that meeting about Interval representing $80 to $90 million of the $165 million figure.  Tr. 1164 (Speaks), Tr. 7450-52 (Corigliano).  In the summer of 1998, however, six years before trial, Shelton had told the AA interviewers that $80 to $90 million of the adjustments reflected in GX 160 was related to Interval.  Tr. 10414.  Shelton needed to explain to the jury where he received the information about the $80 to $90 million.

Thus, Shelton invented a new story.  At trial, he claimed for the first time that before the March 6 meeting with Scott Forbes, Shelton met with Corigliano for a five minute pre-meeting.  Tr. 13354-58.  Shelton claimed that at this five minute pre-meeting, Corigliano told him that Interval represented $80 to $90 million of the $165 million and that Corigliano wanted Shelton to explain that fact to Scott Forbes during the meeting.  Tr. 12462, 13354-58.  This testimony was false.  Indeed, in Shelton's interview with the AA investigators, Shelton indicated that he did not meet with Corigliano prior to the March 6 meeting.  Tr. 10412.  Moreover, Shelton testified that although Corigliano purportedly told him about the $80 to $90 million in

60

the supposed five minute pre-meeting, Shelton did not recall telling Scott Forbes during the one hour March 6 meeting about the $80 to $90 million figure.  Tr. 13357.

Had Scott Forbes been told that the Interval number represented $80 to $90 million, he would have noted this fact on his schedule, something he did not do.[13]  Finally, over the weekend of March 7-8, 1998, Shelton reviewed schedules prepared by Corigliano showing the Interval number as $43 million, not $80 to $90 million.  Tr. 13420-30; GXs 382, 382A.  Shelton did not revise the $43 million figure.

All of these facts demonstrate that Shelton testified falsely at trial about the supposed pre-meeting with Corigliano and the after-the-fact cover story about the Interval number being $80 to $90 million of the $165 million on the March 6, 1998 schedule.

2.    **Shelton Destroyed GX 530 and then Lied About Doing So.**

Pember, Sabatino and Corigliano testified at trial that

_____

[13] The trial transcript at 7527 line 20 indicates that Corigliano said "yes" in response to a question "did Shelton make any statements in the March 6 meeting regarding there being $80 or $90 million in the Interval number."  As explained in the Government's submission dated October 4, 2004 (Memorandum of the United States in Opposition to Forbes' Motion for Modifications to be Made to the Trial Transcript (Forbes' Motion No. 34)), based on Corigliano's other testimony on this point, the Government believes that Corigliano said "no" in response to that question.  Compare, Tr. 9566, line 5.  Shelton himself was not able to testify that he told Scott Forbes at the March 6 meeting that Interval represented $80 to $90 million.  Tr. 13357.

Shelton ripped up a budget schedule, GX 530, that was given to
Shelton by Pember around January 1998.  After Pember and Sabatino
reviewed the schedule with Shelton, Shelton ripped it up and said
that he never saw the document.  Tr. 3773-74 (Pember), 4235-36
(Sabatino), 7413 (Corigliano).

       The document was highly incriminating.  It showed the
improper use of merger reserves to increase revenue by $110
million.  At trial, Shelton claimed that he never received the
document, never ripped it, and had no knowledge of merger
reserves being used to increase revenue.  Tr. 13425-27.  These
statements were all false.  Shelton knew exactly how much of the
merger reserves were being used to increase revenue since he told
Scott Forbes on March 6, 1998 that $20 million of a planned $25
million of reserves had been used in January 1998 to meet the
budget.  Tr. 5772-73.  Moreover, documents received by Shelton
showed that the budgets for the CUC businesses that Shelton
oversaw did not add up to the budget numbers that CUC provided to
HFS, budget numbers that were presented at meetings Shelton
attended.  Tr. 13241-74.  Hence, Shelton was certainly aware that
his own companies were not budgeting the amount of income that
was presented to HFS.  The difference, as Shelton well knew, and
as he explained to Menchaca, was the merger reserves.  Cross-
examination of Shelton highlighted the fact that Shelton knew
there was more than a $100 million difference in the company's

62

individual budgets and the budget presented to HFS.  Tr. 13274-83.

###    3.    Shelton Invented a False Explanation at Trial to Explain Away His Role in Approving the Plane Expense.

Shelton also lied at trial about the use of the Cendant merger reserves to pay for the 1995 and 1996 plane travel of Walter Forbes.  In 1995 and 1996, Walter Forbes flew on private jets purportedly to conduct company business.  The purported business had nothing to do with any merger.  It certainly had nothing to do with the CUC/HFS merger (the Cendant merger) which did not occur until 1997.  Indeed, Shelton, the President and Chief Operating Officer of CUC knew that it was not until January 1997 that CUC and HFS even began merger talks.  Tr. 13147-49.

Around September 1997, Walter Forbes sought Shelton's approval to have CUC reimburse Walter Forbes for his 1995 and 1996 business travel.  Walter Forbes said nothing about wanting to be reimbursed as a result of the 1997 merger with HFS.  When Shelton spoke to Corigliano about approving the expenses, Corigliano and Shelton agreed to charge the expenses to the Cendant merger reserve instead of treating them as operating expenses.  The fact that Corigliano discussed with Shelton the use of merger reserves to pay for ordinary expenses shows that Corigliano made no effort to hide the fraud from Shelton.

In his Audit Committee interview, Shelton said that Corigliano, his subordinate, told him to charge the plane

expenses to the merger reserve.  Shelton also said that he had

not spoken to Walter Forbes about charging the plane expenses to

the merger reserve.  Thus, in 1998, Shelton blamed Corigliano for

the idea of charging the plane expenses to the merger reserve.

See Tr. 10481-82.

At trial however, Shelton changed his story. There,

Shelton said for the first time that he had spoken to Walter

Forbes about the plane expenses being merger related as detailed

below:

> Q.    And who were the parties to this conversation?
>
> A.    Walter Forbes and me.
>
> Q.    And tell us, as best you can recall now, what
> Walter said and what you said.
>
> A.    Walter mentioned to me that he had received some
> bills pertaining to corporate travel that was done on
> his  plane.  The background is that Walter [had] a
> share, timeshare in a  plane.  He used it for himself
> and then the company would  also use it for some
> corporate travel.  And if it was used for corporate
> travel, he would charge some amount of that expense
> back to the company to cover his costs, although  not
> 100 percent.  He would pay for some of it out of his
> pocket.  At this point some invoices had come in and he
> said to me, I just got some invoices in for corporate
> travel on my plane.  And he said, I'm not sure that
> this is fair that I should be paying for corporate
> travel out of my own pocket because the merging with
> HFS, Henry Silverman has a corporate plane.  In fact,
> he's ordered a second corporate plane.  All his
> corporate flights are paid for 100 percent by the
> company and I don't think it's fair that I should be
> subsidizing plane fare anymore.  That was the first
> conversation that I had with him.
>
> Q.    What did you say in response to that?

> A.    I basically nodded.  And I don't remember beyond
> that.  It was just, yeah, I think that sounds right to
> me.

Tr. 12316-12317.

This testimony was false.  It was contradicted by
Walter Forbes, who admitted that the plane travel was not related
to the Cendant merger.  Forbes testified that he did not think it
was unfair that Silverman's plane travel was paid for, and Forbes
did not believe that he ever had a conversation with Shelton
about the fairness of CUC paying for Walter Forbes' plane travel.
Tr. 14252-59.  Shelton testified falsely when he claimed that he
and Walter Forbes discussed Silverman or the Cendant merger in
any way in deciding to charge the plane expenses to the Cendant
merger reserve.

### 4.    **Shelton Lied About the Cheat Sheets Disappearing.**

Shelton also could not dispute Corigliano's testimony
that he provided Shelton with the cheat sheets.  Shelton's
testimony that the sheets "kind of disappeared and just sort of
stopped coming" (Tr. 11991) was easily rejected by the jury.
Thus, the jury no doubt rejected Shelton's attempt to minimize
the importance of the fact that Corigliano shared the cheat
sheet, a tool of the fraud, with Shelton.  Given that Chris
McLeod confirmed the fact that Shelton received the cheat sheets,
albeit by euphemistically calling the sheets "forecasts" (Tr.
11030-33), Shelton's concession that he received these documents

65

(while at the same time claiming that Corigliano hid the fraud from him) was highly incriminating.  Sabatino corroborated Corigliano's testimony that he referred to the document as "cheat sheets."  Tr. 4061-62.  Thus, Shelton's attempt to describe these documents as "forecasts" (Tr. 11970, 11990-91) and to claim that they just "disappeared" was simply not credible.

**SECTION 2**

**<u>ARGUMENT</u>**

**POINT I**

**SHELTON HAS FAILED TO SUSTAIN HIS HEAVY BURDEN OF DEMONSTRATING THAT THE VERY CONSCIENTIOUS <u>JURY IN THIS CASE CONVICTED AND AN INNOCENT MAN</u>**

**(RESPONSE TO SHELTON POINT I)**

Shelton effectively concedes that the trial evidence was sufficient to prove every element of every crime for which he was convicted.[14]  He is therefore left to argue that he should be awarded a new trial because two of the Government's witnesses supposedly were not credible and because Shelton can conceive of additional incriminating evidence that the Government did not present.  Shelton Mem., Point I, 82-90.  These arguments should be rejected.

As a general matter, "the proper place for a challenge to a witness's credibility is 'in cross-examination and in

---

[14] As noted, Shelton has declined to present any argument in his memorandum of law under Rule 29 that would justify the entry of a judgment of acquittal.  <u>See</u> Section 2, Point X, <u>infra</u>.

subsequent argument to the jury, not in an appellate brief.'"
United States v. Roman, 870 F.2d 65, 71 (2d Cir. 1989), quoting
United States v. Friedman, 854 F.2d 535, 558 (2d Cir. 1988).
During the four days of Mr. Puccio's comprehensive summation, all
of Shelton's current challenges to the credibility of the
prosecution witnesses were "forcefully and eloquently presented .
. . to the jury, which nevertheless found [the witnesses]
credible."  United States v. Reinhold, 20 F.Supp.2d 541, 552
(S.D.N.Y. 1998) (rejecting, in a prosecution for conspiracy to
commit wire fraud based on fraudulent accounting, a Rule 33 claim
that the Government's key witness, a cooperating co-conspirator,
"testified falsely" and was "patently incredible").

       As this Court well knows, the jurors in this case were
remarkably dutiful.  After sitting through approximately seven
months of often arcane and tedious testimony about accounting,
they did not rush to judgment in order to rid themselves of their
responsibilities in this case.  Rather, they deliberated for 33
working days, through the Thanksgiving, Christmas, and New Year's
holidays, and declined the Court's invitation to take a one week
break between Christmas and New Year's Day.  Cf. United States v.
Nersesian, 824 F.2d 1294, 1328 (2d Cir. 1987)(denying request for
a new trial based on allegedly improper summation where "the
district court observed that, in its opinion, the jurors, who
deliberated for ten days, 'considered the evidence very

carefully.'") The jurors never suggested that they were deadlocked throughout their protracted deliberations, and so must have devoted the vast bulk of their time to a painstaking review of the voluminous trial record that included over 700 exhibits and fifteen thousand pages of testimony, as well as to the arguments of counsel that are now reiterated in Shelton's post-trial motions. They demonstrated their absence of bias against corporate officials or wealthy individuals by declining to convict co-defendant Walter Forbes of any charges, even though he was Shelton's corporate superior and far wealthier than Shelton.

Shelton now invites this Court to disagree with the assessment of twelve very conscientious jurors regarding the credibility of two of the prosecution's more than twenty witnesses (Corigliano and Pember). As Shelton effectively concedes by raising no challenge to the extensive scope of cross-examination which this Court permitted defense counsel in this case,[15] he "had every opportunity to cross-examine [the prosecution witnesses] before the jury, [and] . . . it was for the jury to assess [those witness's] credibility." <u>United States</u>

_____

[15] For instance, in addition to the extensive cross-examination of those witnesses by Forbes' lawyers, Shelton's very capable counsel cross-examined Corigliano over the course of seven trial days from July 20 through August 2, 2004, Tr. 8180-9292, and cross-examined Pember over the course of three trial days from June 2 through 7, 2004. Tr. 2982-3439. Counsel also recross-examined both witnesses. Tr. 3788-3863 (Pember); Tr. 9654-75 (Corigliano).

v. Rittweger, 2003 WL 22290228, *9 (S.D.N.Y., Oct. 6, 2003)
(rejecting, in a prosecution for conspiracy to commit securities
fraud and wire fraud, and related crimes, a Rule 33 challenge to
the credibility of a prosecution witness).  Although Shelton, as
he did during summation, presents numerous challenges to the
Government's trial proofs, he has failed to sustain his heavy
burden of proving that the convictions were against the weight of
the evidence.

        In this Circuit, requests for a new trial based on
challenges to the credibility of the prosecution witnesses are
"not favored and should be granted only with great caution."
United States v. Wong, 78 F.3d 73, 79 (2d Cir. 1996)(affirming
the denial of new trial motion based on after-discovered
impeachment evidence); United States v. Sasso, 59 F.3d 341, 350-
51 (2d Cir. 1995)(same); see United States v. Gambino, 59 F.3d
353, 364 (2d Cir. 1995)("motions for a new trial are disfavored
in this Circuit [and] the standard for granting such a motion is
strict").[16]  The Second Circuit has established appropriately

---

[16] The strict standard for assessing Shelton's challenge to the
weight of the trial evidence also applies to claims based on
newly discovered impeachment evidence.  United States v. Sanchez,
969 F.2d 1409, 1415 (2d Cir. 1992)("As in the case of motions for
a new trial based on newly discovered evidence, motions for a new
trial based on the identification of perjured testimony should be
granted only with great caution and in the most extraordinary
circumstances.").  Cases involving newly discovered impeachment
evidence are therefore instructive in evaluating Shelton's claim
based on the weight of the evidence.  As will be shown herein,
                                              (continued...)

strict limits on a district court's authority to grant a new trial based on post-trial defense challenges to the weight of the evidence.  Such claims require the court to overrule the credibility and weight determinations that are delegated exclusively to the jury during the trial, which are based on unanimous agreement on factual matters that the Government must prove beyond a reasonable doubt.  Consequently, in the context of a motion for a new trial under Fed. R. Crim. P. 33:

> It long has been our rule that trial courts must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses.  It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment.  Where testimony is patently incredible or defies physical realities, it may be rejected by the court, despite the jury's evaluation. But the trial judge's rejection of all or part of the testimony of a witness or witnesses does not automatically entitle a defendant to a new trial.  The test is whether it would be a manifest injustice to let the guilty verdict stand.
>
> Manifest injustice cannot be found simply on the basis of the trial judge's determination that certain testimony is untruthful, unless the judge is prepared to answer "no" to the following question: "Am I satisfied that competent, satisfactory and sufficient evidence in this record supports the jury's finding

---

[16](...continued)
the courts of this Circuit have repeatedly rejected claims based on newly-discovered evidence that substantially impeached the testimony of important prosecution witnesses, even though, in those cases, the jury never heard the impeaching information, and the reviewing court cannot know how the jury would have decided had it been informed of that information.  In this case, by contrast, all of the evidence and arguments presented in Shelton's current attack on the weight of the evidence have already been presented to the jury and found unconvincing.

> that this defendant is guilty beyond a reasonable
> doubt?"  In making this assessment, the judge must
> examine the totality of the case.  All the facts and
> circumstances must be taken into account.  An objective
> evaluation is required.  There must be a real concern
> that an innocent person may have been convicted.  It is
> only when it appears that an injustice has been done
> that there is a need for a new trial "in the interest
> of justice." Although a trial court has broader
> discretion to grant a new trial pursuant to Rule 33
> than to grant a motion for a judgment of acquittal
> pursuant to Fed.R.Crim.P. 29, where the truth of the
> prosecution's evidence must be assumed, that discretion
> should be exercised sparingly.

United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992)

(emphasis added, internal quotation marks and citations

omitted)(reversing the grant of a new trial based on the district

court's conclusion that the convictions were not supported by the

weight of the evidence).

        For all of his complaints about the strength of the

Government's trial evidence in this case, Shelton has failed to

demonstrate that the jury convicted an innocent man.  Judges in

this district and elsewhere in this Circuit, applying the Second

Circuit's strict limits on such claims, as articulated in

Sanchez, have repeatedly rejected challenges to the weight of the

evidence like those which Shelton has presented here.  E.g.

United States v. Milikowsky, 896 F.Supp. 1285, 1312 (D.Conn.

1994) (Burns, J.) (denying a Rule 33 motion in a prosecution for

conspiracy to fix prices in violation of the Sherman Act, based

on claims that the testimony of a principal prosecution witness,

a cooperating co-conspirator, "should be given no weight" and

71

that another witness's testimony should be rejected because it
was "vague and nonspecific;" based on the totality of the
evidence, the district court was satisfied that "competent,
satisfactory and sufficient evidence in the record supports the
jury's finding"); United States v. Ramerez, 313 F.Supp.2d 276,
280 (S.D.N.Y. 2004) (defendant failed to demonstrate "exceptional
circumstances" showing that an innocent man may have been
convicted); United States v. Lohm, 1993 WL 488635 *8-11 (N.D.N.Y.
1993)(defendant's "painstaking effort . . . to dismantle the
credibility" of key prosecution witnesses failed to demonstrate
"a miscarriage of justice" or "manifest injustice").[17]   This

---

[17] Shelton relies heavily on United States v. Autouri, 212 F.3d
105 (2d Cir. 2000), in which the district court granted a new
trial based on the weight of the evidence, and the Court of
Appeals concluded that the ruling was not an abuse of discretion.
Autouri is most notable for the rarity in which such motions are
granted, as district courts in this and surrounding Circuits
almost routinely decline to find that a jury's guilty verdicts
are against the weight of the evidence.  See United States v.
Livoti, 25 F.Supp.2d 390, 393 (S.D.N.Y. 1998); United States v.
Shkolir, 17 F.Supp.2d 263, 268 (S.D.N.Y. 1998); United States v.
Murgas, 177 F.R.D. 97, 107 (N.D.N.Y. 1998); United States v.
Martinez, 844 F.Supp. 975, 980-81 (S.D.N.Y. 1994); United States
v. Sampson, 332 F.Supp.2d 325, 330-31 (D.Mass. 2004); United
States v. Stewart, 325 F.Supp.2d 474, 486-87 (D.Del. 2004);
United States v. Gray, 292 F.Supp.2d 71, 94 (D.D.C. 2003); United
States v. Edmonds, 765 F.Supp. 1112, 1119 (D.D.C. 1991); United
States Clemons, 658 F.Supp. 1116, 1120-21 (W.D.Pa. 1987); United
States v. Caramandi, 415 F.Supp. 443, 445 (E.D.Pa. 1976); United
States v. Whiteside, 404 F.Supp. 261, 265 (D.Del. 1975); United
States v. Mancini, 396 F.Supp. 75, 78 (E.D.Pa. 1975); United
States v. Schall, 371 F.Supp. 912, 935 (W.D.Pa. 1974); United
States v. Kermidas, 332 F.Supp. 1312, 1316 (M.D. Pa. 1971);
United States v. Joines, 327 F.Supp. 253, 255 (D.Del. 1971);
United States v. Morris, 308 F.Supp. 1348, 1350 (E.D.Pa. 1970);
                                        (continued...)

Court should do so as well in this case.

_____

[17](...continued)
<u>United States v. Lewis</u>, 235 F.Supp. 220, 221 (E.D.Tenn. 1964);
<u>United States v. Pepe</u>, 209 F.Supp. 592, 596 (D.Del. 1962).

**A.    Any Absence of Proof that Shelton Carried Out the Day to Day Execution of the Accounting Fraud Cannot Show that He Did Not Direct His Subordinates to Do So.**

Shelton claims that the evidence failed to show that he received copies of various documents that were used to execute the fraud,[18] or that some of the other conspirators told him about various aspects of the fraud.[19]  The purported lack of evidence that Shelton saw those documents or had conversations about those subjects supported the Government's theory of the case that Shelton and Forbes directed the over-all strategy of the fraud by meeting periodically with Corigliano, discussing the cheat sheets, and deciding how much to inflate CUC's operating income, while delegating the nuts and bolts of effectuating the fraudulent accounting to Corigliano and his subordinates.  The defendants adopted this "hands-off" treatment of the fraud both because they did not have the time to carry out mundane details

---

[18] See Shelton Mem. 8 (documents pertaining to topside adjustments); id. at 12-13 (documents pertaining to creation of excess Ideon reserve); id. at 15 (December 1997 schedule of revenues and earnings and 1998 budget for Comp-U-Card); id. at 16 (initial and revised income statements for Comp-U-Card, fraudulent journal entries, and Pember's schedule for allocation of reserves to inflate earnings); id. at 22 (Speaks' March 31, 1998 email to Pember); id. at 26 (projection models); and id. at 28 (Speaks' April 9, 1998 email to Corigliano and others).

[19] See Shelton Mem. 8 (topside adjustments), id. at 14-15 (December 1997 controller's meeting); id. at 15 (January 1998 meeting regarding false journal entries); id. at 20 (underfunding of cancellation reserve); id. at 20-21 (three month delay in recording rejected billings); id. at 23 (impropriety of rejects in transit policy and underfunding of the membership reserve); id. at 29 (Speaks' knowledge of the allocations).

of the fraudulent accounting, and because they sought to distance themselves from any documents or conversations by which the scheme was executed.

Even if one would expect that Shelton would have been shown certain documents during his involvement in the fraud, the purported absence of evidence that he saw those documents is not so extraordinary that it requires this Court to grant a new trial, since Shelton's involvement in the crime did not require that he see any of those documents.[20]  See <u>United States v. Campbell</u>, 292 F.Supp.2d 1159, 1163-64 (N.D.Iowa 2003)(rejecting a Rule 33 challenge to the weight of the evidence based on the absence of the "serialized buy money" or drugs in the defendant's possession when he was arrested shortly after he engaged in the controlled drug deal, where the defendant could have discarded the money and drugs shortly before he was arrested).

Just as one who orders a subordinate to commit murder is guilty even though he was unaware of how those who killed the victim accomplished the crime, absence of evidence that Shelton saw various fraudulent documents or spoke about the fraud to lower level CUC employees did not exonerate him.  The defendant in the hypothetical example would be no more guilty of

---

[20] Of course, Shelton did see the cheat sheets, did destroy a budget document (GX 530) which described that $110 million dollars of merger reserves were being budgeted to inflate 1998 revenue and did receive GX 519 on his computer despite his self-serving testimony that he did not look at it.

premeditated murder had he purchased and given the murder weapon
to the killer, in addition to telling the killer who to kill.
Accordingly, conclusive evidence that the defendant never laid
eyes on the gun would not preclude a conviction or justify post-
trial relief.  Likewise here, the absence of additional evidence
beyond that required to prove Shelton's guilt beyond a reasonable
doubt is not an extraordinary circumstance that demonstrates the
conviction of an innocent man.

**B.    Shelton's Attacks on Corigliano's Testimony Cannot Show that
the Jury Convicted an Innocent Man.**

        Shelton focuses much of his fire on the credibility of
Corigliano (Shelton Mem. 62-78), an issue that was at the core of
the defense of both Shelton and Forbes, from their opening
statements, through almost three weeks of cross-examination of
Corigliano, through their summations.  Even if wholly convincing,
however, Shelton's attacks on Corigliano's testimony would not
justify a new trial.  The jury could have convicted Shelton even
had the Government not presented Corigliano's testimony at all,
because the remaining evidence, and particularly the testimony of
Pember, was fully sufficient to sustain the convictions.  As
Shelton's lawyer conceded in his opening statement, Tr. 111-120,
there was no disagreement between the parties that a massive
accounting fraud took place at CUC for at least the last 3 years
while Shelton was the second-ranking executive at that company.
Shelton's lawyer insisted that the only contested issue in this

76

case was whether Shelton knew about and participated in that fraud, or whether he was oblivious to it.  Id.

As demonstrated above in the Government's Statement of Facts, the evidence other than Corigliano's testimony convincingly demonstrated that Shelton participated fully in the fraud.  For instance, as shown in Section 1.C., supra, Pember provided substantial evidence of Shelton's guilt.  The sufficiency of this evidence to sustain the jury's verdicts is not disputed by Shelton; nowhere in his 140 page brief does he claim that Corigliano's testimony was necessary to sustain the Government's burden of proof on any count.  "It is well established that a conviction may be sustained on the basis of the testimony of a single accomplice, (here, Pember) so long as that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt."  United States v. Peterson, 190 F.Supp.2d 343, 360 (E.D.N.Y. 2002), quoting United States v. Diaz, 176 F.3d 52, 92 (2d Cir. 1999).

But the verdicts in this case were not sustained by Pember and Corigliano's testimony alone.  Other evidence, described in Section 1.D., supra, supports Pember's testimony that Shelton was one of the leaders of the fraud.  Because Corigliano's testimony supported, but was not essential to the verdicts, Shelton's challenges to Corigliano's testimony cannot show that the jury convicted an innocent man.  See Sanchez, 969

77

F.2d at 1415 (overturning district court's grant of a new trial
based on the court's finding that the testimony of three police
officer witnesses was not credible, where the testimony of a
cooperating co-conspirator who testified pursuant to a
cooperation agreement was sufficient to support the convictions,
even though "extensive evidence was introduced to impeach his
testimony"); United States v. Goldstein, 2003 WL 1961577 *2
(S.D.N.Y. 2003) (rejecting a Rule 33 motion based on a defense
claim that the testimony of three prosecution witnesses was
"incredible," because even if that testimony was wholly
discredited, "the balance of the evidence proffered by the
Government at trial was more than sufficient to support" the
convictions); see also United States v. Monteleone, 257 F.3d 210,
220 (2d Cir. 2001) (affirming the denial of a new trial under
Rule 33 based on newly discovered evidence that one of the
Government's key cooperating witnesses had committed perjury
during the trial, where the testimony of other cooperating
witnesses supported the convictions).  The Second Circuit has
repeatedly affirmed the denial of new trial motions based on
after-discovered evidence that a crucial prosecution witness
committed perjury in the case at bar or elsewhere.  See United
States v. Moreno, 181 F.3d 206, 212-13 (2d Cir. 1999) (rejecting
defense claims that the testimony of four of the Government's
cooperating witnesses was mutually contradictory and was

otherwise incredible, and that two of the witnesses committed
perjury, where "independent evidence support[ed the] defendant's
conviction"); United States v. White, 972 F.2d 16, 20-22 (2d Cir.
1992)(after-discovered evidence that the Government's "principal
witness" committed perjury during the trial in that case, where
the jury convicted the defendant only of counts where the
testimony of that witness was corroborated by other evidence, and
"the jury did not rely on [that witness's] testimony alone to
convict"); see also United States v. Reyes, 49 F.3d 63, 68 (2d
Cir. 1995)(after-discovered evidence that a DEA agent who
testified at trial had committed perjury in other cases, where a
cooperating co-conspirator provided "the core of evidence" in the
prosecution case, and the defendant "had ample opportunity to
impeach" that cooperating witness).

Likewise, in United States v. Saada, 212 F.3d 210 (3d
Cir. 2000), the defendant sought a new trial based on an
audiotape which captured a conversation involving one of the
principal prosecution witnesses, a cooperating co-defendant named
Rishty.  During that conversation, which occurred after the
defendants had been convicted, Rishty advised another person to
give false testimony against an innocent third party, under the
guise of cooperating with the government, in order to receive a
reduced sentence on a pending criminal charge.  Rishty told the
other person that Rishty would "back up" his story "100 percent."

Rishty also admitted that he had withheld information from the Government during his own debriefings, and that the Government had occasionally given Rishty information about a particular crime when asking him whether it had occurred.

Notwithstanding this powerful, after-discovered impeachment evidence, which is far more compelling than anything that Shelton identifies in his present motion to attack the testimony of Corigliano, the Third Circuit affirmed the denial of Rule 33 relief in Saada on the ground that the impeachment evidence was not so compelling to warrant a new trial, where there was sufficient other evidence, apart from Rishty's testimony, to support the convictions. 212 F.3d at 215-16. Even if the jury had declined to believe anything that Corigliano said that implicated Shelton, a new trial would be unwarranted.[21]

_____

[21] Although Shelton relies heavily on Autouri, that case hardly compels a new trial here. In that case, the Court of Appeals merely held that the district court did not abuse its discretion by concluding that the verdicts were against the weight of the evidence. The Court of Appeals did not hold that a contrary finding by the district court, that the weight of the evidence would have supported the verdicts, would have amounted to an abuse of discretion had the district court come to that conclusion instead. The abuse of discretion standard, by its nature, contemplates that different judges can reach contrary conclusions from the same evidence on occasion, and that neither will have abused their discretion. See United States v. Ramirez, 297 F.3d 185, 193 (2d Cir. 2002); United States v. Malpeso 115 F.3d 155, 163 (2d Cir. 1997).

Additionally, Autouri is distinguishable. First, as shown herein, Corigliano's testimony was not "the core of the Government's case" against Shelton, Autuori, 212 F.3d at 120, as the witness Googel's testimony was against Autuori, because

(continued...)

**C.  Shelton Has Failed to Demonstrate that Corigliano Committed Perjury, or that the Jury Could Not Rationally Credit Any of His Testimony Which Inculpated Shelton.**

In any event, many of Shelton's challenges to Corigliano's testimony fail on their own terms.  First, Shelton boldly contends that Corigliano repeatedly perjured himself during the trial in this case, and "[h]is testimony should be rejected in its entirety."  Shelton Mem. 62.  He variously contends that Corigliano's trial testimony was inconsistent with his prior statements to Government investigators, and was contradicted by Pember and other prosecutions witnesses, various defense witnesses, and certain documents.

None of these claims demonstrate that Corigliano committed perjury, and the jury could reasonably decline to discredit the entirety of Corigliano's testimony which

---

[21](...continued)
evidence independent of Corigliano's testimony was sufficient to convict Shelton.  The Autuori Court did not consider whether the evidence in that case would have been sufficient without Googel's testimony.

Although the Court of Appeals noted that the testimony of another prosecution witness, Gates, was "problematic," 212 F.3d at 121, the Court gave no indication that it would have affirmed the grant of a new trial had the district court's grant of a new trial been based on such "problems" alone.  Yet, as shown above, Shelton is not entitled to a new trial here unless he can show that both Corigliano's and Pember's testimony that implicated Shelton should be discredited in its entirety, since Corigliano's testimony was not necessary to support the convictions.  The testimony of a cooperating witness is always subject to strenuous challenge, and the kind of inconsistencies identified with respect to Gates' testimony are generally insufficient to overturn a verdict of guilt based on the weight of the evidence.  Accordingly, Autuori does not require a new trial here.

incriminated Shelton in the charged crimes.  Perjury requires
proof that the witness gave "false testimony concerning a
material matter with the willful intent to provide false
testimony, as distinguished from incorrect testimony resulting
from confusion, mistake, or faulty memory."  <u>Monteleone</u>, 257 F.3d
at 218; <u>see</u> <u>also</u> <u>United States v. Gambino</u>, 59 F.3d 353, 365 (2d
Cir. 1995)("even a direct conflict in testimony [between a
witness's sworn testimony in the case under review and his sworn
testimony in another proceeding"] does not in itself constitute
perjury").

        Shelton's purported demonstration that Corigliano's
trial testimony in this case was perjured fares no better than a
similar claim that was rejected in <u>United States v. Kuzniar</u>, 881
F.2d 466 (7th Cir. 1989), which was cited with approval by the
Second Circuit in <u>Sanchez</u>, 969 F.2d at 1414.  In <u>Kuzniar</u>, the
district court granted a new trial under Rule 33 after concluding
that the only witness (Ahrens) who testified about any
incriminating conversations between the defendants was
"unbelievable as a matter of law," because he was contradicted by
various business records and other testimony which showed that he
could not have been in a position to hear the damning admissions.
The district court reasoned that it should have excluded Ahrens'
testimony in its entirety, and that a new trial was required
because Ahrens' testimony was "dramatic and very damaging."  881

F.2d at 469-70.

The Court of Appeals reversed, even though the defense had "effectively showed that Ahrens was lying" regarding the timing of his employment at the defendants' business, and "submitted substantial evidence to show that [the witness] did not work for the defendants at the time he allegedly heard their incriminating conversation." Id. at 471. Noting that Ahrens' testimony was corroborated in some respects by other evidence, the Seventh Circuit held that "nothing exceptional was present to justify preventing Ahrens' testimony from being heard by the jury," and the district court abused its discretion by granting a new trial in the interests of justice. Id.

Many of Shelton's challenges to Corigliano's testimony are no more powerful than those which the Seventh Circuit found to be insufficient to justify a new trial in Kuzniar. For instance, contrary to Shelton's claim, Shelton Mem. 83, ¶ (i), there was nothing "incredible" about Corigliano's testimony regarding his own state of mind when he sold CUC and Cendant stock. Certainly Shelton presented no evidence to contradict that testimony. Corigliano testified that he participated in the fraud because his corporate superiors directed him to, and Corigliano decided to follow those orders. Tr. 7964-65, 8185, 8255-56. Corigliano acknowledged that he reaped substantial profits from his stock sales. Tr. 7898-7903. Because he was

initially motivated by a desire to satisfy his bosses, and not by
the prospect of cashing in on improperly inflated stock options
that he had yet to receive, Corigliano's testimony about the
reason why he joined the conspiracy was eminently plausible.  Tr.
8248-49.  The jury could reasonably conclude that Corigliano
testified truthfully about his own thinking, that he would have
committed the fraud even if he would not have been able to enrich
himself from his stock sales, because the other benefits he
obtained from the fraud, in the form of promotions and salary
increases for being a "team player," were sufficient to cause him
to act unlawfully.  Shelton cannot show that Corigliano's
testimony was "patently incredible or defie[d] physical
realities."  Sanchez, 969 F.2d at 1414.

Corigliano's challenged testimony about the timing of
activity at CUC headquarters to detect hidden electronic
listening devices ("bugs") (Shelton Mem. 66), does not
demonstrate a miscarriage of justice for several reasons.  First,
the testimony had little if any impact on the proof of Shelton's
guilt, because Corigliano attributed to Forbes, not Shelton, the
decision to sweep the CUC offices for bugs.

Second, GX 430, the invoice for the bug-sweeping
services, was dated November 17, 1997, and supported Corigliano's
testimony that bug-sweeping activity occurred at CUC in the fall
of 1997.  Although the defendants presented other documents which

84

showed bug-sweeping activity at CUC in November 1996, Corigliano
acknowledged that there was prior bug-sweeping activity at CUC in
late 1996 in response to the Halmos litigation (Tr. 8141), so the
defense exhibits did not contradict his testimony.

Third, even if Corigliano was mistaken about the timing
of the bug sweeping activity, or about his conversation with
Shelton shortly after the March 9, 1998, Silverman meeting in New
York City (Shelton Mem. 84, ¶ iv),[22] the jury was not required to

---

[22] Shelton's argument about Corigliano's allegedly false
testimony about a meeting with Walter Forbes is a classic example
of how the defense labored to manufacture an alleged
inconsistency in Corigliano's testimony.  On direct examination
Corigliano testified that he couldn't remember the exact date of
his meeting with Walter Forbes. "I can't be more specific than
sometime after the 11th or 12th of March, but not a month later,
obviously.  Within a few days."  Tr. 7488 (emphasis added.)  On
cross-examination by counsel for Walter Forbes Corigliano
reaffirmed that "the meeting happen[ed] after we met on the 9th
and after I heard from Walter that Henry wasn't going to take
issue with a penny or two from last year."  Tr. 9650.  Hell bent
on finding an inconsistency, Forbes' counsel strained to fit
Corigliano's testimony into a time frame where they could allege
the meeting couldn't have happened.

> Q.   What's a few days to you?  How many days should we
>      mark in yellow on that chart to encompass
>      your sworn testimony that the meeting
>      occurred within a few days of March 11 or
>      12th?
>
> A.   I just -- I told you what I remember.  And I
>      remember meeting with Walter in Kirk's office
>      after we were aware that penny --
>
> Q.   Could you answer my question and tell me --
>
> A.   I don't know.  Soon after.  I can't put a time
>      frame on.

(continued...)

discredit Corigliano's other testimony that implicated Shelton in the charged crimes.  Corigliano could have been honestly mistaken in his recollection of the timing of those events, and still testified truthfully that he conspired with Shelton and others for many years to fraudulently inflate CUC's earnings.  See United States v. Brennan, 326 F.3d 176, 188-91 (3d Cir. 2003) (affirming the rejection of the defendant's Rule 33 weight of the evidence claim where the testimony of the government's key witness regarding the date when he received $3 million in bearer bonds from the defendant in New York City was contradicted by an airline ticket showing that he was not in New York on that date, and the witness conceded that he "could not explain that

---

[22](...continued)
        Q.   What's a few? You used the word "few."  What's a few days?

        A.   Two, three, four, five.  Not a month.  That's the best I can do.

        Q.   You think five is a few?

        A.   I said, I couldn't be specific about --

        Q.   Let's use five.  Color five more days, Patrick.

Id.

        Shelton also ignores the testimony of John Oller who recounted that Walter Forbes told the Audit Committee investigators that he returned to Connecticut either on Wednesday or Thursday the week following Monday, March 9th.  Tr. 14526.

ticket"); <u>United States v. Petrillo</u>, 237 F.3d 119, 124 (2d Cir. 2000) (affirming the denial of a Rule 33 claim based on newly discovered evidence forming the basis for a challenge to the credibility of a key prosecution witness), <u>abrogated</u> <u>on</u> <u>other</u> <u>grounds</u>, <u>Crawford v. Washington</u>, 541 U.S. 36, 64 (2004); <u>Lohm</u>, 1993 WL 488635 at *10 (declining to completely discredit the testimony of a prosecution witness whose challenged inculpatory testimony on certain points was not necessary to support the convictions).

Corigliano's false statements in January 1999 to Government officials about his involvement in the fraud, (Shelton Mem. 62), a subject that was thoroughly explored at trial, (Tr. 7029-33, 7054, 7581-7611, 7630-34, 7641-70), were likewise insufficient to demonstrate a miscarriage of justice. <u>See</u> <u>Reinhold</u>, 20 F.Supp.2d at 551-52 (denying a Rule 33 challenge, even though the key prosecution witness, a cooperating co-conspirator, acknowledged "that he had not been truthful at all times in his meetings with the Government"). In <u>Gambino</u>, the Second Circuit affirmed the district court's denial of a new trial, even after the defense presented newly discovered evidence of a recorded conversation in which the Government's essential witness, former mobster Salvatore Gravano, had urged an associate to "out and out lie" when testifying before a grand jury. 59 F.3d at 364, 366. The tape not only demonstrated Gravano's

efforts to suborn perjury, but showed that Gravano himself had likely committed perjury before the grand jury as well. Nevertheless, the Court of Appeals agreed that the tape recording did not "undermine confidence in Gambino's conviction." Id. at 366. As in Gambino, Corigliano's admitted lies to the Government, although appropriate fodder for cross-examination, fail to justify a new trial under Rule 33.

If Corigliano's actual falsehoods to the government investigators in January 1999 are insufficient to demonstrate that the verdict were against the weight of the evidence, certainly the mere omission of any events about which Corigliano testified at trial in certain notes taken by FBI Special Agent Gerber and former AUSA Paul Weissman (Shelton Mem. 65, 73) is insufficient to sustain Shelton's burden. See United States v. Boone, 2004 WL 187151, *2, 5, 8 (S.D.N.Y., Jan. 29, 2004)(denying a Rule 33 motion based on inconsistencies between the arresting officer's trial testimony and his account of the arrest and seizure of drugs and drug paraphernalia reflected in a written complaint prepared by a local prosecutor based on his interview of the officer shortly after the arrest; the jury had an opportunity to assess the officer's credibility in light of those inconsistencies); Reinhold, 20 F.Supp.2d at 551-52 (denying a Rule 33 claim that a key cooperating witness lied, based on inconsistencies between his trial testimony and his prior

statements to government investigators regarding the timing of the inception of the fraudulent scheme).

Shelton contends that the jury should have discredited Corigliano's testimony because portions of it were contradicted by other prosecution witnesses, such as Pember, Sabatino, Kearney, Speaks, and Thomas Albright, and by defense witnesses such as Chris McLeod and Joel Zychick. Shelton Mem. 84, ¶¶ (vi), (vii), (viii), and (ix). Any such conflicts do not demonstrate that the jury convicted an innocent man. As Shelton implicitly concedes, the jury was not required to acquit merely because Shelton's own testimony flatly contradicted certain portions of the testimony of Corigliano, Pember, and Sabatino. Rather, the jury was empowered to assess the credibility of each of the witnesses and decide that Shelton's testimony was insufficient to even create a reasonable doubt. Any inconsistency between the testimony of Corigliano and other witnesses does not mean that the jury had to conclude that Corigliano was lying. Rather,

> discrepancies in some portions of testimony do not
> require a finding that one or more witnesses falsified
> evidence, as recollections do vary over time. The jury
> was entitled to credit evidence that it found to be
> truthful and, by necessity, discredit evidence which
> conflicted with what it found truthful.

Lohm, 1993 WL 488635 at *9-10 (discrepancy in testimony was "insufficient to require discounting the entirety of [the witness's] testimony" about a particular transaction). See also Sanchez, 969 F.2d at 1415 ("the differences in recollection

89

presented a credibility question for the jury, at most").  In
Sanchez, the contradictions between the prosecution witnesses
went not to peripheral matters, but to their ability to observe
the defendant at a critical moment when he was running from the
bathroom in which drugs had just been flushed down a toilet upon
arrival of the police.  969 F.2d at 1412-13.  Nevertheless, the
district court abused its discretion by overruling the jury's
credibility findings and finding the weight of the evidence to be
against the guilty verdicts.  See also United States v. Brodie,
403 F.3d 123, 153-56 (3d Cir. 2005)(a rational juror can credit
even testimony that has been weakened by evidence of the
witness's prior inconsistent statements, cross-examination, and
defense evidence).

        Additionally, even though Corigliano's and Pember's
recollections, over six years after the events at issue,
predictably differed on some details, they corroborated each
other on some of the most significant events that inculpated
Shelton in the charged crimes as shown in Sections 1.B. and 1.C.
of the factual recitation portion of this brief.  The jury could
rationally conclude that the mutual corroboration of Corigliano's
and Pember's testimony about Shelton's guilt outweighed any
inconsistency in the less remarkable details of the extensive,
years-long fraud.  See Sanchez, 969 F.2d at 1415 (contradictions
between the testimony of police officers regarding the

defendant's attempt to avoid capture did not support a new trial, where "the testimony was consistent in a number of other respects").        Shelton points out that Corigliano denied that GX 613, a March 4, 1998 memorandum from Walter Forbes to Silverman and  Monaco, had been stored on Corigliano's computer, even though a defense witness, David Stenhouse, who was qualified as an expert in computer forensics (Tr. 11295-303), testified that he had recovered a copy of that document from Corigliano's computer.  Although Corigliano at one point denied during cross-examination that the memo had been stored on his computer (Tr. 9244), his initial response to that inquiry on cross-examination was more equivocal.  Id.  (Corigliano testifying that he was "not aware" that the memo had been stored on his computer).  Such equivocal testimony is not tantamount to perjury, and does not damage the witness's general credibility to the same extent.  Cf. Milikowsky, 896 F.Supp. at 1297-99 (prosecutors did not have a duty to correct erroneous testimony because it was not unequivocally false, where witness's testimony regarding a particular event was often equivocal and qualified rather than consistently certain).  Additionally, the jury is entitled to discount testimony that is elicited on cross-examination in drawing inferences from the evidence.  See Brodie, 403 F.3d at 154-55.

        Shelton challenges Corigliano's testimony regarding

such collateral matters as whether Corigliano was dishonest
because he: (a) did not volunteer his criminal conviction when he
applied for a home equity loan from People's Bank, and supposedly
misled People's Bank about the purpose of the loan, Shelton Mem.
84, ¶ xi; and (b) did not inform the SEC that his residential
real estate holdings in Old Saybrook, Connecticut comprised two
separately taxable parcels that were purchased in a single
transaction, rather than one, and that Corigliano had paid
retainers to lawyers to represent himself and his wife in pending
litigation. Shelton Mem. 84, ¶ x.  Corigliano explained, however,
that he was never asked by bank officials whether he was a
convicted criminal.  Tr. 9674-75.  Given that the People's Bank
loan was secured by Corigliano's two million dollar equity
interest in real estate that he owned free and clear (Tr. 7920-
21),[23] the bankers probably would have cared little about that
conviction.  Corigliano denied that he told the bank official who
prepared his application that the loan was for home improvements.
Tr. 9672-73.  The defendants, who had no shortage of resources to
procure witnesses in this case, presented no evidence to
contradict that testimony.

        As for the accuracy of Corigliano's disclosures to the

---

[23] Shelton points out that Corigliano did not inform the bankers
that he was facing imminent disgorgement of most of his assets
(Shelton Mem. 84, ¶ (xi)), but Corigliano did not pledge any of
those assets as collateral for the loan.

SEC about his assets, Corigliano plausibly explained that he regarded the two adjoining but separately taxed parcels of real property, which he purchased in a single transaction, as a single piece of property. Tr. 8167-71. Corigliano correctly informed his lawyers, who informed the SEC, what he paid for that property in 1998 (Tr. 8171-74), and estimated the value of that property based on the sale price of what he regarded as a comparable property in his neighborhood. Tr. 8178, 8501, 8505-06. As SEC attorney James Kidney testified, the SEC was likely unconcerned about Corigliano's characterization of his real estate holdings in Old Saybrook. Tr. 13531.

Corigliano also testified, without contradiction, that it was his understanding that, once he paid the retainer fees to the lawyers who represented him and his wife, no portion of the retainers would be returned to him, even if the lawyers did not exhaust the retainer, because the unused balances would be disgorged to the SEC. Tr. 8109-11, 9367-69, 9377. That understanding was accurate. Tr. 9124-25 (representation of Gary Naftalis, Esq., counsel for Corigliano); Tr. 13600-07 (testimony of SEC attorney David Frohlich). For that reason, Corigliano did not treat the retainer funds as his assets that had to be disclosed as such to the SEC. Tr. 8110. Defense counsel argued to the jury that, notwithstanding Corigliano's testimony, he had concealed from the SEC the second parcel of real property and the

93

retainer fees, but Corigliano's testimony about the retainers was supported by Frohlich.  Tr. 13603.

In any event, each of those matters went exclusively to Corigliano's general credibility, and were wholly collateral to his testimony about Shelton's charged criminal conduct.  Even perjured testimony on such collateral matters by the Government's "star witness" is insufficient to set aside a criminal conviction based on otherwise strong evidence of guilt, particularly where, as here, "independent evidence was adduced to corroborate [the witness's] testimony regarding [the defendant's] participation in the crime."  Wong, 78 F.3d at 77, 81-82.  See also United States v. Spencer, 4 F.3d 115, 119 (2d Cir. 1993) ("new evidence which merely discredits a government witness and does not directly contradict the government's case ordinarily does not justify a new trial").

**D.    Shelton's Challenges to Pember's Credibility Fail to Demonstrate that the Jury Convicted an Innocent Man.**

Because Shelton implicitly recognizes that the verdicts did not require the jury to credit Corigliano, he also attacks Pember's testimony, but those challenges hardly demonstrate that the jury convicted an innocent man.  First, as demonstrated in Sections 1.C. and 1.D. of the factual recitation portion of this brief, Pember's testimony was highly corroborated by several incriminating documents and by the testimony of other witnesses.

Second, Pember's testimony was credible because she had

no motive to "frame" Shelton, and every reason to provide only truthful information regarding his involvement in the fraud. Pember's cooperation agreement provided that the Government would seek a downward departure from the applicable Sentencing Guidelines Range on Pember's behalf in exchange for her substantial assistance in the investigation and prosecution of "one or more persons." GX 1759. Pember entered into the cooperation agreement in September 1999, id., after Corigliano falsely told the Government that he had no involvement in the accounting fraud at CUC. Tr. 7581-7614. Pember's cooperation substantially assisted the Government's investigation and prosecution of her immediate supervisor, Corigliano, and ultimately led to his guilty plea and his own agreement to cooperate. Tr. 8431-33.

By providing the Government with substantial evidence of Corigliano's guilt, and by making herself available to testify against Corigliano if necessary, Pember provided "substantial assistance" that would have earned her a downward departure motion, even if Pember did not have any incriminating information regarding Shelton. Because her plea agreement required that she tell the Government everything she knew about the fraud, however, Pember would have breached the agreement had she failed to tell the Government the incriminating information she knew about Shelton. In that event, Pember could have forfeited the benefits

95

from her guilty plea and her cooperation against Corigliano had
the Government learned that Pember had withheld information
regarding Shelton.

Thus, Pember's plea agreement created a powerful
incentive for her to tell the whole truth and only the truth
about Shelton, but created no incentive for her to falsely
implicate Shelton.  Indeed, Pember's failure to implicate Walter
Forbes demonstrates that she  implicated only persons at CUC whom
she personally knew to be involved in the fraud.  Thus, she did
not have a misplaced belief that she would receive a "volume
discount" in her sentence based on the number of her corporate
superiors that she implicated.

Shelton's attacks on Pember's credibility, all of which
were evidently rejected by the jury, fail to demonstrate that her
testimony was "patently incredible or defie[d] physical
realities." Sanchez, 969 F.2d at 1415; see Peterson, 190
F.Supp.2d at 360 (denying a Rule 33 new trial motion where the
challenged accomplice testimony, which was the only evidence
directly implicating the defendant in the charged crimes, did not
satisfy the Sanchez "patently incredible" standard).  That Pember
testified pursuant to a cooperation agreement, Shelton Mem. 53-
54, and stood to earn a reduction in her sentence in return for
her substantial assistance, and that her personal circumstances
were such that a protracted period of incarceration would work a

96

substantial hardship on her family, is present in many cases
involving a cooperating witness, and hardly amounts to an
extraordinary circumstance.  See Lohm, 1993 WL 488635 at *10
(rejecting a Rule 33 claim that a witness was not credible
because he testified that "common sense would tell you anybody
would lie to get out of jail," which did not mean that the
witness testified falsely in that case); United States v.
Mansker, 240 F.Supp.2d 902, 919-21 (N.D.Iowa 2003)(rejecting a
Rule 33 challenge, even though "all of the government's witnesses
had an overwhelming motive to lie" because their cooperation
against the defendant was their only hope of avoiding substantial
prison sentences for drug-trafficking, and there was not "a
scintilla of corroborating physical evidence" for their
testimony).  Shelton's argument is essentially the same as that
rejected by the Second Circuit in United States v. Zane, 507 F.2d
346 (2d Cir. 1974), where the defendant claimed that a
cooperating witness's testimony revealed "a deep-seated
determination to resort to any means to keep out of jail."  The
Court of Appeals rejected this "novel doctrine" which would
effectively require

> new trials whenever after a criminal trial the conduct
> of a defendant-turned-government-witness indicated a
> desire to escape the toils of justice by any form of
> lying or skulduggery that could be made to appear
> similar to the alleged giving of false testimony at the
> trial in the hope of obtaining consideration for his
> co-operation with the prosecution.

507 F.2d at 348.

Shelton challenges as incredible Pember's testimony that she did not believe that CUC's stock price was inflated as a result of the fraud. Shelton Mem. 85, ¶ (i). Pember, who was not an expert in forensic stock market analysis, may have been mistaken that her conduct did not contribute to the drastic loss in Cendant's market value, but that hardly makes her a liar, or required the jury to discredit her incriminating testimony against Shelton.

That Pember may have been mistaken about the timing of her delivery of GX 530 to Shelton (Shelton Mem. 85, ¶ (ii)), like Corigliano's apparent mistakes about the timing of some of the events he recounted, did not require the jury to completely discredit her testimony or render that testimony unreliable as a matter of law. See Brennan, 326 F.3d at 188-91. In any event, Shelton did not "conclusively" establish, as he claims, that the first version of GX 530 was created no earlier than January 1998, rather than in December 1997, as Pember testified. As Pember reasonably explained, Corigliano could have informed Pember in December 1997 about the planned $25 million decrease in forecasted earnings for the Software Division, even though the forecast was not officially reduced until January 1998. Tr. 3856-57.

That Pember's testimony that she and Shelton met with

98

the E&Y auditors was contradicted by those auditors also does not establish that Pember's testimony was unbelievable.  The jury was not obliged to conclude that the auditors' self-serving recollection of those meetings was more trustworthy than Pember's.  Even if Pember was mistaken about Shelton's presence in those meetings, his absence did little to undermine the thrust of Pember's inculpatory testimony, because, as Pember testified, the cushion in the Cendant merger reserve was not discussed at any meeting with outside auditors.  Tr. 2571-76.  Accordingly, Pember had no reason to testify falsely about that matter.

Pember's failure to tell Speaks that she had informed Shelton about certain accounting irregularities that Speaks had asked Pember to bring to Shelton's attention (Shelton Mem. 85, ¶ (v)), does not contradict Pember's testimony that she discussed those matters with Shelton.  Rather, it merely shows that Pember was being circumspect, as conspirators must be, careful not to take Speaks fully into her confidence about the full extent of Shelton's knowledge of the fraud.  Even though Speaks played a minor role in the conspiracy that Pember assigned to him, Pember could reasonably have declined to tell Speaks more than he needed to know to carry out that role.[24]

---

[24] In any event, Pember ultimately brought Speaks to the March 6 meeting and it was there that Speaks was able to observe that Shelton was knowledgeable about the misuse of the merger reserves.

Pember had good reasons to protect Shelton at that time. Shelton was still the second most powerful executive on the CUC side of Cendant, with substantial influence over Pember's duties and compensation. It was Shelton who had urged Silverman to retain Pember in her role as controller for the former CUC entities (Tr. 7293-97; GX 616), and who was instrumental in providing Pember with a lucrative "stay bonus" when she threatened to resign from the company. Tr. 2610-13, 7298-7302; GX 498. When Pember expressed her unwillingness to report to Scott Forbes after Corigliano relinquished his role as CFO of the CUC-side entities of Cendant, Shelton convinced Cendant's top management to allow Pember to report to Shelton rather than to Scott Forbes (Tr. 2605, 2613-14), even though he was already burdened with a crushing work load from his other responsibilities. Tr. 13573-74. Had Pember leaked to Speaks information about Shelton's knowledge of the fraud, Pember could have jeopardized her relationship with Shelton, her powerful patron. In any event, Pember did tell Speaks that she needed to speak with Shelton and Corigliano about a "game plan" to deal with the revenue recognition and cancellation reserve issues Speaks had raised. GX 534.

This Court had an opportunity during Pember's protracted trial testimony to observe her demeanor and other tell-tale signs of credibility. This Court's own assessment of

100

Pember's credibility as a witness can properly inform its decision about Shelton's challenges to her testimony.  See Reinhold, 20 F.Supp.2d at 551 (rejecting defense challenges to a cooperating witness's credibility based on the district court's personal observations that the witness "was careful, candid, forthcoming, and persuasive" and "carefully distinguished between what he could recall and what he could not").  This Court should find that the jury could reasonably credit Pember's testimony, particularly in light of such tell-tale signs of credibility as her recollection of key details of her conversations with Shelton, e.g., Tr. 2571, 2587-88, 2597-99, 2612, 2670-71, 2772-74, 2878-79, 2886-87, 2889, 2895-97, 2903-07, 2911-14, 2953, 2959-60, and her willingness to admit that there were certain details that she could not recall.  E.g., Tr. 2602, 2944, 2945-46, 3029, 3037.  Pember also testified that she had not discussed certain aspects of the fraud with Shelton, thus demonstrating that she was not overselling Shelton's involvement in the fraud, but was testifying truthfully.  E.g., Tr. 2759, 3036, 3231, 3343, 3842-43.

**E.    The Jury Reasonably Declined to Accord Substantial or Any Weight to Shelton's Evidence, or to Draw Shelton's Proposed Exculpatory Inferences from the Evidence.**

Shelton "ask[s] the Court to take note of" certain evidence and inferences which, he contends, are inconsistent with the verdicts.  This Court, however, placed no limits on Shelton's

101

very protracted summation, during which he urged the jury to take
note of those matters.  The jury concluded that the Government
has met its burden notwithstanding those points, and Shelton has
failed to show that the jury convicted an innocent man.

Although Shelton testified at trial that he was
ignorant of the fraud, the jury reasonably rejected his self-
serving testimony for several reasons, starting with the most
obvious, his powerful motive to lie.   As he admitted, he had
more at stake in the outcome of this case than any other person
except his co-defendant Walter Forbes.  Tr. 12618-22.  His motive
to lie was therefore as great or greater than any other witness.
See Rittweger, 2003 WL 22290228 at *5 (the jury could reasonably
have discounted [the defendant's] self-serving statements").

The jury could have reasonably concluded that Shelton's
testimony was false, not only because it was contradicted by the
testimony of the cooperating witnesses, but because it was
completely self serving, was in many respects illogical and was
completely inconsistent with his intelligence, business acumen
and attention to detail.  See Sections 1.D.7. and 1.E., supra.
Shelton's testimony also required the jury to believe that he was
oblivious to the gigantic fraud that swirled around him for over
a decade, even though it was carried out on an almost daily basis
by a CFO who reported directly to Shelton, who occupied an office
for many years that was right next to Shelton's and who spoke to

102

Shelton on an almost daily basis whenever Shelton was working at
CUC headquarters in Stamford.  Tr. 6518-19.  There was nothing
about Corigliano's relatively undistinguished history before he
came to CUC in 1983 to suggest that he was capable of single-
handedly formulating such a wide-spread and complex fraud,
recruiting others to carry it out, and successfully executing the
fraud for years while keeping his corporate superiors completely
oblivious to the scheme.  Shelton's defense was an invitation for
the jury to suspend its common sense, an invitation that the jury
reasonably declined.

     For the jury to have credited Shelton's trial
testimony, it would have had to conclude that Corigliano, Pember,
Sabatino, Speaks, Scott Forbes, Monaco, and Menchaca were
intentionally seeking to frame an innocent person.  See Sections
1.B., 1.C., 1.D.1. - 3., 1.D.6., supra.  Although Corigliano
falsely attempted, during his January 1999 interview with the
Government, to shift responsibility for the fraud away from
himself and onto Pember and Sabatino (Tr. 7625-29), both of those
persons were in fact knowing participants in the fraud, not
innocent persons.  Other than Shelton's self-interested
testimony, there is no evidence that either Pember or Sabatino
ever falsely accused anyone of participating in the fraud and
they were both careful not to suggest that other persons
participated in the fraud.  The jury could reasonably conclude

that, although the three cooperating defendants were willing to deceive the investing public for personal gain, none were so cold-blooded that they would be willing to send an innocent man to prison, even to reduce their own prison sentences.

The Third Circuit's recent decision in Brodie, supra is instructive, even though it involved a challenge to the sufficiency of the evidence pursuant to Fed. R. Crim. P. 29, rather than a challenge to the weight of the evidence pursuant to Fed. R. Crim. P. 33. In Brodie, the defendant was the President of the Purolite Company, which unlawfully sold products to companies that did business with Cuba, in violation of the Trading with the Enemy Act of 1917 ("TWEA"). Following trial, the district court reversed the convictions for lack of sufficient evidence to prove that the defendant knew about and participated in the illegal sales conducted by his corporate subordinates. On the Government's appeal, the Third Circuit reversed, and identified the following evidence which supported reasonable inferences that the defendant knew about the illegal sales:

> 1) the improper sales generated $2.1 million in revenue, a not insignificant amount of money for a company the size of Purolite, and certainly "not so minuscule as to reasonably escape the notice of the company's president." 403 F.3d at 151;
>
> 2) the defendant was a "an active participant in the company affairs, not . . . a corporate figurehead whom the jury might more readily infer was ignorant of the actions of his fellow officers and subordinates." Id.;

104

3) although Purolite had "offices and operations in various parts of the world," the defendant's office was in close proximity to the other Purolite officials "most intimately involved in the prohibited sales." Id.;

4) when accountants at Deloite and Touche ("D&T"), the outside auditor for Purolite, informed the defendant that they had discovered in Purolite's books evidence of a large sale of its products **to** a company with which, by operation of the TWEA, American firms could not do business, the defendant fired D&T and hired different auditors. Id. at 136-37. Even though the defendant elicited evidence that Purolite was dissatisfied with the timing and cost of D&T's audit work, the Court of Appeals held that the jury could rationally infer that the defendant fired the auditors "not out of dissatisfaction with their services, but rather because of their knowledge of that transaction." Id. at 152-53;

5) when one of Purolite's salesmen mentioned plans to do business with Cuba during a meeting with other company officials, the defendant "jumped up" and "became excited," and the salesman thereafter stated, "well I mean our friends in the Caribbean." Id. at 143.

Each of those matters has a compelling parallel in this case, and like the jury in Brodie, the jury in this case could reasonably infer Shelton's knowledge of the charged fraud from that evidence. First, the fraud in this case endured for over ten years while Shelton was the second highest ranking executive at CUC, and resulted in the fraudulent inflation of CUC's reported operating income by at least $293 million during its final three years alone. Tr. 10662-66; GX 10110. That amount was "not so minuscule as to reasonably escape the notice of the company's president," Kirk Shelton. Brodie, 403 F.3d at 151.

Second, Shelton, like defendant Brodie, was "an active participant in the company affairs, not . . . a corporate figurehead whom the jury might more readily infer was ignorant of the actions of his fellow officers and subordinates." E.g., Tr. 3728-29, 6522, 12870, 13565-66, 13576-77, 13626-27.  Although Shelton's co-defendant Forbes characterized himself as a "big picture" leader who concentrated on long-term, strategic goals at the expense of the company's short-term performance (Tr. 13576-77, 13614-17), Shelton was the CUC executive who paid scrupulous attention to the company's quarterly earnings, and once remarked that Wall Street would punish the company if it missed its projected EPS by as little as a penny a share.  Tr. 7208-09; GX 17.

Third, Shelton was not only the direct supervisor of Corigliano, the CUC executive "most intimately involved" in the fraud during most of the conspiracy period, Shelton also worked in an office that was directly adjacent to Corigliano's.  The likelihood that Shelton was wholly ignorant of Corigliano's work on the fraud was substantially reduced by their physical proximity while working at CUC headquarters on the third floor of 707 Summer Street in Stamford.  Tr. 6232.

Fourth, Shelton urged Silverman to retain Pember in her position as controller for the former CUC entities, even though Silverman wanted to remove her for poor performance.  Tr. 7293-

106

97; GX 616.  Shelton knew that if Pember was replaced in the critical job of CUC controller, a position with access to all of CUC's financial data, her replacement might discover the fraud and blow the whistle on the conspirators.  A rational jury could draw the same kind of inference that the Court found proper in Brodie, that the defendant's selection of an auditor/controller was predicated on a desire to conceal improper transactions.

Fifth, during a meeting in Shelton's office with Menchaca and Sarkie around March 1997, Corigliano suggested that CUC use reserves to increase operating income in response to an inquiry from Shelton.  Shelton abruptly cut him off, precluding further remarks on that subject.  Tr. 6987-90.  Like the jury in Brodie, the jury in this case could conclude that Shelton's conduct was an effort to conceal the fraudulent conduct from other members of the company who were not participating in the fraud, thus demonstrating either consciousness of guilt or willful blindness.

Shelton's presentation of character evidence (Shelton Mem. 89, ¶13), cannot possibly establish that the convictions resulted in a miscarriage of justice, since the jury was entitled to give little or no weight to such testimony.  See United States v. Pujana-Mena, 949 F.2d 24, 29 (2d Cir. 1991) (evidence of good character is not entitled to special consideration, and "often possesses limited probative value in determining whether the

107

defendant committed the specific crime charged.")  In any event, the Government never disputed that, in addition to committing the crimes for which he was convicted, Shelton was a clever and industrious business executive who earned the respect and admiration of persons who had no first hand information about his criminal conduct (e.g., Tr. 11360-62, testimony of Charles Ainsworth), and who were accordingly willing to provide character testimony.

        Several of Shelton's claims depend on the testimony of defense witnesses such as Christopher McLeod and Amy Lipton and Government witness Anthony Menchaca.  Shelton Mem. 4, 11, 19, 20, 23, 27, 32, 45, 69-70, 76-78, 106, 116.  Those persons had close working relationships with Shelton for many years, and may have obtained promotions, salary increases, and other benefits as a result of those relationships when they worked at CUC.  Tr. 6448, 8265, 11600-02, 11726-77, 11737-39, 12240-43, 12460-63.  McLeod, in particular, had been Shelton's close personal friend for many years, even before they began working together at CUC in the early 1980's.  Tr. 11600-02, 12624.  The jury was fully entitled to discredit the testimony of all of those persons based on their obvious bias in favor of Shelton.[25]  See generally United States

_____

[25] Shelton's claim that McLeod and Amy Lipton somehow contradicted Corigliano is hardly convincing.  These two witnesses were highly compensated as a result of the fraudulent activity that took place at CUC and later Cendant.  Given that
                                                    (continued...)

v. Abel, 469 U.S. 45, 49 (1984)(witness's membership in a prison gang was sufficiently probative of his possible bias towards the defendant to warrant its admission into evidence; United States v. Lena, 670 F.Supp. 605, 610 (W.D.Pa. 1987)(prosecutor permissibly cross-examined defense witness regarding the purchase of his property by the School Board at a price three times that which the witness paid for it and at a time when the defendant was the treasurer of the School Board).

        Shelton contends that none of his co-conspirators told him, in so many words, that any of the accounting machinations that executed the fraudulent scheme "was fraudulent or violative of GAAP." Shelton Mem. 86, ¶ 1.  He also points out that the "cheat sheets" were not expressly designated as such, and did not expressly inform the reader that they showed improper usage of merger reserves.  Id. 87, ¶ 4.  Shelton is merely identifying a host of hypothetical "smoking gun" evidence that was not presented in this case, because the conspirators were too careful to leave such guns lying around.  Shelton conceded that

---

[25](...continued)
each of these witnesses purportedly missed the fraud occurring under their watch, their powers of observation can hardly be touted to contradict anyone.  That McLeod did not receive significant documents possessed by Shelton renders meaningless any argument that Shelton must be innocent since McLeod was not named as a coconspirator.  Similarly, Lipton's testimony that she was happy to be appearing as a witness while she was holding back tears, and her inability to remember anything including her role in altering board minutes, raises serious credibility issues with her testimony.  Tr. 11507, 11532-37.

Corigliano, Pember, and others had committed "a big fraud." Tr. 117 (Shelton opening). That concession was forced by the fact that any reasonable person, much less a Yale and Harvard educated business executive with Shelton's impressive acumen, would recognize that the unsupported increases in CUC's revenues and unsupported decreases in CUC's operating expenses were obviously fraudulent, without having it explained to them by a CPA.

That Shelton never even casually acknowledged his involvement in the fraud to persons other than his co-conspirators (Shelton Mem. 86, ¶ 2), is merely a testament to Shelton's prudence, not his innocence. The jury was entitled to find Shelton guilty even though he never confessed to the crimes.

That Shelton did not personally lie to the E&Y auditors (Shelton Mem. 87, ¶ 6), is entirely consistent with the Government's theory that Shelton delegated the day-to-day dirty work of effectuating the fraud, including concealing it from the auditors, to Corigliano, Pember, and other subordinates. Having done so, Shelton would not be expected to be aware of the more mundane activities by which the fraud was effectuated, such as the creation of phoney journal entries. Shelton Mem. 87, ¶ 5. Since Shelton had little or no contact with lower ranking CUC officials who effectuated certain components of the fraud, such as Speaks (Tr. 619), one would not expect Speaks to have any direct knowledge of Shelton's involvement in the fraud. Shelton

Mem. 87, ¶ 7. By the same token, Shelton's use of Corigliano as his conduit through which his directives regarding the fraud were funneled to such subordinates as Speaks and Sabatino explains why the latter never personally communicated their knowledge about the fraud to Shelton. Shelton Mem. 89, ¶ 14.

Nor should this Court negate the verdicts because the senior Cendant executives who came from HFS did not discover the fraud before Sabatino and Speaks told them about it in April 1998. Shelton Mem. 86-87, ¶ 3. Unlike Shelton, those former HFS officials did not have conversations with other members of the conspiracy, such as Forbes, Corigliano, and Pember, in which their plans to improperly misuse merger reserves were laid bare. Neither Silverman, Monaco, Scott Forbes, nor the E&Y auditors instructed Corigliano to inflate the merger reserves beyond what was needed for merger-related expenses, then reverse the excess reserve amounts to increase income and reduce operating expenses. As the evidence showed, however, Shelton did those things. See Sections 1.B. and 1.C., infra.

Shelton erroneously argues that Sabatino's testimony that Shelton once directed Corigliano to select the higher of two proposed figures for earnings per share, even though Shelton had no basis for selecting that figure, "lacked any probative value." Shelton Mem. 88, ¶ 8. But Shelton did not object to that testimony as irrelevant when it was offered at trial (Tr. 4076-

78), and for good reason.  Shelton's current attempt to explain away this testimony is unavailing.  Shelton Mem. 51.  If a one cent adjustment in earnings was a purely discretionary act of the accounting department, then Corigliano would never have brought up the issue with Shelton.  Moreover, if Corigliano were hiding the fraud from Shelton as Shelton claimed, Corigliano would never have brought up the concept of adjusting earnings with Shelton. The fact that Sabatino heard Shelton's directive and thereafter, made fraudulent accounting adjustments to carry out Shelton's executive decision to adjust earnings by as little as one cent demonstrates that Shelton was a leader of the fraud, rather than an ignorant victim as he claimed.

Furthermore, the fact that Shelton had authored the memo that indicated that "if we miss [earnings] by even one cent per share, the market will punish us" (GX 17) demonstrates that Shelton understood the significance of precisely managing earnings to meet Wall Street expectations.  As Shelton himself acknowledged, a one cent difference in EPS could have a significant impact on CUC's stock price.  Tr. 7208-09, 12300-01. Accordingly, the legitimate answer to Corigliano's question to Shelton should have been, "what's EPS supposed to be according to our actual earnings?"  Shelton's willingness to direct Corigliano to use the higher figure without any basis for belief that the higher figure was justified by the company's earnings, even if

112

insufficient standing alone to prove Shelton's guilt, was relevant evidence of his willingness to disseminate wrongfully inflated financial results to the investing public.

Shelton contends that Sabatino's testimony about the incident during which Shelton tore up GX 530 was not credible because Sabatino did not mention the incident when he was interviewed by the Audit Committee, and did not recognize GX 530 when it was shown to him by the Audit Committee. Shelton Mem. 88, ¶ 10. The jury could rationally conclude that Sabatino either was not asked about the tear-up incident during his Audit Committee interview and elected not to volunteer it or forgot about the incident during that interview, rather than adopting Shelton's theory that Sabatino falsely concocted the incident after the Audit Committee interview.[26]

Shelton claims that the jury should have accepted his claims of innocence because he allowed himself to be interviewed by the Audit Committee and by the Government. Shelton Mem. 89, ¶ 11. The jury, however, personally observed a far more significant and penetrating "interview" of Shelton, his two weeks of testimony in this trial, at which Shelton repeatedly contradicted the testimony of Corigliano, Pember, Sabatino, and

---

[26] Shelton erroneously claims that Sabatino testified at trial that he told the Audit Committee that "he had never seen GX 530." Shelton Mem. 88, ¶ 10. To the contrary, Sabatino testified that he did not <u>remember</u> if he was shown GX 530 during his July 1998 interview by the Audit Committee. Tr. 4569-70.

others (Tr. 11752-55, 11797, 11915-16, 12101, 12133-35, 12163-66, 12237), and insisted that only he, and not they, was testifying truthfully.  The jury reasonably discredited Shelton's testimony that he was ignorant of the massive fraud that was committed under his nose for years by those whom he directly supervised and their underlings.  That Shelton was willing to offer similar false claims of innocence to the Audit Committee and to the Government was therefore fully consistent with the jury's conclusion that Shelton was a person who was willing to lie under oath to escape punishment for his crimes, and not one who denied guilt from a clean conscience.

Shelton points to the fact that he, unlike Corigliano and Pember (and Walter Forbes) did not unload any of his Cendant stock in the period shortly before the fraud was revealed. Shelton Mem. 89, ¶ 12.  The jury could rationally conclude that Shelton, a shrewd and very wealthy man, declined to sell his stock in late 1997 and early 1998 because he was more concerned about providing evidence of his knowledge of the fraud by making suspiciously timed stock sales than he was about losing even a substantial portion of his vast net worth.

Shelton argues that it would have been irrational for him to agree to merge CUC with HFS and cede control of the CUC accounting function to persons not involved in the fraud, and therefore run the risk that those persons would expose the fraud

114

(as they ultimately did).  Shelton Mem. 88, ¶ 9.  He points to
evidence that CUC had other potential merger partners which would
not have insisted on obtaining control of the combined entity.
As the evidence showed, a merger between HFS and CUC was regarded
by Wall Street analysts as potentially very lucrative for both
companies based on potential "synergy."  Tr. 1473-74, 8359-61.
Thus, the jury could have concluded that Walter Forbes' and
Shelton's decision to merge with HFS was driven not only by a
desire to create large merger reserves that could be used to
inflate CUC's income, but also because there were sound and
legitimate business reasons for the merger.  Additionally Walter
Forbes and Shelton received substantial financial benefits from
the merger.  Tr. 7194-7205.  The jury could have reasonably
concluded that Walter Forbes and Shelton believed that any risk
of exposure of the fraud during the two years that Silverman was
the CEO of Cendant was outweighed by the benefits of such a
propitious merger.  Indeed, Walter Forbes would not have
succeeded in building CUC from a corporate start-up into a
substantial multi-national entity had he not been a risk taker.

        Although Shelton has raised many challenges to the
evidence, effectively "disputing the existence of nearly every
tree" in the forest, this Court "should not miss the forest for
the trees."  Brodie, 403 F.3d at 150.  The "forest" is the heavy
burden that Shelton must overcome to demonstrate a miscarriage of

justice and the conviction of an innocent man.  He has failed to
do so, and his challenge to the weight of the evidence should be
rejected.

### POINT II

### THE GOVERNMENT DID NOT INTRODUCE FALSE TESTIMONY AT TRIAL

### (RESPONSE TO SHELTON POINT II)

Shelton claims that the prosecutors knew or should have
known that Corigliano and Pember testified falsely at trial.
Shelton Mem. Point II, 90-94.  Shelton has failed to demonstrate
that the testimony of either witness was false let alone
demonstrate that the prosecutors knowingly permitted these
witnesses to testify falsely.[27]  Moreover, because Shelton put
before the jury the basis for his present claims that Corigliano
and Pember testified falsely and argued repeatedly over days of
cross-examination and closing arguments that the testimony was
false, he is not entitled to a new trial simply because the jury
did not accept his argument.

**A.    Shelton Has Failed to Sustain His Heavy Burden of
        Demonstrating a Due Process Violation.**

A defendant seeking relief based on a due process claim
that the Government has intentionally elicited perjured testimony
faces a heavy burden that Shelton has plainly failed to sustain.

---

[27] While defendant Walter Forbes filed motions claiming that
Corigliano and Kearney testified falsely at trial (Forbes' Trial
Motions Nos. 28 and 30), no trial motion was ever filed by Walter
Forbes or Shelton claiming that Pember testified falsely.

Relief based on "allegations of perjured testimony should be
granted only with great caution and in the most extraordinary
circumstances." United States v. McCarthy, 271 F.3d 387, 399 (2d
Cir. 2001), quoting United States v. Zichettello, 208 F.3d 72,
102 (2d Cir. 2000)(collecting cases).  In order to prevail on
such a claim, the defendant must show: (i) the witness actually
committed perjury; (ii) the alleged perjury was material; (iii)
the government knew or should have known of the alleged perjury
at the time of trial; and (iv) the perjured nature of the
testimony remained undisclosed during trial.  Id.; United States
v. Glover, 588 F.2d 876, 879 (2d Cir. 1978)(rejecting due process
claim where the defendant "failed to establish either that [the
challenged] testimony was perjurious or that the government's
behavior was improper").

        Here, Shelton can not demonstrate that Corigliano and
Pember committed perjury and thus, he cannot satisfy any of the
four prongs set forth above.   That Corigliano and Pember
testified that they did not believe they engaged in insider
trading does not mean that they committed perjury.  Simental v.
Matrisciano, 363 F.3d 607, 615 (7th Cir. 2004) (denying new trial
based on alleged subornation of perjury where the defendant
failed to establish that the challenged testimony of a
cooperating co-conspirator was perjured, since "it was
theoretically possible that [the witness] was telling the

truth"). Shelton has offered no evidence (like a prior statement, a diary entry, or a witness who heard Corigliano and Pember confess to committing insider trading) to suggest that these witnesses perjured themselves when they testified as to their beliefs.

Furthermore, the suggestion that Corigliano and Pember have testified inconsistently with other witnesses about when a meeting occurred or who gave directions to commit an act, does not mean that they have committed perjury. Inconsistencies, failures of recollection or erroneous testimony does not by itself constitute perjury. See Milikowsky, 896 F.Supp. at 1298 (erroneous testimony and statements regarding a cooperating witness's state of mind does not by itself amount to false testimony).

Nor does Shelton prove anything by arguing, as he did at length at trial, about the value of Corigliano's home. This sideshow, created by defense counsel in an effort to waste time, wear Corigliano down and put the SEC on trial, was a meaningless distraction for the jury.

In any event, the testimony Corigliano gave about his home's value,[28] even if mistaken, does not amount to perjury and

_____

[28] Corigliano disclosed the price he paid for the house repeatedly to the SEC. The SEC certainly had the ability to determine if home prices were rising in Connecticut. While Shelton claims Corigliano lied about the value of his home,
(continued...)

certainly not perjury of a material matter.  To obtain a new trial on the basis of purportedly false testimony, a defendant must show a "reasonable likelihood that the false testimony could have effected the judgment of the jury." United States v Helmsley, 985 F.2d 1202, 1205-06 (2d Cir. 1993).  Quite simply, there is nothing about the purportedly false testimony concerning the value of Corigliano's home that had any affect on the judgment of the jury, although it may have distracted the jury temporarily from the incriminating evidence presented against Shelton.

**B.    Shelton Has Failed to Show that the Bases for His Attacks on Corigliano's and Pember's Testimony were Hidden from the <u>Jury.</u>**

Significantly, Shelton has failed to demonstrate that the jury could possibly be misled by Corigliano's and Pember's <u>allegedly</u> false testimony, because all of the information on which Shelton now grounds his claim of perjury were disclosed by the defense to the jury.  As the Second Circuit has held, even the Government's knowing elicitation of perjured testimony (which the Government does not concede here) does not violate a

---

[28](...continued)
Shelton testified that his Darien home was worth a little more than two million dollars and his Vail condo was worth about one million dollars.  Tr. 12622-23.  The Darien home was recently appraised at $2.7 million and the Vail condo at $1.425 million for a combined $4.125 value.  According to Shelton's present argument, he too committed perjury when he estimated the combined value of his homes at $3 million.

defendant's due process rights if the evidence which demonstrates
that the testimony was false is presented to the jury during
trial. McCarthy, 271 F.3d at 399 (rejecting due process claim
where defense counsel addressed the conflicting testimony on
cross-examination, and "[t]he jury was entitled to weigh the
evidence and decide the credibility issues for itself"); United
States v. Joyner, 201 F.3d 61, 82 (2d Cir. 2000) ("cross-
examination and jury instructions regarding witness credibility
will normally purge the taint of false testimony"), rhg denied,
313 F.3d 40 (2d Cir. 2002); United States v. Helmsley, 985 F.2d
at 1208 ("We have never permitted a successful collateral attack
for a prosecutor's knowing use of false testimony based entirely
on evidence of which the defendant was aware, or in the exercise
of reasonable diligence should have been aware at trial. . .").

     Shelton and Walter Forbes repeatedly confronted
Corigliano and Pember on cross-examination (and in the case of
Corigliano, a second cross-examination) with their supposed lies.
Both defense counsel argued extensively in their six days of
closing argument that Corigliano had lied and Shelton's counsel
argued extensively that Pember had lied. Thus, the defense
repeatedly placed before the jury the very evidence which,
Shelton now claims in his motion for a new trial, demonstrates

that Corigliano and Pember committed perjury at trial.[29]  The

jury, as the finder of fact, however, was the proper body to

resolve any issues regarding the credibility of Corigliano's and

Pember's trial testimony.  McCarthy, 271 F.3d at 399-400;

Zichetello, 208 F.3d at 102 (where the defendants had "ample

opportunity to rebut [the witness's] testimony and undermine his

credibility . . . [the reviewing court would not] supplant the

jury as the appropriate arbiter of the truth")(internal citations

omitted); Mason v. Phillips, 548 F.Supp. 674, 675 (S.D.N.Y. 1982)

(Weinfeld, J.) (inconsistency between witness's trial testimony

and his prior statement was "an issue of credibility . . . for

the jury to decide").

        As the Second Circuit has explained:

        We have always assumed, though never expressly held,
        that perjured testimony must have remained undisclosed
        during trial in order to require reversal of a
        conviction.  This position is consistent with our

---

[29] By contrast, in United States v. Wallach, 935 F.2d 445 (2d
Cir. 1991), cited by Shelton, the district court sustained the
government's objection to the presentation of defense evidence
which would have been used to demonstrate that an essential
prosecution witness's testimony was perjured.  935 F.2d at 456.
After the trial, however, the Government conceded that the
witness's testimony had been perjured, thus effectively conceding
that the excluded evidence should have been admitted.  See United
States v. Ward, 190 F.3d 483, 491 (6th Cir. 1999)("We think
Wallach does not apply here, because in that case the perjured
testimony was not brought to the attention of the jury, whereas
here, the court gave the defendant several opportunities to
cross-examine and re-cross examine the witnesses to bring out any
inconsistencies in testimony to the attention of the jury.").

> long-held view that when perjury is introduced at
> trial, the subsequent conviction is to be reversed only
> if there is reason to believe that the verdict was
> based on the false testimony.  Once the perjury is
> disclosed during trial, however, there is less
> likelihood that the verdict was tainted by the false
> evidence.

United States v. Blair, 958 F.2d 26, 29 (2d Cir. 1992)(internal

citations omitted); Mason v. Phillips, 548 F.Supp. at 675 (no due

process violation where "the jury was both informed of the

[witness's] prior inconsistent statement and given a transcript

of it"); Shasteen v. Saver, 252 F.3d 929, 993-36 (7th Cir. 2001)

(rejecting a due process claim based on perjured testimony by a

key prosecution witness on a material fact, where the prosecution

"produced the records necessary to discredit the [challenged]

testimony" and the defense "had adequate opportunity to expose

the alleged perjury on cross-examination"); United States v.

Lochmondy, 890 F.2d 817, 822-23 (6th Cir. 1989)(no due process

violation where the "allegedly inconsistent statement given by

[the witness] was disclosed to the defense by the government

prior to the witness taking the stand").

**C.    The Government Did Not Vouch For Corigliano's or Pember's**
       **Credibility.**

        In Shelton's vitriolic attack on the Government, he

accuses the prosecutors of improperly "vouch[ing]" for Corigliano

and Pember.  Shelton Mem. 94.  This suggestion, which was not

briefed as a separate point by Shelton, is unfounded and should

be summarily rejected.

The Government repeatedly made clear to the jury that
it was for the jury to decide the credibility of these witnesses
and all other witnesses, based on the evidence.  See, e.g., Tr.
16018, 16025-26, 16078, 16094, 16100.  A prosecutor does not
engage in improper vouching by arguing, as the prosecutors did
here, that the evidence (such as the cooperation agreements that
were admitted into evidence, and which created a powerful
disincentive for Corigliano and Pember to lie) demonstrated that
the witnesses testified truthfully.  Rather, vouching occurs when
a prosecutor "suggests to a jury that there is additional
evidence, not introduced at trial but known to the prosecutor,
that supports the witness's credibility." United States v.
Newton, 369 F.3d 659, 681 (2d Cir. 2004), citing United States v.
Young, 470 U.S. 1, 18 (1985).  Shelton does not identify any
"additional evidence not introduced at trial" to which the
prosecutors alluded during summation, so his vouching argument
fails.  United States v. Rivera, 971 F.2d 876, 884 (2d Cir.
1992)(prosecutor's summation remarks were "permissible inferences
from the evidence at trial, and did not constitute improper
vouching"); United States v. Torres, 503 F.2d 1120, 1127 (2d Cir.
1974)(prosecutor did not engage in impermissible vouching by
stating: "I submit that Guzman's testimony was wholly credible.
There is no reason in the world why you should disregard his
testimony."); United States v. Brennan, 326 F.3d 176, 187 (3d

123

Cir. 2003)(prosecutor did not vouch when he argued that the hotly contested testimony of a witness was credible, based on evidence presented at trial).

Furthermore, the Court properly charged the jury that credibility determinations were for the jury to decide and gave specific instructions on how to evaluate the testimony of cooperating witnesses such as Corigliano and Pember. See Tr. 16407-16. Accordingly, Shelton is entitled to no relief on his claims that the Government knowingly elicited perjured testimony and improperly vouched for its witnesses.

## POINT III

### THE COURT PROPERLY INSTRUCTED THE JURY ON CONSCIOUS AVOIDANCE

### (RESPONSE TO SHELTON POINT III)

During its final charge, the Court instructed the jury on the doctrine of conscious avoidance. Tr. 16300-01, 16322-23. The decision by the Court to provide the jury with such an instruction was eminently proper and should not be disturbed.

## A.  The Conscious Avoidance Instruction Did not Constructively Amend the Indictment.

Shelton erroneously contends that the conscious avoidance instruction worked a constructive amendment of the indictment, because the indictment alleged, the evidence showed, and the Government argued that Shelton had actual knowledge of, and indeed was one of the directors of, the fraud. Shelton Mem. Point III, 95-98. This argument is grounded on the erroneous

124

premise that, having alleged and proved that a defendant had actual knowledge of the fraud, the Government was not entitled to a conscious avoidance instruction, because the two theories (actual knowledge and conscious avoidance) are legally and logically inconsistent.

The law is precisely to the contrary. "A conscious avoidance instruction is not inappropriate merely because the government has primarily attempted to prove that the defendant had actual knowledge." United States v. Zedner, 401 F.3d 36, 50 (2d Cir. 2005)(internal quotation marks and citation omitted); United States v. Jacobs, 117 F.3d 82, 98 (2d Cir. 1997)("Even when the government attempts to prove actual knowledge, an instruction on conscious avoidance can still be proper."); accord United States v. Bautista, 252 F.3d 141, 147-48 (2d Cir. 2001); United States v. Hopkins, 53 F.3d 533, 542 (2d Cir. 1995).

There are several reasons for this rule. First, a conscious avoidance instruction is not available unless and until the accused claims that he was subjectively ignorant of incriminating facts. United States v. Mang Sun Wong, 884 F.2d 1537, 1542 n.2 (2d Cir. 1989). Because it would be error for the Government to argue conscious avoidance before an assertion of ignorance by the defense, United States v. Adenji, 31 F.3d 58, 63 (2d Cir. 1994), it follows that there can be no requirement that the indictment allege conscious avoidance, before the defendant

125

even has an opportunity to assert his ignorance of incriminating facts.[30]  It should therefore come as no surprise that Shelton fails to identify a single case holding that an indictment was constructively amended by a conscious avoidance instruction.

Second, Shelton's purported dichotomy between actual knowledge and willful blindness fails to recognize the reality of the massive fraud involved in this case, and the high division of labor along the various levels of corporate management at CUC. The Government's evidence established that the charged fraudulent scheme was developed and fostered at the highest level of CUC's corporate management, but that the execution of the scheme was carried out by subordinate accounting personnel, both in the corporate accounting department and within some of the divisions of CUC.  Because Shelton and other leaders of the conspiracy delegated the day-to-day operation of the fraudulent accounting to their subordinates, they were able to insulate themselves from the preparation of the fraudulent accounting records, even while they gave general direction and remained apprised of the results of the fraud.  In such a scheme, it is quite likely that a conspirator will have actual knowledge of the existence and

---

[30] Here, Shelton first interposed a claim that he was ignorant of the fraud during his opening statement.  Tr. 117-121.  Only after Shelton asserted such ignorance did the Government first propose, on May 19, 2004, what was captioned a "willful blindness" instruction.  Docket No. 746, Preliminary Requests to Charge of the United States, Request No. 29, p. 45.

general operation of the scheme, but remain willfully blind to
its details.  See Brodie, 403 F.3d at 158 (affirming conscious
avoidance instruction where the defendant was the president of a
U.S. company that made unlawful sales of its products to
companies doing business with Cuba; the company funneled the
unlawful sales through a U.K. subsidiary, thereby allowing the
defendant to distance himself from the actual sales).

          Third, the Government was entitled to demonstrate that
Shelton was either actually aware of certain incriminating facts,
or if he was not positively certain of those facts, that any
ignorance was the result of conscious avoidance of the truth.
During trial, Shelton vigorously attacked the credibility of the
three cooperating witnesses who testified about Shelton's actual
knowledge of the fraud.  Presented with that attack, the jury
might have elected to credit only some of the Government's
evidence, and the evidence which the jury credited may have
provided greater support for a finding of conscious avoidance
than for a finding of actual knowledge.  United States v.
Wert-Ruiz, 228 F.3d 250, 257 (3d Cir. 2000).  Because the
Government cannot know in advance how the jury will assess the
credibility of the witnesses, it was permitted to claim both that
Shelton had actual knowledge of an incriminating fact and that he
consciously avoided knowledge of that fact, as the Second Circuit
decisions cited above make clear.

                              127

A conscious avoidance instruction cannot constructively amend the indictment for the additional reason that such an amendment occurs only "when the charging terms are altered, either literally or constructively," United States v. Clemente, 22 F.3d 477, 482 (2d Cir. 1994), i.e. when the trial evidence "modif[ies] essential elements of the offense charged to the point that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged by the grand jury." United States v. Vebeliunas, 76 F.3d 1283, 1290 (2d Cir. 1996). So long as the "the allegations and the proof substantially correspond," and the trial evidence is consistent with the "core of criminality" alleged in the indictment, there is no constructive amendment of the indictment. United States v. Danielson, 199 F.3d 666, 670 (2d Cir. 1999); accord United States v. Salmonese, 352 F.3d 608, 620 (2nd Cir. 2003).

A conscious avoidance instruction, however, cannot work such an alteration. The Court's instructions here charged that the Government had to prove that Shelton acted knowingly with respect to every count, and further charged that conscious avoidance was merely a principle by which the Government could prove the element of knowledge. Tr. 16322-23. Thus, whether the jury found that Shelton had actual knowledge of certain incriminating facts or consciously avoided knowledge of those

facts, the essential element of knowledge was not in any way
altered.  Cf. United States v. Mucciante, 21 F.3d 1228, 1233-34
(2d Cir. 1994)(holding that an indictment is not constructively
amended by the inclusion of an aiding and abetting instruction,
which "does not penalize conduct apart from the substantive crime
with which it is coupled"); accord United States v. Bradstreet,
135 F.3d 46, 53 (1st Cir. 1998).  According, Shelton's
constructive amendment claim is meritless.

**B.    There was Ample Evidentiary Support for the Conscious
        Avoidance Instruction.**

        Shelton's challenge to the sufficiency of the evidence
to support the conscious avoidance instruction fares no better
than his constructive amendment claim.  This Court previously and
properly rejected this argument when the defendants first
interposed it during trial.

        "Courts in this Circuit commonly give the jury a
conscious avoidance instruction when a defendant claims to lack
some specific aspect of knowledge necessary to conviction but
where the evidence may be construed as deliberate ignorance."
United States v. Reyes, 302 F.3d 48, 55 (2d Cir. 2002)(emphasis
added); accord United States v. Fletcher, 928 F.2d 495, 502 (2d
Cir. 1991); United States v. Lanza, 790 F.2d 1015, 1022 (2d Cir.
1986).  Such an instruction is warranted when (1) the defendant
asserts the lack of some specific aspect of knowledge required
for conviction, and (2) the appropriate factual predicate for the

charge exists.  <u>United States v. Svoboda</u>, 347 F.3d 471, 480 (2d Cir. 2003); <u>United States v. Abreu</u>, 342 F.3d 183, 188 (2d Cir. 2003); <u>United States v. Aulicino</u>, 44 F.3d 1102, 1115 (2d Cir. 1995)(collecting cases); <u>United States v. Beech-Nut Nutrition Corp.</u>, 871 F.2d 1181, 1195 (2d Cir. 1989).  The second prong is satisfied if there is "evidence such that a rational juror may reach the conclusion beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact."  <u>Svoboda</u>, 347 F.3d at 480.

Here, Shelton effectively concedes, as he must, that the first prong has been satisfied.  Shelton testified that he was ignorant of the fraudulent accounting that was perpetrated for years in the company for which he was the second ranked executive, even though he had ready access to the information that would have revealed the fraud and could have directed any of his subordinates who were involved in the fraud to disclose that information to him.  The Second Circuit has held that, under similar circumstances, a conscious avoidance charge was virtually compelled.  <u>United States v. Aina-Marshall</u>, 336 F.3d 167, 171 (2d Cir. 2003) (affirming the conscious avoidance instruction and explaining that where the defendant testifies that she possessed contraband but did not know that the material was contraband, "a conscious avoidance charge is appropriate in all but the highly

unusual -- perhaps non-existent -- case"). As the Government
previously explained, the sheer magnitude, duration, and numerous
transactions comprising the fraud, all of which occurred while
Shelton was the second highest ranking executive at the company
where the fraud was exclusively conducted, provides substantial
support for a conscious avoidance instruction. See Svoboda, 347
F.3d at 480-81 (timing and magnitude of the defendant's
profitable stock trades based on tips received from a co-
conspirator alerted the defendant to the likelihood that the co-
conspirator was unlawfully revealing inside information);
Fletcher, 928 F.2d at 503 (conscious avoidance instruction
supported by the fact that the fraudulent scheme involved
numerous transactions); United States v. Gurary, 860 F.2d 521,
527 (2d Cir. 1988) (conscious avoidance instruction was properly
given in a tax fraud prosecution where the defendants sold
fictitious invoices totaling over $136 million during a period of
eight years to over 200 purchasers).

        Shelton's defense was that his unfaithful subordinates,
Corigliano, Pember, and Sabatino, were wholly responsible for and
concealed from Shelton the wide-spread fraud that infected every
financial statement that CUC filed with the SEC for a period of
several years while Shelton was the Chief Operating Officer of
that company. That defense opened the door to the conscious
avoidance instruction, particularly because Corigliano and Pember

131

reported directly to Shelton during various periods of the conspiracy.  See United States v. Walker, 191 F.3d 326, 337 (2d Cir. 1999) (conscious avoidance instruction was properly given where the defendant argued that his employees were solely responsible for preparing false applications for asylum, and the defendant claimed that he was ignorant of the wrongdoing, but he supervised his employees and occasionally reviewed their completed applications).

In a written submission filed during trial, Docket No. 1335, filed November 4, 2004 ("Government's Conscious Avoidance Trial Brief"), the Government cited thirteen items of evidence which supported an inference that Shelton was aware of a high probability of the existence of incriminating facts, but consciously chose not to investigate the existence of those facts.[31]  The Government expressly noted that there was other evidence supporting a conscious avoidance instruction beyond that identified in its trial brief (Government's Conscious Avoidance Trial Brief at 3, n.1).  Three other significant facts supporting that instruction that were not mentioned in the trial brief were:

(a) Shelton's testimony that, while he was employed at CUC, he never saw a January 20, 1998 email sent to him and Corigliano by Pember (GX 519), even though the email was recovered from Shelton's computer following

---

[31] The thirteen items are identified on pages 4 to 6 of the Government's Conscious Avoidance Trial Brief, and will not be repeated here.

his termination from Cendant, Tr. 12434-39;[32]

(b) Shelton's tearing up and discarding, in Pember's and Sabatino's presence, a document identified at trial as GX 530.  Tr. 2874-80;[33] and

(c) Shelton's facial gesture directed at Corigliano during a meeting in Shelton's office with Menchaca and Sarkie around March 1997, after Corigliano suggested that CUC use reserves to increase operating income, in a manner designed to prevent Corigliano from making further remarks on that subject.  Tr. 6987-90.

That Shelton can now spin counter-arguments that the thirteen items identified in the Government's Conscious Avoidance Trial Brief are consistent with legitimate accounting, Shelton Mem. 101-09, does not eliminate the possibility of a contrary, reasonable inference that each of those items would have aroused Shelton's suspicion of possible fraud.  Zedner, 401 F.3d at 50 (although the jurors could have concluded from the evidence that

---

[32] GX 519 and its attached spreadsheet showed the variance between CUC's improperly inflated forecasted divisional earnings that CUC had previously provided to HFS for the fourth quarter of 1997 and the actual earnings for those divisions, and sought to elicit Shelton's and Corigliano's input about how to explain the discrepancy to the former HFS officials who were then in control of Cendant's accounting functions.  Tr. 2739-58, 7388-95.

[33] GX 530 was a schedule, prepared by Pember to summarize adjustments that Corigliano had asked Pember and Sabatino to make to the 1998 CUC budget, which included the use of $110 million from the Cendant merger reserve to increase CUC's earnings.  Tr. 2868-71.  GX 530 bore the damning notation: "Note reserves are being managed to meet quarterly targets."  Tr. 2874.  Shelton's destruction of that deeply incriminating document is evidence of, at the very least, his awareness of a high likelihood of accounting fraud.  His destruction of GX 530 was also a conscious effort to avoid learning about the fraud from any of the information contained on that document.

133

the defendant "genuinely believed" that [certain bonds which he attempted to negotiate] were genuine . . . . the jury could also have reasonably concluded that Zedner was aware of the high probability that the bonds were counterfeit and deliberately avoided confirmation of that fact"); cf. United States v. Hussein, 351 F.3d 9, 21 (1st Cir. 2003) (defendant's innocent explanation for his conduct "raises . . . at most a jury argument - and a criminal jury is neither required to rule out every possible hypothesis inconsistent with guilt nor to accept a defendant's interpretation of ambiguous facts").

Thus, Shelton argues that "there is nothing sinister about the phrase, 'cheat sheet,'" because it refers, in common parlance, to "a shorthand summary of information." Shelton Mem. 106. The jury could have rationally concluded, however, that Shelton's and Corigliano's use of the phrase "cheat sheets" to describe the documents which showed increases to CUC's earnings by the use of reserves would have, at the very least, alerted Shelton to a high probability of accounting fraud. See Fletcher, 928 F.2d at 503 (defendant's use of false taxpayer identification numbers supported giving of conscious avoidance instruction). Such a conclusion would have been particularly reasonable given the conspirators' studied concealment of the incriminating

134

portions of the cheat sheets from the auditors.  Tr. 6284-85.[34]

Shelton's self-serving testimony and arguments were simply insufficient to preclude a conscious avoidance charge; "[u]nless a defendant's testimony and supporting evidence is so strong as to call for a directed verdict in [his] favor, [he] has no right to object to the jury being told that" the evidence can support a finding of guilt based on conscious avoidance.  Aina-Marshall, 336 F.3d at 171.  The instruction was unwarranted only if "it would have been irrational for a jury to conclude that [the defendant] avoided the truth" about incriminating facts.  Zedner, 401 F.3d at 50.

Additionally, Shelton's effort to demonstrate that each of those items were individually insufficient to support the conscious avoidance instruction cannot demonstrate that the conscious avoidance was improperly given.  In deciding whether or not to give the instruction, a district court must assess the totality of the evidence, considered as an integrated whole, and not focus upon the individual items of information which raise suspicion of criminality.  United States v. Pena, 949 F.2d 751,

---

[34] According to one online source, although "the meaning of cheat sheet has broadened to include any memory refreshing tool," the principal meaning is "a piece of paper with information written down on it that an unethical person might create if they weren't prepared for a test." See http://whatis.techtarget.com/definition.  Additionally, the verb form of "cheat" means to "deprive of something valuable by the use of deceit or fraud." Webster's Ninth New Collegiate Dictionary (1985).

757 (5th Cir. 1991); <u>United States v. Gonzalez</u>, 933 F.2d 417, 434

(7th Cir. 1991).  In reviewing this Court's decision to give the

conscious avoidance instruction, the Court of Appeals must review

that information in the light most favorable to the Government,

"crediting every inference that the jury might draw in favor of

the government."  <u>Aina-Marshall</u>, 336 F.3d at 171 (a defendant

challenging the sufficiency of the evidence to support a

conscious avoidance instruction "bears a heavy burden").

        Shelton's principal challenge to the sufficiency of

many of the items previously identified by the Government to

support the conscious avoidance instruction is also entirely

beside the point.  He claims that the documents identified in the

Government's Conscious Avoidance Trial Brief could not have

alerted Shelton to a high probability of accounting fraud at CUC

because the Government did not argue that other persons who also

received some of those documents participated in the fraud.

Shelton Mem. 101-02 (GX 160); Shelton Mem. 102-03 (GX 606);

Shelton Mem. 103 (GX 519); Shelton Mem. 106 (the "cheat sheets");

Shelton Mem. 108 (DX 1288); Shelton Mem. 109 (discrepancies

between 10-Qs and subsidiary reporting packages).[35]  This argument

is unavailing.

---

[35] Indeed, this in the only argument that Shelton advances for
some of the items identified in the Government's trial
submission.  Shelton Mem. 102-03 (Shelton's creation of GX 606);
103-04 (GX 519).

Unlike each of the other persons identified by Shelton who were exposed to some of the documents but who were ignorant of the fraud, Shelton had numerous conversations about the fraud with his co-conspirators.  Shelton's contrary claim presumes that evidence which proves actual knowledge cannot also support a conscious avoidance instruction.  This presumption is contrary to controlling Second Circuit authority.  Svoboda, 347 F.3d at 480 ("Of course, the same evidence that will raise an inference that the defendant had actual knowledge of the illegal conduct ordinarily will also raise the inference that the defendant was subjectively aware of a high probability of the existence of illegal conduct.") (internal quotation marks and citation omitted); Mang Sun Wong, 884 F.2d at 1543 (evidence that the defendant maintained physical distance from the location of a drug deal supported both an inference that the defendant knew that a confederate was picking up the heroin, and that "he was purposefully avoiding knowledge of the truth").  Thus, the jury might credit only so much of the Government's evidence that supports a finding of conscious avoidance, but discredit other portions of the evidence that proves actual knowledge.  Wert-Ruiz, 228 F.3d at 257 (affirming conscious avoidance instruction, notwithstanding a co-conspirator's testimony that the defendant had actual knowledge of the unlawful source of laundered funds, because the jury could have discredited portions of that

137

testimony).  Because the other persons who saw the suspicious documents did not have incriminating conversations with Pember and Corigliano, as Shelton did, Shelton's claim that those other persons where similarly situated to him is misplaced.

Moreover, unlike any of those other persons, Shelton directly supervised and, at various times, had frequent contact with two of his principal co-conspirators, Corigliano and Pember. By comparison to other persons identified by Shelton, he was far better situated to investigate any suspicions raised by the tell-tale documents by confronting his direct subordinates and demanding an explanation.  For that reason, Shelton's claim that his position as Chief Operating Officer of CUC provided no support for the conscious avoidance instruction, Shelton Mem. 100-01, is misplaced.  See United States v. Gold, 743 F.2d 800, 822 (11th Cir.  1984) (affirming conscious avoidance instruction where "[t]he entire defense case . . . rested on the argument that the defendants--despite their supervisory responsibilities and 'hands-on' management style--were innocently oblivious to the endemic fraud that permeated" the company's business).

Additionally, whether any of those other persons consciously avoided knowledge of the fraud was immaterial to the Government's burden of proving any of the charges.  Although the Government had the burden of proving the guilty knowledge of the defendants and their co-conspirators, it had no obligation to

138

prove that anyone else either did or did not have such guilty knowledge. Thus, the Government's failure to attempt to prove that any of those other persons, like Shelton, consciously avoided knowledge of the fraud, is of no moment.

Many of Shelton's arguments regarding the thirteen items are unconvincing on their own terms. For instance, Shelton ignores the fact that GX 160 inconsistently showed $165 million added to revenue accounts on the first page, but showed the same $165 million attributed to both increased revenue and "cost saves" (i.e., "expense reductions") on the second page. He attempts to sidestep the inconsistency by characterizing the first page as reflecting an addition of $165 million in "costs saves in the revenue line." Shelton Mem. 101. The first page of GX 160, however, makes no reference to additional "costs saves"; that category appears only on the second page.

Shelton argues (Shelton Mem. 104), that Pember's email to Shelton, GX 519, did not raise a suspicion of fraud, even though the email described the use of reserves to increase earnings, because Pember wrote in the email that "CUC has made the numbers." Unlike persons who did not conspire with Corigliano and Pember to cook the books at CUC, however, Shelton knew, from his numerous conversations with Corigliano and Pember, that CUC had not "made the numbers" through legitimate accounting, but had done so only by fraud. See Sections 1.B. and

139

1.C., supra.

Shelton contends that no reasonable suspicion of accounting fraud arose from Pember's statement that the "variance flows thru 12/97," because the email contains "no explanation about how a variance 'flows' throughout the year."  Shelton Mem. 104.  A defendant's failure to seek an explanation for suspicious events, however, can demonstrate the he "consciously avoided confirming" an incriminating fact."  Zedner, 347 F.3d at 480 ("a defendant's involvement in the criminal offense may have been so overwhelmingly suspicious that the defendant's failure to question the suspicious circumstances establishes the defendant's purposeful contrivance to avoid guilty knowledge." (internal emphasis, quotation marks, and citation omitted); Pena, 949 F.2d at 757-58 (conscious avoidance instruction was properly given the suspicious circumstances surrounding a co-conspirator's request for defendant to tow an automobile later found to contain cocaine, the defendant "could not avoid liability by choosing not to learn the illegal nature of his participation" in the co-conspirator's activities); Wert-Ruiz, 228 F.3d at 256.  It was precisely Shelton's failure to ask his subordinate Pember what she meant by this supposedly "obtuse" reference (Shelton Mem. 104) to the use of merger reserves that allowed the jury to conclude that Shelton consciously avoided learning about the existence of the fraud.

140

Shelton argues that a reference in another email (GX 506) from Pember to Shelton regarding "reserve adjustments" could be construed as proper accounting, because there is nothing inherently wrong about adjusting reserves.  Shelton Mem. 105. Again, Shelton ignores the mounds of evidence regarding his conversations with Corigliano and Pember, which, at the very least would have caused Shelton to suspect that the adjustments to the CUC merger reserves were improper.  That adjustments to reserve accounts can, in theory, be permissible under certain circumstances does not mean that the unsupported adjustments undertaken in this case could not give rise to a suspicion of fraud.

Shelton argues that there was nothing suspicious about the fact that the cheat sheets showed consistent increases in CUC's <u>income</u> over many quarters, because "reserves can have a positive impact on <u>earnings</u>."  Shelton Mem. 106 (emphasis added). To the contrary, even if a merger reserve adjustment can legitimately increase earnings by reducing ordinary expenses (when the company corrects a mistaken characterization of a merger related expense as an ordinary expense and adjusts the merger reserve to cover that expense, <u>see</u> Shelton Mem. 10) such adjustments cannot be properly used to increase income.  Tr. 448.

Shelton argues that his suspicions should not have been aroused when Pember whispered to him during a January meeting

that discrepancies between NUMA's and NOAG's actual and budgeted
results was the result of merger reserve usage.  He contends
that, because he did not know the reason for the discrepancy
until Pember told him, he was previously ignorant of the improper
merger reserve usage.  The evidence established, however, that
when Pember told Shelton about the merger reserve usage, Shelton
expressed no surprise, suggesting that he was already aware of
(or suspected) the usage.  Tr. 2772.  Pember's concealment (by
whispering to Shelton) of that information from Scott Forbes and
Monaco supports an inference that Shelton was aware of a high
likelihood of misconduct.  See United States v. Pascarella, 84
F.3d 61, 70 (2d Cir. 1996)(defendant's concealment of the
proceeds of stolen checks, by structuring deposits of the
proceeds to avoid currency transaction reporting requirements,
supported conscious avoidance instruction); Fletcher, 928 F.2d at
503 (defendant's use of aliases and surreptitious movement of
funds supported giving of conscious avoidance instruction);
United States v. Gonzales, 90 F.3d 1363, 1371 (8th Cir. 1996)
(affirming conscious avoidance instruction where "both defendants
were connected to transactions in which they did not use their
correct names or addresses on the documents when wiring money").

        Shelton contends that Corigliano's $20 million increase
in the Ideon merger reserve was not suspicious, because Shelton
believed that the increase was actually made to the return

142

reserve (not the merger reserve) and was a legitimate response to a spike in the return of software products.  Shelton Mem. 108. The jury, however, was entitled to discredit Shelton's self-serving attempt to explain away Corigliano's damning testimony, and conclude that the sudden and unsupported increase, at the very least, sparked Shelton's suspicions about the propriety of the amount of the reserve.

Shelton argues that the discrepancy between the earnings contained in the subsidiaries' reporting packages and the earnings reported in CUC's 10-Q forms should not have piqued Shelton's suspicions, offering various innocent explanations for the discrepancies.  Shelton Mem. 109.  Even assuming that some of those factors might explain occasional disparities, the jury could reasonably conclude that the consistent, quarter by quarter variance by which CUC's consolidated earnings substantially exceeded the sum of the subsidiaries' reported income, at the very least, aroused Shelton's suspicion that CUC's reported earnings on the 10-Q forms were improperly inflated.

Additionally, Shelton declines to address in his current brief the Second Circuit cases cited in the Government's Conscious Avoidance Trial Brief, in which that Court rejected challenges to conscious avoidance instructions that were supported by even less compelling evidence of a defendant's willful blindness than existed here.  See Svoboda, 347 F.3d at

143

481 (evidence was sufficient to support a conscious avoidance instruction in a prosecution for securities fraud and insider trading, where the defendant tippee knew that his tipper was privy to confidential inside information, and the timing of the tippee's trades (as little as one day before the announcement of a tender offer) and the spectacular success of those trades (up to 400% return) was highly suspicious); Abreu, 342 F.3d at 187 (conscious avoidance instruction was properly given based on evidence that the defendant denied knowledge of the presence of cocaine in a steamer trunk in his bedroom, but admitted that he had accepted the trunk from his son and knew that his son was involved with drugs); Reyes, 302 F.3d at 55-56 (conscious avoidance instruction was properly given where the defendant worked in a business in which stolen automobile airbags were commonly sold, and referred airbag customers to a company that was trafficking in stolen airbags); see also United States v. Matos, 905 F.2d 30, 34-35 (2d Cir. 1990)(conscious avoidance instruction was properly given where the defendant denied knowledge of 30 kilograms of cocaine found in a jeep in his garage, based on substantial foot traffic to the defendant's apartment, people carrying packages out of the apartment, and a single phone call to the apartment in which the unidentified

caller inquired about the availability of "some thing").[36]

## C.    There was Evidence that Shelton Avoided Knowledge of the Fraud.

Shelton's contention that there was no evidence that he deliberately avoided learning about the fraud is likewise infirm. For starters, it ignores Shelton's: (a) testimony that he never read GX 519 and its attached spreadsheet, in which Pember sought Shelton's and Corigliano's advice about how to explain to HFS officials the discrepancy between CUC's 1997 forecasted and actual fourth quarter earnings, because the forecasted earnings had been fraudulently inflated; (b) destruction of GX 530 in the presence of Pember and Sabatino; (c) dissuasion of Corigliano from speaking about the misuse of merger reserves to increase income in the presence of Menchaca and Sarkie. These are paradigmatic examples of conscious avoidance. See Brodie, 403 F.3d at 143-44, 158 (affirming conscious avoidance instruction in a prosecution for unlawful trading with Cuba, where, inter alia, the defendant corporate president caused a subordinate to

---

[36] Instead, Shelton relies heavily on United States v. Ferrarini, 219 F.3d 145 (2d Cir. 2000), in which the Court concluded that an erroneous conscious avoidance instruction was harmless. In that case, unlike here, "the government does not argue, and the evidence does not show, that [the defendant] deliberately avoided learning the truth." Id. at 158. See Aina-Marshall, 336 F.3d at 171-72 (distinguishing Ferrarini as a case in which the defendant's participation in criminal acts could not have occurred without his actual knowledge, and upholding a conscious avoidance instruction where (as in this case) the defendant conceded the occurrence of the crime but denied knowledge of its occurrence).

substitute the words, "our friends in the Caribbean" for "Cuba"
during a meeting with other company officials); Hopkins, 53 F.3d
at 542 (conscious avoidance instruction was supported by evidence
that, when a subordinate told the defendant about illegal
tampering with waste water samples, he responded, "I know
nothing, I hear nothing"); Mang Sun Wong, 884 F.2d at 1542
(defendant's efforts to physically distance himself from a drug
transaction conducted by his subordinate supported the conscious
avoidance instruction).

Additionally, as shown above, Shelton's failure to
inquire of his subordinates about all of the tell-tale indicia of
fraud that swirled about him was powerful evidence that he
"consciously avoided confirming" incriminating facts.  E.g.,
Zedner, 347 F.3d at 480; Brodie, 403 F.3d at 158.  Shelton
ignores the evidence that he repeatedly declined to inquire of
his subordinates about documents and conversations that would
have, at the very least, created a suspicion of criminality.
Instead, he argues that, by turning a copy of GX 160 over to
Scott Forbes at the March 6, 1998 meeting, Shelton demonstrated
his subjective belief that the proposed reversal of the $165
million in reserves described in that document was proper.
Shelton Mem. 110.  Although that was Shelton's self-serving
"spin" to the jury, the jurors could have reasonable disbelieved
that explanation, and concluded that the prosecution witnesses

testified truthfully that the conspirators decided in March 1998 that they would be unable to hide the fraudulent accounting from the former HFS officials who were now in control of Cendant, and had to make a pre-emptive effort to recruit those persons into the fraud.  Tr. 7428-33.  Given Shelton's failure to demonstrate that a jury could not rationally conclude from the totality of the evidence that he consciously avoided knowledge of the fraud, this Court did not err by giving the challenged instruction.

**D.    <u>Shelton has Failed to Demonstrate Reversible Error.</u>**

In any event, the conscious avoidance instruction could not have caused reversible error, because it is clear beyond a reasonable doubt that the jury would have convicted Shelton even had the instruction not been given.  The jury convicted Shelton of all counts, including the Count One conspiracy.  In order to find Shelton guilty of that offense, the Government was required to prove, inter alia, that Shelton knowingly and willfully agreed to participate in the conspiracy.  Tr. 16295.  This Court instructed the jury, however, that the doctrine of conscious avoidance could play no part in the jury's assessment of that knowledge element of the conspiracy offense.[37]  Accordingly, the

---

[37] The pertinent instruction provided:

> A defendant's knowledge of the objectives of the alleged conspiracy can also be proven pursuant to the doctrine of conscious avoidance . . . .  However, I instruct you that this doctrine may not be used to establish . . .
>
> (continued...)

jury must have found that Shelton had actual knowledge of the existence of the conspiracy, and that he knowingly joined the conspiracy.  As Shelton effectively concedes by declining to challenge the sufficiency of the evidence supporting the conspiracy conviction, the evidence was sufficient to prove Shelton's actual knowledge of the conspiracy and that Shelton knowingly participated in the conspiracy.

The purpose of the charged conspiracy was to fraudulently inflate CUC's and Cendant's publicly reported income in various SEC filings and other public communications by the use of various improper accounting practices.  Indictment, Count 1, ¶¶ 17-19.  Shelton's knowledge of the existence of the conspiracy and his knowing participation in the conspiracy thus required his actual knowledge of those fraudulent accounting practices.  Given the jury's finding of Shelton's actual knowledge with respect to the conspiracy count, there can be little doubt that the jury also found that Shelton actually knew about CUC's and Cendant's fraudulent accounting practices with respect to other counts of the indictment.  See Bronshtein v. Horn, 404 F.3d 700, 709-14 (3rd Cir. 2005)(trial court's erroneous instructions that permitted the jury to convict the defendant of first degree

---

[37](...continued)
      any other element of the offense of conspiracy . . . .
Tr. 16300-301.

murder without finding that he had a specific intent to kill the victim were harmless, where the court's instructions regarding conspiracy to commit murder and the jury's verdict of guilty on that charge demonstrate beyond a reasonable doubt that the jury made the required finding of specific intent); see generally United States v. Covington, 133 F.3d 639, 644-45 (8th Cir. 1998)(finding erroneous conscious avoidance instruction harmless; "the risk of conviction for negligent or reckless behavior is particularly low when, as here, there is a conviction for conspiracy requiring proof of a conspiratorial agreement").  This is particularly so where, as Shelton points out (Shelton Mem. 96-97), the bulk of the Government's evidence proved Shelton's actual knowledge, and the Government made scant  reference during summation to  Shelton's conscious avoidance.

Additionally, the jury was instructed that it could find that Shelton consciously avoided knowledge of CUC's and Cendant's fraudulent accounting only if the evidence established the elements of conscious avoidance beyond a reasonable doubt. Tr. 16300, 16322-23.  If, as Shelton contends, there was no evidence to support those requirements, but there was abundant evidence of Shelton's actual knowledge of the fraud, the jury presumptively convicted Shelton based on a finding of actual knowledge, rather than conscious avoidance, particularly where, as here, the prosecution focused primarily on a theory of actual

149

knowledge during summation.  <u>United States v. Adeniji</u>, 31 F.3d 58, 63-64 (2d Cir. 1994).

Shelton contends that he was harmed by the conscious avoidance instruction because it permitted the jury to convict him based on a negligence standard, rather than a conscious decision to avoid knowledge of the fraud.  Shelton Mem. 110-11. That claim is repudiated by the fact that the instruction expressly stated that Shelton could not be convicted because he was "merely negligent, foolish or mistaken."  Tr. 16323.  <u>Abreu</u>, 342 F.3d at 188 (rejecting a similar claim based on language in the conscious avoidance instruction similar to that in this case); <u>accord</u> <u>United States v. Littlefield</u>, 840 F.2d 143, 148 n.3 (1st Cir. 1988).  This Court should reject Shelton's challenges to the conscious avoidance instruction.

**POINT IV**

**THE COURT PROPERLY ADMITTED EVIDENCE RELATING TO SHELTON'S PARTICIPATION IN CHARGING 1995 AND 1996 <u>PLANE EXPENSES AGAINST THE 1997 CENDANT MERGER RESERVE</u>**

**(RESPONSE TO SHELTON POINT IV)**

One year before trial, the United States advised the defense that it would offer evidence at trial regarding the fact that Walter Forbes' 1995 and 1996 plane expenses were charged to the Cendant merger reserve created in 1997 as result of the merger of CUC and HFS.  <u>See</u> Government Letter dated May 28, 2003, attached as an exhibit to Forbes' Motion in Limine # 3, Docket

150

No. 631, filed April 21, 2004.  The United States made clear that the evidence would be offered as part of the conspiracy charged in the indictment -- a conspiracy that included the charging of ordinary expenses against merger reserves.  <u>See</u> Indictment Count 1, ¶¶ 33, 35, 36, 39, and 41.  The defense was also advised that the evidence would be offered in the alternative under Fed. R. Evid. Rule 404(b).

One year later, on the eve of trial, the defense sought to preclude the United States from offering this evidence at trial.  The Court properly rejected the defense motion to preclude this highly probative evidence.  <u>See</u> Ruling on Forbes Motion in Limine No. 4, Docket No. 724, filed May 11, 2004; <u>see also</u> Government Mem. in opposition to Forbes' Motion to Preclude, Docket No. 657, filed April 29, 2004.  Shelton now moves for a new trial contending that the Court improperly admitted the evidence that revealed that Shelton had knowledge of, and participated in, the charging of the 1995 and 1996 plane expenses to the 1997 Cendant merger reserve.  Shelton Mem. Point IV, 111-116.  The Court properly admitted that evidence.

**A.    The Plane Expense Evidence was Highly Probative of the <u>Crimes Charged in the Indictment</u>.**

At trial, Shelton and Corigliano both testified that they discussed charging Walter Forbes' plane expenses to the merger reserve.  They disagreed, however, when in the approval process that conversation took place.  Corigliano testified that

151

he and Shelton discussed charging the expenses to the merger
reserve <u>after</u> Shelton had reviewed the charges and determined
that approximately $596,000 should be approved.  Tr. 7375-78.
Shelton testified that he and Corigliano discussed charging the
expenses to the merger reserve <u>before</u> Shelton reviewed and
reduced the expenses.  Tr. 12319.

　　　　In either event, evidence that Shelton and Corigliano
discussed charging ordinary business expenses that Walter Forbes
accrued in 1995 and 1996 to a merger reserve created in 1997 was
highly probative and admissible evidence.  As the Court found in
its ruling, this evidence "relate[d] directly to a major issue in
the case" - - "the manipulation of merger reserves."  Docket No.
721.  More specifically, the evidence related to Shelton's
knowledge that ordinary business expenses were being charged to a
reserve created for merger related expenses - - the precise fraud
charged in the indictment.  <u>See</u> Indictment at ¶¶ 33, 35, 36, 39,
and 41.

　　　　Shelton overlooks critical testimony at trial when he
suggests that there was no evidence to demonstrate that the
accounting for the plane expenses was improper.  Professor Sack
testified that when two companies do not think about merging
until 1997 (as was the case with CUC and HFS), it was not
acceptable to charge 1995 and 1996 expenses to the merger reserve

created in 1997.  Tr. 569.[38]  There was no dispute at trial that the first meeting between CUC and HFS to discuss any possible business combination occurred in January 1997 in New York City, a meeting that Shelton attended.  Tr. 13148-50.  Even Walter Forbes testified that his travel from 1995 and 1996 had nothing to do with the 1997 HFS merger.  Tr. 14258-59.  Moreover, Corigliano explained how charging the plane expenses to the Cendant merger reserve furthered the conspirators goal of improving operating income.  Tr. 7380.

Thus, the jury had more than enough evidence to figure out: (a) that 1995 and 1996 plane expenses that had nothing to do with HFS and were not properly charged to the 1997 HFS/CUC merger reserve; and (b) that improperly charging non-merger related expenses to the merger reserve furthered the conspiracy charged in the indictment.  Even if Shelton could reduce this issue to a battle of the experts, the evidence was properly admitted to permit the jury to consider whether Shelton participated in, and

_____

[38] Professor Weil's rather expensive opinion that the plane expenses were either merger related expenses or were "other unusual charges" was rather meaningless given that the definition of other unusual charges in the Cendant financial statement was that the expense was "associated with and coincident to the Cendant merger."  DX 1283 at F-10, 24.  Hence, Professor Weil, who admitted that "I just don't know the facts" whether the plane expenses were related to the merger and "I am just not giving an opinion on that subject" (Tr. 11291), could hardly provide support for Shelton's speculation that the 1995 and 1996 plane expenses could somehow be charged to a 1997 merger reserve.

had knowledge of, the fraudulent accounting taking place in the company he ran.[39]

Finally, even assuming the Court had not permitted the Government to introduce evidence during its case-in-chief of Shelton's knowledge of, and role in approving, the plane expenses, the evidence would have been admissible to challenge Shelton's testimony at trial. As the Court will recall, Shelton maintained that he had "no hint" or any "clue" of improper accounting (Tr. 12538-39), and that Corigliano hid the fraud from him (Tr. 12539). Evidence that Corigliano openly discussed charging 1995 and 1996 plane expenses (non-merger related expenses), to a 1997 merger reserve would have been properly used by the Government to rebut Shelton's claim that he had no clue that Corigliano was engaged in accounting shenanigans. For that reason as well, no relief is warranted.

## B. The Plane Expense Evidence was Admissible Pursuant to Fed. R. Evid. 404(b).

The challenged evidence regarding Walter Forbes' plane expenses was also properly admitted pursuant to Fed. R. Evid.

---

[39] Shelton presented the jury with numerous arguments why his actions in approving the $596,000 of plane expenses were not probative of his criminal knowledge or intent (arguments he repeats in his memorandum for a new trial). Thus, there is no danger that the evidence of a mere half million dollar expense, which was hotly contested, somehow unfairly influenced the jury that was considering charges in a case involving a $14 billion market loss and hundreds of millions of dollars of phantom income.

154

404(b).  The Second Circuit follows an "inclusionary" approach to
Rule 404(b) evidence.  <u>See</u> <u>United States v. Carboni</u>, 204 F.3d 39,
44 (2d Cir. 2000) (citing <u>United States v. Inserra</u>, 34 F.3d 83,
89 (2d Cir. 1994)).  Information about a defendant's other wrongs
<u>is admissible</u> to show proof of a defendant's scheme common to the
one charged in an indictment "<u>unless</u> it is introduced for the
<u>sole purpose</u> of showing a defendant's bad character, it is not
relevant under Rule 402, or it is overly prejudicial under Rule
403."  <u>United States v. Fasciana</u>, 226 F. Supp. 2d 445, 455
(S.D.N.Y. 2002) (emphases added) (citing <u>United States v.
Mickens</u>, 926 F.2d 1323, 1328 (2d Cir. 1991)).

        Evidence that Shelton admittedly approved the use of
the Cendant merger reserves to account for a non-merger related
expense is properly admitted under Rule 404(b) to prove Shelton's
knowledge of the charged fraudulent scheme, which included the
misuse of the Cendant merger reserves to reduce expenses that
were unrelated to the merger.  The Second Circuit routinely
affirms the admission of evidence under Rule 404(b) to prove the
defendant's knowledge of the charged offense when a defendant,
like Shelton, places knowledge at issue.  <u>See</u>, <u>e.g.</u>, <u>United
States v. Muniz</u>, 60 F.3d 65, 69 (2d Cir. 1995); <u>United States v.
Thomas</u>, 54 F.3d 73, 82 (2d Cir. 1995); <u>United States v. Inserra</u>,
34 F.3d 83, 89 (2d Cir. 1994); <u>United States v. Aminy</u>, 15 F.3d
258, 260 (2d Cir. 1994); <u>United States v. Pitre</u>, 960 F.2d 1112,

155

1119 (2d Cir. 1992); <u>United States v. Ramirez</u>, 894 F.2d 565, 569 (2d Cir. 1990). The plane expense evidence was further admissible to prove Shelton's intent to defraud, and the absence of mistake or accident, which like knowledge, are expressly identified by Rule 404(b) as proper subjects of proof by way of "other acts" evidence.

## C. The Evidence was Properly Admitted Over A Rule 403 Objection.

Not only was the plane expense evidence admissible under Rules 401 and 404(b), it was properly admissible over a Rule 403 objection. As the Court held after balancing the Rule 403 factors, the admission of the plane expense evidence was not unduly prejudicial. Indeed, the Court found that the evidence, involving expenses of $596,000, was neither "sensational" or "disturbing" and did not lead to the confusion of the issues. Thus, the Court's holding that the probative value of the evidence was not outweighed by the risk of unfair prejudice was correct and should not be disturbed.

Manipulation of merger reserves was a significant part of the criminal conduct at issue in this case. The fact that Shelton and Corigliano and other coconspirators charged Walter Forbes' non-merger related plane expenses to the Cendant merger reserve was highly probative, relevant evidence. Its probative value was not <u>substantially</u> outweighed by any supposed prejudice against Shelton. <u>See</u> <u>Pitre</u>, 960 F.2d at 1120 ("[T]he [404(b)]

156

evidence of prior narcotics transactions did not involve conduct
any more sensational or disturbing than the crimes with which
[the appellants were] charged.")(internal quotation marks
omitted); United States v. McGuire, 744 F.2d 1197, 1205-06 (6th
Cir. 1984) (in criminal case charging that defendants made and
conspired to make false entries in order to secure federal
mortgage monies, defendants -- a bank president and a mortgage
loan officer -- were not prejudiced by admission of "evidence
relating to loan applications not named in the indictment");
United States v. Miller, 573 F.2d 388, 393 (7th Cir. 1978)
(approving admission of financial statements pursuant to Rule
404(b) and observing that false information in financial
statements are not the sort of misconduct that ordinarily arouses
the irrational passions of a jury); cf. United States v.
Schnabel, 939 F.2d 197, 202 (4th Cir. 1991) (admission of
defendant's tax returns into evidence, which showed defendant's
substantial financial interest in his company, was not unduly
prejudicial under Rule 403).

Accordingly, evidence that Shelton participated in, and
had knowledge of, the charging of 1995 and 1996 business expenses
to a 1997 merger reserve was properly admitted.

**POINT V**

**THE COURT PROPERLY ADMITTED THE TESTIMONY OF JOHN OLLER**

**(RESPONSE TO SHELTON POINT V)**

157

Shelton argues yet again that this Court improperly admitted the testimony of Wilkie Farr partner John Oller about Shelton's statements to Oller during the Cendant Board of Directors' Audit Committee investigation in the summer of 1998. Shelton Mem. Point V, 116-122. Shelton has done little more than resurrect the same arguments on this point that the Court previously rejected in a written opinion during the trial. Accordingly, the Court should reject these same arguments again for the same reasons.

Shelton's description of Oller's testimony differs somewhat from what Oller actually said on the witness stand. With respect to the June 10, 1998 interview of Shelton, Oller testified as follows:

Q.   And did you listen to everything he said?

A.   Yes.

Q.   Were you there for the entire interview of Mr. Shelton on June 10th of 1998?

A.   I believe so.

Tr. 10355. Similarly, with respect to the June 24, 1998 interview of Shelton, Oller testified that:

Q.   And were you present for the follow-up interview of Mr. Shelton on July 24th, 1998?

A.   Yes.

Q.   And did you attend the entire interview of Mr. Shelton on July 24th, 1998?

A.   As best I can recall, yes.

158

> Q.   All right.  And did you listen to what Mr. Shelton
> said during his interview on July 24th, 1998?
>
> A.   Yes.

Tr. 10357.  Contrary to the impression Shelton attempts to create

in his brief, Oller did not say that he was absent during  parts

of the Audit Committee interviews of Shelton.  Rather, Oller

chose his words carefully.  He simply could not guarantee that he

was present for every second of the interviews because he could

not remember whether or not he stepped out of an interview for a

moment or two:

> Q.   And you were in there at every moment that Mr.
> Shelton was speaking; is that correct?
>
> A.   Every moment -- I believe so.  You know, I can't
> guarantee that I didn't run to the men's room for a
> minute and come back.  But I -- something like that
> could have happened.  But with that caveat, I think I
> was there the whole time.
>
> Q.   I mean, if you were part of the interview team,
> presumably if you had to leave or someone had to leave,
> the interview would stop; is that what happened?
>
> A.   I don't -- if I had to leave for a minute to the
> restroom, I don't know that the interview would have
> stopped entirely but --
>
> Q.   It may have happened?
>
> A.   It may have happened.

Tr. 10366-67 (emphasis added); see Shelton Mem. 117, 119

(attempting to suggest that Oller was not present for all of

Shelton interviews).

     Oller testified that, although he had read the two

159

memoranda relating to the Shelton interviews (GXs 1760 and 1761),
he could not remember much of what Shelton said during the
interviews.  Tr. 10359-62 (GX 1760); 10417-18 (GX 1761).  Oller
testified that he reviewed both memoranda at the time when both
interviews were fresh in his mind and that he concluded that both
memoranda accurately reflected Shelton's statements during the
two interviews.  Tr. 10363 (GX 1760); 10418-20 (GX 1761).

        As the Court concluded during the trial, this evidence
sufficiently laid the foundation to permit Oller to read the two
interview memoranda to the jury.  A memorandum recounting a
witness' prior conversation with a defendant is excepted from the
general hearsay prohibition -- and the information in the
document may be read into evidence by the witness -- under
specific, straightforward circumstances.  See Fed. R. Evid.
803(5).  Rule 803(5) provides:

> A memorandum or record concerning a matter about which
> a witness once had knowledge but now has insufficient
> recollection to enable the witness to testify fully and
> accurately, shown to have been made or adopted by the
> witness when the matter was fresh in the witness'
> memory and to reflect that knowledge accurately.  If
> admitted, the memorandum or record may be read into
> evidence but may not itself be received as an exhibit
> unless offered by an adverse party.

This exception has "long been favored by the federal and
practically all the state courts that have had occasion to decide
the question." United States v. Kelly, 349 F.2d 720, 770 (2d
Cir. 1965).

Three circumstances must exist before a witness may read into evidence portions of a document pursuant to Rule 803(5):  1) the witness's memory must be impaired such that he cannot recall the events in question; 2) the document containing the relevant information must have been prepared or adopted by the witness at the time of the disputed events; and 3) the proponent of the information must show that the document accurately describes the witness's recollection of the recorded events.  See Parker v. Reda, 327 F.3d 211, 213 (2d Cir. 2003) (affirming admission into evidence, pursuant to Rule 803(5), of information in a jailer's memorandum describing a physical altercation with an inmate).

The Government easily met this burden.  Oller testified that he was present for, but could not recall, Shelton's statements during the interviews.  He recalled that he reviewed, and in some cases revised himself, the interview memoranda at the time when the interviews, and Shelton's statements, were fresh in Oller's  mind and when he was able to remember those statements. Finally, Oller testified that he adopted, and to some degree prepared himself, the memoranda as being accurate.  That others drafted or made changes to the memoranda does not render Oller's challenged testimony inadmissible.  5 Weinstein's Federal Evidence (2d ed., 2000), § 803.10[4], at p. 803-54.  The fact remains that Oller adopted both memoranda at a time when

161

Shelton's statements were fresh in his mind.  That testimony was sufficient to meet the Government's burden, as Oller's adoption of the memoranda was sufficient under Rule 803(5).  See United States v. Williams, 571 F.2d 344 (6th Cir. 1978)(adoption by a witness of a statement written by a Government agent and signed by the witness was sufficient to permit the witness to read the statement to the jury under Rule 803(5)).

The fact that the two interview memoranda are not verbatim transcripts of the interviews is also irrelevant. Shelton's argument misconceives the Government's primary purpose for using them.  The Government did not use Shelton's statements in the memoranda only to prove the truth of the matter asserted. The Government also argued that many, but not all, of Shelton's statements to Oller were _false_ denials of Shelton's involvement in the charged scheme.  See United States v. Steele, 685 F.2d 793, 809 (3d Cir. 1982)(a document was properly used under Rule 803(5) to prove that co-conspirators made certain statements, and not for the truth of the matter asserted).[40]  For example, although several participants to the March 6, 1998 meeting between Scott Forbes, Shelton and others testified that Shelton led the discussion about the proposed use of merger reserves by Cendant to inflate earnings, Shelton told Oller that he had said

---

[40] Other statements in the memoranda were properly offered for the truth as statements of a party-opponent.  Fed. R. Evid. 801(d)(2)(A).

very little at that meeting.  The jury could permissibly conclude that Shelton's false denial of the extent of his role in the March 6 meeting during the Audit Committee interview was evidence of his consciousness of guilt.  See United States v. Aleskerova, 300 F.3d 286, 293 (2d Cir. 2002); United States v. Anglin, 169 F.3d 154, 160 & n.5 (2d Cir. 1999).[41]

        United States v. Almonte, 956 F.2d 27 (2d Cir. 1992) does not support Shelton's contention that the memoranda were inadmissible.  First, that case does not even address the use of a memorandum pursuant to Rule 803(5).  In Almonte, the Court of Appeals affirmed the district court's denial of a defense request to impeach the testimony of a DEA agent by reference to a memorandum written by an AUSA.  The AUSA testified that his memorandum was merely a "shorthand summary" of the agent's statements to the AUSA.  956 F.2d at 29.  The Second Circuit applied the well-settled rule that a witness may not be impeached by a mere "summary" of his prior statement unless the witness "endorses" the summary or the summary consisted of a verbatim

---

[41] The Government used other portions of the memoranda to prove notice to Shelton regarding, or Shelton's knowledge of, certain facts or to otherwise demonstrate relevant facts about Shelton's state of mind.   See United States v. Davis, 780 F.2d 838, 847 (10th Cir. 1985)(in drug-trafficking prosecution, the district court properly admitted, pursuant to Fed. R. Evid. 801(d)(2), a note pad seized from the defendant, which was relevant as circumstantial evidence of the author's knowledge and familiarity with drug transactions).

transcript of the witness' statements.  Id., citing United States
v. Leonardi, 623 F.2d 746, 757 (2d Cir. 1980); cf. Palermo v.
United States, 360 U.S. 343, 350 (1959)(it would be "grossly
unfair to allow the defense to use statements to impeach a
witness which could not fairly be said to be the witness' own
rather than the product of the investigator's selections,
interpretations, and interpolations")(emphasis added).

     Here, by contrast, Almonte is inapplicable because the
Government did not use the memoranda to impeach Shelton.  Indeed,
Shelton had not yet testified when Oller took the stand.
Nevertheless, Shelton's voluntary statements to Oller were
independently admissible as proof of Shelton's consciousness of
guilt, among other purposes, regardless of whether or not he
testified.  United States v. Strother, 49 F.3d 869, 877 (2d Cir.
1995).

     Almonte's requirement of a substantially verbatim
statement or witness adoption of the statement only applies when
the statement is being used to impeach a witness, not when the
statement is being attributed to a defendant for other purposes.
This requirement is consistent with the concern of Congress, as
reflected in the Jencks Act, that witnesses not be impeached with
statements other than their own.  Under the Jencks Act, interview
notes can be considered a "substantially verbatim recital" of a
witness' statement only if they "could fairly be deemed to

164

reflect <u>fully and without distortion</u> what had been said to the government agent" and thus be used to impeach the witness' testimony at trial. <u>Palermo v. United States</u>, 360 U.S. 343, 352-53 (1959)(emphasis added). Here, however, Shelton was not impeached with the interview memoranda and <u>Almonte</u>'s "substantially verbatim" requirement is inapplicable.

Shelton also cites <u>Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.</u>, 168 F.Supp.2d 57 (S.D.N.Y. 2001), but that case is also inapposite. Like <u>Almonte</u>, <u>Bank Brussels</u> did not resolve the admissibility of a memorandum pursuant to Rule 803(5).[42] The defendant in <u>Bank Brussels</u> moved <u>in limine</u> to preclude the admission into evidence of an "edited, non-verbatim non-final draft transcript" of a statement made by the defendant's employee to a lawyer. <u>Bank Brussels</u>, 168 F.Supp.2d at 58. The draft transcript, which was thoroughly edited to delete portions of the employee's remarks, <u>id.</u> at 59, was offered solely to prove the truth of the employee's statements, as reflected in the transcript, pursuant to Fed. R. Evid. 801(d)(2). <u>Id.</u> at 59, n. 2. The employee not only refused to adopt the transcript, but affirmatively testified that it "contained numerous errors and statements that can easily be taken out of

---

[42] The court in <u>Bank Brussels</u> specifically left open the issue of whether or not the challenged document was admissible under Rule 803(5), and acknowledged that portions of the document could be admitted under that Rule. 168 F.Supp.2d at 62.

context." Id. at 59. Relying on Almonte, the district court in Bank Brussels held that the draft transcript could not be admitted into evidence to prove the truth of the employee's statements as reflected in the transcript, because the proponent had failed to demonstrate that the transcript was a "verbatim" recitation of the employee's statements. Id. at 60-61. Bank Brussels imported Almonte's "verbatim" requirement for prior statements offered for impeachment to statements offered as admissions of a party.[43]

The Bank Brussels court offered Almonte as support for its conclusion that a party offering a statement of a party-opponent must authenticate the statement by proving that it is "substantially verbatim." As demonstrated above, Almonte does not support that proposition at all. Rule 901 requires only that the Government produce "evidence sufficient to support a finding that the matter in question is" what the Government claims it is. See 5 Weinstein's Federal Evidence, (2d ed. 2000) § 801.30[3] ("A statement qualifies as a party admission even though the party denies having made it, if the statement's proponent provides adequate proof to support a finding that the statement was made by the party.")

Even if Bank Brussels was correctly decided on its

---

[43] The Bank Brussels court did, however, note that the employee-witness' statements "might, obviously, be proved by the testimony of persons who heard her make the statements." Id. at 58.

facts, it has no application here.  Unlike the proponent of the
draft transcript in that case, the Government did not, in many
cases, offer the memoranda to prove the truth of Shelton's
statements as set forth in the memoranda.  Rather, many of the
statements in the memoranda were offered for the other purposes
described above.  In many instances, juxtaposition of Shelton's
statements to Oller with the testimony of other witnesses
supported an inference that Shelton's statements demonstrated his
consciousness of guilt.  Unlike Bank Brussels, whether or not
Shelton's statements to Oller were accurate recitations of
historical events had no bearing on the relevance of those
statements.

        To the extent that anything in the memoranda was also
relevant to prove the truth of Shelton's statements to Oller,
those memoranda were also admissible pursuant to Fed. R. Evid.
801(d)(2)(A).  Case law that, unlike Bank Brussels, directly
addresses the use under Rule 803(5) of a memorandum which
summarizes the out-of-court statement of a defendant supports the
admission of the memoranda for that purpose.  See United States
v. Green, 258 F.3d 683, 689-90 (7th Cir. 2001) (rejecting the
defense claim that a police officer's report of the defendant's
confession to the charged crime was inadmissible under Rule
803(5) because the defendant had not "adopted" the report; "We
agree that assertions attributable to [the defendant] in [the

police officer's] report are classic admissions and not hearsay under Rule 801(d)(2)(A).  The [district] court did not err in allowing [the officer's] report to be read to the jury."); <u>United States v. Picciandra</u>, 788 F.2d 39, 44 (1st Cir. 1986)(DEA agent's report of a defendant's statements were permissibly read to the jury as a prior recorded recollection, pursuant to Fed. R. Evid. 803(5)); <u>United States v. Sawyer</u>, 607 F.2d 1190, 1192-93 (7th Cir. 1979)(IRS Revenue Agent's memorandum of a conversation with the defendant was properly admitted into evidence as a prior recorded recollection pursuant to Rule 803(5); the agent's testimony "tended to show" that the memo was "accurate"); <u>see also</u> <u>United States v. Lewis</u>, 954 F.2d 1386, 1392-95 (7th Cir. 1992)(district court properly applied Rule 803(5) to permit an agent to read his report that summarized his interview of a witness; an example of the summary that was read to the jury is set forth the opinion).  Shelton's contention that a non-verbatim written record of a defendant's admission must be excluded from evidence unless the record was subsequently adopted by the defendant should therefore be rejected.  The requirement under Rule 803(5) that the recollection have been recorded accurately is the proper test to ensure the trustworthiness of the statement.  <u>See</u> <u>Parker v. Reda</u>, 327 F.3d 211, 213 (2d Cir. 2003).

**POINT VI**

**<u>EVIDENCE OF PRE 1995 MISCONDUCT WAS PROPERLY ADMITTED</u>**

(RESPONSE TO SHELTON POINT VI)

Shelton alleges that the admission of evidence pertaining to events that occurred before January 1995 created a constructive amendment of, and a prejudicial variance to, the indictment.[44]  Shelton Mem. Point VI, 122-129.  Specifically, he claims that Corigliano's testimony about the misuse of "general reserves," "profit sharing receivables," and the GETKO and Essex merger reserves was improperly admitted, because the indictment did not identify any of those reserves or receivables.  Id. at 123-24.  This Court rejected a virtually identical claim when it was raised during trial by defendant Walter Forbes (Forbes' Motion for Mistrial Due to Constructive Amendment and/or Prejudicial Variance, Docket No. 953, filed July 21, 2004), and Shelton has presented no grounds for this Court to now reverse

_____

[44] Although the caption to this claim states that the admission of evidence regarding fraudulent conduct before 1995 amounted to a "prejudicial variance" of the indictment, as well as a "constructive amendment," Shelton offers no argument in support of his variance claim.  This omission is apparently intentional, because Shelton does not claim that he suffered any prejudice as a result of the admission of the challenged evidence regarding pre-1995 events.

In order to prevail on a variance claim, the defendant must affirmatively establish "prejudice," that is, he must show how the preparation of his defense was undermined by admission of the challenged evidence.  United States v. Salmonese, 352 F.3d 608, 620-21 (2nd Cir. 2003); United States v. Silverman, 449 F.2d 1341, 1345-46 (2d Cir. 1971).  Absent a demonstration of affirmative prejudice, Shelton is not entitled to a new trial based on a variance claim.  United States v. Ragen, 314 U.S. 513, 526 (1942); Berger v. United States, 295 U.S. 78, 81-84 (1935); United States v. Oberman, 318 F.2d 877, 880 (4th Cir. 1963).

that determination.

**A.    Shelton has Failed to Demonstrate a Constructive Amendment of the Indictment.**

A constructive amendment of the indictment occurs only "when the charging terms are altered, either literally or constructively," United States v. Clemente, 22 F.3d 477, 482 (2d Cir. 1994), i.e., when the trial evidence "modif[ies] essential elements of the offense charged to the point that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged by the grand jury." United States v. Vebeliunas, 76 F.3d 1283, 1290 (2d Cir. 1996); accord United States v. Joyner, 201 F.3d 61, 69 (2d Cir. 2000); United States v. Mucciante, 21 F.3d 1228, 1234 (2d Cir. 1994); United States v. Weiss, 752 F.2d 777, 787 (2d Cir. 1985). So long as the "the allegations and the proof substantially correspond," and the trial evidence is consistent with the "core of criminality" alleged in the indictment, there is no constructive amendment of the indictment. United States v. Danielson, 199 F.3d 666, 670 (2d Cir. 1999); accord United States v. Salmonese, 352 F.3d 608, 620 (2nd Cir. 2003); United States v. Delano, 55 F.3d 720, 729-30 (2d Cir. 1995). Here, Shelton declines to allege, much less demonstrate, that the challenged evidence about pre-1995 events "modified an element" of any charge, caused Shelton to be convicted of a crime other than those alleged in the indictment, or was inconsistent with the

170

"core of criminality" alleged in the indictment.  He has therefore failed to even state a claim of constructive amendment.[45]

Even though the indictment alleges that the charged conspiracy was committed from "the late 1980's to in or about April 1998," Indictment, Count One, ¶ 17, Shelton complains because Corigliano testified about activity that occurred after the late 1980's, but before 1995.  Events that occurred during the indictment period plainly cannot create a constructive amendment based on their timing.  Accordingly, Shelton argues that the Government was precluded from presenting evidence about certain pre-1995 events because they were not identified with specificity in the indictment, as were some of the events that occurred from January 1995 through April 1998.  This argument fails: the indictment is not constructively amended merely because it alleges a lengthy and complex fraudulent scheme, but provides a detailed description about only some of the components of that scheme.

United States v. Cohen, 518 F.2d 727 (2d Cir. 1975)

---

[45] In assessing Shelton's claim, this Court must examine the totality of the indictment, and not merely a particular averment which allegedly conflicts with the trial evidence.  United States v. Ansaldi, 372 F.3d 118, 127 (2d Cir. 2004); United States v. Teitler, 802 F.2d 606, 617 (2d Cir. 1986); see generally United States v. Jackson, 876 F.Supp. 1188, 1201 (D.Kan. 1994)(rejecting a variance claim based on a "narrow reading" of the indictment; "[p]ractical, not technical, considerations guide a court in interpreting an indictment" in response to a variance challenge).

repudiates Shelton's constructive amendment claim. Like the defendant in that case, Shelton has failed to establish that any of the challenged evidence affected the "core of criminality" alleged in the indictment: the fraudulent manipulation of reported earnings in order to cause the investing public to overvalue CUC stock. The defendants in <u>Cohen</u>, like Shelton, were charged with, *inter alia*, conspiracy to commit securities fraud and substantive securities fraud counts. The fraud charged in <u>Cohen</u> arose from the sale of the stock of a company called Richard Packing. As in this case, the price of the stock had been inflated by the defendants' materially false statements about, *inter alia*, the company's earnings projections. 518 F.2d at 729-31. The charging document in that case, an information, identified various means by which the fraudulent scheme had been effectuated. <u>Id.</u> at 732.

On appeal, the defendants claimed a "prejudicial variance between the conspiracy charged in the information and the conspiracy the Government proved at the trial," because the information contained no allegations regarding a host of conduct proved at trial which advanced the scheme. This included evidence about "the many oral representations concerning the projected earnings" of Richard Packing, false statements about the number of franchises sold by the company and the money that had been committed to purchase those franchises, written

172

misrepresentations contained in press releases, and the
deliberately delayed disclosure of the company's annual report.
Id. at 733.

     The Second Circuit rejected the variance claim with
reasoning that applies fully here:

> Cohen's participation in the conspiracy was shown at
> trial to have been, in no small part, participation in
> repeated misrepresentations about the success that
> Richard Packing was enjoying, and these misrepresen-
> tations were not all specifically spelled out in the
> information.  However, the Government was, in essence,
> charging that the defendants conspired illegally to
> manipulate the price of Richard Packing shares, and in
> so doing fraudulently to deceive the investing public.
> Central to this deception were the material misrepres-
> entations included in [a stock] offering circular which
> Cohen helped to prepare and which he reviewed.  The
> many oral misrepresentations by Cohen on such matters
> as earnings projections, the Status Marketing- Richard
> Packing relationship, and the placement of franchises
> were not independent acts separate and apart from the
> conspiratorial central fraudulent activities and unre-
> lated to them, but were integral to the very core of
> the overall scheme and in furtherance of that scheme.
> The Government need not, when charging conspiracy, set
> out with precision each and every act committed by the
> conspirators in the furtherance of the conspiracy.

Id. at 733.

     The Second Circuit's reasoning in Cohen compels the
rejection of Shelton's claim regarding evidence about the Essex
and Getko merger reserves.  The indictment here did not allege
that only the Ideon and Cendant merger reserves, established in
1996 and 1997, respectively, were misused.  Rather, it alleged
that "[f]rom at least as early as the 1980's to in or about 1998,
[the conspirators] established excessive merger reserves and then

drew upon them to fraudulently inflate the reported income of CUC
and Cendant." Count 1, ¶ 30 (emphasis added).  The allegations
about the misuse of the 1996 Ideon and 1997 Cendant reserves are
obviously illustrative, rather than exhaustive instances of the
misuse of merger reserves.  The "core of criminality" alleged in
the indictment was to inflate the reported earnings of CUC and
CMS to meet analysts' projected targets.  Indictment, Count 1, ¶¶
23-25.  The indictment alleges that the conspirators "used
fraudulent accounting machinations" to achieve the targeted
overstatement of the Company's earnings.  Id. at ¶ 29.  The
indictment identifies some of the accounting practices that were
undertaken towards that end, which are introduced by the word,
"including."  Id.

        The indictment does not allege that these were the only
improper accounting practices that Shelton and his co-
conspirators employed to fraudulently overstate CUC's earnings.
By misusing the Essex and Getko merger reserves to inflate CUC's
operating incomes, the conspirators employed the same improper
accounting machination of creating an excess merger reserve (or
"cushion") in order to increase operating income of CUC, as the
conspirators later employed with respect to the Cendant and Ideon
merger reserves.  See Joyner, 201 F.3d at 68-69 (no constructive
amendment of the indictment which alleged that the defendant
occupied "designated roles, among others," but evidence proved

174

his participation in other roles; such language is expressly
illustrative and not exclusive, and the "essential elements of
the offense charged were . . . in no way modified by the
government's evidence"); Mucciante, 21 F.3d at 1234-35 (no
constructive amendment where the indictment, when "fairly read,"
did not restrict the government to proving that a particular
person was the only victim of the charged fraudulent scheme).
The conspirators' misuse of profit sharing receivables to inflate
CUC's operating income was likewise within the "core of
criminality" alleged in the indictment, because the conspirators
used those receivables as part of the "various reserve
adjustments" and "miscellaneous adjustments" in order to "get to
the operating earnings number that [the conspirators] were
looking for." Tr. 6285, 6288-6293, 6301-6303; GX 663. As such,
the profit sharing receivables were part of the "the plug number
to get to the operating earnings that the company needed to get
to hit the analysts' numbers." Tr. 6286.

        Accordingly, Shelton's complaint that "general
reserves" and "profit-sharing receivables" are "accounting
concepts wholly unrelated to merger reserves" (Shelton Mem. 126)
is entirely beside the point. The issue is not whether a
particular kind of a revenue or expense account is more or less
like another; the issue is whether the method by which the
defendants misused a revenue or expense account is within the

175

core of criminality alleged in the indictment.  Here, the
defendants fraudulently manipulated general reserves and profit
sharing receivables, then used the excess funds in those accounts
to fraudulently inflate CUC's reported income.  See United States
v. Montgomery, 384 F.3d 1050, 1061 (9th Cir. 2004) (rejecting a
constructive amendment claim where the mail fraud indictment
charged that the defendant/real estate broker with mailing
statements to rental unit owners that withheld information
concerning rental dates and the amount of money received from
rentals, but the evidence showed that the defendant had also
stayed and allowed others to stay in rental units without any
payment at all; the difference was at most a non-fatal variance).

        Shelton's general premise, that the indictment must
allege each act or means by which the conspirators advanced the
massive criminal scheme is refuted by controlling law.  The
Second Circuit has reiterated that:

> Because proof at trial need not, indeed cannot, be a
> precise replica of the charges contained in the
> indictment, this court has consistently permitted
> significant flexibility in proof, provided that the
> defendant was given notice of the core of criminality
> to be proven at trial.

United States v. Frank, 156 F.3d 332, 338 (2d Cir. 1998); see
also United States v. LaSpina, 299 F.3d 165, 181 (2d Cir. 2002);
United States v. Patino, 962 F.2d 263, 265-66 (2d Cir. 1992)(no
constructive amendment where prosecutor argued that defendant had
illegally used three separate guns in furtherance of a crime of

176

violence, where the indictment charged the use of a different gun on a different date).

Shelton's claim is also materially indistinguishable from that which was recently rejected in <u>United States v. Janati</u>, 374 F.3d 263 (4th Cir. 2004). There, the indictment charged a complex health care fraud scheme that transpired between 1996 and 2003, and identified 61 fraudulent claims for reimbursement that were submitted between 2000 and 2003. <u>Id.</u> at 266-67. The defendants, principals of the clinic that submitted the fraudulent claims, took the position that their employees, not the defendants, were responsible for any fraud that had occurred in connection with those 61 claims, and that the defendants were ignorant of that misconduct. The Government sought to present evidence regarding 1,300 other transactions that were not identified in the indictment, but which were undertaken from 1996 to 2000, before the allegedly deceptive employees were hired by the defendants. <u>Id.</u> at 267-68.

In <u>Janati</u>, the district court granted the defense motion to exclude evidence of the 1,300 transactions that were not identified in the indictment. On the Government's appeal, the exclusion order was reversed. The Court of Appeals explained that "the government is permitted to present evidence of acts committed in furtherance of the conspiracy even though they are not all specifically described in the indictment." <u>Id.</u> at 270.

177

Rejecting the defendants' variance claim, the Court explained
that the Government was entitled to prove "facts [that were not]
<u>different</u> from those alleged in the indictment, [but] facts
which, although not specifically mentioned in the indictment, are
entirely consistent with its allegations." <u>Id.</u> (emphasis in
original).

     The same reasoning applies to Shelton's complaint that
"the Indictment's detailed specification of the alleged scheme
involving the misuse of the Ideon and Cendant merger reserves
precluded the government from charging Shelton with misuse of the
Essex and GETKO reserves . . ."  Shelton Mem. 126.  None of the
evidence currently challenged by Shelton described events that
were different in kind from any of the indictment allegations.
As in <u>Janati</u>, Corigliano's challenged testimony about pre-1995
conduct that is not described in the indictment does not create a
variance, much less a constructive amendment of the indictment.

     <u>United States v. Milstein</u>, 401 F.3d 53 (2d Cir. 2005),
on which Shelton principally relies, neither purports to overrule
the long line of Second Circuit authority cited above which
supports this Court's prior rejection of Forbes' constructive
amendment claim, nor demonstrates that this Court erred in
rejecting that claim.  In <u>Milstein</u>, the defendant was convicted
of distributing misbranded prescription drugs with fraudulent
intent, in violation of 21 U.S.C. §§ 331(a) and 333(a)(2), based

178

on an allegation in the indictment that the defendant "forged or falsified" the material in which drugs were packaged.  401 F.3d at 64.  At trial, however, the Government presented evidence that the drugs were not only improperly re-packaged, but were also not sterile.  Id.

On appeal, the defendant argued that the Government constructively amended the indictment when the district court instructed the jury that it could convict the defendant on the misbranding count if it found only that "the labeling of the ampules of saline diluent suggested untruthfully that these ampules were sterile . . . when in fact they were a danger to health."  Id. at 64-65.  The Court of Appeals reversed the misbranding conviction (but not the convictions for any other count).

Unlike the district court in Milstein, this Court never instructed the jury that it could convict Shelton on any count if it found only that he was knowledgeable about the pre-1995 conduct that was not specifically identified in the indictment. Nor did the Government argue that Shelton could be convicted based on his knowledge of the pre-1995 conduct in furtherance of the fraud.  Indeed, although the challenged evidence established, as the indictment alleged, that the conspiracy commenced before 1995, none of it established that Shelton was involved in the conspiracy before Corigliano was promoted to CFO in January of

179

1995.  Rather, the evidence showed that Corigliano's knowledge of
the pre-1995 conspiratorial conduct arose from his work under the
supervision of CUC CFO Stuart Bell, and Bell reported to Walter
Forbes, not to Shelton.  Tr. 6238-6327, 6338-6430, 6455.
Corigliano's first conversation with Shelton about the fraud,
according to his testimony, was when he discussed one of the
cheat sheets with Shelton in late 1994 or early 1995, after
Corigliano had succeeded Bell as CFO.  Tr. 6455-56, 6492-93.

        Contrary to Shelton's argument, Milstein does not hold
that the indictment was constructively amended merely because the
Government presented evidence of a particular manner of
misbranding (packaging non-sterile pharmaceutical drugs in a
package that described the drugs as sterile) that was different
from another manner of misbranding that was described in the
indictment (packaging drugs destined for distribution in other
countries that described the drugs as destined for distribution
in the United States).  What made Milstein different from the
numerous Second Circuit cases cited above which have rejected
constructive amendment claims based on the mere admission of
evidence that is not identified in the indictment was the
district court's instruction that the jury could convict the
defendant based on a finding that the defendant engaged in only
conduct that was not identified in the indictment.  Such an
instruction altered "the core of criminality" charged in the

indictment by permitting the jury to convict the defendant
without any consideration of any conduct identified in the
indictment.  No such alteration occurred here.

Additionally, the challenged evidence in <u>Milstein</u>
changed the "core of criminality" because it pertained to
significantly more heinous conduct than that identified in the
indictment.  The <u>Milstein</u> indictment alleged that the drugs were
misbranded because they purported to be manufactured for
distribution in the United States, but were in fact manufactured
for distribution outside the United States.  401 F.3d at 59.
Although drugs manufactured for distribution outside the United
States do not "necessarily" comply with FDA standards, <u>id.</u>, the
mere fact that the drugs were not manufactured for distribution
in the United States did not necessarily make them unsafe.
By contrast, evidence not mentioned in the indictment that the
drugs contained "bacteria and endotoxins," 401 F.3d at 59-60, was
a potentially much more serious offense than misbranding
regarding the proper country of distribution.  Jurors who would
not be inflamed by evidence that the defendant sold drugs in the
United States that were destined for sale in Canada might easily
be inflamed by evidence that the defendant sold contaminated
drugs in packaging describing the drugs as sterile.  Here,
however, evidence that Corigliano and Bell engaged in the
manipulation of general reserves, profit sharing receivables, and

the Essex and GETKO reserves, in far smaller amounts than the
Ideon and Cendant merger reserve manipulations expressly
identified in the indictment, was no more inflammatory than the
events expressly chronicled in the indictment.  Accordingly,
Milstein does not compel a new trial here.[46]

        In any event, Shelton's constructive claim, like the
constructive claim in Milstein, cannot justify a new trial on all
counts for which Shelton was convicted, because the challenged
pre-1995 evidence had no bearing on all of those counts.  For
instance, Shelton was convicted in Count 2 of mail fraud, based
on an allegation that Shelton caused the mailing of CUC's Form
10-Q Report for the second quarter of CUC's 1997 fiscal year,
which report fraudulently inflated CUC's income for that quarter.

---

[46] Other cases cited by Shelton, which were brought to this
Court's attention in Walter Forbes' constructive amendment motion
during trial, do not compel reversal of Shelton's convictions.
Several of those cases involved the presentation of evidence that
"fell entirely outside the criminal scheme alleged in the
indictment," leaving the defendant with "no inkling" of the
evidence on which the conviction was based.  United States v.
Wozniak, 126 F.3d 105, 109-11 (2d Cir. 1997) (indictment charging
conspiracy to distribute cocaine and methamphetamine was
constructively amended where the trial evidence dealt primarily
with defendant's trafficking in marijuana, and the district court
instructed the jury that it could convict the defendant for
trafficking in marijuana); United States v. Zingaro, 858 F.2d 94,
97 (2d Cir. 1988)(defendant was charged with RICO conspiracy
involving the extortion of gamblers, but the jury instructions
permitted a conviction based on the extortion of a non-gambler).
Likewise inapposite is United States v. Thomas, 274 F.3d 655 (2d
Cir. 2001), in which the conviction was reversed because of the
absence of any mention in the indictment of an essential element
of a charged offense.  Shelton does not claim that the indictment
in this case failed to allege an essential element of any of the
charged crimes.

Indictment, Count 2, ¶¶ 3-5.  The pre-1995 manipulation of general reserves, profit-sharing receivables, and the Essex and GETKO reserves had no bearing on the material falsity of CUC's 1997 second quarter Form 10-Q, however.

Likewise, Count 3 alleged mail fraud based on the mailing of an August 28, 1997 proxy statement containing materially false representations regarding CUC's earnings for its fiscal years ending January 31, 1996 and January 31, 1997, and the first fiscal quarter of its 1998 fiscal year.  Count 3, ¶¶ 2 and 3.  Count 4 alleged wire fraud based on the facsimile transmission of a February 2, 1998 schedule of CMS earnings for the fiscal year ending December 31, 1997.  Count 4, ¶¶ 2-3. Evidence of the conspirators' pre-1995 conduct also had no bearing on Counts 5 and 6, which alleged that Shelton caused the inclusion of false statements in reports required to be filed with the SEC, pertaining to CUC's Form 10-Q Report for the third fiscal quarter ending October 31, 1997, and Cendant's Form 10-K Report for the fiscal year ending December 31, 1997, respectively.

Finally, Counts 7 through 12 alleged that Shelton was guilty of securities fraud based on the purchase of Cendant stock by the Hartford Steam Boiler Company in January and February of 1998.  Because Corigliano's testimony about pre-1995 events was wholly inconsequential to the jury's verdicts on those counts,

Shelton is not entitled to a new trial based on the admission of that evidence. See Milstein, 401 F.3d at 66 (declining to reverse the convictions on counts other than those for which the improperly admitted evidence could have been, in accordance with the Court's instructions, the exclusive basis for conviction).

**B.    Shelton Has Failed to Demonstrate a Violation of His Sixth Amendment Right to Notice of the Charges.**

Shelton also seeks to repackage his meritless constructive amendment claim as a violation of his Sixth Amendment right to fair notice. Shelton Mem. 128. Dressing up the same claim in different legal clothing, however, does not change the proper result.[47]

A Sixth Amendment challenge that the indictment fails to provide fair notice of the charges is one that alleges "a defect in the indictment," and must be raised before trial pursuant to Fed. R. Crim. P. 12(b)(3)(B). See United States v. Murray, 618 F.2d 892, 899 (2d Cir. 1980)("Under Fed.R.Crim.P. 12(b)(2), objections based on defects in the indictment must be

---

[47] The purposes of both the specific pleading requirements and the variance doctrine are the same: to provide sufficient information to allow for the preparation of the defense; to permit a subsequent plea of double jeopardy; and to prevent the jury from convicting on a different crime than that charged by the grand jury. United States v. Brozyna, 571 F.2d 742, 745-46 (2d Cir. 1978).  In order to satisfy the Sixth Amendment notice clause, "[t]he Government need not recite all of its evidence in the indictment, nor is its trial proof limited to the overt acts specified" in the indictment." United States v. Marrero-Ortiz, 160 F.3d 768, 773 (1st Cir. 1998).

raised prior to trial.") Because Shelton merely claims that the trial evidence refers to events that were not described in the indictment, his claim implicates only the Fifth Amendment based doctrines of constructive amendment and variance, not the Sixth Amendment's fair notice provision.

In any event, Shelton's Sixth Amendment claim fails on its own terms. The Sixth Amendment is not violated merely because the indictment did not provide chapter and verse references to the pre-1995 events which were part of the charged crimes. This Court properly rejected similar arguments that were presented in Forbes' Pre-Trial Motion to Dismiss the Indictment for Lack of Fair Notice, Docket No. 195, filed April 25, 2003, and Forbes' Pre-Trial Motion to Dismiss Counts 2-4 and 7-16 on the Ground of Alleged Vagueness, Docket No. 201, filed April 25, 2003. It should reach the same result again now. See United States v. Bernstein, 533 F.2d 775, 785-86 (2d Cir. 1976); United States v. Sullivan, 2004 WL 253316, *2-4 (S.D.N.Y. 2004); United States v. Rittweger, 259 F.Supp.2d 275, 287-88 (S.D.N.Y. 2003); see generally United States v. Sabbeth, 262 F.3d 207, 218 (2d Cir. 2001); United States v. Alfonso, 143 F.3d 772, 776 (2d Cir. 1998); United States v. Stavroulakis, 952 F.2d 686, 693 (2d Cir. 1992). Shelton's Sixth Amendment complaint simply overstates the level of evidentiary detail to which he is entitled before trial under the Constitution. See Janati, 374 F.3d at 270-71 (an

185

indictment "readily meets [the notice] requirements" of the Fifth and Sixth Amendments where it charged a conspiracy to commit healthcare fraud over a specified period involving specified types of false claims, and identified representative overt acts in furtherance of the alleged conspiracy, but did not specify all of the false insurance claims during the course of the scheme); United States v. Parker, 165 F.Supp.2d 431, 444 (W.D.N.Y. 2001) ("[a]n indictment which complies with Rule 7(c)(1) satisfies the Sixth Amendment's requirement that the charge inform the defendant of the nature and cause of the accusation") (internal quotation marks omitted); United States v. Upton, 856 F.Supp. 727, 739 (E.D.N.Y. 1994)(the indictment satisfied the Sixth Amendment fair notice clause where it specified the inclusive dates of the fraudulent scheme, the purpose and nature of the scheme, the general nature of the means by which the scheme was executed (falsifying log books, works cards, and computer transactions), and the nature of the communications that furthered the scheme; indictment was not required to specify and describe each of the false communications that advanced the scheme).[48]

---

[48] Shelton's citation to United States v. Bortnovsky, 820 F.2d 572 (2d Cir. 1987) does not advance his claim.  That case involved a scheme to submit fraudulent insurance claims based on a series of staged burglaries.  Although the defendant submitted insurance claims for numerous burglaries, the Government contended that only some were staged.  Although the indictment did not identify which of the burglaries were staged, the

(continued...)

POINT VII

**CORIGLIANO'S AND PEMBER'S TESTIMONY WAS PROPER AND ADMISSIBLE**

(RESPONSE TO SHELTON POINT VII)

Shelton claims, as he did before and during the trial, that Corigliano's and Pember's testimony included improper and inadmissible opinions on accounting issues. Shelton Mem. Point VII, 129-133. This Court properly rejected this argument, as the challenged testimony was properly admitted because it was based on the witness's "inside information" about how the fraud was executed and why the publicly reported financial results of CUC were fraudulent. The challenged testimony dealt with Corigliano's and Pember's personal observations, and not their opinions. The witnesses essentially offered what they knew, what they did, and what they believed. They testified about events they participated in, as well as conversations and actions they

_____

(...continued)

district court rejected the defendant's request that the Government do so in a bill of particulars. 820 F.2d at 574. The Government then presented evidence about twelve of the burglaries, even though it claimed that only four were staged. The Government also presented numerous documents regarding the twelve burglaries, even though it claimed that only three of the documents were false. Id. Although the Government turned over 4,000 documents in discovery, the district court denied the defendant's request for a continuance based on his retention of new counsel only four days before trial. Under these circumstances, the Court of Appeals held that the district court had abused its discretion by denying the request for a bill of particulars. Id. Bortnovsky does not address a claim that the trial evidence departed so substantially from the indictment that Shelton was deprived of the fair notice of the "core of criminality" charged in the indictment.

187

observed during their years at CUC.

Corigliano and Pember testified that they understood the company's accounting policy (a fact), they knew of no factual basis or support for the topside and other charged accounting machinations (a fact), they knew they were making up CUC's financial numbers (a fact), they knew of no accounting principle that would permit them to make up the numbers (a fact), and that, as far as they knew, GAAP could not justify their conduct.

Corigliano and Pember did not need specialized knowledge to testify that they made up the numbers that found their way into CUC's press releases and financial reports. They testified primarily about the discrepancy between the numbers that they calculated and the numbers they reported. When Corigliano testified, in one of the examples of supposedly improper "lay opinion testimony" identified by Shelton, that the membership cancellation reserves for fiscal year 1991, as memorialized on CUC's general ledger, were "$9 million short" (Tr. 6277-78), he was not giving his "opinion" based on "scientific, technical, or other specialized knowledge." Rather, he was testifying that, by virtue of his position in the CUC accounting department at that time, he had personal knowledge about what the cancellation reserves were supposed to be, based on the historic cancellation rates that CUC had experienced. Tr. 6242, 6263-68. Corigliano also had personal knowledge about the

188

amount of cancellation reserves that were memorialized in the CUC

general ledger.  Tr. 6269-72.  Subtracting the amount that

membership cancellation reserve should have been and the amount

that had actually been set aside to yield a difference of nine

million dollars is not a matter about which "scientific,

technical, or other specialized knowledge" is required.  Rather,

it is a fact, not an opinion, that derives from third grade level

mathematics, for which expert testimony is wholly unnecessary.

See Commentary to 2000 Amendments to Rule 701 (permissible "lay

testimony 'results from a process of reasoning familiar in

everyday life,' while expert testimony 'results from a process of

reasoning which can be mastered only by specialists in the

field,'" citing State v. Brown, 836 S.W.2d 530, 549 (Tenn. 1992);

see United States v. Misle Bus & Equip. Co., 967 F.2d 1227, 1234

(8th Cir. 1992) (lay testimony as to whether "agreements" to fix

prices had been reached was properly admitted, because words such

as "agreement," "understanding," and "promise" have well

established meanings that do no require a conclusion as to the

legal implications of the conduct).

        Simply because the conspirators' fraudulent actions

also resulted in violations of GAAP does not mean that they had

to be qualified as experts before telling the jury what they did,

why they did it, and what they understood to be the results of

their actions.  Their testimony about relatively straightforward

189

facts and the easily understood inferences arising from those
facts did not rely on "scientific, technical, or other
specialized knowledge within the scope of Rule 702," and did not
amount to improper lay opinion testimony that is prohibited by
Rule 701.  See Fed. R. Evid. 701, Advisory Committee's Note, 2000
Amendment (revised Rule 701 does not prohibit testimony about
"manner of conduct" or "an endless number of items that cannot be
described factually in words apart from inferences.")

        An analogy may help to illuminate this point.  A
wildlife biologist who conducted a census of the fish in a
particular lake could testify, consistent with Rule 701, that he
caught, tagged, and released 400 different fish of six inches or
more during a one month period, but that he falsely wrote in his
report that he counted 700 such fish.  Such testimony would not
require specialized knowledge because it is understandable to a
lay juror, regardless of whether or not the juror is schooled in
ichthyology.  See Soden v. Freightliner Corp., 714 F.2d 498,
510-12 (5th Cir. 1983)(lay witness's conclusion had a rational
basis because it would have been apparent to anyone with the same
perceptions, knowledge, and experience as the witness); see also
In re Merritt Logan, Inc., 901 F.2d 349, 360 (3d Cir. 1990)
(noting modern trend favors admission of opinion testimony if
founded on witness's personal knowledge and susceptible to cross-
examination).  If however, the witness sought to testify that he

190

had concluded, based on his examination of the fish that he had captured and released, that they had been exposed to certain water-borne toxins, such testimony would be subject to the requirements of Rule 702.  See United States v. 0.59 Acres of Land, 109 F.3d 1493, 1495-96 (9th Cir. 1997) (homeowner's lay opinion about the effects of electromagnetic fields on the value of her home was inadmissible).

     To the extent that any of Corigliano's or Pember's testimony expressed an opinion (as opposed to a factual assertion based on a witness's personal knowledge), that opinion was well supported by the witness' business experience, developed during years of employment with CUC and the defendants, and helpful to the jury's understanding of the disputed factual issues.  Any such testimony was not based on any specialized knowledge, expertise, or skill.  See Teen-Ed, Inc. v. Kimball Int'l, Inc., 620 F.2d 399, 403 (3d Cir. 1980) (witness's personal knowledge of company's balance sheets acquired in course of his accounting duties "was clearly sufficient under Rule 602 to qualify him as a witness eligible under Rule 701 to testify to his opinion of how lost profits could be calculated and to inference that he could draw from his perception of Teen-Ed's books."); see also United States v. Fawaz, 881 F.2d 259, 266-67 (6th Cir. 1989) (accountant's testimony about how defendant's tax return was prepared was admissible because the witness was asked about his

191

own direct knowledge of returns in the context of his knowledge
of defendant's personal financial condition at the time).

        The Advisory Committee's Note to Rule 701 is clear:
business executives (such as Corigliano and Pember) can
permissibly testify about their companies' financial practices,
the manner in which their companies conduct business, and the way
in which their companies may have been damaged by tortious or
criminal conduct.  This type of testimony is admissible because
of the executive's "knowledge and participation in the day-to-day
affairs of the business."  Fed. R. Evid. 701, Advisory
Committee's Note (describing holding in <u>Lightning Lube, Inc. v.
Witco Corp.</u>, 4 F.3d 1153 (3d Cir. 1993), <u>overruling on other
grounds recognized by Lithuanian Commerce Corp., Ltd. v. Sara Lee
Hosiery</u>, 214 F. Supp. 2d 453, 458 (D.N.J. 2002)).  Stated
differently, a corporate insider's opinion testimony about the
company:

> is admitted not because of experience, training or
> specialized knowledge with the realm of an expert,
> but because of the particularized knowledge that
> the witness has by virtue of his or her position
> in the business.  The [2000] amendment [to Rule
> 701] does not purport to change this analysis.

<u>Id.</u>  As the Advisory Committee's Note to Rule 701 notes, "most
courts have permitted the owner or <u>officer of a business</u> to
testify to the <u>value of projected profits of the business</u>,
without the necessity of qualifying the witness as an accountant,
appraiser, or similar expert."  Fed. R. Evid. 701, Advisory

192

Committee's Note (emphases added).

Here, the witnesses testified about discrepancies between what the company earned and what the company said that it earned.  They did not testify in an expert capacity regarding GAAP.  Their testimony was admissible because it was supported by an adequate foundation, namely their personal and particularized knowledge about CUC's accounting practices and actions.  See Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256, 265 (2d Cir. 1995) (president of company could testify as to how lost profits could be calculated since testimony was based on his personal knowledge of the business); Wactor v. Spartan Transp. Corp., 27 F.3d 347, 351 (8th Cir. 1994) (witnesses could testify about the improper procedure of employing lock lines on tows through locks since it was based on their perceptions and experience); Lightning Lube, 4 F.3d at 1175 (company's founder "not required to qualify as an expert to offer opinion testimony concerning [his business's] lost profits."); Williams Entersprises, Inc. v. Sherman R. Smoot Co., 938 F.2d 230, 234 (D.C.Cir. 1991) (broker permissibly testified as a lay witness based on facts, such as account history, of which he had personal knowledge); Merritt Logan, 901 F.2d at 360 ("Mr. Logan's personal knowledge of his business . . . [was] sufficient to make [this] witness[] eligible under Rule 701 to testify as to how lost profits could be calculated."); see generally DIJO, Inc. v.

Hilton Hotels Corp., 351 F.3d 679, 685 (5th Cir. 2003)
(recognizing that the 2000 amendment to Federal Rule of Evidence
701 "'did not place any restrictions on the pre-amendment
practice of allowing business owners or officers to testify based
on particularized knowledge derived from their
position.")(emphases added).

Even if Corigliano or Pember could have been qualified
as an expert, that did not prevent them from offering non-expert
testimony based on their personal knowledge about CUC's
accounting practices. See Teen-Ed, 620 F.2d at 403 ("The fact
that Zeitz [the company's accountant] may have been able to
qualify as an expert witness on the use of accepted accounting
principles in the calculation of business losses should not have
prevented his testifying on the basis of his knowledge of
appellant's records about how lost profits could be calculated
from the data contained therein.")(emphasis added).  The Court
properly rejected this argument during the trial and should do so
again.

In any event, none of the challenged testimony is cause
for a new trial.  "An error in admitting evidence is harmless if
'the . . . court can conclude with fair assurance that the
evidence did not substantially influence the jury.'"  United
States v. Edwards, 342 F.3d 168, 178 (2d Cir. 2003) (erroneous
admission of a note containing a cocaine-cutting recipe was

harmless, where the remaining evidence of the defendant's guilt
was overwhelming)(quoting United States v. Garcia, 291 F.3d 127,
143 (2d Cir. 2002) and United States v. Rea, 958 F.2d 1206, 1220
(2d Cir. 1992)).  Pember's and Corigliano's testimony that CUC's
accounting was improper, and explaining the reasons why it was
improper, and the quantitative effects of that impropriety, all
dealt with matters that Shelton never contested at trial.  See
generally Neder v. United States, 527 U.S. 1, 16-17 (1999)
(omission of "materiality" element of several of the charged
crimes was harmless beyond a reasonable doubt, where the
defendant never contested the materiality of the false statements
at issue).

        Shelton's sole defense to the charges was that he was
ignorant of the fraud; his lawyer conceded during his opening
that there was no dispute that Corigliano and others perpetrated
a massive fraud by overstating CUC's publicly reported earnings.
Tr. 117.  Shelton presented no evidence which contradicted the
Government's proof of the fraud, and never argued in summation
that the fraud did not occur, that it was not as extensive as the
Government's evidence showed, or that the overstatement of CUC's
publically reported earnings was less than Brian Heckler
testified that it was.

        To the contrary, Shelton's lawyer vigorously attacked
Corigliano and Pember as serial liars who were so adept that they

fooled not only Shelton but other high-ranking CUC officials such
as McLeod and Menchaca, as well as the E&Y auditors about the
fraud.  Tr. 8266-68.  Shelton's lawyer urged the jury, as Shelton
now urges this Court, to discredit Corigliano's and Pember's
precisely because they were master liars who carried out the
fraud.  Tr. 15594.

        Additionally, Shelton is in no position to complain
that the Government elicited improper expert opinion testimony
from Corigliano and Pember regarding their understanding of the
fraud and how it worked, as Shelton's lawyer elicited testimony
from both of those witnesses that bore far more heavily on their
accounting expertise than anything elicited by the Government. [49]

---

[49] E.g., Tr. 3232 (Pember knew that CUC's accounting practices
violated GAAP and were "wrong"); Tr. 8197-8201 (Corigliano knew
that the accounting practices were improper;  Corigliano
intentionally violated the basic rules of GAAP); Tr. 8212
(according to Corigliano, one cannot properly use a merger
reserve to cover a shortfall between budgeted and actual
earnings); Tr. 8225, 8406 (according to Corigliano, a merger
reserve, when properly used, should have no impact on operating
income); Tr. 8367 (Corigliano testifying that litigation costs
must be estimated in order to establish a merger reserve); Tr.
8489 (Corigliano acknowledging the existence of professional
accounting literature regarding merger reserves); Tr. 8625, 8643-
44 (Corigliano explaining that if a "cushion" is deliberately
created in a reserve, "that would go against the accounting
rules," and that GAAP is clear on that issue); Tr. 8626-29
(Corigliano responding to hypothetical questions about how to
make good faith estimates about future litigation expenses in
order to properly establish a merger reserve); Tr. 8628-29
(Corigliano testifying that, "based on his experience and
background as a CPA," the proper way to reduce a merger reserve
by a known excess amount is to increase income by that amount,
isolate it as separate line item, and recognize a one-time income
for reversal of merger reserves); Tr. 8922 (Corigliano knew that
                                                (continued...)

Although Shelton now complains that Pember and Corigliano should not have been permitted to testify that there was "no basis" for CUC's reported financials, he elicited precisely that testimony repeatedly during his cross-examination of those witnesses.[50]

Because Shelton did not contest the Government's evidence that Corigliano and Pember were highly knowledgeable about the fraud, but to the contrary, embraced and exploited that evidence, Corigliano's and Pember's challenged testimony regarding the existence, methods, and scope of the fraud "was unimportant in relation to everything else the jury considered during the trial." United States v. Yousef, 327 F.3d 56, 122 (2d Cir. 2003)(admission of letter containing references to uncharged criminal conduct, even if erroneous, was harmless). Accordingly, admission of that testimony could not create reversible error.

_____

[49](...continued)
reversing reserves into revenue was a violation of GAAP, that it would increase operating income, and that it was wrong); Tr. 8982 (Corigliano testifying that, in his professional opinion, the reserve adjustments of $165 million proposed at the March 6, 1998 meeting violated GAAP); Tr. 9006-07 (Corigliano testifying about the treatment of non-recurring income under GAAP); Tr. 9099 (Corigliano testifying that the use of merger reserves at CUC violated GAAP).

[50] E.g., Tr. 2994-96 (Pember had "a lot of practice . . . arbitrarily making up the numbers" at CUC); Tr. 3154 (Pember acknowledging that the investing public was not privy to the information about the inflation of CUC's reported earnings); Tr. 8282 (Corigliano testifying that the topside adjustments at CUC had no basis in fact, they were made to hit the earnings targets, "somebody just made up the numbers as part of the adjustments"); Tr. 8730 (Corigliano acknowledging that "the numbers were made up"); Tr. 8742 (Corigliano acknowledging that he "arbitrarily" picked numbers between the quarters).

See <u>United States v. Taylor</u>, 253 F.3d 1115, 1117 (8th Cir. 2001)
(even if the admission of expert testimony regarding handwriting
identification was erroneous, it was harmless, where the
defendant admitted that some of the exemplars were in his
handwriting); <u>see</u> <u>also</u> <u>United States v. Rodriguez</u>, 356 F.3d 254,
260-61 (2d Cir. 2004)(any error in the admission of testimony
regarding the defendant's alien status was harmless, where there
was overwhelming evidence to support that fact).  For that reason
as well, this claim should be rejected.

POINT VIII

**THE COURT PROPERLY DENIED SHELTON'S BLEATED REQUEST
<u>TO FORCE THE GOVERNMENT TO IMMUNIZE A DEFENSE WITNESS</u>**

**(RESPONSE TO SHELTON POINT VIII)**

During the defense case, defendant Forbes moved for an
order requiring the Government to confer immunity on Bell, whom
the defense subpoenaed.  <u>See</u> Docket Nos. 1207 and 1210, filed
September 27, 2004, and Docket No. 1252, filed October 4, 2004.
Thereafter, Shelton joined the motion.  In denying the motions,
the Court properly ruled that the defense had not made the
requisite showing to obtain such extraordinary relief.  <u>See</u> Tr.
13698-13705, 14550.

Shelton now claims that this Court erred in not
requiring the Government to confer immunity on  Bell.  Shelton
Mem. Point VIII, 133-138.  Because Shelton failed to show (during
trial and in his current motion for a new trial) that Bell's

198

purported testimony would be exculpatory of Shelton, Shelton was

not entitled to the extraordinary relief he sought.  Quite

simply, the Court properly denied the defense's belated[51] trial

motion to compel the United States to grant Bell immunity.

Accordingly, Shelton is not entitled to a new trial on this

ground.

This is not a case where Shelton claims that Bell

provided exculpatory evidence: (a) to a grand jury; (b) during an

interview with the United States; (c) while testifying under oath

in another matter; or (d) in an affidavit or a written statement.

On the contrary, there is no evidence in any record whatsoever to

believe that Bell could provide any testimony that would

exculpate Shelton.[52]  That Bell's lawyer purportedly told Forbes'

counsel -- in an off the record conversation -- that his client

(Bell), if immunized, would deny committing fraud at CUC, is

hardly the type of "evidence" that would warrant a grant of

immunity or judicial intervention.  It is hard to imagine a

criminal defense lawyer who represents a witness planning to

---

[51] The Court correctly noted that the defense waited until
virtually the end of the trial to first suggest that Bell was
entitled to immunity even though the defense knew before trial
that Bell would refuse to testify.  Tr. 13698.

[52] Testimony at trial from Corigliano, Kearney and Albright
indicated that Bell was involved in fraudulent accounting.  See,
e.g., Tr. 6257-60, 6302-03, 6320-26, 6343-44, 6351-61,
(Corigliano); Tr. 9714-16, 9727-34 (Kearney); Tr. 3890-98
(Albright).

assert his Fifth Amendment privilege that would not make a similar off the record claim for public consumption.  The "evidence" that the defense promoted in their motion to the Court can be little more than speculation that Bell <u>might</u> exculpate the defendants (including Shelton) in the course of exculpating himself.  These circumstances are hardly "extraordinary."[53]

---

[53] Forbes' counsel recognized the deficiency in their submission and candidly acknowledged that it was the "best that we could do under the circumstances."  Tr. 13700.

A.    **The Government Was Not Required to Confer Immunity on a
      Defense Witness Absent Extraordinary Circumstances and the
      Court Was Not Empowered to Grant Judicial Immunity.**

       In the Second Circuit, the general rule, (which Shelton
does not dispute) is that the Government is not required to
confer immunity for the benefit of the defense.  United States v.
Dolah, 245 F.3d 98, 105 (2d Cir. 2001) citing United States v.
Turkish, 623 F.2d 769, 777 (2d Cir. 1980), abrogated on other
grounds, Crawford v. Washington, 541 U.S. 36 (2004).  Similarly,
the Second Circuit has rejected the notion of judicially-ordered
immunity.  See Dolah, 245 F.3d at 105 n.5 (noting that Second
Circuit has adopted the "carrot-and-stick" approach rather than
"judicially-granted immunity"); United States v. Bahadar, 954
F.2d 821, 824-27 (2d Cir. 1992) (same).  Under the "carrot-and-
stick" approach, if the defendant can satisfy a three-part test,
the Government must grant the defense witness immunity or risk
dismissal of the indictment.  Bahadar, 954 F.2d at 827.

       The three-part test that Shelton was required to
satisfy before placing the Government in a position to choose
whether to confer immunity on a defense witness is as follows:

> First, the district court must find that the government
> has engaged in discriminatory use of immunity to gain a
> tactical advantage or, through its own overreaching,
> has forced the witness to invoke the fifth amendment.
> Second, the witness's testimony must be material,
> exculpatory, and not cumulative.  Third, the testimony
> must be unobtainable from any other source.

Bahadar, 954 F.2d at 826.  See also Dolah 245 F.3d at 105, citing

<u>United States v. Burns</u>, 684 F.2d 1066, 1077 (2d Cir. 1982) (three part test must be satisfied to compel the United States to grant immunity).

Shelton can cite no case from this Circuit where a defendant has satisfied this extraordinary showing by submitting a declaration of a defense lawyer purporting to describe what the witness's lawyer claims his client would do if immunized.  <u>See</u> <u>Turkish</u>, 623 F.2d at 772 (claims for defense witness use immunity have been uniformly rejected by the Second Court).  Like all other defendants before him, Shelton has not made the requisite showing with respect to Bell.  Thus, the Court properly ruled that the defense had not met its burden to compel the United States to grant immunity to Bell.

Moreover, the United States did not engage in any discriminatory use of immunity in this case to gain a tactical advantage over the defense.  <u>See</u> Tr. 13703-04 (Government explained that no one had received immunity in this case).  Nor did the United States engage in any action that could possibly constitute overreaching.  Quite simply, it did not force Bell to claim that he would invoke his Fifth Amendment privilege if called to testify by the defense.  Rather, Bell and his lawyer apparently made that decision on their own.  <u>United States v.</u> <u>Washington</u>, 398 F.3d 306, 310-311 (4th Cir. 2005)(district court properly declined to compel the Government to immunize a witness

so that he could testify for the defense, where the defendant "proffered no evidence that [the witness] had been coerced into asserting his Fifth Amendment privilege by threats of prosecution").

**B.    Shelton's Reliance on the Westerdahl Case is Misplaced.**

Shelton attempts to analogize this case to United States v. Westerdahl, 945 F.2d 1083 (9th Cir. 1991)(some witnesses granted immunity but not a witness who was prepared to testify that the defendant did not participate in a robbery). As the Court concluded during trial (See Tr. 13698-99), Westerdahl is inapposite. Shelton has failed to demonstrate that the Government made discriminatory use of immunity. The Government never denied Bell an opportunity to enter a cooperating plea agreement (like Corigliano, Pember and Sabatino) or to provide a proffer to the Government pursuant to a proffer agreement (like Kearney). Because Bell unilaterally declined to enter into any such arrangements, the Government did not engage in any conduct vis-a-vis Bell that was designed to gain a tactical advantage over Shelton at trial.[54]

---

[54] Nor is Shelton in any position to determine what interest the Government has in investigating or prosecuting Bell.  Shelton Mem. 134.  The decisions about: whether to pursue an investigation, the manner in which to pursue it, whether to present charges to a grand jury, what charges to present, and when to present them are solely within the province of the Department of Justice.  United States v. George, 363 F.3d 666, 672 (7th Cir. 2004)(the Government permissibly exercised its discretion not to immunize a proposed defense witness who was
(continued...)

Nor has Shelton shown that Bell's immunized testimony would have been material, non-cumulative exculpatory evidence regarding Shelton. See Bahadar, 954 F.2d at 826. The declarations of Forbes' lawyers (which Shelton joined but did not supplement) were woefully insufficient in this regard. That Bell's counsel supposedly believed that Bell would deny that he committed any fraud while he was at CUC before 1995 would not have contradicted Corigliano's testimony that he and Shelton conspired to commit the fraud from 1995 to 1998 with persons other than Bell.[55] That Bell's counsel purportedly believes that Bell would have testified that the accounting at CUC during Bell's tenure as CFO was proper would have done nothing to repudiate Shelton's concession at trial that Corigliano, Pember, and others engaged in a "big [accounting] fraud" at CUC. Nor does Shelton demonstrate that, had he been immunized, Bell would have testified that Shelton did not conspire with Corigliano or others after Bell left CUC in 1995. Thus, Shelton cannot satisfy

---

[54](...continued)
involved in the charged fraudulent schemes, where "the government would gain nothing and the immunity would hinder future actions").

[55] While Shelton now suggests that Bell could have refuted Corigliano's testimony about fraud taking place during Bell's tenure, Shelton argued to the jury the exact opposite -- that Bell and Corigliano were both engaged in fraud during Bell's tenure. See Tr. 15471 (fraud was ongoing before 1995); 15528 (Bell was Corigliano's mentor); 15530 (Corigliano was a disciple of Bell); 15531 (Bell recommended Corigliano to be CFO as an insurance policy to prevent Corigliano from blowing the whistle on Bell).

the second prong of the three part test.  United States v. Alvarez, 358 F.3d 1194, 1216 (9th Cir. 2004)(district court properly declined to direct the Government to immunize a proposed defense witness, where "nothing in her proposed testimony would have directly contradicted that of the immunized government witnesses")(emphasis in original).

Finally, Shelton can not demonstrate that the whatever information he sought from Bell could not be obtained from other sources.  If Shelton believed that the pre-1995 documents offered in evidence did not reflect accounting that intentionally violated GAAP, he was always free to provide evidence on this subject by asking his own highly qualified and compensated expert, Professor Roman Weil, to shed light on that subject. Shelton also could have called other witnesses who worked in the CUC Accounting Department during Bell's tenure as CFO.  While Corigliano, Pember and Kearney all mentioned Bell in their testimony, they were not the only Accounting Department employees at CUC who worked under Bell.

Shelton thoroughly cross-examined at trial all of the witnesses who were involved in accounting at CUC under Bell, i.e., Corigliano, Kearney, Sabatino and Pember.  Shelton himself testified about events at CUC while Bell was CFO.  Bell's refusal to testify without immunity did not prevent Shelton from arguing in the alternative that: (a) Corigliano's testimony was false

205

regarding all matters (including Bell's involvement and the pre-
1995 fraud); and (b) that Bell and Corigliano engaged in fraud
together during the pre-1995 period without Shelton's
involvement.  Shelton did not and can not satisfy any prong of
the three part test that would have required the United States to
confer immunity on Bell for Shelton's benefit.  Shelton has
offered no reason for this Court to reverse its well reasoned
ruling during trial, rejecting this claim.

**POINT IX**

**THE COURT PROPERLY DENIED SHELTON'S
REQUEST FOR A MISSING WITNESS INSTRUCTION**

**(RESPONSE TO SHELTON POINT IX)**

Realizing the deficiency of his immunity claim, Shelton
argues that this Court erred by declining to give a missing
witness instruction regarding Bell.  Shelton Mem. Point IX, 138-
39.  This argument is particularly unwarranted where the witness,
Bell, was equally unavailable to both the United States and the
defense.

A witness who invokes the privilege against self
incrimination is "unavailable" even though the Government has the
power to grant immunity.  Dolah at 102.  No missing witness
instruction should be given with respect to such a witness who is
unavailable to both sides.  United States v. Myerson, 18 F.3d
153, 158 (2d Cir. 1994) (despite the government's power to grant
immunity, a witness invoking his constitutional rights is

206

unavailable to the government as well as the defense, and no missing witness charge need be given).  Given Forbes' long-term social and business relationship with Bell, and Shelton's lengthy working relationship with Bell, the Government had no greater power to convince Bell to testify than did the defense.  The only appropriate action, which the Court undertook, was to give no missing instruction regarding Bell.

Accordingly, Shelton is not entitled to a new trial on this issue.

### POINT X

### <u>SHELTON IS NOT ENTITLED TO A JUDGMENT OF ACQUITTAL</u>

### (NOT BRIEFED BY SHELTON)

While Shelton purports to style his post trial memorandum as a motion for a judgement of acquittal pursuant to Rule 29, Fed. R. Crim. P., he made no effort to brief this motion.  Indeed, in viewing the evidence in the light most favorable to the Government, Shelton could not possibly argue (and he did not argue) that he is entitled to a judgment of acquittal.  Thus, Shelton's motion for a judgment of acquittal should be summarily denied.  <u>See</u> <u>United States v. Milikowsky</u>, 896 F.Supp. 1285, 1312-13 (D. Ct. 1994) (where "Court has already determined that the evidence presented by the government was sufficient for purposes of withstanding a motion for a new trial pursuant to Fed. R. Crim. P. 33 . . . [and] [b]ecause the

207

Defendants must meet a standard significantly more stringent than that for a new trial in order to obtain a judgment of acquittal, the Defendants' motion for judgment [of acquittal] must be denied, a fortiori."); <u>United States v. Davis</u>, 397 F.3d 173, 181 (3d Cir. 2005)("Because the power to grant a motion for a new trial is broader than the court's power to grant a motion for a judgment of acquittal, our determination that defendants are not entitled to a new trial means that they are similarly not entitled to a judgment of acquittal").

Therefore, Shelton's Rule 29 motion should be summarily denied.

208

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court deny Shelton's Motion for a Judgment of Acquittal and a New Trial. The time has come for Shelton to be sentenced for his criminal conduct.

Respectfully submitted,

CHRISTOPHER J. CHRISTIE
Special Attorney
U.S. Department of Justice


By:  JOHN J. CARNEY
Special Attorney
U.S. Department of Justice
Federal Bar No. 24063


By:  NORMAN GROSS
Special Attorney
U.S. Department of Justice
Federal Bar No. 24933


By:  JAMES MCMAHON
Special Attorney
U.S. Department of Justice
Federal Bar No. 24062


By:  RICHARD J. SCHECHTER
Special Attorney
U.S. Department of Justice
Federal Bar No. 24238

Dated: May 19, 2005
Newark, New Jersey

209

<u>CERTIFICATE OF SERVICE</u>

      The undersigned certifies that on this day I caused to be served copies of the foregoing upon the following via email delivery:

      Thomas P. Puccio, Esq.
      Scott Edelman, Esq.
      Thomas Arena, Esq.
      Hope C. Seeley, Esq.

      I declare under penalty of perjury that the foregoing is true and correct.

_____
DEBRA ELLIOTT
U.S. Department of Justice

Dated: May 19, 2005
      Newark, New Jersey