**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |  |
|---|---|---|
|  | : |  |
| UNITED STATES OF AMERICA, | : | No. 3:02 CR 264 (AWT) |
|  | : |  |
| v. | : |  |
|  | : |  |
| WALTER A. FORBES, and | : | June 8, 2005 |
| E. KIRK SHELTON. | : |  |
|  | : |  |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION OF**
**DEFENDANT E. KIRK SHELTON FOR A JUDGMENT OF**
**ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29 OR**
**FOR A NEW TRIAL PURSUANT TO FED. R. CRIM. P. 33**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.................................................................................iv

PRELIMINARY STATEMENT ...........................................................................1

REPLY TO THE GOVERNMENT'S STATEMENT OF FACTS.............................3

I.     SHELTON DID NOT DIRECT CORIGLIANO TO ENGAGE IN
FRAUDULENT ACTIVITY ........................................................................3

II.    THE FORECASTS .....................................................................................5

III.   THE MERGER WITH HFS .........................................................................7

IV.   SHELTON'S LACK OF ANY ROLE IN THE CREATION OF THE CENDANT
MERGER RESERVE...................................................................................8

V.    THE "BLOW YOUR OWN HORN" EMAIL -- GX 506...............................10

VI.   THE JANUARY 1998 RESERVE REVERSAL............................................12

VII.  THE "GOOD NEWS/BAD NEWS" EMAIL -- GX 519................................13

VIII. THE DISCUSSION WITH SCOTT FORBES AND MIKE MONACO ABOUT
RESERVE ADJUSTMENTS TO NUMA/NAOG ........................................15

IX.   MONACO'S TESTIMONY DID NOT INCRIMINATE SHELTON ..........................16

X.    SABATINO'S TESTIMONY DID NOT INCRIMINATE SHELTON ........................17

      A.    The Alleged "Tear Up" Meeting .....................................................17

      B.    The Alleged "Pop-In" Conversation.................................................19

XI.   KEARNEY'S TESTIMONY DID NOT INCRIMINATE SHELTON .........................21

XII.  ALBRIGHT'S TESTIMONY DID NOT CORROBORATE CORIGLIANO'S
TESTIMONY ..........................................................................................22

XIII. SPEAKS' AND SCOTT FORBES' TESTIMONY DID NOT CORROBORATE
CORIGLIANO AND PEMBER ..................................................................23

XIV. MENCHACA'S TESTIMONY DID NOT CORROBORATE PEMBER ....................24

XV.  SHELTON'S OWN TESTIMONY WAS NOT INCRIMINATING ...........................25

A.    Shelton's Purported Receipt Of The Consolidations..........................................25

B.    Shelton Did Not Commit Perjury In Connection With The Plane Expense ........26

C.    Shelton Did Not Commit Perjury Regarding GX 530 -- A One-Page
       Document Reflecting CUC's 1998 Budget.........................................................28

D.    Shelton Did Not Commit Perjury Regarding An Interval Cover Story...............32

ARGUMENT ........................................................................................................................34

I.    THE COURT SHOULD ORDER A NEW TRIAL IN THE INTERESTS OF
       JUSTICE PURSUANT TO FED. R. CRIM. P. 33 (REPLY TO GOVERNMENT
       POINT I)..........................................................................................................................34

II.   THE EVIDENCE ESTABLISHED THAT CORIGLIANO AND PEMBER
       COMMITTED PERJURY AT TRIAL (REPLY TO GOVERNMENT POINT II)........38

A.    The Evidence Established That Corigliano Committed Perjury At Trial ............38

B.    The Evidence Established That Pember Committed Perjury At Trial.................42

III.  THE CONSCIOUS AVOIDANCE INSTRUCTION WAS IMPROPER (REPLY
       TO GOVERNMENT POINT III) ....................................................................................47

A.    The Conscious Avoidance Charge Effected A Constructive Amendment of
       the Indictment....................................................................................................47

B.    There Was No Evidence From Which A Reasonable Jury Could Infer That
       Shelton Harbored An Actual Suspicion That CUC Was Likely Engaged In
       Accounting Fraud ..............................................................................................48

C.    No Reasonable Jury Could Find That Shelton Remained Deliberately
       Blind...................................................................................................................55

D.    The Conscious Avoidance Instruction Was Not Harmless Error.......................57

IV.   THE COURT IMPROPERLY ADMITTED EVIDENCE RELATING TO
       WALTER FORBES' PLANE EXPENSE CHARGE (REPLY TO
       GOVERNMENT POINT IV) ..........................................................................................60

A.    Evidence Relating To Walter Forbes' Plane Expenses Was Not Probative
       Of The Charged Conspiracy..............................................................................60

B.    Evidence Relating To Walter Forbes' Plane Expenses Was Not
       Admissible As Similar Act Evidence Under Rule 404(b) ..................................63

C.    The Introduction Of Evidence Relating To Walter Forbes' Plane Expenses
       Was Unfairly Prejudicial....................................................................................63

V.    OLLER'S TESTIMONY WAS IMPROPERLY ADMITTED (REPLY TO
      GOVERNMENT POINT V) ...........................................................................64

      A.    The Memoranda Do Not Satisfy The Requirements Of Fed. R. Evid.
            803(5) ...........................................................................................................64

      B.    Oller's Testimony Was Improper Under *United States v. Almonte*, 956
            F.2d 27 (2d Cir. 1992) ..................................................................................66

VI.   THE INTRODUCTION OF EVIDENCE CONCERNING ALLEGED
      MISCONDUCT PRIOR TO 1995 CONSTITUTED A CONSTRUCTIVE
      AMENDMENT OF AND A PREJUDICIAL VARIANCE TO THE
      INDICTMENT, AND A VIOLATION OF SHELTON'S SIXTH AMENDMENT
      RIGHTS (REPLY TO GOVERNMENT POINT VI)..................................................69

      A.    Shelton Demonstrated A Constructive Amendment Of The Indictment ............70

      B.    Shelton Demonstrated A Violation Of His Sixth Amendment Right To
            Notice Of The Charges ..................................................................................74

VII.  THE COURT IMPROPERLY ALLOWED CORIGLIANO AND PEMBER TO
      OFFER EXPERT TESTIMONY ON TECHNICAL ACCOUNTING ISSUES
      (REPLY TO GOVERNMENT POINT VII) .................................................................76

VIII. THE COURT IMPROPERLY DECLINED TO REQUIRE THE
      GOVERNMENT TO IMMUNIZE STUART BELL (REPLY TO
      GOVERNMENT POINT VIII).....................................................................................80

      A.    The Government Gained A Tactical Advantage In Refusing To Immunize
            Stuart Bell....................................................................................................80

      B.    Bell Would Have Been A Critical Witness Whose Testimony Was
            Material, Exculpatory And Non-Cumulative ..................................................80

      C.    The Government Gained A Tactical Advantage In Refusing To Immunize
            Stuart Bell....................................................................................................81

IX.   THE COURT IMPROPERLY DECLINED TO GIVE THE JURY A MISSING
      WITNESS INSTRUCTION (REPLY TO GOVERNMENT POINT IX) .....................82

X.    SHELTON IS ENTITLED TO A JUDGMENT OF ACQUITTAL PURSUANT
      TO FED. R. CRIM. P. 29 (REPLY TO GOVERNMENT POINT X)...........................83

CONCLUSION .................................................................................................................84

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Arthur Andersen LLP v. United States,*
   544 U.S. ___, No. 04-368, slip op. at 9 (May 31, 2005) ....................................................50

*Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.,*
   168 F. Supp. 2d 57 (S.D.N.Y. 2001) ........................................................................68, 69

*Danis v. USN Communications, Inc.,*
   121 F. Supp. 2d 1183 (N.D. Ill. 2000) ...............................................................................62

*In re Campbell Soup Co. Sec. Litig.,*
   145 F. Supp. 2d 574 (D.N.J. 2001) ....................................................................................62

*Palermo v. United States,*
   360 U.S. 343 (1959) ...........................................................................................................67

*Russell v. United States,*
   369 U.S. 749 (1962) ...........................................................................................................75

*United States v. Aina-Marshall,*
   336 F.3d 167 (2d Cir. 2002) ..............................................................................................50

*United States v. Almonte,*
   956 F.2d 27 (2d Cir. 1992) ..........................................................................66, 67, 68, 69

*United States v. Autuori,*
   No 3:96-CR-161 (EBB), 1998 WL 774232 (D. Conn. Aug. 28, 1998), *aff'd in*
   *part, rev'd in part,* 212 F.3d 105 (2d Cir. 2000) ...................................................... passim

*United States v. Bortnovsky,*
   820 F.2d 572 (2d Cir. 1987) ..............................................................................................75

*United States v. Cohen,*
   518 F.2d 727 (2d Cir. 1975) ..............................................................................................72

*United States v. Danielson,*
   199 F.3d 666 (2d Cir. 1999) ..............................................................................................70

*United States v. Ferrarini,*
   219 F.3d 145 (2d Cir. 2000) ..............................................................................................58

*United States v. Frank,*
   156 F.3d 332 (2d Cir. 1998) ..............................................................................................73

*United States v. Glen,*
   312 F.3d 58 (2d Cir. 2002) ................................................................................................77

*United States v. Gold,*
   743 F.2d 800 (11th Cir. 1984) ...........................................................................................51

*United States v. Helmsley,*
   985 F.2d 1202 (2d Cir. 1993) ............................................................................................46

*United States v. Janati,*
   374 F.3d 263 (4th Cir. 2004) ......................................................................................73, 74

*United States v. Mang Sun Wong,*
   884 F.2d 1537 (2d Cir. 1989) ............................................................................................52

*United States v. Milstein,*
  401 F.3d 53 (2d Cir. 2005) ................................................................ 47, 71, 72

*United States v. Mollica,*
  849 F.2d 723 (2d Cir. 1988) ........................................................................ 73

*United States v. Myerson,*
  18 F.3d 153 (2d Cir. 1994) .......................................................................... 82

*United States v. Pattino,*
  962 F.2d 263 (2d Cir. 1992) ........................................................................ 70

*United States v. Pirro,*
  212 F.3d 86 (2d Cir. 2000) .......................................................................... 75

*United States v. Reyes,*
  302 F.3d 48 (2d Cir. 2002) .......................................................................... 59

*United States v. Strother,*
  49 F.3d 869 (2d Cir. 1995) .......................................................................... 67

*United States v. Svoboda,*
  347 F.3d 471 (2d Cir. 2003) ........................................................ 51, 52, 55, 59

*United States v. Thomas,*
  274 F.3d 655 (2d Cir. 2001) ........................................................................ 70

*United States v. Walker,*
  191 F.3d 326 (2d Cir. 1999) .................................................................... 50, 51

*United States v. Wozniak,*
  126 F.3d 105 (2d Cir. 1997) ........................................................................ 47

*United States v. Zedner,*
  401 F.3d 36 (2d Cir. 2005) .......................................................................... 48

*Wechsler v. Hunt Health Sys. Ltd.,*
  198 F. Supp. 2d 528 (S.D.N.Y. 2002) ...................................................... 62, 78

## RULES

Fed. R. Crim. P. 16(a)(1)(G) ............................................................................ 76

Fed. R. Crim. P. 29 ........................................................................................... 83

Fed. R. Crim. P. 33 ........................................................................................... 34

Fed. R. Evid. 701 ........................................................................................ 77, 78

Fed. R. Evid. 702 ........................................................................................ 76, 78

Fed. R. Evid. 801(d)(2) .................................................................................... 68

Fed. R. Evid. 803(5) .................................................................................... 64, 65

Fed. R. Evid. Rule 404(b) ................................................................................ 63

## PRELIMINARY STATEMENT

In responding to defendant Shelton's motion for a judgment of acquittal, or in the alternative a new trial, the government ignores the complexities of the case and instead portrays the evidence as black and white. Reading the government's brief, one would think that the government's case against Shelton was open and shut. The government ignores:

- that the jury deliberated for thirty-two days before reaching a verdict against Shelton;

- that the government's two main cooperating witnesses -- Cosmo Corigliano and Anne Pember -- were thoroughly discredited and demonstrated to have testified falsely on numerous material matters;

- that the government's third cooperating witness, Casper Sabatino, testified that he believed that the fraud had been successfully concealed from defendant Shelton;

- that the centerpiece of the government's case against Shelton -- his supposed knowledge of the use of merger reserves to increase earnings for 1996 and 1997 -- was known and approved of by each of Scott Forbes, Michael Monaco and Ernst & Young in Shelton's presence in March 1998;

- that there was ample, uncontroverted evidence inconsistent with Shelton's guilt, *e.g.*, his lack of stock sales, his efforts to cooperate with Cendant's Audit Committee and the United States Attorney's Office, and his voluntary decision to merge CUC with Cendant, thereby putting Henry Silverman in charge of making decisions about Cendant's accounting; and,

- that the government was sufficiently concerned about its case against Shelton that it insisted on the inclusion of a conscious avoidance charge in the jury instructions.

The government's opposition brief is characterized by three critical flaws:  <u>First</u>, it fails to grapple meaningfully with the apparent inconsistencies and outright falsehoods in the testimony of Corigliano and Pember, much less the lack of any corroboration for almost the entirety of their testimony with respect to Shelton's claimed knowledge of the fraud. <u>Second</u>, to the extent that the government points to evidence that supposedly does corroborate Corigliano and Pember, the evidence does nothing of the sort. <u>Third</u>, the government fails to acknowledge

all of the evidence marshaled by Shelton in his Opening Brief that runs completely counter to the government's arguments about his guilt.

The government adopts a schizophrenic approach in its efforts to characterize the basis for the jury's verdict. On the one hand, in an effort to vindicate the Superseding Indictment upon which the conviction purportedly stands (and perhaps in its effort to "win" an enormous sentence), the government sticks to its claim that Shelton was the mastermind of a multi-year criminal conspiracy, claiming that Shelton somehow gave Corigliano broad instructions on CUC's financial goals, leaving Corigliano to execute the details. On the other hand, perhaps recognizing the weaknesses that pervade its case, the government repeatedly seeks to lower its burden of proof by making arguments that various bits and pieces of evidence capable of multiple plausible interpretations should have put Shelton on notice of the fraud, or otherwise provided him with a "hint," "indication" or "clue" of the accounting manipulations being perpetrated by Corigliano, Pember and other members of the accounting department.

As demonstrated below, allowing Shelton's conviction to stand would be precisely the kind of miscarriage of justice that Rule 33 is intended to prevent. The Second Circuit's decision in *United States v. Autuori*, No 3:96-CR-161 (EBB), 1998 WL 774232 (D. Conn. Aug. 28, 1998), *aff'd in part, rev'd in part*, 212 F.3d 105 (2d Cir. 2000), is illustrative of the appropriateness of a Rule 33 motion to remedy a situation like this one in which a conviction appears to stand on implausible and inconsistent testimony that creates a risk of a wrongful conviction. For the reasons stated in the Opening Brief and below, Shelton's motion for a judgment of acquittal, or in the alternative for a new trial, should be granted.

**REPLY TO THE GOVERNMENT'S STATEMENT OF FACTS**

The government accuses Shelton of "cherry pick[ing] selected facts" in his Opening Brief to provide a one-sided presentation of the evidence. Br. at 15.[1] In fact, Shelton's brief undertook to do what the government does not. Shelton's Opening Brief acknowledged and explained the evidence that, according to the government, purportedly supported Shelton's conviction. Shelton showed how the testimony of the government's two principal witnesses -- Corigliano and Pember -- was internally inconsistent and contradicted by the testimony of numerous other witnesses. The government, in contrast, does not acknowledge the vast bulk of the evidence contradicting the uncorroborated testimony of Corigliano and Pember. It is the government, not Shelton, that has "cherry-picked" the facts to present a selective, one-sided presentation of the evidence.

## I.    SHELTON DID NOT DIRECT CORIGLIANO TO ENGAGE IN FRAUDULENT ACTIVITY

The government acknowledges that Shelton did not engage in the day-to-day management of the fraud. Rather, the government contends that the evidence showed that Shelton was the mastermind of the criminal conspiracy, that he gave Corigliano broad instructions on what financial goals he wanted the company to achieve, and that he left it to Corigliano and Pember to execute the details. *See* Br. at 15-16. Notwithstanding that this theory is irreconcilable with the government's aggressive lobbying for the inclusion of a conscious avoidance jury instruction, the government has resorted to this argument out of strategic

---

[1]    All references herein to the Memorandum Of The United States In Opposition To Shelton's Motion For A Judgment Of Acquittal Pursuant To Rule 29 And For A New Trial Pursuant To Rule 33 shall be "Br. at __."

All references herein to the Memorandum Of Law In Support Of Motion Of Defendant E. Kirk Shelton For A Judgment Of Acquittal Pursuant To Fed. R. Crim. P. 29 Or For A New Trial Pursuant To Fed. R. Crim. P. 33 shall be either "Opening Brief" or "Shelton Br. at __."

necessity.  The government lacks any evidence that Shelton knew any of the details of the various components of the fraud -- the topsides, the manipulation of the cancel reserves, the allocation of revenue from deferred recognition programs to immediate recognition programs, and the income effect of the rejects-in-transit.  The government is left to arguing that Shelton knowingly directed Corigliano regarding the details of the fraud, and also that Shelton, whom the government elsewhere portrays as incredibly detail-oriented, did not concern himself with the details of how Corigliano carried out the fraudulent activity.

The evidence does not support this theory.  By his own admission, Corigliano neither discussed the topside adjustments nor the level of revenue and earnings to report each quarter with Shelton.  Tr. 8288-89, 8441-42.  On the government's own theory of the case, there was no need at the end of the quarter for Corigliano to seek Shelton's direction on the amount of topside adjustments or the amount of merger reserves to reverse into income.  By that time, analyst expectations had long been established and known to the entire financial community.  Thus, there was no reason for any top-level conversation of the sort the government conjectures to have taken place.

The government cannot avoid Corigliano's own testimony about the absence of any instructions from Shelton on how to implement the fraud.  According to Corigliano, he broadly delegated the making of these unsupported quarterly adjustments to Sabatino and Kearney.  *See* Tr. 9714-15, 9950-51.  Corigliano testified that he did not understand that the allocations or the manipulation of the cancel reserves had a significant effect on income and thus did not include these items on the so-called "cheat sheets."  *See* Tr. 8305-06, 8334-35. Corigliano further admitted that he did not appreciate that the rejects-in-transit had an income

effect until early April 1998.  *See* Tr. 7540, 8297-98.  Plainly, Corigliano could not have

communicated these facts (of which he claims to have been unaware) to Shelton.

      Moreover, the government elicited testimony from Pember that at a meeting in

late 1997, Corigliano lied to Shelton and told him that the manipulation of the cancel reserves

and the allocations were proper accounting.  *See* Tr. 2912-13.  Thus, the evidence did not show

that Shelton directed Corigliano to commit a wide-ranging accounting fraud.  It showed that

Corigliano hid from Shelton the longstanding accounting fraud in which he was engaged.

## II.    THE FORECASTS

      As it did at the trial, the government argues that Shelton somehow directed the

fraud based on his periodic receipt from Corigliano of the one-page forecasts, which the

government persists in calling "cheat sheets."  Br. at 15-17.  The government suggests that the

forecasts were blatantly fraudulent documents, going so far as to suggest that McLeod had given

"highly incriminating testimony" that the forecasts were given to Shelton.  Br. at 20.

      The forecasts, however, were neither nefarious nor fraudulent.  Shelton

acknowledged receiving forecasts at trial.  *See* Tr. 11745-46.  All but one of the forecasts showed

that the reserves contributed only a modest, fractional increase to income.  *See* GX 58; GX 58a;

GX 1774; GX 1777.  Even Corigliano admitted that these forecasts did not, in and of themselves,

indicate that CUC's reserve usage was improper.  *See* Tr. 8307.

      In contending that McLeod gave "highly incriminating testimony" that Shelton

had received the forecasts, the government fails to mention that McLeod, whom the government

did not allege to be a participant in the fraud, acknowledged that he and other senior managers

also received various iterations of the forecasts.  *See* Tr. 10895.  McLeod emphasized that he did

not see anything improper on the forecasts he received.  *See id.*  McLeod specifically testified

that, based on conversations with Corigliano, McLeod understood the "reserves" line item to represent the income effect that resulted when the company charged against the merger reserve a legitimate merger-related cost that the company had initially accounted for as an operating expense. *See id.*

The government urges this Court to reject Shelton's testimony that he did not see GX 62b -- the lone forecast introduced into evidence that showed a non-de minimis amount of reserves going into income. *See* Br. at 18-21. GX 62b, a forecast prepared in late 1996, projected that CUC would reflect as income $100 million from reserves in 1997. *See id.*; GX 62b. Although the government credits Corigliano's uncorroborated testimony that he gave GX 62b to Shelton, *see* Br. at 19, there is every reason to reject Corigliano's assertion on that point. Shelton's testimony was supported by McLeod, who testified that despite regularly receiving forecasts before he left for the Software Division in California in 1997, he (like Shelton) did not receive GX 62b. *See* Tr. 10896, 11052-53.

Moreover, even assuming that Shelton received GX 62b, the government overstates its significance. There is nothing suspicious about reserves having a positive impact on earnings. *See* Tr. 517, 1636. In some cases, merger reserves can be used properly with the effect of increasing operating income. Indeed, on March 9, 1998, Scott Forbes, Michael Monaco and Henry Silverman were made aware of virtually identical information about the use of merger reserves to increase CUC's 1997 earnings, when they received the three-page schedule showing CUC's non-operating income based on merger reserve usage for 1996 and 1997. *See* DX 1288. The document showed that there had been $54 million and $75 million in non-operating income from "Ideon consolidation activity" for 1996 and 1997, respectively. *See id.* After hearing Corigliano and Pember's explanations for these adjustments, neither Scott Forbes nor Monaco

thought that there was anything wrong with the use of CUC's merger reserves, and both signed off on Cendant's Form 10-K, which included income figures that included the above-described reserve adjustments. *See* Tr. 2146-48, 2161, 6133.

The government argues that the forecasts "tracked the company's fraudulent inflation of its financial results." Br. at 16. This assertion in the government's brief comes right before the government makes the following statement: "The fraudulent methods directed by Bell, and executed by Corigliano, included the baseless inflation and misuse of merger reserves, failure to write off rejects in transit, the manipulation of revenue recognition to accelerate revenue, and unsupported topside adjustments." Br. at 16. In juxtaposing the two sentences, the government misleadingly suggests that the forecasts disclosed how each of these accounting manipulations inflated CUC's revenue and earnings. As this Court (and the government) is aware, however, Corigliano admitted what is clear from the face of the forecasts: that they did not show any the impact on CUC's financial results from topside adjustments, allocations, rejects in transit or manipulation of the membership reserve.

## III.    THE MERGER WITH HFS

The government contends that Shelton fought to keep Pember in place so that she could continue the fraud after the merger between HFS and CUC became effective. *See* Br. at 22-24. In making this argument, the government overlooks the elephant in the room -- namely, the question of why Shelton would be willing to merge CUC with HFS in the first place. Had Shelton been participating in the fraud, the last thing he would have wanted was to merge with HFS and cede control over CUC's financial and accounting function to Silverman, Monaco and Scott Forbes. Yet, Shelton agreed to put Silverman in complete control of the combined company. *See* Tr. 12226. He allowed Silverman to choose the CFO, the Chief Accounting

Officer, the General Counsel, the outside law firm, and, perhaps most significantly, the outside auditor for the new company. *See id.* Shelton did not oppose any of Silverman's choices. *See id.*

The government has not endorsed Corigliano's testimony that CUC needed the HFS merger to perpetuate the fraud. Nor does Corigliano's testimony makes any sense. In January 1997 and again in April 1997, Silverman made clear to Shelton that Silverman was willing to sell HFS to CUC. *See* Tr. 12221-22. Had Shelton caused CUC to agree to pay Silverman's price, CUC could have acquired HFS and taken control of the accounting and financial functions of the combined entity. *See* Tr. 12222; Tr. 307-09. Certainly, if the merger had been necessary to perpetrate a fraud in which they were participating, Shelton would not have thought twice to use stockholder money to purchase HFS and retain control.

Nor, contrary to the government's suggestion, did Shelton make a "lavish financial offer" to induce Pember to stay with the company in order to perpetuate the fraud. Br. at 22. The government notes that in October 1997 Shelton arranged for a bonus of $125,000 to be paid to Pember if she stayed at the company through March 1998, to assist CUC in finalizing its year end financials. *See* Br. at 22-24. The evidence, however, showed that the stay bonus paid to Pember paled in comparison to the financial remuneration that Pember's counterparts received at HFS. For example, as of March 30, 1998, Scott Forbes annual salary of $200,000 was increased 50% to $300,000, and in March 1998 he sold $2.4 million of Cendant stock. *See* Tr. 2075; 5899.

## IV.    SHELTON'S LACK OF ANY ROLE IN THE CREATION OF THE CENDANT MERGER RESERVE

The government erroneously suggests that beginning in late 1997, Shelton "was also working with [Pember] to build a substantial cushion into the Cendant merger reserve." Br.

at 30.  As shown above, there is simply no credible evidence that Shelton had any involvement in the creation of excess amounts in the Cendant merger reserve.  Pember's testimony on this issue was internally inconsistent, unsupported by any documents, and refuted on key points by the testimony of three E&Y auditors -- witnesses who had no reason at all to be friendly to Shelton.

The government's claim that Shelton helped to established an inflated Cendant merger reserve relies entirely on Pember's testimony that she "shared with Shelton four or five versions of the [cushion] schedule" showing the inflated components of the Cendant merger reserve.  Br. at 30.  The government ignores the evidence establishing that Pember's testimony was false.  Thus, the government does not address the fact that Pember retracted her testimony on direct examination that she had given Shelton the exact version of the cushion document that was GX 493.  *Compare* Tr. 2568-69, 2571 *with* Tr. 3387-88, 3841, 3844-45.  The government ignores that Pember claimed that she gave Shelton prior versions of GX 493, none of which had been admitted into evidence and as best as Shelton can tell do not exist.

The government even wholeheartedly accepts Pember's testimony that she gave to Shelton predecessor versions of GX 493 immediately after she, Shelton, and Corigliano met with Kenneth Wilchfort, Marc Rabinowitz and Simon Wood of E&Y to discuss the establishment of the Cendant merger reserve.  *See* Tr. 2573-74.  Each of the three E&Y auditors, however, testified that he had never attended any meetings with Shelton, Corigliano and Pember where they reviewed a schedule relating to the establishment of the Cendant merger reserve.  *See* Tr. 11142, 11147, 11153.

Although the government now suggests that the E&Y witnesses had a motive to curry favor with Shelton -- a preposterous assertion given that Cendant has sued E&Y for $3 billion and there is nothing E&Y would like more than to show that Shelton, a member of

9

Cendant's senior management, defrauded E&Y -- it bears remembering that, when given the chance to cross-examine each of these witnesses, the government did not suggest they were lying about not having met with Shelton. Instead, the government limited its cross examination to whether it was possible, during a phone call with Corigliano and Pember, that Shelton may have been in the room unbeknownst to the auditors. *See* Tr. 11144-45, 11149-50, 11154-55.

Finally, the government fails to acknowledge that Pember lied when she testified that she had general discussions with Shelton about a purported "cushion" in the Cendant reserve. On direct examination, Pember testified that she spoke to Shelton about the cushion in the Cendant reserve on a "couple" of occasions between October 1997 and January 1998. Tr. 2600-01. But, on cross examination, Pember admitted that she did not believe that she and Shelton had ever used the word "cushion" in any of their conversations. *See* Tr. 3842. Given that the word "cushion" appears on GX 493, *see* GX 493, and presumably appeared on predecessor versions of GX 493 (assuming they in fact ever existed), Pember's inability to recall a conversation in which she and Shelton used the term "cushion" suggests that she never gave GX 493 or any earlier versions to Shelton.

## V.    THE "BLOW YOUR OWN HORN" EMAIL -- GX 506

Examination of the documents upon which the government relies shows that they do not meaningfully corroborate Corigliano and Pember's testimony that Shelton knew about CUC's fraudulent accounting.

The government argues that GX 506 -- the January 14, 1998 email from Pember to Shelton -- alerted Shelton that Pember was engaged in financial improprieties. *See* Br. at 33-35. Specifically, the government focuses on Pember's statement that "with the exception of our 'reserve' adjustments, Mary [Sattler] is virtually done [with the year-end consolidation] today."

Br. at 34; GX 506. Nothing about the term "reserve adjustment" suggests any impropriety; and the evidence was overwhelming that there is nothing improper with adjusting reserve accounts. *See, e.g.,* Tr. 511-14, 529. The government's own expert witnesses conceded that reserve adjustments can properly have the effect of increasing income, and that there is nothing inherently suspicious about such adjustments. *See* Tr. 517 (Sack); Tr. 10690-91 (Heckler); DX 30773, at 4 (H&Q analyst report indicating that CUC could increase its income through the use of reserves). Robert Davidson, another government witness, also testified that reserves could be appropriately adjusted on a quarterly basis. *See* Tr. 5625.

The government cites Corigliano's testimony that, by the term "reserve adjustments," Pember was referring to the "cushions" in the merger reserves that "we were taking in to make our year end operating numbers." Br. at 25. Corigliano's interpretation of the meaning of Pember's email is hardly persuasive evidence that Pember used the common accounting phrase "reserve adjustments" to refer to the improper use of merger reserves to increase operating income. Much less is there any basis for concluding that by "reserve adjustments," Pember was referring to the "topside adjustments," as to which there was not an ounce of evidence that Shelton ever knew about or participated in making. Most significantly, however, Corigliano's testimony furnishes no basis for a conclusion that Shelton understood an innocuous reference to "reserve adjustments" to signal that fraud was being committed.

The government contends that it is significant that Shelton received and responded to Pember's email. *See* Br. at 34. But a moment's reflection on the substance of Shelton's response leads to the conclusion that Shelton had no understanding that Pember's email was describing fraudulent conduct. First, GX 506 states that, like CUC, HFS was conducting its own consolidations, but had an advantage over CUC because HFS's consolidation

process was "automated," whereby CUC's consolidations were done "manually."  GX 506.  Had

Pember been communicating that CUC was engaged in fraudulent "reserve adjustments," she

plainly would not have characterized the status of CUC's accounting process as having been the

same as HFS's process.  Second, replying the following day, Shelton advised Pember that he and

Corigliano were "well aware of the situation and appreciate the job you guys are doing."  GX

506.  Shelton then invited Pember to "feel free to vent frequently because a) it is relatively

inexpensive, b) email make it easy, c) it's more fund than consolidations, and d) no one will do it

for you."  GX 506.  Had Shelton believed that Pember sent him a document disclosing fraudulent

conduct, it is unfathomable that he would have responded in a chatty style, inviting her to send

him more emails to report other facts about the fraud whenever she wanted.

## VI.     THE JANUARY 1998 RESERVE REVERSAL

The government next argues that the evidence showed Shelton's knowledge of the

fraud because Pember testified that in early 1998, she spoke to Shelton about whether to transfer

$25 million or $20 million in reserves to revenue for the month of January 1998.  *See* Br. at 42-

43.  Even assuming this conversation occurred, there is no evidence that Shelton understood that

Pember advised Shelton that anything about the proposed transfer of reserves was improper.

Notably, although the January reserve reversal was set forth in GX 160, the schedule shared with

Scott Forbes at the March 6 meeting, Scott Forbes testified that he did not understand anything

discussed at the March 6 meeting to have been indicative of a fraud.  *See* GX 160; Tr. 6059-60.

Despite the government's efforts to criminalize the March 6 meeting, the

government has no answer to the fact that the participants at the meeting like Scott Forbes and

Anthony Menchaca testified as government witnesses that they did not believe that Shelton was

proposing anything criminal or fraudulent. *See* Tr. 5781, 6059-60 (S. Forbes); Tr. 10054, 10204

(Menchaca); Tr. 1145 (Speaks).

## VII.    THE "GOOD NEWS/BAD NEWS" EMAIL -- GX 519

The government contends that certain footnotes in the "Good News/Bad News"

email (GX 519) that Pember sent to Shelton put him on notice of the fraud. *See* Br. at 36-38.

The government would ignore the text of the email, which Pember began with the false statement

that CUC "has made the numbers." GX 519. The government offers no explanation as to why

Pember would have been lying to Shelton about making the numbers had he been the organizer

of the conspiracy. Besides Shelton, Corigliano was the only other recipient of this email, and

Corigliano obviously knew the truth about whether the company had actually made its numbers.

*See* GX 519. The inescapable conclusion is that Pember included this false statement because

she intended to mislead Shelton about the company's results.

Contrary to the government's arguments, nothing in the footnotes evidence a

fraud. One needs to credit Pember's interpretation of obtuse language in the footnotes to

conclude that she is discussing illegal conduct. For instance, the first footnote, which purports to

explain the reason for a $43 million variance in the membership businesses, states: "Results

from reversal of prior period reserves throughout the year we use the 'individual' area as a catch

all quarter to quarter, so any 'corrections' are forced thru the 4th quarter." GX 519. Pember

testified that the phrase "reversal of prior period reserves" was a reference, however infelicitous,

to the reversal of the topside adjustments done at year end. Tr. 2754-55. But there was no

evidence, from Pember or Corigliano or anyone else, that Shelton knew about the topside

adjustments. To suggest that a reader of this footnote should have known, based only on the

language in the email, that the author was discussing the unwinding of unsupported topside adjustments -- which Shelton was never told about in the first instance -- is absurd.

The government also suggests that the statement in the January 19, 1998 email that there were wide variances between the forecasted and actual results for some of CMS' largest divisions was enough to put Shelton on notice that CUC was engaged in fraudulent accounting.  *See* Br. at 36; GX 519.  The argument ignores, however, that many government witnesses (who were unaware of the fraud) learned of the discrepancy between the forecasted and actual results for certain of CUC's business segments.  In fact, the day after Pember claimed that she sent GX 519 to Shelton, she sent a slightly revised email, showing the same variances between forecasted and actual results, to Scott Forbes.  *See* GX 546.  Yet the government has consistently portrayed Scott Forbes as a victim who had no reason ever to suspect the fraud.

To the extent the footnotes conveyed any notion that the company was using reserves to increase earnings and that this practice somehow caused the variances, Pember communicated that same message in the email she sent to Scott Forbes the next day, employing far greater clarity than she had in her email to Shelton.  *Compare* GX 519 *with* GX 546. Pember's email to Scott Forbes disclosed that CUC's use of reserves affected its income (and thus caused the variances):  "[d]uring the fourth quarter, any standard cost adjustments, *membership reserve adjustments* as well as other *reserves* are made on a *YTD basis*.  The forecast for the period did not reflect *these one time adjustments*."  GX 546, at 2, n.1 (emphasis added).  To the same effect, the third footnote of GX 546 disclosed that "software reserves are reviewed at year end and an excess was brought in 12/97."  *Id.*, at 2, n. 3.  The government never suggested that any of these statements put Scott Forbes on notice of fraud.  By the same token,

the more benign statement in the previous day's email to Shelton cannot be read to have created

guilty knowledge on Shelton's part.

## VIII.  THE DISCUSSION WITH SCOTT FORBES AND MIKE MONACO ABOUT RESERVE ADJUSTMENTS TO NUMA/NAOG

The government next points to a meeting in late January 1998 that Shelton and

Pember attended with Scott Forbes and Monaco as evidence that Pember put Shelton on notice

of the fraud.  *See* Br. at 39-40.  The government notes that at the meeting, when Shelton was

questioned by former HFS personnel about wide discrepancies between NUMA's and NAOG's

1997 results and their budgeted results for 1998, Shelton was unaware of the reason for the

discrepancy and Pember told Shelton quietly that the differences were due to the use of merger

reserves.  *See* Br. at 40.  But even accepting Pember's uncorroborated testimony, there is nothing

to suggest that this meeting evidences Shelton's fraudulent knowledge.  To begin with the most

obvious point, Shelton did not know the reason for the discrepancy between the actual and

forecasted numbers.  *See* Tr. 2772.  He had to be told the reason by Pember.  *See id.*  Second,

what Pember claims she told Shelton did not put him on notice of fraudulent conduct.  There is

no testimony that Pember ever indicated to Shelton that this use of reserves was improper or that

it violated GAAP.  Third, on March 9, 1998, Scott Forbes and Monaco received a copy of DX

1288, which showed that the earnings for Spark Services and NUMA included a $11 million

reserve adjustment.  *See* DX 1288, at 2.  Thus, Scott Forbes and Monaco were put on notice of

the same facts that Pember asserts she whispered to Shelton at the meeting in late January 1998.

Yet, they did not suspect fraud on the basis of that same information.

**IX.    MONACO'S TESTIMONY DID NOT INCRIMINATE SHELTON**

Seeking to water down its burden of proof, the government contends that certain trial testimony from Monaco "undermined Shelton's trial defense that he had no 'hint' that Pember and Corigliano, Shelton's coconspirators, were engaged in improper accounting." Br. at 51. The government specifically focuses on two parts of Monaco's testimony: (1) Monaco's assertion that on March 7, 1998, after Scott Forbes told Monaco about the March 6th meeting, Monaco advised Shelton and Corigliano that Cendant would not participate in any "wrong accounting," Br. at 51; and (2) Monaco's testimony that, in that same conversation, Shelton advised Monaco that CUC had used "non-operating items" to increase CUC earnings in earlier years, Br. at 51-52.

To the extent that Monaco's statement to Shelton that HFS would not be a party to any "wrong accounting" sufficed to give Shelton a "hint" that CUC may have been engaged in something improper -- which is not the test for criminal liability in any event -- any such hints that Shelton (and Monaco for that matter) may have received were fully dispelled after the meeting on March 9, 1998, just three days later. On that day, Corigliano presented Monaco and Scott Forbes with a three-page schedule providing a detailed breakdown of the non-operating items included in the 1996 and 1997 financial statements and the 1998 budget. *See* DX 1288. Far from hiding the reversal of reserves and other accounting items in CUC's numbers, DX 1288 showed that CUC had $112 million in non-operating income in 1996, and $144 million in non-operating income in 1997. *See id.* The schedule further showed that there had been $54 million and $75 million in non-operating income from "Ideon consolidation activity" for 1996 and 1997, respectively. *See id.* Corigliano told Monaco and Scott Forbes that "Ideon consolidation activity" represented ordinary expenses that had been recharacterized as merger-related expenses and charged to the reserve. *See* Tr. 9009. Monaco and Scott Forbes vetted the use of the Ideon

reserve and questioned Corigliano and Pember for hours. *See* Tr. 2146-48. Monaco and Scott

Forbes determined that the use of the Ideon reserve -- the charging to the reserve of merger

related expenses that had initially been treated as operating expenses -- had a positive $99

million P&L effect for 1996 and 1997. *See* DX 1303; Tr. 2157, 2167, 2179.

## X.    SABATINO'S TESTIMONY DID NOT INCRIMINATE SHELTON

Recognizing the significant credibility problems surrounding each of Corigliano

and Pember, the government searches for some support of its case in the testimony of Casper

Sabatino. In so doing, the government also seeks to overcome Sabatino's testimony that he

believed the fraud was concealed from Shelton. The government wrongly contends that

Sabatino's testimony incriminated Shelton with respect to two events: (i) the meeting at which

Shelton allegedly tore up GX 530 or an as-yet unidentified document "similar to" GX 530, *see*

Br. at 52-53, and (ii) the "pop-in" conversation at which Corigliano asked Shelton whether the

earnings per share figure should be X or Y, where the numbers differed by a penny. *See* Br. at

53.

### A.    The Alleged "Tear Up" Meeting

Sabatino's testimony concerning the alleged "tear up" meeting is so dissimilar to

Pember's testimony, and his own account of this alleged event has changed so often over time,

that it provides no meaningful corroboration of Pember's testimony.

In contrast to Pember, who testified that the supposed "tear up" meeting occurred

in late 1997, *see* Tr. 2841-42, Sabatino remembered attending a meeting at which Shelton tore up

a document sometime in early 1998 and possibly as late as March 1998, *see* Tr. 4592. In

contrast to Pember, Sabatino was not sure that GX 530 was the document Shelton tore up. *See*

Tr. 4589-90, 4593. Indeed, Sabatino was not sure that he ever saw GX 530 during the period he

worked at CUC.  *See id.*  And, in contrast to Pember, who described the meeting as just including

her, Shelton and Sabatino, Sabatino testified that Corigliano had attended the meeting at which

Shelton tore up a document.  *See* Tr. 4213.

In the summer of 1998, Sabatino was interviewed extensively as part of an

investigation conducted by the Audit Committee of Cendant's Board of Directors.  Despite the

fact that Sabatino was one of the two "whistleblowers" who disclosed the fraud in April 1998,

Sabatino never mentioned a meeting at which Shelton was shown GX 530, or at which he and

Pember obtained Shelton's approval to provide Parsippany with a false budget.  *See* Tr. 4564-87.

Indeed, during one of these interviews months after the supposed incident, when Sabatino was

already cooperating with government investigators, Sabatino was shown a copy of GX 530 and

***Sabatino said that he had never before seen the document***.  *See* Tr. 10499.

In attempting to refute Shelton's argument that Sabatino's testimony about GX

530 was not credible, the government argues that "the jury could rationally conclude either that

Sabatino was not asked about the tear-up incident during his Audit Committee interview and

elected not to volunteer it or forgot about the incident during that interview."  Br. at 113.  In

providing this excuse for Sabatino, the government seeks to obfuscate the significance of

Sabatino's Audit Committee interview.  The point is not that the Audit Committee may not have

asked Sabatino about a "tear up incident"; it obviously did not.  The point is that the Audit

Committee asked Shelton about whether he had ever seen GX 530, and Sabatino responded no.

*See* Tr. 10499.  The government's suggestion that Sabatino may have had a momentary lapse in

memory during his Audit Committee interview is preposterous.  *See* Br. at 113.  Sabatino

testified at trial that he did not have any knowledge of Shelton's participation in the fraud.  *See*

Tr. 4580-81, 4489, 4644, 4913.  Sabatino surely would not have forgotten an incident, just

months earlier, in which Shelton tore up a document that the government cites as one of the most crucial in the case.

**B.    The Alleged "Pop-In" Conversation**

Without citing to the record, the government describes the pop-in conversation as one in which Sabatino heard "Shelton direct Corigliano and Sabatino to make quarterly earnings a certain EPS number even though Shelton had no basis for such a direction," Br. at 53, suggesting that there was something nefarious about this exchange. The government's summary description of the conversation results in a complete distortion and leaves out many important facts, many of which Shelton addressed in his Opening Brief.

The government ignores, for instance, that Sabatino testified that the alleged conversation took fifteen seconds. *See* Tr. 4078. The government fails to note that the difference between the two quarterly earnings figures proposed by Corigliano was just one penny. *See* Tr. 4076-77. The government fails to address the fact that Sabatino did not say that Shelton had heard or was even present for any portion of his conversation with Corigliano about making unsupported topside adjustments. Nothing improper was discussed in Shelton's presence.

The government's own witnesses repeatedly confirmed that accountants have a large degree of discretion within the applicable accounting rules at the end of a reporting period about how much to report in earnings. Sabatino himself explained that a reserve adjustment as small as $50,000 could affect earnings by a penny. *See* Tr. 4616. Professor Robert Sack, one of the government's accounting experts, and Robert Davidson, a government witness who was the former President of the CUC software division, both testified that public companies have legitimate flexibility in establishing reserves. *See* Tr. 503-04, 508-12 (Sack); Tr. 5631

19

(Davidson). Davidson specifically testified that adjustments made to reserves could affect earnings per share by two or three cents over the course of a year. *See* Tr. 5629-30.

In light of this testimony from the government's own witnesses, the government cannot contend that Shelton must have known that Corigliano was engaged in a fraud because Shelton did not ask Corigliano what the "basis" was for the two alternative EPS figures. Given the flexibility public companies have in making various accounting adjustments and estimates, there was no reason for Shelton to assume that Corigliano lacked a basis on which to report the two proposed EPS figures.

Whatever nefarious inferences the government seeks to draw from this conversation are belied by Sabatino's own testimony to the contrary. The government does not address the fact that Sabatino testified that the fraud involving the improper use of merger reserves was successfully *concealed* from Mr. Shelton. *See* Tr. 4913. This testimony is completely inconsistent with any suggestion by the government that such fraud was revealed to Mr. Shelton during the "pop-in" meeting.

Finally, the government has not acknowledged that in each of the quarters in which Corigliano and his staff made topside adjustments, the net effect on the company's EPS was always greater than one penny. Thus, the important thing about the "pop-in" conversation is what Corigliano failed to disclose -- namely, the *entire* adjustment to EPS for that quarter. By framing his question to Shelton as a choice between two end results -- X and Y, which differed by a single penny -- Corigliano concealed from Shelton the vast majority of the adjustments that he and Sabatino were implementing to reach the desired result.

## XI.    KEARNEY'S TESTIMONY DID NOT INCRIMINATE SHELTON

The government contends that Kearney also "provided credible testimony about Shelton's knowledge of the fraud" because "Kearney testified that during a discussion of the size of the unsupported topside adjustments, Corigliano told Kearney that Shelton was aware of the reserves that were needed to make the quarter." Br. at 54.

But, as the evidence overwhelmingly showed, Sabatino and Kearney, at Corigliano's direction, made the topside adjustments without regard to the amount of reserves CUC had available. Indeed, although Kearney prepared analyses showing the excess amounts of reserves maintained by CUC, *see* Tr. 9961-62 and GX 114, the topside adjustments made by Corigliano had no relationship to Kearney's reserve analyses. *See* Tr. 9953, 9962. Corigliano did not draw upon the reserves at the end of the quarters to make the topside adjustments. Corigliano only reversed reserves into income at the end of the fiscal year when the topside adjustments were removed from the consolidation spreadsheet. *See* Tr. 2754-55; Tr. 8525. Thus, it would have been a non-sequitur, or extremely misleading, for Corigliano to respond to an inquiry by Kearney about the size of the topside adjustments by referring to the "amount of reserves" they needed to use.

Moreover, Corigliano conceded that the amount of the topsides at the end of the quarters in 1995 was often much higher than the amount of available reserves. *See* Tr. 8444-64. For the first and second quarters of 1995, the topside adjustments totaled more than $30 million, even though the forecasts prepared by Corigliano showed that there were just $8.5 million of reserves available for that entire year. *Compare* GX 9500 (showing topside adjustments) *with* GX 58 (showing $8.5 million in available reserves). Thus, Corigliano's supposed statement about the amount of "reserves" to Kearney, even if actually made by Corigliano and even if

21

truthful on Corigliano's part, had nothing to do with the quarterly topside adjustments that were much larger than the total reserves available for the year.

The government also argues that Kearney corroborated Pember's testimony regarding the $9.5 million reserve reversal at CUC's subsidiary, Spark Services. *See* Br. at 55. This is true, but irrelevant. Neither Pember nor Kearney testified that they ever told Shelton about the $9.5 million reversal. Indeed, Kearney admitted that he did not send Shelton the revised financial statement for Spark Services that showed the $9.5 million reversal.

## XII. ALBRIGHT'S TESTIMONY DID NOT CORROBORATE CORIGLIANO'S TESTIMONY

The government contends that Thomas Albright, the former CFO of the CUC subsidiary Essex, corroborated Corigliano's testimony about Shelton's role in the alleged fraud. *See* Br. at 53-54. The government contends, first, that Albright provided the jury with significant evidence that Bell had created excess reserves at Essex, and second, that Albright corroborated Corigliano's testimony about a meeting at which Corigliano whispered to Shelton that a negative expense item on Essex's financials was the result of a reserve reversal. *See* Br. at 54. Both contentions are meritless.

First, the evidence showed not only that Albright did not corroborate Corigliano's testimony about the establishment of excess amounts in the Essex reserve, but that Albright directly contradicted Corigliano on this issue. Corigliano testified that in December 1994, he and Bell gave Albright an instruction to increase Essex's reserves by approximately $1 million. According to Corigliano, this instruction was illegitimate and had no basis in fact. *See* Tr. 6401-02. Indeed, Corigliano testified that the vast majority of the increase in Essex's reserves was "cushion" and that Albright knew it. *See* Tr. 8855-56. But Albright, a government witness,

could not have been more clear that he did not believe that any of the reserves established by

Essex at that request of Corigliano and Bell in December 1994 were inappropriate. *See* Tr. 3963.

Second, the government lacks any basis on which to suggest that the late 1995

meeting at which Corigliano supposedly whispered in Shelton's ear an explanation about a

negative expense item at Essex was anything but benign. The evidence showed that at a meeting

held shortly after Albright had reversed $1.1 million in reserves at the request of Corigliano,

Shelton appeared surprised by a negative expense line item on Essex's financial statement and

asked Albright and Corigliano for an explanation. *See* Tr. 3966. Shelton's expression of

surprise indicated that he had been unaware of the reversal prior to the meeting. Albright's

uncontradicted testimony was that he matter-of-factly told Shelton that the negative expense item

was the result of an accrual reversal. *See* Tr. 3951. No one said at the meeting that the reversals

were inappropriate, or that they violated GAAP. *See* Tr. 3966. The only gloss on Albright's

testimony that Corigliano added was that, after Albright explained the reason for the negative

expense line item, Corigliano whispered to Shelton that Essex had taken down some reserves.

*See* Tr. 6635-36. Thus, the explanation that Corigliano claimed he gave to Shelton was the same

as the explanation that Albright had articulated for all to hear. Moreover, Albright testified that

he later told E&Y about the reserve reversal and E&Y did not raise any concerns with Albright.

*See* Tr. 3968.

## XIII.   SPEAKS' AND SCOTT FORBES' TESTIMONY DID NOT CORROBORATE CORIGLIANO AND PEMBER

The government next contends that Speaks and Scott Forbes corroborated

Corigliano's and Pember's testimony about Shelton's role in the fraud because both Speaks and

Scott Forbes testified that Shelton described the $20 million in merger reserves that were used to

increase the January 1998 earnings. *See* Br. at 55-56. This testimony, however, failed to

corroborate Pember or Corigliano. Speaks testified that at the March 6, 1998 meeting "[t]he message given by Mr. Shelton was that 20 million of merger reserves was reversed in January." Tr. 1428. Scott Forbes recalled that Shelton "said that for the month of January the full 25,507,000 number that was budgeted was not needed." Tr. 5772-73. The testimony provided by Pember at trial, however, pertained to a phone conversation that she allegedly had with Shelton in February 1998 regarding the January 1998 numbers. *See* Tr. 2895-96. Testimony by witnesses as to Shelton's alleged statements at a meeting in *March* 1998 do nothing to corroborate testimony made by one of the government's cooperating witnesses as to Shelton's alleged statements during a phone conversation in *February* 1998. Notably, the government fails to cite *any* testimony provided by Corigliano that is purportedly corroborated by Speaks and Scott Forbes.

## XIV.    MENCHACA'S TESTIMONY DID NOT CORROBORATE PEMBER

The government claims that Menchaca's testimony was "highly incriminating" because it showed that Shelton knew that merger reserves were being used to increase CUC's earnings. Br. at 50. The government's contentions are unpersuasive. To begin with, Menchaca's testimony cannot be squared with other evidence about which there is no dispute. Menchaca testified that in February 1998, he noticed a discrepancy between the actual Comp-U-Card results for January 1998 and the results which had been sent to Parsippany. *See* Tr. 10041-32. Documentary evidence introduced at trial, however, showed that the January 1998 results were not finalized until early March 1998, and had not been distributed among senior management as of March 6. *See, e.g.,* GX 1779.

In any event, Menchaca's testimony, fairly viewed, was not incriminating. Menchaca testified that he asked Shelton about a discrepancy between (i) the numbers that he

had received on an operating basis and (ii) the numbers that he saw had been presented to HFS.

Menchaca testified that he did not understand the difference between the numbers, that he raised

the issue of the discrepancy with Shelton, and that Shelton told him that the difference was due

to merger-related adjustments.  *See* Tr. 10199.  Menchaca did not question the explanation.  He

testified that he did not understand Shelton's reference to the use of merger reserves as

suggesting in any way that CUC was engaged in any improper accounting.  *See* Tr. 10200.

Menchaca later attended the March 6 meeting long enough to see that Shelton was explaining the

merger-related adjustments to Scott Forbes.  *See* Tr. 10200.  Menchaca left that meeting satisfied

that a process was in place to make sure that Scott Forbes was being apprised of all relevant

information.  *See* Tr. 10203.  Until the fraud was discovered in mid-April 1998, Menchaca never

had any suspicion that there was a fraud going on.  *See* Tr. 10117.

## XV.    SHELTON'S OWN TESTIMONY WAS NOT INCRIMINATING

### A.    Shelton's Purported Receipt Of The Consolidations

The government challenges Shelton's testimony that he did not see the

"consolidations" until after he left Cendant in April 1998.  The government, however, does not

cite to any trial testimony of any of its witnesses contradicting Shelton's testimony on this score.

There is none.  Nor does the government cite to a single consolidation that indicates any such

documents had been sent to Shelton.  Again, there is none.  Instead, the government makes the

absurd argument that Shelton's conviction should stand on a broad statement made by Shelton's

counsel during opening statement that was later clarified during Shelton's trial testimony.  Br. at

57.  Here is what Shelton's counsel said in opening:  "The evidence will show that Mr. Shelton

received this spreadsheet not before the topside adjustments were made, but afterward."  Tr. 141.

But the government did not establish that Shelton received any adjusted consolidations.

Moreover, the pertinent issue is whether Shelton saw both the unadjusted and adjusted consolidations. There has never been any suggestion that Shelton was ever provided with both sets of consolidations that would have alerted him to the topside adjustments that Corigliano had authorized be made to the schedules.

**B.    Shelton Did Not Commit Perjury In Connection With The Plane Expense**

The government contends that Shelton perjured himself in testifying about plane expenses charges incurred by Walter Forbes in 1995 and 1996. There is no dispute about many of the facts about the plane expense charge. It is not disputed that in September 1997, (1) Shelton filled out a form authorizing CUC to charge these expenses to the Cendant merger reserve account; (2) Shelton authorized CUC to reimburse Walter Forbes' plane expenses only after reducing the amount to be reimbursed by more than $400,000 from the amount approved by the Compensation Committee of the CUC Board; and (3) Shelton signed the plane expense voucher, as did Menchaca, knowing that voucher would be made available to CUC's outside auditors during its annual audit.

What is in dispute is whether Shelton spoke with Walter Forbes in early September 1997 prior to filling out the plane voucher. Shelton testified that at around that time, Walter Forbes approached Shelton about obtaining reimbursement for corporate travel expenses that Walter Forbes had incurred in 1995 and 1996 on his timeshare plane. *See* Tr. 12315-16. Walter Forbes had recently received a new invoice for travel expenses incurred in those years for which the timeshare company had previously failed to charge him. *See* DX 1776, at 10-11. At the time, Walter Forbes had an arrangement in which he previously had agreed to pay a portion of his business-related plane expenses. After learning that HFS, CUC's future merger partner, was fully reimbursing all of Henry Silverman's plane expenses, however, Forbes told Shelton

26

that it was unfair that Forbes was not also receiving full reimbursement.  *See* Tr. 12316.  This

prompted Forbes to seek full reimbursement for more than $1 million in plane travel expenses

from the 1995 and 1996 time period.  *See* DX 1776, at 9.  Although the Compensation

Committee of CUC's Board of Directors approved the full amount of Walter Forbes's request,

Shelton convinced Walter Forbes to accept only $596,000 of the approved amount.  *See id.*

   Ironically, as support for its claim that Shelton perjured himself, the government

relies on the testimony of Walter Forbes, whose testimony the government lampooned as false

throughout the government summations.  Now, when it suits the government's purposes, the

government embraces Walter Forbes' testimony as testimony that should be accepted without

question.  At trial, Walter Forbes testified, at odds with Shelton, that he did not believe he had a

discussion with Shelton regarding his reimbursement for plane expenses prior to Shelton's

preparation of a voucher for the repayment of Forbes' 1995 and 1996 plane expenses.  *See* Tr.

14255-56.

   Forbes' version of events is plainly inaccurate and is contrary to all of the

available evidence.  First, Walter Forbes testified that his decision to seek reimbursement was

not driven by the fact that he received some new bills from his timeshare company.  *See id.*  But

the evidence showed that Forbes received bills for outstanding plane charges in 1995 and 1996

on September 5, 1997, right before he requested reimbursement for these expenses.  *See* DX

1776, at 10-11.  Thus, Forbes' testimony would make the timing of the request for

reimbursement following days after his receipt of bills a total coincidence.  Second, it does not

make any sense that Forbes (as he testified) would not have spoken to Shelton about his request

for reimbursement, especially given that Shelton had reduced the amount of Forbes'

reimbursement by more than half a million dollars below the amount authorized by the

Compensation Committee.  The government's view is apparently that such a decision by

Shelton, made in good faith to save the company money, did not give rise to any discussion

between Shelton and his boss, Forbes, about the reason for Forbes' getting $500,000 less than he

expected to receive in reimbursement.  To the contrary, Walter Forbes fully admitted at trial that

he likely spoke to Shelton around this time period about the fact that he was not planning to use

his timeshare plane any further because Silverman planned to purchase a second plane for

Cendant.  *See* Tr. 14416.  There is no basis for the conclusion that the difference in Shelton's and

Walter Forbes's testimony regarding the events surrounding Walter Forbes's reimbursement for

his plane expenses should be reconciled by labeling Shelton's testimony as perjurious.

Moreover, contrary to the government's claims, Shelton's trial testimony is not

inconsistent with his statements at his Audit Committee interview in the summer of 1998.  In that

interview he told the Audit Committee interviewers that he had not spoken to Walter Forbes

about charging the plane expenses to the merger reserve.  *See* Tr. 10481-82.  That is true, and

entirely consistent with the account of events described above.  Shelton never testified that he

discussed the accounting treatment for the plane expenses with Walter Forbes.  Rather, he had

these conversations with Corigliano.  Shelton never testified that he informed Walter Forbes that

the plane expense had been charged to the reserve.  Thus, there was no inconsistency between his

trial testimony as the audit committee interview.

### C.    Shelton Did Not Commit Perjury Regarding GX 530 -- A One-Page Document Reflecting CUC's 1998 Budget

The government also asserts, without any basis, that Shelton committed perjury

with respect to his testimony that he did not attend a meeting at which he tore up GX 530 -- a

one-page budget for calendar year 1998 containing a note that "reserves were being used to meet

quarterly targets."  Once again, the evidence shows that the testimony on which the government

bases its charge of perjury -- the testimony of Pember and Sabatino -- is unreliable and should not be credited.

At the outset, it is important to focus on Pember's exact testimony concerning GX 530, which the government describes as "highly incriminating." Br. at 62. GX 530 shows the planned use of merger reserves to increase revenue by $110 million in 1998. According to Pember's testimony, she and Sabatino showed Shelton the document and "explained that these reflected the adjustments that were going to be in the 1998 budget that Casper, Mr. Sabatino[,] was going to be giving to HFS momentarily." Tr. 2878. Pember testified that Shelton focused on the line item showing reserves going into revenue and asked, "Can we do that." Tr. 2879. Rather than tell Shelton that it was improper, violative of GAAP, and illegal for reserves to go to revenue, Pember testified that she replied, "it was my understanding that we, CUC, was going to be doing something along those lines for this year, which was 1997, and that the plan was to do it the following year as well." Tr. 2879.

Two things are salient about Pember's testimony, which is unreliable as will be shown below. First, even accepting Pember's testimony, Shelton did not know as late as early 1998 whether reserves could be reversed into revenue. Shelton would not have asked Pember, "can we do that?" if he knew it was improper to reverse reserves into revenue. This is, to put it mildly, a very strange question for a purportedly longstanding member of a criminal conspiracy involving accounting fraud to be asking another co-conspirator. Second, according to Pember, she did not respond to Shelton's question by telling him that it was against the accounting rules to reverse reserves into revenue. She told him only that CUC had done it last year -- which she evidently felt a need to tell Shelton because she knew that Shelton was not aware of that fact -- thereby suggesting that it was part of CUC's past practice and not objectionable accounting.

Thus, even accepting Pember's version of the meeting, she did not discuss the fraud with Shelton in anything approaching a forthright manner; rather, she answered his question in a manner that concealed, or at a minimum evaded, the improper nature of the accounting in which she was engaged.

The government's position is that Shelton knew how much merger reserves were being used to increase revenue, as evidenced by his alleged statements at the March 6, 1998 meeting; as well as various internal budget documents that he was receiving. *See* Br. at 62-63. First, the statements that Shelton allegedly made in March 1998 cannot shed any light upon the awareness that Shelton may or may not have had in either December 1997 or January 1998 when he allegedly received GX 530. Second, the government fails to make any showing how a gap between the total cash budgets for the divisions and the overall company-level budget facilitates an understanding as to the propriety or impropriety of using merger reserves.

In any event, there is no reason to credit Pember's testimony that such a meeting ever occurred. Pember testified that she and Sabatino gave Shelton GX 530 at a meeting in mid-December 1997. Pember was certain that mid-December 1997 was the time period during which she showed Shelton this document because around this time she and Sabatino were preparing a bogus budget that included millions of dollars of false income, and she wanted to receive Shelton's authorization to send this bogus budget to Cendant's headquarters in Parsippany, New Jersey, before the year end. *See* Tr. 2840-41, 2878, 3365, 3773-73. According to Pember, she and Sabatino approached Shelton with GX 530 to obtain his authorization to transmit the false budget information to Parsippany. At three separate points during her testimony, Pember emphatically stated that the meeting took place in mid-December 1997 because, as she

recognized, it would have made no sense to approach Shelton for his authorization to give the budget to Parsippany *after* the budget had already been sent. *See id.*

Pember was caught having lied about this supposed meeting. A computer expert testified that forensic evidence from Pember's computer irrefutably showed that the document was first created on her computer in mid-January, 1998. *See* Tr. 11306-09. In addition, GX 530 reflects a $25 million adjustment to the 1998 budget for the Software division, and documentary evidence introduced at trial conclusively showed that this $25 million adjustment was made in mid-January 1998. *See* Shelton Br. at 59. It was therefore impossible for Pember to have created GX 530 in mid-December, and thus impossible for her and Sabatino to have obtained Shelton's approval to distribute the bogus budget to Parsippany.

As demonstrated above, Sabatino does not provide any corroboration of Pember's testimony as to this supposed meeting. At trial, Sabatino testified that he did not believe that the meeting took place in December 1997, as Pember had testified, and he was not sure that GX 530 was the document Shelton tore up. *See* Tr. 4235-36, 4589-90. Sabatino further admitted that he did not know that he ever saw GX 530 during the period he worked at CUC. *See id.* Whatever limited corroboration Sabatino's trial testimony provides for Pember's version of events evaporates, however, in the face of the statements Sabatino made in the summer of 1998. As discussed above, despite the fact that Sabatino was one of the two "whistleblowers" who disclosed the fraud in April 1998, Sabatino never mentioned in any of his early meetings with the governments a meeting at which Shelton was shown GX 530 or at which Sabatino and Pember obtained Shelton's approval to provide Parsippany with a false budget. Indeed, during one of his interviews, Sabatino was shown a copy of GX 530 and Sabatino said that he had never before seen the document. *See* Tr. 10499.

**D.    Shelton Did Not Commit Perjury Regarding An Interval Cover Story**

The government wrongly contends that the $80-90 million of Interval gains reflected on GX 387 was a "cover story" concocted by Shelton and Corigliano in early April 1998. That speculative hypothesis is not supported by the evidence or common sense. In early April 1998, Shelton visited his close friend Anthony Petrello in Houston who is President and Chief Operating Officer of Nabors Inc., and who holds both a law degree and an M.B.A. from Harvard University. *See* Tr. 12506-11. This visit was voluntary. There was no need for Shelton to visit Petrello at all, or to discuss the events that occurred at Cendant with Petrello. During his visit, Shelton described to Petrello the events of March 6 through 9, and Silverman's increasing hostility towards Shelton and his former CUC colleagues. From Houston, Shelton called Corigliano and asked him to fax a copy of GX 160 to Petrello's residence. Corigliano's fax included the handwritten notation on the front page, "Includes $80-90 million related to II [Interval International]," apparently an attempt or Corigliano's part to remind Shelton that the $165 million adjustment included significant amounts of gain from Interval. *See* GX 387. Petrello reviewed GX 387 in conjunction with CUC's SEC filings, and he assured Shelton that, as far as he could tell, the document did not reflect any improper accounting.

Corigliano's claim that he wrote the $80-90 million notation to remind Shelton of a cover story that had been developed for Petrello makes no sense. First, a large percentage of the Interval deferrals are detailed in footnotes in the Cendant Form 10-K for calendar 1997, which was filed in late March 1998. Second, if these alleged conspirators were going to concoct a cover story, they would have done so *prior* to March 6 in an effort to deceive Scott Forbes. Third, contrary to the government's claim that "participants in the March 6 meeting testified that no one said anything at that meeting about Interval representing $80 to 90 million of the $165 million figure," Br. at 60, Corigliano testified that he was sure that Shelton mentioned *$80-90*

*million* of Interval gains *at the March 6 meeting*. *See* Tr. 7527. The government simply ignores this testimony and cites only from Corigliano's redirect testimony in which, despite his earlier certainty that Shelton had discussed the Interval gains at the March 6 meeting, Corigliano claimed that Shelton had not discussed the subject. Fourth, DX 1288, which was provided to HFS on March 9, demonstrates that $15 million of Interval was to be recognized in the first quarter of 1998 alone. Fifth, Speaks remembered Shelton discussing the entire $107 million gain from Interval at the March 6 meeting. *See* Tr. 1163-64. Sixth, Shelton would not need a cover story for his close friend and confidante, Petrello. Seventh, Corigliano would not need to remind Shelton about a cover story supposedly created just a day or two prior.

Against this overwhelming evidence to the contrary, it is astounding that the government isolates this small part of Shelton's testimony and labels it perjury based on Corigliano's testimony to the contrary. The government's claim that its "cover story" theory is corroborated by the second page of GX 160 misapprehends the nature of the Interval transaction. The gain from Interval was in two parts: first, there was revenue CUC had received from Interval's new owners who paid CUC to continue to provide services to Interval customers. *See* DX 1283 (Cendant's Form 10-K for 12/31/97) at F-45 n. 20 & F-53, n. 22. The $38 million of Interval revenue reflected on the second page of GX 160 represented this on-going stream of income. In addition, Shelton was under the impression -- based in part on conversations with Corigliano -- that there was a second component to the Interval gain for 1998, which represented $55 million of proceeds from the sale of Interval. *See* Tr. 12470-73. Shelton believed that CUC was unable to recognize these proceeds in 1997 at the time Interval was sold because there had existed a possibility that the Federal Trade Commission would confiscate them. Only when it became apparent in 1998 that such proceeds would not be confiscated did Shelton believe that

CUC could recognize the $55 million as a one-time gain. Shelton believed that this $55 million was included within the $165 million of budget adjustments reflected on page one of GX 160.

Moreover, contrary to the government's claim that Shelton was concocting a "cover story" with Corigliano in early April 1998, the evidence shows that Corigliano and Pember were hiding the fraud from him around this time. On March 31, 1998, Speaks sent Pember an email outlining the accounting issues in connection with the cancellation reserve and Comp-U-Card's revenue recognition practices. Speaks attached several detailed analyses to his email, and he explicitly requested that Shelton and Corigliano be made aware of these issues. Pember, however, forwarded the email only to Corigliano with the question, "Cosmo – How should we proceed?" GX 31. Shelton never saw Speaks' email despite Speaks' request that Shelton be informed of these issues. Also typical of the manner in which Corigliano hid the fraud from Shelton was Corigliano's admission that as late as April 13, 1998, he was still telling Shelton that the delay in booking the rejects in transit did not have an income effect.

## <u>ARGUMENT</u>

**I.    THE COURT SHOULD ORDER A NEW TRIAL IN THE INTERESTS OF JUSTICE PURSUANT TO FED. R. CRIM. P. 33 (REPLY TO GOVERNMENT POINT I)**

The Government has avoided any meaningful discussion of *United States v. Autouri*, No 3:96-CR-161 (EBB), 1998 WL 774232 (D. Conn. Aug. 28, 1998), *aff'd in part, rev'd in part*, 212 F.3d 105 (2d Cir. 2000), in which the Second Circuit affirmed the decision of a Connecticut District Court to exercise its discretionary power to order a new trial pursuant to Fed. R. Crim. P. 33 on facts substantially similar to this case.

Autouri was convicted for his purported participation in a scheme to defraud by making materially misleading representations to potential investors in a real estate partnership syndicate. The Government relied heavily on the testimony of two Government witnesses to support its argument that Autouri knew that his representations or omissions to potential investors were materially misleading. In addition, the Court noted as significant that much of the supposed evidence against Autuori was evidence that had been insufficient to put other government witnesses on notice of any problem. Thus, the District Court observed:

> [a]ll of the evidence falls into one of two categories. Either government witnesses undermined the Government's theory that the Defendant must have known about a scheme to defraud by testifying that a given fact, pointed to by the Government as a red flag, was no cause for alarm, or the testimony between [the primary Government witness] and other government witnesses was so hopelessly conflicted that no reasonable inferences of knowledge or intent could be drawn therefrom.

*Autouri,* 1998 WL 774232 at *20.

In ruling on the Rule 33 motion, the Court noted that it would be a manifest injustice to allow the conviction to stand where the testimony of the two key Government witnesses "was fatally undermined by prior inconsistent statements, inconsistent statements made during trial, and, in the case of [the primary cooperating Government witness], many contradictions by fellow Government witnesses." *Id.* at *30.

*Autouri* leaves no doubt that this Court has the discretion to reverse Shelton's conviction and order a new trial. The ample record evidence supporting Shelton's motion for a new trial is outlined in detail in the Opening Brief (*see* Shelton Br. at 7-94) and is clarified herein (*see supra* Statement of Facts, at 3-34; *see infra* The Evidence Established That Corigliano And Pember Committed Perjury At Trial, at 38-46), and we will not replicate that presentation again. Suffice it to say, however, that the inconsistencies and contradictions that plagued the testimony

of the Government's witnesses in *Autouri* are strikingly similar to the defects in Corigliano's and Pember's testimony. As in *Autouri*, both Corigliano and Pember testified to events and meetings which other witnesses either did not recall or affirmatively denied. *See id.* Their testimony was riddled with inconsistencies – internal inconsistencies, inconsistencies with prior statements, and inconsistencies with each other's testimony. *See id.* As in *Autouri*, documents and other forensic evidence refuted their testimony concerning alleged conspiratorial meetings with Shelton. Moreover, as was the case in *Autouri, see* 1998 WL 774232 at *32, both Corigliano and Pember had substantial motives to misconstrue the truth; that consideration is even more compelling in this case where both of the witnesses were cooperating conspirators who received deals with the government in exchange for their cooperation. *See, e.g.,* GX 1546 p. 7; Tr. 7960-61 (Corigliano plea agreement provided that government would not oppose a sentence of home confinement).

The parallels with *Autuori* extend beyond the problems with the testimony of Corigliano and Pember. Just as in *Autuori,* where the District Court noted that many government witnesses had received the same documents and information that the defendant had received and had not been alarmed by such documents and information, in this case, government witness after government witness acknowledged the receipt of many of the same documents and the same information that the government argued put Shelton on notice of the fraud. Yet, those same government witnesses consistently testified that, faced with much of the same information, they had not perceived anything improper or fraudulent about CUC's accounting. *See* Shelton Br. at 31-45.

Thus, the Government has persistently argued that Shelton's knowledge of reserve adjustments that increase revenue (such as the reserves line item on the so-called "cheat sheets" or the information reflected on GX 160) would have alerted Shelton to a fraud, despite

36

the fact that Scott Forbes, Monaco and Menchaca had access to similar or identical information (as did Silverman, McLeod and Ernst & Young), yet they disclaimed any suspicion of wrong-doing prior to April 1998. *See Autouri*, 1998 WL 774232 at * 29 ("The Government's theories were often undercut by testimony from one or more government witness who refused to give a document the import claimed for it by the prosecution, e.g., the CMC budget.").

The Government's strenuous and lengthy attempt to rehabilitate the inconsistent and contradicted testimony of Corigliano and Pember (*see* Br. at 81-101) does not diminish the fact that a verdict based upon this dubious testimony is a miscarriage of justice. Even assuming arguendo that the government could devise a potential explanation that would allow for the "theoretical possibility" that the respective witness did not commit perjury, it would still be inappropriate to allow the verdict to stand. Whether a consequence of perjury, mistake, or murky recollection, the inconsistent and contradictory nature of this testimony is a compelling justification for a new trial. *See Autouri*, 212 F.3d at 121 (holding that the proper inquiry is whether "the credibility of the principal witnesses was weak and that the soundness of the verdict is highly doubtful.").

The Government responds to Shelton's argument for a new trial by citing a litany of cases, from as far back as 1962, in which a Rule 33 motion was denied. *See* Br. at 72-73 n. 17. Shelton does not dispute the obvious; most Rule 33 claims are denied and each case must turn on its own facts.

This case is one of the exceptional ones. It would be a miscarriage of justice for Kirk Shelton's conviction to stand on the basis of this record, and in particular the dubious (if not outright perjurious) testimony of the government's two main witnesses. As the Government is quick to point out, a grant or denial of a new trial pursuant to Rule 33 is an exercise of discretion.

*Autuori* makes clear that the trial court has ample discretion in this case. And the record establishes that Shelton's conviction should not be permitted to stand.

## II. THE EVIDENCE ESTABLISHED THAT CORIGLIANO AND PEMBER COMMITTED PERJURY AT TRIAL (REPLY TO GOVERNMENT POINT II)

The Government's description of the standard for a finding of perjury in the case of Corigliano and Pember is irreconcilable with the manner in which the government throws around the use of the same perjury concept in connection with Shelton's sentencing and the government's advocacy for a sentencing enhancement. Thus, while pointing to relatively minor inconsistencies in testimony as a basis for labeling Shelton a perjurer for sentencing purposes, the government writes with respect to Corigliano and Pember: "[i]nconsistencies, failures of recollection or erroneous testimony does not by itself constitute perjury." Br. at 118. The government ignores, however, that in the case of Corigliano and Pember, the basis for a finding of perjury went well beyond mere inconsistencies in testimony.

### A. The Evidence Established That Corigliano Committed Perjury At Trial

The government's various efforts to defend Corigliano's testimony are unavailing. The government argues that there was nothing "incredible" about Corigliano's testimony that he did not "connect" in his own mind the fact that the CUC stock price might be inflated by his own misconduct at the time he sold more than $23 million in CUC stock. *See* Br. at 83-84. In seeking to excuse Corigliano's testimony, the government mischaracterizes it. The government suggests that Corigliano testified only that he did not have a financial motivation to participate in the fraud. But Corigliano's testimony went further; Corigliano testified that he did not believe the price of CUC's stock was inflated. That testimony is patently false, and the government permitted it to stand uncorrected. Thus, at the same time that the government credits

Corigliano's testimony that he repeatedly advised Shelton of the various accounting machinations in which he was engaged because he wanted to make sure Shelton understood their effect on CUC's bottom line, the government is prepared to suspend its critical faculties and allow Corigliano to testify that he did not know the fraud affected CUC's stock price.

The government seeks to whitewash Corigliano's false testimony about the bug-sweeping incident because, according to the government, his testimony did not have any impact on the proof of Shelton's guilt. *See* Br. at 84-86. Contrary to the government's assertion, Corigliano's testimony went directly to the issue of Shelton and Walter Forbes' alleged participation in a scheme to defraud HFS. Moreover, even assuming arguendo that Corigliano's testimony was collateral, it was false and the government had an obligation to recognize it as such.

Corigliano testified on direct examination that in or about October 1997, Walter Forbes told Corigliano that Walter Forbes wanted to have the CUC offices swept for "bugs" -- electronic listening devices – because he did not want Silverman listening to any of their conversations. Tr. 7344, 7347. After being confronted with overwhelming evidence that the bug sweeping incident occurred in November 1996, not in November 1997, Corigliano claimed on cross-examination that he was mistaken about the date of the bug sweeping, and sought to minimize his false testimony, testifying that it "[t]urned out that I had my dates wrong," Tr. 9663, and contending for the first time that "I was never sure of the times" of the bug sweeping, despite his failure to note any such uncertainty on direct examination. Tr. 9661. Yet, the date was absolutely critical because only by placing the bug sweeping conversation in Fall 1997 was Corigliano able to link the conversation with any supposed concern about Silverman learning about reserves.

The government, in one fell swoop, argues that it is of no moment that Corigliano's testimony was contradicted on various material issues by numerous other witnesses, including its own witnesses such as Sabatino, Kearney, Speaks, and Albright, or by defense witnesses whom it has conceded were not co-conspirators, such as McLeod, Zychick, and Lipton. *See* Br. at 89. Contrary to the government's assertions, these witnesses contradicted Corigliano on matters that went to the heart of the government's case against Shelton:

- Speaks contradicted Corigliano's testimony that Corigliano did not directly tell Speaks to improperly inflate the Comp-U-Card budget by $200 million in preparation for the December 11, 1997 controllers' meeting. *Compare* Tr. 684-85 *with* Tr. 8919-20.

- McLeod testified that the cheat sheets were not fraudulent documents, that Corigliano gave him false explanations for the allocations and the cancel reserves, and that he did not participate in any conspiratorial conversations with Corigliano and others in various conspiratorial conversations in 1997 and 1998. *See* Tr. 10874-75, 10879, 10895, 10900, 10912.

- Albright contradicted Corigliano's testimony that the Essex reserves were inflated. *Compare* Tr. 6401-02, 8855-56 *with* Tr. 3963.

- Zychick contradicted Corigliano's testimony that the GETKO reserves were inflated. *Compare* Tr. 6536, 6538 *with* Tr. 11170-77.

- Sabatino and Kearney contradicted Corigliano's testimony about his limited role in making the topside adjustments and manipulating the unadjusted consolidations. *Compare* Tr. 7087-88, 8513, 8518 *with* Tr. 4058-60, 4677, 9726.

- Lipton contradicted Corigliano's testimony regarding various conspiratorial conversations that they purportedly had in 1997 and 1998. *See* Tr. 11486-87, 11545.

The government seeks to minimize the significance of the fact that Corigliano denied that GX 613, a March 4, 1998 memorandum from Walter Forbes to Silverman, had been found on his computer, as established by the unrebutted testimony of Shelton's computer forensics expert, David Stenhouse. The government concedes that Corigliano denied during

cross-examination that the memorandum had been stored on his computer (Gov't Opp. at 91), but attempts to minimize the significance of his testimony by noting that Corigliano's "initial response to that inquiry on cross-examination was more equivocal" because Corigliano first said he was "not aware" that the memo was on his hard drive. *Id*. The issue is not whether Corigliano had a failure of recollection about whether a document was stored on his computer. The issue is that on direct examination, Corigliano testified that Shelton personally handed a purportedly fraudulent document to him. Given that there is now no dispute that the document was not only found, but created on Corigliano's computer, it is axiomatic that Corigliano gave false testimony when he claimed that Shelton handed the document to him.

The government also suspends its disbelief in crediting Corigliano's testimony that he did not tell People's Bank that the purpose of his recent $500,000 loan was for home improvements, even though this purpose is reflected on the application form. *See* GX 3079 (bank loan application). Ignoring its own responsibility to present truthful testimony, the government claims that Shelton should have presented evidence to contradict this patently false testimony. Ironically, however, the government continues to assert that Corigliano's testimony went to a collateral matter and therefore plainly would have argued at trial that any further proof offered by Shelton of Corigliano's false statements on the loan application could not have been proven by extrinsic evidence.

One other contradiction in Corigliano's testimony warrants mention here. On direct examination, the government elicited false testimony from Corigliano about his decision to destroy documents. Consistent with his pattern of blaming Kirk Shelton for his own actions, Corigliano claimed that on April 15, 1998, he deleted "cheat sheets" in response to a conversation with Shelton. Tr. 7553. Corigliano specifically denied that he destroyed his files

after talking to Lipton. Tr. 9247. This testimony was false, as evidenced by the notes taken by Special Agent Mark Gerber, which indicated that Corigliano destroyed documents after Lipton encouraged him to clean his office, not after any conversation with Shelton. *See* Tr. 11553-56.

### B.    The Evidence Established That Pember Committed Perjury At Trial

The government argues that Corigliano's false testimony is irrelevant to the Court's Rule 33 analysis because the testimony of Pember was sufficient to convict Shelton. But the testimony of Pember was as unreliable as the testimony of Corigliano.

The government unpersuasively claims that Pember had no motive to "frame" Shelton because her plea agreement required her to provide substantial assistance in the investigation and prosecution of only "one or more persons." Br. at 95 (citing GX 1759). The government argues that Pember's cooperation assisted in the investigation and prosecution of Corigliano. *See id.* Thus, under the government's flawed reasoning, Pember did not need to cooperate against Shelton to earn a 5K1 letter from the government.

This argument is meritless. Sabatino, Kearney and Speaks all became cooperating witnesses well before Pember. Indeed, Sabatino and Speaks were the whistle-blowers of the fraud. Each of them had a wealth of evidence incriminating Corigliano, but none against Shelton. Pember well knew that her information would be much more valuable if she incriminated Shelton, and that the government would view her information as much less valuable if she added just another voice to the well-documented sins of Corigliano.

Implicit in the government's argument that Pember had no motive to lie about Shelton is a set of assumptions about the government's behavior in writing 5K1 motions that is contrary to experience. As this Court is aware, in writing 5K1 letters, federal prosecutors typically weigh not just the fact, but also the utility, of a cooperator's information. The fourth

cooperator to provide incriminating information against a putative defendant is viewed by the government as significantly less valuable than a cooperator who is the first in line to provide information against a new target. 5K1 letters routinely make such distinctions in moving courts for downward departures. Surely, this was a factor that gave Pember -- who has three teen-aged children, a disabled husband, and a strong desire to avoid prison --  a motive to provide false testimony about Shelton.

            The government contends that Pember's testimony regarding her stock sales was not false because Pember, CUC's controller, "was not an expert in forensic stock market analysis." Br. at 98. This contention is absurd. Pember admitted that she lied to auditors, created false accounting documents, and inflated CUC's earnings from 1990 to 1998. Notwithstanding this conduct, Pember testified that she "did not, in my head, think that the things that I was doing was criminal." Tr. 3097. She further testified that despite her role in overstating CUC's earnings, she "didn't believe that the stock was overstated" and did not think that she had affected the stock price by her improper conduct. Tr. 3135. Compounding her already incredible testimony, Pember stated under oath that her role in the undisclosed fraud did not give her "inside information" or an advantage the rest of the investing public did not have. Tr. 3154. It does not take an expertise in forensic stock market analysis to know that Pember had inside information, not shared by the investing public, that inflated the price of CUC's stock (although it should be recalled that Pember holds a Masters degree in Finance, *see* Tr. 2326). It is plain that Pember is studiously asserting her ignorance in order to avoid settling the SEC's insider trading claims against her and having to disgorge millions of dollars in unjust gains on her stock sales.

The government mischaracterizes Pember's testimony when it suggests that she "may have been mistaken about the timing of her delivery of GX 530 to Shelton." Br. at 98. Pember's false testimony was not merely a matter of mistaken dates. Pember claimed that she gave GX 530 to Shelton in mid-December 1997 because she wanted Shelton's authorization to send bogus budget documents to HFS. *See* Tr. 2840-41, 2878, 3365, 3772-73. In fact, the evidence conclusively established that GX 530 was not created until mid-January 1998, a month after Pember sent the phony budget information to HFS and before she could have obtained Shelton's authorization to have done so. *See supra* Shelton Did Not Commit Prejury Regardin GX 530 -- A One-Page Document Reflecting CUC's 1998 Budget, at 28-31 (discussion of GX 530); Shelton Br. at 57-60 (same). The government's contention that Shelton did not "conclusively" establish that GX 530 was not created until mid-January 1998 ignores a veritable mountain of evidence establishing that the document could have been created only in mid-January 1998. *See id.*

The government argues that the jury was not required to accept the "self-serving recollection" of the three E&Y auditors that they did not meet with Pember and Shelton to discuss the establishment of the Cendant merger reserve. Br. at 99. To begin with, the notion that the testimony of the E&Y auditors was "self-serving" is completely without basis. Cendant has sued E&Y for $3 billion. There is nothing E&Y would like more than to be able to show that Shelton, a senior CUC and then Cendant officer, lied to E&Y about merger reserves and other accounting issues. In apparent recognition that the testimony of the E&Y auditors was unimpeachable, the government did not cross-examine any of them on whether they were mistaken or lying about not having attended any meetings with Shelton.

44

The government also argues that, even if Pember was "mistaken" about Shelton's presence at these meetings, his absence would not undermine Pember's inculpatory testimony because the reserve schedules given to E&Y at these meetings did not have the cushion schedule. Br. at 99. This argument is misleading. Pember testified that it was immediately after the meetings with the auditors that she handed out to Corigliano and Shelton the predecessor version of GX 493 that contained the "Total Cushion" column. *See* Tr. 2572. If, as the E&Y auditors make plain, there were not meetings at which Shelton gave them the phony merger schedules, then it follows that Shelton was not present at any post-E&Y meetings at which Pember showed him prior versions of GX 493 that contained a "cushion" column.

The government resorts to speculation when it attempts to reconcile Speaks' testimony that he repeatedly asked Pember to alert Shelton to various accounting manipulations at CUC and Pember's testimony that she repeatedly told Shelton about the fraudulent activity. In the government's view, the evidence "merely shows that Pember was being circumspect, as conspirators must be, careful not to take Speaks fully into her confidence about the full extent of Shelton's knowledge of the fraud." Br. at 99. The government's theory is not supported by the evidence. Pember never said that she was trying to protect Shelton or that she did not want Speaks to be fully involved in the fraud. To the contrary, she sent emails to Speaks in which she sought to comfort him by saying that she would tell Shelton about the various accounting issues that Speaks kept raising with Pember. *See* GX 534. The government's speculation has never been endorsed by Pember or anyone else.

The repeated instances of false testimony by Corigliano and Pember creates more than a "reasonable likelihood that the false testimony could have effected the judgment of the jury," which is cited by the government as the applicable standard under *United States v.*

*Helmsley*, 985 F.2d 1202 (2d Cir. 1993). Br. at 119. These two witnesses were the centerpiece of the government's case. Had the government acknowledged that they had perjured themselves, surely that acknowledgement would have had an impact on the jury.

Finally, the government argues that even accepting that its witnesses perjured themselves, Shelton has no remedy because he was able to make arguments to the jury regarding the false testimony. *See* Br. at 120. According to the government's view of the law, a defendant convicted on the basis of perjured testimony has no basis for a new trial as long as the defendant was able to make arguments to the jury about the perjurious nature of the testimony. What the government's argument ignores, however, is that in this case the government sanctioned the perjurious testimony by offering it through witnesses that had cooperation agreements, and then assuring the jury that the government would have taken action as to those witnesses had perjury been committed. *See* Tr. 14860 (conveying the message to the jury that the government believes Corigliano was telling the truth by suggesting that Corigliano's cooperation agreement has not been "thrown out the window"; Tr. 14861 ("If they testify falsely, if they lie, the agreement goes out the window"); Tr. 14858 ("So Cosmo Corigliano, who the defense has called a liar so many times I can't even count them, is credible."). The fair and correct inference that the jury undoubtedly drew from such statements was that the government was standing by Corigliano and Pember. Faced with clear evidence that both witnesses committed perjury, the government's improper vouching and failure to correct the record violated due process and, in and of itself, requires the grant of a new trial.

### III.    THE CONSCIOUS AVOIDANCE INSTRUCTION WAS IMPROPER (REPLY TO GOVERNMENT POINT III)

#### A.    The Conscious Avoidance Charge Effected A Constructive Amendment of the Indictment

The government's post-indictment request for a conscious avoidance instruction that allowed Shelton's conviction based on a new theory of Shelton's criminal knowledge requires the grant of a new trial.  Shelton prepared a defense case to rebut allegations in the Indictment that he had developed and organized an accounting fraud; he should not have been forced to counter accusations instead (as was required upon the inclusion of the conscious avoidance instruction) that he had suspected a fraud (which *other persons* were directing) and had chosen to deliberately remain blind of the fraud.

The conscious avoidance instruction "operate[d] to broaden the possible bases for conviction from that which appeared in the indictment," *United States v. Milstein*, 401 F.3d 53, 65 (2d Cir. 2005), and was "a per se violation of the Grand Jury Clause of the Fifth Amendment that requires reversal even without a showing of prejudice to the defendant." *United States v. Wozniak*, 126 F.3d 105, 109 (2d Cir. 1997) (internal citation and quotation marks omitted).

The government claims that the Indictment could not have specifically alleged conscious avoidance because the government could not have known prior to trial whether Shelton would deny actual knowledge of the fraud.  *See* Br. at 125-26.  This argument is silly. First, the government knew full well from Shelton's Audit Committee interviews and two proffers with the government that he denied knowledge of the fraud.  Second, the government had the investigative resources to present an Indictment to the Grand Jury consistent with the evidence it would present at trial.  The Grand Jury Clause of the Fifth Amendment requires the government to do so.

In any event, the government misconstrues Shelton's position.  Shelton has not argued that the Indictment was constructively amended because it failed to specifically allege conscious avoidance.  Rather, Shelton argues that the allegations of the Indictment are *irreconcilable* with the theory of conscious avoidance.  As such, it is impossible for the Grand Jury to have based the Indictment on the theory of Shelton's conscious avoidance.  Consequently, it was error to allow Shelton's conviction on such a theory.

The government quotes *United States v. Zedner*, 401 F.3d 36, 50 (2d Cir. 2005) for the proposition that "[a] conscious avoidance instruction is not inappropriate merely because the government has primarily attempted to prove that the defendant had actual knowledge."  Br. at 125.  Here, the Indictment went significantly beyond alleging defendants' knowledge; the Indictment alleged that defendants *organized* and *directed* a fraud.  Indeed, the government continues to claim even at this late date that "the Government's evidence established that the charged fraudulent scheme was *developed* and *fostered* at the highest level of CUC's corporate management . . ." and that "Shelton and other leaders of the conspiracy *delegated* the day-to-day operation of the fraudulent accounting to their subordinates . . ." Br. at 126 (emphasis added).  A leader of a conspiracy cannot develop that conspiracy, foster it, and delegate its constituent operations to subordinates, without having actual knowledge of it.  For that reason, the inclusion of a conscious avoidance instruction in the jury charge was an impermissible amendment of the Indictment.

**B.      There Was No Evidence From Which A Reasonable Jury Could Infer That Shelton Harbored An Actual Suspicion That CUC Was Likely Engaged In Accounting Fraud**

The government's various arguments in support of the conscious avoidance instruction illustrate the government's true motive in having requested the instruction:  to lower

the government's burden of proof and invite the jury to convict based on a negligence or "should have known" standard.  The government erroneously argues that Shelton's role as Chief Operating Officer ("COO") of CUC is evidence of his conscious avoidance.  *See, e.g,* Br. at 130 (Shelton "was the second ranked executive . . . [and] he had ready access to the information that *would have* revealed the fraud and *could have* directed any of his subordinates who were involved in the fraud to disclose that information to him.") (emphasis added); Br. at 131-32 ("That defense opened the door to the conscious avoidance instruction, particularly because Corigliano and Pember reported directly to Shelton"); Br. at 138 ("Moreover, unlike any of those other persons, Shelton directly supervised, and had frequent contact with two of his principal co-conspirators, Corigliano and Pember.").

Of course, an executive does not have knowledge -- or even "hints" or "clues" -- of all the actions of all the company's employees.  The government conceded as much in its summation argument.  *See* Tr. 15118 ("To be clear, to be absolutely clear, ladies and gentlemen, we are not asking, the United States is not asking you to return a verdict of guilty because Walter A. Forbes and E. Kirk Shelton ran this company.").  Indeed, if an individual's role as an executive were a sufficient basis on which to predicate conscious avoidance, then knowledge of this fraud could be imputed to Menchaca, Scott Forbes and Michael Monaco, particularly in light of "the sheer magnitude, duration, and numerous transactions comprising the fraud."  Br. at 131. But no one has ever suggested that these similarly situated individuals harbored suspicions of fraud because they were executives of CUC / Cendant.  Accordingly, the relevant inquiry is not whether Shelton, in his executive role, "could have" or "should have" discovered the fraud, but rather, whether he entertained an actual suspicion that CUC was likely engaged in fraudulent accounting.  *See, e.g., Arthur Andersen LLP v. United States*, 544 U.S. ___, No. 04-368, slip op.

at 9 (May 31, 2005) (Noting that knowledge and knowingly "are normally associated with awareness, understanding, or consciousness.").

The government inappositely relies upon *United States v. Aina-Marshall*, 336 F.3d 167, 171 (2d Cir. 2002), to support its contention that Shelton's role as COO supported a conscious avoidance instruction. *See* Br. at 130. The government claims the "Second Circuit [] held that, under similar circumstances, a conscious avoidance charge was virtually compelled." Br. at 130. The government cannot seriously contend that this case and *Aina-Marshall* present "similar circumstances." While in Nigeria, the defendant in *Aina-Marshall* was asked by a woman she had not seen in ten years to transport a bag of dried fish into the United States, and to call a stranger's beeper once in the country to arrange for him to pick up the bag. When a U.S. Customs inspector looked inside the bag, the defendant looked heavenward and started to pray. The inspector found heroin at the bottom of the bag. Exactly how the role of a corporate executive analogizes to that of a smuggler found in possession of narcotics, the government nowhere explains.

To meet its burden, the government must point to specific events and transactions that would permit a reasonable jury to find beyond a reasonable doubt that Shelton was aware of a high probability that CUC was committing fraud yet purposefully avoided confirming that fact. For example, in *United States v. Walker*, 191 F.3d 326, 337 (2d Cir. 1999) (cited at Br. at 132), the Second Circuit affirmed a conscious avoidance instruction where there was evidence that the defendant, an immigration attorney who supervised employees, had reviewed highly suspicious documents, was told that some of the forms filed by his office with the INS contained inaccurate information, and had authorized his employees to sign blank forms that were later completed with materially inaccurate information. *See also United States v. Svoboda*, 347 F.3d 471, 480-81

50

(2d Cir. 2003) (cited at Br. at 131) (conscious avoidance instruction proper where defendant *personally* received numerous stock tips from a friend which allowed defendant to quadruple investments overnight); *United States v. Gold*, 743 F.2d 800, 822 (11th Cir. 1984) (cited Br. at 138) (conscious avoidance instruction proper where defendant-supervisor was *personally* warned by employee that practices were likely illegal and defendant responded that "she did not want to hear about it."). In this case, unlike *Walker*, the government cannot point to specific evidence that shows Shelton suspected CUC was likely committing fraud.

The government attempts to justify the conscious avoidance instruction with a non-sequitur: since Shelton had actual knowledge of the fraud from conversations with Corigliano and Pember, the government argues that he must have known that certain documents and events were suspicious. For example, the government argues that Shelton would have found Pember's "Good News, Bad News" email suspicious because "[u]nlike persons who did not conspire with Corigliano and Pember to cook the books at CUC, however, Shelton **_knew_**, from his numerous conversations with Corigliano and Pember, that CUC had not 'made the numbers' through legitimate accounting, but had done so only by fraud." (Br. at 139) (emphasis added).[2]

This argument turns conscious avoidance on its head: in the government's view, conscious avoidance is justified on the assumption that Shelton possessed actual knowledge. The doctrine of conscious avoidance, however, is an *alternative* to the doctrine of actual knowledge; it would be entirely inappropriate to give the jury a conscious avoidance instruction

---

[2] This flawed line of reasoning is endemic to the government's argument. *See, e.g.,* Br. at 137 ("Unlike each of the other persons identified by Shelton who were exposed to some of the documents but who were ignorant of the fraud, Shelton had numerous conversations about the fraud with his co-conspirators."); Br. at 138 ("Because the other persons who saw the suspicious documents did not have incriminating conversations with Pember and Corigliano, as Shelton did, Shelton's claim that those other persons where [sic] similarly situated to him is misplaced."); Br. at 141 ("Again, Shelton ignores the mounds of evidence regarding his conversations with Corigliano and Pember . . .").

in a case where a finding of actual knowledge is a precondition to a finding of defendant's

conscious avoidance.[3]  Contrary to the approach suggested by the government, the pertinent

inquiry is:  assuming Shelton did not have actual knowledge, was there sufficient evidence for a

reasonable jury to conclude beyond a reasonable doubt that Shelton was aware of a high

probability of fraud?

With the correct question in mind, the fact that similarly situated executives such

as Scott Forbes, Monaco and Menchaca received many of the same documents that supposedly

show Shelton's willful blindness demonstrates that those documents would not have alerted a

recipient to a fraud.  The government properly notes it is under no obligation to prove (or

disprove) the guilty knowledge of these similarly situated persons.  *See* Br. at 137-38.  However,

these similarly situated persons -- each of whom was a government witness, whose veracity has

never been questioned by the government -- made clear that they did not suspect any wrongdoing

based on the receipt of many of the same documents and the same information upon which the

government hinges its case against Shelton.  That record testimony stands unrebutted, and it

negates any reasonable inference that these documents would have placed a reader on notice that

---

[3]      The government quotes *Svoboda*, 347 F.3d at 480 and *United States v. Mang Sun Wong*, 884 F.2d
1537, 1543 (2d Cir. 1989) in an effort to support its illogical argument that Shelton's alleged
conversations with Pember and Corigliano support an inference of conscious avoidance.  *See* Br. at 137.
The quoted language from *Svoboda* that "the same evidence that will raise an inference that the defendant
had actual knowledge of the illegal conduct ordinarily will also raise the inference that the defendant was
subjectively aware of a high probability of the existence of illegal conduct" is an observation about
*circumstantial* evidence of a defendant's actual knowledge.  Thus, in *Mang Sun Wong*, evidence that the
defendant maintained physical distance from the location of a drug deal was circumstantial evidence that
supported an inference that defendant had actual knowledge of, or, in the alternative, consciously avoided,
the illegal nature of the transaction.  The same observation does not hold true for *direct* evidence of a
defendant's actual knowledge.  For example, had the government in *Mang Sun Wong* presented testimony
of an undercover agent that defendant had expressed his intention to participate in an illegal drug deal,
such testimony would not support an inference of defendant's willful blindness.  In this case, the
government fails to appreciate the distinction between direct and circumstantial evidence of actual
knowledge, and mistakenly argues that *direct* evidence of Shelton's actual knowledge can support an
inference of conscious avoidance.

CUC was likely engaged in fraud.  As discussed above, the government's rejoinder that these persons were not similarly situated because they, unlike Shelton, did not have conversations with Pember and Corigliano about the fraud, *see* Br. at 138, impermissibly assumes the very fact that cannot be presumed:  namely, Shelton's actual knowledge.[4]

Similarly unavailing is the government's argument that the "cheat sheets" were suspicious documents.  In an attempt to make the innocuous phrase "cheat sheet" sound sinister, the government quotes a definition from a website devoted to training Information Technology specialists.  *See* Br. at 135, n. 34.  Claiming that, according to this website, the *principal* definition of "cheat sheet" is "a piece of paper with information written down on it that an unethical person might create if they were unprepared for a test," the government fails to note that the observation that "the meaning of cheat sheet has broadened to include *any memory refreshing tool*" is also part of the *principal* definition.  *See* Exhibit A attached hereto (emphasis added).  Indeed, the same website itself provides an assortment of "cheat sheets" on numerous IT topics for the website's users.  *See* Exhibit B attached hereto.

Nor was there anything suspicious about the numbers reflected on these forecasts. The government's own accounting experts explained that, in the event merger-related expenses

---

[4]    Accordingly, there is no reasonable basis to conclude from Shelton's knowledge of commonly-known facts, or his receipt of widely distributed documents, that Shelton suspected CUC was likely committing fraud.  Both Anthony Menchaca and Scott Forbes received GX 160 (the March 6 schedule), yet both testified that they did not suspect any fraudulent accounting.  *See* Tr. 5783-86, 5950-54 (S. Forbes); Tr. 10204 (Menchaca).  On January 21, 1998, Scott Forbes and Michael Monaco were informed about both the variances in the segment reporting and the fact that those variances were caused by reserve adjustments -- facts which Pember supposedly relayed to Shelton in the "Good News, Bad News email." *See* GX 546; Tr. 6013, 6025-26.  And Pember's lie to Shelton in the "Good News, Bad News" email that the company had "made the numbers" only served to deflect any suspicions about the other information contained in the email.  Finally, there was nothing suspicious about Corigliano's decision to increase the Software reserve by $20 million.  Accounting experts confirmed that the prudent approach to establishing a reserve is to ensure it is large enough to cover all anticipated merger-related expenses.  Corigliano's decision to increase the reserve would have appeared to an observer without actual knowledge of the fraud as an act of prudence, not dishonesty.

are charged in the first instance to operating expense accounts, a transfer of reserve funds into those operating expense accounts (and a resulting increase to operating income) would be appropriate.[5]  Scott Forbes and Monaco believed, for this very reason, that over $99 million of Ideon merger reserves had been used legitimately with the effect of increasing operating income. *See* Tr. 2159-83 (Monaco); Tr. 5886-96 (S. Forbes); DX 1288; DX 1303.  The record establishes that there is nothing nefarious about the concept of reserve adjustments that have the effect of increasing income, and there was nothing suspicious about Corigliano's forecasts that reflected relatively minor increases to earnings from the use of merger reserves.

        The government's new examples of Shelton's supposed willful blindness are just as infirm.  Shelton's testimony that he did not recall reading the "Good News, Bad News" email while an employee at CUC is not evidence of his willful blindness. *See* Br. at 132-33.  As discussed above, even if he had read the email while at CUC, that would not show his conscious avoidance.  The government fails to explain how Shelton would have known that the email contained (allegedly) toxic information without reading it.

        The government next points to Shelton's alleged meeting with Pember and Sabatino during which Shelton purportedly tore up GX 530. *See* Br. at 133.  But as the

---

[5]        The government curiously claims -- in direct contrast to the testimony of its own experts and witnesses -- that "even if a merger reserve adjustment can legitimately increase earnings by reducing ordinary expenses (when the company corrects a mistaken characterization of a merger related expense as an ordinary expense and adjusts the merger reserve to cover that expense, <u>see</u> Shelton Mem. 10) such adjustments cannot be properly used to increase income. Tr. 448." Br. at 141.  This claim is incoherent on its face:  *if* a merger reserve adjustment legitimately increases earnings by reducing ordinary expenses *then* by definition that adjustment properly increases income (*i.e.* earnings).  Nothing on page 448 of the transcript supports the government's assertion.  Rather, that page of the transcript reflects Professor Sack's testimony that it would be improper for a company to build an excess into a reserve with the expectation of using that excess to improperly inflate operating earnings.  That testimony is entirely consistent with the view of Shelton (as well as the view of Sack, Heckler, Scott Forbes, Monaco, Speaks, and Pember) that a reserve can, in appropriate circumstances, be used with the effect of increasing operating earnings. *See, e.g.,* Tr. 517 (Sack), Tr. 10690-91 (Heckler), Tr. 2159-83 (Monaco), Tr. 5886-96 (S. Forbes). *See also* DX 1288; DX 1303; DX 30773, at p.4 (H&Q analyst report indicating that CUC could increase its income through the use of reserves).

government has relentlessly argued throughout this case, if accepted as true, the dubious

testimony of this alleged meeting would be, if anything, evidence of Shelton's actual knowledge

of the fraud; it does not support an inference of conscious avoidance. If the government's view

of the meeting is accepted, Shelton became aware of whatever information was on the document

and then disclaimed knowledge; that is entirely different than consciously avoiding learning the

information in the first place.

Finally, the government points to Corigliano's testimony about Shelton's facial

gesture of disapproval, directed at Corigliano, during a meeting between Shelton, Corigliano,

Menchaca and Sarkie, at a moment when Corigliano suggested that CUC use reserves to increase

its operating income. *See* Br. at 133. Despite Corigliano's self-serving spin on the meaning of

this supposed "facial gesture," the only reasonable interpretation of Shelton's facial expression

of disapproval is that Shelton disapproved of Corigliano's suggestion. Nothing about the

expression suggests that Shelton was aware of a high probability of fraud.

### C.     No Reasonable Jury Could Find That Shelton Remained Deliberately Blind

The government has also failed to meet the second prong of the conscious

avoidance analysis -- whether Shelton consciously took steps to remain blind to the fraud while

he harbored such suspicions. *Svoboda*, 347 F.3d at 480 ("there must be evidence that the

defendant (1) was aware of a high probability of the disputed fact **and** (2) deliberately avoided

confirming that fact.") (citations omitted) (emphasis added).

Even if one accepts the government's questionable premise that the evidence

sufficed to show Shelton suspected CUC's accounting was improper, the events of March 9,

1998, foreclose any finding that Shelton deliberately avoided confirming those suspicions. On

March 9, 1998, Shelton voluntarily joined Corigliano, Scott Forbes and Monaco to review

CUC's accounting in connection with its use of merger reserves in 1996 and 1997. Shelton participated in a rigorous review of the accounting for these reserves; no stone was left unturned. *See* Shelton Br. at 33-35. The meeting participants brought in Rabinowitz to provide his imprimatur of the reserve accounting, and Pember produced six inches of back up receipts to support the reserve usage. Whatever doubts Shelton may have entertained before March 9, 1998 about the propriety of CUC's accounting for reserves would have been definitively quelled by the end of that meeting.

Moreover, even Pember's dubious testimony about the meeting at which she supposedly showed GX 530 to Shelton made clear that Shelton attempted to confirm that the accounting adjustments reflected on that document were not improper. Pember testified that, when shown GX 530, Shelton responded "to the effect of reserves to revenue? Can we do that? Something along those lines." Tr. 2879. Contrary to the government's claim that this alleged meeting demonstrates Shelton's willful blindness, Pember's testimony -- if believed -- confirms that Shelton inquired about the propriety of the planned reserve adjustments.

The government has failed to highlight any evidence demonstrating that Shelton made a conscious decision to avoid learning key facts. There is no evidence that Shelton avoided conversations, meetings or documents to prevent confirming suspicions that CUC's accountants were engaged in fraud. Indeed, neither Corigliano nor Pember (if their testimony is to be credited) testified that Shelton gave them the impression that he did not want to hear about the fraud. There is simply no evidence that would allow a reasonable juror to conclude that Shelton purposefully avoided learning the truth about CUC's accounting.

**D.    The Conscious Avoidance Instruction Was Not Harmless Error**

There is a real probability that the jury would have reached a different verdict had the Court not issued a conscious avoidance instruction. This improper instruction implicated the single-most important issue in this case -- Shelton's knowledge of the fraud -- and there can be no presumption that it did not affect the jury's deliberations in reaching a verdict.

Contrary to the government's contention, there was not "abundant evidence of Shelton's actual knowledge of the fraud." *Compare* Br. at 149. If that were true, the government would not have pressed so vigorously for a conscious avoidance instruction and the jury would not have deliberated for thirty-two days. Moreover, the inability of the jury to reach a verdict concerning Walter Forbes shows, at the very least, that the jury was unable to credit Corigliano's testimony. Yet it was Corigliano who provided most of the evidence of Shelton's actual knowledge of the fraud. Unable to believe that testimony, the jury likely turned to the improper conscious avoidance instruction for guidance.

The government claims that, "as Shelton points out (Shelton Mem. 96-97), the bulk of the government's evidence proved Shelton's actual knowledge . . ." Br. at 149. Shelton has done nothing of the kind. The pages of Shelton's Opening Brief cited by the government refer the reader to the allegations of the Indictment that allege Shelton's direction and control of the conspiracy, and excerpts from the government's opening and summation arguments in which the government argued Shelton's actual knowledge. Obviously, Shelton has not endorsed the government's allegations or arguments concerning his guilt, nor has he ever conceded that the government's evidence proves his actual knowledge.

Where a conscious avoidance instruction is given in the absence of a proper evidentiary predicate, and where there is only equivocal evidence of actual knowledge, there is a very significant risk that the jury will convict the defendant because of his negligence:

> The fact that a jury can -- on the evidence -- find actual knowledge does not mean that it can also find conscious avoidance. *If conscious avoidance could be found whenever there was evidence of actual knowledge, a jury could be given a conscious avoidance instruction in a case where there was only equivocal evidence that the defendant had actual knowledge and where there was no evidence that the defendant deliberately avoided learning the truth. Under those circumstances, a jury might conclude that no actual knowledge existed but might nonetheless convict, if it believed that the defendant had not tried hard enough to learn the truth.* . . . [S]uch a result might constitute reversible error.

*United States v. Ferrarini*, 219 F.3d 145, 157 (2d Cir. 2000) (emphasis added).

In this case, there was only equivocal evidence of Shelton's actual knowledge and no evidence that Shelton deliberately avoided learning the truth. There is a significant risk that the jury convicted Shelton for failing to notice hints or clues (the alleged conduct that was made the centerpiece of the government's cross-examination of Shelton), even though he lacked any actual knowledge of the fraud, and despite his attempt to learn the truth on March 9, 1998. Indeed, even the government appears to be under the misapprehension that Shelton can be found to have possessed guilty knowledge based on a finding that he negligently failed to inquire about the accounting. *See, e.g.,* Br. at 130 (Shelton "could have directed any of his subordinates who were involved in the fraud to disclose that information to him."); Br. at 140 ("Shelton's failure to ask his subordinate Pember what she meant by this supposedly 'obtuse' reference . . ."); Br. at 146 ("Shelton's failure to inquire of his subordinates about all of the tell-tale indicia . . ."). The fact that Shelton *did* make such inquiries on March 9, 1998 escapes the government's notice.

The government mistakenly argues that the conscious avoidance instruction must have been harmless because the jury was required to find that Shelton had actual knowledge of the fraud to convict on conspiracy.  Having forcefully argued at trial that the doctrine of conscious avoidance should be presented to the jury as an alternative basis upon which to establish Shelton's guilty knowledge, the government now turns about-face and argues -- in an effort to further its new position -- that the instruction was merely redundant surplusage.

More fundamentally, nothing in this Court's charge gave the jury the impression that it could convict on the conspiracy count only if it found Shelton possessed actual knowledge.  The Court's charge instructed the jury that it had to establish both knowledge and unlawful intent, and that conscious avoidance could only be used to find the former element.  Knowledge and intent are two very different kinds of mental state:  knowledge focuses on what the defendant knows and believes, while intent focuses on his purposes and motives.

The government's position is directly contrary to Second Circuit case law:

> Thus, when [*United States v. Reyes*, 302 F.3d 48 (2d Cir. 2002)] states that conscious avoidance cannot prove intent to participate, we do not understand it to mean that conscious avoidance cannot be used to prove any aspect of intent to participate; it simply means that just as actual knowledge of the illegal purpose of a conspiracy is insufficient to prove a defendant's joinder in a conspiracy, so conscious avoidance of such knowledge is also insufficient. There must be further proof that the defendant joined in the illegal agreement with the intent of helping it succeed in its criminal purpose.  In sum, we can see no reason why the factfinder may not rely on conscious avoidance to satisfy at least the knowledge component of intent to participate in a conspiracy.

*Svobado*, 347 F.3d at 479.  In other words, although knowledge is a necessary condition for criminal intent, there is no reason to conclude that such knowledge cannot be predicated upon defendant's conscious avoidance.  Accordingly, the jury's verdict is not a basis for concluding that the jury found beyond a reasonable doubt that Shelton had actual knowledge of the fraud.

Shelton deserves a trial in which the jury is not confused about its essential task of finding whether he had knowledge of the conspiracy's objectives. The jury should not have been given the option of finding the most crucial issue in this case on a basis for which there was insufficient evidence in the record, and no predicate in the Indictment. An order for a new trial would not significantly burden the government since it is retrying the case against Walter Forbes, and would further the interests of justice by ensuring that a defendant has not been found guilty merely for something short of knowledge of the fraud.

## IV.    THE COURT IMPROPERLY ADMITTED EVIDENCE RELATING TO WALTER FORBES' PLANE EXPENSE CHARGE (REPLY TO GOVERNMENT POINT IV)

### A.    Evidence Relating To Walter Forbes' Plane Expenses Was Not Probative Of The Charged Conspiracy

The government's principal response to Shelton's argument about the erroneous admission of the plane expenses demonstrates the fallacy in the government's argument. The government argues that evidence of Shelton and Corigliano's discussion regarding the plane expense charge to the Cendant merger reserve was probative to show "Shelton's knowledge that *ordinary business expenses* were being charged to a reserve created for merger related expenses -- the precise fraud charged in the indictment." Br. at 152 (emphasis added). The fallacy is that the government offered no evidence that the Forbes' plane expense was an "ordinary business expense." The only testimony presented on this issue was that the plane expense was a one-time cost that was properly classified as either unusual or infrequent and non-recurring, and accordingly was not properly treated as an ordinary business expense.

The government's contention that the voucher is evidence that Shelton intended to violate the relevant accounting rules is completely unsupported by the evidence. First, the

government does not meaningfully respond to the fact that Shelton included all of the relevant information relating to the plane expenses on the voucher itself, knowing that the voucher was to be reviewed by the company's outside auditors. Thus, the voucher made clear that the expenses were plane expenses, that they dated from 1995 and 1996, and that they were being charged to the Cendant merger reserve. In other words, the very same facts that the government points to as evidence that Shelton should have known there was a problem were provided to Shelton on a document that was to be reviewed by Ernst & Young. This is hardly evidence of fraudulent conduct or evidence of guilty knowledge.

Second, the only evidence presented at trial regarding the propriety of the accounting of the plane expense charge is the testimony of Professor Roman Weil, who testified that Cendant appropriately included the plane expense charge as an "other unusual charge" in the line item "Merger Related Costs and Other Unusual Charges" on the income statement in its 1997 Form 10-K, in accordance with Accounting Bulletin No. 30. *See* Tr. 11275; DX 1283.

No other evidence rebutted Professor Weil's expert testimony. The government seeks to enlist Professor Robert Sack's testimony that when two companies do not consider merging until 1997, it is not appropriate accounting to charge 1995 and 1996 costs to the reserve established for that merger. *See* Br. at 152. Professor Sack, however, was addressing merger-related expenses, not the treatment of "unusual charges" under the accounting rules. When specifically questioned about "other unusual charges," Professor Sack conceded that there is no GAAP definition for that term, that a determination as to what to include in the "Merger Related Costs and Other Unusual Charges" line item would involve an exercise of judgment, and that under certain circumstances, expenses relating to activity occurring *before* the merger *can* properly be charged to the reserve later established for the merger. *See* Tr. 542, 544-45.

61

Significantly, the government failed to present any expert accounting testimony on the specific accounting transaction in question -- namely, the charge of 1995 and 1996 plane expenses to the Cendant merger reserve account.  Having failed to introduce any expert testimony that the accounting treatment of the plane expense was improper, the government effectively asked the jury to speculate that the charge was accounted for improperly.

In an effort to salvage its contention that the accounting treatment of the plane expense was somehow improper, the government cites to Cendant's Form 10-K discussion of the "Merger Related Costs and Other Unusual Charges" line item.  This is not a situation where the Government may simply substitute this language in place of offering expert testimony.  The rules of accounting and the requirements of GAAP, as already pointed out by Shelton, are questions of fact properly addressed through expert testimony.  *See* Shelton Br. at 113-14 (citing *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574 (D.N.J. 2001); *Wechsler v. Hunt Health Sys. Ltd.*, 198 F. Supp. 2d 528 (S.D.N.Y. 2002); and *Danis v. USN Communications, Inc.*, 121 F. Supp. 2d 1183 (N.D. Ill. 2000)).  Although the government accuses Shelton of "reducing this issue to a battle of the experts," Br. at 153, the government ignores the weight of legal authority that required it to provide expert testimony on this issue.

The government also erroneously contends that evidence of the discussion between Shelton and Corigliano regarding the plane expense charge would have been admissible in any event to rebut Shelton's claim that he had no "hint" or "clue" of improper accounting.  Br. at 154.  This argument, however, assumes that the accounting for the plane expense charge was improper -- a fact that the government never established.  To the contrary, there was no evidence that Corigliano or Shelton discussed the *propriety* of the accounting for the plane expense

charge.  Moreover, as Professor Weil's unrebutted testimony established, the accounting for the

plane expense charge was correct.

> **B.      Evidence Relating To Walter Forbes' Plane Expenses Was Not
> Admissible As Similar Act Evidence Under Rule 404(b)**

Because, as set forth above, the government failed to provide any evidence that

the plane expense change to the Cendant merger reserve was wrongful or illegal, the evidence

was not admissible as "similar act evidence" under Rule 404(b).  The government misses the

point in arguing that the Second Circuit permits the "routine" admission of 404(b) evidence

where a defendant, like Shelton, places knowledge at issue.  Br. at 155.  Shelton does not dispute

that he was aware of the plane expense charge to the Cendant merger reserve.  The issue is

whether the document establishes that Shelton had any knowledge that the accounting for plane

expense charge was improper.  Evidence that Shelton followed the suggestion of Corigliano to

charge the plane expense to the merger reserve shows only that the transaction took place, and

does nothing to prove any knowledge of impropriety on Shelton's part.  Accordingly, admission

of the document or testimony relating thereto was not proper under Rule 404(b).

> **C.      The Introduction Of Evidence Relating To Walter Forbes' Plane
> Expenses Was Unfairly Prejudicial**

Finally, the government contends that evidence of the plane expense charge was

harmless because the Court previously determined that such evidence was neither "sensational"

nor "disturbing."  Br. at 156.  This is not the test for whether the evidence should have been

excluded.  Evidence of the plane expense charge was the only instance of Shelton's participation

in the charging of a purported ordinary business expense to a merger reserve.  There was no

other evidence presented in the entire case.  As such, the unfair prejudice resulting from the

introduction of this evidence was enormous, and the probative value was non-existent given that

the plane expense was appropriately accounted for as an unusual charge.  The government in this case presented a vast conspiracy involving the misuse of hundreds of millions of dollars in merger reserves to increase income.  Evidence that Shelton was aware of and approved a charge of less than $600,000 to the Cendant merger reserve account created an intolerable risk that the jury concluded that Shelton participated in the fraud charged in the Superseding Indictment, based on nothing more than his participation in this lone accounting decision.

Compounding the problem, the government repeatedly waved the plane expense voucher in front of the jury, reminding the jury of the large expenses incurred by the CUC management team.  Given the lack of probative value, the government's repeated reliance on the plane expense documents was more calculated to prejudice the jury against the defendants, than to have any appropriate probative value.  For these reasons, we respectfully submit that the Court abused its discretion in admitting the evidence of the plane expense and that this admission unfairly prejudiced Shelton.

## V.    OLLER'S TESTIMONY WAS IMPROPERLY ADMITTED (REPLY TO GOVERNMENT POINT V)

### A.    The Memoranda Do Not Satisfy The Requirements Of Fed. R. Evid. 803(5)

The government mischaracterizes John Oller's testimony in arguing that it was admissible under Fed. R. Evid. 803(5).  Oller conceded at trial that the memoranda from which he read during his testimony described events (*i.e.* Shelton's alleged interview statements) as to which Oller could not say he had firsthand knowledge when he "adopted" the memoranda:

Q.    Well, is there anything – and going back to 1998, is there anything in there – was there anything in there where you looked at it and said, Well, I don't quite remember, and you checked with somebody else and they said, Well, no, you may not remember it but that was said?  That kind of thing?

A.    Yeah.  I'm sure that happened.  Not a lot.  But I'm sure that kind of thing happened.

Q.    And so then, correct me if I'm wrong, then the final would not only be a product of your memory, it would be the product of the memory of other people as well, right?

A.    To that extent, I suppose that's right.

Q.    In other words, if somebody else remembered something who was part of your team and you didn't, it all got consolidated into the finished product, right?

A.    That's fair.

Q.    Isn't that the way these things work?

A.    Yes.

Tr. 10378-79.

Thus, Oller plainly conceded that he did not have personal, firsthand knowledge of everything in the memoranda at the time he purportedly adopted its contents.  While this type of group writing may be acceptable practice for memorializing an interview from the perspective of investigative technique, it does not comply with Fed. R. Evid. 803(5), which requires that the witness had personal knowledge of the contents at the time the recollection was recorded.  Had Oller been called to testify when the interviews were still fresh in his mind, he would have been unable to testify to some of the events that he testified to at the trial.  The evidentiary rules would have required Oller to say that he had a personal recollection of anything as to which he was going to testify.  Rule 803(5) cannot *expand* the scope of a witness' testimony beyond those matters to which he could have testified had his recollection not been impaired.  Yet, the government employed Rule 803(5) with precisely such effect in this case.

**B.** **Oller's Testimony Was Improper Under** *United States v. Almonte*, **956 F.2d 27 (2d Cir. 1992)**

Alternatively, admission of the memoranda was improper under the Second Circuit's holding in *United States v. Almonte*, 956 F.2d 27 (2d Cir. 1992). The government argues that *Almonte* is limited to the use of recorded recollection for impeachment purposes. Contrary to the government's claim that "Shelton was not impeached with the interview memoranda," Br. at 165, the government invoked Oller's testimony to highlight prior statements Shelton allegedly made at his Audit Committee interviews as a means of picking away at aspects of Shelton's trial testimony. *See* Tr. 16061-62, 16067-68 (on issue of plane expenses); Tr. 16090-91 (on issue of Shelton's understanding of non-operating income); Tr. 16103 (on Shelton's testimony about what transpired before the March 6 meeting). The government made these arguments during rebuttal, and they were the final impression the jury was left with before starting their deliberations. This use of Oller's testimony was squarely impermissible under the holding of *Almonte,* and by itself constitutes reversible error.[6]

The government contends that Oller's testimony was used principally to show Shelton's consciousness of guilt, *see* Br. at 163, 167, but the government never requested that the testimony be admitted only for this limited purpose. Regardless of the manner in which the government used Oller's testimony during its summation and rebuttal arguments, the jury was

---

[6]     The government claims that Oller's testimony was admissible for non-impeachment purposes (an argument that is disputed below) and that, accordingly, *Almonte* did not preclude its admission. It is hornbook law that while a piece of evidence may be admitted for a permissible purpose, it cannot be used subsequent to its admission for an impermissible use. The fact that Shelton had not yet testified when Oller took the witness stand does not excuse the Government's use of Oller's testimony as impeachment material. As the Government reminds this Court, the admissibility of Oller's testimony was briefed during trial, *see* Br. at 158, and the Government was fully aware, prior to summation, of *Almonte's* holding that, even under the government's cramped reading, precludes the use of a witness's prior statement for purposes of impeachment unless the impeaching evidence is a substantially verbatim transcript of the witness's prior statement or was adopted by the witness as an accurate reflection of her prior statement.

not limited to use that evidence only in a manner suggested by counsel. Moreover, in light of the government's express invitation in summation to the jury to use Oller's testimony as an impeachment device, the jury very likely (and impermissibly) considered that testimony when assessing Shelton's credibility. Thus, in the absence of any request by the government to admit Oller's testimony for a limited purpose, and in the absence of any jury instruction to that effect, the jury was free to find Oller's testimony relevant to any factual issue of consequence in this case, including Shelton's credibility, the truth of any matters allegedly declared by Shelton at the interview, and Shelton's consciousness of guilt.

Although the government argues that *Almonte's* holding should be limited to situations where the prior statement is offered for impeachment, *see* Br. at 163-65 -- a proposition that would still require a new trial since Oller's testimony was impermissibly used for this purpose -- its rationale is clearly applicable to situations where the evidence is used for non-impeachment purposes. Quoting *Palermo v. United States,* 360 U.S. 343, 350 (1959), the government notes that it would be "grossly unfair to allow [a party] to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations, and interpolations." Br. at 164 (alterations added). That rationale applies with even greater force in a situation where a prior statement is offered to demonstrate a defendant's consciousness of guilt, or where a statement is offered as an admission by the defendant. A false exculpatory statement is relevant only if the defendant actually made the statement. *See United States v. Strother*, 49 F.3d 869, 877 (2d Cir. 1995). It would be grossly unfair to use a supposed false exculpatory statement of the defendant, as circumstantial evidence of defendant's guilt, if that allegedly false exculpatory statement was "the product of the investigator's selections, interpretations, and interpolations." Indeed, the

concerns of reliability that motivated the *Almonte* court's concerns about a third-party's

characterization of a witness's prior statement, are even greater when the statement is being

offered to directly undermine a defendant's innocence.

For similar reasons, *Almonte's* rationale also applies to situations where prior

statements of a party-opponent are offered pursuant to Fed. R. Evid. 801(d)(2).  *See Bank*

*Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 168 F. Supp. 2d 57 (S.D.N.Y. 2001).  *Bank*

*Brussels'* logic is perfectly sound:  before a declaration of a party-opponent can be offered as an

admission of a party-opponent, it must first be shown to be a prior statement *of that* party-

opponent.

The government attempts to circumvent *Bank Brussels'* holding by arguing that

"unlike the proponent of the draft transcript in that case, the government did not, in many cases,

offer to prove the truth of Shelton's statements as set forth in the memoranda."  Br. at 167.  This

re-description of trial events is directly contrary to the government's representations at trial that

the interview memoranda were admissible as double-hearsay, because Shelton's out-of-court

declarations were exempt as admissions of a party-opponent from the hearsay exclusion pursuant

to Fed. R. Evid. 801(d)(2).[7]  In any event, in the absence of a request that evidence be admitted

for a limited purpose, the presumption is that relevant evidence can be used to show that any

issue of consequence is more or less likely -- including, of course, by using the evidence to show

the truth of the matter asserted therein.  Thus, even if the government had not explicitly relied

upon Fed. R. Evid. 801(d)(2) in moving the admission of Oller's testimony, the default

---

[7]    *See* Memo. of United States in Supp. of Mot. Seeking to Admit Defs.' Statements That Exist as Past Recollection Recorded Pursuant to Fed. R. Evid. 803(5) (Gov't Trial Mot. No. 3) (filed July 16, 2004), at p.3 ("In this event, the Government will seek permission from the Court pursuant to Fed. RR. Evid 803(5) and 801(d)(2)(A) to have Mr. Oller read into the record portions of the interview memoranda containing the defendants' statements to the Audit Committee investigators.").

presumption is that it was admitted for that purpose, among others. Accordingly, the holding of *Bank Brussels* applies to *all* of Oller's testimony.

       The concerns which underwrite *Almonte* and *Bank Brussels* are not academic points in this case; there is a real risk that the investigators misconstrued, exaggerated, misheard, editorialized, or purposefully distorted Shelton's statements. The defendants showed that the memoranda are replete with known errors.[8] The investigators were hired by, and worked at the behest of, Henry Silverman, a man who had shown nothing but contempt for the CUC management team since the date of the merger.[9] The risk of unreliability was further heightened by the fact that the subject matter of the interviews concerned complex accounting; there was a greater likelihood that the investigators made mistakes while summarizing the interviewee's statements about this complex and esoteric matter. Indeed, some of the government's own witnesses denied, or did not recall, making declarations attributed to them by these memoranda.[10]

## VI. THE INTRODUCTION OF EVIDENCE CONCERNING ALLEGED MISCONDUCT PRIOR TO 1995 CONSTITUTED A CONSTRUCTIVE AMENDMENT OF AND A PREJUDICIAL VARIANCE TO THE INDICTMENT, AND A VIOLATION OF SHELTON'S SIXTH AMENDMENT RIGHTS (REPLY TO GOVERNMENT POINT VI)

       The evidence concerning general reserves, profit sharing receivables, and merger reserves in connection with the Essex and GETKO acquisitions was sufficiently outside the "core of criminality" alleged in the Superseding Indictment such that it constituted a constructive amendment and prejudicial variance, and a violation of Shelton's Sixth Amendment right to notice of the charges against him. As a result, Shelton is entitled to a new trial.

---

[8]     *See, e.g.,* Tr. 10353-54, 14532-36.

[9]     *See, e.g.,* DX 847.

[10]    *See, e.g.,* Tr. 6036, 6147 (S. Forbes).

**A.    Shelton Demonstrated A Constructive Amendment Of The Indictment**

The government contends that because Shelton declined to allege in his memorandum that the challenged evidence about pre-1995 events modified an element of any charge, caused Shelton to be convicted of a crime other than those alleged, or was inconsistent with the "core or criminality," he has failed to state a claim of constructive amendment.  Br. at 170-71.  The government further contends that Shelton failed to show how the evidence regarding pre-1995 events "affected the 'core of criminality'."  *Id.* at 172.  The "core of criminality," as identified by the government in its opposition memorandum, purportedly was the defendants' "fraudulent manipulation of reported earnings in order to cause the investing public to overvalue CUC stock."  *Id.*

The critical determination to be made, however, is not whether the evidence affected the "core of criminality," but rather whether it "substantially corresponded" to the charges in the Indictment.  *United States v. Danielson*, 199 F.3d 666, 670 (2d Cir. 1999) (citing *United States v. Pattino*, 962 F.2d 263 (2d Cir. 1992)).  Similarly, when the evidence offered by the government at trial establishes "facts materially different from those alleged in the indictment," and a defendant is thereby prejudiced in his ability to defend himself, the variance constitutes reversible error.  *United States v. Thomas*, 274 F.3d 655, 670 (2d Cir. 2001) (quotations omitted).

Although the Superseding Indictment *generally* alleged that the accounting misconduct took place from as early as the late 1980s to about April 1998, and *generally* alleged the misuse of merger reserves during that time period, the *specific* allegations regarding merger reserves are limited to the misuse of the Ideon and Cendant reserves in connection with CUC's financial statements for fiscal 1997 and calendar 1997.  *See* Shelton Br. at 122 (citing to specific

charges in the Superseding Indictment).  Similarly, although the Superseding Indictment *specifically* alleged that defendants engaged in improper accounting with respect to the company's membership cancellation reserves, revenue and expense recognition, membership solicitation costs, commissions payable liability, the recording of a $2.6 million tax benefit for Sierra, and the increase of $33 million to calendar 1997 earnings as a result of the re-calendarization process, *see id.*, it completely failed to allege misuse of general reserves, profit sharing receivables, and merger reserves in connection with the Essex and GETKO acquisitions. As argued in Shelton's Opening Brief, general reserves and profit sharing receivables are accounting concepts that are wholly unrelated to and materially different from the accounting concepts described in the Superseding Indictment.  *See* Shelton Br. at 126.

The government argues that the specific allegations detailed in the Superseding Indictment were intended to be an illustrative sampling rather than an exhaustive list of the evidence it would introduce at trial.  *See* Br. at 174.  But the specified allegations simply cannot be "illustrative" of evidence regarding accounting practices that are dissimilar in kind.  It is difficult to conceive how any the allegations included in the Superseding Indictment could have alerted Shelton to the possibility that the government would charge him with fraudulent conduct relating to other distinct types of accounting transactions.

Moreover, the detailed specification of the misuse of the Ideon and Cendant merger reserves precluded the government from charging Shelton with the misuse of unidentified additional merger reserves.  *See* Shelton Br. at 126.  As the Second Circuit has recently held, the government cannot present *additional* evidence at trial that charges the defendant with activities beyond the scheme alleged in the indictment where the allegations in the indictment are made with specificity.  *See United States v. Milstein*, 401 F.3d at 64-67.  *Milstein* does not overturn the

line of Second Circuit cases that collectively outline the appropriate considerations to be made in regards to constructive amendment and prejudicial variance.  Rather, *Milstein* adds another consideration to the calculus and further delineates the limits of the government's flexibility of proof.

Contrary to the government's argument, there is no indication in the opinion that *Milstein*'s holding was attributable to a determination that the challenged evidence was of conduct "more heinous" than that identified in the indictment.  Br. at 181.  Rather, *Milstein* perceived packaging non-sterile drugs in a package that described the drugs as sterile as simply another one of the "twenty different methods of misbranding."  *Milstein*, 401 F.3d at 65.

As happened in *Milstein*, the government overstepped the bounds circumscribed by the Superseding Indictment's extensive and particularized allegations regarding the "Fraudulent Use of Merger Reserves."  Indict. Count 1 ¶ 41.  The alleged misuse of the Essex and GETKO merger reserves should have been identified in the Superseding Indictment.

*United States v. Cohen*, 518 F.2d 727 (2d Cir. 1975), relied upon by the government, involves wholly different facts from those present here.  In that case, the "many oral misrepresentations" allegedly made by the defendant, but not specifically spelled out in the criminal information, were "integral to the very core of the overall scheme and in furtherance of that scheme."  *Id.*, at 733.  In contrast to the facts in *Cohen*, the government here did not claim that the alleged misuse of the Essex and GETKO merger reserves was even remotely "integral to the very core of the overall scheme."  Indeed, the government goes so far in its briefing of this motion as to argue that the evidence had "no bearing" on the counts for which Shelton was convicted.  Br. at 182.

The government contends that the controlling law permits "significant flexibility in proof, provided that the defendant was given notice of the core of criminality to be proven at trial." Br. at 176 (citing *United States v. Frank*, 156 F.3d 332, 338 (2d Cir. 1998)). As already argued by Shelton above, general reserves and profit sharing receivables are unlike the accounting practices identified in the Superseding Indictment. If the "flexibility of proof" may be cast so wide as to encompass activities that are dissimilar to the articulated allegations in the indictment, and that occur during a time period where the allegations are exceptionally lacking in specificity (*i.e.*, pre-1995), the government would be left with absolute discretion to introduce all manner of accounting conduct without giving notice in the indictment.

The Second Circuit has warned that courts should be particularly vigilant in preventing deviations from the indictment in conspiracy and fraud cases because of the already broad nature of such prosecutions:

> [W]e must be especially alert to subtle attempts to broaden the already pervasive and widesweeping nets of conspiracy prosecutions. In light of the current broad range of conduct covered by the federal fraud statutes, it is critical that courts vigilantly enforce the Fifth Amendment requirement that a person be tried only on the charges contained in the indictment returned by the grand jury. In order to avoid amending an indictment in violation of the Fifth Amendment, the government in fraud cases should think through the nature of the crime it wishes to allege and then spell out the offense in a carefully drafted indictment, instead of confronting the defendant with its theory of criminality for the first time at trial.

*United States v. Mollica*, 849 F.2d 723, 729 (2d Cir. 1988) (quotations omitted). The government failed to take heed of the Second Circuit's admonition.

The government's contention that *United States v. Janati*, 374 F.3d 263 (4th Cir. 2004), is "materially indistinguishable," Br. at 177, is unpersuasive. There, the indictment charged a complex health care fraud scheme and identified 61 fraudulent claims for reimbursement. *See id.*, at 266-67. The additional evidence that the government sought to

introduce at trial in that case was in regard to 1300 false claims for reimbursement, including the original 61 claims charged in the indictment. *See id.*, at 266. The additional evidence at issue in *Janati* pertained to fraudulent transactions that were of the *same type* as those articulated in the indictment. In contrast, here the evidence that Shelton challenges concerned accounting transactions that were materially different than those alleged in the Superseding Indictment.

Finally, the government argues that the challenged evidence regarding pre-1995 events "had no bearing on all of [the] counts" for which Shelton was convicted. Br. at 182. The government's argument begs the question why, if the government truly considered the challenged evidence as having "no bearing" on the charges against Shelton, it sought to introduce the evidence at trial in the first instance. Only pages before arguing that this evidence had "no bearing" on the counts against Shelton, the government makes the completely contradictory argument that the alleged misuse of the Essex and GETKO merger reserves was simply another example of the allegation contained in the Superseding Indictment that conspirators employed "improper accounting machinations" to create excess merger reserves "in order to increase operating income of CUC." Br. at 174. The government cannot have it both ways -- either the challenged evidence "substantially corresponded" to the charges in the Superseding Indictment and substantiated a conviction of Shelton, or in the alternative, it had no bearing on the charges and constituted a constructive amendment and prejudicial variance. Shelton has shown here that the latter circumstance occurred.

**B.    Shelton Demonstrated A Violation Of His Sixth Amendment Right To Notice Of The Charges**

The surprise testimony also violated Shelton's Sixth Amendment right to notice of the charges against him. The Sixth Amendment requires that a defendant be afforded sufficient notice of the charges against him to permit him to plead former jeopardy upon

prosecution and to enable him to prepare a defense. *See Russell v. United States*, 369 U.S. 749, 763-64 (1962). Sufficient notice requires that "the indictment must state some fact specific enough to describe a particular criminal act, rather than a type of crime." *United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000) (Gibson, J., separate opinion).

Contrary to the government's characterization of Shelton's argument as a demand for "chapter and verse references" to the pre-1995 events, Shelton did not receive *any* notice in the Superseding Indictment of any specifics concerning improper accounting in the late 1980s through January 1995. Whereas the government provided *some* particulars as to events and accounting matters occurring in the 1995 to 1998 period, it provided *none* as to the period before then.

As a result, Shelton went to trial without notice of the dates of the alleged accounting improprieties or the documents reflecting these allegedly false entries during the late 1980s to January 1995. *See United States v. Bortnovsky*, 820 F.2d 572, 574-75 (2d Cir. 1987) (per curiam) (finding that the Government's failure to identify dates of the alleged fake burglaries and three fraudulent documents was insufficient notice to the defendant). Shelton was left to guess which of the countless accounting transactions the government would challenge over a multi-year period, and as a result, his ability to present a defense was severely impaired and prejudiced. The introduction of evidence regarding alleged misconduct before 1995 violated Shelton's Sixth Amendment right to notice of the charges against him, and requires the grant of a new trial.

VII.   **THE COURT IMPROPERLY ALLOWED CORIGLIANO AND PEMBER
       TO OFFER EXPERT TESTIMONY ON TECHNICAL ACCOUNTING
       ISSUES (REPLY TO GOVERNMENT POINT VII)**

As established in the Opening Brief, Corigliano and Pember provided numerous

opinions and conclusions on technical accounting issues that constituted expert testimony, and as

such, should have been disclosed pursuant to Fed. R. Crim. P. 16(a)(1)(G) and subjected to an

admissibility analysis pursuant to Fed. R. Evid. 702 and *Daubert*.

Although the government contends that Corigliano and Pember's testimony

related to their "inside information" about how the fraud was executed and why publicly reported

financial results of CUC were fraudulent, based upon their personal observations and not their

opinions, Br. at 187, Corigliano and Pember's testimony was not limited in such manner.  To the

contrary, rather than simply providing an account of what he *did* or *observed* at CUC based on

personal experience, Corigliano made *judgments* and gave *opinions* regarding the *wrongfulness*,

the *impact*, and the *legitimacy* of his acts.  For example, Corigliano opined:  that the reporting of

the membership rejects was *wrong* and had an *impact* on earnings, *see* Tr. 6367-68; that some

reserves in connection with the GETKO acquisition were *legitimate* and others were not, *see* Tr.

6536-41; and that the alleged allocation of expenses between months of November and

December 1996 and January 1997 was *illegitimate* and overstated results by approximately $30

million, *see* Tr. 7325-26.  Similarly, with respect to the pre-1995 period, Corigliano repeatedly

gave opinions on the propriety of pre-1995 accounting practices which had not been specifically

alleged in the Indictment.  For example, he testified that the reported numbers for fiscal year

1994 included adjustments that were *not "[l]egitimate."*  Tr. 6377 (emphasis added).

Like Corigliano, Pember also provided expert opinions as to the propriety of

accounting transactions that were also based upon her purportedly specialized knowledge of

GAAP.  She opined:  that the company's use of reserves was *inappropriate*, *see* Tr. 2332-33;

that, *in general*, a company *needs* to reserve for future cancellations and rejects, *see* Tr. 2349-50; as to how Comp-U-Card *should have* treated excess balances in accrued liability accounts, *see* Tr. 2435-37; and about what comprises a *material* transaction, *see* Tr. 2819. These opinions were necessarily predicated upon Pember and Corigliano's expertise with the GAAP rules and accounting standards. Their personal experience with these accounting issues did not transform their expert testimony into permissible fact or lay opinion testimony under Rule 701.

Although the Advisory Committee's Note to Rule 701 notes that "most courts have permitted the owner or officer of a business to testify to the value of projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert" based upon "the particularized knowledge that the witness has by virtue of his or her position in the business," Fed. R. Evid. 701, Advisory Committee's Note, the challenged testimony given by Corigliano and Pember at trial is not captured by this language. The government, over the defense's objection, failed to limit the testimony elicited from Corigliano and Pember at trial to issues concerning the performance of CUC's business, the manner in which the company conducted business, and the damages that may have resulted from such conduct. Rather, on multiple occasions, Corigliano and Pember provided testimony as to the *propriety* or *legality* of accounting decisions (*i.e.*, the company's compliance with the accounting standards), opinions that require highly specialized understanding of and experience with GAAP.

As argued in Shelton's memorandum, courts applying Rule 701, as amended, have consistently concluded that Rule 701 precludes opinion testimony, even from witnesses with firsthand knowledge of events, to the extent that the testimony is based on the witness's specialized knowledge or training. *See United States v. Glen*, 312 F.3d 58 (2d Cir. 2002) (district court abused its discretion in allowing drug dealer's lay opinion testimony about manner

in which drug dealers carry handguns, notwithstanding fact that drug dealer witnessed event); *Wechsler v. Hunt Health Sys. Ltd.*, 198 F. Supp. 2d 508, 529 (S.D.N.Y. 2002) (CPA "personally involved with the financial statements" could not opine whether defendant's accounting was proper because he had not been offered as an expert). The 2000 amendment to Rule 701 was intended to "eliminate the risk that the reliability requirements set forth in Rule 702 [concerning expert testimony] will be evaded through the simple expedient of proffering expert testimony in lay witness clothing." Fed. R. Evid. 701 Advisory Committee's Note.

Here, the government did precisely what the Federal Rules sought to prohibit. While the government offered generalized expert testimony about accounting concepts, the government studiously avoided offering expert testimony about particular false entries or false accounting treatments, restricting any such testimony to a very high-level summary conclusion. To fill in the gaps, the government offered testimony from its cooperators, who were solely within the government's control, and not made subject to expert disclosure rules or *Daubert* hearings. This tactic was in plain violation of Rule 701.

Finally, the government contends that any error in admitting Corigliano and Pember's expert testimony was harmless and therefore does not warrant cause for a new trial. *See* Br. at 194-95. In making this argument, the government summarizes Shelton's case as constituting a sole defense of ignorance, and as presenting "no evidence that contradicted the government's proof of the fraud." *See id.*, at 195. The government grossly oversimplifies and mischaracterizes the case presented by Shelton's counsel. First, although Shelton's counsel conceded the point that some fraud existed at CUC, Shelton surely *did not* accede to the government's characterization of the fraud -- namely, who was involved, which transactions constituted the fraud, and the duration of the fraud. Second, Shelton presented substantial

evidence at trial that contradicted the government's proof of many aspects of the fraud. The idea that Shelton presented "no evidence which contradicted the Government's proof of the fraud" is without basis, given the extensive cross-examination testimony that Shelton elicited from the government's witnesses, the several weeks that Shelton spent to present its case (*e.g.*, the testimony of Joel Zychick), and the numerous documents Shelton introduced into evidence. In the context of a very close case, where the jury deliberated for thirty-two days, the government cannot seriously argue that its unilateral presentation of expert testimony through lay witnesses that were thereby shielded from procedures designed to permit a fair trial is harmless error.

Finally, the Government claims that Shelton is foreclosed from complaint about the improper expert opinion testimony elicited by the Government from Corigliano and Pember because Shelton, on cross-examination, elicited "testimony from both of those witnesses that bore far more heavily on their accounting expertise than anything elicited by the Government." Br. at 196. First, the testimony elicited by Shelton from Corigliano and Pember on cross-examination was appreciably different in degree and amount. The government's argument is without any support in the record. Second, and even more importantly, once the government was permitted to explore the issues raised by the improper expert opinion testimony offered by Corigliano and Pember, Shelton had no choice but to respond to that testimony in kind. Shelton could not be expected to watch helplessly as the government introduced improper expert opinions through Corigliano and Pember, and then fail to follow the same procedure for fear of being accused of waiving the argument. Such a result would be entirely unfair under the circumstances, given that Shelton had made a timely and proper objection prior to the introduction of the improper testimony.

**VIII.    THE COURT IMPROPERLY DECLINED TO REQUIRE THE
GOVERNMENT TO IMMUNIZE STUART BELL (REPLY TO
GOVERNMENT POINT VIII)**

**A.    The Government Gained A Tactical Advantage In Refusing To
Immunize Stuart Bell**

It is absolutely clear that by the time Bell would have been called as a witness, the
government had no intention of ever prosecuting Bell, who stepped down from CUC in early
1995, more than seven years before the government indicted Shelton and Walter Forbes, and
well over nine years before Bell would have been called to testify.  As the government knows
well, any of the crimes with which Bell could conceivably have been charged, were governed by
a five-year statute of limitations, which had long run by the time of Bell's potential immunity.

The government's assertion that it "never denied Bell an opportunity to enter a
cooperating plea agreement (like Corigliano, Pember and Sabatino) or to provide a proffer to the
Government pursuant to a proffer agreement (like Kearney)," Br. at 203, is irrelevant to the issue
of whether the government gained a tactical advantage through its failure to immunize Bell.  The
government secured access, through cooperation agreements, to testimony of former CUC
employees who offered testimony of use to the government, *e.g.*, Sabatino, Kearney, Pember and
Corigliano.  The only reason for the government's refusal to have immunized Bell was a tactical
one -- to prevent Bell from providing testimony helpful to the defense.

**B.    Bell Would Have Been A Critical Witness Whose Testimony Was
Material, Exculpatory And Non-Cumulative**

The government cannot credibly contend that Bell's testimony would not have
been material, exculpatory and non-cumulative.  The government has no basis to controvert the
proffer made by counsel for Walter Forbes that Bell would have denied committing any fraud at
CUC and thereby further contradicted Pember and Corigliano, and that Bell would have provided

legitimate explanations for accounting done at CUC during Bell's tenure as CFO.  *See* Simon Decl. to Forbes Trial Motion No. 36; Cary Decl. to Forbes Trial Motion No. 36.

Contrary to the government's contention, that Bell may not have been able to testify about events after 1995 does not undermine the significance of his testimony at this trial. As mentioned above, the government proceeded on the theory that the alleged fraudulent scheme was initiated under the direction of Bell in the 1980s, and that Bell taught Corigliano how to sustain the fraud and to deceive the auditors.  Bell's testimony that he did not personally engage in accounting fraud and was not generally aware of any fraudulent activity at the company would have been devastating to Corigliano's credibility.  Corigliano's account of how the fraud was perpetrated at CUC involved numerous private meetings and discussions with just Bell, and similarly, private meetings and discussions with Shelton.  Bell's denial of such meetings and conversations was a unique source of corroboration for Shelton to which he was denied access by virtue of the government's refusal to grant immunity to Bell notwithstanding the apparent lack on the government's part to pursue any charges against Bell.

## C.    The Government Gained A Tactical Advantage In Refusing To Immunize Stuart Bell

There was no available substitute for the testimony that Bell could have offered on Shelton's behalf.  Expert testimony as to the propriety of documents showing pre-1995 accounting activity would not have equated to testimony *from Bell himself*, particularly because such documents often were innocuous without Corigliano's sinister spin on those documents. No other witness could testify to the range of issues raised by Corigliano during the period between the late 1980s to 1995.  And, Bell was the only person who could have provided testimony rebutting statements that Corigliano alleged that he made in private conversations between the two of them.

In light of Bell's unique ability to testify to numerous material matters, combined with the fact that the government's failure to immunize him accomplished no legitimate law enforcement purpose, Bell should have been granted immunity.

## IX.    THE COURT IMPROPERLY DECLINED TO GIVE THE JURY A MISSING WITNESS INSTRUCTION (REPLY TO GOVERNMENT POINT IX)

In *United States v. Myerson*, 18 F.3d 153 (2d Cir. 1994), the Second Circuit expressly recognized that "in circumstances that indicate the government has failed to immunize an exculpatory witness," *id.* at 160, a district court may abuse its discretion "by refusing to give a missing witness charge." *Id.* The Second Circuit went on to explain that courts must engage in a case-specific analysis to determine whether such a refusal is an abuse of discretion. *See id.* This is precisely such a circumstance. Granting immunity to Bell would not have come at any cost to the government in light of the passage of time and the running of the applicable five-year statute of limitations.

The government does not dispute that if called to testify, Bell would have asserted his Fifth Amendment privilege against self-incrimination. Instead, the government contends that Bell was equally unavailable to both the government and the defense, and that it "had no greater power to convince Bell to testify than did the defense." Br. at 207. In a discussion of Bell's availability to the parties, the professional relationship that Shelton maintained with Bell, however, is hardly comparable to the government's power to grant immunity to Bell. Shelton was in no position to compel Bell's testimony. In contrast, the government had absolute power to do so, and given the passage of the five-year statute of limitations, could have done so at no cost to the efforts of law enforcement. Under these circumstances, the failure to give a missing witness charge was an abuse of discretion that justifies a new trial.

**X.**  **SHELTON IS ENTITLED TO A JUDGMENT OF ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29 (REPLY TO GOVERNMENT POINT X)**

Defendant Shelton reiterates his request (as reflected in his initial motion dated March 7, 2005) for a judgment of acquittal pursuant to Fed. R. Crim. P. 29 on the ground that the "government failed to present sufficient evidence that Mr. Shelton knowingly or willfully participated in a conspiracy to misstate CUC's financial results, that he knowingly or willfully caused CUC or Cendant to file any false SEC filings, that he knowingly and willfully engaged in any fraud related to the stock of CUC or Cendant, or that he acted with the requisite intent to defraud or deceive the holders of CUC or Cendant securities."  Many of the arguments raised in support of Shelton's motion for a new trial also compel a grant of his motion for a judgment of acquittal.  In addition, the Rule 29 motion cites as further support the arguments made in Shelton's summation.  *See* Tr. 15449-16006.  For the reasons articulated during that summation and in the various briefs supporting the motion, defendant Shelton respectfully submits that his Rule 29 motion should be granted as to all of the counts of the Indictment.

## CONCLUSION

For the foregoing reasons and those set forth in Shelton's Opening Brief (filed on April 4, 2005), E. Kirk Shelton respectfully requests that the Court vacate the jury verdict and order a new trial in the interests of justice.

DATED:  June 8, 2005

Respectfully submitted,

DAY, BERRY & HOWARD LLP


By: _____
      Gary H. Collins (CT 22119)
      Stanley A. Twardy, Jr. (CT 05096)
      City Place 1, 185 Asylum Street
      Hartford, CT  06103
      Tel.: (860) 275-0314
      Fax: (860) 275-0343

      MILBANK, TWEED, HADLEY & McCLOY, LLP
      Scott A. Edelman (CT 25268)
      Thomas A. Arena (CT 25269)
      1 Chase Manhattan Plaza
      New York, NY  10005-1413
      Tel.: (212) 530-5000
      Fax: (212) 530-5219

      LAW OFFICES OF THOMAS P. PUCCIO
      Thomas P. Puccio (CT 22983)
      230 Park Avenue, Suite 301
      New York, NY  10172
      Tel.: (212) 883-6383
      Fax: (212) 883-6388

      Attorneys for Defendant E. Kirk Shelton

## <u>CERTIFICATION</u>

I hereby certify that on June 8, 2005 a copy of the foregoing was served on the following parties via overnight mail:

John J. Carney, Esq.
James McMahon, Esq.
Richard J. Schechter, Esq.
Norman Gross, Esq.
United States Attorney's Office
District of New Jersey
970 Broad Street, Suite 700
Newark, NJ 07101

_____
Gary H. Collins