UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


UNITED STATES OF AMERICA     :     No. 3:02CR00264 (AWT)
                     :
                     :
                     :
                     :
          v.             :
                     :      June 23, 2005
                     :
                     :
E. KIRK SHELTON                 :


**SURREPLY MEMORANDUM OF THE UNITED STATES IN OPPOSITION
TO SHELTON'S MOTION FOR A JUDGMENT OF ACQUITTAL
<u>PURSUANT TO RULE 29 AND FOR A NEW TRIAL PURSUANT TO RULE 33</u>**


CHRISTOPHER J. CHRISTIE
NORMAN GROSS
JAMES MCMAHON
RICHARD J. SCHECHTER
JOHN J. CARNEY
Special Attorneys
U.S. Department of Justice
970 Broad Street, Room 700
Newark, NJ 07102
Tel: (973) 645-2700
Fax: (973) 645-2702

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . 1

    POINT ONE . . . . . . . . . . . . . . . . . . . . . . 1
    RESPONSE TO SHELTON REPLY BRIEF POINT X
    JUDGMENT OF ACQUITTAL

    POINT TWO . . . . . . . . . . . . . . . . . . . . . . 3
    RESPONSE TO SHELTON REPLY BRIEF POINT I
    WEIGHT OF THE EVIDENCE

    POINT THREE . . . . . . . . . . . . . . . . . . . . . 11
    RESPONSE TO SHELTON REPLY BRIEF POINT II
    ALLEGED PERJURY OF CORIGLIANO AND PEMBER

    POINT FOUR . . . . . . . . . . . . . . . . . . . . . 12
    RESPONSE TO SHELTON REPLY BRIEF POINT III
    CONSCIOUS AVOIDANCE INSTRUCTION

    POINT FIVE . . . . . . . . . . . . . . . . . . . . . 17
    RESPONSE TO SHELTON REPLY BRIEF POINT IV
    CONSCIOUS AVOIDANCE INSTRUCTION

    POINT SIX . . . . . . . . . . . . . . . . . . . . . . 20
    RESPONSE TO SHELTON REPLY BRIEF POINT V
    TESTIMONY OF JOHN OLLER

    POINT SEVEN . . . . . . . . . . . . . . . . . . . . . 25
    RESPONSE TO SHELTON REPLY BRIEF POINT VI
    ALLEGED CONSTRUCTIVE AMENDMENT OF THE INDICTMENT

    POINT EIGHT . . . . . . . . . . . . . . . . . . . . . 26
    RESPONSE TO SHELTON REPLY BRIEF POINT VII
    CORIGLIANO'S AND PEMBER'S ALLEGED EXPERT TESTIMONY

    POINT NINE . . . . . . . . . . . . . . . . . . . . . 27
    RESPONSE TO SHELTON REPLY BRIEF POINT VIII
    IMMUNIZATION OF BELL

    POINT TEN . . . . . . . . . . . . . . . . . . . . . . 29
    RESPONSE TO SHELTON REPLY BRIEF POINT IX
    MISSING WITNESS INSTRUCTION

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . 30

## TABLE OF AUTHORITIES

### FEDERAL CASES

Crawford v. Washington,
    541 U.S. 36 (2004) . . . . . . . . . . . . . . . . . 29

Ernst Haas Studio, Inc. v. Palm Press, Inc.,
    2005 WL 525446 (S.D.N.Y., March 7, 2005) . . . . . . . 2

Hoffman v. United States,
    341 U.S. 479 (1951) . . . . . . . . . . . . . . . . . 27

Parker v. Reda,
    327 F.3d 211 (2d Cir. 2003) . . . . . . . . . . . . . 21

United States v. Almonte,
    956 F.2d 27 (2d Cir. 1992) . . . . . . . . . . . . . 21

United States v. Ansaldi,
    372 F.3d 118 (2d Cir. 2004) . . . . . . . . . . . . . 25

United States v.  Autuori,
    1998 WL 774232 (D.Conn. 1998) . . . . . 3, 4, 5, 6, 7, 10

United States v. Bouzanis,
    2004 WL 1152852 (N.D.Ill., May 24, 2004) . . . . . . . . 9

United States v. Boyd,
    55 F.3d 667 (D.D.C. 1995) . . . . . . . . . . . . . . 19

United States v. Dazey,
    403 F.3d 1147 (10th Cir. 2005) . . . . . . . . . . . 22

United States v. Dolah,
    245 F.3d 98 (2d Cir. 2001) . . . . . . . . . . . . . 29

United States v. Edgerton,
    734 F.2d 913 (2d Cir. 1984) . . . . . . . . . . . . . 27

United States v.  Goldstein,
    2003 WL 1961577 (S.D.N.Y. April 28, 2003) . . . . . . . 2

United States v. Hopkins,
    53 F.3d 533 (2d Cir. 1995) . . . . . . . . . . . . . 14

United States v. Irizarry,
    341 F.3d 273 (3d Cir. 2003) . . . . . . . . . . . . . 2

United States v. Jackson,
    335 F.3d 170 (2d Cir. 2003) . . . . . . . . . . . . . 21

<u>United States v. Johnson</u>,
    302 F.3d 139 (3d Cir. 2002) . . . . . . . . . . . . . . . 11

<u>United States v. Lenhard</u>,
    894 F.2d 408
    1990 WL 5310(6th Cir., Jan. 26, 1990) . . . . . . . . 8, 9

<u>United States v. Lentz</u>,
    383 F.3d 191 (4th Cir. 2004) . . . . . . . . . . . . . 7

<u>United States v. Maciejewski</u>,
    70 F. Supp.2d 129 (N.D.N.Y. 1999) . . . . . . . . . . . 2

<u>United States v. McDermott</u>,
    245 F.3d 133 (2d Cir. 2001) . . . . . . . . . . . . . 20

<u>United States v. Morales</u>,
    974 F. Supp. 315 (S.D.N.Y. 1997) . . . . . . . . . . . 2

<u>United States v. Patino</u>,
    962 F.2d 263 (2d Cir. 1992) . . . . . . . . . . . . . 25

<u>United States v. Polishan</u>,
    2001 WL 848583 . . . . . . . . . . . . . . . . . . . 10

<u>United States v. Porter</u>,
    986 F.2d 1014 (6th Cir. 1993) . . . . . . . . . . . . 21

<u>United States v. Pritt</u>,
    238 F.3d 417, 2000 WL 1699833
    (4th Cir., Nov. 14, 2000) . . . . . . . . . . . . . . 7

<u>United States v. Schultz</u>,
    333 F.3d 393 (2d Cir. 2003) . . . . . . . . . . . . . 21

**FEDERAL RULES**

Fed. R. Crim. P. 29 . . . . . . . . . . . . . . . . . . . 2

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . 26

Fed. R. Evid. 704(b) . . . . . . . . . . . . . . . . . . 19

Fed. R. Evid. 801(d)(2)(A) . . . . . . . . . . . . . . . 24

Fed. R. Evid. 803(5) . . . . . . . . . . . . . . . . . . 21

**INTRODUCTION**

By permission of the Court (Docket No. 1580), the Government files this surreply memorandum in opposition to defendant E. Kirk Shelton's post-trial motions.  Having demanded a jury, rather than a bench trial, Shelton now demands that this Court throw out the jury's verdict.  Shelton contends that his conviction was the fault of the jury, the Court, and the Government, but not his own criminal conduct.

The jury here devoted more than eight months of their lives to render a just verdict, and saw through every smokescreen and red herring offered during Shelton's ten days of testimony and marathon closing argument.  The jury's verdict of guilty on all counts could not be more clear -- Shelton is criminally responsible for the massive fraud that victimized CUC and Cendant shareholders.  The fact that Shelton does not "get it," however, is simply not a basis to discard the jury's verdict.  More than seven years have elapsed since $14 billion vanished from the savings and pensions of Cendant shareholders in April 1998.  The time has come for Shelton to be sentenced.

**POINT ONE**

**(RESPONSE TO SHELTON REPLY BRIEF POINT X)**
**(JUDGMENT OF ACQUITTAL)**

As the Government pointed out in its initial Memorandum in Opposition to Shelton's post-trial motions ("GB"), Shelton

1

presented no argument or authority to support his request for a
judgment of acquittal pursuant to Fed. R. Crim. P. 29.  GB 205-
06.  Instead of conceding that he has no basis for Rule 29
relief, however, Shelton now insists, based on nothing beyond his
own say-so, that this Court grant a judgment of acquittal and
preclude further prosecution of this case.  Shelton Reply Brief
("RB") 83.

This request, again unsupported by citation to any
authority other than Rule 29 itself, is frivolous.  Ernst Haas
Studio, Inc. v. Palm Press, Inc., 2005 WL 525446, *4 (S.D.N.Y.,
March 7, 2005)(awarding attorney's fees for pursuing a frivolous
appeal, and explaining that "to . . .  file a brief . . . that
fails to state reasoned arguments based on cited authority
setting out grounds for reversal goes beyond frivolity"); see
United States v. Irizarry, 341 F.3d 273, 312 (3d Cir. 2003)
(defendant's failure to develop a legal claim with supporting
argument precluded consideration of the claim).

Shelton apparently believes that this Court should
suspend the rules that apply to every other convicted defendant
and award a judgment of acquittal without Shelton even attempting
to meet his "heavy burden" for such relief.  United States v.
Maciejewski, 70 F.Supp.2d 129, 132 (N.D.N.Y. 1999)(a "defendant
challenging the sufficiency of the evidence following a
conviction bears a heavy burden"); accord United States v.

2

<u>Morales</u>, 974 F.Supp. 315, 318 (S.D.N.Y. 1997); <u>United States v.</u>
<u>Goldstein</u>, 2003 WL 1961577, *1 (S.D.N.Y. April 28, 2003)(finding
the evidence sufficient to prove the defendant's intent to
defraud). Shelton contends that "this case is . . . exceptional"
(RB 37), and in one sense, he's right. Shelton's willingness to
spend millions of dollars to avoid a just result in this case,
even at the additional cost of advancing frivolous claims, is
exceptional. That willingness, however, cannot buy Shelton
immunity from the rules of criminal procedure.

POINT TWO

(RESPONSE TO SHELTON REPLY BRIEF POINT I)
(WEIGHT OF THE EVIDENCE)

Shelton again relies exclusively on the anomalous
<u>Autuori</u> case (RB 34-37) but ignores the Government's arguments
and caselaw (GB 66-114). As Shelton concedes, however, (RB 37)
"each case must turn on its own facts." On the facts of this
case, the grant of a new trial would frustrate, rather than
advance "the interests of justice."

<u>Autuori</u> is notable for its many differences from this
case. First, unlike Shelton, Autuori was not a principal of the
company that issued securities and promulgated false statements
in disclosure documents to the investing public, and who directly
supervised the admitted participants in the fraudulent scheme.
Rather, Autuori was merely a consulting accountant retained by
the Colonial Realty Company who assisted in seeking financing for

3

the company and in selling the securities.  United States v. Autuori, 1998 WL 774232, *21 (D.Conn. 1998)("there was no evidence that [Autuori] had any control over management or held a position of authority within Colonial").  Because he, unlike Shelton, was a corporate outsider, Autuori "can not be tarred with the same brush as the Colonial co-schemers without proof of more than proximity."  Id.  Shelton, by contrast, was the second most powerful executive at CUC, with direct supervisory authority over the two conspirators who were assigned to implement the improper accounting in order to carry out and conceal the fraud.

Second, the Government's proof of Autuori's guilt required the jury to credit Googel, a single, substantially discredited cooperator.[1]  Id. *32 ("[W]ithout Googel's testimony

---

[1]  For instance, virtually all of Googel's testimony about his incriminating meetings with Autuori was contradicted by other prosecution or neutral witnesses.  Id. *21-22.  Here, Corigliano's most damning testimony against Shelton and Walter Forbes, regarding Corigliano's frequent and private conversations with them about the use of the cheat sheets to manipulate CUC's earnings, Tr. 4060-68, 6189-6208, 6222-37, 6279-6324, 6424-32, 6455-57, 6492-93, 6506-17, 6520, 6564-82, 6588-6605, 6666-84, 6714-20, 6761-62, 6827-28, 6891, 6945-49, 6951-53, 6989-90, 7085-86, 7116-18, 7379, 7410, 7513, was not contradicted by any witnesses other than the defendants themselves.

Additionally, a prosecution witness in Autuori, Ermler, who was employed by Colonial and who had greater familiarity with the company's finances and key documents than did Autuori, contradicted virtually all of Googel's testimony that both inculpated Autuori and mentioned Ermler.  Id. * 4 (Ermler contradicts Googel's characterization of Colonial's financial condition and Googel's testimony that Autuori attended meetings in early 1990); id. *7 (Ermler contradicts Googel's testimony
(continued...)

there is no evidence from which a jury could reasonably infer

[Autuori's] requisite criminal knowledge and intent."). Here,

Shelton does not argue in either his initial or reply brief that

Corigliano's testimony was necessary to convict Shelton on any of

the counts, and, as the Government demonstrated (GB 75-79), it

was not.[2]

---

[1](...continued)
that Autuori suggested that Colonial should switch auditors); id.
*9 (Ermler and others contradict Googel's testimony that: (a)
Colonial's attorneys advised Autuori and others that Colonial's
securities could not be sold even with additional disclosures;
(b) he did not become angry when lawyers advised the Colonial
principals that they had to make additional disclosures to
investors; and (c) Googel discussed a watered-down disclosure
with Autuori).

       Here, Menchaca and McLeod, unlike Ermler, corroborated
Corigliano and other prosecution witnesses in part. See, e.g.,
Tr. 10043-52 (Shelton told Menchaca in early 1998 that part of
the difference between the reported accrual profits of $30
million and the cash-based profits of $10 million for the
individual membership units that Menchaca managed for the month
of January 1998 was attributable to the merger reserve); Tr.
11051-54 (McLeod explains that, had he seen the GX 62b "cheat
sheet," as Shelton did, McLeod would have demanded an explanation
from Corigliano for the large merger reserve line of $100 million
which contributed almost 25% to Comp-U-Card's EBIT); Tr. 11093-97
(McLeod testifies that had he seen GX 530, it would have caused
him to suspect improper manipulation of merger reserves); Tr.
11097-11100 (McLeod testifies that the GX 519 e-mail, which was
sent to Shelton but not McLeod, regarding Pember's false
explanations for the positive discrepancy between projected and
actual earnings for the Software Division, would have caused
McLeod to question Pember's explanations).

       [2] Although another prosecution witness in Autuori, Gates,
testified that Autuori made false statements about Colonial's
finances during a single meeting between the two men, the
District Court discredited all of Gates's testimony because he
falsely claimed at trial that he had shown the grand jury a
                                              (continued...)

Third, prosecution witnesses in <u>Autuori</u> testified that, at a key meeting attended by Googel and Autuori at which Colonial's financial condition was discussed, Autuori said virtually nothing. <u>Id.</u> * 6. Here, by contrast, most of the Government witnesses who were at the key March 6, 1998 meeting testified that Shelton, not Corigliano, did most of the talking. Tr. 798-805 (Speaks); 2943-48 (Pember); 5769-70 (Scott Forbes); 7442-43 (Corigliano).

Fourth, Googel claimed that Autuori assisted Googel in carrying out the fraud, but "did not explain just how Autuori assisted him" and "did not testify that he ever told [Autuori] about any plans to defraud potential investors or lenders." <u>Id.</u> * 18. Here, Corigliano and Pember testified at length about Shelton's direct supervision of their own involvement in the fraud. See GB §§ 1 (4)(b) and (c).[3]

---

[2](...continued)
spreadsheet provided to Gates by Autuori, but the Government itself contradicted that testimony. <u>Id.</u> * 13-14, 31.

Nothing similar occurred in this case. Even if Pember was mistaken about the timing of her delivery of GX 530 to Shelton, Shelton has failed to show that Pember never showed him that document. Given Sabatino's testimony that he also saw Shelton rip up a document during a meeting with Pember and Shelton, Tr. 4215, the jury could reasonable reject Shelton's testimony that he never saw GX 530.

[3] Shelton ignores the fact that the former CUC and HFS executives who received some of the suspicious documents that Shelton received did not receive them all. RB 36. McLeod, for instance, did not receive all of the cheat sheets and would have
(continued...)

Fifth and most significantly, the district court judge in <u>Autuori</u> did not preside, as this Court did, over the trial in this case, nor observe first-hand, as this Court did, the testimony which Shelton now argues the jury was not entitled to believe.  Appellate court judges generally do not pass on witness credibility precisely because they are absent when the trial testimony is presented.  <u>United States v. Lentz</u>, 383 F.3d 191, 210 (4th Cir. 2004).  Nothing in <u>Autuori</u> has any bearing on this jury's assessment of the important indicia of credibility that are known only to those who watched and heard the witnesses testify.

Other decisions substantially undermine Shelton's "weight of the evidence" claim.  In <u>United States v. Pritt</u>, 238 F.3d 417, 2000 WL 1699833 (4th Cir., Nov. 14, 2000) (unpublished disposition), the district court awarded a new trial under Rule 33 "in the interests of justice" in a mail fraud prosecution. The fraudulent scheme involved the defendant's false claims for insurance benefits and a lawsuit against a vehicle manufacturer for injuries sustained in what the Government alleged was a staged accident.  The district court concluded that a non-

---

[3](...continued)
suspected the fraud if he had.  Tr. 11052-54, 11093, 11097-11100.
Only the conspirators received GX 506 (Pember's "venting" email
which mentions the reserve adjustments) and GX 519 (Pember's
"good news, bad news" email, which set forth fictitious
explanations for the discrepancies between CUC's budgeted and
actual results).  Scott Forbes did not believe that GX 160 was an
innocuous document, but was disturbed and confused by Shelton's
statements about it during the March 6 meeting.  Tr. 5763-86.

essential prosecution witness, a disbarred lawyer who made prior
statements that were inconsistent with his trial testimony, was
not credible.  The defendant also presented physicians who
testified that the defendant was actually disabled.  The Court of
Appeals reversed the grant of a new trial, explaining that "it
cannot be said, under any standard of review, that the jury's
verdict . . . is against the weight of the evidence").  Id. *5-9.

In United States v. Lenhard, 894 F.2d 408, 1990 WL 5310
(6th Cir., Jan. 26, 1990)(unpublished), the defendant was
convicted of mail fraud for his involvement in a staged car
theft/insurance fraud scheme.  The Government's case rested
largely on the testimony of a cooperating co-conspirator, Arndt,
who, following his arrest, had initially denied to police that
the defendant was involved in the scheme, and gave inconsistent
statements about details of the scheme even after he implicated
the defendant.  The district court denied the defendant's motion
for a new trial based on challenges to Arndt's credibility.  The
Court of Appeals affirmed, explaining:

> In essence, Lenhard contends that Arndt is lying, and that
> his story is more believable than Arndt's. There is no doubt
> that Arndt's credibility was shaken by his admission to
> lying to officers in his original story (pre-cooperation),
> his drug involvement, and the inconsistencies of his
> pretrial statement and his testimony at trial. Nevertheless,
> the inconsistencies involved small details . . . . [which
> were] not central to Arndt's testimony. The crux of his
> story has remained unchanged since he started cooperating
> with the government: that he and Lenhard acted in concert to
> dispose of the Jeep and report it stolen . . .

8

* * * *

It is up to the jury to make credibility determinations. The jury decided that Arndt's story was more believable than Lenhard's, despite Arndt's past credibility problems and his inconsistent statements concerning details of the case.

Id. *3-4 (internal citations omitted).

Shelton's contention that the jury committed a miscarriage of justice because Shelton presented documents and forensic evidence that conflicted with Pember's and Corigliano's testimony on certain details, such as the dates when certain incriminating conversations occurred, should also be rejected. A similar claim was turned aside in United States v. Bouzanis, 2004 WL 1152852 (N.D.Ill., May 24, 2004):

Testimony is properly excluded as incredible as a matter of law only when a reasonable person could not have believed the proffered testimony, meaning, in essence, where "the testimony contradicts indisputable physical facts or laws." [Defendant #1] apparently means to argue that [the cooperating witness's] testimony contradicts indisputable physical facts or laws because [the witness] testified to meetings with [defendant #1] when [that defendant] was in Greece. The court disagrees that [the witness's] testimony was incredible as a matter of law or that only a "modicum" of evidence supports [the] conviction. Admittedly, [the witness] did not recount the dates of his meeting with the [the defendants] with laser precision but he was sufficiently able to place his conversations in a time frame. The testimony does not indisputably contradict the physical facts. A reasonable jury could have come to three different conclusions based on [the witness's] testimony: (1) that [the witness] met with the [defendants] the number of times he stated but did not meet with [defendant #1] from November 3 to November 13, 2000; (2) that [the witness] met with the [defendants] the number of times he stated but that he was mistaken concerning his recollection of the dates; or (3) that [the witness] was lying. The jury in this case was able to hear this evidence and must have decided either (1) or (2).

Id. *3.

        Likewise unavailing are Shelton's claims that the jury
could not credit any of Corigliano's inculpatory testimony
because he lied during his initial interview with the Government,
then reached a favorable plea agreement which substantially
reduced his sentencing exposure.  In United States v. Polishan,
2001 WL 848583 (M.D.Pa., July 27, 2001), the defendant
"orchestrated a massive fraud of the financial accounting of" a
publicly traded company, which "resulted in the substantial over-
statement of net income," and included "making false and
fraudulent material statements" in the company's 10Q and 10K
reports.  Id. *1.  Polishan was the chief financial officer of
the company, and was implicated by his direct subordinate, Kenia.
The district court rejected Polishan's argument that Kenia's
testimony was incredible, even though

> Mr. Kenia initially accepted responsibility for the entire
> fraud, denying that Mr. Polishan was a culpable participant,
> [which] required that his testimony be weighed with great
> caution, as did the fact that he had reached a very
> favorable agreement with the government in exchange for his
> cooperation.  The fact that Mr. Kenia admitted not informing
> Mr. Polishan of the full extent of the fraud also militated
> against acceptance of his testimony without corroboration.

Id. *10.

        Shelton's exclusive reliance on Autuori (and avoidance
of the legions of cases cited by the Government in which
"interest of justice" new trial claims were rejected) cannot
sustain his substantial burden of demonstrating a "miscarriage of

                              10

justice" because the jury ignored the weight of the evidence.
United States v. Johnson, 302 F.3d 139, 150 (3d Cir. 2002).

**POINT THREE**

**(RESPONSE TO SHELTON REPLY BRIEF POINT II)**
**(ALLEGED PERJURY OF CORIGLIANO AND PEMBER)**

Shelton does not even cite, much less address the caselaw that alleged perjury on some matters by Government witnesses is not an independent basis for relief if the jury is presented with the evidence which supposedly demonstrates the perjury. Compare RB 46 with GB 118-121. Although his claim should be rejected on that ground alone, it fails on its own, truncated terms. As Exhibit 1 of Corigliano's supposed perjury, Shelton claims that Corigliano falsely testified that he did not believe that CUC's stock price was inflated during the fraud. RB 38-39. In fact, Corigliano testified to precisely the contrary. Tr. 7587-89.[4]

---

[4] Shelton's other examples of Corigliano's supposed perjury do not withstand scrutiny. McLeod's testimony that Corigliano hid the fraud from him was consistent with Corigliano's testimony that he did not believe that McLeod participated in the fraud. Tr. 8266-68. Shelton claims (RB 40) that Albright contradicted Corigliano's testimony that he and Stu Bell asked Albright to improperly inflate the Essex merger reserve. Albright testified, however, that there were no legitimate business reasons to increase the reserves in the manner that Corigliano and Bell requested. Tr. 3891. Shelton argues (RB 41-42) that Corigliano admitted to Special Agent Gerber that Corigliano deleted the cheat sheets from his computer immediately after speaking to Amy Lipton, not after Corigliano spoke to Shelton. Gerber testified, however, that his interview notes did not compel that conclusion. Tr. 11557-64. In any event, Gerber's notes did not address, and
(continued...)

11

Shelton argues that, because the E&Y auditors denied ever meeting Shelton, Pember must have lied about giving a copy of the "cushion" schedule to Shelton immediately after they had met with the auditors. Pember testified, however, that she removed the "cushion" column from the schedule before giving it to the auditors, but included it in the version that she gave to Shelton and Corigliano. Tr. 2566-76. Shelton's alleged lack of contact with the auditors had no bearing on his opportunity to receive the cushion schedules, or to discuss the fraud in person or via e-mails with Pember when the auditors were absent.

**POINT FOUR**

**(RESPONSE TO SHELTON REPLY BRIEF POINT III)**
**(CONSCIOUS AVOIDANCE INSTRUCTION)**

Shelton claims that, owing to the conscious avoidance instruction, the jury could have convicted him of conspiracy even without any finding that Shelton had actual knowledge of the existence of the conspiracy. (RB 59-60). Such an argument can proceed only by ignoring this Court's instruction (cited at GB 146), that "the doctrine of conscious avoidance" could be used to prove only "a defendant's knowledge of the objectives of the alleged conspiracy," but not any of the other knowledge elements

---

[4](...continued)
therefore do not contradict Corigliano's testimony that Shelton told Corigliano in April 1998 that Cendant officials "had asked for [Shelton's] laptop, and would want Corigliano's." Tr. 7552-53.

12

of the crime.  Tr. 16300-01.

Shelton also declines to support his claim of harm when he asserts (RB 47) that he prepared a defense to rebut allegations of actual knowledge but was unfairly forced to counter evidence of conscious avoidance.  He does not identify a single strategic decision he made that would have been different had the indictment alleged conscious avoidance, and thus declines to demonstrate that he suffered any harm from the challenged instruction.[5]

Unable to find a single case which holds that a constructive amendment can ever occur when the court instructs the jury on conscious avoidance even though the indictment charges actual knowledge, Shelton is reduced to arguing (RB 48) that the actual knowledge allegations in the indictment are "irreconcilable" with conscious avoidance.  As the cases cited by the Government demonstrate, however, there is no contradiction in the law or logic between allegations that Shelton had both actual knowledge of the fraud because he helped to organize and direct it, and also consciously avoided knowledge of some of the details of the execution of the fraud, such as the inflation of the NUMA

_____

[5]  Shelton erroneously argues (RB 48) that this Court's carefully crafted instruction lowered the Government's burden of proof to negligence.  But the conscious avoidance instruction itself precluded such an outcome, Tr. 16322-23; other instructions required proof beyond a reasonable doubt of knowledge and intent, e.g., Tr. 16245, 16292, 16296-97.

and NOAG 1997 results by manipulating the merger reserves, Tr.
2771-73, and the effect of the Essex merger reserves on CUC's
income, Tr. 7247-48.  Shelton consciously avoided knowledge of
certain features of the fraud by declining to ask Corigliano or
Pember follow-up questions when they whispered to him that
reserves were being used to affect income.  Id.  See United
States v. Hopkins, 53 F.3d 533, 542 (2d Cir. 1995).[6]

        Shelton argues (RB 49) that his role as President of
CUC had no relevance to the issue of his conscious avoidance,
because even the President could not have known everything that
happened at CUC.  The conscious avoidance instruction did not
permit a finding of conscious avoidance based solely on Shelton's

---

        [6]  Without citation to authority, Shelton claims (RB 52, n.
3) that only "circumstantial evidence" of actual knowledge can
also prove conscious avoidance.  He ignores, however, that there
was abundant circumstantial evidence of his conscious avoidance,
including his refusal to ask questions when confronted with "red
flags," Tr. 2674, 2772-74, 2903-07, 2911-15, 3678; his tearing up
of GX 530, Tr. 2874-80; and his "shushing" of Corigliano.  Tr.
6987-90.

        Shelton argues (RB 55) that "the only reasonable
interpretation" of his shushing Corigliano is that Shelton
disapproved of Corigliano's suggestion to use merger reserve to
increase income.  Surely if Shelton – who professed that he did
not countenance misconduct at CUC and warned subordinates not to
"sweep problems under the rug," Tr. 11919-31 -- had "disapproved"
of Corigliano's suggestion, Shelton likely would have taken much
stronger action than merely shushing Corigliano and never
mentioning the matter again.  Given that Shelton did not tell
Corigliano that his suggestion was improper, but merely made a
"stern face" that caused Corigliano to shut up, the jury could
reasonably conclude that Shelton disagreed only with the
disclosure of the suggestion, not the suggestion itself.

corporate status, Tr. 16322-23, and the Court instructed that
Shelton could not be convicted based on vicarious liability.  Tr.
16250-51.

     Nevertheless, Shelton's position as President was
certainly relevant to rebut his argument that he was similarly
situated to other CUC and HFS executives who were unaware of the
fraud.  Unlike Menchaca, Scott Forbes, and Monaco, Shelton, by
virtue of his corporate position, directly supervised and had
extensive contact with two other members of the conspiracy,
Corigliano and Pember.  Although Menchaca, Scott Forbes, and
Monaco received some of the documents from which the jury could
infer that Shelton consciously avoided certain details of the
fraud, the former were not privy to other "red flag" documents,
such as GX 506, GX 519, and GX 493 (the version of the Cendant
merger reserve schedule with the "cushion" column).  Tr. 2568,
2573.[7]

     Shelton claims (RB 53, n. 4) that he had no knowledge
that reserves were being used to inflate income because Pember

---

[7]  Shelton makes much of the fact that Silverman, Scott
Forbes and Monaco all received GX 160, but Corigliano and Pember
lied to Scott Forbes and Monaco about the Ideon merger reserve on
March 9, 1998.  Tr. 2950-60, 4421-25, 7481-86.  Shelton claims
(RB 56) that, because Corigliano and Pember gulled Scott Forbes
and Monaco during the March 9 meeting, Shelton must have been
gulled as well, but this argument ignores Shelton's unique
relationship and numerous prior conspiratorial conversations with
Corigliano and Pember to which neither Scott Forbes nor Monaco
were parties.

falsely told Shelton in the GX 519 e-mail that CUC "made the numbers." Tr. 2739-42. The jury could reasonably infer, however, based on the Excel spreadsheet that was attached to that email and Pember's and Corigliano's previous conspiratorial conversations with Shelton, that Shelton understood Pember's use of that phrase to mean that the numbers were "made" only because they were "made up."

Shelton again claims (RB 54, n.5), as he did at trial, that merger reserves can be used to legitimately increase operating income. To the contrary, when used correctly, merger reserves cannot increase operating income. Tr. 453-54 (Sack testimony). Shelton suggested at trial that if CUC accountants had erroneously treated merger-related expenses as ordinary operating expenses, then CUC would have been entitled to correct the error at a later date, which would therefore increase income. Tr. 10689-91 (cross-examination of Heckler); Tr. 15989-92 (Puccio summation). There was no evidence that anyone at CUC made such an "accidental" miscategorization of merger-related expenses, and certainly no evidence that Shelton was informed about such hypothetical mistakes.

Also infirm is Shelton's argument (RB 56) that the evidence showed that he honestly believed that reserves could be used to increase revenue, because Pember testified that, when Shelton asked her if such a practice was permissible, Pember

16

replied that CUC had historically engaged in that practice.  Tr.
2879.  Shelton testified at trial, however, that he never had
such a conversation with Pember, and denied any knowledge that
CUC had used merger reserves to increase revenue.  Tr. 12397,
13021-23.  In any event, Pember never told Shelton that reserves
could properly be moved to a revenue account, only that CUC had
done so in 1997 and planned to do so in 1998.

### POINT FIVE

### (RESPONSE TO SHELTON REPLY BRIEF POINT III)
### (CONSCIOUS AVOIDANCE INSTRUCTION)

Shelton contends (RB 60) that the trial evidence
demonstrated that Walter Forbes' airplane lease expenses
represented "a one time cost that was properly classified as
either unusual or infrequent and non-recurring."  To the
contrary, as Walter Forbes himself testified, he used a leased
plane to conduct CUC business on an on-going basis.  Tr. 14250-
51.  Shelton himself testified that CUC paid for a percentage of
Walter Forbes' private jet travel from 1990 to 1995, and that
percentage increased with the passage of time.  Tr. 13170-73.

Shelton contends (RB 60-61) that he could not have
intended to violate accounting rules by charging the airplane
expense to the Cendant merger reserve because he supposedly
"knew" that the voucher would be made available to the auditors.
This, he claims, demonstrates his consciousness of innocence.

17

The voucher, however, did not recite that the charged expenses had nothing to do with the Cendant merger. GX 1776. Nor was there any evidence that the auditors otherwise knew when merger discussions between CUC and HFS commenced. Thus, for all the voucher revealed, but as Shelton knew otherwise, the 1995 and 1996 airplane expenses were related to the Cendant merger.[8]

Shelton contends (RB 61) that Weil's testimony irrefutably proved that charging the airplane expense to the Cendant merger reserve was proper, based on his assumption that the cost of Walter Forbes' use of leased corporate jets was an "unusual and infrequent" expense. Tr. 11271-72. As shown above, the evidence, did not support that assumption. Weil also conceded that he was so unaware of the facts of this case that he believed that Walter Forbes' 1995 and 1996 airplane expenses could have been related to a merger that was never proposed until 1997. Tr. 11290. Finally, Weil's testimony that the 1995 and 1996 plane expenses could be properly attributed to the Cendant merger reserve cannot be squared with Cendant's 1998 10K, which explained that:

"The Company incurred merger-related costs and other unusual

---

[8] Nor was there any evidence that Shelton "knew" that the auditors were likely to unearth the airplane expense voucher during the audit. After all, E&Y failed for several years to discover the fraud, and Shelton, who urged the retention of E&Y after the Cendant merger, Tr. 5768, could reasonably believe that the auditors would either not discover or not appreciate the significance of the voucher.

18

> charges ("Cendant Merger Charge") of $844.9 million ($589.8
> million after tax) <u>associated with and coincident to</u> the
> Cendant merger and the fourth quarter 1997 merger with Hebdo
> Mag."

DX 1283, Cendant Corporation Form 10-K Annual Report to the SEC,
at F 24, <u>see</u> <u>also</u> F 10 (emphasis added).  Given these
shortcomings, the jury could reasonably reject in its entirety
Weil's very expensive opinions, as the jury instructions
expressly permitted them to do.  Tr. 16411-12.

Shelton argues (RB 62) that evidence about the
airplane expenses should have been excluded because the
Government did not present an expert who opined that those
expenses could not have been legitimately charged to the merger
reserve.  The Government was not required to prove, however, as
the element of any of the charged crimes, that the accounting
regarding the airplane expense violated GAAP.[9]  Rather, the
Government was required to prove that Shelton participated in the
charged fraud.  Issues of criminal intent must ultimately be
resolved by the jury, without direct testimony by experts.  Fed.
R. Evid. 704(b); <u>United States v. Boyd</u>, 55 F.3d 667, 671 (D.D.C.
1995).

Admission of the challenged evidence properly

---

[9]  Nevertheless, Shelton himself elicited testimony from
Scott Forbes, a CPA and the Chief Accounting Officer for HFS,
then Cendant, that an "unusual expense" that could be charged to
the Cendant merger reserve had to occur during the merger.  Tr.
5918-19.

facilitated the jury's decision on that point.  Corigliano
testified that he and Shelton decided to charge the airplane
expenses to the Cendant merger reserve when the conspirators were
looking for ordinary operating expenses to improperly charge to
the reserve.  Tr. 7374-81.  Shelton directed that the expenses be
charged to the "merger reserve," not that they be treated as "an
unusual expense."  DX 1776, Tr. 12314-24.  The jury did not need
an expert to explain that, even if there was some academic basis
to treat the airplane expenses as "an unusual expense," Shelton
and Corigliano decided to charge those expenses to the Cendant
merger reserve for the improper purpose of fraudulently
manipulating the merger reserve, and not for a proper reason.

**POINT SIX**

**(RESPONSE TO SHELTON REPLY BRIEF POINT V)**
**(TESTIMONY OF JOHN OLLER)**

Shelton contends that this Court abused its very broad
discretion[10] by admitting Oller's testimony because, although
Oller testified that he was present for virtually all of
Shelton's Audit Committee interview, Oller speculated that there
might be some unidentified portions of the interview memoranda
that Oller did not personally recall when the memorandum was
written.  This Court had an opportunity to consider the careful

---

[10]    United States v. McDermott, 245 F3d 133, 140 (2d Cir.
2001).

20

manner in which the interview memoranda were prepared, Tr. 10350-59, 10366-67, 10376-84, the high level of detail they contained, GX 1760 and GX 1761, Tr. 10391-10417, 10468-10482, and the extent to which many of Shelton's statements to the interviewers were corroborated by the trial testimony of Shelton himself and other witnesses.  See United States v. Porter, 986 F.2d 1014, 1017 (6th Cir. 1993)(affirming the admission evidence under Rule 803(5) where "the detail in the statement and the care with which it was put together make it clear that [the] witness once had knowledge of the matters in the statement").  Because the vast majority of the memoranda satisfied the requisites of Rule 803(5), any deficiencies were properly addressed to the weight of Oller's testimony, not its admissibility.  Cf. United States v. Schultz, 333 F.3d 393, 416 (2d Cir. 2003)("factors which make evidence less than conclusive affect only weight, not admissibility").[11] Shelton has failed to demonstrate that this Court "acted arbitrarily or irrationally" by admitting Oller's testimony. United States v. Jackson, 335 F.3d 170, 176 (2d Cir. 2003)

---

[11]  Even though this Court admitted Oller's testimony pursuant to Fed. R. Evid. 803(5), Tr. 10389, Shelton's reply brief continues to harp on United States v. Almonte, 956 F.2d 27 (2d Cir. 1992) a case that neither cites Rule 803(5), nor has been cited in any other case that addressed that rule.   Shelton nevertheless ignores (and apparently has no answer for) the Second Circuit's subsequent decision in Parker v. Reda, 327 F.3d 211 (2d Cir. 2003), upon which this Court relied in admitting the evidence, Tr. 11250-55, 11391-403, and which was cited in the Government's initial brief.  GB 159, 167.

("Generally, we will not overturn a district court's evidentiary rulings unless the court acted arbitrarily or irrationally.")

Shelton was accompanied at his Audit Committee interviews by his own lawyers.  Tr. 10391.  Shelton presented an affidavit from one of those lawyers, stating that one portion of the interview memoranda (reciting that Shelton had admitted that he planned to sell some of his Cendant stock shortly after the merger) was incorrect.  Auerbach Declaration, attached to Docket No. 1044, filed Aug. 9, 2004, Shelton Memorandum in Opposition to Government's Motion to Admit Oller's Testimony.  Thereafter, the Government did not elicit Oller's testimony about that fact.  Even though Shelton presented Mr. Weissman, the federal prosecutor formerly assigned to this matter, in support of his defense, he never summoned any of his own lawyers to challenge any other portions of Oller's testimony, thereby effectively conceding the reliability of that testimony.  When confronted at trial with Oller's testimony, Shelton himself acknowledged that much of it was accurate.[12]  See <u>United States v. Dazey</u>, 403 F.3d

---

[12]  For instance, Shelton acknowledged that, as Oller testified, Shelton may have told the Audit Committee interviewers that GX 3022 was discussed at the December 1997 meeting in New York City.  Tr. 12747-49.  Shelton also conceded, again consistent with Oller's testimony, that Shelton may have received the budget document included in GX 373.  Tr. 12750-52.  Shelton further conceded that, as he told the Audit Committee interviewers, Shelton did not carefully review CUC's 10K and 10Q SEC filings.  Tr. 12772.  Shelton elaborated on some of his statements to the Audit Committee interviewers, confirming that
(continued...)

1147, 1165-68 (10th Cir. 2005) (rejecting a new trial request
based on the admission, pursuant to Rule 803(5), of testimony
regarding a defendant's out-of-court statements, where the
defendant's trial testimony largely corroborated the challenged
evidence).

        Shelton also unearths the canard that Oller's testimony
was unreliable because it was bought and paid for by Henry
Silverman, who was determined to have Shelton brought low after
the fraud was discovered.  RB 69.  If Oller and the rest of the
Audit Committee investigators were out to frame Shelton, one must
wonder why the Committee's final report mildly criticized Shelton
only for accounting for the airplane expense, rather than making
the case that Shelton was one of the principal participants in
the fraud.  Wilkie Farr & Gallagher Report to the Audit Committee
of the Board of Directors of Cendant Corporation ("Audit
Committee Report"), August 24, 1998, pp. 15-16, 192-94.

        Shelton argues, (RB 69) that his challenge to Oller's
testimony is not "merely academic," but he fails to demonstrate
that he suffered any improper harm from that evidence.   Indeed,

---

[12](...continued)
he made those statements.  E.g. Tr. 13183-84 (Shelton explains
his statements to the interviewers about charging the airplane
expense to the Cendant merger reserve); Tr. 13207-08 (Shelton's
explanation for his statements to interviewers about GX 616); Tr.
13286-87 (Shelton explains his statements to the interviewers
about his recollections of the reasons why he attended the March
6, 1998 meeting).

Shelton attempted to make affirmative use of his "voluntary
statements" to the Audit Committee interviews, bragging about how
he provided truthful answers to them on four occasions.  Tr.
11868-70.  Shelton's claim that the Government exploited Oller's
testimony during rebuttal summation fails to identify any
significant harm to the defense, however.[13]

        Shelton irrelevantly claims (RB 68) that the
Government's post-trial argument that Shelton's statements to the
interviewers were not admitted for the truth but to prove his
consciousness of guilt (GB 160-61) was contradicted by
Government's argument during trial that Shelton's statements to
the interviewers were admissions for purpose of Fed. R. Evid.
801(d)(2)(A).  That Shelton's out-of-court statements were made
by a party does not mean that the Government was necessarily

---

[13]  See Tr. 16090-91 (rebuttal summation point that Shelton
told the interviewers that he did not know what non-operating
income was; the Government did not seek to impeach Shelton with
that prior statement, but merely pointed out that it was
inconsistent with defense counsel's summation).

    The Government did briefly contrast during its rebuttal
summation Shelton's statement to the interviewers that he did not
speak to Corigliano about GX 160 before the March 6 meeting with
Shelton's trial testimony that he did.  Tr. 16103.  The
Government gave several reasons during its rebuttal summation to
disbelieve Shelton's testimony about the supposed March 6 "pre-
meeting," only one of which was Shelton's statement to the
interviewers.  Tr. 16102-03 (pointing out that if Corigliano had
told Shelton at the supposed pre-meeting that "the Interval
number" was $80-90 million, Corigliano and Shelton would have
installed that number in GX 382 and 382a, the schedules that
Corigliano created during the weekend of March 7-8, but they did
not).

vouching for the veracity of those statements.  In any event, to
the extent that the statements were not offered for the truth,
the Government was not required to establish that they fell
within any exception to the prohibition against hearsay.  United
States v. Ansaldi, 372 F.3d 118, 130 (2d Cir. 2004).

### POINT SEVEN

### (RESPONSE TO SHELTON REPLY BRIEF POINT VI)<br>(ALLEGED CONSTRUCTIVE AMENDMENT OF THE INDICTMENT)

Shelton pointlessly argues that the indictment was
constructively amended because the general reserves, the Essex
and GETKO merger reserves, and the profit sharing receivables
were "dissimilar in kind" to the Ideon and Cendant merger
reserves identified in the indictment.  RB 71.  To demonstrate a
constructive amendment, however, Shelton has to show that the
Government proved a different crime than that charged in the
indictment, not the same crime committed by the exploitation of
accounting transactions other than those identified in the
indictment.  See United States v. Patino, 962 F.2d 263, 266 (2d
Cir. 1992).

Whatever the "accounting dissimilarities" between the
general reserves, profit-sharing receivables, and pre-1995 merger
reserves on one hand and the post-1995 Ideon and Cendant merger
reserves on the other, the conspirators used all of those
accounting transactions to improperly inflate the publicly
disclosed earnings of CUC, and not to commit a different crime

25

with a different harm, different victims, or a different inducement for the victims to buy CUC stock.

## POINT EIGHT

### (RESPONSE TO SHELTON REPLY BRIEF POINT VII) (CORIGLIANO'S AND PEMBER'S ALLEGED EXPERT TESTIMONY)

Shelton misconstrues and attempts to avoid the Government's argument by claiming that he did not "waive" his challenge to Corigliano's and Pember's opinion testimony even though he larded the record with such opinion testimony when he cross-examined those witnesses. RB 79. The Government's argument was not predicated on waiver but on harmlessness. GB 193-196. If Shelton himself believed that the opinion testimony was so important to his defense that it warranted over a dozen separate inquiries of the Government witnesses, GB 195-96, nn. 49 and 50, he cannot reverse course following a conviction and claim that the opinion testimony was so harmful to the defense that it warrants a new trial.

Shelton's argument that, once the Government was permitted to present supposedly improper lay opinion testimony, he "had no choice but to respond to that testimony in kind" is incoherent. Neither the Government nor the Court had any say in Shelton's trial strategy. If he believed that Pember's and Corigliano's lay opinion testimony was not only improper under Fed. R. Evid. 702 but harmful to his defense, he would not have amplified it on cross-examination.

26

POINT NINE

(RESPONSE TO SHELTON REPLY BRIEF POINT VIII)
(IMMUNIZATION OF BELL)

Contrary to his current claims of reversible error, Shelton never wanted Bell to testify in this trial. Although Shelton contends (RB 80) that any prosecution of Bell for his conduct while at CUC was time barred when Shelton sought the immunity order, Shelton never asked the Court to make a finding (based on an *in camera* submission by Bell) that Bell could not carry his burden of demonstrating a viable risk that he would incriminate himself if he testified at this trial. United States v. Edgerton, 734 F.2d 913, 919 (2d Cir. 1984)("The mere assertion of the [Fifth Amendment] privilege, however, by the one whose testimony is sought, based on his reasonable belief, is not enough. . . . It is for the court to say whether his silence is justified.") quoting Hoffman v. United States, 341 U.S. 479, 486 (1951).

Additionally, had he truly wanted Bell's testimony, Shelton would not have waited until the eleventh hour of trial to first request that Bell be immunized. Shelton's failure to timely seek an order to immunize Bell, or to seek a ruling from this Court that Bell was without a viable Fifth Amendment privilege regarding the testimony that Shelton supposedly sought from Bell, demonstrates that Shelton wanted merely the claim of error, not Bell's testimony.

27

There was good reason for this strategy.  Shelton did not want Bell on the witness stand because he was one of the conspirators in the charged accounting fraud at CUC.  Bell's likely complicity was amplified by his refusal to speak to the Audit Committee interviewers, Audit Committee Report at 4-5, n.8, much like Corigliano and Pember, id. at 4, nn. 5 and 6, who later admitted that they were deeply involved in the fraud.   If Bell had admitted his complicity in the charged fraud on the witness stand at trial, he would have further doomed Shelton.  If on the other hand Bell had denied his involvement in the fraud, the Government would have argued that such a denial was not credible given the evidence of his involvement, and that Bell was falsely attempting to exculpate his friend Shelton.

Speculating that Bell ultimately would have advanced his cause, Shelton complains that the Government received a tactical advantage by refusing to immunize Bell.  RB 80-81. Whether the Government preserves a tactical advantage it would have lost when it refuses to immunize a proposed defense witness is not the issue: a defendant can always assert that his defense would have been advanced if the Government immunizes a proposed defense witness who refuses to testify on Fifth Amendment grounds.  The issue is whether the Government is acting in bad faith by refusing to immunize a defense witness under the same circumstances that it has immunized a prosecution witness.

28

United States v. Dolah, 245 F.3d 98, 105 (2d Cir. 2001)(to compel the Government to immunize a proposed defense witness, a defendant must demonstrate, *inter alia,* that "the government has engaged in discriminatory use of immunity to gain a tactical advantage or, through its own overreaching, has forced the witness to invoke the Fifth Amendment")(emphasis added); abrogated on other grounds, Crawford v. Washington, 541 U.S. 36 (2004).

Here, the Government did not immunize any witness, much less a witness who (like Bell) refused even to speak to the Government or the Audit Committee interviewers about their knowledge of the accounting fraud which endured for years while Bell was the CFO of CUC.  Because Shelton cannot point to any witness who received preferential immunity treatment from the Government compared to Bell, his request was properly denied.

### POINT TEN

#### (RESPONSE TO SHELTON REPLY BRIEF POINT IX)
#### (MISSING WITNESS INSTRUCTION)

Shelton argues that he was entitled to a missing witness instruction solely because this Court erroneously declined to compel the Government to immunize Bell (RB 82).  As shown above, the predicate for Shelton's missing witness claim, that this Court erred regarding the immunity claim, fails as a matter of law.  Accordingly, the missing witness claim fails for lack of a viable predicated.

29

## CONCLUSION

For the reasons set forth above and in the Government's initial brief, the Government respectfully requests that this Court deny Shelton's Motion for a Judgment of Acquittal and a New Trial.

Respectfully submitted,

CHRISTOPHER J. CHRISTIE
Special Attorney
U.S. Department of Justice

/s/ Norman Gross

By: NORMAN GROSS
Special Attorney
U.S. Department of Justice
Federal Bar No. 24933

/s/ James McMahon

By: JAMES MCMAHON
Special Attorney
U.S. Department of Justice
Federal Bar No. 24062

/s/ Richard J. Schechter

By: RICHARD J. SCHECHTER
Special Attorney
U.S. Department of Justice
Federal Bar No. 24238

/s/ John J. Carney

By: JOHN J. CARNEY
Special Attorney
U.S. Department of Justice
Federal Bar No. 24063

Dated: June 23, 2005
Camden, New Jersey

<u>CERTIFICATE OF SERVICE</u>

      The undersigned certifies that on this day I caused to be served copies of the foregoing upon the following via email and United States Mail:

      Gary Collins, Esq.
      Day, Berry and Howard, LLP
      City Place 1
      185 Asylum Street
      Hartford, CT 06103


          /s/ Lynda Powers
          LYNDA POWERS
          U.S. Department of Justice

Dated: June 23, 2005
      Camden, New Jersey