<u>**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**</u>

The Defendant, E. Kirk Shelton, respectfully submits this Sentencing Memorandum for the Court's consideration in connection with his sentencing hearing, currently scheduled for the week of July 18, 2005.

## I.    Introduction

Notwithstanding the allegations by the government and his convictions, Mr. Shelton's life is a seamless testimony to hard work, integrity and honesty. Mr. Shelton has been a devoted husband to his wife of 21 years and an involved and committed father to his two teenaged sons. He has performed extraordinary acts of kindness to those around him and to the community at large, and he has strived to live an exemplary life with the highest moral and ethical standards both in the work place and at home.

His family, friends and colleagues consistently describe a man known for his integrity, honesty, fairness, generosity, strong family values and commitment to the community. Mr. Shelton has performed numerous good deeds and charitable acts on behalf of his family, friends, co-workers, and countless other members of the community. Mr. Shelton was the person neighbors turned to when their children were having problems with drug addiction or depression; he was the compassionate boss who took time out of his schedule to assist employees with health care problems; he was the mentor who helped young executives realize their goals. His direct participation and personal time provided have had a dramatic and positive impact on the lives of others.

The jury's verdict in finding Mr. Shelton guilty of the twelve counts in the Indictment is in sharp contrast to his outstanding history, character and background. A review of the numerous letters submitted on Mr. Shelton's behalf shows that the jury's determination that he was

involved in the offenses of conviction is out of character and contrary to the manner in which he

has tried to live his personal and professional life. Scores of letter writers addressed this issue:

- "I know my husband better than anyone, and I know that he is a good man to his core. … Not once in the 29 years we have spent together have I ever seen Kirk exhibit any behavior or utter any statement that might suggest he was not living up to the highest standards of ethics or moral conduct. Not once." *Letter from Amy M. Shelton*, Letters Appendix at 002 (hereinafter "Letters App. at ___).

- "For my father, honesty is not the best policy – it is the only policy. … He is an undeniably good person, and I have never known him to ever do, or be accused of doing any questionable acts." *Letter from Scott Shelton,* Letters App. at 005.

- "I would like to say that Kirk has more integrity than most people I have met in life. I have always used him as an example for our children as someone to look up to, to emulate. Throughout Kirk's life, he has behaved in an honest and decent manner, has worked hard, and has treated people by the golden rule." *Letter from Vicki M. de Angeli*, Letters App. at 009.

- "At no time have I observed him to be anything but scrupulously honest, generous, and forthright in his dealing with others. I have observed him on many occasions to perform acts of kindness and generosity." *Letter from Michael M. de Angeli*, Letters App. at 011.

- "Kirk is one of the most selfless individuals I know….He is a caring, generous person who can be counted on in any situation." *Letter from Christine de Angeli*, Letters App. at 014.

- "The one thing that immediately strikes you with Kirk is what a genuinely good guy he is. He has a heart of gold. Despite his business successes and wealth, he has always been a very down to earth person." *Letter from Gene Szczecina*, Letters App. at 017.

- "[Kirk Shelton] has shown courage and depth of character that go beyond words." *Letter from Bob Schultz*, Letters App. at 025A.

- "[Kirk Shelton] was always modest, even self-effacing, and seemed free of the insecurities that cause others to puff themselves up, mistreat subordinates, and require endless adulation." *Letter from Richard A. Ratner, M.D.*, Letters App. at 028.

- "I found that Kirk was the same way at the office as he was with his friends and family. … He was friendly toward everyone. He was considerate and warm and seemed to take a personal interest in the lives of the people he worked with and interacted with on a daily basis." *Letter from Carolyn J. Ratner,* Letters App. at 030.

2

- "If I recall correctly, I ended my testimony by stating that everything I know about Kirk is inconsistent with the activities which at the time he was accused. In thinking through that statement as I write and even knowing that he has now been convicted, I still stand by that statement." *Letter from Jack Skydel*, Letters App. at 033.

- "I have traveled around the world and made hundreds of friends and acquaintances, but none can compare to Kirk. He is a complex personality with deep emotions, an exceptional individual with unshakeable convictions." *Letter from Tim Werner,* Letters App. at 040.

- "I believe Kirk to be honest, generous, of high integrity, fair, humble, frugal, unpretentious, sharing and compassionate." *Letter from Bob Bauerle*, Letters App. at 047.

- "I have always known Kirk to share the values of his parents, to have a strong work ethic, and to do the right thing." *Letter from Jonathan W. Storck*, Letters App. at 049.

- "Kirk was honest in his dealing with the public and had a reputation for integrity." *Letter from Ben Werner, Jr.*, Letters App. at 051.

- "Kirk's consistent conduct over his entire life stands in stark contrast to the well publicized styles of certain 'Imperial Executives' with $10,000 shower curtains.  Kirk has always been respected by co-workers and friends alike was because of his scrupulous honesty and his level headedness." *Letter from Anthony Petrello,* Letters App. at 054.

- "During my 30 years associated with Kirk, my faith in his integrity and honesty has never wavered." *Letter from Bruce A. Pollock,* Letters App. at 059.

- "During that 28 years I have never seen Kirk act with anything other than the highest integrity, whether it be business dealings, interpersonal dealings or how he has raised his family. Even in those two clichéd arenas where many people take shortcuts, paying taxes and toting up their golf scores, I have never seen Kirk do anything but the right thing. Playing by the rules, and applying the rules fairly to everyone regardless of their station in life is an integral part of the code he has lived his life by." *Letter from Robin Jackson,* Letters App. at 060.

- "I know very few people who have the intelligence, integrity and honesty as Kirk.  In every circumstance that I have seen, he has "done the right thing" when faced with an ethical question.  I would trust him in any business matter . . . .". *Letter from Peter Tolnai,* Letters App. at 063.

- "Kirk Shelton is one of the most honest and ethical people I know[.] * * *  I have always kidded him about his being the biggest 'Boy Scout' I know—he ALWAYS does the right thing, even when he has had numerous opportunities to do otherwise." *Letter from Patrick G. Healy,* Letters App. at 068.

3

- Kirk Shelton is "bone good", meaning that he is "good and decent and kind down to the bone." *Letter from Sheila M. Phelan,* Letters App. at 070.

- Kirk Shelton "is a great dad, husband, member of our community but most of all, to me, Kirk Shelton is my friend. He is filled with love and integrity and is a great role model for my children." *Letter from Lisa Ross-Benjamin,* Letters App. at 078.

- "Kirk often impressed me with his true sense of right and wrong.  * * * Kirk often when talking to his sons would speak of the right way and the wrong way to do things. He never wanted to see the boys take shortcuts and do shoddy work." *Letter from Paula Noll,* Letters App. at 084.

- "Kirk Shelton is a good person, a decent person. Through the years, I have watched with admiration his great and loving devotion to his wife and children. I have heard him speak numerous times about business … [H]e always spoke of his duties to the company and stockholders in a manner that connoted a high moral ground and sense of ethics." *Letter from Manual and Peg Perez,* Letters App. at 088.

- "This man, Kirk Shelton, is a staff and a light for me and my family. I value his ideals, his honesty and his friendship. I consider him to be one of the finest people I have met in my lifetime." *Letter from Martina H. DeMott,* Letters App. at 090.

- "Although I don't understand what happened at Cendant/CUC, I don't believe that Kirk would have ever knowingly or deliberately broken the law. His sense of values, and his inherent honesty and integrity, would not have permitted it." *Letter from Clifford L. Wald,* Letters App. at 092.

- "Of the diversity of the people who I have met, I view Kirk as someone who stands above so many others in respect to the ethical values that guide him. Mr. Shelton is a friend who has my affection because my experiences with him have defined him as a genuine, kind and considerate person. … He is a colleague who is respected for his intelligence, fair dealing and good values." *Letter from Morris B. Sachs, III,* Letters App. at 094.

- "[Kirk and I] have debated the right/wrong issues of corporate governances and personal responsibility and I KNOW his view to be one of immense integrity." *Letter from Kenneth L. Gestal,* Letters App. at 096.

- "Kirk is not motivated by the greed of money." *Letter from Tim Hanratty,* Letters App. at 097.

- "Kirk Shelton has been the singular most important mentor in my business career." *Letter from Craig Sherman,* Letters App. at 112.

- "At CUC, "[t]here was a genuine sensitivity for doing the "right thing" whether it was for the employees, our customers, or our company. From my position and vantage point, I was able to personally observe the high regard and respect with which Kirk was viewed by our employees. I credit Kirk's leadership for setting our standards….". *Letter from L. Sue Trizila,* Letters App. at 117.

- "I have always found him to be an extremely honest man who displayed integrity in everything he did. He strived to create a work environment that mirrored his philosophy of integrity, honesty, openness, frugalness and respect for the individual. … My belief is that if Kirk did anything wrong in his role at CUC, it is because he did not know it was wrong. Kirk is not the type of person to lie, cheat, steal or to condone these actions in others." *Letter from Richard J. Fernandes,* Letters App. at 118; 120.

- "He always seemed to me to be a person of great integrity and honor, and I considered him a role model in many ways." *Letter from Amy N. Lipton,* Letters App. at 121A.

- "The crime for which Kirk has been convicted is totally out of character. … Kirk is a person with integrity … He was always honest and fair in dealing with our clients and business partners." *Letter from Christopher K. McLeod,* Letters App. at 121C.

- "…I have always known him to be a decent, hard working, honest person who emphasized ethical behavior. He managed the business not from a management textbook, but from his heart and soul." *Letter from Michael Bodetti,* Letters App. at 126.

- "I say with total conviction that Kirk Shelton's combination of integrity, character, intelligence, leadership, loyalty and honesty makes him the most trusted and respected person I have ever worked with…. The Kirk Shelton I know is not corrupt nor was he extravagant. He took his responsibilities as a corporate leader to heart….His life has been one of diligence, generosity, loyalty, principle, devotion to others and he remains a true role model to many." *Letter from Kelly E. Green,* Letters App. at 127; 129.

- "Kirk is one of the finest people I have ever known. The world is better because of him, and mine is much better. I owe him much of what I hold dear of my own life and especially my business moral compass." *Letter from Andrew D. Carr,* Letters App. at 133.

- "Many of the management skills, particularly those relating to personal counseling, motivation, and fair dealing that many of us responsible for the operations of the company so successfully employed, were based on Kirk's principles and ethos." *Letter from William B. Avery,* Letters App. at 148.

5

- "I came to admire Kirk Shelton not only for his maturity and his competence, but for his integrity and character. … Never, not once, was I, nor were my employees, subjected to any kind of inappropriate pressures by Mr. Shelton or his colleagues. To the contrary, we were urged to put realistic numbers in our budget, to live with the results whether good or bad, and in all cases to run the company in a straightforward manner, always acting in the best interest of our shareholders. So unambiguous was his manner of operating that I find it incomprehensible that he ever acted otherwise in his business life." *Letter from William B. King,* Letters App. at 149.

- "Kirk is smart, hard working, and would never make an unethical decision." *Letter from Robert LoCascio,* Letters App. at 161.

- "While I have met many accomplished individuals in my career, Kirk stands out as the single most humble person I've met. He preaches and practices fairness in everything I've seen him do." *Letter from Victor Cheng,* Letters App. at 163.

- "His kindness and generosity have touched so many people, and he has reached out selflessly time and time again. He is a man that should be held up as a model of decency and, despite the outcome of the trial, he is a man who should be trusted, respected and valued for all of his good deeds." *Letter from William M. Aron,* Letters App. at 179.

- "Kirk is a man of true integrity, the highest of moral standards, uncompromising principles, and a fierce loyalty to family and friends." *Letter from Anne B. Pugliese,* Letters App. at 192.

- "…I have always known Kirk to be a man of decency, honesty and integrity – a private perspective that my wife and I mutually share which now appears to be perfectly incongruous with his public persona and the conclusions of the jury of his peers." *Letter from Daniel and Heidi Schley,* Letters App. at 195.

This case is atypical in many ways. It is atypical because Kirk Shelton did not directly benefit from the results of illegal activity -- he sold no stock and placed himself in the exact same position as the victims by accumulating stock. In fact, he lost over $30 million as a result of this case. Additionally, this is not a typical fraud case in which a defendant looted his company, made exorbitant purchases with company funds, or used debt financed by the company to enrich himself. None of this occurred here. On the contrary, Kirk Shelton was considered the "Boy Scout" of the company who operated in a frugal, unpretentious manner and set a daily example for his employees. Finally, this is an atypical case because the company has continued to prosper.

Just twelve days after the fraud had been disclosed in April 1998, the stock rebounded to $24 – the same price where it had been the summer prior to the merger discussions.

This is also a case in which significant punishment already has occurred. Over the past seven years, Kirk Shelton has lost his career at the company he had virtually built from the bottom up. He has gone from a senior executive at a Fortune 500 company to a person unable to work in a public company. He has watched his wife and children suffer knowing he may face separation from them. Unquestionably, real punishment already has been exacted.

This Court must impose a sentence that, while respecting the jury's verdict, reflects balance and reasonableness. A fundamental principle of sentencing is that a court ***"shall impose a sentence sufficient, but not greater than necessary"*** to meet specified sentencing goals, including the goal of "just punishment." *See* 18 U.S.C. § 3553(a). The Court is faced with a defendant who has lived an exemplary life, who has raised a family with the highest of values, who contributed time and money to community efforts for over two decades and who tried to impose a moral and ethical code in his professional career. Based upon a complete review of Mr. Shelton's extraordinary background, history and character as fully detailed below, as well as consideration of the other sentencing factors listed in 18 U.S.C. § 3553(a), a sufficient and just sentence in this case is a sentence of probation with extensive community service.

**II.    Factors To Be Considered In Imposing A "Reasonable" And "Individualized" Sentence Pursuant To 18 U.S.C. § 3553(a)**

Title 18, United States Code § 3553(a) provides the framework within which a sentencing

judge must determine the appropriate sentence for a defendant:

> <u>Factors to be considered in imposing sentence</u>.  The Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection.  The court, in determining the particular sentence to be imposed, shall consider:
>
>> (1)  the nature and circumstances of the offense and the history and characteristics of the defendant;
>>
>> (2)  the need for the sentence imposed –
>>
>>> A.  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>>
>>> B.  to afford adequate deterrence to criminal conduct;
>>>
>>> C.  to protect the public from further crimes of the defendant; and
>>>
>>> D.  to provide the defendant with needed education or vocation training, medical care, or other correctional treatment in the most effective manner;
>>
>> (3)  the kinds of sentence available;
>>
>> (4)  the kinds of sentence and the sentencing range established for—
>>
>>> A.  the applicable category of offense committed by the applicable category of defendant as set forth in the Guidelines
>>> . . .
>>
>> (5)  any pertinent policy statement—
>>> A.  issued by the Sentencing Commission . . .

      (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

      (7) the need to provide restitution to any victims of the offense.

Under the traditional Guidelines system, the sentencing court was obligated to:

> impose a sentence of the kind, and within the range, referred to in subsection (a)(4) unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines that should result in a sentence different from that described.

18 U.S.C. § 3553(b)[1].

Earlier this year, the Supreme Court ruled that the Guidelines' mandatory nature was unconstitutional.  *See United States v. Booker*, ___ U.S. ___, 125 S. Ct. 738 (2005).  The Court excised § 3553(b) from the Guidelines' statutory scheme, holding that the Guidelines' binding authority violated a defendant's Sixth Amendment right to trial by jury.  The Court held, however, that a sentencing court was still required to consider the guideline range, but it also must consider the other factors enumerated under § 3553(a) when imposing a sentence.  While the federal sentencing statute "requires a sentencing court to consider Guidelines ranges, … it permits the court to tailor the sentence in light of other statutory concerns as well…." *Booker*, 125 S. Ct. at 757.  Thus, a sentencing court must now undertake a more refined and particularized analysis:

> Sentencing will be harder now than it was a few months ago. District courts cannot just add up figures and pick a number within a narrow range.  Rather, they must consider all of the applicable factors, listen carefully to defense and government counsel, and sentence the person before them as an individual.  *Booker* is not an invitation to do business as usual.

---

[1] All references hereafter to the United States Code refer to Title 18.

*United States v. Ranum*, 353 F. Supp. 2d 984, 987 (E.D. Wis. 2005).

Following *Booker*, the Second Circuit confirmed that the applicable Guidelines sentence was only one of seven factors that a sentencing court must now consider. *See United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). As the Second Circuit has explained:

> [S]entencing judges remain under a duty with respect to the Guidelines – not the previously imposed duty to apply the Guidelines, but the continuing duty to 'consider' them, along with the other factors listed in section 3553 (a). We have every confidence that the judges in this Circuit will do so, and that the resulting sentences will continue to substantially reduce unwarranted disparities *while now achieving somewhat more individualized justice. In short, there need be no 'fear of judging.'*

*Crosby*, 397 F.3d at 111-12 (emphasis added); *see also United States v. Canova*, ___ F.3d ___, 2005 WL 1444147 *14 (2d Cir. June 21, 2005) (prior to *Booker*, sentencing courts "understandably gave predominant, indeed controlling, weight to two factors in § 3553(a): the sentencing range established by the federal Sentencing Guidelines … and the pertinent policy statements of the Sentencing Commission;" now a court must comply with its statutory obligation to consider all of the factors in § 3553(a)).

Thus, while a sentencing court must consider the applicable Guidelines sentence, there is no presumption that that sentence satisfies all the objectives of § 3553(a). In fact, neither § 3553(a) nor the majority opinions in *Booker* suggests that the sentencing court should give the Guidelines any priority over the other factors listed in § 3553(a). The Guideline calculations are to be treated "as just one of a number of sentencing factors." *United States v. Ranum*, 353 F. Supp. 2d 984, 985 (E.D. Wis. 2005). Indeed, giving the Guidelines any sort of presumptive correctness or weighted consideration would in effect resurrect them to the level of de facto mandatory, which obviously runs afoul of *Booker*. *See United States v. West*, 2005 WL 180930,

at *2, 3 (S.D.N.Y. Jan. 27, 2005); *Simon v. United States*, Docket No. CR-90-216 (CPS), p. 9

(E.D.N.Y. March 17, 2005) (attached hereto as Exhibit A) (Senior Judge Sifton found that

"Guidelines are advisory and entitled to the same weight accorded to each other factor that the

Court is instructed to consider by § 3553(a)".).

In *Crosby*, the Second Circuit summarized the issues that must be considered by a

sentencing judge after *Booker*:

> First, the Guidelines are no longer mandatory.  Second, the sentencing judge must
> consider the Guidelines and all of the other factors listed in section 3553(a).
> Third, consideration of the Guidelines will normally require determination of the
> applicable Guidelines range, or at least identification of the arguably applicable
> ranges, and consideration of applicable policy statements.  Fourth, the sentencing
> judge should decide, after considering the Guidelines and all the other factors set
> forth in section 3553(a), whether (i) to impose the sentence that would have been
> imposed under the Guidelines, *i.e.*, a sentence within the applicable Guidelines
> range or within permissible departure authority, or (ii) to impose a non-Guidelines
> sentence.  Fifth, the sentencing judge is entitled to find all the facts appropriate for
> determining either a Guidelines sentence or a non-Guidelines sentence.

*Crosby,* 397 F.3d at 113. Most importantly, because the Guidelines are not binding, "courts need

not justify a sentence outside of them by citing factors that take the case outside the 'heartland.'

Rather, courts are free to disagree, in individual cases and in the exercise of discretion, with the

actual range proposed by the guidelines, so long as the ultimate sentence is reasonable and

carefully supported by the reasons tied to the § 3553(a) factors." *Ranum*, at 987.

Similarly, the limitations established by the Sentencing Commission with respect to

downward departures under a Guidelines' analysis have no bearing upon the facts that a court

can take into account when considering the other § 3553(a) factors.  It would be entirely

appropriate, for example, for a sentencing court to consider, pursuant to § 3553(a)(1), a

defendant's life of charitable work, or his commitment to his family, even if such factors are

discouraged grounds for departure within the traditional Guidelines' analysis.  Indeed, as one

court has observed:

> The Guidelines' prohibition of considering these factors cannot be squared with the § 3553(a)(1) requirement that the court evaluate the 'history and characteristics' of the defendant. . . . Thus, in cases in which a defendant's history and character are positive, consideration of all of the § 3553(a) factors might call for a sentence outside the Guideline range.

*Ranum*, 353 F. Supp. 2d at 986; *see also United States v. Emmenegger*, 329 F. Supp. 2d 416, 428 (S.D.N.Y. 2004) (noting that the Guidelines "err in giving virtually no weight to the 'history and characteristics of the defendant,' which Congress instructs the sentencing courts to consider equally with 'the nature and circumstances of the offense.' 18 U.S.C. § 3553(a)(1)" and finding defendant's age to be a relevant factor in assessing likelihood of recidivism).

In this case, the Probation Office has calculated the Total Offense Level under the Guidelines to be Level 34 with an imprisonment range of 151 to 188 months.[2] *See* Presentence Report ("PSR") PSR, ¶ 150. None of the other § 3553(a) factors justify a sentence that would remove Kirk Shelton from society for in excess of twelve years. Instead, such a sentence would undermine the principal goal of sentencing that a defendant should receive "just punishment" and ignore Mr. Shelton's unblemished life history and his extraordinary accomplishments and contributions to society. For the reasons articulated below, a non-Guidelines sentence that does not include incarceration would be reasonable in this case and satisfy Judge Newman's recognition of imposing "individualized justice," *Crosby*, 397 F.3d at 114, as well the statutory mandate that "a sentence be sufficient, but not greater than necessary" to comply with the purposes of sentencing.

---

[2] The Probation Office incorrectly calculated Mr. Shelton's Total Offense Level in the Presentence Report. The PSR calculation included unwarranted enhancements for a Leadership Role in the Offense and Obstruction of Justice while disregarding mitigating evidence presented at trial as to Mr. Shelton's minimal role based upon the testimony of the Government's own witnesses. *See infra*, Section V.B at 69-71.

### III.  The History And Character Of E. Kirk Shelton

#### A.  Mr. Shelton's Parents And Upbringing

Mr. Shelton's father, Edward Shelton, lost his own father at the age of fifteen during the height of the Great Depression. He was nonetheless able to overcome the challenges created by growing up fatherless during a time of economic crisis by attending the United States Naval Academy in Annapolis, Maryland in the 1930s. Edward Shelton always credited the Naval Academy with providing him with an enduring commitment to discipline and hard work, sharpening his sense of right and wrong and, perhaps most importantly, emphasizing the importance of *always* being honest and telling the truth.  These values—which he would eventually pass on to his children—guided virtually every aspect of his life.

Edward Shelton was forced to leave the Academy during his senior year due to poor eyesight. He received his undergraduate degree from the University of Washington, and his master's degree from California Institute of Technology. He then taught at both Syracuse University and the Naval Academy.  For the majority of his professional career, he was an electrical engineer for Brookhaven National Laboratory in Upton, New York.

Mr. Shelton's mother, Edna Weiss Shelton, was the daughter of Hungarian immigrants. Edna Shelton's parents initially prospered after coming to America but then lost all their assets during the Depression.  She nonetheless found a way to attend and graduate from Hunter College.  She eventually received a master's degree in mathematics from Syracuse University and she taught high school math for the majority of her professional career.

Edward and Edna Shelton were married in the Naval Academy's chapel in 1947. Kirk Shelton was born in Port Jefferson, New York in 1955.  His sister, now Vicki de Angeli, was born in 1957. The Shelton family lived in Setauket, New York.

Kirk Shelton described his father "as the most important person in his life" who was "extremely moral and well-respected." *See* ¶ 121, Presentence Report ("PSR"). Similarly, he described his mother "as a very intelligent woman" who "viewed and treated everyone as equals." *Id.* Imbued with depression era values, **"**Kirk's parents were living examples of how to act in the world: they were honorable, law-abiding, and disciplined their kids … appropriately." *Letter from Richard A. Ratner, M.D., P.A.*, Letters App. at 027. Edward and Edna Shelton worked hard and lived frugally, emphasizing quality over quantity. "Time and again they showed, by example, that in the long run, it was wiser to defer gratification and work hard to attain something of quality, and then to take good care of it for as long as possible." *Letter from Tim Werner*, Letters App. at 037; *see also Letter from Mary Pollock*, Letters App. at 044 (Growing up, their parents taught them "the value of the dollar and a good day's work;" They "did not talk about material things that money would buy but rather the value of things.").

As noted by Mr. Shelton's sister, their parents "always treated everyone with dignity" and emphasized "the importance of honesty . . . .". *Letter from Vicki de Angeli*, Letters App. at 007.  Mr. Shelton's father used every opportunity to instill these values upon his children, as evidenced by the following example:

> I can remember our family sitting in a restaurant and our father would always check the bill over to make sure it was correct.  On one particular evening we were waiting and waiting for our server to return, and being rather impatient, I asked my father what were we waiting for.  He said that the waiter had made an error of $1 on our bill:  he had undercharged us, and my father wanted to make sure to pay all that he owed. This is the man that set the example for us on the right way to behave.

*Letter from Vicki de Angeli*, Letters App. at 007; *see also Letter from Joseph W. Prokop*, Letters App. at 043 ("Kirk's character and family values were instilled in him by his parents….").

Edward Shelton taught his children that anything that might even appear to be improper was never to be tolerated. His sister wrote:

14

In the early 1970's the minimum wage was $1.60, and I remember Kirk asking my father if he could apply for a summer job at Brookhaven National Laboratory where the minimum wage was $5 per hour. My father would not let Kirk apply because he felt that if someone within my father's department were to hire Kirk, it would look as if our father was involved in getting Kirk the job, even though he would not be involved in the hiring at all. Kirk saw that not only do you *do* the right thing, but if something could possibly be *seen* as improper, you simply didn't do it.

*Letter from Vicki de Angeli*, Letters App. at 007.

Edward Shelton died as a result of a fall in 1986. Edna Weiss Shelton died in 1999, the day that Kirk Shelton first voluntarily met with prosecutors from the United States Attorney's Office in Newark, New Jersey. Mr. Shelton's sister recalled the sadness of that particular day in her letter as follows:

On January 7th, 1999, our mother lay dying in the hospital, and I kept telling her to hang on, that Kirk would get there soon. He was in Newark meeting with the prosecutors in this case, and in fact arrived at the hospital 2 hours after she slipped into a coma. I told Kirk to say his goodbyes anyway, and that I was sure she could hear him – Kirk meant the world to her, and I just know she heard his last words. I am just sorry that Kirk was not able to hear our mother's last words to him.

*Id*. at 009. Mr. Shelton looked upon his parents as ideals of character and integrity and has tried to model his own life after them.

### B.    Mr. Shelton's High School, College And Graduate School Years

"Kirk … grew up in [a] middle class suburban home on Long Island in which education, hard work, and individual responsibility were emphasized on a daily basis." *Letter from Tim Werner*, Letters App. at 036. Mr. Shelton always displayed an exceptional selflessness and depth of thought of a person far beyond his years. An anecdote from his sister, Vicki de Angeli, illustrates this point:

Whenever our parents took us out for dinner, I always ordered steak and he always ordered chicken. After several years I finally asked him why he didn't order steak like I did, because I knew he liked it as he ate it at home. His answer was that steak was usually the most expensive thing on the menu, and chicken

was usually the cheapest, so he would order chicken.  When I further asked what difference did that make, as it wasn't our money – that Mom and Dad were paying and they didn't seem to care, he replied that, "I care.  Just because Mom and Dad have never told you not to order steak, doesn't mean that you shouldn't care."

*Letter from Vicki de Angeli*, Letters App. at 007.  For Kirk Shelton, helping others was an innate instinct, as shown in the following example:

One memory I have that demonstrated Kirk's innate generosity was related to a one-hundred mile trek through the White Mountains that Kirk, myself, and another friend undertook at age fifteen.  On the first night out we met up with a small group of "city slicker" teens a few years older than us who had planned poorly and were almost out of food.  Even though we had to make our own cache of food last another two weeks under uncertain conditions, Kirk was the first to insist that we share what we could with these hungry strangers.

*Letter from Tim Werner*, Letters App. at 037; *see also Letter from Joseph W. Prokop*, Letters App. at 042 (Kirk "often used his time to tutor or help other students, including on many occasions assisting me.").

Mr. Shelton attended local public schools in the Three Village School District Setauket. He not only excelled in school, but he further developed his strong work ethic during his high school years when he worked on a pig farm and painted houses. *See* PSR, ¶ 122; *Letter from Tim Werner*, Letters App. at 038 ("One of the many jobs that Kirk had in high school was working on a local pig farm. It wasn't the most glamorous position he's ever held, but it paid for the … insurance and gas bills."). His strong sense of ethics and integrity is shown by the following anecdote:

During our painting career, there were many opportunities to cut corners at the expense of a client, and most of us were inclined to do so on various occasions, especially after having worked for ten or twelve hours in the hot sun, but Kirk wouldn't hear of it.  I'm not sure how he convinced us to do the right thing, but after a while, we just figured it was easier to do it right the first time.  In the long run, this served our reputation well, and we were even more successful as a result.  Kirk was always looking at the big picture, and doing the right thing regardless of the consequences was, and is, a key characteristic of his personality.

16

*Letter from Tim Werner*, Letters App. at 038-039; *see also Letter from Bob Bauerle,* Letters App.

at 047 ("Kirk would insist that every part of the job be done correctly, no short cuts.  We would

argue that the customer wouldn't know if we used primer on the third story soffits.  Kirk would

answer that he would know and we should do the work we agreed to do. His integrity was

unshakeable even in the face of peer pressure."); *Letter from Jack Skydel,* Letters App. at 034

(*"*Kirk [and I] were perhaps too honest for our own good. All our jobs were on referrals, we

passed on the discounts on materials we received from buying in bulk and lived up to all our

estimates including those we underestimated  . . . ."). Bob Bauerle recounted that the young Kirk

Shelton was even committed to being an honest consumer:

> The winter of our senior year of High School, Kirk, another high school buddy
> and I took a road trip up to New Hampshire to go skiing.  We were driving in
> Kirk's big 1962 Oldsmobile, as I recall.  Were caught in an ice storm and forced
> to stay in a roadside motel.  We had 4 sets of skis on the rooftop carrier.  When
> we registered at the motel we registered three people.  The desk clerk, seeing we
> had brought along an extra pair of skis and there were only the three of us.  Once
> we were settled in the room I remember discussing the possibility of putting our
> third and fourth pairs of skis in the trunk next time and registering for two in the
> next motel.  Kirk wouldn't hear of any such thing.  He lectured me on the need for
> a business to charge a fair price and play by the rules of the market.  He further
> explained the expectation that we as customers would also treat the businessman
> in a fair and honest fashion.  To this day I try to teach my employees and children,
> this same lesson.  I must give Kirk the credit for teaching it to me at such a young
> age.

*Letter from Bob Bauerle*, Letters App. at 046.

Kirk Shelton was "outstanding academically and musically, and socially he was great fun

and a very normal kid."  *Letter from Jonathan W. Storck*, Letters App. at 049. "While he was

talented in sports and gifted in both music and the academic arena, he also worked harder than

any of us. With his natural abilities Kirk could have coasted through life with ease, but never

once did we see any evidence of this in any aspect of his life….". *Letter from Tim Werner,*

Letters App. at 037.  Mr. Shelton was an accomplished musician, playing piano as well as brass

instruments, and he was a member of the jazz band in high school. *See Letter from Joseph W. Prokop*, Letters App. at 042 (He frequently used his musical talents as a way to benefit the community, such as at Church dinners and dances and school events). Mr. Shelton graduated from Ward Melville High School in 1972 where he was class valedictorian with a 4.0 grade point average.

After high school, Kirk Shelton attended Yale University on a partial academic scholarship that he earned through Brookhaven Laboratory. He had numerous jobs during the academic year, which included working in the student laundry and the typing pool, serving as a teaching assistant, playing in a jazz group. During the summer breaks, he continued to paint houses.  When Kirk and his friend, Bruce A. Pollack, took over the management of the college hamburger stand, his commitment to ethics, honest and integrity were again evident:

> [The college hamburger stand] had been in business for more than ten years and never earned a profit.  Thus at the beginning of the school year, the Master had no difficulty agreeing to our proposal that we split the profits with the College.  At year end when we presented the Master with a check for $600, it was an extremely proud moment for us.  Clearly the Master had no expectation, based on past performance, of receiving a profit sharing distribution, but it never would have occurred to us to keep the money.

*Letter from Bruce A. Pollack*, Letters App. at 059.

Kirk Shelton graduated from Yale, *summa cum laude*, in 1976 in three and one-half years.  During his senior year, he met the woman who would later become his wife, Amy Schultz, and to whom he has been married since 1984.

After graduating from Yale, Mr. Shelton enrolled at Harvard Business School, where he earned an M.B.A. degree, also with honors in 1978.

### C.    Mr. Shelton's Strong Commitment To His Wife And Children

Kirk Shelton and his wife, Amy, have been married for twenty-one years and are the

proud parents of two boys, Scott, age 17, and Kip, age 15.  Both boys attend the King and Low-

Heywood Thomas School in Stamford. This fall, Kip will be entering his sophomore year and

Scott will be in his senior year.

A single excerpt cannot adequately articulate the type of husband and father Kirk Shelton

has been these many years. However, the following observations made by his wife are

particularly insightful:

> To say that Kirk has been a devoted husband and father would be an
> understatement. From the time our children were born, he has never missed
> any meaningful event in their lives, from school conferences, plays and
> music recitals, to sporting events and graduations. He has always put the
> children before work, yet somehow managed to accomplish both. His strong
> bond with our sons, Scott and Kip, has been wonderful to see. They have
> come to rely on him as the "voice of reason," as an object of love and
> admiration. His sharing of knowledge, musical expertise and life
> experiences have given our children a better, more secure future than they
> could have gotten anywhere else. Kirk has embraced his role as a father and
> husband to a degree a wife can only hope for. With Kirk, I got more than I
> hoped for. Together we have developed a family value system based on
> positive experiences from our own upbringings. On Sunday nights, we
> would host weekly "family meetings" where we would teach the kids
> various life lessons, and help build their value system. It is a value system
> centered on love, honesty, productivity and open communication. And,
> although rocked by the events surrounding Kirk's indictment and
> conviction, we have both continued to instill these values in our boys.

*Letter from Amy Shelton*, Letters App. at 002; *see also Letter from Cristina Antunes*, Letters

App. at 064 (Ms. Antunes, who has worked for the Sheltons for the last few years, noted that

she has "seen a chart that Kirk printed out to his kids, of the Shelton Family Values, where he

says to his kids to be honest and always tell the truth, no matter what the consequences are.

To me, this is a man with integrity.").[3]

Many friends also commented on Mr. Shelton's dedication to his wife and children.

For example, Carl R. Kuehner, III, made the following observations in his letter:

> … I think Kirk's greatest accomplishment and most passionate commitment is to his wife, Amy and their two sons, Scott and Kip. Kirk is a straight arrow and is an exemplary husband and father. I know of very few marriages that work these days, that are still passionately bound by the vows they took so many years ago. It is because of Kirk and Amy's unbreakable bond, that they have created a true home for their children, a place of strength and solace, love and support; that is the foundation that Kirk has laid and the legacy that he will leave for his children to go forward in the world and be the best they can and build their lives and live them with an unwavering sense of what is right and good and true.

*See Letter from Carl R. Kuehner, III*, Letters App. at 185. Similarly, as noted by Mr. Shelton's

childhood friend, Joseph W. Prokop, "I have long admired Kirk as the most devoted family

person that I have known, which I believe is the best indication of his excellent character and

moral values. Kirk has remained a devoted and supporting friend and husband to his wife Amy

from the day that he met her in early 1970's. Kirk is a dedicated father and as a father and

---

[3] Kirk Shelton drafted a memorandum around 1997 that has been used as a tool to reinforce to his children the values that he and his wife deem critical to leading an honest and decent life. This document was on his laptop that was turned over to the government. The Shelton Family Values Memorandum provides:

**The Shelton Family
Important Things to Remember**

1. Do the jobs that you are responsible for.
2. Always tell the truth.
3. Try your hardest in everything you do.
4. Share with others.
5. Be good to your family.
6. Treat others with respect.
7. Take care of your things and anything you borrow.
8. Treat others the way you want to be treated.
9. Take good care of yourself-eat healthy, exercise and get plenty of sleep.
10. Never take things that don't belong to you.

husband is an example to all other men." *Letter from Joseph W. Prokop, Esq.,* Letters App. at 043.[4]

Mr. Shelton's involvement in all aspects of his children's lives also is well-documented. Sheila M. Phelan, a close family friend whose son (Kevin) is best friends with Mr. Shelton's oldest son (Scott), has been impressed with Mr. Shelton's relationship with his children from the time she met him. She wrote:

> Kirk is a completely devoted father. He loves his boys beyond all measure and has a huge influence on their lives. And I don't just mean the big picture. Kirk probably knows more about what's for homework than the kids do, or at least Scott. Ever since I have known the family, Kirk has been just as likely as Amy to check in with me on what the plans were and let me know what he was comfortable with in terms of rules and curfews.

> I know Scott well, and I know how connected he is to his Dad. I love that kid and feel he is as much a part of my family as Kevin is of the Shelton's. I know for a fact that Scott, now seventeen, shares almost everything with his dad. I came across a communication between my son and Scott in which Scott refers to conversations with his Dad that I wish I could have with my son. Teenage boys tend to shut down, but Kirk has engendered a relationship with Scott in which he feels safe to be as open as possible. In this world, that can be a life saver for teens.

*Letter from Sheila M. Phelan*, Letters App. at 071; *see also Letter from Christine de Angeli,* Letters App. at 014 ("I have spent many an evening in his house when he was helping his sons, Scott and Kip, with homework. His patient, caring attitude is truly unique in this society where everyone seems to be out for themselves. Having grown up in suburban Washington, I saw what other fathers were like, and there were none so devoted and giving of themselves as Kirk.").[5]

---

[4] *See also Letter from Kenneth L. Gestal*, Letters App. 095 ("I have watched the Shelton's two boys grow up to be healthy, grounded, well rounded young men. The kids' participation in school, sports and community activities is evidence of their SOLID upbringing. Kirk is not only a terrific father and role model for his children, but the obvious caring relationship with Amy is at the core of their value system.").

[5] *See Letter from Laurie Doering*, Letters App. at 075 ("Kirk has always been present at school functions to watch his children sing, perform, "move-up" at the close of each school year and support

Kirk Shelton has successfully instilled his parents' Depression-Era values to his own children, which is evidenced by Scott Shelton's letter to the Court. He wrote:

> My father never spoke of money, unless he was giving me what I call the "light bulb speech", something I've heard more times than I can count. The basic content of the "light bulb speech" is a testament to the importance of turning off lights when leaving the house, or a room so as not to waste money and electricity. This "light bulb speech" is not unique to simply light bulbs however. The "light bulb speech" is an all encompassing speech that also preaches the importance of turning off televisions, wearing clothes as much as possible before washing them, and taking short showers. Often times I wonder how much money and energy would be saved if everyone on the planet were given the "light bulb speech", and frequently find myself giving it to friends.

*Letter from Scott Shelton*, Letters App. at 005.[6] Numerous family friends also confirmed that Mr. Shelton has strived to not spoil his children with material items and to make sure they understand hard work and personal responsibility.  Christopher J. Garcia observed the following:

> Living in Fairfield County can distort children's views of the world and life becomes a virtual entitlement. Not Kirk's family, however. They are the most down to earth, well-grounded family we know in this area. Even in the worst of times, which they have experienced for the last 7 years, they have never changed. Despite the enormous success Kirk has achieved in his career and the sizeable financial gains that come with the

them in academic and extracurricular events."); *Letter from Lisa Ross-Benjamin*, Letters App. at 077 ("Kirk has always been and remains a dedicated parent, attending virtually all functions at the school. Not only is he there for his own children, but also Kirk is, a very well known Dad around campus, cheering on other kids as well."); *Letter from Paula Noll,* Letters App. at 083 ("His concern for his boys stood out to me, because I often wondered how he could possible find the time to worry about such things, when he had so many other business concerns that seemed to be part of his life. … Getting to their school activities and supporting them in whatever they were involved in, was his life. Kirk was the hands-on type of father who was totally involved in the boy's day-to-day lives."); *Letter from Ken Keith*, Letters App. at 123 (For ten years, Mr. Shelton flew to California for business; "Kirk took a flight from NY to arrive in California by 9 am and would leave in the evening to catch an overnight flight back. After doing this for many months, I asked him why use this grueling schedule. He responded that it allowed him to spend less time away from his kids."); *Letter from* Anne S. Karfopoulos, Letters App. at 155 ("Based on my observations, as the boys grew up, Kirk spent all of his free time with them, despite his extremely hectic business schedule."); *Letter from Martina H. Demott,* Letters App. at 090 ("Kirk with his boys is inspirational."); *Letter from Kevin C. Clark*, Letters App. at 181 ("Kirk is an actively engaged parent, a leader within the school community for ten years, is a champion for education and teaching our youth about ethics and family values.").

[6] Scott also credited his father with instilling in him the principle of helping others. He stated that "[f]rom the time when I was little and would tell my father about things that happened in school, how some girl was picked on, or someone was having a hard time, he always encouraged me to stand up for people, and to help people." *Letter from Scott Shelton*, Letters App. at 004.

territory, you would never know that from his family. Warm, generous, and caring are the words that come to mind most when referring to Kirk's family, but they are most descriptive of Kirk who sets that example every day.

*Letter from Christopher J. Garcia*, Letters App. at 190. Mr. Shelton's brother-in-law, Gene

Szczecina, made similar observations:

> Kirk is also a great father of two very gifted children (I know, we are still biased). Most children who grow up with a parent who can provide them with just about anything and everything grow up to be very spoiled children. This is not the case with Scott and Kip. Kirk made sure from the very beginning that his children were not spoiled. If they had a special toy, and they lost it, Kirk did not run out and buy them another. Instead, he made them suffer the loss of that toy in an attempt to teach them responsibility. Kirk's involvement with his children continues to this day. He is very involved in their studies, and he helps both boys out with their homework almost on a daily basis. We can tell you from personal experience that Amy and Kirk have done a wonderful job raising two very well behaved children.

*Letter from Gene Szczecina*, Letters App. at 018; *see also Letter from Catherine M. Petrello*,

Letters App. at 055B ("[Kirk and Amy] instilled values and principled behavior in their children

through good parenting and by example. Living in an affluent town it would have been easier for

them to give their children whatever they desired – but did not. Scott and Kip are "good kids"

who are respectful."); *Letter from Kevin Phelan*, Letters App. at 072A ("Scott and Kip aren't

spoiled Fairfield County children who get whatever they want, when they want it. Mr. Shelton

has been firm in having them earn things and has never spoiled them with presents.").

Finally, F. Scott Conant provided the following insights into the Shelton household from

his viewpoint as a teacher:

> Scott and Kip Shelton are among the finest young citizens that I have had the pleasure of instructing. Their innate decency and kindness, in combination with good humor, are a reflection of the Shelton home. These young men are intellectually curious and socially aware. They respect themselves and others, and have not taken their many talents for granted.
>
> Kirk has been a guiding light in their lives. He set the bar high yet created an atmosphere where hard work is balanced with meaningful (and memorable) family time.

*Letter from F. Scott Conant,* Letters App. at 106.

In light of Mr. Shelton's significant involvement in every aspect of his children's lives, it is understandable that so many people have expressed concern about the impact a sentence of incarceration would have on the Shelton children. Clifford L. Wald, a long-time family friend whose sons are friends with the Shelton boys, stated the following:

> I know the Shelton children very well and I am deeply concerned for their welfare during Kirk's incarceration. I can already see signs of depression in Scott and anxiety in Kip. I have heard and read descriptions of how other children in these situations have suffered. Although I, and others, will certainly do our best to help these children there is no replacement for ones father, especially one like Kirk. The collateral damage to these children could be great and tragic.

*Letter from Clifford L. Wald*, Letters App. at 092. *See also Letter from GerriAnne and Brian Mason*, Letters App. at 016 ("These are important years for the boys to have their father."); *Letter from Richard A. Ratner, MD*, Letters App. at 029 ("Kirk's kids are enduring a very difficult time in their lives with the current turmoil superimposed upon a critical developmental stage as they prepare for adulthood. It is a bad time to be without a father."); *Letter from Adrienne Wald*, Letters App. at 086 ("His 2 teenage sons are at vulnerable ages. They are at a point in their lives where they need the guidance of both parents. I fear that nothing good comes out of taking a father away from his duties as a loving father, especially during the crucial teenage years. Over the long term surely you must know what this does to a family. It would serve no purpose to society to take a solid family and pull them apart.").[7]

Scott Shelton provided the best articulation of the consequences of being separated from his father. He wrote:

---

[7] The medical experts also agree that if Mr. Shelton were to be incarcerated, it would likely have a negative effect on the personality development of the Shelton children. *See* PSR, ¶ 131. *See also* Letter from Dr. David L. Lopez, MD, attached hereto as Exhibit B. Dr. Lopez, who has been treating Scott, indicated that his father's incarceration could create life long difficulties for Scott.

> I was 9 when this began. I am now 17 and will be graduating next spring. For as long as I can remember, my life has been dominated by this trial. I want you to remember one thing. I am a living, breathing, bleeding human being. I have a little brother and a mother who depend on this man.

*See Letter from Scott Shelton*, Letters App. at 005.

### D.    Mr. Shelton's Exemplary Employment History

#### 1.    <u>Dur-O-Wal</u> (1978-1981)

In 1978, after graduating from business school, Mr. Shelton had his pick of jobs. He turned down the opportunity to work at a large financial institution or investment bank – the type of career path that had lured many of his classmates. Instead, wanting to become involved in managing a business, Mr. Shelton joined Dur-O-Wal, a small manufacturing company that made steel products used to reinforce concrete or brick walls. Mr. Shelton learned much at Dur-O-Wal and from its owner Eugene M. Isenberg, and knew that he wanted to devote his career to operating a business.

According to Isenberg, Mr. Shelton quickly set himself apart as being an individual of character who was thoroughly committed to honesty and integrity:

> I initially became acquainted with Kirk when I hired him to work for me following his graduation from business school at age 23. My involvement with Kirk as an employee for three years and my continual contact with him since that time have given me a strong and comprehensive basis for my personal judgments about his abilities and character. Kirk was more than capable, always professional and totally reliable.
>
> *    *    *
>
> Kirk was always straight-forward and honest and described in detail the advantages and disadvantages of a course of action. I valued Kirk's objectivity and judgment and trust him implicitly with important decisions, as I would today. He has always proven to be a man of the utmost professionalism and integrity.

*Letter from Eugene M. Isenberg*, Letters App. at 107.

In 1981, Isenberg sold Dur-O-Wal to another company. Mr. Shelton declined to move to Chicago to work with Dur-O-Wal's new owners.  Instead, he answered a New York Times help-wanted advertisement for a company then called Comp-U-Card, which became known as CUC International ("CUC").  At the time CUC was a discount shopping service.  The founder and Chief Executive Officer of CUC was Walter A. Forbes, who had the goal of building CUC into the first computer-based shopping system.

      **2.**        <u>**CUC**</u> **(1981-1998)**

When Mr. Shelton joined CUC, it had fewer than fifty employees. Stuart Bell, a young graduate of the Harvard Business School, was the Chief Financial Officer of the company. Christopher McLeod, who had previously worked with Mr. Shelton at Dur-O-Wal, joined the company shortly thereafter and, like Mr. Shelton, assumed significant management responsibilities at CUC.

Mr. Shelton quickly rose to a leadership position within CUC by virtue of his hard work, intelligence, and dedication to honesty and integrity.  In 1984, Mr. Shelton was placed in charge of marketing for the company.  In 1988, Mr. Shelton and Mr. McLeod embarked on a decade-long arrangement in which they split management responsibility for CUC's various operating businesses.  Among the divisions run by Mr. Shelton were BCI, FISI*Madison, and Entertainment Publications. Mr. McLeod assumed responsibility for CUC's flagship Comp-U-Card division, among other businesses. In 1992, Mr. Shelton was formally appointed CUC's President and Chief Operating Officer; Mr. McLeod was appointed to the position of Executive Vice President.  Both were made members of the Office of the President.  Notwithstanding Mr. Shelton's more senior title as President and COO, he and McLeod continued to split the responsibility of supervising CUC's various divisions, and both reported directly to Walter

Forbes. This arrangement lasted until December 1997, when CUC merged with HFS, Inc. When Mr. Shelton left the company in 1998, it had grown to approximately 34,000 employees.

Neither Mr. Shelton nor Mr. McLeod, prior to 1995, had any responsibility for overseeing CUC's accounting department. From the time Mr. Shelton joined CUC through the end of 1994, the accounting function at CUC was within the purview of Stuart Bell. Unlike Shelton, Bell was a certified public accountant. By all accounts, Mr. Bell was a strong and effective CFO. Mr. Bell interacted with Wall Street analysts, he authorized the issuance of press releases announcing the company's financial results, and he oversaw the making of all required SEC filings. Mr. Bell, like Mr. McLeod and Mr. Shelton, was a member of the Office of the President beginning in 1988 and reported to Walter Forbes.

- **Serving as a mentor and treating co-workers with respect**

Mr. Shelton's positive influences as a counselor, mentor and manager have had a profound impact on many, many people at CUC. He always treated his colleagues and staff with respect and dignity. A few examples are provided below:

**Craig Sherman** (Letters App. at 110-111):

*Yet among all of those managers, Kirk Shelton has been the singular most important mentor in my business career.* Let me explain how I came to know Kirk and how he has influenced me over the years.

One year after joining CUC International, I asked to go down to one of our call centers and take the new-hire training class incognito, as if I had been hired off the street. I subsequently wrote an analysis of the training program that caught the attention of the president of my division, who forwarded it to Kirk. Kirk took me to lunch and asked to read 'any important memo's' I wrote going forward. That started our relationship. Two years later, the company instituted a formal "mentor" program. As luck would have it (for all I know it was by design, though I never asked), Kirk became my mentor. Typically, these types of programs falter after a few months: the company's HR department launches it with great fanfare but then the enthusiasm wears off and the senior managers get too busy to give their 'mentees' attention. In Kirk's and my case, that never happened. Kirk made the time to meet with me once every six weeks for the next 3 years. Even when I moved to Japan, we kept up by phone once every couple of months.

27

Kirk was really committed to helping me. First, before our first meeting, Kirk interviewed my three previous bosses. Then, when we met, he gave the best candid critique of my strengths and weaknesses I have ever received – before or since. And, he gave me very specific recommendations on how to improve as a general manager.

Throughout our years of this formal/informal relationship, I found Kirk to be one of the most caring, thoughtful and concerned counselors I have ever had. ….

I remember many of the conversations very clearly because I thought of our time together as the most educative activity in my career (in fact, I often say that I got the equivalent of an MBA in those meetings). ….

In all of the years of our mentor relationship, Kirk showed he truly cared about me. He treated me and others in the organization with great respect. I felt less like an employee and more like a partner and I think he engendered that feeling in most of us.

**John P. Tuohy** (Letters App. 113-114)**:**

I worked under Kirk, typically 2 or 3 levels below him, for about 13 years until 1998, when Kirk left Cendant. But due to our smaller size and informal culture, particularly in the earlier years, I had ongoing contact and a personal relationship with him. Though almost 10 years my junior, I considered him (and still do) a mentor, friend, and role-model. He, more than anybody during our 13 business years together, personified in my mind the ideals and values of CUC – intelligence, decisiveness, humility, informality, humor, cohesiveness, teamwork, loyalty, fairness, and an aversion to corporate politics. …

Over the years, Kirk was very loyal to CUC "oldtimers" – people who had been there contributing back to the earlier days. As the company grew and opportunities and promotions opened up, particularly in the divisions and subsidiaries, Kirk saw to it that we had a shot at them. He then kept an eye on our progress and well-being, stepping in as he saw fit.

In 1994, Kirk and (another principal) relocated me and my family to Miami (to give me opportunity to further career growth). I became essentially the #2 person for a subsidiary company CUC had acquired. For the first two years, everything worked out fine. Then things turned south on me. My boss, the #1 guy, became increasingly difficult. At the same time, CUC for certain reasons had to put our company up for sale for the CUC/HFS merger (into Cendant) to be completed. For several months, it was not clear what would become of me, all of which was very stressful, particularly having uprooted my family to Miami. Kirk personally saw to it that in the end my family and I were brought back to CT, that an appropriate position was found for me, that I received a raise and new options, and that I even got in essence a paid 7-week "vacation" (during some transitional downtime), all at least in part for enduring this period of difficulty. He also had to arrange and oversee special legal assistance to deal with limitations imposed on my new job by

my boss (for competitive reasons). Kirk had a lot on his own plate at the time particularly with the pending merger. It would have been very easy for him (and probably for most other executives for whom I have worked) for my circumstances to have had a much lower priority or to have fallen thru the cracks. Kirk's friendship, the personal telephone contact he maintained with my wife and me during this timeframe, his manner, his assurances, his word, and his follow-through were what kept my family and me calm and made it all work out.

**Amy N. Lipton** (Letters App. at 121A)**:**

He seemed to conduct business very decently, and would speak frequently to me and others about his business principles. Those principles, which included treating others fairly and in a way that one would wish to be treated oneself, inspired me and seemed to inspire others around him. I never saw him take advantage of anybody. If he thought that an employee wasn't performing well, he would tell that person. If he wanted something in a negotiation, he would ask for it. He treated his subordinates kindly. He treated the lowest level employee with the same politeness as he treated senior executives. He didn't yell at people in a cutting way. While ideas were discussed heatedly, I never saw him embarrass anyone; in fact, he seemed to go out of his way to respect people's dignity. His style seemed very straight and direct, and I think that he was widely respected by people who worked at the company.

**Ken Keith** (Letters App. at 122):

Over the course of my years working with Kirk we had many opportunities to work side by side on many projects. Kirk set an example for us all. He worked hard, challenged us to think and act, included us in all decisions, helped me develop my team, included us in related acquisitions and gave us the authority to run our businesses. He didn't over control, micro manage, override our decisions but lead by example. He never tried to succeed by claiming our success as his own. He rewarded us with fair compensation and opportunities to grow. He always treated everyone with respect, no foul language, no degrading talk. He was a gentleman in every setting.

During the many years I worked with Kirk, I felt like I worked with him not for him. He encouraged risk taking, let me make mistakes and required me to make decisions. Failures were learning experiences, not one strike and you're out. He required me to grow and learn and without his help I wouldn't have been able to become CEO of a $120,000,000 company with 300 employees. Because of his leadership and support we grew the business to over $600,000,000 and 1,000+ employees.

**Michael Bodetti** (Letters App. at 125):

Over the years I developed an admiration for Kirk as a business manager and as a person. Kirk always treated people with respect. It didn't matter if it was an entry-level person or a senior manager; Kirk treated them all as important members of the organization. This was consistent over the 12 years that I spent at CUC and continues to this day. Kirk ran a

multi-billion dollar organization with thousands of employees yet he always made time for individuals. In 1998 my father died and I received condolences from many people. The one that stood out most was a hand written note from Kirk expressing his sadness and making a connection to a similar loss that he had. A seemingly minor gesture, yet one I will never forget.

**Kelly E. Green** (Letters App. at 128):

After the CUC/FISI merger, I moved to Connecticut and joined the CUC staff. Within a short time I was reporting to Kirk in the role of the SVP of Sales. Kirk became the boss I have spent my career trying to emulate. He was involved and allowed you to do your job. He was skilled, intelligent and confident yet never showed arrogance or disrespect to any level employee. He was busy yet found a way to always be responsive. He took his work seriously but Kirk didn't take himself seriously. His integrity was beyond question and I am not aware of his ever lying or misleading me on any issue.

**Andrew D. Carr** (Letters App. at 132):

The lessons Kirk has provided me extended beyond being the best businessman I have ever met. He understood, sympathized, and helped me as a human being. He came to my office, and gave me what was pretty good news about my first raise at CUC, but it still meant I couldn't afford a house in the expensive Stamford Connecticut market for my young family. I was near tears. He couldn't change corporate policy to help me without being unfair to others, and he didn't. But, I knew after that meeting that my needs as a family man mattered to him, and I loved him for it.

**Vincent D'Agostino** (Letters App. at 134):

I was uniquely fortunate to have Kirk as my first boss. He soon became my friend and mentor.

While business school provides you with a broad knowledge of business, it really trains you to work in a structured environment. In 1981, CUC was anything but that. I was extremely fortunate to have had Kirk as my superior. We were charged with creating the interactive arm of the business – a daunting task in 1981. This was at the advent of personal computers and interactive cable television networks. I found myself lost in such an unpredictable environment. Kirk identified a few unique business opportunities for our group and worked closely with me to structure my job in a way I could succeed in it. He was patient with me and reassuring at every step. He taught me how to tactfully push the other parts of the organization we needed to assist us. We worked long hours, six or seven days a week, but he was always willing to take time to explain confusing points about the business or provide advice on personal issues.

On a personal basis, Kirk was like a big brother to me during those first few years at CUC. In 1983, my wife and I decided to buy a condominium. Because of the interest rates at the time, finding anything we both wanted and could afford was difficult. Kirk

spent time with me, looking at some of the properties we were considering and helping me understand some of the more complex financing options that were currently available.

He lived up to a promise he made four years earlier that many would have walked, been tempted to walk away from. There was risk in both personnel moves – hiring an outsider to run systems and moving me into a marketing job. But Kirk was more concerned with fulfilling his promise to me, and only asked me to work with him to mitigate any risks to the organization. I will never forget that. It allowed me to grow into a general manger and eventually develop the skill set need to run a subsidiary of the Company, Benefit Consultants, Inc., in 1995. If he had not lived up to his commitment to me, my career would have been set back and it is unclear that I would have had the skills to successfully start my own company, Webloyalty.com, Inc., as I did in 1998. I have always appreciated Kirk's consideration of my personal goals and the opportunity he gave me to achieve them at CUC. In my dealings with him, he has always lived up to his word.

**Charlie M. Deschermeier** (Letters App. at 139):

First, I will always remember the first business meeting I attended during my first week with the company. I was asked to attend a meeting with several senior executives, including Kirk, to discuss several marketing issues. During the course of that meeting I still recall raising several issues where I strongly disagreed with a number of the people in attendance. As you can well imagine, I remember wondering at the time if I was rapidly bringing my new job to an end as I argued my points. At the end of that meeting, as I was leaving the room, Kirk asked me to see him in his office. I was expecting him to tell me that it would make sense for me better learn about the company and it's processes before taking such strong positions. To my pleasant surprise Kirk told me that while he may not have agreed with all of my opinions it was absolutely critical that I always express my honest opinions and stand by my convictions. I knew at that point I had joined the right firm.

**Jeffrey Feuer** (Letters App. at 141):

At another important moment in my career, Kirk revealed his character again. Following the acquisition of our largest competitor to the business unit I was working in, I was laid off. Though I was offered a generous severance, I felt I earned an annual bonus normally awarded approximately one month after my date of separation. Kirk welcomed my reasoning and granted my request despite having absolutely no financial or other incentive apart from fairness. He chose to reward a departing employee thousands of dollars to the detriment of his company's financial performance. This is the man I recall when I hear Kirk's name.

- **Efforts to build a culture of honesty at CUC**

Mr. Shelton was tireless in his efforts to build and maintain a culture of honesty and compliance within CUC.  *See also infra,* Section III.E.4 at 53-57. He authored training manuals and put on training seminars for all CUC management.  The seminars stressed both verbally and in writing the need to "always present honest, accurate information."  *See* DX 31,000; DX 31,001; DX 31,002; *see also* Transcript at 11921-11931.  The manual contains a section entitled *Upward Communication* and it provides:

> Always present honest, accurate information.  Even if it's controversial, it's important.  Don't say what you think someone wants to hear, say what you think and believe in.

*Id.*; *see also* Transcript at 11921-31.  Kirk Shelton also looked to informal means to promote a culture of compliance within CUC.   Even small personal expenses were not to be charged to the company (to the detriment of stockholders) under his stewardship.   He admonished the CUC management team in an e-mail dated September 12, 1997, that they were not permitted to use the company's driver, Mike, for personal trips to the airport.  Specifically, he wrote:

> I recently noticed that I had not received bills for personal services from Mike. I also know that he has taken some of you to the airport for personal trips and that those have not shown up. I have asked Mike to correct this.

> Going forward, you must tell Mike if a trip is personal – it is tax fraud to receive services and not report it to the IRS – ask Leona Helmsley. Please make sure we are squeaky clean here – none of us will look good behind bars.

> Kirk

DX 427 (emphasis in original); Transcript at 8789-8793.

Mr. Shelton even refused to accept a free trip to Disneyland for his family (and conveyed this to Corigliano and others in the company). *See* DX 30,180.  If the best evidence of one's character is how they behave when no one is watching, Mr. Shelton's refusal to accept a free gift

32

–when no one would have even questioned him for doing so--speaks volumes of his sincere commitment to honesty and truthfulness.  As Sue Trizila observed:

> [N]ever have I worked for an executive, before or since, who refused any complimentary travel awards; indeed, many seem to view it as one of the "perks" of the job.  Kirk, however, created a distinct line between his professional responsibilities and his personal activities.  That event stands for me as a simple illustration that a person's character manifests itself in many ways.
>
> \*       \*       \*
>
> There was a genuine sensitivity for doing the "right thing" whether it was for the employees, our customers, or our company.

*Letter from L. Sue Trizila,* Letters App. at 117.[8]  Virtually everyone who worked closely with Mr. Shelton has commented on the culture of honesty he promoted. *See, e.g., Letter from Craig Sherman,* Letters App. at 111-112 ("[Kirk Shelton] always asserted that honesty, fairness and moderation were paramount: one must honestly account for a mistake, honestly describe a business opportunity or a personal strength without over-embellishment (and not take credit where credit is not due), and fairly reward success."); *Letter from Michael Bodetti,* Letters App. at 125-126; ("[D]uring the 17 years that I have known Kirk I have always known him to be a decent, hard working, honest person who emphasized ethical behavior.).[9]

---

[8]  This submission is replete with examples of Kirk Shelton's commitment to honesty and integrity in his personal life. Included among those are the results of his two audits conducted by the IRS. In the 1994 audit, it was determined that he owed no money. *See* Transcript at 12331. In the 1986 audit, it was determined that he had paid too much! Transcript at 12330; *see also* DX 30,187; DX 30,188; DX 30,189.

[9] *See also Letter from Kelly E. Green,* Letters App. at 127 ("Kirk Shelton's combination of integrity, character, intelligence, leadership, loyalty and honesty makes him the most trusted and respected person I ever worked with.") *Letter from Andrew D. Carr,* Letters App. at 131 (Kirk Shelton worked hard to establish and maintain a "culture of honesty and integrity."); *Letter from Vincent D'Agostino,* Letters App. at 136 (Kirk Shelton "has always lived up to his word."); *Letter from Henry C. McCall,* Letters App. at 144 ("Never did I observe or detect a reason to question his personal or professional integrity, honesty or truthfulness."); *Letter from Jonathan E. Beyman,* Letters App. at 145 ("At no time [during my] frequent interactions [with Kirk Shelton] do I recall ever questioning Kirk's honesty or his professional integrity."); *Letter from William B. Avery,* Letters App. at 147 ("Based on my experience with Mr. Shelton, I have found him to be the fairest, most open and honest person imaginable, both in business and in life."); *Letter from William B. King,* Letters App. at 149 ("I came to admire Kirk

- **LivePerson, Inc.** **(January 1999 to mid-2000)**

Mr. Shelton joined LivePerson, Inc., a computer-based customer service software company, in January of 1999 as the acting Chief Operating Officer. Because LivePerson was a cash-strapped start-up, Mr. Shelton agreed to work for no salary or bonus. Once again, Mr. Shelton earned the respect of his colleagues and made a lasting, positive impression on them. Its founder and CEO, Robert LoCascio, provided the following observations: "The day I met Kirk, my professional life was changed and to this day I owe him a tremendous amount for what he personally did for me and for my company. After we were funded, Kirk decided to join LivePerson in January of 1999 as our COO, he was the 6th employee at the time. Working with Kirk, LivePerson went from 6 employees to 180, from 3 customers to 400, and raised $72mm including doing a successful IPO on April 7th." *Letter from Robert LoCascio*, Letters App. at 161. Likewise, Scott E. Cohen, a Senior Vice President in charge of worldwide sales, business development and client services, stated, "Kirk Shelton proved to be an invaluable resource to me personally, and to the company." He further observed:

> His forthright, specific knowledge and ability to help us evaluate business opportunities and work in an often chaotic and fast paced business environment proved to be invaluable.
>
> Kirk offered the intelligence, experience, and guidance that so many companies lack, hampering their ability to survive, grow, and proper. Kirk was an advisor, counselor, and

---

Shelton not only for his maturity and his competence, but for his integrity and his character. I have no reservations in vouching for both."); *Letter from Robert J. Flowers,* Letters App. at 151 ("While associated with Kirk for [] six years, I was greatly impressed by his business abilities, his respect for other company employees, and his honesty and integrity."); *Letter from Robert La Mar and William Thomas*, Letters App. at 157 ("Kirk had always been completely honest and ethical with us and had a frugal mindset that was very appealing.  He always seemed to put the employee's and the company's best interests ahead of his own or of false short term corporate goals."); *Letter from David Stueber*, Letters App. at 158 ("Mr. Shelton has always acted with the utmost integrity, honesty and thoroughness in my dealings with him."); *Letter from Thomas F. Maurath*, Letters App. at 160 ("His honesty and concern for someone he was trying to hire was one of the reasons I gave up a successful career to join and unproven entity.").

mentor to the entire management team, but even more so for me. His patience and willingness to listen, his business acumen, and his ability to help deal with crisis situations was something that I greatly appreciated at the time, and realize as I look back, how much of a difference it made in the company's and in my personal success.

*Letter of Scott E. Cohen,* Letters App. at 167-168.

Finally, Mr. Shelton's principle of treating people with respect also was noted by his

colleagues at LivePerson. Victor Cheng, who shared an office with Mr. Shelton, wrote:

> He earned the respect of virtually every employee at Live Person. This was no small task considering the wide range of people who worked there including: a 20 year old high school drop out whiz kid, an ex-army foot soldier, and a former Brooklyn pizza joint owner. We all looked up to Kirk – not just for his accomplishments – but because of the way he treated all of us.

> He listened to us – especially about the technical areas he did not understand. He respected our opinions regardless of our age, education or experience – which varied enormously. And when it came time for him to make a decision, we respected his decisions and the thoughtful process that led to it.
> …………

> Kirk carried on this habit [of being fair to others and don't expect them to do something you're not willing to do yourself] while at Live Person. Since the company was growing so fast, we were constantly running out of office space. At one point we had to put two and three people in each office in order to give every employee a place to sit. Kirk was overseeing the space situation and got rumblings that a few people were complaining about how cramped it was getting. While we were getting additional space, it would be a few weeks until it would be ready. So Kirk moved himself into the smallest office and then crammed more people into it than any other office. He ended up having less space than everyone else. Within a few days, the complaints went away.

*Letter of Victor Cheng,* Letters App. at 164-165.

### E.    Mr. Shelton's Life-Time Dedication To Good Works And Charitable Activities

Kirk Shelton's life has been an extraordinarily committed in performing good deeds and

charitable acts for his family, friends and numerous members of the community.  "Kirk Shelton

makes a very positive impact on virtually every life that he touches.  He is always the first person

to volunteer to help you if you need it; he is completely selfless in this regard." *Letter from*

*Patrick G. Healy*, Letters App. at 067. As noted by a long-time friend, Ronald V. Davis:

35

Many people talk about helping others, but do not get emotionally involved in the lives of those less fortunate. Kirk is different, his concern, commitment and service to others have been well documented in his regular community service in organizations like the Stamford YMCA. I have seen specific examples of his dedication and commitment to disadvantaged kids. He gives from his heart and because he truly cares about people and is unselfish in his loving and giving nature.

*Letter from Ronald V. Davis,* Letters App. at 198. As outlined below, Mr. Shelton's acts of

kindness have had a dramatic, lasting and positive impact on the lives of others.

### 1. Good works and charitable activities involving organizations and educational institutions

- ### YMCA Stamford

Kirk Shelton became a member of the Stamford YMCA in 1981 when he moved to

Stamford and began working at CUC.  Over the years, he has encouraged CUC employees to

join the Stamford YMCA, and by the early 1990s many CUC employees had become members.

Several groups would go to the YMCA during their lunch hour to play basketball, swim, run and

work out.  He also began to support the YMCA with financial contributions.

Charles H. Ainsworth, the former CEO of the Stamford YMCA, explained that he came

to know Kirk Shelton because of their shared vision of what the YMCA should be:

In YMCA work we tend to be "fishers of men and women" as we go about engaging people first in a concern for their own health and well being (physical fitness activity being the prime focus) and then in the process of community development through leadership development (encouraging members to be involved in board and committee work as our prime focus).

The Stamford YMCA, you may be aware, is located in the heart of Downtown Stamford where it has been since 1868.  Urban YMCAs have many challenges and opportunities, but among them is balancing service and addressing needs of a very diverse clientele.  The Stamford YMCA had been focusing on the downtown business professional, a group insufficient in number to make the YMCA financially viable.  On the other hand, the YMCA was located not far from large African American and Latino communities, who either did not feel welcome at the YMCA prior to my arrival or who felt they could not afford its programs and services.  The challenge was to make the YMCA economically self sufficient while at the same time making it broadly accessible and encouraging the

36

intermingling of populations who would not have mixed in any other setting in that community.

Individuals like Kirk Shelton do not **need** the YMCA.  They have the resources to access any variety of institutions to meet their needs for fitness and community.  But when someone of Kirk Shelton's background remains committed to . . .  to remain involved in a diverse activity center, that person becomes a focus of my attention as a "fisher."  And so I came to know Kirk.

*Letter from Chuck Ainsworth*, App. at pp. 099-100 (emphasis in the original). Mr. Ainsworth

asked Mr. Shelton to join the YMCA's Board of Directors around 1992.

Mr. Ainsworth also asked Mr. Shelton to join the marketing committee, and together they

rewrote the YMCA's marketing plan, marketing materials and approach for getting new

members.  Mr. Shelton served as Chairman of the Membership Committee. As recognized by

fellow Committee member, Salvatore A. Cingari, "Kirk's volunteering of both his time and

financial resources recognized his commitment to the betterment of our community. It was a

pleasure to serve with Kirk in this capacity, especially knowing the personal and financial

sacrifices involved in assuming such responsibilities." *Letter from Salvatore A. Cingari*, Letters

App. at 101. The growth in membership revenues enabled the YMCA to expand its programs for

kids, such as its LEAD (leadership, enrichment, acceptance and development) after-school

program, summer camp and teen center. In the mid-90's Mr. Shelton helped raise over $2 million

so that the 20 year-old facilities could be renovated. The much-needed renovations were

completed in the late 1990s. At the end of Kirk Shelton's term as a director, he was asked to

become a trustee of the Stamford YMCA, a position he still holds.  He has contributed a

significant amount of time and money to the YMCA over the past twenty-five years.

More recently, Mr. Shelton, after conferring with Timothy B. Hodges, the new CEO of

the Stamford YMCA, began working with both the LEAD kids (middle and high school) and

LEAD Academy kids (elementary school).  Mr. Hodges noted the impact that Mr. Shelton has had over the past few months:

> In just a three-month period, Kirk has done more for the Stamford Y than many have over a number of years. After we launched our first computer lab for our K-4 after-school program, Kirk worked diligently to ensure the students were able to utilize the software necessary to help them advance academically. Additionally, when it was evident that we did not have the personnel to effectively lead the computer class designed for the students, he took on the role as the primary instructor of the course.
>
> He also became a mentor for our middle school and high school program, assisting students with their homework. His impact was apparent after the first day, when the students with whom he had worked asked the Program Director when he would be returning.
>
> Using his experience with the students, Kirk has also played a remarkable role in our fundraising strategy. Through his personal efforts and contacts, he helped raise more than $100K for our after-school programs within a four-week period. Even more notable are the comments received along with several of the contributions, stating what a wonderful person Kirk is and that we are fortunate to have him working on our behalf.
>
> In addition to the aforementioned, Kirk has been an effective mentor and resource to several members of the Y staff, as well as true inspiration to me, personally. Along with assisting us with our programs, he has helped with our future marketing and fundraising plans, and is presently working with us to develop an effective training program for our Membership staff.

*Letter from Timothy B. Hodges*, Letters App. at 106A-106B; *see also Letter from Angie Lopez*, Letters App. at 106C ("Kirk had a wonderful rapport with people of all ages, especially children. He was often found sitting between groups of children actively educating them. His ability to connect with the students and his talent at teaching concepts as well as more advanced topics, are both truly superior.").

The following description provides additional details about the programs and initiatives that Mr. Shelton currently devotes his time and energy, and illustrates the lasting impact his work will have on the lives of the children who participate in the programs:

> <u>LEAD Academy</u>:  The LEAD Academy is an after-school program held at the Y's downtown Stamford facility that serves roughly 60 children in the K-4[th] grade age group.

The program offers daily homework time (with help), sports and sports lessons and other recreational programs.  Earlier this year, the Academy opened a computer lab, which Kirk Shelton has taken the lead role in.  The computer lab offers grade-based academic enrichment programs as well as a variety of academic games.  Mr. Shelton runs a session every weekday, and each session is targeted to a specific grade level, K-4.  In order to set-up and operate the lab, Mr. Shelton has done the following:

- Purchased and installed headphones to allow 12 students to work simultaneously
- Installed Achievement-tech, the grade-based software on all computer lab computers
- Attended Achievement-tech training sessions
- Researched a large variety of academic game software to find the best products for K-4[th] graders
- Purchased and installed over 10 different software products including:  Math Blaster (5 levels); Reading Blaster (2 levels); Jump Start Reading; Jump Start Math; Encarta Encyclopedia and K-2 Typing Tutor.
- Set up a weekly curriculum for each grade level including:  typing, math, reading
- Conducted daily classes from 4:30-5:30

LEAD Program:  an after-school program for over 100 middle and high-school children that offers tutoring, responsibility training, job skills training, and sports.  The LEAD program operates out of the Yerwood Center, about ½ mile from the YMCA.  It also recently opened a large computer lab with 24 stations, which also offers Achievement-tech academic programs for grades 5-12.  The Program staff is able to track each student's progress in each subject area by software.  The Program staff is able to run reports on each student, and assign curriculum based on their progress.  Mr. Shelton works with the students at the Yerwood Center every day from 3:00 p.m. through 4:30 p.m. in a variety of academic areas, including:

Tutoring:  Mr. Shelton tutors students daily, primarily in math and science:
- Achievement-tech:  All students participate in the program, and their progress is tracked.  Mr. Shelton runs a variety of team based contests, where students compete for prizes.
- Job skills training:  Mr. Shelton developed and conducted a 5-week jobs skills training program for the high-school students that teaches them about the workplace, how to interview, how to write resumes, how to write cover letters and how to look for jobs.
- Jobs:  Mr. Shelton is obtaining a variety of summer jobs in the Stamford area for high school students.  During the job skills training, he conducted interviews, and selected the appropriate students to go to those companies.

Marketing:  Mr. Shelton has worked with Sarah Miller, the new marketing and fund development person at the Stamford YMCA, to develop a new marketing program to increase membership.  The YMCA serves two different markets, the local families of

Stamford, who utilize many of the family and children-focused programs, and people who work in Stamford, who use the work-out facilities. In order to get the funding necessary to conduct the family oriented programs, which offer financial aide to those that need it, the YMCA needs to have enough corporate members. This program targets corporate sponsors.

Fund raising: Mr. Shelton has also devoted significant time to fundraising activities with Timothy B. Hodges, the YMCA's CEO. A year ago, the Y lost over $300,000 and Mr. Hodges was brought in as the new CEO. He is attempting to reduce the large deficit, but in order to continue the new programs, such as the computer labs and training programs, new funding was needed. Mr. Hodges, Sarah Miller, Pat Paladino (the YMCA's CFO), Steve Barnes (a board member) and Mr. Shelton became the fundraising group, and met weekly. Mr. Shelton also met frequently with Ms. Miller and Mr. Hodges to develop YMCA fundraising materials, conduct mail and phone campaigns, and make calls on local executives to get their support. Mr. Shelton has personally raised over $100,000 as part of this effort.

As Mr. Ainsworth observed, Kirk Shelton was singularly unique in terms of the depth of his commitment to the community and stands out amongst the leaders in the business community. Mr. Shelton was one of the few people in the community that was focused on the 'bigger picture' -- he had a sharp understanding of what public service is all about and the ability of the YMCA to bring people together. *See generally* Transcript at 11344 (Testimony of Charles H. Ainsworth); *see also Letter from Charles H. Ainsworth*, Letters App. at 100 ("I cannot over emphasize what it means to a YMCA CEO when he finds a person of means and personal commitment to share a vision to strengthen the YMCA in its mission to serve a broad spectrum of a community in programs that have great long term impact.").

- **Discovery Museum**

Alexius C. Conroy described how Kirk Shelton also devoted his time and expertise to help raise scholarship money to create opportunities for approximately 500 Bridgeport students to participate in programs offered by the Discovery Museum. He wrote:

I served as chairman of the Discovery Museum Foundation, which supported the Discovery Museum in Bridgeport. One of our goals was to raise money from individuals and corporations to provide "scholarships" for sixth grade classes from schools which did not have the financial resources to participate in an

40

educational program the museum offers at their Challenger Space Center designed
to expose children to the experience of space travel by operating as astronauts in a
space capsule and in a mission control mock up of that facility.  The program was
designed to stimulate an interest in mathematics and science as a career.

I asked Kirk to help in this effort, which he enthusiastically did.  He donated his
time, financial resources, and fund raising skill to this effort, which, as I recall,
resulted in approximately 500 students from Bridgeport and New Haven
participating in this program on scholarship, who would otherwise have not been
able to attend.  I observed a number of these sessions, and was always delighted
to hear the students' discussions during their debriefing after a simulated flight in
space as they discussed fuel consumption, course plotting, and meteor events with
the enthusiasm they reserved for rock video or sports chatter when they initially
entered the facility.  Maybe one of these students is now in the space program or
is a research scientist that will discover something that is important to mankind.
This type of experience can be a transformational event for a child.  Without
Kirk's help, their "trip into space" would not have occurred.

*Letter from Alexius C. Conroy*, Letters App. at 171-172.

- ## __King & Low-Heywood Thomas School__

Kevin C. Clark detailed Mr. Shelton's efforts to provide scholarship opportunities for

students at King & Low Heywood Thomas School ("KLHT") in Stamford.  Specifically, he

wrote:

Kirk, along with his wife Amy were instrumental in the school's effort to meet
some significant goals including re-writing the school's strategic plan which
emphasizes diversity, reaching to families who require scholarships for financial
hardships, migrating through significant upheaval within the school
administration in the late nineties and raising needed funds to keep the school
operational.  I specifically recall at each annual fundraiser event on the athletic
fields, Kirk making the effort to circulate to new parents and key constituents in
the school community asking for their financial support on behalf of our goals.

*Letter from Kevin C. Clark*, Letters App. at 180-181.  The school provides financial assistance to

approximately 50 students and there are plans to significantly increase this assistance as part of

the schools overall diversity.  Notably, one of the children that Mr. Shelton works with at the

YMCA is a scholarship recipient.

41

Similarly, Catherine E. Mishkin, a history teacher at KLHT, made the following

observations:

> Kirk and Amy have been exemplary leaders for 12 years through their volunteer
> work on every level and through their financial support of the [King & Low
> Heywood Thomas] school. It is unusual for a Dad to take the time to get involved
> but Kirk is an exception and has always been visible to our community and
> willing to work whether it was cooking over the grill at the Parents' Association
> fundraiser or serving on committees.

*Letter from Catherine E. Mishkin*, App. at pp.105. *See also Letter from Lisa Ross-Benjamin*,

Letter App. at 078 ("I serve as head of theater support for the school. Kirk again is always the

first to step up to the plate. He never misses a performance, and is helpful and involved in the

planning and support for our theatre program and celebrating of the kids"); *Letter from Clifford

L. Wald*, Letter App. at 091-092 ("Several years ago the school embarked on a capital campaign

to upgrade and expand the facilities. Kirk and Amy Shelton were key figures in the fundraising

efforts and generous contributors of their own funds to this campaign.").

Finally, other parents, Manuel and Peg Perez, noted that Mr. Shelton was instrumental in

bringing together the different factions that had developed:

> Our children attended the same school, KLHT, which was a very trouble[d] organization
> a few years ago. During a contentious power struggle between the Parent's Association
> and Headmaster, a struggle that had split apart the school community and was leading to
> a serious drop in the morale of both the teaching staff and students, Kirk stepped in,
> helped provide counsel to the Parent's Association, and organized many school meetings,
> forcing disparate groups to work together to solve the problem. He was successful. Kirk
> didn't have to do this. No one asked him. But he jumped in because he was genuinely
> concerned not only for the welfare of the children but to insure continuity of an old,
> venerable institution. I suppose some might say what he did was a small thing your
> honor, isn't it the small things in life that add up to the totality of person's character.

*Letter from Manuel and Peg Perez,* Letter App. at 088-089.

**2.      Good works performed by providing time and counsel**

The many letters written on behalf of Kirk Shelton further detail a life-long passion for

helping others by sacrificing his time and counsel to those in need.  A small sampling of excerpts

from those letters documenting Mr. Shelton's many good deeds that have had a lasting effect on

others is presented below:

- **Counseled friend whose son was contemplating suicide**

*Letter from Scott Frisoli*, Letters App. at 073:

Despite overwhelming personal and professional pressures during the last couple
of years, Kirk took the time to help me and my family get through some very
difficult times. A couple of years ago I had a falling out with my then 11 year old
son, Sean. When the situation became desperate and my son mentioned the word
"suicide" I immediately reached out to Kirk and several other friends for
guidance. Kirk was the only person who responded to my family's cry for help by
following through with emotional support and advice. He emailed me the very
night that I expressed my grief and followed up with phone calls until the crisis
was over. There is no adequate way of expressing what his genuine support and
kindness meant to me and to my family during that tough time.

- **Provided support to youngster grappling with her parent's divorce**

*Letter from Melissa Ross*, Letters App. at 079-080:

[Kirk Shelton] offered a great deal of support during the time of my parents divorce.
Throughout the entire ordeal, I found that he offered his support in different forms,
financial, and emotional in order to make sure that I was getting through the days in one
piece.  No matter what it was, it seemed that Kirk was always offering to help better my
mood and boost my spirits.

- **Advised friends regarding their son's battle with drug addiction**

*Letter from Manuel and Peg Perez*, Letters App. at 089:

What truly speaks volumes about Kirk's character and decency is the caring and
support he gave my wife and me during the five years our teenage son went
through the horrors of drug addiction and nearly died. I'm sure you will
understand it when I say that as a parent your life is good when your children are
good and hell when they are not. I don't know what my wife and I would have
done without [Kirk's] care and thoughtfulness. He encouraged us to keep trying to
find a rehab that would work for our son despite repeated failures.  He insisted

that we turn to him and his wife Amy for support.  Most of all, he reminded us that our son was a terrific kid with a terrible disease.

And finally, [when] Peg and I decided to divorce he made sure that she and my son were always included in his family gatherings.  In one sense he recreated the home my son lost.

- **Provided support to former employer's terminally-ill assistant**

*Letter from Eugene M. Isenberg*, Letters App. at 108.

Kirk's compassion for others was best demonstrated when my long-time assistant, Carolyn Elsinger, became terminally ill several years after Kirk had left our firm. He came to visit her weekly and offered assistance in numerous ways.  Such was the depth of her feeling for Kirk that she continued to send gifts to his children even as her health declined measurably.

- **Provided counsel and a home to a teenager who attempted suicide**

Perhaps one of the most selfless acts engaged in by Mr. Shelton occurred over the past few months. In December 2004, *while the jury was deliberating in this case*, the Sheltons came to the aid of an 18-year-old daughter of a friend of the family who had attempted suicide. They continued to provide the youngster with a safe home and emotional support until last month even while dealing with the negative outcome of the jury verdict in January and while preparing for sentencing over the past few months. Although the teenager is no longer residing with the Sheltons, they continue to provide emotional support to her.

- **Counseled friend who feared his death would leave his family destitute**

*Letter from Clifford L. Wald*, Letters App. at 091-092:

Three years ago, I had to undergo life-threatening surgery.  In the month before the surgery I was a nervous wreck.  Kirk was extremely supportive to me.  He helped me think through my options and told me that he would help take care of my family in the event of a disaster.  This was a great relief to me.  While I was recuperating in the hospital following the surgery Kirk visited often and help (sic) my wife, Adrienne, deal with the stress of the situation.  He was a great friend to me in the months following my surgery, including me in activities and generally helping me recover emotionally.

*See also Letter from Adrienne Wald*, Letters App. at 086 ("During a critical family health crisis with my husband a few years ago, Kirk was here by our sides to reassure both of us. Taking the time out to travel to the hospital in NYC, to be there with us, exemplifies the character of a man who shows concern for others without personal gain to himself.").

- **Helped employee address her child's health-care crisis**

*Letter from L. Sue Trizila*, Letters App. at 116.

… My daughter, a college student, was covered under my CUC health insurance plan. One semester, unbeknownst to me, she very irresponsibly dropped enough courses to lose her full time student status, rendering her ineligible for insurance coverage. As luck would have it, she became seriously ill and was rushed to the hospital. Since years earlier she had undergone brain surgery and a bone marrow transplant, I feared our inability to pay enormous medical bills might prevent her from getting the medical attention she might require. As you can imagine, I was quite distraught at the potential magnitude of my family's situation. However, immediately upon learning of my situation, Kirk Shelton let me know that her medical bills would be covered and to not worry about anything but getting her well again. Since CUC was a self-insured company, Kirk could have certainly decided that coverage should not be allowed. However, he exercised compassionate business judgment reflecting his identity as a manager, parent and decent human being. I will never forget this incredible act of kindness.

- **Provided advice and support to a friend whose daughter was born with cerebral palsy**

*Letter from Bill Cook*, Letters App. at 081:

When a friend's daughter was born very prematurely and had cerebral palsy, Kirk and his wife Amy dropped everything they were doing and went down to the friend's house in Houston to help out. Some time later, Kirk offered financial support to the family in question in order for them to take a much needed vacation that otherwise wouldn't have been possible.

- **Agreed to serve as guardians for child with cerebral palsy**

*Letter from Anthony G. Petrello*, Letters App. at 052; 055:

[My daughter] has special needs. Carena requires 24 hour assistance and will continue to do so the remainder of her life. … In the event my wife and I are not here to take care of our daughter, we decided they [Kirk and Amy Shelton] would be wonderful guardians for her, and would bring all their resources and love to care for her the rest of her life. There are few people any parent would ever feel

45

comfortable having raise their child; that circumstance is more pronounced where the child is one with special needs and cannot eat, walk or attend to almost all of life's situations without assistance. Kirk and Amy are the rare persons that have the talent, fortitude and love to undertake such a task.

- **Located best surgeon to operate on his sister's tumor**

*Letter from Vicki de Angeli,* Letters App. at 008:

Having Kirk as a brother means that he is always there for me in any time of need. When I first got the diagnosis of a tumor, Kirk immediately called everyone he knew in the health care field and found the best doctor for my surgery. He also told me that if the doctor didn't take our insurance, then he would pay whatever it cost. I feel I am one of the luckiest people there is to have that kind of love and support from my brother.

- **Volunteered to help distant relative receive a heart transplant**

*Letter from Richard A. Ratner, M.D., P.A.,* Letters App. at 028:

 [Kirk Shelton's] generosity extended beyond his immediate family. When my brother developed heart disease and there was the possibility that he would require a heart transplant, Kirk stepped forward spontaneously and volunteered to pay all the costs of this unimaginably expensive procedure should my brother ever need it. Sadly, Peter died from the illness before the procedure could be done.

- **Assisted his in-laws with quality of life issues**

*Letter from Terry Szczecina,* Letters App. at 020:

Both my mother and father have had numerous medical issues. My mother has had major heart surgery twice and my father once. Kirk and Amy have always been active participants in my parent's health care. They always made sure my parent's received the best care. One of my mother's heart surgeries was done at Hartford Hospital. Kirk was the one who picked my mother up from Hartford Hospital in a blizzard to take her to his home in Connecticut to recuperate after surgery. In order for my mother to eventually return to her own house in New Jersey, Kirk and Amy set up a home health care situation that would be sure to meet all of her needs.

Over the years, they have also helped my parents with various household expenses such as lawn care, snow removal and home improvement projects. In addition, Kirk and Amy enabled my parents to see their siblings in Arizona and California. They had not seen them for years because my parents could not afford to travel. These trips meant so much to my parents. What else meant so much to my parents, as well as the siblings, were the numerous family get togethers arranged by Kirk and Amy. These included a wonderful family reunion in Walt Disney World, yearly Christmas and Easter celebrations and a special 50th wedding anniversary partly for my parents. We all have Kirk and Amy to thank for these special family memories. My father passed away a year and a half ago

and for my mother, siblings and I, having all those great memories is even more meaningful. My father thought the world of Kirk. He would often ask for Kirk's advice and respected his opinion. Kirk insisted on covering my father's funeral expenses so my mother would be left in better financial shape. Since my father's death, Kirk and Amy continue to make sure my mother is well taken care of. They helped to move my mother into an assisted living facility this past summer due to my mother's health situation.

- **Intervened on behalf of female employees in their efforts to end the sexual harassment perpetrated by a powerful senior executive**

*Letter from Kelly E. Green*, Letters App. at 128:

Shortly after we acquired Entertainment Publications (EPUB), I was assigned the challenge of running the sales force at EPUB.  Soon thereafter, we had an incident where an experienced and successful Division VP was accused of sexual harassment by multiple sources.  The allegations came to life hesitantly because employees felt the culture of the old management was to "look away" from such behavior.  After we interviewed several people, it was apparent the allegations were likely true and confirmed by other witnesses.  I went to Kirk for advice, since the DVP was a long-term employee with a track record of bring in significant sales.  I was new to the company and his removal would leave a significant opening that would be tough to fill.  Kirk did not waver (sic) and advised me to discuss the accusations with the DVP and expressed his opinion that if the allegations were confirmed, the DVP would need to be removed because it was the right thing to do.  The accusations were significant breaches in our employee policies (established by Kirk) and had happened over a long period of time.  I worked closely with Kirk and we made the decision to terminate the DVP (even though we feared it would harm production).  * * * Kirk helped me do the right thing.

- **Nursed a sick friend back to health**

*Letter from Anthony G. Petrello*, Letters App. at 053:

During our first year at Harvard, when we were both about 22, I became seriously ill and was hospitalized while at school. After being released from the hospital, I required several weeks of bed rest. Kirk, then at an age when most others cared only about football and hanging out in the pub, spent weeks preparing my meals, administering my medicine and caring for me. During the years thereafter, he always looked after my health; he would never let me undertake anything physically strenuous. Whether it was moving all my furniture himself when I moved apartments in 1979, or even carrying my 35 lb daughter (who cannot walk) everywhere during a vacation in the Colorado mountains a few years ago, so she could play with other children, he has always displayed that compassion and responsibility. For the more than thirty years I have known him, Kirk has consistently displayed these attributes.

47

- ### Counseled a friend during a personal crisis

*Letter from William M. Aron*, Letters App. at 179:

A few years ago, I was faced with a personal crisis and needed someone to talk to. I run a small Company, and just as I was going through a divorce, my top two executives walked out and set up a competitive shop. I did not know which way to turn and what problem to tackle first. Naturally, Kirk was the first to call. He spent the time to help me through a problem, which in his world of business might have been quite small, but for me it was monumental. He reached out to me in a time of need and shared both his wisdom and guidance. Yet, I have seen Kirk do this time and time again. Even with the weight of the trial and its unfortunate outcome, Kirk has never put himself before others. To me it is this remarkable quality of selflessness which sets Kirk apart from most men.

- ### Provided business advice to friends during professional difficulties

*Letter from James D. Halper*, Letters App. at 193:

Kirk has always been a selfless and giving person. He was the first person to go out of his way to help someone else. I remember when two of our forum members' businesses were having tremendous difficulties at the same time. It was an emotional experience for both the forum members and their families. Both were family businesses, which represented the life's work of one or two generations. As busy as Kirk was, he spent many, many hours working through the options with them regarding their businesses and future careers. One of the businesses was saved and the other was ultimately seized and liquidated by the bank causing our forum member and his family to move from his home of 15 years. Kirk was the lead among the group to help and hold these peoples' hands when they needed it most, regardless of what he had going in his life at the time.

- ### While serving as an executive of a Fortune 500 Company, Kirk Shelton spent his free time helping an employee move

*Letter from Andrew D. Carr*, Letters App. at 130-133:

The lessons Kirk has provided me extended beyond being the best businessman I have ever met. He understood, sympathized, and helped me as a human being. He came to my office, and gave me what was pretty good news about my first raise at CUC, but it still meant I couldn't afford a house in the expensive Stamford Connecticut market for my young family. I was near tears. He couldn't change corporate policy to help me without being unfair to others, and he didn't. But, I knew after that meeting that my needs as a family man mattered to him, and I loved him for it.

Later, when I was able to scrape together and borrow my way into a home, I couldn't afford movers. Kirk came over and, on his own back moved me into the new house. He carried boxes and appliances, including my refrigerator all day

long, just because I asked for his help.  At this time I knew him only from the office, and it would have been painless and easy for him to have not helped – what senior executive doubles as a moving man?

### 3.    Good works involving acts of financial generosity

In addition to formal charitable work and good deeds, Mr. Shelton's life has been filled

with financial generosity that further illustrates his sincere compassion for others.

Representative comments from the letters outlining these good works are set forth below:

- **Enabled Terry & Gene Szczecina to realize the dream of parenthood**

*Letter from Gene Szczecina*, Letters App. at 017-018:

To say that Kirk is generous would be an understatement.  For example, back in the early 90's, we were trying to start a family.  Unfortunately, we had infertility problems, and were not able to have a child.  We decided to try the latest in infertility treatments, including very expensive medical procedures like GIFT.  However, we did not have insurance to cover these expenses, so we went into debt to try and start a family.  Our attempts were not successful, and ended in a pretty scary situation with Terry being in Johns Hopkins Hospital on Christmas Eve 1991 with severe internal bleeding due to a failed medical attempt to have a biological child.  It was at that time that we decided to stop attempting any further medical attempts at trying to have a baby.

We started looking into adoption, but were in no position financially to be able to do so.  It was at that time Kirk gave us the gift of a lifetime, our son Drew.  Kirk graciously offered to cover our costs of adoption, which at the time were about $20,000.  Shortly after that we were fortunate enough to be chosen by Drew's birthmother to be his adoptive parents.  Drew has grown up to be very close with his Uncle Kirk and his Aunt Amy, who is his God Mother.  Drew is also best buddies with Kirk and Amy's youngest son Kip.  Whenever we get together, which is quite often, Drew and Kip go off and disappear for hours playing together for the remainder of our visit.

- **Assisted his niece, Christine de Angeli, in attaining her life's ambition to serve the public**

*Letter from Christine de Angeli*, Letters App. at  013-014:

I am employed by the State of Wisconsin at Dodge Correctional Institution where I work as a psychological services assistant.  It is my career goal to work in a psychological capacity with both sex offenders and serial killers. I was able to get this job upon graduating from the University of Pennsylvania this past December, and am planning on working here until I begin graduate school in 2006. I owe this

attainment of my dreams in a large part to Kirk, who has supported me both financially and emotionally during my years in college. There were many times during the past several years that I would consult him about a problem, and he was never too busy to take the time to listen and offer sage advice.  Never did I hear from him that he was too busy or too tired to talk to me.

Kirk is one of the most selfless individuals I know, and has always been happy and willing to help and accommodate those around him.  Over this past summer I obtained an internship at New York Presbyterian Hospital in Westchester, NY, and needed a place to stay.  Kirk allowed me to live in his home, providing me with room and board and asking nothing in return.

- **Helped Robin Jackson recover from economic ruin**

*Letter from Robin Jackson*, Letters App. at 060-061:

When I first moved to New York, after flirting briefly with a failed entrepreneurial venture, I was without money and without a job.  I had moved to New York partly because I thought it was a good long term opportunity and partly because of Kirk's advice.  My family was not in a good position to help financially but Kirk offered me a spot in his apartment that he was sharing with two other friends, at a time when New York apartments were very hard to come by.  He was also generous with business contacts to help me find work.  He offered this without being asked - it was simply his nature to help out a friend in need.  I doubt I would have been able to make the move to New York without his help.  After several months of sleeping on the sofa, one of the other roommates moved out to get married, and I was able to take his spot.  By that time I was working and could pay my way, but Kirk's generosity was what allowed me to get started in New York.  This generosity was material when measured against Kirk's resources – he definitely could have used the rent payments from a paying tenant as he was also just starting out in his career.

- **Helped Valerie Schultz and her family to secure housing**

*Letter from Valerie Schultz*, Letters App. at 022:

In 1997, Ed and I were living in a small two-bedroom apartment with two children.  Kirk & Amy lent us $15,000 to put a deposit on a house.  When we tried to repay them, they refused to take the money.  There were many occasions that our debt was building and Kirk and Amy lent us money, never asking why we needed it or when it would be repaid.

50

- **Financial assistance to his sister, Vicki de Angeli, and her family**

*Letter from Vicki de Angeli*, Letters App. at 008:

Kirk has also been the one to help us out with money if needed. When we needed a new car, he helped us pay for it. He also helped us with the purchase of our house. Most importantly, he has supported putting our children through college, and I am extremely grateful for all of his help.

- **Provided for the medical welfare of family elders**

*Letter from GerriAnne & Brian Mason*, Letters App. at 015-016:

My family can never say enough about Kirk's generosity, particularly to my mother and father.   They faced a number of serious medical conditions where Kirk and Amy stepped in to be sure they had the very best medical care.  When my father was diagnosed with lung cancer in June of 2003, Kirk made certain he had peace of mind concerning the care of my mother.  My father worked for Western Electric and my mother for Bell Labs. When they retired, Kirk helped them to diversify their investments.  My father was a fiercely loyal man and believed his primary investments should be with the company that provided his livelihood and later his pension—Lucent Technologies.  When that stock proved to be almost worthless, Kirk stepped in to help them out once again.  The rest of the siblings do not have the means to provide this type of care and assistance and we will be forever grateful.  He has never once asked for our thanks.

Kirk did not just provide financial assistance; he gave love and unforgettable memories.  He had enough patience to take my dad golfing, when he played for the first time in his sixties.  He took my mom and dad on the only "grown up" vacation they ever had.  He and Amy hosted my parents' 50th anniversary party where I watched my dad come to tears dancing to their wedding song.  Every year Kirk and Amy bring the family together for holidays and special occasions.  It is difficult to put into words how strong a family we are, but I feel we are stronger because of the time we take with each other.

- **Covered expenses to ease the financial strain of cancer treatment**

*Letter from Gene Szczecina*, Letters App. at 018:

Another example of Kirk's good character and generosity is the fact of how he helped to cover expenses, which were incurred when my sister Lori had to undergo cancer treatment 13 years ago.  This had been a very difficult time for us as the doctor's had only given my sister no more than 6 months to live.  She underwent experimental chemotherapy treatment at M.D. Anderson Medical Center in Texas.  We're fortunate to report that the treatment was a success.  Today, my sister is married and just recently gave birth to a beautiful baby girl!

- **Donated funds to assist worker to take time off to attend to her sick husband**

*Letter from Kathy Costa*, Letters App. at 066:

In May of 2001 my husband Alan was diagnosed with cancer. All treatments were done at Mass General Hospital in Boston, consequently it would have been financially impossible for me to be with my husband during this very difficult time. Upon hearing of our situation Mr. Shelton donated money to a fund for my husband so that I could be with him through his year long chemotherapy and radiation treatments.

Whenever I saw Mr. Shelton he always inquired about my family and offered his support and prayers to us. The kindness and concern that he bestowed on me and my husband was remarkable.

Mr. Shelton is truly a very thoughtful and compassionate man and it is not often that one finds such compassion these days.

- **Supported charities in lieu of giving Holiday gifts**

*Letter from Eugene M. Isenberg*, Letters App. at 108:

[R]ather than give gifts to friends during the holidays, they choose instead to contribute to charities benefiting underprivileged children.

Additionally, Mr. Shelton has made charitable donations to numerous needy causes and

charities, including to the American Cancer Society, Juvenile Diabetes, Multiple Sclerosis and

the American Red Cross.

4. **Promoted a culture of honesty and compliance in the business community**

- **Christopher K. McLeod (worked with Shelton at both Dur-O-Wal and CUC)**

*Letter from Christopher K. McLeod*, Letters App. at 121C:

Kirk strove to build an honest culture at CUC International. I remember him making honesty in both our internal and external relationships as the theme of one of our quarterly all-employee meetings.

- **Ken Keith (Former CEO of CUC's Nashville Operations)**

*Letter from Ken Keith*, Letters App. at 123.

In one meeting in California, we had a particularly tough business problem to resolve with one of our clients.  The salesman assigned to the client verbally attack the young lady that was the internal customer service representative for the client.  Kirk jumped to her rescue, letting the salesman know he was incorrect in his reasons for the attack and how inappropriate his attack had been.  He treated everyone with respect and expected all around him to do the same.

- **Carolyn C. Pazara (Former VP/GM  of CUC's Travel Division)**

*Letter from Carolyn C. Pazara*, Letters App. at 138:

[Kirk built] an organization where the people believed in the business and the customer, having a true commitment to our success. This was achieved by Kirk's passion for how you treat and manage people. He firmly believed that the way you treat each person showing care, respect and providing the tools would bring the business results. Kirk and the team developed a Training program for the Supervisor and Manager levels in how you manage and treat people based on the "Golden Rule". Kirk traveled to each location, meeting with all management levels to deliver his message and instill the vision/values of the organization. His passion for properly managing people and showing concern and fairness became the cornerstone of our business foundation.  The impact of Kirk's involvement as the senior leader of the organization was, as you can imagine, tremendous.

- **Michael Bodetti (CUC co-worker for 12 years)**

*Letter from Michael Bodetti*, Letters App. at 125-126:

Kirk led by example. He always conducted himself in the most ethical manner. In 1989, I was in the midst of a contract negotiation with ATT during which they sent a gift of a very nice phone to Kirk.  Kirk told me of the gift and asked me to return it to ATT stating that it would not be proper to accept. This is one example of the standard way Kirk conducted himself on a regular basis.

One of Kirk's mottos was that "Good would always triumph over evil". One day in 1998, we were with several other executives standing in front of the Cendant building on Summer Street in Stamford, CT.  There was a discussion regarding some of the poor and seemingly unethical approaches that the new management was taking with vendor negotiations. Kirk stepped in and said he would address the issues stating "Don't worry, just as I always tell my kids, good always triumphs over evil." This was very reassuring.

- **L. Sue Trizila (CUC co-worker for 6 years)**

*Letter from L. Sue Trizila*, Letters App. at 117:

One summer Kirk and his family vacationed at the Walt Disney World Dolphin Hotel in Orlando. Since CUC booked thousands of rooms each year at this property, the General Manager insisted his stay be compliments of the hotel. Even after Kirk made me contact the hotel, they still would not accept any payment. Kirk absolutely would not accept this "gift" and ended up writing a check to CUC for the full rack rate of the rooms. As I said, never have I worked for an executive, before or since, who refused any complimentary travel awards; indeed, many seem to view it as one of the "perks" of the job. Kirk, however, created a distinct line between his professional responsibilities and his personal activities. That event stands for me as a simple illustration that a person's character manifests itself in many ways.

*        *        *

There was a genuine sensitivity for doing the "right thing" whether it was for the employees, our customers, or our company.

- **Richard J. Fernandes (CUC co-worker for 13 years)**

*Letter from Richard J. Fernandes*, Letters App. at 118-120.

In my time at CUC, I can remember numerous examples of Kirk displaying these traits [of integrity, honesty, openness, frugalness and respect for the individual] in his day-to-day dealings with others in the company. One example that immediately jumps to mind involves CUC's largest client at the time, Citibank. CUC provided membership services which were marketed to Citibank's credit card holders. Citibank required CUC to provide many reports detailing the level of service provided, including a report listing telephone service standards (for example, average speed of answering the call). It came to Kirk's attention that we were not meeting Citibank's contractually required service levels in answering the telephone. His immediate reaction was to emphasize that we had no choice but to let Citibank know of the situation regardless of the consequences. At this point in CUC's history, losing Citibank as a client would have had disastrous results, requiring massive layoffs. Kirk's reaction, to tell the truth and be honest with the client, did not come as a surprise to anyone who knew him. (An interesting side note to this anecdote is that the person arguing most vehemently to "adjust" the reports before sending them to Citibank was a person who, I understand, testified about Kirk's alleged dishonesty during his trial.)

Another example of Kirk's emphasis on doing the right thing came about because of a management problem in my area of responsibility. At that point in my CUC career, I was responsible for an operations center in Houston, Texas which employed almost 200 people. Our staffing at this center was determined by staffing models partially driven from data from our telephone switch. In other

words, the switch told us how we were doing in answering the telephones, and the model told us whether we needed more people to answer the telephones. It turns out that our switch was configured incorrectly and was providing incorrect data on our performance. To make a long story short, due to this problem, we were significantly overstaffed and we were wasting a tremendous amount of money. At a monthly business review for my business unit, I admitted the problem and made sure that senior management understood the implications of the problem. If I had not come forward with the problem, it is very unlikely that anyone else would have discovered the error. At the end of the meeting, Kirk pulled me aside and praised me for being honest and for doing the right thing in disclosing this problem. His encouragement in this situation emphasized to me the importance that integrity and honesty played in the work environment that he managed. He felt it was important to emphasize his views by going out of his way to communicate to me.

Another time, Kirk spent two days conducting a management training program for the Houston supervisors and managers. The training program was one that he developed and which emphasized management issues such as honesty and the "Golden Rule" and how these things applied to our business lives at CUC. Kirk took the time to do this training when CUC was already a multi hundred million dollar business. He felt that this training was vital in order to continue the culture of business honesty and integrity that he had created. The impact on many of these young supervisors and managers was tremendous. For someone of Kirk's level to spend a few days with them imparted the importance of these lessons. To be frank, the fact that Kirk conducted the sessions had an even bigger impact on the more senior management personnel because we realized the commitment he was making in order to conduct this training. Having a senior executive spend this amount of time to train relatively junior managers is unheard of. Kirk believed that it warranted his attention because he needed to convey the importance of these issues and that this message be sent from the top down.

- **Jack Skydel (Solicited Business from CUC)**

*Letter from Jack Skydel*, Letters App. at 034:

During my testimony it was brought out that during that period I was working at Lehman Brothers as an investment banker and pursuing CUC as a client. It was also brought out that although we presented several acquisition ideas over time to CUC, we were never retained. I bring this up again in this letter because with the benefit of the prior examples before you, I am hoping you can appreciate why this result was so unusual. It was certainly frustrating to me. Lehman was and is a major investment bank, we had brought to the Company a number of high quality ideas and I had great access built on a life long relationship. It would have been quite easy for Kirk to direct an advisory assignment or a fairness opinion to me even if the original idea had not been generated by Lehman. However, Kirk always treated business as business and unfortunately, Lehman never quite hit the mark.

- **Kelly E. Green (CUC co-worker for 12 years)**

*Letter from Kelly E. Green,* Letters App. at 129:

At CUC there were many times where we had a chance to take a shortcut, ignore an obligation or disregard a contract that prohibited us from a new opportunity. But thanks to Kirk's leadership we didn't succumb to this temptation. We bought companies through acquisition that had ridiculous contracts in place with employees or vendors. We probably had the leverage to ignore or renegotiate those commitments, but because of Kirk, it was never seriously considered. We simply honored the contracts because it was the right thing to do.

5.      **Promoted a culture of frugality in the business community**

- **Craig Sherman (CUC co-worker for 8 years)**

*Letter from Craig Sherman*, Letters App. at 110-111:

Kirk inspired me and others by his frugality.  I remember he was a member of the local YMCA and when they introduced a 'premium membership' with nicer bathrooms, etc. he told me he couldn't understand why people cared about that sort of thing.  When he went on business trips, not only would he always travel coach, he would share a room with the other senior executives to save money!  He never took advantage of his level/status in the company.  This was inspiring – as a relatively low-level employee, I felt like my hard work was all going to help the company, not to the lifestyles of the senior executives.  (In contrast, I found the most senior team and culture at Cendant after Kirk left and Henry took over to be extremely self-aggrandizing – something I found profoundly de-motivating.)

- **Richard J. Fernandes (CUC co-worker for 13 years)**

*Letter from Richard J. Fernandes*, Letters App. at 120:

In an era of corporate executives spending freely for personal benefit, Kirk was always incredibly frugal.  I can clearly remember a conversation I had with him trying to convince him to stop driving himself to the airport and to start taking a corporate car.  My feeling was that he could spend the extra time in the car doing work or resting.  His response was that it was important for him to send a message that we were not a free spending company and that everyone was equal.  If others drove to the airport, then he should do the same.  Kirk always dealt with CUC's money as if it were his own money.  He didn't do many things that have become standard practice among senior executives, even at much smaller companies.  He shared hotel rooms with other managers whenever possible; he drove himself to the airport; he stayed in relatively inexpensive hotels.  All of this was done because he thought it was the right thing for the company and the right message to send.

- **John P. Tuohy (CUC employee of 17 years)**

*Letter from John P. Tuohy*, Letters App. at 115:

Kirk does not like pretense. (He has never, nor would he, drive a prestigious car of his own.) He "abused" 2 senior executives at subsidiary CUC company locations (as always, with humor) when one, he saw, had reserved a company parking space in his name; the second, when he had procured a couch for his office. When Kirk first got promoted into what was clearly the #2 spot at CUC, another executive, now obviously no longer in the running, clearly had the second best office (second only to Walter Forbes'). Kirk insisted that he keep it (both remained in those same 2 offices for another 14 years by my count).

Kirk is notoriously frugal and careful with expenses. Increases in budgeted expenses year over year had to also show increased efficiencies. He always made us share rooms when traveling, regardless of seniority. He would personally open up random outbound Fed Ex packages to ensure that employees weren't Fed Ex-ing frivolously.

- **Michael Bodetti (CUC employee of 12 years)**

*Letter from Michael Bodetti*, Letters App. at 126:

Kirk ran CUC with a primary focus on keeping costs down and he went out of his way to praise people for doing their part. Unlike CEOs from other companies, Kirk would answer his own calls and respond to his own e-mail. When he traveled he usually traveled coach and stayed at average hotels – many times even sharing rooms. Kirk drove an average car and his office was furnished the same as a manger level office. He never asked anyone to take cost cutting measures that he didn't take himself.

- **Kelly E. Green (CUC employee of 12 years)**

*Letter from Kelly E. Green,* Letters App. at 128:

He had an extreme diligence when it came to using company resources. He watched expenses and served as an example to his subordinates by not staying in fancy hotels, avoiding expensive restaurants, traveling utilizing the same airline policies of people several levels below him and never got anywhere near the line between corporate versus personal expenses. We all watched our expenses because Kirk watched his expenses.

- **Andrew D. Carr (CUC co-worker for 6 years)**

*Letter from Andrew D. Carr*, Letters App. at 132:

Not only did he sacrifice personally for me, he set an example of frugality for the entire company.  When we were losing a million dollars a month in the Travel Operations division, Kirk took control and, by dint of his exceptional character,

let everyone immediately know that the operation had to be turned around.  He, and the rest of us, traveled on 6AM flights, returning often at 11PM.  When we had to stay over somewhere, all the executives, including Kirk, had to double up. And we are not talking about sharing a suite at the Ritz; we are talking about sharing rooms at places like the Cross Country Inn in Westerville Ohio, a property that looks UP to Motel 6.  Everyone got the message.

- **La Mar & Thomas (Founders of Ben. Conslt's/Bought by CUC)**

*Letter from Robert La Mar & William Thomas*, Letters App. at 156-157:

In or around 1989, however, we decided that Benefit Consultants was simply growing too large too fast for our personal management style and we went to Kirk and told him of our intention to retire.  Kirk responded with a suggestion that we continue to run a division of the business with which we brought the most expertise.  We agreed, but only if we could do so as independent contractors. Kirk agreed and, without a formal contract, we continued our relationship for another 10 years.  Kirk's word that we would fairly work out any problems was, in our mind, a better idea than a hard and fast corporate agreement.  In fact, it was preferable as Kirk had always been completely honest and ethical with us and had a frugal mindset that was very appealing.  He always seemed to put the employee's and the company's best interests ahead of his own or of false short term corporate goals.

## IV.     The Nature And Circumstances Of The Offense

Mr. Shelton previously submitted his Statement of the Case to the Probation Office, which is attached hereto as Exhibit C. The Statement of the Case provides a detailed analysis of the evidence presented at trial and is incorporated herein.

There are several critical facts about this case that warrant this Court's careful consideration of "the nature and circumstances of the offense" under 18 U.S.C. § 3553(a)(1) in determining a just and reasonable sentence:  (1) Mr. Shelton was not the leader or mastermind of the fraud, and his involvement in the fraud -- to the extent the government presented any evidence of involvement (and we dispute that it presented any credible evidence) – was minimal; (2) Mr. Shelton did not take advantage of the fraud by engaging in insider trading activities nor was there any intent to harm shareholders; and, (3) This case was not a "corporate looting-type" case that resulted in the collapse of Cendant, but instead, Cendant's employees continue to work at a thriving and productive company.

### A.     Mr. Shelton Was Not The Mastermind Of The Fraud And His Knowledge/Participation, At Most, Was Minimal

The undisputed leaders and organizers of this fraud were Stuart Bell and Cosmo Corigliano – not Kirk Shelton. While the government is now attempting to cast Mr. Shelton as the head of a massive, ten-year conspiracy, the evidence presented at trial does not support this claim. At trial, the government focused on a few meetings and documents in late 1997 and early 1998 which the government claimed showed Kirk Shelton knew or consciously avoided knowing there were improper accounting procedures being employed. Thus, in accepting the jury's verdict for purposes of this argument, the evidence presented showed Mr. Shelton to be a minimal participant in the criminal enterprise (if it even showed that) and is a mitigating factor to be

considered by the court in reviewing the circumstances of the offense under 18 U.S.C. § 3553(a)(1).

The fraud at CUC was extremely complex, and in fact, it was never discovered by anyone -- not by Ernst & Young, CUC's auditors, not by Deloitte & Touche, Cendant's auditors, and not by any of the senior executives from HFS. The fraud was disclosed by two lower level accountants – Casper Sabatino and Steven Speaks – to HFS on April 9, 1998. To discover the fraud, one would have needed to examine detailed journal entries and accruals -- documents that were never made available to Mr. Shelton, or anyone else outside of the accounting department.

The government presented evidence that Bell, who was CFO from the early 1980s to 1995, invented all of the accounting machinations that comprised the fraud. Bell and Corigliano worked closely as a team to implement these accounting tricks for years before Corigliano became CFO in 1995. **Not a single government witness, including Corigliano, Pember, Sabatino, Speaks and Kearney, testified that Mr. Shelton did anything improper prior to 1995 despite the government's own claim that the fraud was raging during this time period.** *See* Transcript at 14831 (government summation, 10-18-04).

Bell pushed hard to have his protege Corigliano assume the role of CFO, and thereby guarantee that Corigliano would hold the reins of the fraud. *See Defendant Shelton's Statement of the Case* (hereinafter *"Statement"*) at 12-13, attached as Exhibit C. As CFO, Corigliano planned and executed the fraud down to the minute details. Corigliano had knowledge of, and supervised, every aspect of this fraud.

The evidence shows that, in stark contrast to Corigliano, Mr. Shelton lacked knowledge of the fraud. For example, contrast Shelton's with Corigliano's and Pember's participation in the following components of the fraud:

60

- Topside Adjustments:  Not a single witness testified that Shelton participated in, or was told about, the topside adjustments – the very heart of this fraud.  Corigliano, in contrast, was the leader who scrutinized Sabatino's and Kearney's implementation of the topside adjustments.  *See Statement* at 13-14.

- Ideon Merger Reserve:  Pember and Corigliano closely supervised the reversal of these reserves into earnings for the fiscal years ending 1/31/1997 and 12/31/1997.  Pember, at the direction of Corigliano, decided the expense categories into which these reserves were reversed.  None of the documents evidencing the improper use of this reserve – many of which were created by Pember – were ever presented to Shelton.  *See Statement* at 15-16.

- Cendant Merger Reserve:  Pember was fully responsible for building an improper "cushion" in the Cendant reserve.  In January 1998, Pember and Corigliano convened a number of conspiratorial meetings at which they directed the junior accountants such as Speaks and Sattler to improperly use the reserves to increase earnings.  Shelton did not attend any of these meetings and directed no one to use the reserves in an improper manner.  *See Statement* at 16-19.

- Revenue Recognition:  There is no credible evidence that Shelton knew about the improper acceleration of revenue recognition.  All of the evidence shows that Pember and Corigliano instructed lower-level accountants to make these improper adjustments.  *See Statement* at 19.

- Cancellation Reserve:  There is no evidence that Shelton knew that this reserve was under-funded, and all of the credible evidence indicates that Shelton was unaware that CUC's policy of recording rejects by a 3 month delay had any impact on income.  In contrast, Pember directed junior accountants to under-fund the reserve and to deceive E&Y regarding the cancellation rate data.  Corigliano deceived Shelton about these practices.  *See Statement* at 20.

Unlike the case of Corigliano or Pember, there is no credible evidence that Shelton voluntarily instructed a subordinate to engage in improper accounting or deception of any kind.

Six of the alleged coconspirators have never indicated they viewed Shelton to be a member of any criminal conspiracy, let alone a leader of one.  Walter Forbes, Stuart Bell, Casper Sabatino, Steven Speaks, Kevin Kearney and Mary Sattler have either affirmatively denied Shelton's participation in a conspiracy or have never indicated their belief that Mr. Shelton was a member of a criminal conspiracy. Casper Sabatino, an indicted, cooperating witness who testified in the

government's case, told the government that he did not consider Shelton to be among the five or more participants to the wire fraud to which he pleaded guilty. *See* Transcript at 4580-81. It is remarkable that the government is suggesting that Mr. Shelton was a "leader or organizer" of an accounting fraud at CUC when Sabatino – the *Senior Vice President of Accounting* at CUC – testified that he did not consider Shelton to be a participant of that criminal enterprise.

The government's two main witnesses, Corigliano and Pember, both equivocated as to whether they had thought of themselves as committing crimes at the time. If Corigliano and Pember did not acknowledge to themselves contemporaneously that their accounting was illegal at the time of the alleged fraud, they could not have characterized their accounting decisions as criminal or fraudulent in any contemporaneous conversations with Mr. Shelton.

Moreover, it is very noteworthy that at trial the government successfully urged the court to issue a conscious avoidance instruction to the jury.[10]  The government argued that there was sufficient evidence in this case for the jury to find *beyond a reasonable doubt* that Mr. Shelton had *purposefully remained blind to* (i.e. consciously avoided) the fraud.  Mr. Shelton could not have been a leader of a criminal enterprise to which he remained *willfully blind.*  Having previously argued that the evidence is sufficient to support a finding beyond a reasonable doubt that Mr. Shelton acted like an ostrich in this nest of criminals, the government cannot now portray him to be the leader of the flock.

---

[10] Indeed, the government made as a central focus of its cross-examination of Mr. Shelton, not the issue of his actual knowledge, but of his possible negligence and recklessness. The government framed the operative issue as whether Mr. Shelton had "a hint, a clue, a suggestion, or an indication" about the fraud. *See* Transcript 12537 *et seq*. The government even wrote the words, "No Hint, No Clue, No Suggestion, No Indication" on an easel in front of the jury box for the jury to stare at while cross-examination continued.

### B.    Mr. Shelton Did Not Take Advantage Of The Fraud By Engaging In Insider Trading Activities Nor Was There Any Intent To Harm Shareholders

Another important circumstance of this case for the Court's consideration is that Mr. Shelton did not sell a single share of CUC/Cendant stock after January 1997. In fact, during 1997, Mr. Shelton continued to increase his holdings of CUC/Cendant stock, by exercising options, paying taxes, and holding stock. Corigliano, on the other hand, sold over $23 million of stock in the twelve months preceding the fraud's disclosure. Likewise, Pember sold millions of dollars of stock in the 1997 to 1998 time frame.  In contrast to these conspirators, Shelton lost over $30 million in personal wealth when the fraud was disclosed in April 1998.  By accumulating Cendant stock right up to the day of the corrective disclosure, Shelton *placed himself in the exact same position as the victims*.

Furthermore, unlike the typical fraud that involves a deceptive scheme to procure money or property from a victim, there is no evidence that any of the perpetrators in this fraud had any intent to harm shareholders. The conspirators intended to falsely inflate the price of CUC's stock in perpetuity, without any eventual drop in that stock's value. The perpetrators hoped and intended that all CUC stockholders would gain from the fraud. Accepting their testimony as the government does, none of the conspirators – not even Corigliano or Pember – acknowledged to themselves at the time that they were doing anything criminal at the time.  The government has acknowledged this peculiar aspect of the offense in its plea agreements with Corigliano, Pember and Sabatino by stipulating that the loss amount overstates the seriousness of the offense, and in the case of Corigliano, agreeing not to oppose a sentence of home confinement.  The government should not be allowed to ignore the significance of the same facts in connection with Mr. Shelton's sentencing.

**C.     Mr. Shelton Did Not Engage In "Corporate Looting" And Cendant's Employees Continue To Work At A Thriving And Productive Company**

Bankruptcies and tens of thousands of lost jobs and lost pensions followed the discovery of the accounting frauds at companies like Enron, Global Crossing and WorldCom.  The accounting irregularities at CUC/Cendant fortunately did not give rise to these types of human tragedies for its employees.  To the contrary, the number of CUC/Cendant employees has increased dramatically since 1996.  In 1996, CUC was a company with approximately 15,000 employees. *See* Transcript at 30, lines 8-13.  "All told, it had about 20 different businesses located throughout the country, with the largest of those 20 different businesses being its Comp-U-Card division." *Id*. By 1997, following the merger, Cendant had over 34,000 employees. *See* United States Securities and Exchange Commission, Form 10-KA, Cendant Corporation, dated 9/28/98.

Cendant now employs more than 87,000 persons, *see* HOOVERS, A D&B COMPANY (July 1, 2005); and is one of the foremost providers of travel and real estate services in the world.  *Id*. It is ". . . one of the world's largest hotel franchisors, the world's largest vacation ownership organization, and one of the world's largest car rental operators; the world's largest real estate brokerage franchisor, and the world's largest provider of outsourced corporate employee relocation services; and leading providers of travel information processing services worldwide." The Cendant Corporation, http://www.cendant.com (July 2005); *see also* Cendant Corporation, 2004 ANNUAL REVIEW (February 2005).  Thus, Cendant's prosperity has and continues to benefit members of our local, national and international work force.

Similarly, this case did not involve the types of corporate excesses, *e.g.* $6,000 shower curtains, luxury vacations, private golf courses and multimillion-dollar corporate homes all paid

for with shareholders' funds, that left investors penniless in cases like Tyco International and Adelphia Communications. Kirk Shelton and his subordinates never misused corporate assets or took them for their personal gain. Senior executives, including Mr. Shelton flew coach, shared modest hotel rooms, and received no unauthorized or improper benefits. In stark contrast to these other companies, Cendant reported that "2004 was another year of record results [], in which [it] demonstrated continued organic growth and generated $2.2 billion in free cash flow. * * * Net revenues rose 10 percent to $19.8 billion over the previous year, and pretax income rose 18 percent to $2.6 billion in 2004." Cendant Corporation, 2004 ANNUAL REVIEW, Statement of Chairman and Chief Executive Officer, Henry R. Silverman and President and Chief Financial Officer, Ronald L. Nelson (February 2005).[11]  Cendant's $19.8 billion in total revenue for fiscal year 2004 far exceeds the $2.3 billion in total revenues from 1996. *See* United States Securities and Exchange Commission, Form 10-K, CUC INTERNATIONAL INC. AND SUBSIDIARIES, CONSOLIDATED STATEMENTS OF INCOME (January 31, 1997). Cendant continues to thrive and "[o]ver the next two years, [it] expect[s] even better operational and financial results." 2004 ANNUAL REVIEW at 2.

Moreover, Cendant's sound financial performance is not a new phenomenon. Unlike companies like Adelphia, over the course of the past 15 years, CUC/Cendant outperformed the S&P-- *even in the wake of the accounting fraud which necessitated the restatement*. The chart

---

[11] Cendant earnings per share from continuing operations increased to $1.71 in 2004, up 27 percent from $1.35 in 2003. 2004 ANNUAL REVIEW at 2. Further, organic revenue growth in 2004 was $866 million." *Id.*; *see also* Press Release, CENDANT REPORTS RECORD RESULTS FOR FOURTH QUARTER AND FULL YEAR 2004 (February 7, 2005). Moreover, Cendant has ". . . reduced net corporate debt by $2.6 billion since year-end 2002, including retiring all [its] convertible securities, and used $2.4 billion to repurchase stock." 2004 ANNUAL REVIEW at 2.

below shows Cendant's stock price compared to Adelphia and the S&P 500 over the past 15 years.

**CUC/Cendant v. The S&P 500 v. Adelphia**



*See* http://finance.yahoo.com (July 1, 2005).

Accordingly, this case presents a factual circumstance that is utterly unlike that presented by Enron, Global Crossing, WorldCom, Tyco International and Adelphia Communications. Employees at the local, national and international level continue to benefit from CUC/Cendant's prosperity. Cendant has not left investors penniless and continues to provide them with exceptional value (and dividends).

## V.    The Advisory Guidelines Calculation

### A.  The Advisory Sentencing Guidelines Range

The Probation Office calculated Mr. Shelton's Offense Level as follows:

> Base Offense ................................................6
> Loss exceeded $80 million.........................18
> More than minimal planning........................2
> Leadership role............................................4
> Abuse of position of trust............................2
> Obstruction of justice ..................................2
> **Total Offense Level ..................................34**

Based on a total offense level of 34 and a criminal history category of I, the advisory guideline imprisonment range is 151 to 188 months. However, Mr. Shelton disagrees with the Probation Office's recommendations of (1) a four level increase for a leadership role in the offense under U.S.S.G. § 3B1.1(a); and, (2) a two level increase for obstruction of justice under U.S.S.G. § 3C1.1. Moreover, the offense level should be decreased by four levels under U.S.S.G. § 3B1.2 since Mr. Shelton was a minimal participant in the offense. Therefore, the proper Advisory Total Offense Level is 24,[12] which corresponds to 51 to 63 months of incarceration.

Furthermore, Mr. Shelton respectfully submits that numerous factors are present to warrant this Court to depart downwardly from the offense level to a lower Total Offense Level. The grounds for downward departure are as follows:

1. Mr. Shelton has a long history of extraordinary charitable and employment-related good deeds;

2. The loss figure of over $80 million significantly overstates the seriousness of Mr. Shelton's offense conduct;

---

[12] 6 (base offense level) + 18 (loss greater than $80 million) +2 (more than minimal planning) + 2 (abuse of position of trust) = 28, minus 4 for minimal participant  = 24.

67

3.   Numerous enhancements being considered are based on overlapping conduct; and,

4.   A combination of factors.

Accordingly, a proper Guidelines computation combined with the factors that warrant a downward departure permit this Court to impose a sentence that does not separate Mr. Shelton from his family and the community.

### B.   Objections To The Total Offense Level Calculation

Mr. Shelton respectfully submits that facts which significantly affect the sentence must now be proven beyond a reasonable doubt.  *See United States v. Pimental*, Crim No. 99-1031-NG, 2005 WL 958245, at *7 (D. Mass. Apr. 21, 2005) ("Certain facts like the amount of loss continue to assume inordinate importance in the sentencing outcome.  So long as they do, they should be tested by our highest standard of proof."); *see also United States v. Huerta-Rodriguez*, 355 F. Supp. 2d 1019, 1027 (D. Neb. 2005). The evidence presented at trial did not prove beyond a reasonable doubt that Mr. Shelton was the leader of the fraud nor can it be proven beyond a reasonable doubt that he committed perjury during his testimony.

### 1.    Mr. Shelton was a minimal participant at most rather than a leader of the fraud

The Probation Office recommends a four-point enhancement for Mr. Shelton's role in the offense pursuant to U.S.S.G. § 3B1.1(a). PSR, ¶ 110. On the contrary, Mr. Shelton deserves a four point *reduction* to his offense level pursuant to U.S.S.G. § 3B1.2 since he was at most a minimal participant in the criminal enterprise.  As Application Note 1 to that Guideline explains, "[u]nder this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant."  Mr. Shelton's lack of knowledge regarding the fraud and the devices by which it was implemented warrant a reduction to his offense level. *See supra*, Section IV.A at 60-63.

As an initial matter, the Second Circuit Court of Appeals has "made it clear that such role enhancements should not be *automatically* imposed on business owners or executives." *United States v. Huerta*, 371 F.3d 88, 92 (2d Cir. 2004) (citing *United States v. Burgos*, 324 F.3d 88, 93 (2d Cir. 2003)) (emphasis in original). The mere fact that Mr. Shelton held a supervisory role at CUC is insufficient to support an enhancement under this Guideline. *See Burgos*, 324 F.3d at 92-93 (reversing three-point enhancement against business owner where no evidence that business owner directed or managed employee of said business in fraudulent scheme that they jointly undertook). To support its claim for enhancement, there must be evidence of Mr. Shelton's actual and substantial leadership role in the fraud. *See, e.g., United States v. McGregor*, 11 F.3d 1133, 1138-39 (2d Cir. 1993) (reversing imposition of three-point enhancement, holding that single instance of recruitment and supervision insufficient for finding defendant to be a manager or supervisor); *United States v. Caba*, 911 F. Supp. 630, 641 (E.D.N.Y. 1996) (refusing to impose enhancement pursuant to U.S.S.G. § 3B1.1 on business owner although employees were unwitting participants in fraudulent scheme). This burden cannot be met.

First, six of the alleged coconspirators[13] have never indicated they viewed Shelton to be a member of any criminal conspiracy, let alone a leader of one. Even Casper Sabatino, who was the *Senior Vice President of Accounting* at CUC, testified that he did not consider Mr. Shelton to be a participant of that criminal enterprise. Secondly, the government argued that there was sufficient evidence in this case for the jury to find *beyond a reasonable doubt* that Shelton had *purposefully remained blind to* (i.e. consciously avoided) the fraud. Thus, Mr. Shelton could not have been a leader of a criminal enterprise to which he remained *willfully blind.*

---

[13] Walter Forbes, Stuart Bell, Casper Sabatino, Steven Speaks, Kevin Kearney and Mary Sattler.

As argued *supra*, Section IV.A at 60-63 and incorporated herein, the undisputed leaders and organizers of this fraud were Stuart Bell and Cosmo Corigliano - the former Chief Financial Officers of CUC.  It was Bell, the CFO from the early 1980s to 1995, who invented and implemented all of the accounting schemes up to 1995, and it was Corigliano who had knowledge of, and supervised, every aspect of this fraud.  Furthermore, the evidence presented by the government, at most, established Mr. Shelton had limited knowledge of just a small fraction of the fraud. At trial, the government focused on a few meetings and documents in late 1997 and early 1998 to link Mr. Shelton to the fraud. However, there is no credible evidence that Mr. Shelton instructed a subordinate to engage in improper accounting or deception of any kind. Since the record does not support Mr. Shelton's actual and substantial leadership role in the fraud, a four-level enhancement is not warranted. On the other hand, because the evidence showed – at most – that Mr. Shelton lacked knowledge and understanding of the scope of and structure of the fraud, a four-level reduction in his Offense Level is appropriate.[14]

### 2. Mr. Shelton did not willfully impede or obstruct justice during his trial testimony

The Probation Office recommends that, pursuant to U.S.S.G. § 3C1.1, Mr. Shelton deserves a two-point enhancement for obstructing justice because he allegedly committed perjury at trial regarding the Interval cover story and Exhibit 530. PSR,  ¶¶ 103, 113. However, the trial record does not demonstrate that Mr. Shelton knowingly provided materially false testimony on a material issue in the case.

---

[14] Alternatively, if this Court were to reject Mr. Shelton's argument that he was a "minimal participant," then Mr. Shelton should be classified as a "minor participant" under U.S.S.G. § 3B1.2(b) and a two-level reduction would be warranted. Certainly, Mr. Shelton is substantially less culpable than the other participants. *See* U.S.S.G. § 3B1.2, cmt. (n.3).

U.S.S.G. § 3C1.1 "is not intended to punish a defendant for the exercise of a

constitutional right."  U.S.S.G. § 3C1.1 Application Note 1.  The United States Supreme Court

noted the following:

> Of course, not every accused who testified at trial and is convicted
> will incur an enhanced sentence under § 3C1.1 for committing
> perjury. . . .  [A]n accused may give inaccurate testimony due to
> confusion, mistake or faulty memory. . . .  Her testimony may be
> truthful, but the jury may nonetheless find the testimony
> insufficient to excuse criminal liability or prove lack of intent.

*United States v. Dunnigan*, 507 U.S. 87, 95 (1993).  "The enhancement is far from automatic"

and "the elements of perjury must be found by the district court with [] specificity . . ." *Id.* at 97.

"In this Circuit, an enhancement for obstruction of justice based on perjured testimony

may be imposed only where the sentencing court finds that the defendant 1) willfully 2) and

materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as

to a material matter." *United States v. Ben-Shimon*, 249 F.3d 98, 102 (2d Cir. 2001) (internal

citation and quotation marks omitted); *see also United States v. Canova*, ___ F.3d ___, 2005 WL

1444147 *20 (2d Cir. June 21, 2005).  "If a court chooses to rely upon allegedly perjured

testimony as a basis for application of the enhancement, however, it must make specific findings

which indicate that the judge has considered all of the elements of perjury, including materiality,

and has found that they have all been met." *United States v. Zagari*, 111 F.3d 307, 328 (2d Cir.

1997).

However, "the willfulness contemplated by § 3C1.1 [is] distinct from the intent required

to prove perjury. The former refers to a defendant's 'specific purpose of obstructing justice,'

whereas the latter refers to his 'purposeful giving of the false testimony.'" *Canova*, 2005 WL

1444147 *20  (citing *Zagari*, 111 F.3d at 329 n. 20) (internal citations omitted). Thus, the court

is "required to find that the perjury had been committed with the specific intent to obstruct justice."*Id.*

It cannot be established under either a standard of proof beyond a reasonable doubt or by clear and convincing evidence[15] that Mr. Shelton willfully and materially committed perjury with the specific intent to obstruct justice. In his Statement of the Case, attached hereto as Exhibit C, Mr. Shelton showed that none of the government's examples establish this enhancement. *See Statement* at pp. 26-28 (plane expense), pp. 28-30 (GX 530), pp. 37-38 (Interval "cover story"). The thrust of the government's argument is that Shelton perjured himself with respect to the plane expense, GX 530, and Interval because his testimony was inconsistent with the testimony of the cooperating conspirators, and the testimony of Walter Forbes on one discrete issue. Ironically, the government does not apply that stringent standard to its own witnesses. When confronted with the glaring internal inconsistencies among the cooperating witnesses' testimony, and the inconsistencies between that testimony and the documentary evidence, the government is quick to explain them away as the product of faulty recollection or innocent mistake. *See, e.g., Memorandum of the United States in Opposition to Shelton's Motion for a Judgment of Acquittal Pursuant to Rule 29 and for a New Trial Pursuant to Rule 33*, pp. 76-101.[16]

---

[15] A discussed above, there is support in *Booker* for the proposition that the applicable burden of proof in sentencing determinations is now proof beyond a reasonable doubt. Prior to *Booker,* the district court was required to find all of the elements of perjury by clear and convincing evidence to support an enhancement for obstruction of justice. *See United States v. Ruggiero,* 100 F.3d 284, 294 (2d Cir. 1996); *United States v. Onumonu,* 999 F.2d 43, 45 (2d Cir. 1993).

[16] *See, e.g., id.* at p. 86 ("Corigliano could have been honestly mistaken in his recollection of the time of those events . . ."); p.89 ("Any inconsistency between the testimony of Corigliano and other witnesses does not mean that the jury had to conclude that Corigliano was lying."); p.98 ("That Pember may have been mistaken about the timing of her delivery of GX 530 to Shelton . . ., like Corigliano's apparent mistakes about the timing of some of the events he recounted, did not require the jury to completely discredit her testimony or render that testimony unreliable as a matter of law.")

Moreover, the jury's verdict does not necessarily imply that Mr. Shelton's denials of knowledge of the fraud were perjurious. Directly on point is *United States v. Caba*, 911 F. Supp. 630, 641-42 (E.D.N.Y. 1996), in which the court refused to apply the obstruction of justice enhancement even though the defendant had testified that he lacked any knowledge of a food-stamp fraud of which the jury found him guilty. The district court noted it could only apply the enhancement on a finding that the defendant had "willfully" testified falsely and with the purpose of obstructing justice *Id.* at 641. The court continued:

> [T]he thrust of [defendant's] testimony was that he was not seeking to conceal his activities and that he did not intend to facilitate a fraud or cause a loss . . . Although, in the court's view, [defendant] was deliberately closing his eyes to what might be occurring, still it is not inconceivable that he viewed his activities as violating some technical regulations of the Government without intending or causing any real loss to the Government. Accordingly, the mens rea requirement of this Guideline has not been conclusively established here so as to compel a finding of obstruction under the Guidelines.

*Id.* at 642.

Similarly, in this case, based upon the court's jury instructions, the jury could have convicted Mr. Shelton on a finding that he deliberately closed his eyes to the fraud. Even if Mr. Shelton had some suspicions that the accounting was not entirely proper, that fact does not support the conclusion that Mr. Shelton committed perjury when he denied knowledge of a criminal conspiracy at CUC. Indeed, each of the principal, cooperating co-conspirators testified that he or she was not fully appreciative of the wrongful nature of their conduct. As in *Caba*, there is a significant likelihood that the conspirators viewed their activities as violating some "technical regulations," without intending any harm or unlawful result. Accordingly, the jury's verdict does not necessitate a finding that Mr. Shelton's denial of knowledge of improper accounting was made with the purpose of willfully obstructing justice.

### C.  Arguments For Downward Departures

The particular facts and circumstances of this case as well as the character of Mr. Shelton and other compelling consideration warrant this Court to downwardly depart from the recommended offense level.

### 1.  This Court possesses authority to depart from the guidelines range

Even before *Booker*, a court could exercise its discretion to grant a departure. In a typical guidelines analysis, the district court is required to impose a sentence within the applicable Sentencing Guidelines range. *See* U.S.S.G. Ch. 1, Pt. A, intro., p.s.; 18 U.S.C. §3553(b). "The Commission intends the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes." <u>See</u> U.S.S.G. Ch.1, pt.A, intro. comment 4(b); *see also United States v. Bryson*, 163 F.3d 742, 47 (2d Cir. 1998). "When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted." *Id*.

In forming the Guidelines, the Sentencing Commission did not adequately take into account cases that are, for one reason or another, "unusual." *See Koon v. United States*, 518 U.S. 81, 93 (1996) (citing 1995 U.S.S.G. Ch. 1, pt. A, intro. comment 4(b)). The Commission did not intend, with the exception of certain factors (race, sex, national origin, creed, religion, socioeconomic status, lack of guidance as a youth, drug or alcohol dependence, and economic hardship), "to limit the kinds of factors, whether or not mentioned anywhere else in the Guidelines, that could constitute grounds for departure in an unusual case." *Koon v. United States*, 518 U.S. at 83 (quoting 1995 U.S.S.G. Ch. 1, pt. A, intro. comment 4(b)).

74

In *Koon*, the United States Supreme Court further recognized that:

> [T]he [Sentencing Reform] Act authorizes the district courts to depart in cases that feature aggravating or mitigating circumstances of a kind or degree not taken into consideration by the Commission. The Commission, in turn, says it has formulated each guideline to apply to a heartland of typical cases. Atypical cases were not "adequately taken into consideration," and factors that may make a case atypical provide potential basis for departure. Potential departure factors "cannot by their very nature, be comprehensively listed and analyzed in advance." Faced with this reality, the Commission chose to prohibit consideration of only a few factors, and not otherwise to limit, as a categorical matter, the considerations that might bear upon the decision to depart.

*Koon*, 518 U.S. at 94 (internal citations omitted).

The *Koon* Court adopted the Commission's summary of the way in which courts should consider certain factors in determining whether to depart downward. With respect to factors that might remove a case from the heartland of typical cases, the Court referred to them as "special factors." "If a special factor is an encouraged factor, the court is authorized to depart if the applicable guideline does not already take it into account." *Id.* at 96. On the other hand, "[i]f a special factor is a discouraged factor, or an encouraged factor already taken into account by the applicable guideline, the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." *Id.* at 96.

The *Koon* Court also recognized the importance of adopting, as a reviewing court, a deferential approach to afford the district court the necessary flexibility to resolve questions involving "multifarious, fleeting, special, narrow facts that utterly resist generalization." *Id.* (citing *Cooter and Gell v. Hartmarx Corp.*, 496 U.S. 384(1990)). The Second Circuit Court of Appeals has agreed with the notion that district courts should be allotted "wide discretion" in determining what aggravating and mitigating circumstances to consider when deciding whether to depart from the Guidelines. *See United States v. Carpenter*, 320 F.3d 334, 341-42 (2d Cir. 2003); *United States v. Bryson*, 163 F.3d 742, 746-47 (2d Cir. 1998).

In *United States v. Correa-Vargas*, 860 F.2d 35, 37 (2d Cir. 1988), the Second Circuit Court of Appeals stated the following:

> [W]e prefer to allow the district courts to exercise their sound judgment in departing from the Guidelines, rather than impose rigid adherence to a table of numbers, Only by allowing the district courts *sensible flexibility* can we promote the equally important purposes of just punishment, respect for the law and adequate deterrence set forth in the Sentencing Reform Act.

*United States v. Correa-Vargas*, 860 F.2d at 37 (emphasis added). *See also United States v. Rogers*, 972 F.2d 485, 493 (2d Cir. 1992) ("the authority to depart provides a 'sensible flexibility' to insure that atypical cases are not shoehorned into a Guidelines range that is formulated only for typical cases"). Furthermore, the Second Circuit has noted that "it was not Congress' aim to straitjacket a sentencing court, compelling it to impose sentences like a robot inside a Guidelines' glass bubble, and preventing it from exercising discretion, flexibility or independent judgment."[17]  *United States v. Lara*, 905 F.2d 599, 604 (2d Cir. 1990).

Therefore, "[t]he controlling decision as to whether and to what extent departure is warranted can only be made by the courts" at the time of sentencing. U.S.S.G. §5K2.0, p.s.; *See also Rogers*, 972 F.2d at 495 ("the traditional role of the district judge in bringing compassion and common sense to the sentencing process" has survived the guidelines' promulgation); *United States v. Mickens*, 977 F.2d 69, 73 (2d Cir. 1992) (remanding case to give sentencing court "opportunity to fulfill the traditional role of a district judge in bringing compassion and common

---

[17]  Likewise, the Fifth Circuit has noted:

> Sentencing under the Guidelines is not, however, an exact science.  Justice cannot be meted out according to mathematical formulas.  The universe of potential factors that might affect the seriousness of a given offense is too broad to be refined to a mechanistic approach.  The Sentencing Guidelines are not intended to cover all contingencies or rigidly bind district judges. The Guidelines do not impose the sentence, they provide a framework for a district court to impose a sentence.

*United States v. Mejia-Orosco*, 867 F.2d 216, 219 (5th Cir. 1989).

sense to the sentencing process").

Mr. Shelton's character and conduct fall outside of the "heartland" of Guideline cases, and therefore, this Court possesses authority to depart on the basis of any of the asserted grounds for departure.

### 2. Mr. Shelton's extraordinary good deeds, employment-related contributions and employment history warrant a downward departure

A person's employment record and history of charitable and employment-related contributions and "good deeds" are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range. *See* U.S.S.G. §§ 5H1.5 and 5H1.11. However, these factors may be a basis for departure if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present. *Koon v. United States*, 518 U.S. 81, 96 (1996); *see also United States v. Rioux*, 97 F.3d 648 (2d Cir. 1996) (downward departure allowed in part on the basis of defendant's charitable efforts and civic good deeds, which included fundraising for the Kidney Foundation); *United States v. Jagmohan,* 909 F.2d 61 (2d Cir. 1990) (defendant's previous employment record can be proper ground for downward departure in exceptional cases); *United States v. Crouse*, 145 F.3d 786 (6th Cir. 1998) (civic work was a permissible ground for the district court to consider in departing downward).

Mr. Shelton's extraordinary commitment to the welfare of others and his charitable activities began many years ago – well before the government's investigation of Cendant ever began – and have continued unabated in spite of his legal difficulties. The breadth and depth of Kirk Shelton's activities and mentoring, and his willingness to give of himself hours a week, week after week, year after year, go "above and beyond" the efforts of the ordinary volunteer and

77

person. His extraordinary good deeds are detailed *supra* at Section III at 14-59 and are incorporated herein.

Mr. Shelton's life-time record of charitable activities and good works is even more impressive than those recognized as "extraordinary" in other cases in which courts have departed downward pursuant to U.S.S.G. §§ 5K2.0 and 5H1.11.  *See United States v. Serafini*, 233 F.3d 758, 775 (3d Cir. 2000) (upholding departure for community and charitable activities where wealthy defendant had donated sums to needy individuals, had volunteered as church usher and in various schools, and had hired and mentored college student after serious accident); *United States v. Woods*, 159 F.3d 1132, 1136 (8th Cir. 1998) (upholding downward departure for defendant's charitable activities, which included bringing two troubled young women into her home and paying for them to attend private high school, as well as helping to care for elderly friend); *United States v. Jones*, 158 F.3d 492, 500-01 (10th Cir. 1998) (upholding downward departure based on combination of good works and other factors where twelve letters submitted in support of defendant described his "good works"); *United States v. Rioux*, 97 F.3d 648 (2d Cir. 1996) (upholding downward departure based on combination of defendant's physical condition and his participation in fundraising efforts for Kidney Foundation). Without a doubt, Mr. Shelton's record of selfless acts eclipses the records of these defendants and warrants a downward departure in this case.

### 3.  The loss figure of over $80 million significantly overstates the seriousness of Mr. Shelton's offense conduct

In this case, undoubtedly the most influential factor in the Guidelines analysis is the loss amount. There is an 18-point enhancement as punishment for an alleged loss amount of over $80 million. Because under the previous mandatory Guidelines analysis Mr. Shelton faced a sentence at the high-end of the sentencing table, this enhancement drastically affects his Guidelines

sentence.  For example, assuming an offense level of 34 (which the government urges here) a six point reduction to 28 (i.e. a one-third reduction in the suggested loss amount enhancement) halves the applicable range of imprisonment.

The Sentencing Commission recognized the severe effect that the loss amount can have on the applicable Guidelines range, and that undue emphasis on this single factor may in some cases inappropriately distort the Guidelines calculation.  For example, application note 10 to U.S.S.G. § 2F1.1 encourages a downward departure where the "loss determined under subsection (b)(1) [] overstates the seriousness of the offense."  As the Second Circuit has noted, this commentary by the Commission "is simply a recognition that when an aggravating factor is translated to a sliding scale of offense levels, the assumptions underlying that translation cannot fairly reflect every possible case." *United States v. Restrepo*, 936 F.2d 661, 667 (2d Cir. 1991); *accord United States v. Koczuk*, 166 F. Supp. 2d 757, 763 (E.D.N.Y. 2001) ("where the monetary table bears little or no relationship to the defendant's role in the offense and greatly magnifies the sentence, the district court should have the discretion to depart downward").  In addition, a downward departure on this basis is available even if the sentencing court determines that the defendants did not play a minor or minimal role in the scheme.  *See United States v. Stuart*, 22 F.3d 76, 83-84 (3rd Cir. 1994) ("the district court was unable to apply the full four-level downward adjustment for minimal participation because of [defendant's] knowledge, but it has the power to depart if it considers [defendant's] role in the offense such that the monetary loss enhancement overstated his criminal culpability and inaccurately skewed the sentencing calculus.")

In light of *Booker* and the other factors that a court now must consider under § 3553(a), it is increasingly questionable whether the loss amount continues to deserve the priority it received under the old Guidelines system:

> The Guidelines place undue weight on the amount of loss involved in the fraud. This is certainly a relevant sentencing factor: All else being equal, large thefts damage society more than small ones . . . But the Guidelines provisions for theft and fraud place excessive weight on this single factor, attempting – no doubt in an effort to fit the infinite variations on the theme of greed into a limited set of narrow sentencing boxes – to assign precise weights to the theft of different dollar amounts. In many cases . . . the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence.

*United States v. Emmenegger*, 329 F. Supp. 2d. 416 (S.D.N.Y. 2004);[18] *see also United States v. Pimental*, Crim No. 99-1031-NG, 2005 WL 958245, at *3 (D. Mass. Apr. 21, 2005) ("Even if the loss were as the government described, I would conclude that that figure dramatically overstated [defendant's] culpability, whether considered under the Guidelines or in the light of the 18 U.S.C. § 3553(a) factors.").

Moreover, this is an extraordinary case that lies far outside the "heartland" of typical fraud cases, and imposition of the full 18-point enhancement is unwarranted. Each of the following features of this case, individually and collectively, present circumstances of a kind, or to a degree, not considered by the Commission which mitigate against a drastic enhancement for the loss amount:

---

[18] Although *Emmenegger* was decided before *Booker*, it was decided after *Blakely*. Judge Lynch, the author of the opinion, therefore had to predict the Supreme Court's treatment of the Guidelines in light of *Blakely*. Judge Lynch considered three scenarios, one of which was that the Guidelines would only be advisory and that a sentence would have to be imposed in light of all the § 3553(a) factors. The quoted language was made in consideration of that hypothesis.

1. Estimates of the loss figure are highly speculative.

2. The government presented no credible evidence that Mr. Shelton had knowledge of, or agreed to, most of the improper accounting practices that were significant causes of the overall loss; thus, only a portion of the overall loss figure – whatever it may be – can be attributed to Mr. Shelton pursuant to U.S.S.G. § 1B1.3.

3. The government has already stipulated that an 18 point enhancement overstates the seriousness of Corigliano's and Pember's involvement in this offense even though they (i) were more involved and more culpable than Mr. Shelton, (ii) had complete knowledge of every aspect of the fraud, and (iii) gained millions of dollars through insider trading.

4. Mr. Shelton did not personally gain from the fraud, but rather placed himself in the *exact same position* as the victims by accumulating stock.

5. Unlike almost every other fraud case, there was no *intended* loss and even the government's cooperating witnesses intimately involved in the fraud were equivocal in recognizing their own criminal intent; as a result, there is a vast disparity between the intended loss of zero dollars and the actual loss as alleged by the government.

Each of these unusual circumstances is discussed below.

- Measuring actual loss

This was not the type of fraud that left the company's shareholders with worthless stock or its employees without a livelihood. As the government acknowledged in its summation argument:

> This company made money. This company had some real sales, had some real earnings, too. But it wasn't good enough for the defendants. This was a B company wanting to be an A company.
>
> This case comes down to, ladies and gentlemen, at the end of the day, a third grader coming home with a report card and they got a B and they don't want a B, they want an A. They want to go to their parents, the shareholders, and say, I'm an A student.

Transcript at 14832 . The market also recognized this fact. Just twelve days after the fraud had

been disclosed in April 1998, the stock price rebounded back to $24 – a price around which it

had consistently floated during the summer of 1997. In other words, an average stockholder who

purchased CUC stock before September 1997 would have been able to recoup the value of his

*entire* investment just *two weeks after* the fraud had been disclosed. This case is not a case in

which the stockholders were left holding worthless pieces of paper after the market learned of a

fraud.

The calculation of actual loss in the context of this case is exceedingly complex. The

government's simplistic approach that calculates the loss at $20 billion conveniently serves its

purpose of ascribing the maximum enhancement to Mr. Shelton under U.S.S.G. § 2F1.1, but

does little to accurately measure the real losses suffered by victims.

- <u>Shelton cannot be held responsible for unforeseeable losses</u>

Under the Guidelines, a defendant is only responsible for "all reasonably foreseeable acts

and omissions of others in furtherance of the jointly undertaken criminal activity . . ." U.S.S.G. §

1B1.3. "In order to determine the defendant's accountability for the conduct of others . . . the

court must first determine the scope of the criminal activity the particular defendant agreed to

jointly undertake (<u>i.e.,</u> the scope of the specific conduct and objectives embraced by the

defendant's agreement). . . . The conduct of others that was not in furtherance of the criminal

activity jointly undertaken by the defendant, or was not reasonably foreseeable in connection

with that criminal activity, is not relevant conduct under this provision." U.S.S.G. § 1B1.3 cmt.

note 2. "A defendant's relevant conduct does not include the conduct of members of a

conspiracy prior to the defendant joining the conspiracy, even if the defendant knows of that

conduct." *Id.*

A particularly relevant case on this point is *United States v. Greenfield*, 44 F.3d 1141, 1149 (2d Cir. 1995), in which the Court of Appeals remanded for re-sentencing because the sentencing court had not made the requisite finding that the loss amount was a reasonably foreseeable result of the jointly undertaken activity. The defendant was a member of a three-person conspiracy to install a fake ATM machine in a shopping mall to fraudulently obtain confidential bank account information.  The other two conspirators leased from an equipment supplier the $80,000 worth of equipment from which they constructed the fake ATM.  Those conspirators never paid for the equipment and defendant was held responsible for the $80,000. The Second Circuit remanded, holding that the district court had made no finding that it was foreseeable that the equipment would be stolen (and noted it was probably not foreseeable since one would expect the conspirators to want to avoid raising any suspicions about their activities). In addition, it was not clear that the failure to pay for the equipment was "in furtherance" of the jointly undertaken activity to which defendant agreed.  *See also United States v. Nachamie*, 121 F. Supp. 2d 285, 293-94 (S.D.N.Y. 2000) (reducing loss amount by proceeds obtained from a practice of double-billing insurance provider which was not reasonably foreseeable component of jointly undertaken health care fraud, particularly where defendants' knowledge of the scheme was predicated on conscious avoidance).

In this case, Mr. Shelton cannot be held responsible for any loss that resulted from (i) fraudulent activities that occurred before 1995, (ii) the topside adjustments, (iii) the improper allocations of revenue, and (iv) the improper cancellation reserve.  There is no credible evidence that Mr. Shelton had any knowledge about, or agreed to enter a scheme that involved, the fraudulent nature of these accounting manipulations.  *See Shelton's Statement of the Offense* at 11-12, 13-14, 19-23; *Memo. of Law in Supp. of Mot. of Def. Shelton for a Judgment of Acquittal*

*Pursuant to Fed. R. Crim. P. 29 or for a New Trial Pursuant to Fed. R. Crim. P. 33* (hereinafter "*Memo*") at 7-10, 16-31.

A significant portion of the improper inflation of CUC's stock price – perhaps most of it – resulted from accounting practices as to which there is no credible evidence that Mr. Shelton had knowledge of their fraudulent nature.  For example, the government concedes that the fraud was "raging" prior to 1995 (Transcript at 14831), but there is no evidence whatsoever that Mr. Shelton agreed to fraudulent accounting during this time period.  During the fiscal years ending January 1996 and January 1997, the majority of the fraudulent earnings resulted from improper revenue allocations and the under-funding of the cancellation reserve; there is, however, no credible evidence that Mr. Shelton had knowledge of the improper or fraudulent nature of these accounting manipulations.  Nor was Mr. Shelton informed about the topside adjustments, and hence was kept in the dark regarding the extent to which the company overstated its earnings on a quarterly basis.  Under U.S.S.G. § 1B1.3, Mr. Shelton cannot be held responsible for any part of the stock price inflation that resulted from these practices.  Accordingly, the quantification of the loss amount in this case is exceedingly speculative: determining either the total amount of loss or the portion that should be attributed to Mr. Shelton involves pure guesswork.

- The government has already stipulated that a +$80 million loss overstates the severity of this case

The government has previously and repeatedly stipulated that the actual loss caused by the offenses significantly overstates the seriousness of the cooperating conspirators' conduct in the fraudulent scheme.  For example, on January 14, 2000, the government entered into a plea agreement with Corigliano in which the government stipulated that:

> The above offenses caused losses in excess of $80 million. However, taking into account all of the circumstances of this case and the nature of Mr. Corigliano's role in the offense, the total loss caused by the offenses significantly overstates the seriousness of Mr. Corigliano's conduct, and excessive weight would be attached to this factor by applying the full adjustment which might otherwise be indicated under U.S.S.G. § 2F1.1(b)(1) based on that amount of loss.

GX 1546, p. 6.  The government made identical stipulations in Pember's and Sabatino's plea agreements.  *See* GX 1759, p. 6; DX 1621, p. 6.

The government's willingness to stipulate, when it suits its purposes, that the fraud loss overstates the seriousness of its cooperating witnesses' conduct cannot be squared with its claim that Mr. Shelton should be held fully responsible for losses of more than $20 billion, a claim which entails the preposterous conclusion that Mr. Shelton is at least 250[19] times more culpable than either Corigliano or Pember.

To the contrary, even viewing all of the evidence in the light most favorable to the government, there is no colorable argument that Mr. Shelton is more culpable (let alone *hundreds* of times more culpable), or was more involved in the fraud, than Corigliano or Pember. As discussed in detail *supra* Section IV.A at 60-63 and Section V.B.1 at 69-71 (*see* discussion of Mr. Shelton's role in the offense), there is no evidence whatsoever (and the government does not dispute) that Mr. Shelton had any direct involvement in the making of the topside adjustments – the practice that was the heart of this fraud.  In contrast to Corigliano and Pember, Mr. Shelton was not directly and personally involved in reversing reserves, deceiving E&Y, or establishing a cushion in the Cendant reserve. Mr. Shelton did not participate in any of the conspiratorial meetings in January 1998 at which Corigliano, Pember, Sabatino, Speaks and Sattler conspired

---

[19] 20 billion divided by 80 million equals 250.

85

to use reserves to make the 1997 numbers.  Not only did Mr. Shelton never direct anyone to reallocate revenue from deferred to immediate membership programs, there is no evidence that he knew of any these revenue adjustments, much less thought they were improper.  And, unlike the case of Corigliano or Pember, it is undisputed that Mr. Shelton had no knowledge of the under-funding of the cancellation reserve.

Nor can the government argue that the loss amount should be greater in Mr. Shelton's case because he refused to plead guilty.  The loss amount is meant to reflect the harm (or intended harm) to the victims as a result of the defendant's participation in the criminal activity. Corigliano's and Pember's cooperation with authorities, and Mr. Shelton's decision to exercise his right to plead not guilty, have no bearing upon the losses suffered by the victims. Indeed, the Guidelines explicitly state that a defendant's "refusal to assist the authorities in the investigation of other persons may not be considered as an aggravating sentencing factor," U.S.S.G. § 5K1.2, and that a defendant's exercise of his right to plead not guilty cannot be considered aggravating factors.  *See* U.S.S.G. § 1C1.1 Application Note 1.  In this case, Mr. Shelton cooperated with the Audit Committee and was interviewed by the government at the United States Attorney's Office. Thus, his subsequent decision to go to trial and not cooperate thereafter cannot be used as an aggravating factor. And Pember's and Corigliano's cooperation is already taken into account by other sections of the Guidelines. *See, e.g.,* U.S.S.G. § 5K1.1; U.S.S.G. § 3E1.1. Accordingly, if the actual loss grossly overstates the seriousness of Corigliano's or Pember's involvement in the fraud, then that proposition must hold true for Mr. Shelton as well, regardless of their respective decisions of how to plead.  *See, e.g., United States v. Jackson*, 798 F. Supp. 556 (D. Minn. 1992) (downward departure from loss enhancement appropriate where "actions of other persons involved in the [scheme] aided substantially and caused the loss.")

- <u>Shelton did not sell any stock to gain from this fraud</u>

Another factor counseling against an 18-point enhancement is that Mr. Shelton did not profit from the fraud through stock sales while the stock was inflated by fraud; indeed, he lost millions of dollars in personal wealth because of it.[20]  Mr. Shelton did not sell a single share of CUC/Cendant stock after January ***1997***.  In fact, during 1997, Mr. Shelton continued to increase his holdings of CUC/Cendant stock, by exercising options, paying taxes, and holding stock. Corigliano, on the other hand, sold over $23 million of stock in the twelve months preceding the fraud's disclosure.  Likewise, Pember sold millions of dollars of stock in the 1997 to 1998 time frame.  In contrast to these conspirators -- whom the government stipulated should not receive an 18 point enhancement – Mr. Shelton lost over $30 million in personal wealth when the fraud was disclosed in April 1998.  By accumulating Cendant stock right up to the day of the corrective disclosure, Mr. Shelton ***placed himself in the exact same position as the victims***.

A major drawback of the Guidelines is they give little to no weight to a defendant's motive.  As one court has observed:

> Defendant's offense level under the advisory Guidelines was largely the product of the loss amount.  One of the primary limitations of the Guidelines, particularly in white-collar cases, is their mechanical correlation between loss and offense level. . . .  In the present case, defendant did not act for personal gain.  He made loans outside his authority and was reckless with his employer's money.  But that is not the same as stealing it.

---

[20] *See, e.g., United States v. Broderson*, 67 F.3d 452, 459 (2d Cir. 1995) (district court did not err in determining fraud case fell outside heartland where defendant received none of the proceeds of the fraud, among other factors); *United States v. Walters*, 87 F.3d 663, 671-72 (5th Cir. 1996) (finding no error in district's courts downward departure pursuant to U.S.S.G. § 2F1.1 commentary note 10, where defendant "did not receive any of the misappropriated funds"); *United States v. Ranum*, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005) (sentencing court departed significantly from Guidelines range where defendant's motive was not related to personal financial gain); *cf. United States v. Stuart*, 22 F.3d 76 (3rd Cir. 1994) (where defendant was convicted of receiving stolen goods in the amount of $129,000, appellate court *sua sponte* determined that 9 point enhancement pursuant to USSG § 2B1.1 likely overstated seriousness of defendant's conduct where he only received a $2000 fee for his participation).

*Ranum*, 353 F. Supp. 2d at 990.  Even the cooperating conspirators testified that their motive was not to get rich; indeed, they testified that they never made the connection in their own minds that their fraudulent activities inured to their personal, financial gain.  As the government alluded to in its summation argument, the conspirators' motive was one of pride, of "B students" wanting to impress their "stockholder-parents" with a grade of "A".  Simply put, Mr. Shelton is not as culpable as a fraudster who steals, for his own financial gain, an amount that the government alleges was lost in this case.

- Lack of intended harm

The typical fraud involves a deceptive scheme to procure money or property from a victim. In this case, the conspirators intended to falsely inflate the price of CUC's stock in perpetuity, without any eventual drop in that stock's value. The perpetrators hoped and intended that all CUC stockholders would gain from the fraud.  Accepting their testimony as the government does, none of the conspirators – not even Corigliano or Pember – acknowledged to themselves at the time that they were doing anything criminal. Although the lack of any intent to cause harm does not excuse the conspirators' conduct, it is certainly a feature of this case that takes it out of the heartland of typical fraud cases and mitigates against a drastic 18 point enhancement for the alleged loss amount.  *See Nachamie*, 121 F. Supp. 2d at 295-97 (defendants' inability to fully appreciate criminal nature of the jointly undertaken scheme a reason to consider fraud case not within the heartland); *United States v. Pimental*, Crim No. 99-1031-NG, 2005 WL 958245, at *10 (D. Mass. Apr. 21, 2005) (post-*Booker* sentencing decision finding loss amount overstated defendant's culpability since defendant did not set out to defraud his insurers of the loss that ensued; court sentenced defendant to probation instead of government's suggested

punishment of 33 months imprisonment); *Ranum*, 353 F. Supp. 2d at 990 (downward departure appropriate where defendant did not intend to harm victim even if defendant acted recklessly).

Indeed, in this case the evidence showed that Mr. Shelton was purposefully deceived about significant aspects of the fraudulent scheme. Pember testified that Corigliano lied to Shelton about the revenue allocations and the income effect of the rejects in transit. *See* Transcript at 2912-4. Pember gave Shelton the impression that there was nothing wrong with using reserves to increase revenue. *See* Transcript at 2879. Sabatino testified that the topside adjustments were successfully *concealed* from Shelton. *See* Transcript at 4644-45. The evidence also showed that Bell and Corigliano were the architects of this fraud, and that Shelton, if he had knowledge of anything improper, only obtained such knowledge very late in the life of the conspiracy. All of these facts take Shelton's case outside the heartland of typical fraud cases. *See Nachamie*, 121 F. Supp. 2d at 295-97 (finding downward departure appropriate where defendants did not devise the fraudulent scheme that they joined through their conscious avoidance, who acted with "diminished intent," and who were deceived regarding important aspects of the scheme); *United States v. Costello*, 16 F. Supp. 2d 36, 38 (D. Mass. 1998) (granting downward departure where defendants "did not come up with the scheme at the outset"). Moreover, this basis for finding the case outside the heartland is available even if the court does not find that Shelton deserves a reduction in offense level for his minimal or minor role in the offense. *See Nachamie*, 121 F. Supp. 2d. at 297 n.11 ("In addition, the fact that I rejected a mitigating role adjustment does not prevent me from departing on the analytically distinct basis that the defendants lacked initial intent and operated for a period under diminished intent.").

- Conclusion on loss amount

This case falls far afield from the heartland of typical fraud cases.  The Commission would not have contemplated a fraud where estimates of the loss vary by billions of dollars, where much of the loss was not a foreseeable consequence of the jointly undertaken activity, where many of the victims were able to fully recover their losses, where there were no intended victims, where the defendant did not personally gain, where the defendant was deceived by the other coconspirators, and where the government had previously stipulated that the actual loss overstates the seriousness of the involvement of other coconspirators who are clearly more culpable than the defendant in question.  This case presents a truly unique set of factors and exhibits none of the hallmarks of a typical fraud case.  The court should accordingly reduce the 18-point enhancement to better reflect the true nature of this offense and Mr. Shelton's participation in it.

**4.  Numerous enhancements being considered are based on overlapping conduct**

The Probation Office is recommending numerous enhancements which are based upon identical or overlapping conduct.  For example, the (i) loss amount, (ii) leadership role, (iii) abuse of a position of trust and (iv) scheme to defraud more than one victim, substantially overlap in their factual bases.

When a defendant faces a sentence at the high-end of the Guidelines' sentencing table, the Second Circuit allows a sentencing court to implement a downward departure upon recognition of the fact that a number of the applicable sentence enhancements are based upon overlapping conduct.  In *United States v. Lauersen*, the Second Circuit said that "we think that the cumulation of such substantially overlapping enhancements, when imposed upon a defendant

90

whose adjusted offense level translates to a high sentencing range, presents a circumstance 'to a degree' not adequately considered by the Commission, see 18 U.S.C. § 3553(b)(1), and therefore permits a sentencing judge to make a downward departure." 348 F.3d 329, 344 (2d Cir. 2003), *aff'd on reh'g*, 362 F.3d 160 (2004), *vacated for reconsideration*, ___ U.S. ___, 125 S. Ct. 1109 (2005). The appellate court explained that enhancements based on overlapping conduct can have a disproportionate impact upon a sentence at the high-end of the sentencing table because a change in offense level at the high-end affects the sentence much more than the same change in offense level at the low-end of the table.[21]

The Second Circuit reapplied this doctrine in *United States v. Jackson*, 346 F.3d 22 (2d Cir. 2003). Jackson was convicted of bank fraud, credit card fraud, mail fraud, wire fraud, and conspiracy. The sentencing judge imposed a 10-point enhancement for the loss amount, a two point enhancement because the offense involved more than minimal planning, a four point enhancement because Jackson was an organizer or leader of an extensive criminal activity, and a two point enhancement for use of sophisticated means. Although the appellate court affirmed these enhancements, it noted that "they are little more than different ways of characterizing closely related aspects of Jackson's scheme." *Id.* at 26. The court emphasized that "any one enhancement increases the sentencing range by a far greater amount when the enhancement is combined with other enhancements than would occur if only one enhancement is imposed." *Id.*

---

[21] Defendant Lauersen was an obstetrician and gynecologist convicted of mail fraud, health care fraud and making false statements relating to health care matters. The district court determined Lauersen's offense level to be 29, which included a thirteen level enhancement for the loss amount, and a two level enhancement for abuse of a position of trust. On appeal, the appellate court ruled that the offense level should have been increased four points to 33 because Lauersen's conduct also affected a financial institution and he received more than $1 million in proceeds. The appeals court noted, however, that a downward departure may be warranted on remand because *Lauersen* faced a sentence at the high-end of the sentencing table and these enhancements were based on overlapping conduct. *See Lauersen*, 348 F.3d at 344.

Because the sentencing court did not have the benefit of the Second Circuit's decision in *Lauersen*, the appellate court remanded for reconsideration.

The Second Circuit reconsidered and re-affirmed its *Lauersen* and *Jackson* holdings, stating that "we continue to believe that when the addition of substantially overlapping enhancements results in a significant increase in the sentencing range minimum (as it does at the higher end of the sentencing table), a departure may be considered." *United States v. Lauersen,* 362 F.3d 160, 164 (2d Cir. 2004), *vacated for reconsideration,* ___ U.S. ___, 125 S. Ct. 1109 (2005). With respect to its ruling in *Jackson*, the court noted that:

> the cumulative effects of the overlapping enhancements for the amount of the loss, more than minimal planning, sophisticated means, and leadership of an extensive criminal activity, combined with the significant impact of these enhancements at the higher end of the sentencing table permitted consideration of a departure by the District Court. As we pointed out, 'Most fraud schemes that obtain more than one half million dollars involve careful planning, some sophisticated techniques, and are extensive.'

*Lauersen,* 362 F.3d at 162-63 (quoting *Jackson,* 346 F.3d at 25-26); *see also United States v. Savin,* No. S1 00 Cr. 45 (RWS), 2004 WL 1161323, at *7-9 (imposing downward departure on ground that several enhancements were based on overlapping conduct).[22]

---

[22] Although the Supreme Court has recently vacated *Lauersen* in light of *Booker,* the policies which underwrote the *Lauersen* decision will continue to have an effect within the new sentencing scheme notwithstanding the excision of § 3553(b)(1). In *Booker,* the Supreme Court severed and excised 18 U.S.C. § 3553(b)(1) which made the Guidelines binding. However, in so doing, the Court also excised the subordinate clause of that section which read: ". . . unless the court finds that there exists an aggravating or mitigating  circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission . . ." In *Lauersen,* the Second Circuit relied upon that subordinate clause to find that, when a defendant faces a sentence at the high end of the sentencing table, the existence of several sentence enhancements based on identical or overlapping conduct is a mitigating circumstance present to a degree not adequately taken into consideration by the Sentencing Commission. *See Lauersen,* 348 F.3d at 344. Booker thus excised the statutory grounding for the *Lauersen* decision, which explains why, just twelve days after *Booker* was decided, the Court vacated and remanded *Lauersen* for reconsideration. *See* ___ U.S. ___, 125 S. Ct. 1109 (2005). Nevertheless, nothing in the Court's vacatur indicates its disagreement with the Second Circuit's finding that the existence of numerous enhancements based on overlapping conduct presents a mitigating circumstance warranting downward departure from the otherwise applicable Guidelines range.

The arguments in connection with enhancements for (i) abuse of a position of trust, (ii) organizer or leader, and (iii) more than minimal planning, all rely upon the fact that Mr. Shelton was an officer and director of CUC who supervised more than five employees and who abused his position of trust. Accordingly, a *Lauersen* departure is appropriate for this overlapping conduct that significantly impacts Mr. Shelton's sentence at the high-end of the sentencing table.

In addition, the basis for the "more than minimal planning" enhancement is completely subsumed within the justification for the enhancement for Mr. Shelton's alleged role as leader or organizer of an extensive criminal enterprise. The role enhancement can only be imposed where "the criminal activity involved five or more participants or was otherwise extensive." When that criminal activity is fraud, then *any* fraud that involves five or more participants or was otherwise extensive necessarily "involves more than minimal planning." In other words, in fraud cases, an enhancement for being a leader or organizer of an extensive fraud *necessarily entails* an enhancement for more than minimal planning in a fraudulent scheme.

Similarly, the enhancements for loss amount, abuse of a position of trust, and more than minimal planning all rely upon the fact that there were many shareholders who were harmed in this fraud. It would be impossible to cause a loss in the billions of dollars, as the government alleges here, without more than minimal planning or without scheming to defraud more than one victim. The government's argument for abuse of a position of trust also relies upon the fact that thousands of shareholders had their trust broken – a fact that is adequately taken into account by the loss amount.

Therefore, since numerous enhancements in this case are based on substantially overlapping conduct, a downward departure is justified.

93

## 5.    Combination of mitigating factors

While Mr. Shelton submits that the factors enumerated in this memorandum constitute a basis for downward departure independently, they certainly warrant a downward departure when considered in conjunction with one another and with the other information provided herein. The Sentencing Commission contemplated that a combination of factors[23] could warrant a downward departure, by stating that:

> The Commission does not foreclose the possibility of an extraordinary case that because of a combination of such characteristics or circumstances, differs significantly from the heartland of cases covered by the guidelines in a way that is important to the statutory purposes of sentencing, even though none of the characteristics or circumstances individually distinguishes the case.

U.S.S.G. § 5K2.0. The Court of Appeals for the Second Circuit has determined that in extraordinary cases, the district court "may downwardly depart when a number of factors that, when considered individually, would not permit a downward departure, combine to create a situation that differs significantly from the 'heartland' cases covered by the guidelines. *United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996);[24] *see, e.g., United States v. Jagmohan*, 909 F.2d 61 (2d Cir. 1990) (combination of employment record and unusual circumstance of commission of offense); *United States v. Broderson*, 67 F.3d 452, 4 59 (2d Cir. 1995) (same); *United States v. Jones*, 158 F.3d 492, 501, 504 (10th Cir. 1998); *United States v. Cook*, 938 F.2d 149, 153 (9th Cir. 1991) ("There is no reason to be so literal-minded as to hold that a combination of factors cannot

---

[23] We are mindful that this Court has expressed skepticism of a "combination of factors" as a basis for a downward departure in previous matters; however, this basis for downward departure is included in light of the Second Circuit's approval of it in *United States v. Rioux*, 97 F.3d 648 (2d Cir. 1996).

[24] In *Rioux*, the Court of Appeals held that the district court did not abuse its discretion by departing downward from Level 20 to Level 10, in part on the basis of the defendant's charitable efforts and civic good deeds, which included fundraising for the Kidney Foundation. *See Rioux,* 97 F.3d at 663.

94

together constitute a mitigating circumstance. [A] unique combination of factors may constitute the circumstance that mitigate."); *United States v. Ribot*, 97 F. Supp. 2d 74, 85 (D. Mass. 1999).

When considered together, the unusual circumstances of this case – Kirk Shelton's extraordinary charitable activities and good works, his minor role in the offense, the fact that the offense conduct is contrary to the manner in which he has led his life, the overlapping enhancements, the loss figure overstates the seriousness of his conduct – present a situation "sufficient to take the case out of the Guidelines' heartland," *see Koon v. United States*, 518 U.S. 81, 96 (1996), and present a compelling case for a downward departure.

## VI.    A Sentence Of Probation Would Sufficiently Satisfy The Purposes Of Sentencing

The sentence imposed by this Court must be "sufficient, but not greater than necessary" to comply with the general purposes of sentencing applicable in this case: (1) afford adequate deterrence to criminal conduct; (2) protect the public from further crimes by Mr. Shelton; and, (3) reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense.[25] *See* 18 U.S.C. § 3553(a)(2). A sentence of probation is the minimum sentence necessary to comply with these general purposes.

### A.    Adequate Deterrence

This Court is required to consider the need for the sentence to afford adequate deterrence to criminal conduct. 18 U.S.C. § 3553(a)(2)(B). To address this, we reviewed the criminological literature which reveals that criminal sanctions have little general deterrent effect on criminal behavior. More importantly, to the extent that criminal sanctions do have a general deterrent

---

[25] 18 U.S.C. § 3353(a)(2)(D) directs the sentencing court to consider the need for the sentence imposed "to provide the defendant with needed education or vocation training, medical care, or other correctional treatment in the most effective manner." Given Mr. Shelton's background, training and education, this provision is not applicable.

effect, the *certainty* (how certain an offender will be detected) and *swiftness* of punishment have a far greater deterrent effect than the severity of the sanction.

    The concept of deterrence assumes that fear of legal sanctions prevents individuals from breaking the law. To the extent that formal punishment risks and consequences are assessed to be greater than the benefits of the criminal act, the rational individual will obey the law.[26] Some suggest that the greatest deterrent impact occurs when criminal acts are rational and calculative in nature. Most types of white-collar crime, therefore, should be more deterrable than forms of violence. In a recent work on corporate crime, Sally S. Simpson, a reputed criminologist, reviewed the decades of research literature on deterrence and white collar crime and concluded:

> [T]he importance of formal legal sanctions for deterring criminal conduct appears to depend on one's commitment to criminal activities, the influence of other inhibitory mechanisms in one's life (e.g., informal sanctions, educative and habituative influences), the perceived benefits of illegal conduct relative to its costs, and alternative opportunity structures…**When sanction threats are taken into account by potential offenders, certainty of punishment tends to matter much more than sanction severity. The body of evidence, then, tends to only weakly support a deterrence perspective**.[27]

    Simpson further found that "deterrence is unlikely for both the corporation and its officers or managers. Punitiveness, as a strategy for corporate crime control, is not well grounded in the empirical literature."[28] She further discussed the importance of extralegal factors in deterring criminal behavior:

---

[26]Sally S. Simpson, *Corporate Crime, Law, and Social Control* (Cambridge University Press 2002).

[27]*Id.* at 35 (emphasis added).

[28]*Id.* at 6.

> Perhaps the most important explanation for why managers are undeterred by legal sanction threats is that other social control mechanisms are more powerful inhibitors of misconduct….There are many reasons to believe that socially or self-imposed costs will be more influential over managers than those imposed by the state…Engaging in crime would threaten meaningful commitments and attachments for corporate personnel. To the extent that managers are embedded in a valued social network based on ties with conventional others (e.g., peers, family, and friends), the discovery of unethical conduct can threaten these ties. If the opinions of friends and family matter to managers, then the accompanying threat to these relationships should have inhibitory effects.[29]

Importantly, we do not imply that the criminal justice system has no deterrent effect on criminal behavior. Indeed, a recent seminal assessment of the deterrence literature concluded that the collective actions of the criminal justice system (policing, courts, corrections) exert some deterrent effect on criminal behavior.[30] Studies also indicate that extra-legal consequences – moral and social – seem to have a stronger effect on behavior than prison or legal consequences.[31] We respectfully submit that empirical research does not substantiate the assertion that a lengthy term of incarceration has a general deterrent effect. The largest impediment to a deterrent effect, we believe, is the lack of certainty and swiftness of punishment. Conversely, research indicates that the severity of punishment has little if any preventive impact on possible criminal wrongdoers.

This theory was recently articulated by the Honorable Ewing Werlein, Jr. In sentencing Daniel Bayly, a Merrill Lynch executive accused and convicted by the government of

---

[29]*Id.* at 59.

[30]Daniel S. Nagin, "Criminal Deterrence Research at the Outset of the Twenty-First Century," in Michael Tonry (ed.), *Crime and Justice*: *A Preview of Research*, vol. 23 (Chicago: University of Chicago Press, 1998), p. 3.

[31]Nagin, D.S., and Pogarsky, G., Integrating celerity, impulsivity, and extralegal sanction threats into a model of general deterrence: Theory and evidence, *Criminology*, 39(4) pp. 404-430 (2001).

participating in a fraud that the government argued could have caused a decline in Enron stock

price of $383 million, the Court spoke to deterrence:

> With respect to this defendant, the Court does not anticipate that he
> will be a recidivist. But it is true that punishment has the function
> of deterring like criminal conduct in others who might be tempted
> to commit such a crime. And this is where the aspect of judgment,
> I suppose, comes into effect in a well-publicized white collar
> crime.
>
> The question is whether it takes very long sentences, as the
> Government argues, to serve as an effective deterrent or not. Some
> persons – I believe that Chuck Coulson is one – has argued that in
> those kinds of cases a shorter prison term is appropriate, that the
> financial penalties perhaps are more effective. But at the same
> time, there's no question that there's considerable difference in the
> way people approach this philosophically and what they believe is
> best suited for a particular – for this type of an offense.
>
> I believe that a sentence in the range indicated here will serve a
> deterrent thing. For a person who has been a leader in the
> investment banking world to go to prison at all is a deterrent effect
> upon others. The ignominy of a conviction and a sentence by one
> who commits a crime of this type is quite different than what is
> tolerated by persons that often appear with respect – in this Court
> with respect to other offenses they have committed where the
> ignominy of a conviction is not that serious and the protection of
> the public from other crimes is a very key ingredient to
> sentencing.[32]

In this case, Kirk Shelton already has been severely punished. Over the past seven years

he has lost his career and his reputation in the business world. Clearly, no more of an example

needs to be set. This exact point was recognized by many people who know Mr. Shelton and

who have watched him struggle under the cloud of the accusations over the past seven years. His

wife, Amy, wrote the following:

---

[32]*United States v. Daniel Bayly,* H-CR-03-363, Sentencing Transcript at 60-61, attached hereto as
Exhibit D.

As his wife, I would like to tell you what Kirk never would: he has already paid a large price through the painful suffering and humiliation he has had to endure these past seven years, including the pain and humiliation of losing his job and his reputation, the pain of watching his children suffer, the pain of knowing there is a possibility he may not be living with them or me for a long time to come, the pain of feeling he will not be there for the kids he helps at the YMCA, the pain of seeing the hurt in his family and friends' eyes. Perhaps I am naïve or this is just a frightened, sad wife speaking about the fate of the man she loves, but I wonder if some Higher Power might not consider that when everything is taken in account and added up – from the fabric of Kirk's life to his generosity and decency, from his devotion to family, friends and those less fortunate to his spirituality – that he has not already paid a very large price.

*Letter from Amy M. Shelton*, Letters App. at 003.

Likewise, one of Mr. Shelton's friends, Patrick G. Healy, offered similar observations:

… [I]n terms of punishment, I think we should remember that Kirk has already experienced enormous levels of punishment. He has fallen from the heights of being a fully productive, high performing #2 executive in a Fortune 500 Company into a terrible abyss. He has spent the past 6 years of his life not working and not doing what he loves. He has spent the past 6 years with lawyers, prosecutors, the SEC, the Justice Department, the FBI, etc. He has spent the past 6 years planning his defense, and worrying about his future – both for himself and his family. He has experienced the enormous embarrassment of having his name plastered across the media, and labeled a criminal (even before his trial). He – and his family – has faced the embarrassment of former friends and acquaintances distancing themselves from the Sheltons. He has faced the anger of having his children coming home from school after being teased and ridiculed by their classmates. And, finally, he and his family will most likely now experience complete and utter financial ruin – virtually everything he and Amy have worked for over the past 25 years will most likely be obliterated; his wife and kids will experience a very different lifestyle than they have been accustomed to. All, while Kirk possibly looks out from behind bars. Punishment? Kirk Shelton has been severely punished already.

*Letter from Patrick G. Healy*, Letters App. at 068-069; *see also Letter from Gene Szczecina,*

Letters App. at 018-019 ("This stress has totally dominated their lives for the past seven years.

… I personally believe that Kirk and his family have already paid a deer [sic] price by dealing

with this stress for such a long period of time."); *Letter from Vicki de Angeli,* Letters App. at 009

("These past seven years have been a nightmare for us all, and Kirk's family has been

particularly devastated. I have seen my brother age 20 years in seven.").

### B.    Protecting The Public

Another factor that the court must consider is the risk of recidivism by the particular

defendant.  *See* § 3553(a)(2)(C).  Although the Guidelines take into account a defendant's

criminal history, they ignore other, relevant factors that are just as pertinent to this inquiry:

> [A] fact-sensitive assessment of the need 'to protect the public
> from further crimes of the defendant,' one of the factors that
> Congress has instructed the courts to consider, 18 U.S.C. §
> 3553(a)(2)(C), is conspicuously absent from the Guidelines. . . . .
> Unlike defendants whose crimes require no special skill or
> position, [defendant] Emmendegger yielded to a temptation and
> committed a crime particularly adapted to his chosen career.  That
> career is over, and his potential to commit this particular type of
> crime has been eliminated.

*Emmenegger*, 329 F. Supp. 2d at 428.

There is no risk in this case that Mr. Shelton will re-offend. *See* PSR, ¶ 164 ("Mr. Shelton

does not appear to pose a substantial risk to the community, financially or otherwise.").  For all

practical purposes, he will never be an executive of a public company again.  The SEC has

commenced a proceeding against him in which it seeks a lifetime director and officer bar.  The

investigation and prosecution has had a devastating impact, for more than seven years already,

on his family and professional life.  He has suffered a loss of his profession, wealth and

reputation.  Moreover, viewed in the context of his entire life, Mr. Shelton's alleged misconduct

is best described as an aberration in a career otherwise committed to honesty and integrity.  Far

from being a risk to society, Mr. Shelton continues to strive to improve his community through

public and charitable service.  This is not the type of individual whose removal from society is a

necessary safeguard to protect against future harm.  *See, e.g., Ranum*, at 990-91 (significant

downward departure appropriate in bank fraud case where defendant was no longer able to work in banking industry, was not a danger to society, and was highly unlikely to re-offend).

### C.    Just Punishment

This Court also is required to consider the need for the sentence to reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense. 18 U.S.C. § 3553(a)(2)(A). "[P]unishment must not be draconian; the judge who sentences must be sensitive to both the goals of society reflected by the efforts of the government, and special circumstances of those awaiting sentence. The judge must sentence in a manner that reflects his role as the implementor of society's search for justice, as reflected by due and timely punishment of those who transgress, without ever being indifferent to a defendant's plea for compassion, for compassion also is a component of justice." United States v. Kloda, 133 F. Supp. 2d 345, 348 (S.D.N.Y. 2001).

Based upon all the information provided in the memorandum – the facts and circumstances of this case, the evidence showing Mr. Shelton's lack of knowledge of the fraud, the aberrational nature of his involvement, his life-long history of good works, his excellent character, no prior record, the impact this matter has had upon him and his family, the lack of personal gain, and the others issues raised – a just sentence would be one that does not separate him from society. As recognized by Laurie Doering, a family friend:

> Incarceration would further *prevent* Kirk from giving back to society in the form of much needed community service. I strongly believe that there are many, more purposeful ways to punish and teach reform to people who are accused of non-violent crimes such as this. The benefits of using Kirk to help others in need are great and would be advantageous to society as a whole. He is an educated person who, again, is NOT a threat to humanity.
> ***
> Kirk's case is a prime example of how a convicted individual could *contribute* to society, perhaps by performing years of much need community service, even with a possible imposition of house arrest and lifestyle change. Kirk will be further punished by virtue of perception in his community. It seems to be much more appropriate, and perhaps more

difficult for Kirk, to impose a sentence of service. Most importantly, Kirk's children would continue to have their father as a part of their lives – something that they desperately need.

*Letter from Laurie Doering*, Letters App. at 076.

**VII.    Mr. Shelton Should Receive A Sentence Consistent With Those Imposed Upon Similarly Situated Fraud Offenders In Order To Avoid Unwarranted Disparity**

This Court must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *See* 18 U.S.C. §3553(a)(6). In fact, this mandate, to avoid unwarranted sentence disparities, was the primary impetus for the creation of the Federal Sentencing Guidelines.

In 1984, Congress passed the Sentencing Reform Act (SRA) in an attempt to eliminate the disparities for similarly situated offenders that had existed for the prior 50 years under the indeterminate sentencing model.  The SRA created and authorized the United States Sentencing Commission to establish sentencing policies and practices that:

> [P]rovide certainty and fairness in meeting the purposes of sentencing, <u>avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct</u> while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices.

28 U.S.C. §991(b)(1)(B).  (emphasis added).

The United States Sentencing Commission continues to underscore the need to avoid unwarranted sentencing disparity.  Specifically, the Commission stated in its 2002 Annual Report:

> The <u>guidelines seek fairness</u>, which is the establishment of sanctions proportionate to the severity of the crime and <u>the avoidance of unwarranted disparity, by setting similar penalties for similarly situated offenders</u>.

***

Disparity in sentencing has long been a concern for Congress, the criminal justice community, and the public.

U.S. Sentencing Comm'n, 2002 Annual Report (emphasis added).

In reviewing 18 U.S.C. §991(b)(1)(B), relevant sections of the Federal Sentencing Guidelines, and pertinent case law, the Ninth Circuit Court of Appeals similarly noted:

> Downward departure to equalize sentencing disparity is a proper ground for departure under the appropriate circumstances. See 28 U.S.C. 991(b)(1)(B); U.S.S.G. Ch. 1, Pt. A, p.s. 3 ("Congress sought reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders."). Indeed, a central goal of the Sentencing Guidelines is to eliminate sentencing disparity. See Koon, 518 U.S. at 113 ("The goal of the Sentencing Guidelines is, of course, to reduce unjustified disparities and so reach towards the evenhandedness and neutrality that are the distinguishing marks of any principled system of justice.").

United States v. Daas, 198 F.3d 1167 (9th Cir. 1999) (emphasis added).

The Guidelines determination that Mr. Shelton should be incarcerated in the range of 151-188 months is inconsistent with those of other defendants who have been sentenced for similar offenses. [33] A review of reported sentences pronounced by the Second Circuit from 1999

---

[33] This sentencing range also is unreasonable since Mr. Shelton would be treated as more dangerous and culpable than most violent felons. Mr. Shelton's offense level is 34, whereas the base offense level for second degree homicide is 33. See U.S.S.G. § 2A1.2. Had Shelton and Corigliano conspired to murder someone (rather than allegedly conspiring to use merger reserves improperly), Mr. Shelton's offense level would be 28, and he would face half the amount of incarceration than the government urges here. See U.S.S.G. § 2A1.5. Shooting a victim in the face with a firearm and causing the victim permanent blindness would result in an offense level of 24, and _less than one-third_ of the amount of incarceration. See U.S.S.G. § 2A2.2 (15 base level + 5 for firearm + 6 for permanent bodily injury – 2 since the previous two enhancements cannot aggregate to more than 9 points). Raping a 12 year-old at gunpoint would result in an offense level of 33 – still less than what the government urges here. See U.S.S.G. § 2A3.1 (27 base level + 4 for use of firearm + 2 for minor). Under no reasonable conception of fair punishment is Mr. Shelton as culpable or in need of restraint as a murderer or a violent rapist of a minor.

Nor does the allegedly large loss amount justify an unusually harsh sentence in this case. Had Shelton and Corigliano burglarized a museum and thereby caused a loss of $20 billion, their offense level would be 22 and Shelton would face just over one-quarter the time of incarceration. See U.S.S.G. § 2B2.1 (12 base offense level + 8 loss amount + 2 for minimal planning). It is unreasonable to suppose that

103

to 2002 reveals that the average sentence for fraud offenses is far lower than the range of imprisonment recommended by the guidelines for Kirk Shelton.[34]  This data, compiled by the United States Sentencing Commission, shows that from FY 1999 until 2002, 1,288 individuals were sentenced for fraud offenses in the Second Circuit. Of these, 762 were sentenced to a period of incarceration and 526 individuals received a sentence of probation and/or fine without any term of incarceration.  The average sentence length was 24.2 months of imprisonment.  During this same period, 10 fraud offenders were sentenced in the Second Circuit where the loss amount was over $100 million.  In these cases, the average sentence length was 59.6 months of incarceration. **Most significantly, 5 of these 10 offenders were not sentenced to any term of imprisonment but instead received a sentence of probation and/or ordered to pay a fine.** Based on the foregoing, it is clear that all fraud offenders who have been sentenced in the Second Circuit during this four-year period have received substantially lower sentences than the Guidelines imprisonment range set forth in the PSR. The following chart summarizes these findings:

---

a burglar who causes a $20 billion loss is only one-quarter as culpable as a fraud defendant who allegedly caused the same amount of loss.

[34] Attached at Exhibit E is a description of the sentence that each defendant convicted of Title 18 U.S.C. §371; 18 U.S.C. §1341; 18 U.S.C. §1343; or Title 15 U.S.C. §78ff received during the fiscal years 1999 until 2002 in the Second Circuit as well as a summary of these sentences. This data was gathered from the Interuniversity Consortium for Political and Social Research (ICPSR) (http://www.icpsr.umich.edu/nacjd/archives.html).

| Sentences Imposed for Fraud Offenses<br>2nd Circuit 1999 – 2002 | | | | |
|---|---|---|---|---|
| Loss Amount | Total Cases | Fine/<br>Probation<br>Only | Prison | Average<br>Prison Length |
| $0 - $1 Million | n=1000 | 449 (44.9%) | 551 (55.1%) | 19.3 MO |
| $1 Million - $10 Million | n=228 | 61 (26.8%) | 167 (73.2%) | 33.2 MO |
| $10 Million - $50 Million | n=46 | 11 (23.9%) | 35 (76.1%) | 50.1 MO |
| $50 Million - $100 Million | n=4 | 0 (0.0%) | 4 (100.0%) | 49.3 MO |
| Over $100 Million | n=10 | 5 (50.0%) | 5 (50.0%) | 59.6 MO |
| All Fraud Cases | n=1288 | 526 (40.8%) | 762 (59.2%) | 24.2 MO |

In reviewing this aggregate data, we recognize that this data cannot identify particular individuals. Therefore, in addition to the aggregate data, we have attached at Exhibit F a chart that provides a sampling of over 50 cases in which fraud has been committed as well as the sentences imposed on the offenders of these frauds. This chart covers defendants sentenced prior to the guidelines, sentenced imposed under the guidelines, and sentences imposed post-<u>Booker</u>. As the Court will see, the sentences imposed are also far less severe than the advisory sentencing guideline range recommended by the Probation Office in this case.

As explained above, a sentence within the guideline range for Kirk Shelton would result in a significant and unwarranted disparity as compared to sentences imposed by the Second Circuit for other similarly situated fraud offenders. Therefore, a sentence outside of the advisory guideline range would avoid this unwarranted disparity and be the most appropriate disposition in this case.

**VIII.    The Need To Provide Restitution To Any Victims Of The Offense**

In the event the Court determines restitution is appropriate, Mr. Shelton asks that it be

imposed in an amount that is warranted by the circumstances in this case.[35]

**IX.    Sentencing Recommendation**

In fashioning an individualized sentence in this case, we respectfully request that the

Court consider the effectiveness and benefits of community service as a form of punishment.

Judges, probation officers, and other criminal justice practitioners have long viewed community

service as a well-established form of punishment, supervision, and rehabilitation used by courts

as a responsible, offender-specific sentencing alternative.[36] The wise endorsement of community

service by courts can be attributed to individual judges who recognize that it "…is a burdensome

penalty that meets with widespread public approval, is inexpensive to administer…produces

public value…and…can to a significant extent be scaled to the seriousness of crimes."[37]

---

[35] Notwithstanding the finding of Probation that "[r]estitution is applicable pursuant to 18 U.S.C. §§ 3663 and 3663A" (PSR at ¶ 158), the exception carved out in 18 U.S.C. 3663A(c)(3) may be applicable in this case. That exception holds that mandatory restitution pursuant to sections 3663 and 3663A is inapplicable where the court finds that:

  A.  the number of identifiable victims is so large as to make restitution impracticable; or

  B.  determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

U.S.C. 3663A(c)(3); s*ee also In re W.R. Huff Asset Mgmt. Co.*, No. 05-2619-op (L), ___ F.3d ___, 2005 U.S. App. LEXIS 10192, at *20-21 (2d Cir. June 3, 2005) (finding mandatory restitution inappropriate in complex case of securities fraud involving multiple victims).

[36]In a May 24, 1994 article, the *Wall Street Journal* noted, "Tight budgets and overcrowded prisons are two reasons why judges want to find new ways to punish criminals who aren't considered a threat to society.

[37]*Intermediate Sanctions in Sentencing Guidelines*, National Institute of Justice, May 1997.

A recent publication by the United Stated Probation and Pretrial Services describes community service as "a flexible, personalized, and humane sanction, a way for the offender to repay or restore the community. It is practical, cost-effective, and fair – a 'win-win' proposition for everyone involved." [38] In selecting an appropriate candidate to perform community service, U.S. Probation & Pretrial Services recommends:

> …Courts can use community service successfully with a wide spectrum of offenders: corporations and individuals, first offenders and recidivists, the indigent and the affluent, juveniles and senior citizens. Not every offender is a good candidate for community service…Courts look for offenders with personal and social stability, who are willing and motivated, and who have no history of violence.

Clearly, Kirk Shelton is a good candidate for community service: he is a first-time offender; he has no history of violence; he has devoted a substantial portion of his life to community causes; and is highly motivated to continue aiding his community.

Therefore, we respectfully ask the Court to consider sentencing Kirk Shelton to a substantial period of community service as part of his sentence. To that end, we ask that the Court consider using the YMCA of Stamford to achieve that objective.

As the Court is aware from this memorandum, from the presentence report and from letters submitted by Timothy B. Hodges, the Chief Executive Officer at the Stamford YMCA, Kirk Shelton has a long history of working with this organization. Beginning in the early 1990s, he was a Board member, a member of their Capital Campaign, and a Trustee. During this period, he also often took time to work with individual programs.

---

[38]A copy of this publication, *Court & Community An Information Series About U.S. Probation & Pretrial Services: Community Service*, 2005 can be found at Exhibit G. http://www.uscourts.gov/misc/revision-community.pdf

As described in the June 23, 2005 letter from Mr. Hodges (which is attached as Exhibit H), the YMCA of Stamford was founded in 1968 and still exists as one of the major urban YMCA facilities serving inner-city communities. They currently have approximately 2,500 members with a substantial portion coming from low to moderate income areas in Stamford. They are in desperate need of volunteers with the skills, knowledge and background of Kirk Shelton.

Over the past year, Kirk Shelton has reinvigorated his community service work with the Stamford YMCA. He has particularly been working in their LEAD (Leadership, Enrichment, Acceptance and Development) program, a daily after-school program serving students K-12. He has organized a computer lab, solicited donations and software packages for educational tutoring in math and reading, and has actively worked as a tutor with dozens of children.

In his letter, Mr. Hodges requests that the Court consider using the Stamford YMCA for a community service sentence. He identifies a number of areas in which Kirk Shelton could be of assistance:

> My request to you is that as part of his criminal sentence you allow him to continue contributing a significant amount of his time assisting us with our efforts. Our needs are many and our resources are limited. My plan for the Stamford Y requires a combination of business, staff, Board, and program development. Virtually every area of our staff and facility needs attention if we want to continue to be a viable option for the community. These are all areas in which Kirk has extensive experience and could continue to be an invaluable resource for us.

> From a Board development standpoint, Kirk has already been helping me identify individuals within our community who could be potential candidates to serve on our Board and provide leadership for our programs. He could also be of significant helping our staff development efforts, and from a direct service standpoint I would want Kirk to continue his remarkable efforts with the youth in our LEAD Program. He has an innate sense of how to relate to our youth and it is heartwarming to watch him lead

the kids through their math blaster, spelling and other tutorial
programs when he teaches.

*See Letter from Timothy B. Hodges*, dated June 23, 2005, Exhibit H.

It is clear that there is an outstanding need in the Stamford community and that Kirk

Shelton could help serve that need. At a time when their budget is tight and they are trying to

work their way out of debt, Kirk Shelton could be of tremendous benefit to the Stamford YMCA.

He possesses the skills and expertise needed to assist in serving the young people of the

Stamford area and we respectfully ask the Court to consider this option as part of his sentence.


### X.      Conclusion

In *United States v. Booker*, Justice Breyer noted that, with respect to the Sentencing

Guidelines, "Congress' basic statutory goal – a system that diminishes sentencing disparity –

depends for its success upon judicial efforts to determine, and to base punishment upon, the *real*

*conduct* that underlies the crime of conviction."  543 U.S.___, 125 S. Ct. 738, 759 (2005).  Here,

we respectfully suggest that, after carefully looking at the "real conduct" underlying

Mr. Shelton's convictions, and carefully considering Mr. Shelton's extraordinary life of integrity,

good deeds, hard work and commitment to his family, the Court should sentence Mr. Shelton to

a period of probation with significant community service. Certainly, such a sentence is most

consistent with the stated purpose of the sentencing guidelines that a defendant should receive a

"just punishment" for his offenses in accordance with all of the factors to be considered in 18

U.S.C. § 3553(a).

Respectfully submitted,
E. KIRK SHELTON


By: _____

Dated:  July 5, 2005


LAW OFFICES OF THOMAS P. PUCCIO
Thomas P. Puccio, Esq. (CT 22983)
230 Park Avenue, Suite 301
 New York, NY  10172
Tel: (212) 883-6383
 Fax: (212) 883-6388


SANTOS & SEELEY, P.C.
Hubert J. Santos (CT 00069)
Hope C. Seeley (CT  04863)
51 Russ Street
Hartford, CT 06106
Tel: (860) 249-6548
Fax:(860) 724-5533

DAY, BERRY & HOWARD LLP
Stanley A. Twardy, Jr. (CT 05096)
Gary H. Collins, Esq. (CT 22119)
City Place 1, 185 Asylum Street
Hartford, CT  06103
Tel: (860) 275-0314
Fax: (860) 275-0343


MILBANK, TWEED, HADLEY &
McCLOY, LLP
Scott A. Edelman, Esq. (CT 25268)
Thomas A. Arena, Esq. (CT 25269)
1 Chase Manhattan Plaza
New York, NY  10005-1413
Tel.: (212) 530-5000
Fax: (212) 530-5219

110

## **CERTIFICATION**

I hereby certify that on July 5, 2005 a copy of the foregoing Memorandum In Aid Of Sentencing was served on the following parties and interested persons via email and Federal Express:


Richard J. Schechter, Esq.
James McMahon, Esq.
Norman Gross, Esq.
United States Attorney's Office
District of New Jersey
970 Broad Street, Suite 700
Newark, NJ  07101
Tel: (973) 645-2700
Fax: (973) 645-2857

Mr. C. Warren Maxwell
Deputy Chief
United States Probation Office
157 Church Street, 22nd Floor
New Haven, CT 06510
Tel: (203) 773-2100
Fax: (203) 773-2200


_____
HOPE C. SEELEY