UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA      :    No. 3:02CR00264 (AWT)
                              :
                              :
                              :
        v.                    :
                              :    July 12, 2005
                              :
                              :
E. KIRK SHELTON               :

SENTENCING MEMORANDUM OF THE UNITED STATES

CHRISTOPHER J. CHRISTIE
JOHN J. CARNEY
NORMAN GROSS
JAMES MCMAHON
RICHARD J. SCHECHTER
Special Attorneys
U.S. Department of Justice
970 Broad Street, Room 700
Newark, NJ 07102
Tel:  (973) 645-2700
Fax:  (973) 645-2702

**Introduction**

The United States submits this sentencing memorandum in connection with the July 18-22, 2005 sentencing of defendant E. Kirk Shelton and in opposition to Shelton's July 5, 2005 "Memorandum in Aid of Sentencing" ("Shelton Mem.").

Consistent with his refusal to accept any responsibility for the crimes for which a jury adjudged him guilty beyond a reasonable doubt, Shelton declines to offer a single word of remorse in his 110 page sentencing submission. Thus, while detailing with painstaking care all of the favorable things that his friends and relatives have said about him in preparation for this sentencing, Shelton's only apparent regret about his crimes is that the value of his own holdings of Cendant stock were depressed when the fraud was disclosed. Having filled his sentencing brief with encomiums to himself and his "lifetime of good deeds," Shelton fails to utter a word of sympathy for the thousands of people who were defrauded because they trusted Shelton and his co-conspirators to truthfully inform the investing public about CUC's true earnings.

Shelton's self-serving and self-laudatory memorandum is designed to convince the Court that he (not the shareholders) is the real "victim" in this case. Thus, the only "victim" that Shelton refers to in his sentencing submission is himself. Shelton Mem. 63, 87.[1]  In an effort to escape any meaningful

---

[1]  Shelton's remarkable contention that he "placed himself in
                                                    (continued...)

1

punishment whatsoever for his criminal conduct, Shelton has the audacity to ask the Court to impose a sentence of probation, the proverbial slap on the wrist sought by white collar offenders. Shelton Mem. 7.  Given the magnitude of the crimes he committed, coupled with his lack of remorse, the Court should impose the term of incarceration that Shelton has earned, within the Sentencing Guidelines range of 151 to 188 months.

Earlier this year, the Supreme Court clarified the continuing role of the Sentencing Guidelines and the scope of the sentencing court's discretion in <u>United States v. Booker</u>, 125 S.Ct. 738 (2005).  <u>Booker</u> makes clear that this Court must consider both the sentencing factors set forth in 18 U.S.C. Section 3553(a), and the Sentencing Guidelines in fashioning a reasonable sentence.  <u>Id</u>. at 764.  While the Sentencing Guidelines are no longer mandatory following <u>Booker</u>, they must still be considered in determining the appropriate sentence.  The Second Circuit has recognized the continuing relevance of the Sentencing Guidelines following <u>Booker</u> in determining an appropriate sentence:

> [I]t is important to bear in mind that <u>Booker</u>/
> <u>Fanfan</u> and section 3553(a) do more than render the
> Guidelines a body of casual advice, to be
> consulted or overlooked at the whim of a
> sentencing judge.  Thus, it would be a mistake to
> think that, after <u>Booker</u>/<u>Fanfan</u>, district judges

---

[1](...continued)
<u>the exact same position as the victims</u>" (Shelton Mem. 87)
(emphasis in original) conveniently overlooks the fact that other
"victims" who were mere shareholders but not executive officers
of CUC and Cendant did not know about and direct the fraud.

> may return to the sentencing regime that existed
> before 1987 and exercise unfettered discretion to
> select any sentence within the applicable
> statutory maximum and minimum.  On the contrary,
> the Supreme Court expects sentencing judges
> faithfully to discharge their statutory obligation
> to "consider" the Guidelines and all of the other
> factors listed in section 3553(a).  We have every
> confidence that the judges of this Circuit will do
> so, and that the resulting sentences will continue
> to substantially reduce unwarranted disparities
> while now achieving somewhat more individualized
> justice.

United States v. Crosby, 397 F.3d 103, 113-14 (2d Cir. 2005).

Under the non-mandatory Guideline regime established by Booker and Crosby, the sentencing judge is empowered to make the factual findings necessary for determining what the recommended Guideline Sentence is in a particular case.  Crosby, 397 F.3d at 113 ("the sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence").

As requested by this Court, this memorandum contains two parts:  Part 1 is a discussion of: (a) the Sentencing Guideline provisions that are applicable to Shelton's criminal conduct; and (b) the reasons why Shelton should not receive a downward departure from the applicable Guideline range.  Part 2 addresses the other sentencing factors contained in 18 U.S.C. § 3553.

**Part 1**

**Guidelines Issues**

Although no longer binding upon the Court, the United States Sentencing Guidelines represent the considered judgment of

the United States Sentencing Commission, a body of experts, drawn from all areas of the legal profession.  Drawing on previous sentences imposed in particular cases, the guidelines were specifically created to ensure that appropriate and consistent sentences were imposed in federal courts throughout the nation. Both the <u>Booker</u> and <u>Crosby</u> Courts stressed the continuing significance of the Guidelines under the new sentencing framework.  In this case, the sentence called for by the Sentencing Guidelines properly reflects the seriousness of Shelton's crimes.  Thus, the United States requests that the Court impose a sentence within the applicable Guideline range, rather than the sentence of probation requested by Shelton. Shelton Mem. 12.

      A.    **<u>The Appropriate Offense Level is 34</u>**.

The United States agrees with the Probation Office that the applicable sentencing Guideline range is offense level 34 with a Criminal History Category of I.   This offense level calls for a Guideline imprisonment range of 151 to 188 months. Pre-Sentence Report ("PSR"), Par. 150.  A sentence within that range would reflect the seriousness of the offenses of conviction and the particular aggravating factors relating to Shelton's conduct.  Using the 1997 Sentencing Guidelines Manual,[2] Shelton's

---

[2]  Shelton does not challenge the determination of the Probation Office that the November 1, 1997 edition of the United States Sentencing Guidelines Manual applies in this case.  All references to the guidelines in this memorandum refer to that edition of the Guidelines Manual, unless otherwise noted.

4

offense level, as calculated in the PSR (Par. 106 - 116), is as follows:

```
Base Offense Level (2F1.1(a))                            6
Loss (2F1.1(b)(1)(S) (more than $80 million))    +     18
More than minimal planning, and
more than one victim (2F1.1(b)(2)(A) and (B))    +      2
Abuse of Position of Trust (3B1.3)               +      2
Organizer and Leader (3B1.1(a))                  +      4
Obstruction of Justice (3C1.1)                   +      2
No Acceptance of Responsibility (3E1.1)          -      0
                                                 _____
```

**Offense Level Total**                                **34**

**Guideline Range**                          **151 to 188 Months**

Although Shelton has raised numerous objections to the Guideline calculations set forth above, the record amply supports each of these adjustments.

**1.**   **Base offense level: (Begin at level 6).**

The PSR recommends a base offense level of 6.  PSR, Par. 107.  Shelton does not object to the base level.

**2.**   **The Loss Amount:  (Add 18 levels).**

The PSR recommends an increase of 18 levels for the loss amount, finding that the "loss exceeded $80 million."  PSR, Par. 108, see also PSR Pars. 81-85, 87.  Although Shelton does not and could not reasonably claim that the fraud in this case caused less than $80 million in loss, he does argue that an 18 level enhancement for loss exceeds the seriousness of his crimes. Shelton Mem. 78-90.  If anything, the 18 level increase understates the seriousness of Shelton's conduct.  Cendant's shareholders lost more than $14 billion in one day -- on April 16, 1998, the day after the fraud was announced to the public.

This $14 billion loss is more than one hundred times greater than the $80 million cap in the 1997 Guidelines Manual. An offense level increase based on only $80 million in loss, when the actual loss exceeds that number by many fold, substantially understates, rather than overstates the seriousness of Shelton's crimes.

### a. **The Loss Substantially Exceeds $80 Million.**

By any measure, the loss suffered by the victims of Shelton's crimes is staggering. Under the Sentencing Guidelines:

> the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information. This estimate, for example, may be based on the approximate number of victims and an estimate of the average loss to each victim, or on more general factors, such as the nature and duration of the fraud and the revenues generated by similar operations.

U.S.S.G. § 2F1.1, App. Note 8; see <u>United States v. Manas</u>, 272 F.3d 159, 164 (2nd Cir. 2001); <u>United States v. Bryant</u>, 128 F.3d 74, 76 (2d Cir. 1997). At sentencing, the government must prove loss only by a preponderance standard. <u>United States v. Tiller</u>, 302 F.3d 98, 106 n.4 (3d Cir. 2002). Pursuant to U.S.S.G. § 2F1.1, Shelton deserves an 18 level enhancement as the loss caused by the offense exceeded $80 million.

The Guidelines describe how to measure loss where the defendant causes a victim to purchase equity stock at a fraudulently inflated price:

> A fraud may involve the misrepresentation of the value of an item that does have some value (in contrast to an item that is worthless). Where for example a defendant fraudulently represents that stock is worth

6

$40,000 and the stock is worth only $10,000,
the loss is the amount by which the stock was
overvalued (i.e. $30,000).

U.S.S.G. § 2F1.1., App. Note 7(a).  Here, Shelton and his co-

conspirators caused many victims to purchase Cendant and CUC

stock for a price far in excess of what the market would value

the stock based on all material information.

In United Statses v. Moskowitz, 215 F.3d 265, 272 (2d

Cir, 2000), the defendants were convicted of various offenses,

including conspiracy, securities fraud, and making false

statements to the SEC, arising from their involvement in a scheme

to fraudulently inflate the price of publicly traded stock.  At

sentencing, the government presented evidence that estimated the

loss at from $7.1 million to $18.3 million based on the decline

in the company's share price upon the revelation of fraud.  The

Government also presented an analysis from the class action

plaintiffs' expert determining loss to the plaintiffs to be $30

million.  Based on that information, the district court

determined that the actual losses were in the range of $5 million

to $10 million.  215 F.3d at 272.

On appeal, the Second Circuit rejected the defendants'

claim that the district court erred by considering the amount of

the settlement in the civil class action lawsuit,  explaining

that:

In light of the ample evidence that would have
permitted a reasonable fact finder to determine
actual losses to be higher than the range of $5
million to $10 million that the district court
found applicable to Moskowitz, the court was well
within its discretion in reaching its loss

7

calculation.

Id. (emphasis in original), abrogated on other grounds by
Crawford v. Washington, 541 U.S. 36 (2004); see United States v.
Snyder, 291 F.3d 1291, 1296 (11th Cir. 2002)(directing the
district court on a sentencing remand of a securities fraud
criminal prosecution to make a "a reasonable estimate of the
victims' loss based on existing information").

The same information which properly informed the
district court's calculation of the fraud loss in Moskowitz
demonstrates that the loss in this case was at least $8 billion.
Beginning in or about the late 1980's and continuing for about a
decade, CUC, and later Cendant, regularly reported financial
results to Wall Street and its shareholders that were
intentionally inflated by hundreds of millions of dollars.  Upon
learning of the overstatement in early spring 1998, Cendant's new
management issued a press release on April 15, 1998 announcing
that the company would restate previously reported financial
results for 1997, including reducing 1997 net income by $100 to
$115 million, because of accounting irregularities relating to
certain business segments of CUC.  See Government Ex. 827.  On
the day before this announcement, Cendant's stock price was
trading at more than $35 per share.  On April 16, after the
marketplace had the opportunity to assimilate the news of the
restated financial results, Cendant's stock price closed at
$19.06 a share, down from $35.62.  Tr. 1461, 7104-15, 7513-14;
Gov. Ex. 2039 and 2039a; In Re: Cendant Corporation Litigation,

264 F.3d 201, 221 (3d Cir. 2001).

   At the time of the announcement Cendant had approximately 1 billion shares issued and outstanding, which translated into a loss of market capitalization of over $14 billion.  Subsequent announcements by the corporation that it would be necessary to restate their 1995, 1996 and 1997 financial statements and the disclosure of the Audit Committee's internal investigation resulted in Cendant's share price falling to $11 5/8 on August 31, 1998.  All told, Cendant shareholders lost more than $20 billion in market capitalization.  In Re: Cendant Corporation Litigation, 264 F.3d at 222.   The stock has never fully recovered.[3]

   In the related Cendant securities class action proceeding in the District of New Jersey, the plaintiffs were

_____

[3]  Shelton attempts to minimize the impact his crimes had upon his victims by arguing that the price of Cendant's stock "rebounded" to CUC's summer 1997 price of $24 twelve days after the fraud was publicly revealed in April 1998.  Shelton Mem. 7, 82.  Shelton's argument boils down to little more than the idea that he should not be held accountable because his crimes did not impact those shareholders who held CUC/Cendant shares for approximately a year or more as much as it did others because those longer-term shareholders suffered only a paper loss.  Aside from the problems with his comparison of CUC apples with Cendant oranges, Shelton conveniently ignores two central facts of his crime:  1) Cendant's shareholders together lost more than $14 billion in a single day; and 2) the shareholders have yet to recover that loss seven years later because Cendant's stock price has not come close to its pre-disclosure level.  His argument conveniently ignores those shareholders, such as the State of New Jersey pension fund, who bought CUC or Cendant shares at significantly higher prices from September 1997 through April 14, 1998.  Shelton also fails to mention that Cendant's stock price dropped again after an additional disclosure of fraud was made in July 1998.

required to prove the damages sustained by the class shareholders as a result of the fraud.  The plaintiffs presented an expert report which calculated the loss from the fraud to be approximately $8.8 billion.  <u>In Re: Cendant Corporation Litigation</u>, 264 F.3d at 241.  Cendant and the corporation's auditors, Ernst & Young, agreed to settle the class action lawsuits by paying more than $3.2 billion in damages to the victims of the accounting fraud.  <u>Id</u>. at 226; <u>see also</u> May 19, 2005 letter from Cendant counsel, Exhibit B to this memorandum.  By any reasonable measure, the loss caused by Shelton's criminal conduct far exceeds the $80 million figure that triggers an 18 level increase under U.S.S.G. § 2F1.1(b)(1)(S).  Accordingly, an 18 level increase, far from overstating the seriousness of Shelton's crimes, is favorable to Shelton.

> **b.  An 18 Level Enhancement for Loss Does Not Overstate the Seriousness of Shelton's Crimes.**

Given that the largest loss range within § 2F1.1 (under the 1997 Manual) is only $80 million, the multi-billion dollar loss here is not fully captured by use of a table that tops out at $80 million.  <u>See</u> U.S.S.G. § 2F1.1., App. Note 10 ("In cases in which the loss determined under subsection (b)(1) does not fully capture harmfulness and seriousness of the conduct, an upward departure may be warranted").  While the United States is not moving for an <u>upward departure</u> on this basis, this factor militates strongly against a <u>downward departure</u> for overstatement of the harm to the victims caused by their financial loss.

Shelton's other arguments to reduce the loss amount in this case are also unavailing.

### i. **Shelton's Intended Harm Argument is Baseless**.

In an effort to avoid full responsibility for the devastating losses suffered by his victims, Shelton contends that there was no intended harm. Shelton Mem. 88-89. Even assuming arguendo that Shelton intended that the shareholders would not lose any money (e.g. Shelton may have believed that the fraud would continue undetected and thus, the stock price would never drop), such an argument is unavailing where an actual loss occurred. U.S.S.G. § 2F1.1, App. Note 7 (to determine loss under the Guidelines, use the greater of intended loss and actual loss); see United States v. Hedges, 175 F.3d 1312, 1315-16 (11th Cir. 1999) (because the actual loss was greater than that defendant subjectively believed would result from securities fraud scheme, court correctly sentenced him based on the actual loss; knowledge was not necessarily relevant to the amount of loss that is attributed to a defendant for sentencing purposes).

Given his role in the company, his business acumen, his MBA training and his Ivy League education, Shelton could also reasonably foresee the full extent of the harm the fraud would cause. Moreover, as the second highest ranking employee at CUC (and unlike his corporate subordinates Corigliano, Pember and Sabatino, who merely carried out the orders of their superiors to implement the accounting aspects of the fraud), Shelton had authority at CUC that was second only to that of defendant Walter

11

Forbes.  As such, he could have stopped the fraud or altered its magnitude by virtue of his leadership position.

Shelton claims that he did not intend to harm shareholders, but to the contrary, believed and hoped that fraudulently overstating earnings in public disclosure documents would necessarily enure to the benefit of shareholders.  Shelton Mem. 63, 87-88.  Aside from the fact that Shelton has never admitted that he participated in the fraud, much less identified his motives for that participation, this claim should be rejected.  It reduces to the claim that the conspirators hoped that the Ponzi-scheme type fraud could continue indefinitely and that the shareholders who purchased CUC and Cendant stock at fraudulently inflated prices would ultimately be able to sell the shares to others at even higher fraudulently inflated prices. Shelton is not entitled to a reduced sentence because the conspirators mistakenly hoped that their fraud would go on even longer than it did.

In any event, whether or not Shelton believed that the elaborate scheme could continue indefinitely, he knew that he and his co-conspirators had caused the victims to pay more for the stock than it was worth based on the disclosure of true information.  At the very least, Shelton took a highly unreasonable risk that disclosure of the fraud would cause the stock price to come crashing down, as it ultimately did, and that investors would lose huge amounts of money, as they eventually did.

Shelton resurrects the argument (which formed the basis for his failed pre-trial motion to dismiss the mail and wire fraud counts) that, because this was not a simple fraud by which the criminal induced the victims to place their money directly in the hands of the criminals, his offense was somehow less culpable. Shelton Mem. 87-88. To the contrary, the conspirators knew that, by falsely inflating CUC's earnings, they caused any person who purchased CUC or Cendant stock during the conspiracy period to pay more for the stock than they would have been willing to pay had they known what CUC's real earnings were. Thus, the conspirators intended the shareholders to part with a portion of the purchase price of the stock solely because they were gulled by the fraud. That the shareholders received something of value in return for their investment does not mean that Shelton and his coconspirators could possibly believe that they were acting in the interests of the shareholders when they inflated CUC's earnings.

Shelton also seeks credit for the success that Cendant has been able to achieve after Shelton was fired from the company, and points out that his crimes did not cause Cendant to become bankrupt and its employees to lose their jobs. Shelton Mem. 64-66. As the July 5, 2005 letter from Cendant's counsel demonstrates (Exhibit A to this memorandum), any success that Cendant has achieved since it was forced to restate its financial statements in 1998 occurred because other persons who remained at the company and who did not participate in the fraud were able to

overcome the substantial harm and expenses that Shelton's fraud imposed on that company.

### ii. Shelton, Who Pleaded Not Guilty, Is Not Entitled to the Benefits of the Plea Agreements of His Co-Conspirators.

The negotiated plea agreements signed by Corigliano and Pember contain a stipulation that, as to them (who carried out Shelton's directives), the $80 million loss figure overstates the seriousness of their crimes.[4]  Shelton is not a party to those plea agreements or, indeed, to any plea agreements.  Shelton nevertheless contends that he should receive the benefit of the negotiated stipulation in Corigliano's and Pember's plea agreements.  Shelton Mem 85.  This argument should be rejected.

The Government stipulated that Corigliano's and Pember's involvement in the fraud was less serious than the 18 level fraud enhancement would require because of their inferior roles in the fraud, relative to the roles of Shelton and Walter Forbes.  One who causes subordinates to commit a crime is for that reason more culpable than those who follow the directives in order to avoid the loss of employment benefits.  Corigliano and Pember would not have committed the fraud but for the orders they were given to engage in the fraud by Walter Forbes, Shelton, and Stuart Bell.  Shelton has advanced no such excuse or explanation

---

[4]  As the Court has already noted, the stipulations in those plea agreements are not binding on the Court.  See Transcript of October 16, 2003, p. 99-100.

14

for his own conduct.[5]

Shelton nevertheless contends that he is <u>less</u> culpable than Corigliano or Pember because they knew more details about the fraud they were ordered to perform by Shelton and others. That Shelton merely directed his subordinates to manage the numbers in order to meet Wall Street earnings targets, but did not take the additional step of directing them to undertake particular accounting practices, such as the accelerated recognition of revenue, does not make Shelton less culpable than those to whom he gave orders.  Shelton told his subordinates, in effect, "get it done, and spare me the details."  Shelton's argument simply disregards the important and reasonable policy choice of the Sentencing Commission that those who occupy a

---

[5]  Pointing to the multiple of 250 between $80 million (which the Government has agreed overstates the seriousness of Corigliano's and Pember's crimes) and $20 billion (the total drop in Cendant's market capitalization from April 15, 1998 and August 31, 1998, when Cendant announced the restatements amounts for fiscal years 1995-97), Shelton contends that he is not 250 times more culpable than Corigliano and Pember and thus, that he can not be held responsible for $20 billion in losses if they are not held responsible for even $80 million in losses.  The Government, however, is not seeking a sentence for Shelton that is remotely 250 times greater than whatever sentence it will ultimately seek for Pember and Corigliano.

Shelton has apparently misread the Corigliano plea agreement when he claims (Shelton Mem. 63), that the Government has agreed not to oppose a sentence of home confinement for Corigliano.  What the plea agreement actually states is that, <u>if</u> this Court grants a downward departure from the applicable Sentencing Guidelines range for Corigliano that would authorize this Court to impose a sentence of house arrest, the Government would not oppose such a sentence.  Gov. Ex. 1546 (Corigliano plea agreement).

higher position in the conspiratorial hierarchy are more blame-worthy than those whom they supervise.[6]

Shelton further suggests that he, like Corigliano and Pember, "cooperated" with federal law enforcement officials and with the Audit Committee because he met with them and gave them a self-serving exculpatory explanation of events.  Shelton Mem 86. Unlike the two cooperating witnesses who admitted their involvement in the fraud to federal law enforcement officials, if not to the Audit Committee investigators, Shelton's false self-exculpatory statements obstructed, rather than advanced, the investigation.

### iii.  <u>**The Case Law Does Not Support Shelton.**</u>

In support of his contention that an $80 million loss amount overstates the seriousness of an offense that cost its victims billions,  Shelton erroneously attempts to seek comfort in <u>United States v. Restrepo</u>, 936 F.2d 661 (2d Cir. 1991).  He declines to mention that the defendants in that money-laundering prosecution who received a downward departure "were laborers whose sole function was to load the boxes of money at the warehouse" on a single occasion.  936 F.2d at 667.  As such, they had no say in the volume of money-laundering which their leaders in the money-laundering conspiracy undertook.

---

[6]  In fashioning an appropriate sentence for Shelton, this Court must take into consideration the fact that it will later have to fashion proportionately lower sentences for Corigliano, Pember, and Sabatino, who were not only less culpable than Shelton, but who, unlike him, pleaded guilty and agreed to cooperate with the Government.

Here, by contrast, Shelton was not a menial functionary in a fraud that was organized, directed, and executed by others who occupied a superior position in the conspiracy to his own. Rather, with the exception of Stuart Bell and defendant Walter Forbes, Shelton directed the activities of all other participants. Analogizing Shelton's role in this crime to the menial servants in <u>Restrepo</u> stands logic on its head.

Also inapposite is another case cited by Shelton, <u>United States v. Koczuk</u>, 166 F.Supp.2d 757 (E.D.N.Y. 2001). The district court in that case granted a departure because the defendant "was not actively involved in [the unlawful] business. . . was merely a low-level employee in [the] operation serving mainly as a chauffeur and interpreter, [and] primarily was taking orders from [the leader of the conspiracy] and made small sums of money." 166 F.Supp.2d at 763 (internal punctuation omitted). The defendant's role in <u>Koczuk</u> is more akin to the role played in the instant crime by the CUC staff accountant Mary Sattler, who was not even charged in this case.

Neither <u>United States v. Greenfield</u>, 44 F.3d 1141 (2d Cir. 1995) nor <u>United States v. Nachamie</u>, 121 F.Supp.2d 285 (S.D.N.Y. 2000) support Shelton's claim that an 18 level enhancement for loss overstates the seriousness of Shelton's offense. In the former, Greenfield and Pace fraudulently acquired equipment, worth about $20,000, which they used to build a phony automated teller machine ("ATM"), which recorded bank account and personal identification numbers of cards that were

17

placed in the machine. Greenfield and Pace also fraudulently acquired additional equipment, worth about $80,000, which they used to create fraudulent ATM cards. They never paid the suppliers for any of that equipment. 44 F.3d at 1144, 1149. A third person, Lyons, then joined the conspiracy, and assisted Greenfield and Pace in using the phony ATM to obtain account access information and fraudulently obtain cash from legitimate ATMs. Id. at 1144.

At sentencing, the district court attributed to Lyons all $100,000 in loss resulting from Greenfield's and Pace's fraudulent procurement of the equipment used to build the phony ATM and create the phony ATM cards. Although properly concluding that Lyons should have known that his co-conspirators had fraudulently obtained, before Lyons joined the conspiracy, the equipment needed to build the phony ATM, the district court failed to make any findings about whether Lyons reasonably should have known that his co-conspirators had also fraudulently obtained the equipment used to create the phony ATM cards. The Government conceded that a remand was necessary for the district court to determine the foreseeability to Lyons of the latter aspect of the fraud. Id. at 1149.

Here, there is abundant evidence from which this Court can conclude that at the very least, $80 million of loss from the fraud was reasonably foreseeable to Shelton. Indeed, in Cendant's fiscal year ending December 31, 1997 alone, during which Shelton's extensive involvement in the fraud was thoroughly

18

established by the trial evidence, the conspirators overstated
Cendant's income by at least $176 million.  Tr. 10666-68; Gov.
Ex. 10110.  In the three years during which Shelton's direct
involvement in the fraud was established by the evidence, the
conspirators overstated CUC's and Cendant's income by at least
$300 million.  Tr. 10665-68; Gov. Ex. 10110.  As the evidence
also established, every dollar of fraudulent overstatement of
CUC's and Cendant's income translated into at least several
dollars of loss to the Cendant shareholders when the fraud was
disclosed.  Thus, unlike Lyons, Shelton's entry into the fraud
predated all of the fraudulent activity to which the loss was
attributed.

        In Nachamie, a Medicare fraud prosecution against
physicians, the Government sought to increase the fraud loss
based on amounts for which co-conspirators double-billed Medicare
for a single claimed procedure, which procedure was never in fact
performed.  The district court concluded that the Government had
failed to establish that the defendant physicians, although
intending to bill Medicare once for non-existent procedures, had
also intended to double-bill Medicare for those claims, or
reasonably foresaw that double-billing.  121 F.Supp.2d at 294.
Here, by contrast, the Government does not seek a sentence based
on the full amount of the loss, amounting to billions of dollars,
but only a tiny fraction of that amount, $80 million.  Even if
the Government could not establish that Shelton could reasonably
foresee the details of all of the fraudulent accounting

machinations put into operation by his corporate subordinates, he certainly knew about, intended to cause, and reasonably could foresee, a sufficiently inflated overstatement of CUC's and Cendant's earnings to cause an $80 million dollar loss.

### iv.  Shelton's "Loss Amount" is More Than $80 Million.

Shelton contends that the $80 million cut-off in U.S.S.G. § 2F1.1(b)(1)(S) overstates the harm in this case because "estimates of loss are highly speculative." Shelton Mem. 81.  Shelton elsewhere concedes, however, that the loss was "at least" $80 million, since the loss in market capitalization which occurred when the fraud was disclosed was, by all measurements, in the billions of dollars, not in the tens or hundreds of millions.  Shelton Mem. 67.  That the Government would have to undertake additional, substantial expenses to hire expert witnesses to calculate the exact amount of the fraud loss hardly means that Shelton is entitled to a reduced sentence because the precise amount of the loss has not been determined.  Shelton cites neither authority nor general sentencing principles to support his contention that he is entitled to a reduced sentence because he elected to engage in a fraud that does not lend itself to easy loss calculations.  By any reasonable measure, Shelton's crimes were so extensive that they caused greater monetary loss than is contemplated by the applicable Sentencing Guideline.

Shelton contends that an additional 18 levels added to his offense level reflecting $80 million of loss overstates the seriousness of the offense because the fraud did not leave the

stockholders with "worthless pieces of paper." Shelton Mem. 82.
This argument is a <u>non sequitur</u>. If the fraud had caused the
price of Cendant stock to fall to zero, the loss amount would be
substantially greater than it was, but that does not mean that a
Sentencing Guidelines level that reflects only $80 million of
loss understates the seriousness of this crime.

Shelton contends that his sentence should be reduced
because he delegated the nuts and bolts of cooking the books (to
mix a metaphor) by directing his subordinate Cosmo Corigliano to
"manage the numbers . . . to meet Wall Street expectations"
without telling him to undertake that management. Shelton Mem.
at 83-84. He argues that because he did not specifically
authorize Corigliano to establish phoney topside adjustments,
improperly accelerate the recognition of revenue, or
intentionally understate the need for a membership cancellation
reserve, any loss derived from those practices should be wholly
disregarded. Shelton Mem 81.

This argument fails, as the Government was not required
to prove that Shelton knew about all of the phony accounting
practices undertaken by his subordinates, but only that their
conduct, all of which was undertaken in furtherance of the
conspiracy for which Shelton was convicted, was reasonably
foreseeable to him. <u>See</u> U.S.S.G. § 1B1.3, App. Note 2; <u>United
States v. Rosen</u>, 409 F.3d 535, 552 (2d Cir. 2005)(prosecution for
securities fraud; "Where the offense is the product of joint
criminal activity, a defendant is responsible for 'all reasonably

foreseeable acts and omissions of others in furtherance of the
jointly undertaken criminal activity.' quoting U.S.S.G. §
1B1.3(a)(1)(B)); <u>United States v. Lopreato</u>, 83 F.3d 571, 576 (2d
Cir. 1996).[7]

Whether or not Shelton personally directed or was even
aware of each of the details of those improper practices is
immaterial since all were reasonably foreseeable to someone who
occupied Shelton's leadership position in the fraud.  <u>See</u> <u>United
States v. Hedges</u>, 175 F.3d at 11315-16 (rejecting the contention
that the defendant could not be held responsible for the full
amount of the loss resulting from the fraudulent overstatement of
the value of publicly traded stock because he supposedly was not
aware that the stock was virtually worthless when he was touting
it; "Because it was this false information [promulgated by
Hedges] that induced the public to invest in Cascade (and thereby
suffer $92 million in losses), Hedges' action made him
responsible for the entire loss that the public suffered from the
fraudulent scheme."); <u>see</u> <u>generally</u> <u>United States v. Lucien</u>, 347
F.3d 45, 55 (2d Cir. 2003)(district court properly attributed to
a defendant convicted of health care fraud who participated
jointly with others as one of several automobile passengers in

---

[7]  By Shelton's misguided reasoning, a mobster who orders his
underling to kill the victim but spare the mobster the details is
less guilty than the mobster who tells his underling precisely
how to accomplish the murder.  Criminal organizers and leaders
who elect to ignore precisely how the crime is committed are no
less culpable because of their decision to remain above the
details of the crime than those who elect to micro-manage the
crime.  Both have made the fateful decision to authorize and
support a crime which they have power to prevent.

scheme involving passengers' faking injuries from staged
automobile collision the total loss from amounts attributable to
other passengers in same car, because those loses were reasonably
foreseeable to the defendant); <u>United States v. Murad</u>, 954
F.Supp. 772, 783 (D.Vt. 1997)(district court properly attributed
to a defendant convicted of conspiracy to commit bankruptcy fraud
the loss caused by the diversion of particular bankruptcy estate
assets, even if the defendant had no actual knowledge of that
particular diversion, where his participation in the conspiracy
put him in a position to reasonably foresee efforts by others
within family to transfer those funds).[8]

###    v.    **Shelton Benefitted Greatly From the Fraud.**

As the market's harsh reaction to the disclosure of the
fraud on April 15, 1998 revealed, the conspirators would not have

---

[8] Had Shelton committed the identical crimes after November 2004
rather than when he did, the 2004 Sentencing Guideline Manual
would call for a loss enhancement of 30 levels (more than $400
million), not 18 levels, a victim enhancement of 6 levels, not 2
levels, and an additional 2 level enhancement since Shelton was
an officer of a publicly traded company convicted of a violation
of securities laws.    <u>See</u> United States Sentencing Guidelines
Manual, §§   2B1.1(b)(1)(P), 2B1.1(b)(2)(B), and
2B1.1.(15)(A)(November 1, 2004).

Given the other applicable enhancements for leadership,
abuse of trust, and perjury, along with the base offense level of
6, Shelton's total offense level under the current version of the
Sentencing Guidelines <u>would be level 52</u>.    Level 43 is the highest
level in the Sentencing Table, and correlates with a Guideline
range of life imprisonment for a defendant with a Criminal
History category of I.    Although the United States is not moving
for an upward departure on this basis, the fact that an
identically situated defendant who commits the same crimes today
would literally be facing a life sentence under the Guidelines
should be considered by the Court when it addresses Shelton's
downward departure requests.

enjoyed the same level of financial success of managing CUC had they accurately reported the company's earnings during the conspiracy period.  Thanks to the fraud, however, the company, and its executives, prospered.  For example, as the second highest ranking official at CUC, Shelton received $60 million from CUC in salary, bonuses, stock options, and stock price appreciation (Tr. 12625), dwarfing the payments to other culpable individuals such as Sabatino, Speaks and Kearney.  Shelton's huge gains demonstrates that an $80 million loss figure does not overstate the seriousness of his conduct.  See U.S.S.G. § 2F1.1., App. Note 8 ("The offender's gain is an alternative estimate that ordinarily will underestimate the loss.")

        Shelton nevertheless contends that he personally received no gain from the fraud, and indeed, was one of its victims, thus justifying a sentence below what the loss amount would call for.  Shelton Mem. 81, 87 and n. 20, 88.[9]  This argument suggests that Shelton committed this economic crime without any rational financial motive, as if out of spite against the thousands of shareholders who were strangers to him.  But of

_____

[9] Even assuming arguendo that Shelton did not act solely for personal monetary gain, a departure based on a defendant's purported lack of personal gain from the offense is "discouraged".  United States v. Broderson, 67 F.3d 452, 458-59 (2d Cir. 1995) ("Nor is lack of personal profit ordinarily a ground for departure, because the Commission generally took that factor into account in drafting the Guidelines.").  A departure on this ground is particularly unwarranted here because, although Shelton did not sell stock immediately prior to the fraud being uncovered (like defendant Forbes), Shelton still retained a $30 million net worth even after the fraud was discovered.  Tr. 12625.

course, Shelton's motives are easy to discern.  He received

employment promotions and election to the Young President's

Organization while earning millions of dollars in salary,

bonuses, and stock options because of the consistent success

enjoyed by CUC, success that was created by the illusion of

consistently growing earnings.

### 3.  More Than Minimal Planning, Multiple Victims: (Add 2 levels).

The PSR recommends a two level enhancement pursuant to

U.S.S.G. § 2F1.1(b)(2) due to the fact that Shelton's criminal

conduct involved more than minimal planning and a scheme to

defraud more than one victim.  PSR, Par. 109.  Shelton does not

object to this enhancement, and rightfully so.  While it is only

necessary for the scheme to involve more than minimal planning or

more than one victim, both factors are present here.  First,

there can be no dispute that the multi-year fraud perpetrated by

Shelton and his conspirators involved more than minimal planning.

The repeated acts of fraud each quarter, each year, and in each

fraudulent financial statement filed with the SEC demonstrates

that the fraud was hardly a spur of the moment or opportunistic

crime.  See United States v. Rosen, 409 F.3d at 553-55 (district

court properly applied more than minimal planning enhancement to

a defendant convicted of securities fraud offenses, where the

orchestration of a circular "daisy chain" of securities sales in

order to inflate the price of a corporation's shares was

foreseeable to the defendant).

Second, each of the many thousands of Cendant

25

shareholders as of April 15, 1998 was defrauded as a result of the actions of Shelton and others. Hence, there can be no doubt that Shelton's criminal conduct involved repeated acts of fraud over a period of years and multiple victims.

### 4. <u>Abuse of a Position of Trust: (Add 2 levels)</u>.

The PSR recommends that Shelton receive a two level enhancement for abuse of a position of trust, pursuant to U.S.S.G. § 3B1.3. PSR, Par. 111. Shelton properly concedes the application of this two level enhancement, which is amply supported by the record.

As President of CUC, Shelton's position of trust was characterized by "managerial discretion, that is, substantial discretionary judgment that is ordinarily given considerable deference" by other persons in the organization. U.S.S.G. § 3B1.3, App. Note 1. Unlike a low-level member of the fraud such as Mary Sattler, Shelton was subject to relatively little supervision, particularly since Walter Forbes delegated the day-to-day management of the company to Shelton. <u>Id</u>. Additionally, Shelton's position of trust contributed in a significant way to facilitate the commission and concealment of the criminal conduct, by making the detection of the offense more difficult. <u>Id</u>.

Persons like Shelton who hold senior management positions at publicly held corporations owe a clearly defined fiduciary duty of trust under the law to the shareholders of those corporations. <u>United States v. Mabrook</u>, 301 F.3d 503, 510

26

(7th Cir. 2002)(enhancement for abuse of a position of private trust pursuant to U.S.S.G. § 3B1.3 applied to a defendant who served as a corporate officer, and utilized fraudulent documents to induce investors, and employ the corporate form to conduct criminal activity); <u>United States v. Olson</u>, 22 F.3d 783, 786 (8th Cir. 1994)(vice president of savings and loan association who was in charge of corporate lending had a position of private trust for purposes of U.S.S.G. § 3B1.3); <u>see</u> <u>United States v. Jolly</u>, 102 F.3d 46, 48-49 (2d Cir. 1996)(explaining that a corporation's management owes a fiduciary obligation to shareholders because management has substantial discretionary control over corporate assets and shareholders cannot engage in direct monitoring of management's conduct or cheaply obtain protective contractual provisions) <u>citing</u> <u>Guth v. Loft</u>, 5 A.2d 503, 510 (Del.Supr. 1939) and Frank H. Easterbrook & Daniel R. Fischel, <u>The Economic Structure of Corporate Law</u>, 90-93 (1991).  Hence, the enhancement for Shelton's abuse of his position of trust is eminently proper.

### 5. <u>**Role in the Offense: (Add 4 levels)**</u>.

The PSR recommends that Shelton receive a four level enhancement for his leadership role in the offense pursuant to U.S.S.G. U.S.S.G. § 3B1.1(a).  PSR, Par. 110.  In his continuing effort to play the role of a "victim" (Tr. 12621-22) rather than the criminal role determined by the jury, Shelton seeks a four level reduction in his offense level claiming that he is a "minimal participant" in the fraud.  Shelton Mem. 68.  The Court should adopt the four level enhancement recommended by the PSR as

27

Shelton was indeed a leader, not a follower, of the fraud.

In determining whether Shelton was an organizer or leader, the Guidelines direct that the sentencing court should consider the following factors:  the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.  U.S.S.G. § 3B1.1, App. Note 4; see United States v. Beaulieau, 959 F.2d 375, 379-80 (2d Cir. 1992).  Thus, the "organizer or leader" enhancement is appropriate where the defendant "played a crucial role in the planning, coordination, and implementation of a criminal scheme." United States v. Paccione, 202 F.3d 622, 624 (2d Cir. 2000).

A defendant may qualify for the four-level organizer/leader adjustment as long as he organized or led even one other participant, so long as the criminal activity involved at least five participants.  See United States v. Zichettello, 208 F.3d 72, 107 (2d Cir. 2000) (under § 3B1.1(a), defendant need only organize or lead one other person, so long as the criminal activity involved at least five participants).  Nor is there any requirement that one single person be identified as the leader or organizer.  Rather, "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy."  U.S.S.G. § 3B1.1, App. Note 4.

28

Accordingly, "comparative [analysis is] irrelevant, since one conspirator's leadership role is not dispositive on the question of whether another was also a leader." <u>United States v. Duncan</u>, 42 F.3d 97, 105 n.6 (2d Cir. 1994); <u>see</u> <u>United States v. Garcia</u>, 936 F.2d 648, 656 (2d Cir. 1991).

Under these standards, Shelton plainly qualifies as an organizer or leader. Corigliano and Pember's testimony made it clear that they looked to Shelton for direction and approval in implementing the fraudulent accounting machinations. Without Shelton's command to manage the numbers, and his repeated directions and approval, the enormous fraud could not have occurred.[10]

As Corigliano's, and later Pember's immediate boss, and as the day to day manager of the CUC companies, Shelton directed and controlled the criminal activity of at least one other participant (Corigliano and later Pember). Not only did Shelton direct Corigliano in a memo to manage the earnings to meet Wall

---

[10] Shelton is not entitled to a four point reduction in his offense level for being a minimal participant pursuant to U.S.S.G. § 3B1.2(a). This section provides that "the downward adjustment for a minimal participant will be used infrequently." U.S.S.G. § 3B1.2, App. Note 2. "It is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group." <u>Id.</u>, App. Note 1. Given Shelton's leadership role in both the company and the fraud, and his receipt of millions of dollars in salary, stock awards, and stock value appreciation as a result of the fraud, his role is neither minimal nor minor. <u>See</u> Memorandum of the United States in Opposition to Shelton's Motion For a Judgment of Acquittal Pursuant to Rule 29 and for a New Trial Pursuant to Rule 33, 15-50. Shelton has cited no case where the second highest ranking employee of a corporation who directly supervised a subordinate CFO who engaged in fraud was rewarded with a downward adjustment under this Guideline section.

Street expectations (Gov. Ex. 3), Shelton repeatedly met with
Corigliano to discuss the cheat sheets and, together with co-
conspirator Walter Forbes, to decide how much fraudulent earnings
would take place each quarter and year.  During those meetings,
Shelton exercised decision making authority in the criminal
activity that was greater than the decision making authority of
others such as Corigliano and Pember.  Shelton also demonstrated
his leadership role by seeking to recruit Scott Forbes into the
conspiracy, and by deciding the amount of merger reserves ($20
million vs $25 million) that would be used to increase January
1998 earnings.  Tr. 2897, 7414-15.  Certainly, Shelton had access
to a larger share of the fruits of the crime than Corigliano and
Pember as Shelton received a higher salary, higher bonus and
greater stock awards than every other criminal participant except
defendant Walter Forbes.  Given the magnitude of the fraud in
terms of duration and market loss, and the number of corporate
employees (such as Pember, Corigliano, Sabatino, corporate
controllers Speaks and Kearney and accounting employee Mary
Sattler) that knowingly assisted the fraud, there can be no doubt
that the fraud was "otherwise extensive."[11]

---

[11] It is of no consequence that other conspirators lower
down in the company and in the conspiracy did not know that
Shelton was a conspirator.  A person who gives an order to a
subordinate to kill a rival is a leader of criminal activity,
even where the subordinate hires a hitman to perform the murder
and the hitman is unaware of who gave the ultimate order.  Nor is
the person who gave the order to kill less culpable by virtue of
the fact that he remains unaware of how the rival was killed,
where the rival was killed, and where the rival's body was
buried.

Finally, there is certainly more than five participants in this criminal activity. Shelton was found guilty by the jury. Corigliano, Pember and Sabatino have pled guilty to charges arising from the criminal activity and it was demonstrated at trial that Stuart Bell was also involved in criminal activity.[12] Steven Speaks and Kevin Kearney, while not charged in the criminal activity, both admitted at trial that they knowingly engaged in activity that was fraudulent. Hence, Shelton was an organizer and leader of criminal activity that involved five or more participants <u>and</u> was otherwise extensive.

## 6. <u>Perjury, Obstruction of Justice: (Add 2 levels)</u>.

The PSR recommends that Shelton should receive a two level upward adjustment based on his perjurious trial testimony. PSR Pars. 60-69, 72-73, 75-79, 103. Shelton objects to this enhancement. The recommendation of the Probation Office is based on sound reasoning and should be adopted by the Court.

U.S.S.G. § 3C1.1 mandates a two-level upward adjustment of the applicable offense level if the Court finds that:

> the defendant willfully obstructed or
> impeded, or attempted to obstruct or impede,
> the administration of justice during the
> course of the investigation, prosecution, or

---

[12] Shelton also now concedes that Bell was one of the "architects of the fraud" (Shelton Mem. 89), even though he simultaneously seeks a new trial because this Court declined to force the Government to immunize Bell so that he could deny any involvement in the fraud. The Government agrees with Shelton's current assessment of Bell's involvement in the fraud, which further supports this Court's decision regarding the compelled immunity issue.

> sentencing of the instant offense of conviction,
> and . . . the obstructive conduct related to the
> defendant's offense of conviction . . . .

U.S.S.G. § 3C1.1.  This enhancement applies where a defendant,

testifying under oath, "gives false testimony concerning a

material matter with the willful intent to provide false

testimony, rather than as a result of confusion, mistake or

faulty memory."  United States v. Dunnigan, 507 U.S. 87, 94

(1993).  In other words, the enhancement applies where a

defendant commits perjury.  See U.S.S.G. § 3C1.1, App. Note 3(b).

In Dunnigan, the Supreme Court upheld the

constitutionality of the obstruction guideline.  As noted by the

Court, "[t]he commission of perjury is of obvious relevance" in

sentencing, "because it reflects on a defendant's criminal

history, on her willingness to accept the commands of the law and

the authority of the court, and on her character in general."

507 U.S. at 94.  The Court further explained:

> It is rational for a sentencing authority to
> conclude that a defendant who commits a crime
> and then perjures herself in an unlawful
> attempt to avoid responsibility is more
> threatening to society and less deserving of
> leniency than a defendant who does not so
> defy the trial process.  The perjuring
> defendant's willingness to frustrate judicial
> proceedings to avoid criminal liability
> suggests that the need for incapacitation and
> retribution is heightened as compared with
> the defendant charged with the same crime who
> allows judicial proceedings to progress
> without resorting to perjury.

Id. at 97-98.

The enhancement applies when a defendant like Shelton,

under oath, testified:  (a) untruthfully at trial; (b) with

32

respect to a material matter; that (c) was designed (given with willful intent) to substantially effect the outcome of the case and not as a result of confusion, mistake or faulty memory. Dunnigan, 507 U.S. at 94-95.  Thus, the sentencing judge must "find that the defendant (1) wilfully (2) and  materially (3) committed perjury, which is (a) the  intentional (b) giving of false testimony (c) as to a material matter." United States v. Zagari, 111 F.3d 307, 329 (2d Cir. 1997).  In this context, "material" means "evidence, fact, statement or information that, if believed, would tend to affect or influence the issue under determination." U.S.S.G. § 3C1.1, App. Note 5); see also United States v. Fayer, 573 F.2d 741, 745 (2d Cir. 1978) ("The test of materiality is whether the false testimony was capable of influencing the fact finder in deciding the issue before him").

In imposing an upward adjustment based on a defendant's trial perjury, a district court should "review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out." Dunnigan, 507 U.S. at 95.  The Second Circuit has construed Dunnigan as "requiring the district court to find that the defendant knowingly made a false statement under oath," and that "separate findings of fact [concerning each of the perjury requirements] are not required as long as a general finding of obstruction tracks those factual predicates necessary to support a finding of perjury." United States v. Williams, 79 F.3d 334, 337 (2d Cir.

33

1996) (internal quotation marks and citations omitted); see also
United States v. Catano-Alzate, 62 F.3d 41, 42 (2d Cir. 1995)
(same); United States v. Fan, 36 F.3d 240, 247 (2d Cir. 1994)
(same); and United States v. Shonubi, 998 F.2d 84, 88 (2d Cir.
1993) (same).

        The jury's verdicts in this case fully support the
application of a perjury enhancement.  During the course of ten
days of sworn testimony, Shelton repeatedly lied to the jury
about his knowledge and role in the fraud by claiming he had no
hint, no clue, no indication, and no knowledge that any fraud had
been committed at CUC and later Cendant.  Tr. 11578-80, 12537-
39.  Shelton contradicted the inculpatory testimony of Anthony
Menchaca, Tr. 12542-44, Michael Monaco, Tr. 12568-74, and Scott
Forbes, Tr. 13358-60, none of whom had any incentive to "frame"
Shelton for crimes he did not commit.  The United States
maintains that Shelton's testimony, given in contradiction of
these witnesses' testimony, is also perjurious.

        Shelton also repeatedly contradicted the testimony of
Pember which directly inculpated Shelton in the charged crimes.
E.g., Tr. 12313-14, 12378-79, 12397-98, 12439, 12500-01, 12537-
59, 12554, 13021-23, 13212-13, 13327-28, 13345-46.  Given the
convictions of Shelton on all counts, however, the jury likely
credited Pember's testimony that inculpated Shelton.[13]  Shelton

_____

[13] Thus, the United States also maintains that Shelton's
testimony, in which he directly disputed Pember's testimony, is
perjurious.  Additional examples of Shelton's perjurious
testimony is contained in a Table attached to this memorandum as
                                            (continued...)

also repeatedly contradicted the testimony of Corigliano that
directly inculpated Shelton in the charged crimes.  E.g., Tr.
11746, 11786-87, 11797, 11915-16, 12026-28, 12101, 12133-35,
12163-68, 12237, 12283-87, 12296-98, 12360-62, 12400-02, 12514-
15.  By convicting Shelton on all 12 counts in which he was
named, the jury unanimously found beyond a reasonable doubt that
Shelton's repeated claims of innocence were false.

        The jury's conviction of Shelton on each count in the
Indictment demonstrates that the jury simply did not believe him
when he claimed to have no clue, no hint and no idea that
improper accounting was occurring at CUC.  Simply put, if the
jury had credited Shelton's testimony, it would not have
convicted him.  This fact alone supports a finding that Shelton
perjured himself.  As the Second Circuit has recognized, where,
as here, "the defendant's testimony relates to an essential
element of his offense, such as his state of mind or his
participation in the acts charged in the indictment, the judgment
of conviction necessarily constitutes a finding that the
contested testimony was false."  United States  v. Bonds, 933
F.2d 152, 155 (2d Cir. 1991); accord United States v. Onumonu,
999 F.2d 43, 46-47 (2d Cir. 1993); United States v. Shonubi, 998
F.2d 84, 87 (2d Cir. 1993).

        Specific examples of Shelton's false testimony are
identified in the PSR at Paragraphs 61-69 (the Interval cover

---

[13](...continued)
Exhibit D.

story); Paragraphs 72-73 (Exhibit 530 budget schedule ripped up by Shelton); and Paragraphs 75-79 (Walter Forbes plane expenses).[14] Shelton's testimony on each of those matters pertained to highly material issues that pertained directly to Shelton's knowledge of and participation in the charged fraud. Finally, Shelton's testimony was <u>designed</u> and was given with the <u>specific</u> <u>intent</u> to effect the jury's verdict.[15] Given his obvious incentive to exculpate himself and the critical importance of the facts as to which he testified falsely, it is inconceivable that Shelton's false testimony was anything but an intentional effort to mislead the jury in pursuit of an acquittal.

Accordingly, the perjury enhancement, as recommended in

---

[14] The PSR recommends that the perjury enhancement be applied as a result of Shelton's testimony concerning the Interval cover story and Exhibit 530 but not Shelton's testimony concerning Walter Forbes' plane expenses. PSR, Par. 103. Since the United States is asking only that one perjury enhancement be applied, it is not necessary for the Court to conclude that Shelton perjured himself in more than one instance. In any event, the United States contends that Shelton also lied when he testified at trial that the 1995 and 1996 plane expenses were merger related. Tr. 13180-83. This conclusion is not based solely on the fact that Shelton's testimony on this point conflicted with that of defendant Walter Forbes. Rather, it is based on the fact that Shelton's trial testimony, seven years after the event, was the exact opposite of what he told the Audit Committee investigators months after the incident. <u>See</u> <u>also</u> June 20, 2005 Letter from the United States to the Probation Office, Par. 10. The United States requests that the Court consider Shelton's multiple acts of perjury when fashioning Shelton's sentence.

[15] While there is no doubt that Shelton sought to mislead the jury, there is no requirement that the perjury ultimately affect the outcome of the case. All that is required is that the perjury be "designed" to effect the outcome of the case. <u>See</u> <u>United States v. Ahmad</u>, 202 F.3d 588, 603 (2d Cir. 2000) (statement was "material" where, "if believed, would tend to influence or affect the issue under determination").

the PSR, should be adopted by the Court.  Any other conclusion
would result in providing defendants like Shelton with a license
to commit perjury in their own defense -- a right that the
Supreme Court has repeatedly held does not exist.  United States
v. Dunnigan, 507 U.S. at 96 (citing cases); United States v.
Ruggiero, 100 F.3d 284, 293 (2d Cir. 1996) (once the factual
predicates have been established, the obstruction adjustment is
mandatory).

> Shelton correctly states (Shelton Mem. 72, n. 15) that
the Second Circuit requires "clear and convincing evidence" to
support a two-level perjury enhancement under U.S.S.G. § 3C1.1.
United States v. Ruggiero, 100 F.3d at 294.  He incorrectly
claims, however, that "there is support in Booker for the
proposition that the applicable burden of proof in sentencing
determinations is now proof beyond a reasonable doubt."  Shelton
Mem. 72, n.5.  To the contrary, the Second Circuit has explained
that, post-Booker,

> > with the mandatory use of the Guidelines excised,
> > the traditional authority of a sentencing judge to
> > find all facts relevant to sentencing will
> > encounter no Sixth Amendment objection.  Thus, the
> > sentencing judge will be entitled to find all of
> > the facts that the Guidelines make relevant to the
> > determination of a Guidelines sentence and all of
> > the facts relevant to the determination of a
> > non-Guidelines sentence.

United States v. Crosby, 397 F.3d 103, 112 (2d Cir. 2005)
(footnote omitted); see also United States v. Vaughan, __ F.3d
__, 2005 WL 1340327 (8th Cir., June 8, 2005)("the remedial
opinion in Booker held that such judicial fact-finding [under the

preponderance of the evidence standard] for sentencing purposes does not violate the Sixth Amendment when made as part of an advisory Guidelines regime"). Shelton's contrary argument that this Court must find that Shelton committed perjury beyond a reasonable doubt before it can impose the two-level obstruction enhancement

> misinterprets the Supreme Court's decision. The significance of <u>Booker</u> is that the Guidelines are only one factor to consider in reaching an appropriate sentence. Courts continue to apply a preponderance of the evidence standard in making evidentiary determinations for sentencing purposes.

<u>United States v. Green</u>, 2005 WL 1460176, *2-*3 (S.D.Ohio, June 21, 2005).[16]

Shelton cites <u>United States v. Ben-Shimon</u>, 249 F.3d 98 (2d Cir. 2001)(Shelton Mem. 71), in which the Second Circuit vacated a sentence that included an obstruction of justice enhancement because the enhancement was not supported by sufficient factual findings. <u>Id</u>. at 102-105. <u>Ben-Shimon</u> is materially distinguishable from the instant case in two significant respects. First, the alleged perjury in <u>Ben-Shimon</u> occurred when the defendant merely denied his guilt under oath during trial and was convicted thereafter. <u>Id.</u> at 103. The PSR

---

[16] <u>See also McReynolds v. United States</u>, 397 F.3d 479, 481 (7th Cir. 2005)("The remedial portion of <u>Booker</u> held that decisions about sentencing factors will continue to be made by judges, on the preponderance of the evidence, an approach that comports with the sixth amendment so long as the guideline system has some flexibility in application"); <u>United States v. Leroy</u>, __ F.Supp.2d __, 2005 WL 1458080, *1 (E.D.Wis., June 20, 2005) ("Under the now advisory guidelines, judges may find facts based on a preponderance of the evidence standard").

recommended an obstruction enhancement merely because the defendant testified in his own defense in a trial in which he was found guilty.  Second, the district court in Ben-Shimon "made no finding on the record as to the factual basis for the obstruction enhancement."  Id.  Instead, the court merely adopted conflicting statements contained in the PSR and denied the defendant's objections.  There was no further analysis as to which aspect of the defendant's testimony was false.

The United States is not seeking the perjury enhancement in this case simply because Shelton testified and denied his guilt.  Rather, the United States is seeking the perjury enhancement because Shelton willfully fabricated events and distorted the truth by testifying falsely as to particular material matters at trial.  Assuming that this Court will make the appropriate findings in this case regarding which portions of Shelton's testimony were perjurious, the protection of a defendant's right to testify at his own trial, which was relevant in Dunnigan's factual findings requirement, will be fully vindicated in this case.

### 7. No Acceptance of Responsibility:(Subtract 0 levels).

The PSR recommends that Shelton receive no reduction in his guideline offense level since he has failed to accept any responsibility for his criminal conduct.  PSR, Par. 115.  Shelton does not contest this recommendation.

The United States requests that in fashioning the appropriate sentence for Shelton within the applicable Guideline

39

range, the Court strongly consider Shelton's lack of any

acceptance of responsibility.  Unlike other conspirators in this

case who have acknowledged their role in the fraud and begun the

process of rehabilitation by cooperating with the United States,

Shelton continues to blame others for his plight in life and

describes his situation as "unfair."  PSR, Par. 137.  Shelton's

decision to deny all responsibility for his actions in the face

of the jury's verdict demonstrates that he fully deserves a

sentence within the Guideline range called for in this case, 151

to 188 months.

          Shelton is correct that he cannot be punished because

he elected to put the Government to its burden of proof.  Having

now been convicted, however, Shelton cannot claim that his utter

refusal to accept responsibility and demonstrate remorse for his

crimes is a matter which the Court should ignore in fashioning

the appropriate sentence.  To the contrary, although

> the due process clause of the fifth amendment
> prohibits a court from punishing a defendant for
> exercising a constitutional right, [t]here is a
> distinction . . . , however, between punishing a
> defendant for exercising his right to remain
> silent and considering the defendant's character
> in determining an appropriate sentence.  We
> disagree with the defendants' claim that these
> remarks evince an intent on the part of the court
> to punish them for their silence.  It is well
> established that a sentencing judge may consider
> lack of remorse when imposing a sentence.

United States v. Johnson, 903 F.2d 1084, 1090 (7th Cir. 1990)

(emphasis added)(internal citations omitted); see also United

States v. Blackman, 66 F.3d 1572, 1578 (11th Cir. 1995)(district

court properly enhanced defendant's sentence following his

sentencing hearing outburst which demonstrated a lack of remorse for his crimes).

    **B.**   **Shelton is Not Entitled to a Downward Departure.**

    In his effort to escape meaningful punishment for his criminal conduct, Shelton makes a series of downward departure motions. Shelton Mem. 74-93. None of these motions are appropriate under applicable Second Circuit precedent. Thus, each departure request should be rejected on its own terms and in the aggregate.

    **1.**  **General Principles Do Not Favor Departures**.

    Departures from the sentencing range dictated by the Guidelines are sanctioned only in select cases. As the Supreme Court has stated:

> Congress allows district courts to depart from the applicable Guideline range if "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."

Koon v. United States, 518 U.S. 81, 92 (1996) (quoting 18 U.S.C. § 3553(b)). As the Guidelines provide, and as the Court in Koon explained, "'[t]he Commission intend[ed] the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes,'" acknowledging that departures may be considered when the conduct differs "significantly" from the norm. Id. at 93 (quoting U.S.S.G. Ch. 1, Pt. A(4)(b)).

41

In Koon, the Court found that the Sentencing Commission had provided "considerable guidance as to the factors that are apt or not apt to make a case atypical, by listing certain factors as either encouraged or discouraged bases for departure." Id. at 94. The Court thus recommended that sentencing courts ask the following questions in determining whether a departure is warranted:

> 1) What features of this case potentially take it outside the Guidelines' 'heartland' and make of it a special, or unusual case?
>
> 2) Has the Commission forbidden departures based on those features?
>
> 3) If not, has the Commission encouraged departures based on those features?
>
> 4) If not, has the Commission discouraged departures based on those features?

Koon, 518 U.S. at 95 (quoting United States v. Rivera, 994 F.2d 942, 949 (1st Cir. 1993) (Breyer, J.)). The Court went on to advise that in the case where "the special factor is a discouraged factor, or an encouraged factor already taken into account by the applicable Guideline, the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." Id. at 96.

Because Shelton is the party seeking a departure, he bears the burden of showing, by a preponderance of the evidence, that it should be granted. See United States v. McDowell, 888 F.2d 285, 291 (3d Cir. 1989). If granted, the departure must be a "reasonable" one. United States v. Alba, 933 F.2d 1117, 1123

42

(2d Cir. 1991).

### 2.  <u>A Departure For Good Deeds is Unwarranted</u>.

Shelton contends that his purported good deeds, charitable contributions, and employment history are "extraordinary," making this a rare case which merits a downward departure from the Guidelines range.  Shelton Mem. 77-78; <u>see also</u> Shelton's Summary of Good Works and Charitable Activities. The Government disagrees, and urges the Court to deny Shelton's request for a departure.

The Guidelines state that "civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. § 5H1.11; <u>see</u> <u>United States v. Rioux</u>, 97 F.3d 648, 663 (2d Cir. 1996).  Shelton's civic, charitable, and employment-related good works are therefore a "discouraged" basis for downward departure.  As noted earlier, where the ground for a requested departure is "discouraged," the Supreme Court has directed that "the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present."  <u>Koon v. United States</u>, 518 U.S. at 96.  Shelton has not demonstrated that any of the factors upon which he relies is present in an unusual or exceptional way.

Departures based on good deeds require <u>very</u> unusual circumstances.  Although the Second Circuit has upheld a downward

departure <u>involving</u> charitable efforts, it has <u>never</u> upheld a
departure on that basis alone.  <u>See</u> <u>United States v. Rioux</u>, 97
F.3d at 663 (affirming a departure based on a combination of the
defendant's medical condition and good works); <u>but</u> <u>see</u> <u>United
States v. Acevedo</u>, 229 F.3d 350, 356 (2d Cir. 2000) (declining to
review the denial of a downward departure request to a defendant
who prevented the suicide of another inmate; the district court
found that the defendant's action was a "good work" falling
within U.S.S.G. § 5H1.11, and as such was not relevant to
determining whether a departure was warranted, and even assuming
it was relevant, "his act was not so exceptional as to warrant a
departure from the heartland situations covered by the
Guidelines").

        The Courts of Appeals have reversed as an abuse of
discretion departures predicated on service to the public that
was more compelling than what Shelton has offered here.  <u>See
United States v. Winters</u>, 105 F.3d 200, 209 (5th Cir. 1997)
(reversing a downward departure based on the defendant's
distinguished military service, during which he was twice wounded
in combat and awarded two Purple Heart medals); <u>United States v.
Rybicki</u>, 96 F.3d 754, 758-59 (4th Cir. 1996) (reversing a
departure based on the national service of "a highly decorated
Vietnam War veteran who had saved a civilian's life during the My
Lai incident and had an unblemished record of 20 years of service
to his country, both in the military and in the Secret Service").

        White-collar criminals such as Shelton "enjoy

44

sufficient income and community status so that they have the
opportunities to engage in charitable and benevolent activities."
United States v. Haversat, 22 F.3d 790, 796 (8th Cir. 1994).
"[W]e expect the district courts to view such evidence with the
skepticism of experience in sentencing executives who commit
white-collar offenses." Id. There is nothing truly exceptional
in contemporary American society for the well-to-do to donate
money or time to charitable causes. As one court has explained:

> On the subject of Morken's service to his
> community, the letters [received by the district
> court at sentencing] document a commendable
> record. In addition to being an accommodating
> neighbor and a good friend, Morken advised local
> business owners, hired young people, served on his
> church council, and raised money for charity
> . . . . Although laudable, Morken's record of
> good works is neither exceptional nor out of the
> ordinary for someone of his income and preeminence
> in a small Minnesota town with a population barely
> over a thousand.

United States v. Morken, 133 F.3d 628, 630 (8th Cir. 1998); see
also United States v. Millar, 79 F.3d 338, 345 (2d Cir. 1996)
(refusing to review the district court's decision not to depart
based upon the defendant priest's charitable works and public
service, where the district court recognized its authority to
depart; the defendant "had benefits that few defendants have,
including education, respect in his work, skills of advocacy,
intelligence, and the calling to serve as a priest"); Haversat,
22 F.3d at 796 ("We conclude that Haversat's charitable and
volunteer activities, while considerable, do not make him an
atypical defendant in antitrust price-fixing cases."); United
States v. Jordan, 130 F.Supp.2d 665, 672-73 (E.D. Pa. 2001)

45

(denying a departure for a defendant convicted of money laundering, despite numerous letters detailing substantial charitable contributions, generosity to community members in need of food, and service as mentor for neighborhood youths; these acts, "while commendable, are not so exceptional or extraordinary for a person" like the defendant who owned a small business); United States v. Scheiner, 873 F.Supp. 927, 933-35 (E.D. Pa. 1995) (departure was not warranted for a doctor convicted of conspiring to defraud an insurance company, despite his contributions to the young and poor minorities, including financial sponsorship of several basketball teams, serving on several community boards, working in a podiatry clinic where free services were provided to the poor, and "generally [having] served as a source of support and inspiration to many"; defendant's charitable activities, while "considerable" and "commendable," were not extraordinary in the context of (a) defendant's background, (b) the effect a departure would have on others in his professional community, (c) the absence of mitigating financial circumstances, (d) the four-year duration of defendant's crimes, and (e) the fact that defendant's criminal conduct continued until detection became inevitable); see generally United States v. DeMasi, 40 F.3d 1306, 1324 (1st Cir. 1994)(the sentencing court should compare the defendant to other defendants with community service backgrounds, not just to other bank robbers, to determine if defendant's record of civic involvement "stands out from the crowd").

46

These decisions are grounded in the recognition that individuals with sufficient stature, ability and opportunity to commit white-collar crimes are commonly involved in community service and charitable endeavors, and such activities do not remove the defendant from the contemplated heartland of defendants charged with white-collar offenses. Indeed, it is widely recognized that "the [Sentencing] Commission intended its guidelines and policy statements to 'equalize punishments for white collar and blue collar crime,'" and courts have endeavored to implement that intention in sentencing. United States v. Thurston, 358 F.3d 51, 80 (1st Cir. 2004) (reversing the district court's downward departure where the white-collar defendant's good works, although "admirable," were insufficient to qualify as exceptional in light of, among other things, his status as a prominent corporate executive with the means to make financial contributions and engage in civic and charitable activities), vacated on other grounds, 125 S. Ct. 984 (2005); see also United States v. Wright, 363 F.3d 237, 248-49 (3d Cir. 2004) (upholding the district court's denial of a downward departure where the defendant minister's good works, although "profound," "substantial," and "sustained," were not so extraordinary as to justify a downward departure).

However much Shelton has used his great wealth to help his family and friends, it falls far short of being so extraordinary as to justify a downward departure. Shelton's submission demonstrates, at most, that Shelton is considered by

47

some to be a good parent, boss, friend, and neighbor.  It does not, however, demonstrate that Shelton has provided truly exceptional service to the community or has made any exceptionally difficult personal sacrifices by comparison to those made daily by other members of the community in which he lives.

Most of the good works cited by Shelton -- showing kindness and compassion for friends, family, and colleagues going through difficult times, and acting as a role model for others in their professional lives -- are what would be expected from anyone who claims to care about others, and particularly from those with Shelton's substantial means.  That many of Shelton's friends and relatives think highly of him as a person and as a professional does not distinguish him from most other white-collar criminals.  See United States v. McClatchey, 316 F.3d 1122, 1135 (10th Cir. 2003) ("excellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her").  The case law is rife with convicted felons who, other than their criminal conduct, appear to be compassionate and praiseworthy people.  The Sentencing Guidelines do not, however, authorize a downward departure merely because a defendant has shown kindness, even considerable kindness, to others or because he has had an otherwise successful career.

Nor does Shelton's record of contributing time and

48

money to various charitable organizations merit a downward
departure.  Shelton made a tremendous amount of money working at
CUC and later Cendant.  Tr. 1265.  During the years 1996 to 1998,
when the fraud at CUC was raging, Shelton's earnings exceeded $29
million.  PSR, Par. 145.  Shelton's vast wealth was obtained in
large measure because he and his coconspirators defrauded the
investment community.  That Shelton may have chosen to give a
small percentage of this money to select relatives, friends and
charities hardly warrants special consideration.  It is not
extraordinary for the most wealthy of white-collar defendants to
be heavily involved in charities and civic organizations.  See
Haversat, 22 F.3d at 796 (white-collar criminals "enjoy
sufficient income and community status so that they have the
opportunities to engage in charitable and benevolent
activities").

        In fact, Shelton has not even demonstrated that his
charitable giving is beyond the norm for wealthy Americans with a
net worth of $30 million.  Shelton has chosen not to document the
specific amount of charitable contributions he has made other
than to claim that he has made 29 contributions of $1,000 or
more.  See Defendant Shelton's Summary of Good Works and
Charitable Activities, p. 15.[17]  Cf. United States v. Thurston,

_____

[17] Shelton has not produced his federal tax returns to the United
States so that it may determine what percentage of his net worth
and income he contributed to charity.  Thus, Shelton has utterly
failed to demonstrate how his charity is any different from the
average contributions made by other white collar executives with
a multi-million dollar income and an extensive net worth.  Even
                                        (continued...)

49

358 F.3d at 79 (reversing the district court's decision to depart downward; the defendant's tithing of 10% of his income to his church, devoting hours each week to his church, and opening his home to the parents of a woman undergoing medical attention were not sufficiently extraordinary).

In United States v. McHan, 920 F.2d 244, 248 (4th Cir. 1990), a wealthy drug defendant who pled guilty and acknowledged his guilt, unlike Shelton, received a downward departure for his substantial charitable contributions.  On appeal, the Fourth Circuit reversed the departure using language apropos to Shelton's current claim:

> It would be ironic if the judicial system were to reward [defendant] with a lower sentence because he was a successful drug dealer rather than an unsuccessful one.  Such an approach to sentencing would create perverse incentives for those involved in criminal enterprises.  Moreover, to allow any affluent offender to point to the good his money has performed and to receive a downward departure from the calculated offense level on that basis is to make a mockery of the Guidelines.  Such accommodation suggests that a successful criminal defendant need only write out a few checks to charities and then indignantly demand that his sentence be reduced.  The very idea of such purchases of lower sentences is unsavory, and suggests that society can always be bought off, even by those whose criminal misconduct has shown contempt for its well-being.

Id. at 248.

As to Shelton's argument that, other than his

_____

[17](...continued)
assuming arguendo that Shelton did contribute $29,000 to charity, that is one tenth of one percent of the $29 million in benefits he received in the years 1996 to 1998.  This can hardly be described as extraordinary.

involvement in this multi-billion dollar, multi-year fraud, he has lived an exemplary life, the Guidelines already take this fact into account, by according him a Criminal History Category of I.

Finally, cases cited by Shelton do not support his request for the extraordinary large downward departure from an Offense Level of 34 to a level that would comport with a sentence of probation (Zone A, level 8, 0-6 months).  None of the cases cited by Shelton involve such steep departures.  Cf. United States v. Serafini, 233 F.3d 758, 773 (3d Cir. 2000)(three level departure); United States v. Woods, 159 F.3d 1132, 1136-37 (8th Cir. 1998)(three level departure); United States v. Jones, 158 F.3d 492, 497-504 (10th Cir. 1998) (three level departure based on a combination of eleven factors).[18]

### 3. **A Departure to Avoid Disparity is Unwarranted.**

Shelton contends that his sentence should be reduced below the applicable Guidelines range to avoid "an unwarranted disparity." Shelton Mem. 102.  To the contrary, a sentence in this case that would be proportional to what other similarly situated defendants have recently received in this Circuit would fall within the applicable Guidelines range of 151 to 188 months. Recently, a district court in the Southern District of New York

---

[18]  The ten level departure affirmed in United States v. Rioux, 97 F.3d at 648 was based in large part on the defendant's poor medical condition, including one transplanted kidney, another diseased kidney, and two replaced hips.  Shelton, by contrast, has no physical maladies.  PSR, Par. 132.

imposed a 20 year sentence and a 15 year sentence on Timothy Rigas and his ill 80 year old father, John Rigas, based on their convictions at trial for conspiracy to defraud Adelphia investors, bank fraud and securities fraud.  To achieve proportionality, Shelton should receive the type of sentences imposed in those cases.[19]

Citing statistics regarding other Second Circuit white collar cases, Shelton nevertheless contends that a sentence of probation is justified.  Shelton Mem. 102-105.  He contends that these statistics demonstrate that the average sentence for persons convicted of fraud offenses in the Second Circuit was 24.2 months, the average sentence for persons convicted of frauds involving over $100 million in losses was 59.6 months, and some defendants received sentences of probation.  Id. at 104.  These data, and Shelton's arguments based on them, fail to consistently differentiate between persons who, like Shelton, pleaded not guilty and declined to cooperate with the Government, and those who, like the cooperating witnesses in this case, pleaded guilty,

---

[19] Other cases that provide a relevant base line include United States v. Bennett, 252 F.3d 559, 560-61 (2d Cir. 2001).  In that case, following convictions for securities fraud, money laundering and bank fraud, the district court granted an upward departure and imposed a 30 year prison sentence.  Following remand, the district court again upwardly departed and imposed a sentence of twenty-two years on the basis of the extraordinary amount of the loss, the number of victims, and Bennett's efforts to shield his assets by placing them in his wife's name while the scheme was ongoing.  See United States v. Bennett, No. 02-1379 (2d Cir. Sep. 18, 2003) (unpublished).  See also United States v. Hoffenberg, Nos. 94 Cr. 213 (RWS), 95 Cr. 321 (RWS), 1997 WL 96563 (S.D.N.Y. Mar. 5, 1997) (20 year sentence imposed on the CEO and Chairman of a public corporation, who defrauded insurance regulators and investors).

thereby earning a two or three level reduction in their offense levels pursuant to U.S.S.G. § 3E1.1, and also agreed to cooperate, thereby earning a potential downward departure pursuant to U.S.S.G. § 5K1.1.

One cannot determine which if any of the defendants identified in the table appended as Exhibit F to Shelton's memorandum pled guilty and cooperated, showed remorse by disgorging ill gotten gains, and/or voluntarily brought their crimes to the attention of authorities.  For instance, the table recites that Judge Cederbaum of the Southern District of New York imposed prison sentences of 87 months incarceration to one defendant (Michael Rosoff) who was convicted by a jury; and 108 months incarceration to another defendant (Mitchell Brater) who was also convicted by a jury, but only five years probation for a third (Richard Levine) who was "convicted of conspiracy."  The table does not mention whether or not Levine pleaded guilty and cooperated.  Consideration in this case of sentences imposed on defendants in other cases who pleaded guilty and cooperated would improperly compare apples and oranges.[20]   Given that Shelton has

---

[20]   Another case mentioned in the table is that of Michael Milken.  Shelton Mem. Exhibit F, p. 3.  Shelton's effort to analogize the facts of his case to that of Milken's misses the mark.  Milken pled guilty and accepted responsibility for his conduct; Shelton accepts no responsibility and blames others for his plight.  Milken cooperated with authorities to assist the prosecution in bringing other cases which enabled him to reduce his ten year prison sentence to 34 months after he fully cooperated; Shelton has not cooperated at all with the authorities.  Milken provided substantial funds ($1.1 billion) to make victims whole; Shelton has provided no funds to compensate his victims and continues to shield his assets from being seized.
(continued...)

53

shown no remorse and has gone to considerable efforts to shield

his assets against restitution to his victims,[21] his reliance on a

chart prepared by the National Center on Institutions and

Alternatives is seriously misplaced.[22]

Shelton's resort to sentences imposed in other cases

involving a multitude of differences from this case is even less

compelling than arguments, frequently rejected, based on

disparities between sentences imposed within a single case.

Those disparities are often a function of the different treatment

of defendants who cooperate and those who stand trial.  As the

Eighth Circuit has explained:

> [T]here is a logical explanation for the shorter
> sentences imposed upon the other criminals
> involved in the drug conspiracy. . . .  Unlike
> Ponce, [other] defendants cooperated with the
> government.  As a result, the government filed
> downward departure motions on behalf of these

---

[20](...continued)

[21] Among other acts, Shelton established an Irrevocable Trust in
the amount of $7.5 million dollars eight days after first meeting
with prosecutors in this case.  Shelton also placed his wife as
the owner of the management group SCIP despite the fact she
appears to have no involvement in the management of the
partnership.  Following the verdict in this case, Shelton
shielded another $2 million of his assets by transferring that
amount to his counsel for pre-paid legal services.  That $2
million payment is in addition to the $22 million already paid by
Cendant for Shelton's approximately 15 lawyers who represented
him prior to, and during, the trial.  Exhibit B, p. 2.

[22] The bias of the National Center on Institutions and
Alternatives in favor of criminal defendants is apparent from its
Internet site at www.ncianet.org.  Among other things, this web
site states that "NCIA has long advocated that imprisonment
without treatment or rehabilitative programming is overused in
many cases" and "[s]ince 1979, NCIA has provided criminal justice
services to defense attorneys, defendants, inmates, and court
systems throughout the country" (emphasis added).

defendants, and they received lower sentences.
Because the differences between Ponce's sentence
and the sentences of these defendants arose from
the plea bargaining process, they are not a proper
basis for a reduction.

Ponce v. United States, 311 F.3d 911, 914-15 (8th Cir. 2002).

Shelton contends that he should be sentenced as leniently as the cooperating co-conspirators because he, like they, "was not fully appreciative of the wrongful nature of their conduct." Shelton Mem. 73. Regardless of what the cooperators thought of the lawfulness of their criminal conduct when they engaged in it, they, unlike Shelton, have not only come to appreciate the wrongfulness of their conduct, they have also pleaded guilty to federal crimes, accepted responsibility for those crimes and made efforts to cooperate in the investigation and prosecution of others. Even while facing the sentencing court, Shelton continues to stand on his claims of innocence, and denies that he did anything even remotely improper, much less criminal.

Shelton further contends that he should receive a reduced sentence because his co-conspirators "viewed their activities as violating some 'technical regulations,' without intending any harm or unlawful result." Id. Shelton's defense at trial, however, was not that he and his co-conspirators engaged in the conspiracy but did so without the intent to commit a heinous crime, or that he was somehow duped into participating in the fraud based on a mistaken belief that his conduct was merely "technical wrongdoing." Rather, his defense was that he

55

was wholly uninvolved in what his attorney conceded was a "big fraud" (Tr. 117) that was committed by Cosmo Corigliano and his underlings.  Thus, Shelton stands in entirely different shoes from his co-conspirators.  The failure of Corigliano and Pember to appreciate during the conspiracy that their conduct violated not only GAAP but federal criminal law has no bearing on Shelton's <u>mens</u> <u>rea</u> because he never admitted that he committed a crime which he believed at the time was "really not that bad."[23]

### 4.  No Departure is Warranted Due to "Overlapping Conduct."

Shelton argues that a downward departure is necessary to mitigate the allegedly cumulative effects of overlapping sentencing enhancements, pursuant to <u>United States v. Lauersen</u>, 348 F.3d 329 (2d Cir. 2003), and <u>United States v. Jackson</u>, 346 F.3d 22 (2d. Cir. 2003).  Shelton Mem. 90-93.  This claim should be rejected.

Each Guideline enhancement that applies to Shelton is triggered by its own set of facts.  For example, the Probation

_____

[23]  Shelton now engages in selective crediting of trial testimony to "prove" his supposed motives for committing the fraud.  In his post-trial motions, Shelton argued that Corigliano's and Pember's testimony was so fraught with lies that the jury was legally obligated to reject in toto those portions which inculpated Shelton.  In support of his request for a lenient sentence, Shelton credits the testimony of Corigliano and Pember that they did not intend to deceive the shareholders when they cooked the books at CUC and Cendant.  Shelton Mem. 88-89.  Although Shelton criticizes the Government for supposedly taking inconsistent positions regarding the loss amount (Shelton Mem. 85) (a contention that the Government disputes), he feels free to rely on the testimony of the supposed perjurers, Corigliano and Pember, when it suits his purposes.

Office recommends an enhancement for more than minimal planning because Shelton's criminal conduct lasted for many years. The Probation Office also recommends an enhancement for Shelton's abuse of his position of trust, i.e., his position as President of CUC. That enhancement would apply regardless of the length of the conspiracy. The Probation Office also recommends a four-level leadership enhancement, which is based on Shelton's relationship vis-a-vis his co-conspirators, by contrast to Shelton's fiduciary relationship vis-a-vis the victims.

Although the Second Circuit affirmed a departure for overlapping conduct in Lauerson, the same panel that decided that case explained on rehearing that "not many combinations of enhancements will be substantially overlapping." United States v. Lauersen, 362 F.3d 160, 167 (2d. Cir. 2004), vacated on other grounds, 125 S.Ct. 1109 (2005). Thus, the Court concluded that enhancements for a leadership role and an abuse of trust (enhancements that Shelton should receive) do not substantially overlap with each other. Id. at 168 n. 12; cf. Lauersen, 348 F.3d at 343-44 (13-level loss enhancement and 4-level enhancement for affecting a financial institution were both "significantly trigger[ed]" by "large amount of money involved in the fraud").

As for the 18 level enhancement for loss, although fraud offenses with large losses and/or multiple victims such as this one may often involve five or more participants and an abuse of position of trust, there is no logical overlap among the facts supporting each of those enhancements. Because Shelton's

57

sentencing enhancements do not substantially overlap, a departure under Lauersen and Jackson is unwarranted. See United States v. Rigas, (June 21, 2005 sentencing proceeding) (district court denied Lauersen departure).

Shelton claims that he should escape the two level enhancement for "more than minimal planning" because all frauds involving multiple participants, extended duration, and large losses, involve more than minimal planning. Shelton Mem. 93. The two level enhancement does not involve duplicative punishment merely because it applies to virtually all frauds. Rather, under the version of the Guidelines Manual that applies in this case, the Sentencing Commission set the base offense level for frauds very low, at a level "6," to accommodate those very rare opportunistic frauds that involve only minimal planning and no loss. Since this was not one of those very rare cases, the more than minimal planning enhancement should be applied.[24]

---

[24] Partially in recognition of the very few fraud cases that do not involve at least "more than minimal planning," the Sentencing Commission substantially revised the guidelines pertaining to fraud offenses in 2001. The Commission: eliminated U.S.S.G. § 2F1.1; created an entirely revised § 2B1.1 that applies to "Basic Economic Offenses;" eliminated the two level enhancement for more than minimal planning; and reduced the number of levels of loss amount, but increased the degree of punishment for each level of loss. U.S.S.G. § 2B1.1(b) (2001). See U.S.S.G. Guidelines Manual, Appendix C - Volume II, Amendment 617, eff. November 1, 2001, "Consolidation of Theft, Property Destruction, and Fraud; Miscellaneous Revisions."

Pursuant to a Congressional directive in the Sarbanes-Oxley Act, the Commission again revised § 2B1.1 in 2004, created a new two-level enhancement for "sophisticated means," U.S.S.G. § 2B1.1(b)(9)(C)(2004), and added additional tiers of loss amounts at the top of subsection (b). U.S.S.G. § 2B1.1(b)(1)(A)-
(continued...)

The fact that Shelton is properly subjected to multiple enhancements because he abused his position of trust, played an aggravated role in the offense, harmed many victims, and caused a huge loss, does not amount to impermissible double-counting under the Guidelines.  See United States v. Barrett, 178 F.3d 643, 649 n. 4 (2d Cir. 1999)("Impermissible double counting does not occur where a court enhances a defendant's sentence for both more than minimal planning and abuse of a position of trust."); United States v. O'Neil, 118 F.3d 65, 76 (2d Cir. 1997) (rejecting the claim that the district court impermissibly double counted the defendant's leadership role in the offense because it also applied the two level adjustment under § 2F1.1(b)(2) for more than minimal planning; "the district court relied on factors beyond [the defendant's] role in the offense in applying the planning adjustment and therefore did not engage in impermissible double counting");[25] United States v. Wilson, 955 F.2d 547, 550

---

[24](...continued)
(P)(2004).  Here, by virtue of the timing of his crimes, Shelton is not subject to a "sophisticated means" enhancement that would clearly apply to the facts of this case, nor to the increased number of offense levels that would apply to a fraud which caused losses in the billions of dollars.

[25]  Accord United States v. Myerson, 18 F.3d 153, 163 (2d Cir. 1994); United States v. Rappaport, 999 F.2d 57, 61 (2d Cir. 1993); United States v. Kneeland, 148 F.3d 6, 16 (1st Cir. 1998) (application of the enhancements for both the defendant's aggravated role in the offense, and for more than minimal planning did not result in impermissible 'double counting.'"); United States v. Porretta, 116 F.3d 296, 301 (7th Cir. 1997) (noting that "[v]irtually every circuit to have addressed the issue has reached the same conclusion," and citing cases).

(8th Cir. 1992)(more than minimal planning adjustment did not double count the 9 level increase based on the value of the stolen property; the former "increases the punishment for repeated criminal acts, regardless of the amount stolen"). Accordingly, this Court should not reduce Shelton's sentence based on supposed "overlapping conduct."

### 5. No Departure is Warranted Due to an Overstatement of the Seriousness of the Offense.

The Government has previously responded to Shelton's claim that the 18 level enhancement for loss overstates the seriousness of the offense. See infra, Part 1, A.2.b.

### 6. No Departure is Warranted Due to Family Circumstances.

U.S.S.G. § 5H1.6 provides that "[f]amily ties and responsibilities and community ties are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range."  Because § 5H1.6 uses the phrase "not ordinarily relevant" a Court should only depart in an extraordinary case.   As this Court and numerous other courts have recognized, all custodial terms of imprisonment impose a hardship on important family responsibilities.  See United States v. Sprei, 145 F.3d 528, 534 (2d Cir. 1998) (vacating departure where religious father's incarceration would impact children's marriage prospects); United States v. Headley, 923 F.2d 1079, 1083 (3d Cir. 1991) United States v. Cacho, 951 F.2d 308, 311 (11th Cir. 1992); United States v. Daly, 883 F.2d 313, 319 (4th Cir. 1989); United States v. Brewer, 899 F.2d 503, 508 (6th Cir.

1990).

As explained by the Second Circuit in <u>United States v.</u> <u>Sprei</u>, 145 F.3d at 534:

> Family ties and responsibilities are a discouraged
> basis for departure.  <u>See</u> U.S. Sentencing
> Guidelines Manual § 5H1.6 policy statement.  This
> is because "many defendants shoulder
> responsibilities to their families.... Disruption
> of the defendant's life, and the concomitant
> difficulties for those who depend on the
> defendant, are inherent in the punishment of
> incarceration." <u>United States v. Johnson</u>, 964
> F.2d 124, 128 (2d Cir.1992).  The presence of a
> hardship resulting from imprisonment is therefore
> ordinarily not enough to warrant a departure.  It
> is only "[e]xtraordinary circumstances ... not
> capable of adequate consideration .... [that] may
> constitute proper grounds for departure." <u>Id</u>.  In
> other words, only if a district court finds the
> hardship to be exceptional may it downwardly
> depart on that basis. <u>See</u> <u>United States v.</u>
> <u>Galante</u>, 111 F.3d 1029, 1034 (2d Cir. 1997).

All families suffer when a loved one commits a crime.
Thus, Shelton's attempt to pull at the Court's heart strings by
implicitly suggesting that he cannot be incarcerated since his
family needs him is hardly atypical.  There is nothing
exceptional or extraordinary about Shelton's family circumstances
to separate Shelton from other defendants facing incarceration
who have the loving support of family members.  Thus, he is not
entitled to a departure on this discouraged basis.

**B.    <u>No Departure is Warranted by Combining the Motions</u>.**

Shelton next asserts that even if no one argument,
standing alone, warrants a downward departure, their combined
effect provides a sufficient basis for such relief.  Shelton Mem.
94-95.  Like the old adage, Shelton can not win (a departure) for

losing numerous departure arguments.

The Sentencing Commission has acknowledged that in
<u>extremely rare</u> cases, where numerous factors and circumstances
are present, a departure may be warranted even though no one
factor or circumstance, standing alone, would justify a
departure:

> The Commission does not foreclose the
> possibility of an <u>extraordinary case</u> that,
> because of a combination of such
> characteristics or circumstances, differs
> significantly from the "heartland" cases
> covered by the Guidelines in a way that is
> important to the statutory purposes of
> sentencing, even though none of the
> characteristics or circumstances individually
> distinguishes the case.  <u>However, the
> Commission believes that such cases will be
> extremely rare.</u>

U.S.S.G. § 5K2.0, commentary (emphasis added); <u>see United
States v. Volpe</u>, 224 F.3d 72, 78-79 (2d Cir. 2000) (district
court properly refused to depart downward on basis of combination
of defendant's efforts to exonerate supposedly innocent man and
inculpate another, and other factors claimed to make Guidelines
sentence unusually harsh); <u>United States v. Payton</u>, 159 F.3d 49,
61-62 (2d Cir. 1998) (district court abused discretion in
departing downward based on combination of defendant's lack of
positive role models as a youth, history of drug abuse and failed
treatment, possible ineligibility for credit for pretrial
detention, and learning disability).

Shelton's circumstances are neither "extraordinary" nor
"extremely rare."  In fact, in the world of white collar
securities fraud prosecutions, Shelton's situation and the

arguments he raises in his downward departure motions are the norm, not the exception.  As discussed above, none of the enumerated departure grounds on their own merits supports a downward departure.  Those grounds are no more persuasive when viewed in combination.  Shelton has failed to show why, in light of the combination of factors he cites, he merits a sentence lower than that set by the Sentencing Commission.  Nor has he adequately explained how a downward departure to a term of probation can be squared with the need "to provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," and "to promote respect for the law."  18 U.S.C. § 3553(a)(2)(A)&(B).  In consequence of these failures, a downward departure based on a combination of factors is inappropriate.

### Part 2

### Section 3553 Factors

Title 18, United States Code, Section 3553(a) provides, in pertinent part, that:

> (a) Factors to be considered in imposing a sentence.--The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed–
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> ***
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

For the reasons discussed above, Shelton's conduct, weighed in view of the factors set forth in Section 3553(a), call for a sentence of imprisonment consistent with the terms recommended by application of the Sentencing Guidelines, a sentence in the range of 151 to 188 months.  <u>See</u> 18 U.S.C. § 3553(a)(4) (Court shall consider the sentence applicable under the Guidelines).

### A.   <u>The Nature and Circumstances of the Offense</u>.

Shelton's criminal conduct, defrauding investors and the public about the earnings of a public company, is among the most serious, costly, and damaging to investor confidence that have ever been committed.  Indeed, at the time of the April 15, 1998 announcement, the CUC/Cendant accounting fraud committed by Shelton and his coconspirators that cost investors more than $14 billion was the largest accounting fraud ever recorded.  <u>See</u>  <u>In re Cendant Corp. Litigation</u>, 264 F.3d at 221; <u>see also</u> Letter

64

Dated July 8, 2005 from the SEC, Exhibit C to this memorandum.

As demonstrated at trial, Shelton and his conspirators systematically lied to the investing public and the SEC about the earnings CUC and later Cendant made.  In fact, as proven at trial, earnings were fabricated each and every quarter and each year from the early 1990's to the time of Cendant's April 15, 1998 announcement.  While the investing public was being systematically defrauded, Shelton alone saw his net worth go from virtually nothing to $60 million.  Tr. 12625.

By any objective standard, the harm caused was extraordinary.  During the period of the conspiracy, Shelton and his conspirators fraudulently claimed that CUC and later Cendant had earned at least $300 million more than the company truly earned.  An unwitting public, believing the representations made by Shelton and CUC, bought stock in CUC and later Cendant, only to suffer losses in the billions of dollars when the truth emerged.

As a direct result of the Shelton's fraudulent schemes, the victims have never been made whole.  While Cendant and the accounting firm Ernst & Young have paid collectively over $3 billion in settlements, these payments are only a fraction of the total loss suffered by the victims, some of whom were pensioners and retired investors who could ill afford such losses. The nearly unprecedented extent of the harm caused by Shelton and his conspirators is underlined by the letter submitted by Cendant.  In a letter dated July 5, 2005, attached as Exhibit A,

hereto, counsel for Cendant described the extraordinary
significance of Shelton's crimes and their impact on Cendant and
its shareholders.  In particular, Cendant's letter explains the
devastating impact that Shelton's crimes had on the value of
Cendant's securities, the value of Cendant as an ongoing
enterprise, and the harm to Cendant's remaining employees in time
and effort spent trying to put right what Shelton and his
conspirators did wrong at CUC and later Cendant:

> it is important to remember the many thousands of
> innocent people who were brutally damaged by Mr.
> Shelton's crimes simply because they worked for
> the company or did business with the company.
> Damage to people whose names never get mentioned
> at trials or in news reports is nonetheless real,
> and Cendant asks that their desire for justice
> also be recognized.
>
> *   *   *   *
>
> Cendant was in the news continuously, a veritable
> poster child for fraud and mismanagement.  (At
> that time the Enron era had not begun).  Since all
> that was known then was that the crimes had been
> committed but not by whom, management's
> credibility was suspect.  From April 16, 1998 to
> today, Cendant and its management have rebuilt
> their reputations and credibility in the
> marketplace one day at a time, mindful that there
> no longer exists any margin for error as a result
> of these crimes.  There is no way to quantify that
> damage but it is there.

Exhibit A, pp. 1, 3.

In addition to the extraordinary monetary harm and
impact on the victims of the defendants' crimes, the malfeasance
and violations of trust committed by Shelton has had less
tangible, but no less serious, impacts.  This impact is
eloquently described in that same letter submitted by Cendant:

> As a senior officer with operational responsibility for a major public company, Mr. Shelton was expected to be honest and not engage in criminal activity. People invest in or chose to work for public companies for many reasons, but they do so with the hope that their investment or employment will be profitable. One essential ingredient to attract investors is a company's reputation for honesty, integrity and the accuracy of its financial reports.

Id. at p. 2.

Finally, the letter submitted to the Court by the United States Securities and Exchange Commission ("SEC"), dated July 8, 2005 and attached as Exhibit C hereto, underlines the extraordinary nature of the offenses committed by Shelton and his conspirators. In its letter, the SEC explains the impact of Shelton's criminal actions:

> The negative effects of the CUC/Cendant fraud are not limited to the companies' shareholders. The fraud also impacted the public's perception of the nation's securities markets. The ability of businesses to raise capital for their operations depends, in great measure, upon individual investors' perceptions of the integrity of our capital markets. Those perceptions turn in large part on investors' ability to rely upon the financial reporting of public corporations, particularly the largest corporations, such as Cendant. Shelton intentionally painted for investors a rosy financial picture at odds with reality, and that underlying reality shocked the public when it was ultimately revealed. The enormous negative impact of the CUC/Cendant fraud on the public's perception of the integrity of our securities markets, while perhaps difficult to quantify, cannot be denied and should be considered in determining Shelton's sentence.

Exhibit C, p. 2.

By any measure – the seriousness and pervasiveness of the illegal conduct, the amount of investor losses, the impact on

67

the victims of the offense, and the impact on the public markets
– Shelton's conduct stands almost unparalleled among "white
collar" offenses.   The Government respectfully submits that this
factor warrants a sentence consistent with the Sentencing
Guidelines and consistent with the handful of sentences imposed
in this Circuit in similar cases such as the Rigas case and the
other cases cited above.

   B.  **History and Characteristics of Shelton**.

         As was repeatedly demonstrated throughout the trial,
Shelton, as the President of CUC and later Vice Chairman of
Cendant, violated the trust placed in him by the CUC/Cendant
shareholders and the SEC.   By repeatedly lying to CUC's investors
and to the market as a whole, Shelton advanced his own personal
interests – – to become rich, to become powerful and to head up a
company considered an investment darling on Wall Street.   Besides
the riches he received, Shelton apparently relished his role as a
member of the Young Presidents Organization ("YPO"), a club
populated only by those who had attained the title of President
prior to the age of 40.   Tr. 11427-28.   That Shelton was willing
to sacrifice his moral compass to attain his goal of running a
large public company, and membership in the YPO, speaks volumes.
At the same time, despite his purported claims of honesty and
decency, Shelton demonstrated an utter lack of respect for the
law and the simple rule of telling Wall Street, CUC investors and
his merger partner, HFS, the truth.

         Although Shelton, like virtually all white collar

offenders, does not have a prior conviction, there are many important facts about his history and characteristics that merit consideration. First, the duration of his criminal conduct shows a longstanding pattern of contempt for the law. Shelton, at the very least, willingly accepted, over a period of years, CUC's practice of manipulating earnings to meet Wall Street expectations without regard to his fiduciary duties to the shareholders. Moreover, his continuing efforts to rationalize his conduct by claiming that he was not aware of each of the accounting machinations perpetrated by his subordinates reflects a profound unwillingness to accept responsibility for the crimes he orchestrated and refused to stop, as he could have. When it came time to receive the huge financial benefits of the fraud, Shelton was more than willing to accept significantly more than his subordinates. Now that the time has come to accept responsibility for the harm that he and his conspirators have caused, Shelton is left to complain that others knew more about the accounting details of the fraud than he did.

Second, Shelton's criminal conduct was not born out of any economic necessity, deprived upbringing or lack of formal education and opportunity. Throughout the period of the conspiracy Shelton was, by any measure, fabulously wealthy and had the loving support of his wife and family. He could have put an end to the fraud at any time without becoming destitute or causing his family to suffer. His formidable educational background also permitted Shelton to walk away at any time. Yet,

69

he chose to stay on at CUC and later Cendant and carried out the fraud. Thus, despite his self-serving claim that his life is a testament to integrity and honesty (Shelton Mem. 1), he committed a massive fraud that victimized those he owed a fiduciary duty to - - the shareholders of the company he ran.

### C.    **The Sentence Must Promote Respect for the Law**

The sentence in this case must reflect the seriousness of the offense committed by Shelton, and provide a message of deterrence to all white collar executives who are thinking of misleading the public to enhance their own wealth and reputation. The fraudulent activity at CUC, Enron, Adelphia, WorldCom, Health South and many other corporate financial scandals have undermined investor confidence in the market as a whole. When high level officials of public companies can not be trusted to tell the truth, the entire marketplace suffers. Stiff prison sentences for this kind of fraud are necessary to demonstrate that those who defraud shareholders of millions, and in this case billions, of dollars are punished as severely as those who rob money from one victim at a time.

Thus, it is a rather axiomatic that the sentence in this case must be long enough to reflect the fact that Shelton's criminal conduct is among the most serious crimes that can be committed by white collar criminals. The sentence must also be significant enough to promote public respect for the law.

### D.    **The Court Should Consider General Deterrence**

One of the factors the Court must consider in imposing

70

sentence is the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). A substantial prison sentence for such conduct can serve as a powerful deterrent against the commission of lucrative financial crimes by persons who, like Shelton, seek to avoid incarceration at literally all costs once their crimes are exposed.

  As this case shows, there can be huge financial incentives to falsify such information. Hundreds if not thousands of executives at public companies make daily decisions to release financial information about their companies to investors and the market as a whole. As recent performance will attest, each of these executives is capable of telling the truth or of fabricating the results of their company's performance. Unless these executives truly understand that there are serious and certain consequences for their actions, the temptation to mislead the market place can not be tempered, let alone, eliminated. It is only when these executives see other similarly situated executives, such as Shelton, go to jail for a lengthy term of imprisonment, that these executives will think twice before deciding to mislead the market place. General deterrence serves an important function and works, perhaps even more effectively than in the context of other types of criminal conduct, to prevent financial crimes of the sort committed by Shelton.

  Shelton argues that no term of imprisonment is necessary to achieve the goals of general deterrence in this

71

case.  Shelton Mem. 95-100.  He contends that wealthy white
collar felons such as himself are peculiarly sensitive to the
ignominy of conviction and, therefore, the fear of conviction
alone, without a prison sentence, is sufficient to achieve
general deterrence.  This argument should be rejected.  First,
recent history has shown that the risk of a felony conviction
alone has not been sufficient to deter corporate executives who
are tempted to put their personal financial interests above their
legal and fiduciary duties to make full and truthful disclosures
to their shareholders and the SEC.  See Kroger, "Enron, Fraud,
and Securities Reform: an Enron Prosecutor's Perspective," 76 U.
Colo. L. Rev. 57, 110 (Winter 2005)(noting that low sentences
traditionally handed down to white collar defendants under the
Sentencing Guidelines failed to adequately deter corporate
crime).[26]

---

[26]  Professor Kroger, who took a leave of absence from his
academic position to serve on the United States Justice
Department's Enron Task Force, had this to say about increasing
sentences for white collar criminals:

> The United States Sentencing Commission has completely
> rewritten the sentencing guidelines applicable to fraud
> cases in the last several years.  The new provisions
> essentially double the penalties imposed on defendants who
> commit large-scale securities fraud.  The first major fruit
> of this change can be seen in the sentence of former Imclone
> CEO Samuel Waksal to seven years in prison for insider
> trading--a much higher sentence than those imposed in
> similar cases in the past.  The importance of these changes
> in sentencing laws cannot be overstated.  For the first
> time, our society has recognized that white collar crimes
> pose a threat to the country's social and economic fabric as
> significant as that of organized crime and narcotics
> trafficking.

(continued...)

Second, Shelton's argument, at its core, relies on premises inimical to basic principles of equal application of the laws.  Shelton contends that he should receive no jail time because he "already has been severely punished," owing to the loss in prestige and money he has incurred as a result of the investigation and prosecution of this case.  Shelton Mem. 98.  According to this logic, one who is wealthy and highly regarded should not be sent to jail for committing the same crime that would justify a sentence of imprisonment for a less well-heeled and well-regarded defendant.  This argument turns on its head the notion that from those who have the greatest advantages in life, the most is properly expected.  The Court should reject the notion that the rich and powerful (like Shelton) should be sentenced more lightly than the poor and powerless because, for the former, the embarrassment of conviction alone (without any prison sentence) is more devastating than it would be for those who have enjoyed fewer advantages in life.

Shelton asserts that the "criminalogical literature . . . reveals that criminal sanctions have little deterrent effect on criminal behavior," (Shelton Mem. 95), and the length of criminal sentences have little deterrent effect on white collar criminals in particular.  _Id_. 96-97.  Not surprisingly, the commentators do not unanimously or even overwhelmingly support this view.  For instance, the author of a survey of academic research regarding

---

[26](...continued)
_Id_. at 15 (footnotes omitted).

73

the efficacy of criminal sanctions for white collar crimes had

this to say:

> White-collar crime is believed to be
> particularly amenable to deterrence due to
> its rational and profit-oriented motivation.
> In a conceptual analysis of the topic,
> Braithwaite and Geis observed that
> white-collar offenders are not committed to a
> lifestyle of illegality, are risk aversive,
> and have more to lose as a result of a
> criminal conviction than street offenders.
> Elsewhere Geis noted that "[j]ail terms have
> a self-evident deterrent impact upon
> corporate officials, who belong to a social
> group that is exquisitely sensitive to status
> deprivation and censure." It is generally
> perceived that executives exhibit distress at
> the thought of being sentenced to
> incarceration: "It results in hypertension,
> it causes heart attacks, it is very serious."
>
> Most judges and prosecutors view general
> deterrence as the one of the goals, if not
> the major purpose, in sentencing white-collar
> offenders. Punishment should serve to
> discourage others from committing similar
> offenses and jail or prison sentences, judges
> and scholars alike tend to believe, are
> particularly effective as a general
> deterrent.

Elizabeth Szockyj, "Imprisoning White-Collar Criminals?", from

"Symposium: A Fork in the Road Build More Prisons or Develop New

Strategies to Deal with Offenders," 23 S.Ill.U.L.J. 485, 492

(1999)(footnotes omitted); accord James J. Fishman, "Enforcement

of Securities Laws in the United Kingdom," 9 Int'l Tax & Bus.

Law. 131, 170 (1991) ("Though it may be small satisfaction to

defrauded investors, incarcerating perpetrators of financial

misdeeds serves an important deterrence to future violators.  The

certainty of enforcement and prison for white collar criminals is

an effective deterrence."); Jennifer S. Recine, Note,

"Examination of the White Collar Crime Penalty Enhancements in the Sarbanes-Oxley Act," 39 Am. Crim. L. Rev. 1535 (Fall, 2002).[27]

### E.    Shelton Has Earned A Lengthy Sentence Comparable to Those Imposed on Similarly Situated Offenders.

The Sentencing Guidelines were promulgated, in part, to minimize disparities in federal sentences.  Although those Guidelines are no longer mandatory, the importance of eliminating sentencing disparities remains an important factor which the Court must separately consider pursuant to 18 U.S.C. § 3553(a)(7).

---

[27]  In her note, Ms. Recine points out that "perpetrators of white-collar frauds are less likely to serve jail time than are other criminals prosecuted by the federal government."  She takes to task the views of "so-called 'optimal penalty theorists,'" such as those quoted in Shelton's sentencing memorandum, who have "argued that in the case of white-collar criminals, fines create the same deterrent effect as jail sentences and avoid the expenditure of societal resources necessary to incarcerate convicted criminals; thus, these theorists argue, sentences for white-collar criminals should be limited to fines." Id. at 1557.  Ms. Recine argues that:

> [A]s the result of prison sentences, such individuals suffer additional stigma when re-integrating into society after completing their term in jail.  Where social ties are strong, as likely is the case with affluent white-collar criminals, individuals are less likely to reject their relationships despite the fact of criminal conviction. Nonetheless, those relationships will be difficult to reestablish after a term of imprisonment because of the stigma that attaches to a convicted criminal.  By this logic, imposing a fine cannot create the same stigma, as the convicted felon will not be forced to experience the stigma of re-integration. Therefore, despite the cost of achieving an effective level of stigma, the desire to avoid the loss of social relationship among affluent and highly educated would-be felons is a deterrent that cannot be achieved effectively through fining alone.

Id. at 1567 (footnotes omitted).

Although securities fraud prosecutions are by no means rare in this Circuit, there have been very few recent sentences in cases which involved truly similar criminal conduct. Measured in terms of the extent of the harm caused (both in terms of the financial losses and number of victims), the scope and complexity of the schemes, and duration of the schemes, Shelton's conduct is rare. However, there are some fairly analogous cases within the past ten years: John Rigas (15 year sentence), Timothy Rigas (20 years) Patrick Bennett (22 years) and Steven Hoffenberg (20 years). As noted, a defendant who commits today the identical crimes committed by Shelton in 1998 will have an applicable Guideline range of life imprisonment. Hence, to achieve sentencing parity, Shelton should receive the type of sentence received by defendants referenced above.

Similarly, a sentence within the applicable Guideline range is necessary to demonstrate that the Court profoundly disagrees with Shelton's claim that he is a victim rather than a victimizer. To date, Shelton expresses the sentiment that his prosecution has been "unfair" and that "his life was taken away from him." PSR, Par. 137. Sentiments such as these reflect rather clearly that Shelton does not "get it." While it is not clear that Shelton will ever accept responsibility for his criminal conduct, any sentence less than the appropriate Guideline sentence (151 to 188 months) will only reinforce Shelton's sentiment that he is above the law.

**G. <u>An Order of Restitution Should be Imposed</u>.**

76

In addition to imposing an appropriate prison sentence, the Court should also impose an order of restitution.  18 U.S.C. § 3553(a)(7).

Under the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A and 3664, this Court is required to impose an order of restitution in this case in favor of the victims of Shelton's crimes for the full amount of their losses, without consideration of Shelton's ability to pay that amount.  18 U.S.C. § 3664(f)(1)(A)("In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant.");  see United States v. Ekanem, 383 F.3d 40, 44 (2d Cir. 2004); United States v. Johnson, 378 F.3d 230, 244-45 (2d Cir. 2004); see also U.S.S.G. § 5E1.1 (directing the sentencing court to enter a restitution order if there is an identifiable victim).[28]

---

[28]  The MVRA provides in pertinent part:

> Notwithstanding any other provision of law, when sentencing a defendant convicted of an offense described in subsection (c), the court shall order, in addition to, or in the case of a misdemeanor, in addition to or in lieu of, any other penalty authorized by law, that the defendant make restitution to the victim of the offense or, if the victim is deceased, to the victim's estate.

18 U.S.C. § 3663A(a)(1).

Subsection (c) of § 3663A includes among the categories of crimes for which victim restitution is mandatory "any offense committed by fraud or deceit."  U.S.S.G. § 3663A(c)(1)(A)(ii). Accordingly, Shelton's crimes of securities fraud, mail fraud, wire fraud, false statements to the SEC, and conspiracy to commit those offenses are subject to the MVRA.  See United States v. (continued...)

Even in a case such as this where the amount of loss is very
high, the court may not reduce the restitution amount on the
ground that payment of the full restitution will be difficult or
even impossible for the defendant.  United States v. Harris, 302
F.3d 72, 75 (2d Cir. 2002)("When restitution is mandatory, the
amount of restitution can only be challenged on the ground that
it does not reflect losses to the victims.").[29]

       Additionally, in a case such as this where

> more than one defendant has contributed to the
> loss of a victim, the court may make each
> defendant liable for payment of the full amount of
> restitution or may apportion liability among the
> defendants to reflect the level of contribution to
> the victim's loss and economic circumstances of
> each defendant.

18 U.S.C. § 3664(h); see United States v. Boyd, 222 F.3d 47, 51
(2d Cir. 2000)(affirming an order which required the defendant to
pay restitution in the full amount of the victims' losses caused
by the conspiracy as a whole, even with regard to losses caused
by conduct that was the subject of substantive counts as to which
the defendant was either not charged or acquitted).  This
provision confers substantial discretion upon the sentencing

---

[28](...continued)
Walker, 353 F.3d 130, 132 (2d Cir. 2003)(applying MVRA to a
securities fraud prosecution); United States v. Lino, 327 F.3d
208, 209 (2d Cir. 2003)(applying MVRA in a racketeering
prosecution based on a "fraudulent scheme to inflate the price of
selected stocks").

[29]  Because the conspiracy in this case extended well beyond
April 24, 1996, the effective date of the MVRA, the requirements
of that statute apply in this case, even though the conspiracy
began before the effective date of the statute.  United States v.
Boyd, 239 F.3d 471, 472 (2d Cir. 2001)(per curiam).

court to decide whether to impose full or joint and several liability for restitution on each defendant. <u>United States v. Nucci</u>, 364 F.3d 419, 422 (2d Cir. 2004); <u>United States v. Lucien</u>, 347 F.3d 45, 54 (2d Cir. 2003).

The Court must also fix a schedule for payment of restitution, and in so doing, must consider the following statutory factors:

> (A) the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled;
>
> (B) projected earnings and other income of the defendant; and
>
> (C) any financial obligations of the defendant; including obligations to dependents

18 U.S.C. § 3664(f)(2).[30] If the Court intends to establish a schedule of periodic payments, it must do so expressly and clearly, as the failure to set forth such a schedule creates a presumption that the entire restitution amount is payable immediately. <u>Nucci</u>, 364 F.3d at 421.

Where, as here, the defendant has the capacity for future employment at the conclusion of his term of imprisonment, the sentencing court should properly consider his potential

---

[30] Although the sentencing court "need not make detailed factual findings on each factor, the record must disclose some affirmative act or statement allowing an inference that the district court in fact considered the defendant's ability to pay." <u>Lucien</u>, 347 F.3d at 53 (internal quotation marks omitted). The sentencing court may not satisfy this requirement merely by stating that it has reviewed information regarding the defendant's financial condition set forth in the pre-sentence report. <u>United States v. Tran</u>, 234 F.3d 798, 812-14 (2d Cir. 2000), <u>overruled on other grounds</u>, <u>United States v. Thomas</u>, 274 F.3d 655 (2d Cir. 2001).

future earnings in fashioning an appropriate payment schedule.
United States v. Lino, 327 F.3d 208, 210 (2d Cir. 2003)("An order
of restitution, if fashioned on a delayed schedule, will call for
payment at times far in the future."). That such a schedule
necessarily involves some guesswork on the part of the court
regarding the defendant's future income is no impediment to the
court making a reasonable prediction, based on information
available at sentencing, regarding the amount of that income.
Id.; United States v. Ismail, 219 F.3d 76, 78 (2d Cir. 2000);
United States v. Atkinson, 788 F.2d 900, 902 (2d Cir. 1986); see
also United States v. Kinlock, 174 F.3d 297, 300 (2d Cir.
1999)("a defendant's present financial situation does not
eviscerate the district court's discretion to order
restitution."). In fashioning a payment schedule that properly
takes into account the defendant's personal expenses, the courts
in this Circuit have frequently required the defendant to pay a
percentage of his post-incarceration income as restitution. See
United States v. Fiore, 381 F.3d 89, 98 n.9 (2d Cir. 2004)
(sentencing court required the defendant to pay monthly
installments following his release from incarceration; each
monthly installment was based upon a formula which imposed a
graduated percentage of his earned income based on the income
amount); United States v. Walker, 353 F.3d 130, 132 (2d Cir.
2003) (sentencing court required the defendant to pay ten percent
of his gross monthly earnings toward restitution during the 3
year period of supervised release); United States v. Jaffe, 314

F.Supp.2d 216, 226 (S.D.N.Y. 2004)(requiring the defendant to pay the greater of $150,000 or fifteen percent of his post-tax annual income on a monthly basis).[31]  Additionally, where the restitution amount is so high that the defendant is unlikely to be able to pay it in installments during the period of supervised release, the parties to whom restitution is owed may move for collection of the balance of the restitution by way of a civil action. 18 U.S.C. § 3663(h); United States v. Savis, 102 F.Supp.2d 514, 518 & n.5 (D.Vt. 2000); see generally United States v. Porter, 90 F.3d 64, 69-70 (2d Cir. 1996).

Mandatory restitution "can only be imposed to the extent that the victims of a crime are actually identified." United States v. Zakhary, 357 F.3d 186, 190 (2d Cir. 2004) (remanding for reimposition of a restitution order because the sentencing court failed to identify the victims), citing United States v. Catoggio, 326 F.3d 323, 328 (2d Cir. 2003).

---

[31] The Court may consider assets not wholly owned by the defendant. 18 U.S.C. § 3664(f)(2)(A).  The Court may also take into account assets potentially available to the defendant but which he voluntarily transferred to close family members after the fraud came to light in fashioning the appropriate payment schedule.  Although the Court may not require the defendant or a non-party to sell assets that are otherwise protected by law against alienation in order to make restitution payments, the Court need not reduce the scheduled payment amounts so as to permit the defendant or his transferees to maintain ownership and possession of those assets.  The defendant and his transferees are then left with the decision about whether or not to liquidate those assets in order to fulfill the defendant's restitution obligations, or to require the defendant to meet the restitution obligations from some other source.  Jaffe, 314 F.Supp. at 226-28; cf. United States v. Ismail, 219 F.3d 76, 78 (2d Cir. 2000)(affirming a restitution order over a defense claim that he was indigent, with limited earning potential, and noting the "potential earnings" of the defendant's spouse).

Additionally, the MVRA requires that the Court determine identifiable victim losses no later than ninety days after the sentencing.  18 U.S.C. § 3664(d)(5).  For purposes of restitution, the Government submits that the Court should determine the amount of the loss to be at least the amount determined by the plaintiff's experts in the civil class action lawsuit: $8.8 billion.  In Re: Cendant Corporation Litigation, 264 F.3d at 241.[32]  As shown above, although the exact amount of the loss caused by Shelton's crimes may be subject to reasonable dispute, it easily numbers in the several billions of dollars by any reasonable measure.

The requirements for mandatory restitution under the MVRA shall not apply only if:

> the court finds, from facts on the record, that--
>
> (A) the number of identifiable victims is so large as to make restitution impracticable; or
>
> (B) determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

18 U.S.C. § 3663A(c)(3).

Here, the number of identifiable victims is extremely large, and may number in the tens and possibly hundreds of thousands.  The Government does not presently know the identity, let alone the location, of all or even most of the persons who

---

[32]  The Government will furnish to the Court and defense counsel a copy of the expert report on which that estimate was based in advance of the sentencing hearing.

were shareholders of Cendant stock in April of 1998, and
ascertainment of that information would be highly impracticable.
Additionally, determining the amount of loss attributable to each
of the many thousands of victims would certainly require a
determination of "complex issues of fact related to the cause or
amount of the victim's losses."  U.S.S.G. § 3663A(c)(3).
Moreover, devoting the time and resources required to identify
such a large number of persons and entities would be highly
impracticable for the Government, and would substantially delay
and burden the sentencing.  Id.  Finally, if the Court required
Shelton to make restitution periodic payments to each of the tens
or hundreds of thousands of victims of his crimes, the
administrative costs of making such payments would substantially
deplete the assets from which restitution should be made.[33]

---

[33]  In Catoggio, the defendant was convicted of engaging in a
complex fraud by which the conspirators gained control of four
securities brokerage firms, and used various methods to create
artificial demand for certain stocks sold by those firms.  The
scheme lasted for several years, during which the conspirators
sold their shares of the inflated stocks for substantial profits.
The defendant stipulated in his plea agreement that the losses
caused by the offense exceeded $80 million.  The PSR noted that
there were thousands of victims, and that it would be impractical
to obtain affidavits of loss from each victim.  The Government,
however, possessed trading records which identified the victims
and their respective losses.  326 F.3d at 325.

     By the time of sentencing, however, the Government had
not provided the Court with a list of identified victims and
losses, but informed the court that efforts to compile such a
list were underway.  Id. at 325, 330.  The district court ordered
the defendant to pay $80 million in restitution, and directed him
to pay $500,000 within 30 days of sentencing, another $500,000
within 30 days of his release from prison, and another $10,000
per month as a condition of supervised release.  Id. at 325-26.

(continued...)

Notwithstanding the obstacles to identifying <u>all</u> of the victims of the fraud and ascertaining the full amount of damages for each of those victims, the Government submits that the Court can fashion an order of restitution that will substantially serve the twin purposes of restitution: to provide compensation to victims and to punish the wrongdoer for his offense.  <u>United States v. Johnson</u>, 378 F.3d 230, 245 (2d Cir. 2004).[34]    A restitution order would also prevent Shelton from entirely

_____

[33](...continued)

        On appeal, the Second Circuit rejected the defendant's claim that the sentencing court was barred from imposing restitution because the Government had failed to identify the victims and their losses within 90 days of the sentencing hearing.  The Court of Appeals noted that a 1,700 page victim restitution report had been submitted to the district court, which identified $192 million in actual losses to approximately 10,000 victims.  <u>Id.</u> at 328.  The Court of Appeals noted that "the district court, although aware of the difficulties involved in ordering restitution in this case, did not consider the process too burdensome," so the restitution avoidance provision of § 3663A(c)(3) did not apply.  <u>Id.</u>  The Court of Appeals concluded that the victims of the fraud were identifiable, and the sentencing erred in not identifying them before ordering restitution, "even where a defendant's complex fraud scheme results in many victims whose identities and losses are difficult to ascertain.  <u>Id.</u> at 329.  The Court remanded the case for the district court to complete that process, and further noted that th $80 million restitution amount appeared to understate the full amount of the victims' actual losses.  <u>Id.</u>

        In contrast to <u>Catoggio</u>, the Government in this case does not possess trading records which would identify all of the victims and their losses.  Additionally, the scope of the fraud here, involving billions of dollars of losses and apparently many more victims than in <u>Catoggio</u>, as well as the uncertainty about precisely how the loss to each victim should be measured, militate against an effort to identify the precise loss amount for every individual victim.

[34]  It should be noted that Cendant has requested by letter dated May 19, 2005, that it receive restitution as a victim of Shelton's crimes and because it compensated other victims.  <u>See</u> Exhibit B to this memorandum.

escaping his restitution obligations under the MVRA simply because he elected to participate in a fraud that harmed a huge number of persons.

## Conclusion

For the reasons set forth above, the Government respectfully requests that the Court sentence defendant Shelton to a term of imprisonment within the applicable Guideline range, 151 to 188 months, and an order of restitution to compensate the victims of his offense.

Respectfully submitted,

CHRISTOPHER J. CHRISTIE
Special Attorney
U.S. Department of Justice

s/John J. Carney

By:   JOHN J. CARNEY
      Special Attorney
      U.S. Department of Justice
      Federal Bar No. 24063

s/Norman Gross


By:   NORMAN GROSS
      Special Attorney
      U.S. Department of Justice
      Federal Bar No. 24933

s/James McMahon

By:   JAMES MCMAHON
      Special Attorney
      U.S. Department of Justice
      Federal Bar No. 24062

s/Richard J. Schechter

By:   RICHARD J. SCHECHTER
      Special Attorney
      U.S. Department of Justice
      Federal Bar No. 24238


Dated: July 12, 2005
       Newark, New Jersey