UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. 3:02 CR 264 (AWT) |
| v. | : | |
| E. KIRK SHELTON. | : | July 18, 2005 |

## DEFENDANT SHELTON'S REPLY
## MEMORANDUM IN AID OF SENTENCING

LAW OFFICES OF THOMAS P. PUCCIO
Thomas P. Puccio, Esq. (CT 22983)
230 Park Avenue, Suite 301
New York, NY  10169
Tel: (212) 883-6383
Fax: (212) 883-6388

SANTOS & SEELEY, P.C.
Hubert J. Santos (CT 00069)
Hope C. Seeley (CT  04863)
51 Russ Street
Hartford, CT 06106
Tel: (860) 249-6548
Fax:(860) 724-5533

DAY, BERRY & HOWARD LLP
Stanley A. Twardy, Jr. (CT 05096)
Gary H. Collins, Esq. (CT 22119)
City Place 1, 185 Asylum Street
Hartford, CT  06103
Tel: (860) 275-0314
Fax: (860) 275-0343

MILBANK, TWEED, HADLEY &
McCLOY, LLP
Scott A. Edelman, Esq. (CT 25268)
Thomas A. Arena, Esq. (CT 25269)
1 Chase Manhattan Plaza
New York, NY  10005-1413
Tel.: (212) 530-5000
Fax: (212) 530-5219

# TABLE OF CONTENTS

I.   Preliminary Statement ...................................................................................................1

II.  Reply Argument .......................................................................................................5

   A.  The Government's Efforts To Convince The Court To Ignore
       Mr. Shelton's Extraordinary Life Of Good Works And Touching
       The Lives Of Others Should Be Rejected............................................................5

   B.  This Case Is Not Analogous To Enron, Worldcom Or Adelphia .......................10

   C.  The Factual Complexities Presented By This Case Are Not Reflected
       In The Guidelines Calculations And Warrant A Non-Guidelines
       Sentence ............................................................................................................14

   D.  The Government's Sentencing Guidelines Arguments Are Erroneous ..............16

   E.  The Government Cannot Defend Its Differential Guidelines
       Treatment Of Mr. Shelton Versus Corigliano And Pember ...............................30

III. Conclusion ..............................................................................................................36

**REPLY MEMORANDUM OF**
**DEFENDANT SHELTON IN AID OF SENTENCING**

The Defendant, E. Kirk Shelton, respectfully submits this Reply Sentencing Memorandum for the Court's consideration in connection with his sentencing hearing, currently scheduled for July 20 and 21, 2005.

## I.    Preliminary Statement

The venom that runs through the government's sentencing submission is seriously troubling to Mr. Shelton, his family, his counsel and others who are aware of the events that unfolded late in the jury's deliberation in this case.

Only seven months ago, in December of 2004, while jury deliberations were ongoing, the government's lead prosecutor offered a resolution of the case (without "cooperation" from Mr. Shelton) with a guilty plea to a single count and a five-year maximum sentence. The government expressly stated at that point that the reason for the offer was not uncertainty about the jury's verdict; the government's lead prosecutor expressed absolute confidence based on the sequence of the jury's notes, which had progressed to questions about defendant Walter Forbes, that Mr. Shelton would be convicted. The stated reason for the offer of a five-year deal: the prosecution team believed that any higher sentence (*e.g.*, more than five years) would be excessive given what they knew about Mr. Shelton.

The government's articulated views during deliberations echoed the view expressed by the government prior to trial. Early in 2004, the government team met with Mr. Shelton's counsel to encourage Mr. Shelton's cooperation against Walter Forbes. In that context, the government team stated its desire to make clear to Mr. Shelton (through his counsel) that the government did not view Mr. Shelton as an evil perpetrator of a fraud over an extended period of time. Rather, the

government suggested that based on its knowledge of the facts, the government was ready to accept that Mr. Shelton had only become aware of some aspects of the fraud in its latest stages, and that his involvement in the fraud had been limited. The government assured Mr. Shelton's counsel that Mr. Shelton could become a member of the government's team even if Mr. Shelton had had only a limited and belated role in the Cendant securities fraud. The government's statements about Mr. Shelton's limited role in the Cendant fraud were not born out of ignorance. At the time Corigliano, Pember and Sabatino had been cooperating for years and each had met with the government on at least a dozen occasions; the government also had total access to Henry Silverman, Michael Monaco, and Scott Forbes and the active assistance of Cendant's counsel when it met with Mr. Shelton's counsel in early 2004.

The government's previously stated views of Mr. Shelton's involvement in the fraud, his character and an appropriate sentence apparently have vanished, however, in the wake of the jury's verdict and the lack of a verdict against his co-defendant, Walter Forbes. Now, perhaps in the hope that a decade-plus sentence would prompt Mr. Shelton to provide testimony for the government at the retrial of Walter Forbes, the government has reversed course. Where the government previously acknowledged a limited role on Mr. Shelton's part in the Cendant fraud, today the government portrays him as its organizer, leader and architect. Where the government previously acknowledged Mr. Shelton's character as being out of step with the crimes with which he was charged, today the government brands Mr. Shelton's life of good works irrelevant, suggesting that there is no distinction between the alleged sin and the sinner, and that he is no different than any other white-collar defendant. Where the government previously characterized anything more than a five-year sentence as unnecessary and unfortunate, today the government insists that anything less than 151 months would be a miscarriage of justice.

Along the way, the government analogizes Mr. Shelton to a mob boss ordering murder hits, and argues that Mr. Shelton's sentence should be equivalent to the sentences meted out to a handful of notorious white-collar criminals who have received double-digit year sentences within the Second Circuit. As demonstrated below, without minimizing the seriousness of what happened at Cendant, there is no basis to compare the decline in Cendant shares to the meltdowns and bankruptcies that occurred in the recently celebrated cases of Enron, Worldcom and Adelphia. Nor is there any basis to compare Mr. Shelton's alleged crimes with those of Steven Hoffenberg and Patrick Bennett -- the other two criminal defendants cited by the government as having received sentences in excess of ten years.

Today, the government ignores any of the subtlety or nuance in its case against Mr. Shelton. The complexities of this case were not lost on the Probation Department, which noted in the Presentence Report that: "Shelton does not strike me as a man driven by greed"; that "it is difficult to assess precisely where Shelton falls in all this"; and that "there may have also been a level of self-deception here. . . ." Presentence Report ¶ 161. The government acknowledges none of those things in its zeal to "win" a decade-plus sentence against Mr. Shelton. Rather, the government portrays Mr. Shelton as a diabolical criminal mastermind who plotted an extensive fraud out of greed for power and acclaim.

This is the same government that vigorously urged this Court to instruct the jury on a theory of conscious avoidance -- a theory wholly at odds with its current, one-dimensional portrayal of Shelton as the mastermind of the fraud and master puppeteer of Corigliano and Pember. Can the government really contend that an otherwise decent, hard-working man, who has touched the lives of his family, friends, neighbors and community in a truly extraordinary way and may have (by the government's own admission) done nothing more than consciously avoid knowledge of the fraud

3

being perpetrated by the accounting department at CUC, should spend the next 12 ½ years of his life in prison?

In his recent opinion in *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), Judge Newman noted that with the newly non-mandatory nature of the sentencing Guidelines, judges within this district are now empowered to issue sentences that will achieve "individualized justice." *Id.* at 114. The case of Mr. Shelton is a case that cries out for use of the flexibility that has been afforded to judges by the Supreme Court's decision in *Booker* and *Fanfan*. In sentencing Mr. Shelton, this Court has his life and the life of his family in its hands. Imposition of the 151 month or more sentence that the government advocates will effectively end Mr. Shelton's life, leaving him in prison until he is in his mid-60s. Such a result would not accord with the trial evidence regarding Mr. Shelton's role in the Cendant fraud, it would not comport with the type of person Mr. Shelton is, and it would do violence to the "individualized justice" that is the duty of this Court to render in sentencing Mr. Shelton.

On Mr. Shelton's behalf, we urge the Court to fashion a sentence that will result in "individualized justice"; a sentence that recognizes the complexities of the case against him; a sentence that recognizes the life he has lived and the people that he has touched.

4

II.    **Reply Argument**

A.  **The Government's Effort To Convince The Court To Ignore Mr. Shelton's Extraordinary Life Of Good Works And Touching The Lives Of Others Should Be Rejected**

The government's minimization of Mr. Shelton's extraordinary acts of kindness and good deeds that he has performed over the course of his life should be rejected. *See* Gov't Sent. Mem. at 43-51; 68-70. Although the government may want to close its eyes to the many positive characteristics of Mr. Shelton in its current quest to win a lengthy, double-digit jail sentence, such blindness runs afoul of this Circuit's post-*Booker* recognition that sentencing must include "individualized justice." *United States v. Crosby*, 397 F.3d 103, 114 (2d Cir. 2005). Furthermore, Mr. Shelton's acts of kindness and good deeds are sufficiently extraordinary to warrant a downward departure under the advisory Guidelines.

1.  **Mr. Shelton's life history of good deeds and positive characteristics must be considered**

In its discussion of Mr. Shelton's history and characteristics pursuant to 18 U.S.C. § 3553(a)(1), the government refused to address Mr. Shelton's life history and ignored all of his numerous good deeds and charitable acts. *See* Gov't Sent. Mem. at 68-70. The government's one-dimensional portrayal of Mr. Shelton's history and characteristics improperly focuses only on the offense conduct. There was no credible evidence presented at trial that Mr. Shelton had any involvement in financial impropriety prior to 1995. Thus, the government's analysis of Mr. Shelton's "history and characteristics" based merely on a time period of 3+ years [1995 to April 1998] as opposed to the entirety of Mr. Shelton's life of 51 years is lacking and should be rejected.

It is uncontroverted that Kirk Shelton has the following history and characteristics that must be considered in fashioning a just sentence in this case:

- Mr. Shelton is an involved and committed father to his two sons who has never missed a meaningful event in their lives, including school conferences, plays, musical recitals, sporting events, and graduations

- Mr. Shelton has been an active participant in helping his children develop morals, personal responsibility, a strong work ethic and positive values

- Mr. Shelton is a loyal and dedicated husband to his wife of 21 years

- Mr. Shelton has touched the lives of countless people by selflessly providing time and counsel to vulnerable individuals: a youngster battling drug addiction; a friend struggling with her parent's unexpected divorce; two different troubled teenagers who were contemplating suicide; and, elderly relatives facing medical issues

- Mr. Shelton has provided many acts of kindness to his family, friends and colleagues over the course of his life, including nursing a sick friend back to health during their college years; assuring that an employee's child's staggering medical bills would be covered by the company's health insurance; not tolerating sexual harassment by a powerful senior executive; assisting relatives to adopt a child; and, assisting many family members with medical expenses

- Mr. Shelton has engaged in significant public service at the Stamford YMCA over the past 25 years that has directly improved the YMCA's after-school programs, summer camps and the teen center

- Mr. Shelton has served as a mentor to many people in the business community, and he has had a profound and positive impact on the careers and personal lives of many of his colleagues at Dur-O-Wal, CUC, Cendant and LivePerson by counseling corporate integrity, honesty and frugality

See Def. Sent. Mem. at 2-6; 13-58.

Mr. Shelton's unblemished life history and his extraordinary accomplishments and contributions to society as detailed in his opening memorandum support the imposition of a thoughtful, just and compassionate sentence.

### 2.  Shelton's charitable acts and good deeds are extraordinary and warrant a departure under the advisory guidelines

The government's focus on Mr. Shelton's "great wealth" in assisting his family and friends, *see* Gov't Sent. Mem. at 47, ignores the scores of good deeds detailed in Mr. Shelton's initial sentencing memorandum. Mr. Shelton's selfless acts are far more personal in nature than simply writing a check to charity or to family members. Mr. Shelton certainly has donated substantial sums of money to charitable causes, but it is his hands-on, personal involvement in performing acts of kindness that have actually touched others and made a difference in people's lives that elevate his good deeds to the level of being extraordinary so as to justify a downward departure.

For example, over the past few years, in the midst of dealing with his own crisis, Mr. Shelton's personal counsel and actions have directly impacted the lives of two youngsters struggling with suicide. As noted by Scott Frisoli in connection with his son's contemplation of suicide:

> Kirk was the only person who responded to my family's cry for help by following through with emotional support and advice. He emailed me the very night that I expressed my grief and followed up with phone calls until the crisis was over. There is no adequate way of expressing what his genuine support and kindness meant to me and to my family during that tough time.

*See Letter of Scott Frisoli,* Letters App. at 073.

In another incident, shortly before last Christmas when the jury was still deliberating, a young and close family friend attempted suicide. The Court will recall the tension that hung over all of the parties at that critical time in the trial. And the Court will no doubt recognize the unbelievable trauma that Mr. Shelton, his wife and family were enduring as the jury deliberated well into its second month. It was at this point in the trial that this 18-year-old young woman called the Shelton family from the hospital and asked for their help. Once again, without hesitation, Mr. Shelton and his wife brought her into their home and gave her the love and support she needed for the next five

months, *even after the verdict*. During those five months, they helped her obtain critical medical care and provided the necessary emotional support to restore her physical and emotional health. The many instances of "good deeds" in which Mr. Shelton has devoted much of his time, effort and resources to help others in their personal lives and make a difference are detailed in Mr. Shelton's initial memorandum at 13-58.

Mr. Shelton did not hesitate to assure an employee that her daughter's medical bills in connection with a serious medical crisis would be covered even though the employee's daughter could have been denied coverage. *See Letter of L. Sue Trizila,* Letters App. at 116 ("[H]e exercised compassionate business judgment reflecting his identity as a manager, parent and decent human being. I will never forget this incredible act of kindness."). Similarly, when the elderly administrative assistant to his former boss at his first place of employment became terminally ill, Mr. Shelton visited her weekly even though he was no longer working at the company. *See Letter of Eugene M. Isenberg*, Letters App. at 108.

The government argued that the fact that "Shelton may have chosen to give a small percentage of this money to select relatives, friends and charities hardly warrants special consideration" since "[i]t is not extraordinary for the most wealthy of white-collar defendants to be heavily involved in charities and civic organizations."[1] This argument misses the point. It is not the amount of money that Kirk Shelton donated that is significant. Rather, what is important is the personal nature and manner in which he donated the funds and the profound impact those funds had on others. The following examples show that Mr. Shelton's financial donations have profoundly impacted the lives of others:

---

[1] The government's underlying assertion in this section of its memorandum is that all white-collar defendants are decent human beings who perform numerous good deeds because of their fortunate status in life. This assertion should be rejected. Not all white-collar defendants are the same and not all engage in selfless acts. Mr. Shelton's many acts of giving in which he has consistently made a positive impact in the lives of others are well-documented in the letters presented to the Court.

- Spontaneously and immediately stepping forward to volunteer to pay for all of the costs for a distant relative's heart transplant (*Letter of Richard A. Ratner*, Letters App. at 028)

- Covering the costs of adoption so that his wife's sister and brother-in-law could become parents (*Letter of Gene Szczecina*, Letters App. at 018) ("Kirk gave us the gift of a lifetime, our son Drew.")

- Assisted with the college tuition for his niece and nephew (*Letter of Vicki de Angeli and Christine de Angeli*, Letters App. at 008, 013)

- Paid the expenses incurred by his brother-in-law's sister while undergoing cancer treatment (*Letter of Gene Szczecina*, Letters App. at 018)

- Raised funds to permit approximately 500 students from Bridgeport and New Haven to participate in an educational program to expose children to space travel (*Letter of Alexius C. Conroy*, Letters App. at 171-172)

Recently, the Court of Appeals for the Third Circuit affirmed a four-level departure for a defendant's good works in a prosecution for securities fraud and filing a false tax return. *United States v. Cooper*, 394 F.3d 172 (3d Cir. 2005).[2] The defendant in that case mentored and paid for four young underprivileged men to attend a better high school in order to play football together. The Court of Appeals found it was significant that the defendant's actions were "not the detached acts of charity one might ordinarily expect from a wealthy business executive" and they were "qualitatively different from the detached donation of money." *Cooper*, at 177. The Court further stated:

> We are aware of the fact that Cooper's failure to make accurate reports to his shareholders contributed to the misconceptions that they held about BICO's financial health. We are also mindful of the fact that thousands of shareholders lost millions of dollars when the value of BICO's stock plummeted. Downward departures for good works, however, are permissible when the works are exceptional. Cooper's good works are exceptional, and we agree with the District Court's grant of a downward departure.

---

[2] *See also United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996). In *Rioux*, the Court of Appeals for the Second Circuit held that the District Court did not abuse its discretion by departing downward from level 20 to a level 10, in part on the basis of Rioux's charitable efforts and civic good deeds, which included fundraising for the Kidney Foundation. *See Rioux*, 97 F.3d at 663. While the 10-level departure in *Rioux* was based partially on the defendant's medical condition, Mr. Shelton's many charitable efforts and civic good deeds are equally deserving of a departure.

*Id.* at 178.

Certainly, Mr. Shelton's documented good works also are "qualitatively different from the detached donation of money"; his acts, as well, have been more personal and have had a dramatic and positive impact on the lives of others that cannot be ignored. Accordingly, since Mr. Shelton's good deeds performed throughout the course of his life have been exceptional, a downward departure is warranted.

### B.    This Case Is Not Analogous To Enron, Worldcom Or Adelphia

In its effort to justify a double-digit year sentence, the government seeks to compare Mr. Shelton's offense to the organizers and leaders of the fraud at Enron, Worldcom and Adelphia. Those comparisons are completely unfounded. While Mr. Shelton in no way minimizes the significance of the stock price decline that occurred at Cendant in 1998, the government ignores the facts in comparing the drop in Cendant's share price to the cataclysmic implosions that occurred at Enron, Worldcom and Adelphia, which hurled each of those companies into bankruptcy, resulted in massive layoffs, and completely wiped out the equity of those companies' common shareholders.

In contrast, Cendant did not go bankrupt; there were no massive layoffs of employees; and, there was no destruction of those employees' pensions. To the contrary, by many measures, Cendant has prospered since the fraud was discovered in April 1998. As reflected in Cendant's Form 10-K's filed from 1998 to 2004, revenues have grown from $5.086 billion in 1998 to $19.785 billion in 2004. *See* Cendant's Form 10-K/A for 12/31/98 (a copy of which is attached hereto as Exhibit A); Cendant's Form 10-K for 12/31/04 (a copy of which is attached hereto as Exhibit B). Likewise, Cendant's net income has grown from $539.6 million in 1998 to $2.082 billion in 2004. *See id.* This growth in profits and earnings has been echoed by a growth in Cendant's workforce, which

increased over 255% from 35,000 to 87,000 employees over the course of the six-year period from 1998 to 2004. *See id.*

Trying to analogize the fraud at CUC to those that were perpetrated at Enron, Worldcom and Adelphia ignores the facts. While the equity of shareholders at each of the aforementioned three companies was completely wiped out in bankruptcy, in the case of CUC, even with the stock price decline that occurred in 1998, a share of CUC stock outperformed the S&P 500 over the 15-year period from 1990 through the present. *See* Shelton Sent. Mem. at 65-66 (citing http://finance.yahoo.com (July 1, 2005)). The suggestion that Cendant's stock price never recovered from the accounting fraud is a simplistic observation that ignores all manner of other intervening events that dampened the demand for Cendant's core travel, hotel and internet commerce businesses during much of the period. Moreover, Cendant's submission to the Court ignores that Cendant's share price gyrated enormously at points in time when the fraud had long passed. Thus, from March 2002 to October 2002, Cendant's stock price plummeted 54% from $19.50 to $9.04, and the share price suffered a 38% decline just in the eleven days after September 11, 2001.[3] *See* www.bigcharts.com (providing share price information on any given day).

In its summation, the government characterized the Cendant fraud as one involving a "B Company" pretending to be an "A Company." Consistent with its conduct in this stage of the proceeding, however, the government is ignoring any of the nuance that it acknowledged previously.

---

[3] Moreover, it is somewhat ironic that Cendant's outside counsel has submitted a letter suggesting that Mr. Shelton should serve a long sentence for the damage that the CUC accounting fraud caused to the reputation of Cendant's CEO and Chairman Henry Silverman, given that Mr. Silverman has realized over $400 million in taxable income, plus unrealized gains of over $300 million on his stock options from Cendant since the disclosure of the fraud to the investing public. *See* Cendant's Annual Proxy Statement, Schedule 14A, filed 3/2/05, for 4/26/05; Cendant's Annual Proxy Statement, Schedule 14A, filed 3/1/04, for 4/20/04; Cendant's Annual Proxy Statement, Schedule 14A, filed 3/28/03, for 5/20/03; Cendant's Annual Proxy Statement, Schedule 14A, filed 3/29/02, for 5/21/02; Cendant's Annual Proxy Statement, Schedule 14A, filed 3/29/01, for 5/22/01. *See also* http://finance.yahoo.com/q/it?s=CD (showing Silverman's stock options exercise, as reported on Form 4's filed with the SEC).

Now, the government is asking the Court to sentence Mr. Shelton as if he were an executive like Bernie Ebbers, who presided over Worldcom, a company that was an "F Company" pretending to be an "A Company." Moreover, the government ignores that unlike Mr. Shelton, Ebbers had as his motive to commit fraud the fact that he had $400 million loans made by Worldcom to him. *See* Krysten Crawford, *Ex-WorldCom CEO Ebbers Guilty*, CNN Money (Mar. 15, 2005) (attached as Exhibit C). Neither CUC nor Cendant were ever the sham, insolvent company that was at issue in the sentencing of Mr. Ebbers or the defendants in the Enron case.

Likewise, the government's invocation of the sentences of the Rigases in the Adelphia case as a relevant consideration in this case ignores the outright theft from Adelphia of which the Rigases were accused and convicted. Unlike the white-collar cases cited by the Government in its submission, there is no allegation that Mr. Shelton engaged in self-dealing or that he committed the fraud for his own personal enrichment. *See* Presentence Report ¶ 161. In the Adelphia case, the government alleged and established that the Rigas Family had operated Adelphia for its own personal benefit, using company assets and credit to finance the family's own personal investments without disclosing that misuse to the public. Moreover, the government nowhere addresses the fact that the Adelphia case presented none of the complexity or nuance inherent in this case, *e.g.*, the fact that Mr. Shelton may have been convicted for consciously avoiding knowledge of the fraud, or the fact that the cooperators themselves equivocated as to whether they understood the criminal nature of their conduct at the time they were working with Mr. Shelton. The Adelphia situation is no basis for the determination of a sentence of Mr. Shelton.

Finally, the government relies on two other cases -- *United States v. Bennett*, No. 02-1379, 2003 U.S. App. LEXIS 19394 (2d Cir. Sep. 18, 2003) (unpublished) and *United States v. Hoffenberg*, Nos. 94 Cr. 213 (RWS), 95 Cr. 321 (RWS), 1997 WL 96563 (S.D.N.Y. Mar. 5. 1997) --

in its effort to win the sentence that it now advocates to the Court. Again, neither of those cases presents remotely similar facts to this one. Both Patrick Bennett and Steven Hoffenberg were the masterminds of massive Ponzi schemes in which worthless securities were sold to unsuspecting members of the investing public, and proceeds of those sales were used to pay off those prior investors who asked for the return of their money. These schemes were doomed almost from the start, and involved outright fraud and deception by the respective defendants and others under their supervision over a period of years.

Bennett personally orchestrated the sale of completely fictitious sales of equipment leases to investors and pledged legitimate leases to more than one party at a time. *See Bennett*, 2003 U.S. App. LEXIS 19394, at *1 (attached as Exhibit D). *See also Biggest Scam Ever: $700 Million Bucks*, www.gamblingmagazine.com (attached as Exhibit E); *Bennett Gets 30 Years*, CNN Money (April 28, 2000) (attached as Exhibit F); *Patrick Bennett Jailed, Appeal Likely*, www.gamblingmagazine.com (attached as Exhibit G). Bennett solicited $700 million from investors for these leases, and concealed the scheme by laundering more than $1 billion in cash he illegally obtained from investors through accounts held in the name of the Bennett Management & Development Corporation. *See id.* Furthermore, Bennett himself stole millions of the investors' money for himself, buying a racetrack and spending lavishly on gambling ventures, including $19 million for a gambling barge. *See id.*

Likewise, Hoffenberg bears no resemblance to Mr. Shelton's case. Like Bennett, Hoffenberg personally orchestrated a massive Ponzi scheme in which he lured small vulnerable investors into buying high interest notes, which would never be repaid, and defrauded investors of more than $460 million. *See Hoffenberg*, 1997 WL 96563, at *1 (attached as Exhibit H). *See also* Leslie Eaton, *Hoffenberg Gets 20-Year Sentence in Fraud Case*, New York Times (March 8, 1997) (attached as

Exhibit I). Hoffenberg then siphoned off millions of dollars for his own personal use, including the purchase of a private jet and yacht. *See Hoffenberg*, 1997 WL 96563, at *4. Along the way, Hoffenberg committed countless fraudulent acts -- he created phony documents, he provided false information to investors, he arranged for others (*e.g.*, a certified public accountant) to similarly provide false information, he lied in his testimony to the SEC, and he ordered his employees to give false testimony to the SEC. *See id.* To make matters even worse, Hoffenberg evaded personal income taxes by causing his personal expenses to be paid by a corporation that he owned. *See id.* at *5. Again, Hoffenberg's stark case of outright and insidious fraud cannot present a set of facts upon which to base a sentence of Mr. Shelton.

Thus, the government's comparison of Mr. Shelton's offense to the organizers and leaders of the fraud at Enron, Worldcom and Adelphia fails. The sentences meted out in these other cases are not the appropriate guidepost for the sentence in this one.

## C. The Factual Complexities Presented By This Case Are Not Reflected In The Guidelines Calculation And Warrant Imposition Of A Non-Guidelines Sentence

The government's effort to win rigid application of the Guidelines ignores the subtleties and factual complexities that the case against Mr. Shelton presented.[4] The sentencing Guidelines – as interpreted by the government in this case -- would require a 151 to 188 month sentence for a person who had committed the following crime: personally initiated, organized, conceived and actively orchestrated a multi-year, billion dollar fraud involving the sale of worthless land or securities to unsuspecting investors, all the while taking the money received and putting all of it into his own pocket without any question in his mind, or the minds of those that he supervised, as to the outright

---

[4] Post-*Booker*, the Guidelines are only one of seven factors that this Court must consider in determining a fair and just sentence. The Guideline calculations are to be treated "as just one of a number of sentencing factors." *United States v. Ranum*, 353 F. Supp. 2d 984, 985 (E.D. Wis. 2005). Indeed, giving the Guidelines any sort of presumptive correctness or weighted consideration would in effect resurrect them to the level of de facto mandatory, which obviously runs afoul of *Booker*. *See United States v. West*, 2005 WL 180930, at *2, 3 (S.D.N.Y. Jan. 27, 2005).

illegality of his conduct.  Under the sentencing Guidelines, such a defendant would be in exactly the

same Guidelines range that Mr. Shelton would find himself if the government's view of the

Guidelines and the sentencing process were accepted.

The government's analysis ignores the critical distinctions between the above-described case

and the case of Mr. Shelton at issue here.  The government's Guidelines calculation fails to take any

account of:

- the fact that Mr. Shelton may have been convicted (at the urging of the government) for consciously avoiding knowledge of the fraud, as opposed to having had actual knowledge of and directing the fraud;

- the fact that the accountants who were perpetrating the fraud (and purportedly informing Mr. Shelton of their activities) were, according to their own testimony, uncertain as to whether or not their conduct was criminal at the time of the fraud, and in Pember's case, did not realize that her activities were inflating the price of Cendant shares or harming Cendant's stockholders. Tr. 3097, 3135, 3153-54.

- the fact that the accountants who were perpetrating the fraud misled Mr. Shelton about the propriety of the accounting[5] and thereby, at a minimum, minimized the extent of any wrongdoing.

- the fact that Mr. Shelton had been an integral part of a management team that had been responsible for enormous, real growth at CUC prior to the disclosure of the fraud, such that, even today, and even accepting *arguendo* the government's claim that Cendant shares have yet to recover from the disclosure of the fraud, CUC still has outperformed the S&P 500 over the 15-year period since 1990.

- the fact that Mr. Shelton did not sell any CUC or Cendant stock while others were doing so at the end of the fraud period, and that he wound up suffering significant investment losses along with outside investors when Cendant's stock price fell as a result of the disclosure of the fraud.

---

[5] *See, e.g.,* Tr. 2878-79 (Pember testifying that she did not tell Shelton that reversing reserves into revenue was impermissible even though Shelton asked her whether they could do that); Tr. 2912-14 (Pember testifying that Corigliano provided Shelton with false explanations concerning revenue recognition and rejects in transit); Tr. 4913 (Sabatino confirming that topside adjustments were successfully concealed from Shelton).

But the government makes nothing of any of the above-stated facts.  The government simply ignores the factual complexities that made this case so far from a black and white one.

The Probation Department's presentence report itself recognized some of the anomalies that this case presents.  Far from presenting Mr. Shelton as a monster who had intentionally set out to commit fraud with an intention to harm CUC's stockholders, the Probation Report noted that:

- "Shelton does not strike me as a man driven by greed . . ." (Presentence Report ¶ 161);

- "it is difficult to assess precisely where Shelton falls in all this" (Presentence Report ¶ 161);

- "there may have also been a level of self-deception here . . ." (Presentence Report ¶ 162).

Again, the government simply ignores those various findings and instead advocates a sentence that ignores those findings as well.  Judge Newman's decision in *Crosby* encouraged judges in this Circuit to decide on whether to apply Guidelines sentences with an eye towards achieving "individualized justice."  In this case, such individualized justice requires that the sentence take into account the nuance and complexity that make this case other than the black and white fraud case that the government is portraying it to be in an effort to win a double-digit year sentence.

### D.    The Government's Sentencing Guidelines Arguments Are Erroneous

#### 1.    Organizer and Leader (U.S.S.G. § 3B1.1(a))

In its efforts to obtain a four-level enhancement for Mr. Shelton's alleged leadership role in the offense, the government focuses on two supposed facts:  (1) Corigliano and Pember's testimony, which purportedly "made it clear that they looked to Shelton for direction and approval in implementing the fraudulent accounting machinations," and (2) Mr. Shelton's supposed command to manage the numbers to meet Wall Street's expectations.  See, *e.g.*, Gov't Sent. Mem. at 29.  The government's arguments in this regard do not withstand scrutiny.

The weakness in the government's position is best evidenced by its repeated reference to a memorandum that Mr. Shelton provided to Corigliano -- knowing that it would be placed in Corigliano's employment file -- in which Mr. Shelton included the following as some of Corigliano's goals:

> Manage the numbers:  Keep track of overall revenues, profits and balance sheet to meet Wall Street expectations and handle all filings and earnings releases.  Stay on top of financials for each business unit.
>
> . . .
>
> Manage the financial community:  Work with analysts and portfolio managers on an ongoing basis.  Communicate all key information and be part of the presentation team.

GX 3.  The government repeatedly points to that memorandum as supposed evidence that Mr. Shelton was directing the fraud.  *See, e.g.,* Gov't Sent. Mem. at 29-30.  The government's argument in this regard is preposterous.

For starters, the argument makes no sense.  Had Mr. Shelton sought to direct Corigliano to commit fraud, surely Mr. Shelton would not have done so in a formal employment review that was to be maintained in Corigliano's personnel file.  Corigliano conceded during his testimony that the document itself (without Corigliano's testimony "gloss") did not instruct him to commit fraud.  *See* Tr. 8802; 8805-07.

The government's argument ignores that the process of providing accurate guidance to Wall Street analysts and then managing a business, in a legal and proper manner, to meet that guidance was (and even is) viewed as a positive thing for a CFO at a public company.   It cannot be challenged that one of the functions of a CFO is to forecast the results of a business and accurately predict for the financial community those results so that Wall Street understands the manner in which the business will perform.

The government's argument that an instruction to manage the numbers to meet Wall Street's expectation is tantamount to a direction to engage in accounting fraud does not make any sense. Indeed, during the period at issue, companies as highly regarded as General Electric were lauded in the Wall Street Journal for their ability to engage in legitimate "earnings management," which was defined as "the orchestrated timing of gains and losses to smooth out bumps and, especially, avoid a decline." Randall Smith, et al., *Managing Profits: How General Electric Damps Fluctuations In Its Annual Earnings*, Wall Street Journal (November 3, 1994) (attached as Exhibit J). As that Wall Street Journal article reported, back in late 1994, when Corigliano was assuming the CFO function, "most U.S. companies [did] try to smooth profit growth." *Id.* In short, at the time that Mr. Shelton's memorandum to Mr. Corigliano was written, there would have been no basis to read it as an instruction to commit fraud. And plainly, the fact of the memorandum provides no basis upon which to result in a four-level enhancement to the already steep sentencing range called for by the Guidelines in this case.

The government's repeated invocation of the memorandum about hitting the numbers is no substitute for what the government's presentation lacks. The government is unable to identify any evidence to indicate that Mr. Shelton directed, organized, and in many cases was aware of, the most significant aspects of the fraud. Thus, the government has not disputed Mr. Shelton's position that he had no involvement in:

- **Topside Adjustments:** Not a single witness testified that Mr. Shelton participated in, or was told about, the topside adjustments -- the very heart of this fraud. Corigliano, in contrast, was the leader who scrutinized Sabatino's and Kearney's implementation of the topside adjustments. *See* Shelton Statement of the Case at 13-14.

- <u>Ideon Merger Reserve</u>: Pember and Corigliano closely supervised the reversal of these reserves into earnings for the fiscal years ending 1/31/1997 and 12/31/1997. Pember, at the direction of Corigliano, decided the expense categories into which these reserves were reversed. None of the documents evidencing the improper use of this reserve -- many of which were created by Pember -- were ever presented to Mr. Shelton. *See* Shelton Statement of the Case at 15-16.

- <u>Cendant Merger Reserve</u>: Pember was fully responsible for building an improper "cushion" in the Cendant reserve. In January 1998, Pember and Corigliano convened a number of conspiratorial meetings at which they directed the junior accountants such as Speaks and Sattler to improperly use the reserves to increase earnings. Mr. Shelton did not attend any of these meetings and directed no one to use the reserves in an improper manner. *See* Shelton Statement of the Case at 16-19.

- <u>Revenue Recognition</u>: There is no credible evidence that Mr. Shelton knew about the improper acceleration of revenue recognition. All of the evidence shows that Pember and Corigliano instructed lower-level accountants to make these improper adjustments. *See* Shelton Statement of the Case at 19.

- <u>Cancellation Reserve</u>: There is no evidence that Mr. Shelton knew that this reserve was under-funded, and all of the credible evidence indicates that Mr. Shelton was unaware that CUC's policy of recording rejects with a three month delay had any impact on income. In contrast, Pember directed junior accountants to under-fund the reserve and to deceive E&Y regarding the cancellation rate data. Corigliano deceived Mr. Shelton about these practices. *See Statement* at 20.

Def. Sent. Mem. at 61. This inability on the government's part reflects that Mr. Shelton's involvement in the fraud (as opposed to his involvement at CUC generally) was quite small, and far from justifying a four-level enhancement, should result in a decrease in his Guidelines range based on his role in the offense. *See* U.S.S.G. § 3B1.2 (minimal participant warrants four level reduction); *See also United Stated v. Huerta*, 371 F.3d 88, 92 (2d Cir. 2004) (citing *United States v. Burgos*, 324 F.3d 88, 93 (2d Cir. 2003)) (the Second Circuit Court of Appeals has "made it clear that such role enhancements should not be automatically imposed on business owners or executives").

The government's other supposed basis for an enhancement -- its statement that "Corigliano's and Pember's testimony made it clear that they looked to Mr. Shelton for direction and

approval in implementing the fraudulent accounting machinations" -- does not hold water. *See* Gov't Sent. Mem. at 29.  To the extent that the testimony of Corigliano and/or Pember is accepted with respect to their conversations with Mr. Shelton (and we continue to urge that neither witness was credible), they acknowledged that Mr. Shelton had a very limited role.

Pember's account of GX 530 demonstrates this point.  According to Pember's own testimony, she and Corigliano had already -- on their own -- marked up CUC's results to include non-existent profits when they presented those figures to HFS management in December 1997. Even accepting Pember's twisted and inconsistent testimony, the most that she did was provide the information to Mr. Shelton after the fact. *See* Tr. 3046.  And according to Pember, when she did, Mr. Shelton responded with a question that demonstrated that he was unfamiliar with the practice described on the document. *See* Tr. 2878-79.  Namely, according to Pember, far from demonstrating leadership or organization of the fraud, Mr. Shelton inquired "reserves to revenue?  Can we do that?" which Pember acknowledged meant to her that Mr. Shelton was unfamiliar with what Corigliano and she had been doing.  Tr. 2879.  Finally, rather than clue Mr. Shelton in about the impropriety of the practice, Pember outright misled him, telling him that the same practice had been followed for 1997 as well, without giving the slightest indication that she believed that the practice was improper. *See id.*

Nor does Corigliano's testimony that he shared the "cheat sheets" with Mr. Shelton on a periodic basis convert Mr. Shelton into an organizer or leader of the fraud.  We have previously explained why those documents, in and of themselves, are not evidence of any fraud, a point that Corigliano reluctantly conceded on cross-examination. *See* Tr. 8307.  By the time that year began, Corigliano had already informed Wall Street of CUC's expectations, thereby leaving himself with no discretion -- according to his own rendition of the fraud -- with respect to the level of earnings to

report. *See, e.g.,* Tr. 6229-31. In that setting, it is hard to understand how a conversation in which Corigliano claimed to have brought Mr. Shelton up to date on the company's financial position, including the availability of reserves, could have rendered Mr. Shelton the leader or organizer of the fraud.

Finally, the government persists in its efforts to invent a record that would support its contention that Mr. Shelton recruited Scott Forbes to join a conspiracy at the March 6, 1998 meeting. Try as the government might to spin the meeting in such a fashion, the testimony is to the contrary. Thus, Scott Forbes himself testified:

> Q:    And there was nothing that Mr. Shelton said or did or anybody said or did, whether you remember it or not, during that meeting on March 6th that in any way prevented you or discouraged you from signing the 10K as you did on March 31 or you wouldn't have signed it, right?
>
> A:    Correct.

Tr. 6088-89. And government cooperator, Steven Speaks testified to the same effect:

> Q:    Okay. Well, in any event nobody invited you or anyone else to commit a crime at this meeting, that's for sure.
>
> A:    I didn't think so, no.

Tr. 1145. *See also* Tr. 3245 (Pember testifying that nothing dramatic happened at March 6 meeting). If anything, the March 6 meeting reflects Mr. Shelton's lack of understanding of the accounting spreadsheet and concepts that had been put in front of him just a short time before by some combination of Corigliano and Pember. In no way do the events of that day render Mr. Shelton an organizer and leader of a criminal conspiracy that spanned some 13 years (according to the government) and involved accounting machinations of which there is no evidence Mr. Shelton was aware.

### 2.     Obstruction of Justice (U.S.S.G. § 3C1.1)

Mr. Shelton's initial sentencing memorandum established that the government's specification of the three instances of his alleged perjury -- his trial testimony concerning the Walter Forbes' plane expense, the Interval adjustment and GX 530 -- cannot give rise to an obstruction of justice enhancement. The government has recently cobbled together a laundry list of additional, purportedly perjurious testimony that Mr. Shelton allegedly gave at trial. This list does nothing to support the government's burden of proving that Mr. Shelton perjured himself. There is no description as to how the testimony is false or who contradicted Mr. Shelton or what document was inconsistent with his testimony. Nor is there a single citation evidencing that Mr. Shelton lied on the witness stand. Close examination of the specified testimony, however, shows that it cannot support such an enhancement.

The government argues that Mr. Shelton committed perjury when he denied receiving the monthly financial statements for NUMA and NAOG. *See* Gov't Sent. Mem., Exh. D, Tab 10. But the distribution lists for NUMA and NAOG's financial statements, which were introduced into evidence, show that Mr. Shelton was not among the recipients of those documents. *See, e.g.* Tr. 3204-3206 (Pember testimony that Mr. Shelton did not receive DX 1850, NAOG financials); Tr. 3206-09 (Pember testimony that Mr. Shelton did not receive DX 1852, NUMA financials). Indeed, the introduction of these financial statements, far from establishing that Mr. Shelton committed perjury, supported the conclusion that Ms. Pember was lying in testifying that Mr. Shelton received these documents. The government cites to no evidence to establish that Mr. Shelton received the monthly financial statements from these divisions.

The government contends that an obstruction enhancement is warranted because Mr. Shelton denied knowing that the auditors were given false information while he was employed by CUC or Cendant. *See* Gov't Sent. Mem., Exh. D., Tab 7. There was no persuasive evidence, however, that Mr. Shelton ever directed Mr. Corigliano or Ms. Pember to lie to the auditors, or that Mr. Corigliano or Ms. Pember ever told Mr. Shelton that they had given the auditors false information. Although Ms. Pember testified that Mr. Shelton attended four or five meetings with the E&Y auditors to discuss the size of the Cendant merger reserve, Tr. 3008-09, 3012, that testimony, as we have demonstrated in our post-trial motions, cannot be credited. *See* Shelton Post-Trial Reply Mem. at 14-16. Each of the E&Y auditors denied attending any such meetings with Mr. Shelton, *see* Tr. 11142, 11147, 11153, and the government, in its cross-examination of those witnesses, did not seek to establish that they were mistaken or lying.

The government claims that Mr. Shelton lied in purportedly denying Sabatino's testimony regarding the so-called "pop-in" meeting. *See* Gov't Sent. Mem., Exh. D, Tab 3. Contrary to the government's description of Mr. Shelton's testimony, Mr. Shelton did not deny that the pop-in meeting occurred. He testified that he did not recall any such meeting, which is a very different concept. *See* Tr. 11755. Mr. Shelton's denial of recollection was completely understandable. Mr. Sabatino described the pop-in meeting as lasting a total of 15 seconds. *See* Tr. 4078. Nothing that was said during the 15-second meeting would have alerted Mr. Shelton to Mr. Corigliano and Mr. Sabatino's fraudulent conduct. Thus, there was absolutely no reason for Mr. Shelton to have recalled this conversation. Moreover, on direct examination, Mr. Shelton recalled a very similar meeting, *see* Tr. 11749-50, but the government failed on cross-examination to ask him any questions about this meeting.

The government suggests that Mr. Shelton perjured himself when he testified that nothing on the "cheat sheets' indicated that they were improper. *See* Gov't Sent. Mem., Exh. D, Tab 2. That testimony, however, is factually true. Nothing on the so-called "cheat sheets" indicates that any of the proposed reserve adjustments were improper. *See* Tr. 8307. As prepared by Mr. Corigliano, the documents did not reflect the unsupported topside adjustments or any improper accounting concerning the allocations, the cancellation reserves or the rejects-in-transit. *See* Tr. 8334-35. Nor did Mr. Corigliano put any indication on the "cheat sheets" that he was using reserves in a manner that was fraudulent or violative of GAAP. *See* Tr. 8307. Indeed, as we have pointed out before, Mr. McLeod also received the forecasts and did not believe them to reflect any fraudulent accounting. *See* Shelton Post-Trial Reply Mem. at 11-13. Mr. McLeod testified that, based on conversations with Mr. Corigliano, he understood the reserves line item to represent the income effect that resulted when the company charged against the merger reserve a legitimate merger-related cost that the company had initially accounted for as an operating expense. Tr. 10895.

The government contends that Mr. Shelton committed perjury when he testified that he was not referring to the so-called "cheat sheets" in his performance review instructing Mr. Corigliano to "manage the numbers." *See* Gov't Sent. Mem., Exh. D, Tab 8. There is no evidence, however, that Mr. Shelton's testimony was perjurious. Mr. Corigliano did not testify that Mr. Shelton was referring to the "cheat sheets" when Mr. Shelton directed Mr. Corigliano to "manage the numbers." Although Mr. Corigliano testified that the cheat sheets were the vehicle by which he fraudulently managed earnings, Mr. Corigliano was not asked, and he did not offer, his understanding of what document, if any, Mr. Shelton was referring to by the phrase "manage the numbers." In any event, any such testimony would have been speculation by Mr. Corigliano.

24

The government contends that the obstruction enhancement is warranted because Mr. Shelton testified that he had not read the "good news/bad news" email (GX 519) at or around the time it was sent to him. *See* Gov't Sent. Mem., Exh. D, Tab 12. There was no evidence, however, that Mr. Shelton read the "good news/bad news" email, as opposed to having simply received it, which Mr. Shelton acknowledged. *See* Tr. 13311. For instance, neither Ms. Pember nor Mr. Corigliano testified that they ever discussed the email with Mr. Shelton. Mr. Shelton's testimony denying that he read this email is not contradicted in the record.

The remaining specifications of perjury identified by the government fall in two general categories: (i) contradictions by Mr. Shelton of the uncorroborated testimony by Mr. Corigliano and Ms. Pember; and (ii) denials by Mr. Shelton of having knowingly engaged in criminal conduct. Given the overwhelming evidence that Mr. Corigliano and Ms. Pember gave false testimony on many material matters, as set forth in Mr. Shelton's post-trial motions, their uncorroborated testimony provides too thin a reed on which to base an obstruction enhancement for Mr. Shelton's alleged perjury. Similarly, Mr. Shelton's mere denials of his participation in the charged scheme amounts to no more than an assertion of his innocence, which should not give rise to an obstruction enhancement. *See* Shelton Sent. Mem. at 72-75.

None of the government's additional specifications of alleged perjury warrant a two-level enhancement for obstruction of justice. In determining whether a defendant willfully obstructed justice through perjury, the court is to evaluate the purportedly perjurious statement "in a light most favorable to the defendant." *See United States v. Shonubi*, 998 F.2d 84, 88 (2d Cir. 1993) (citing U.S.S.G. § 3C1.1, cmt. (n.1); *United States v. Matos*, 907 F.2d 274, 276 (2d Cir. 1990) (and cited at Gov't Sent. Mem. at 35). None of the additional specifications of perjury by the government is

supported by any type of detailed analysis setting forth how Mr. Shelton's testimony was false, who contradicted the testimony, and what documents, if any, were inconsistent with it. As set forth above, each of the additional specified excerpts of testimony are either factually accurate or contradicted by the naked word of Mr. Corigliano and Ms. Pember, which falls short of meeting the clear and convincing evidence standard necessary for the application of such an enhancement. Accordingly, the Court should decline to impose a two-level enhancement for obstruction of justice.

### 3.    *United States v. Lauersen*

In *United States v. Lauersen*, 348 F.3d 329, 344 (2d Cir. 2003), *aff'd on reh'g*, 362 F.3d 160 (2004), *vacated on other grounds*, ___ U.S. ___ (2005), the Second Circuit recognized that, in cases in which a defendant faces a sentence at the higher-end of the sentencing table, the Sentencing Commission did not adequately take into account the cumulative effect of enhancements that substantially overlap in their factual predicates, and that a downward departure is appropriate. *See also United States v. Jackson*, 346 F.3d 22 (2d Cir. 2003).

When a defendant faces a potential sentence at the higher-end, a one point increase to his offense level affects his Guidelines sentence by a much greater amount than if he faced a sentence at the lower-end of the table. The government should not be allowed to unjustly exploit this characteristic of the sentencing table by double- or triple-counting a handful of facts in an effort to drastically prolong Mr. Shelton's sentence.

Accordingly, Mr. Shelton respectfully requests a four-level reduction to his offense level on the ground that several of the proposed enhancements are based upon overlapping factual bases. As discussed below and in Mr. Shelton's initial sentencing memorandum, two of the proposed sentence enhancements -- abuse of a position of trust (2 levels) and 'more than minimal planning or multiple victims' (2 levels) -- overlap completely with other enhancements proposed by the government.

26

The government's claim that "[e]ach Guideline enhancement that applies to Mr. Shelton is triggered by its own set of facts" (Gov't Sent. Mem. at 56) is belied by the government's own arguments in support of these enhancements. As the following chart illustrates, the government's arguments for enhancements for an abuse of a position of trust, Mr. Shelton's role in the offense, and the loss amount are predicated upon a single, operative fact: Mr. Shelton's supervisory position as Chief Operating Officer ("COO") and President of CUC.

| Enhancement | Dependence Upon Mr. Shelton's Executive Status |
| --- | --- |
| Abuse of a Position of Trust (2 levels) | • "As President of CUC, Mr. Shelton's position of trust was characterized by 'managerial discretion, that is, substantial discretionary judgment that is ordinarily given considerable deference' by other persons in the organization." Gov't Sent. Mem. at 26. <br><br> • "Persons like Mr. Shelton who hold senior management positions at publicly held corporations . . ." Gov't Sent. Mem. at 26. |
| Leadership Role in the Offense (4 levels) | • "As Corigliano's, and later Pember's immediate boss, and as the day to day manager of the CUC companies . . ." Gov't Sent. Mem. at 29. <br><br> • "Mr. Shelton exercised decision making authority in the criminal activity that was greater than the decision making authority of others such as Corigliano and Pember." Gov't Memo. at 30. <br><br> • "Certainly, Mr. Shelton had access to a larger share of the fruits of the crime than Corigliano and Pember as Mr. Shelton received a higher salary, higher bonus and greater stock awards than every other criminal participant except defendant Walter Forbes." Gov't Sent. Mem. at 30. |

| Loss Amount (18 levels) | <ul><li>"The Government stipulated that Corigliano's and Pember's involvement in the fraud was less serious than the 18 level fraud enhancement would require because of their inferior roles in the fraud, relative to the roles of Mr. Shelton and Walter Forbes." Gov't Sent. Mem. at 14.</li><li>"Corigliano and Pember would not have committed the fraud but for the orders they were given to engage in the fraud by Walter Forbes, Mr. Shelton, and Stuart Bell." Gov't Sent. Mem. at 14.</li><li>"Mr. Shelton told his subordinates, in effect, 'get it done, and spare me the details.'" Gov't Sent. Mem. at 15.</li></ul> |
|---|---|

The government claims that "the [*Lauersen*] Court concluded that enhancements for a leadership role and an abuse of trust (enhancements that Mr. Shelton should receive) do not substantially overlap with each other. [*Lauersen*, 362 F.3d] at 168 n. 12." Gov't Sent. Mem. at 57. The *Lauersen* Court made no such conclusion, either with respect to defendant Lauersen or as a per se rule to be applied within the Second Circuit. Indeed, the enhancement for abuse of trust was not even at issue in *Lauersen*. *See Lauersen* 362 F.3d at 162 (reviewing enhancements applicable to defendant Lauersen). Footnote 12 of the *Lauersen* opinion, to which the government cites to make its bold assertion, simply provides the *Lauersen* Court's commentary on a Sixth Circuit case, *United States v. Kuhn,* 345 F.3d 431 (6th Cir. 2003), in which, based on the facts of that particular case, the Sixth Circuit found the enhancement for abuse of trust did not substantially overlap with the enhancement for leadership role. The *Lauersen* Court did not in any manner suggest that it was adopting (needlessly, since the abuse of trust enhancement was not at issue in *Lauersen*) the Sixth Circuit holding as a per se rule for all sentencing courts in the Second Circuit. Indeed, in that very footnote, the *Lauersen* Court remarked that these two enhancements are "not entirely dissimilar."

In addition, the enhancement for 'more than minimal planning or multiple victims' (2 levels) completely overlaps with the factual basis for the loss amount enhancement (18 levels). As the Second Circuit has noted, "[m]ost fraud schemes that obtain more than one half million dollars involve careful planning, some sophisticated techniques, and are extensive." *United States v. Lauersen,* 362 F.3d 160, 162-63 (2d Cir. 2004) (quoting *United States v. Jackson,* 346 F.3d 22, 25-26 (2d Cir. 2003)). Plainly, here, the loss enhancement proposed by the government already takes into consideration that the fraud either involved more than minimal planning or more than one victim, as is necessary to trigger the two-point enhancement..

The 'more than minimal planning' enhancement is also completely subsumed in the leadership role enhancement. The four level leadership role enhancement only applies where "the criminal activity involved five or more participants or was otherwise extensive." But any fraud that involves five or more participants or was otherwise extensive is necessarily a fraud that involves more than minimal planning. Moreover, the imposition of a four level enhancement for leadership role in this case entails a two level enhancement for more than minimal planning -- even though the very fact of 'more than minimal planning' is taken into account by the four level role enhancement.

The government cites a string of inapposite cases, pre-dating *Jackson* and *Lauersen,* that stand for the proposition that a sentencing court is permitted to impose certain combinations of enhancements in certain factual circumstances. *See* Gov't Sent. Mem. at 59. Mr. Shelton is not arguing that particular combinations of enhancements may never be imposed. Rather, Mr. Shelton's arguments are focused upon the facts of this case, not some hypothetical case that might exist. With respect to this case, the *Lauersen* jurisprudence in this Circuit, in conjunction with a renewed focus on individualized justice heralded by *Booker / Fanfan,* and, in this Circuit, in *Crosby,* make clear that a departure on the basis of overlapping enhancements is warranted in the interests of justice.

E.    **The Government Cannot Defend Its Differential Guidelines Treatment Of Mr. Shelton Versus Corigliano And Pember**

The government goes to great length to explain what it cannot -- why Mr. Shelton's treatment under the Guidelines should differ so profoundly from Mr. Corigliano's and Ms. Pember's.  Thus, the government spends the better part of 20 pages arguing that Mr. Shelton deserves a whopping 18-level loss enhancement even though the government previously stipulated in Mr. Corigliano's and Ms. Pember's plea agreements that such a sentencing enhancement would overstate the seriousness of their respective offenses.  *See* Gov't Sent. Mem. at 5-25.  Contrary to the government's arguments, just as an 18-level loss enhancement overstates the seriousness of Mr. Corigliano's and Ms. Pember's offense conduct, such an enhancement overstates the seriousness of Mr. Shelton's offense conduct.  There can be no other conclusion in light of the overwhelming evidence establishing Mr. Corigliano and Ms. Pember's far more detailed and culpable roles in the alleged fraud.

The government initially attempts to sidestep Mr. Shelton's challenge to the government's patently inconsistent application of the guidelines on the ground that Mr. Shelton somehow lacks standing.  *See* Gov't Sent. Mem. at 14.  According to the government, because "Mr. Shelton is not a party to those plea agreements," *id.*, he should not "receive the benefit of the negotiated stipulation in Mr. Corigliano's and Ms. Pember's plea agreements."  *Id.*  The government's remarkable position boils down to the following:  the government may adopt one view of the facts when it "negotiates" a plea deal with persons who cooperate, and it may adopt another view of the same facts -- one significantly more severe -- when it comes time to sentence a person who exercises his constitutional right to trial by jury.

The government's attempt to defend its differential guidelines treatment of Mr. Shelton on the merits is no more persuasive.  The government contends that an 18-level loss enhancement is

somehow right for Mr. Shelton, but wrong for Mr. Corigliano and Ms. Pember, based on the truism

that "[o]ne who causes subordinates to commit a crime is for that reason more culpable than those

who follow the directives in order to avoid the loss of employment benefits." Gov't Sent. Mem. at

14.[6] In an apology for Mr. Corigliano and Ms. Pember, the government asserts that they "would not

have committed the fraud but for the orders they were given to engage in the fraud by Walter Forbes,

Mr. Shelton, and Stuart Bell." *Id.*

To begin with the most obvious, whether Mr. Corigliano or Ms. Pember committed the fraud

because they were ordered to do so by Walter Forbes and Stuart Bell is irrelevant to the issue of

whether an $80 million loss enhancement overstates the seriousness of *Mr. Shelton's* conduct. We

are not concerned here with Walter Forbes or Stuart Bell. The pertinent question is whether the trial

evidence supports the proposition that Mr. Shelton directed Mr. Corigliano and Ms. Pember to

commit the fraud, and the answer to that question is emphatically no.

The government believes that $80 million overstates the loss with respect to Mr. Corigliano

and Ms. Pember even though (i) Mr. Corigliano and Ms. Pember committed the fraud for years

before Mr. Shelton was -- as far as the cooperators knew -- ever informed of the fraud; and (ii) Mr.

Corigliano and Ms. Pember dumped virtually all of their stock in the months before the disclosure of

the fraud and made millions. Yet the government believes that $80 million understates the loss to

Mr. Shelton even though, by the cooperators' own testimony, Mr. Shelton was unaware of many of

the accounting practices underlying the decade-long criminal scheme -- including the recording of

unsupported, topside adjustments; the manipulation of the cancellation reserve; the acceleration of

---

[6] There was no evidence presented at trial that Mr. Corigliano and Ms. Pember participated in the fraudulent scheme because they lived in fear of losing their "employment benefits." Neither Mr. Corigliano nor Ms. Pember ever tried to leave CUC, except for Ms. Pember's testimony about her decision to leave CUC in late 1997 because of personal friction with Scott Forbes, which she conceded had nothing to do with her feelings about engaging in the fraud. Tr. 2604-14. Indeed, both Mr. Corigliano and Ms. Pember had the financial wherewithal to leave CUC at any time.

revenue through improper allocations among membership programs; and the effect on income of maintaining a three-month lag on rejects in transit. *See* Def. Sent. Mem. at 60-61 (citing to Statement of the Case at 13-20).

Contrary to the government's fanciful characterization of the trial evidence, Mr. Corigliano and Ms. Pember did not mindlessly follow directives from Mr. Shelton to commit the fraud. Mr. Corigliano and Ms. Pember were sophisticated financial professionals who engaged in the fraud, and profited from it, years before they allegedly ever took a single direction from Mr. Shelton to do anything -- proper or improper. The evidence established that Mr. Corigliano and Ms. Pember embarked on their decade-long criminal scheme in the late 1980s. *See, e.g.,* Tr. 6237-46. By the time Mr. Corigliano and Ms. Pember ended up reporting to Mr. Shelton, Mr. Corigliano had been perpetrating the fraud for at least five years and Ms. Pember for at least seven. *See id.* Moreover, contrary to the government's charitable portrayal of Mr. Corigliano and Ms. Pember as persons who would not have engaged in the fraud but for Mr. Shelton's entreaties, the evidence showed that both Mr. Corigliano and Ms. Pember made millions of dollars from their participation in the fraud. *See* Tr. 3151-52; 7491-94. There was no evidence that anyone ever held the proverbial gun to their heads, or that Mr. Corigliano's and Ms. Pember's free will was somehow overcome by threats and inducements too strong for the average person to resist.

The government seeks to make a virtue out of its lack of evidence of Mr. Shelton's involvement in the details of the fraud, contending that Mr. Shelton's ignorance of the mechanics of the fraud was somehow intentional. *See* Gov't Sent. Mem. at 14-16. The government suggests that Mr. Shelton purposely gave Mr. Corigliano a wide berth to figure out on his own how to inflate earnings by hundreds of millions of dollars so that Mr. Shelton could insulate himself from knowledge of the underlying fraudulent accounting practices when the day of reckoning came. *See*

32

*id.* But, as previously noted, the principal flaw in this argument is that a simple instruction to "manage the numbers," contained in a formal employee evaluation and stored in the company's official records, is hardly a directive that a subordinate engage in rampant accounting fraud. Nor is it a ratification of Mr. Corigliano's prior involvement in fraudulent accounting practices conducted over the course of many years outside Mr. Shelton's supervision.

The government's inflammatory comparison of Mr. Shelton's conduct with that of a Mafia kingpin who orders an underling to commit a murder is particularly inapt. Gov't Sent. Mem. at 30, n. 11. There is no ambiguity about the criminality of an order by a mobster, engaged in a blatantly illegal enterprise, that a subordinate commit murder. There is all the ambiguity in the world about the criminality of an order contained in a performance review, written by the executive of a Fortune 500 company engaged in a legitimate enterprise with real revenue, real earnings and real products, that the Chief Financial Officer "manage the numbers." As noted above, there is no law on the books against directing a subordinate to "manage the numbers." Wall Street expectations can be met in legal ways and illegal ways. It is the paucity of evidence that Mr. Shelton was aware of, much less sanctioned, the underlying fraudulent accounting practices -- the making of unsupported topside adjustments, the manipulation of cancel reserves, the allocation of revenue from deferred to immediate recognition programs, or the lying to CUC's auditors -- that demonstrates that Mr. Shelton was less culpable than either Mr. Corigliano or Ms. Pember. There is no evidence that Mr. Shelton conceived of any of the components of the fraud, many of which were derived by Mr. Corigliano and personally implemented by Ms. Pember.

Nor should the government be heard to contend that an 18-level loss enhancement is appropriate for Mr. Shelton, but not appropriate for Mr. Corigliano and Ms. Pember, because the Sentencing Commission has made a policy choice that "that those who occupy a higher position in

the conspiratorial hierarchy are more blameworthy than those whom they supervise." Tr. 15-16.

That proposition may be true as a general matter, but the pertinent question is whether the trial

evidence supports the government's position that Mr. Shelton supervised and directed Mr.

Corigliano and Ms. Pember's fraudulent activities. As discussed above, the evidence does not

support such a finding.

The government also seeks to take comfort in the fact that it was not necessary for the

government to prove, in order for the jury to return a guilty verdict, that Mr. Shelton knew about all

of the phony accounting practices undertaken by his subordinates. In the government's view,

"[w]hether or not Mr. Shelton personally directed or was even aware of each of the details of those

improper [accounting] practices is immaterial since all were reasonably foreseeable to someone who

occupied Mr. Shelton's leadership position in the fraud." Tr. 22. The issue, however, is not whether

proof of Mr. Shelton's knowledge of the underlying accounting practices by Mr. Corigliano and Ms.

Pember was a necessary element of the government's proof at trial. The relevant issue at this stage,

for purposes of determining Mr. Shelton's sentence, is whether Mr. Shelton's ignorance of those

underlying accounting practices compels the conclusion that an 18-level loss enhancement overstates

the seriousness of his offense conduct. The government does not explain how Mr. Shelton's

direction that Mr. Corigliano and Ms. Pember "manage the numbers" made it foreseeable to him that

they would engage in topside adjustments, the improper acceleration of revenue, and the intentional

understatement of cancel reserves. It is one thing to argue that Mr. Shelton's lack of knowledge of

the fraudulent accounting practices engaged in by Mr. Corigliano and Ms. Pember does not preclude

Mr. Shelton's criminal conviction on the offenses charged in the Superseding Indictment. It is quite

another to argue that Mr. Shelton should be held responsible for all of that underlying conduct at

sentencing.

The government also attempts to explain the inconsistency arising out of its agreement, in the Corilgiano plea agreement, not to oppose a sentence of home confinement for Mr. Corigliano. In a footnote, the government accuses Mr. Shelton of "misreading" the Corigliano plea agreement in asserting that the government had agreed not to oppose a sentence of home confinement for Mr. Corigliano. Gov't Sent. Mem. at 15, n.5. Seizing upon a distinction without a difference, the government contends that the agreement provides that government will not oppose a sentence of home confinement, *if the court grants a downward departure to a Guidelines range that would authorize the court to impose a sentence of house arrest.* Obviously, in the pre-*Booker* sentencing regime in which the government negotiated Mr. Corigliano's plea agreement, the government's agreement not to oppose a sentence of home confinement would be relevant only if the court departed to a Guidelines range that permitted such a sentence. What is important for our purposes, however, is that the government believes that such a sentence would not be inappropriate for Mr. Corigliano notwithstanding the amount of the fraud loss. Having staked out that position, it is unfathomable that the government continues to insist that a sentence of 12 to 15 years is appropriate for Mr. Shelton.

## III.    Conclusion

A fundamental principle of sentencing is that a court *"shall impose a sentence sufficient, but not greater than necessary"* to meet specified sentencing goals, including the goal of "just punishment." *See* 18 U.S.C. § 3553(a). Mr. Shelton has lived an exemplary life, raised a family with the highest of values, contributed time and money to community efforts for over two decades and has tried to impose a moral and ethical code in his professional career. Based upon a complete review of Mr. Shelton's extraordinary background, history and character as fully detailed in his sentencing memoranda, as well as consideration of the other sentencing factors listed in 18 U.S.C. § 3553(a), a sufficient and just sentence in this case is a sentence of probation with extensive community service.

Respectfully submitted,
E. KIRK SHELTON

By: *Thomas P. Puccio*

Dated:  July 18, 2005

LAW OFFICES OF THOMAS P. PUCCIO
Thomas P. Puccio, Esq. (CT 22983)
230 Park Avenue, Suite 301
New York, NY 10172
Tel: (212) 883-6383
Fax: (212) 883-6388

SANTOS & SEELEY, P.C.
Hubert J. Santos (CT 00069)
Hope C. Seeley (CT 04863)
51 Russ Street
Hartford, CT 06106
Tel: (860) 249-6548
Fax:(860) 724-5533

DAY, BERRY & HOWARD LLP
Stanley A. Twardy, Jr. (CT 05096)
Gary H. Collins, Esq. (CT 22119)
City Place 1, 185 Asylum Street
Hartford, CT 06103
Tel: (860) 275-0314
Fax: (860) 275-0343

MILBANK, TWEED, HADLEY &
McCLOY, LLP
Scott A. Edelman, Esq. (CT 25268)
Thomas A. Arena, Esq. (CT 25269)
1 Chase Manhattan Plaza
New York, NY 10005-1413
Tel.: (212) 530-5000
Fax: (212) 530-5219

## CERTIFICATION

I hereby certify that on July 18, 2005 a copy of the foregoing Reply Memorandum In Aid Of Sentencing was served on the following parties and interested persons via email and Federal Express:

Richard J. Schechter, Esq.
James McMahon, Esq.
Norman Gross, Esq.
United States Attorney's Office
District of New Jersey
970 Broad Street, Suite 700
Newark, NJ 07101
Tel: (973) 645-2700
Fax: (973) 645-2857

Mr. C. Warren Maxwell
Deputy Chief
United States Probation Office
157 Church Street, 22nd Floor
New Haven, CT 06510
Tel: (203) 773-2100
Fax: (203) 773-2200

_____
HOPE C. SEELEY