



Not Reported in F.Supp.
1997 WL 96563 (S.D.N.Y.)
(Cite as: 1997 WL 96563 (S.D.N.Y.))

Page 1

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
UNITED STATES of America
v.
Steven HOFFENBERG, Defendant.
**Nos. 94 Cr. 213 (RWS), 95 Cr. 321 (RWS).**

March 5, 1997.

*SENTENCING OPINION*

SWEET, District Judge.

**\*1** Defendant Steven Hoffenberg ("Hoffenberg") pled guilty on April 20, 1995, to five counts: (i) conspiracy to violate the securities laws by fraudulently selling securities, in violation of 18 U.S.C. § 371; (ii) mail fraud, in violation of 18 U.S.C. §§ 1341, 1342; (iii) conspiracy to obstruct justice, in violation of 18 U.S.C. § 371; (iv) tax evasion, in violation of 26 U.S.C. § 7201; and (v) mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1342, exposing him to a total maximum sentence under the applicable statutes of 25 years imprisonment followed by three years of supervised release.

For the reasons set forth below, Hoffenberg will be sentenced to serve a term of imprisonment of 240 months, followed by three years supervised release, to make restitution in the amount of $475,157,340, and to pay a fine of $1,000,000, all subject to the hearing now set for March 7, 1997. Pursuant to 18 U.S.C. § 3013, a special assessment of $250.00, $50.00 per count, is mandatory.

*The Offense Conduct*

Until April 1993, Hoffenberg was the chief executive officer, president and chairman of the board of Towers Financial Corporation ("Towers"). In 1987, Towers acquired a controlling interest in United Diversified Corporation ("UDC"), which conducted business through its subsidiaries, Associated Life Insurance Co. ("Associated") and United Fire Insurance Co. ("United Fire"). Hoffenberg later became chairman of the boards of UDC, Associated and United Fire.

Hoffenberg obtained the Illinois Department of Insurance's approval for this acquisition by representing that Towers would contribute $3 million to the surplus of United Fire, supplying $2 million immediately and an additional $1 million at a later date. In approximately November 1967, Hoffenberg and his co-conspirators used certain of the Associated and United Fire bonds as collateral in securities brokerage accounts in order to purchase stock of Pan American Airways, Inc. ("Pan Am"). When this attempted acquisition failed, United Fire and Associated suffered trading losses of over $80,000.

Between November 1987 and July 1988, Hoffenberg also removed blank checks belonging to UDC and United Fire from the offices of both companies, and then issued over fifty checks on these accounts. Many of those checks were issued for his own benefit or for expenditures, totalling over $3 million, unrelated to the insurance companies, including tuition costs and credit card bills for Hoffenberg's stepdaughter; the payment of investment consultant fees for Towers; the purchase of Emery Air Freight stock; the payment of margin interest; the payment of private airplane leasing expenses; legal and consulting expenses; and payments to Towers and one of its affiliated companies, totalling $1.1 million.

Between December 1987 and June 1988, Hoffenberg and his co-conspirators again used Associated and United Fire bonds as collateral in securities brokerage accounts to purchase and sell stock and options of companies, including Emery Air Freight. In this instance, as well as with the previous attempted Pan Am acquisition, Hoffenberg did not intend for these purchases of stock to be solely for the benefit of the insurance companies, but rather intended them to benefit Towers.

**\*2** On January 24, 1988, Towers contributed $1.8 million in capital to United Fire, $1 million of which was intended to fulfill Towers' agreement with state insurance regulators to make a $3 million capital contribution by December 31, 1987. However, prior to this contribution, Hoffenberg used the $1.8 million to pay for stock in Emery Air Freight in an attempt to acquire that company.

The attempted acquisition of Emery Air Freight ultimately failed. United Fire and Associated lost over $1 million on the purchase of Emery securities, as those stocks were purchased with funds borrowed by using insurance company bonds as collateral. Hoffenberg concealed his activities from Associated and United Fire by: routing all securities trade confirmations, periodic account statements and other communications from brokerage firms to Towers, rather than to the insurance companies' headquarters; causing false entries to be made on the records of the insurance companies; failing to provide supporting documentation for certain expenditures; providing false information or withholding accurate information in annual and quarterly reports regarding the location and use of bonds, capital contributions made to the insurance companies, securities trading done with insurance company assets, and the financial condition of United Fire and Associated. Hoffenberg and his co-conspirators also created false documents and filed false pleadings in related legal proceedings brought by state insurance regulators; closed out securities positions without regard to the profitability of the transactions; committed and suborned perjury; and concealed their fraudulent activities in connection with state insurance regulators' investigations.

Finally, in a further attempt to conceal their activities, Hoffenberg and his co-conspirators filed a lawsuit in the United States District Court for the Northern District of Illinois against individual State of Illinois insurance regulation employees, alleging that these employees instituted "sham conservation proceedings" against the insurance companies and that their actions were motivated by a "personal animus."

As a result of Hoffenberg's fraudulent activity, over $3 million of the funds and assets of United Fire and Associated were misappropriated through trading losses, margin interest expenses and Hoffenberg's unauthorized use of insurance company funds for personal expenditures. These misappropriations significantly reduced the capital available to operate the insurance companies, adversely affecting policyholders and shareholders of UDC.

In July 1988, the Illinois Director of Insurance obtained an order placing UDC, Associated and United Fire in conservation. On February 14, 1989, Hoffenberg agreed, in a signed stipulation, to an entry of an order liquidating Associated and United Fire, based on Hoffenberg's agreement that both companies were insolvent. Hoffenberg lost control of these companies on March 3, 1989, when the liquidation order was entered.

*3 On June 27, 1991, three days before the end of Towers' 1991 fiscal year, the Illinois Insurance Director filed an action charging Hoffenberg and others with using the insurance companies as an instrumentality of Towers, and with transferring investments and cash belonging to the insurance companies into various Hoffenberg-controlled brokerage accounts, in violation of the Racketeer Influenced and Corrupt Organizations Act (the "RICO Action"). The RICO Action alleged that the defendants had caused UDC, Associated Life and United Fire to suffer damages in excess of $4 million, become insolvent, and be placed in conservation and/or liquidation.

In an agreement dated May 4, 1992, the Insurance Director and the defendants agreed to settle the RICO Action, with Towers paying $3.5 million. Towers also agreed to sell its interest in Towers Diversified to the Insurance Director for $1, and to withdraw objections to the liquidation of Towers Diversified. According to the SEC, Towers never disclosed the liquidation of these companies or the filing of this civil suit to its investors, and continued to carry the investment at its full cost. Towers further misrepresented this information in its Annual Reports of 1989 and 1990. In the Towers Annual report of 1989, a note to the financial statements (completed after the agreement by Hoffenberg that the companies were insolvent and could be liquidated) suggested that Towers had never completed its agreement to purchase the companies and that the conclusion of the matter was "being held in abeyance pending the finalization of certain regulatory matters." The 1989 report also falsely stated that there was no "other material litigation in which the Company [was] involved."

The 1990 Towers Annual Report disclosed the litigation between Towers and the previous UDC owners, but made no mention of the "regulatory matters" referred to in the 1989 report. Upon issuance of the 1991 Towers Annual Report, the company admitted that Towers had purchased UDC in 1987 and that the company was placed in "receivership within six months of the acquisition"; however the note also stated that the Insurance Director had "instituted a legal action to take possession of all assets of UDC." The financial statement continued, stating that it was management's belief that the Illinois Insurance Director would not prevail and "that the Company will ultimately be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
1997 WL 96563 (S.D.N.Y.)  
**(Cite as: 1997 WL 96563 (S.D.N.Y.))**

Page 3

determined to be entitled to all assets of UDC, in which case the Company would experience no loss on this investment." At the time that this statement was made, the Insurance Director had already prevailed in the liquidation order, and Towers had already suffered a total loss on its investment.

Hoffenberg, through Towers, was also engaged in illegal conduct in the New York area. Towers had two subsidiaries: Towers Credit Corporation, which was engaged in "factoring," purchase at a discount of commercial accounts receivable, and Towers Collection Services, Inc., which was engaged in the collection of past-due receivables for third parties on a contingency-fee basis. Towers also owned and controlled Towers Healthcare Receivables Funding Corporations I, II, III, IV and V (the "THRFC Bond Funds"), which were formed to raise funds for the purchase of accounts receivable, and which purchased accounts receivable due to hospitals from Towers pursuant to an agreement with the bondholders' indentured trustee. Hoffenberg controlled Towers' daily operations, including the flow of funds among checking accounts and the escrow accounts established for the proceeds of the promissory notes.

*4 In the mid-1980's, Hoffenberg decided to expand Towers. In order to raise capital, he and his co-conspirators devised a plan to sell Promissory Notes (the "Notes"). Towers sold the Notes in private placements by means of six separate offering memoranda prepared at Hoffenberg's direction. Each issuance of the Notes was purportedly collaterized by accounts receivable owned by Towers' subsidiaries, and was additionally guaranteed by Towers to the extent of its consolidated assets. The six offering memoranda, dated from January 1988 through March 1992, resulted in the sale of approximately $272 million in Notes through a network of registered broker-dealers throughout the United States.

Hoffenberg and his co-conspirators fraudulently induced the purchase of the Notes by preparing and providing to investors financial statements which used bogus income and asset figures to falsely conceal Towers' true financial condition. The bogus figures were created after it was determined that the company's net cash position was negative, and that a certain profit must be shown in order to sell the Notes. In addition to creating fraudulent financial statements, Hoffenberg and his co-conspirators arranged to have a certified public accountant falsely certify that the financial statements accurately reflected Towers' financial condition.

Only a small fraction of the proceeds from the sale of the Notes were used for the expansion of Towers' business, the purpose stated in the offering documents. The proceeds were used instead to pay Towers' operating expenses, including a private jet and a yacht used by Hoffenberg, and to pay interest on the Notes themselves.

The Notes were not properly collaterized. Hoffenberg and his co-conspirators represented to investors that the face value of the collateral exceeded the face value of the Notes. In fact, the collateral was comprised in significant part of phony receivables, which were not worth the total outstanding debt of the investors. In addition, the accounts receivable reflected in the financial statements consisted mainly of collection receivables which Towers did not own, but only collected as agent and took a fee, and of certain healthcare receivables purchased by the THRFC Bond Funds. Receivables not actually owned by Towers could not properly collateralize the Notes.

In about July 1990, Hoffenberg and his co-conspirators made additional efforts to raise capital and expand Towers by engaging in the sale of a series of Bonds. To this end, Hoffenberg and his co-conspirators created the THRFC Bond Funds, a series of corporations which issued Bonds to purchase accounts receivable due to healthcare institutions from Towers in accordance with a series of Indenture Agreements.

The Bonds were sold pursuant to five separate, private placement memoranda prepared at the direction of Hoffenberg and his co-conspirators. The private placement memoranda for each issuance of the Bonds represented that the proceeds from the sales of the Bonds would be used by the THRFC Bond Funds: in whole or in part, to purchase healthcare receivables from Towers, and that the healthcare receivables purchased from Towers would collateralize the Bonds. According to the offering documents, the obligors on the healthcare receivables would be major insurance companies such as Blue Cross/Blue Shield, State Farm Insurance Company, Aetna Insurance Company, Allstate Insurance Company, or government entities. The documents provided that more than 50% of the healthcare receivables must represent the payment obligations of insurers having a rating of "A" or better and Government entities under Medicaid or Medicare programs who had agreed in writing to send all

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

payments directly to the servicer. No more than 50% of the healthcare receivables could represent the obligations of government entities which had not so agreed.

**\*5** Between July 1990 and May 1992, Towers sold approximately $210 million in bonds through the five THRFC funds. The offering documents touted not only the quality of the healthcare receivables, but also the financial soundness of Towers; the Bond sales were promoted by the figures in the fraudulent Towers financial statements. The offering documents described Towers and its subsidiaries as having engaged in either servicing or acquiring accounts receivable having an aggregate value in excess of $630,000,000--a vastly inflated number. The gross revenue figures in the offering documents were based on the bogus figures created by Hoffenberg and his co-conspirators and certified by the certified public accountant. Accordingly, the Bond sales, like the Note sales, were promoted by fraud.

Hoffenberg and his co-conspirators also deliberately misrepresented how investor funds would be used, and misused the proceeds from the sale of the Bonds. The strictures in the offering documents and the Indenture Agreements were ignored, and Hoffenberg and his co-conspirators used substantial amounts of the proceeds from the sales to meet Towers's operating expenses. Towers provided two kinds of reports to the Trustee on a regular basis: a cash request report and a collateral ratio report. Both were used to fraudulently obtain money from the Trustee.

When Towers acquired healthcare receivables, it provided to the Trustee a total figure for the receivables it planned to acquire, and the Trustee then released 50% of the value of the receivables to Towers to make the first payment on the receivables. As Hoffenberg needed more money to operate Towers, he directed his co-conspirators to provide inflated figures for receivables to accommodate Towers's cash needs. In this way, the Trustee released 50% of the value of bogus receivables, and Hoffenberg had cash with which to meet his operating expenses.

Towers was also required to send collateral ratio reports to the Trustee. These reports were designed to ensure that each of the Bond Funds were properly collateralized by accounts receivable. Since Hoffenberg was using monies from the Bond Funds to pay his operating expenses, the Bond Funds did not have sufficient collateral to support payments to Towers. To cover up the fraud, Hoffenberg directed his co-conspirators to move collateral from one Bond Fund to another, and to fabricate collateral for the reports. On numerous occasions, Hoffenberg and his co-conspirators created phony receivables, then included those items in reports designed to misrepresent the Bond Funds' true financial picture.

One condition to the issuance of the Bonds was that Duff & Phelps Credit Rating Company rate the Bonds as AA or better. Because Hoffenberg and his co-conspirators were acquiring healthcare receivables that were not from A rated insurers, and this might have affected Duff & Phelps's rating of the Bonds, Hoffenberg directed his employees to alter the reports sent to Duff & Phelps by combining healthcare receivables from small insurers and adding those numbers to the amounts of receivables acquired from A rated insurers.

**\*6** The Indenture Agreement also prohibited Towers from holding any healthcare accounts receivable on its books for more than 90 days. After 90 days, it is less likely that a receivable will be collected. To secretly enable Towers to keep old accounts on their books, Hoffenberg directed employees to "freshen" accounts--if an account was more than 90 days old, it was deleted and reentered as a "new" account.

In or about 1989, the Securities & Exchange Commission ("SEC") began an investigation of the fraudulent sale of Towers' securities by Hoffenberg and his co-conspirators. In the course of this investigation, which ultimately resulted in a lawsuit against Towers, the SEC deposed Hoffenberg and numerous officers, employees and agents of Towers. The SEC also issued numerous subpoenas and requests for documents to Towers, Hoffenberg and his co-conspirators. Hoffenberg and his co-conspirators had agreed from the outset of the SEC's investigation to take whatever steps they deemed necessary to obstruct that investigation 3nd conceal their criminal activities.

As part of his attempt to obstruct the SEC investigation, Hoffenberg gave false testimony to the SEC in New York City on several occasions between November 21 and December 12, 1991. In 1992, Hoffenberg directed Towers employees and associates to testify falsely during the SEC investigation. Hoffenberg and his co-conspirators have also admitted to fabricating and falsifying documents in response to the SEC subpoenas. For example, in response to the SEC request for

Not Reported in F.Supp. \
1997 WL 96563 (S.D.N.Y.) \
(Cite as: 1997 WL 96563 (S.D.N.Y.))

Page 5

accounting records supporting Towers' financial statements, in or about May 1992, Hoffenberg and his co-conspirators instructed employees to fabricate computer runs of certain accounts receivable to reflect a 30% collection rate and to substantiate Towers's bogus accounting theories used in compiling its financial statements for 1989, 1990, and 1991. After these false computer runs were created, Hoffenberg directed two employees to make tick marks on the runs so that it appeared as if an accountant had used the runs in certifying the financial statements for the appropriate years. Towers then provided the runs to the SEC.

Between 1987 and 1991, Hoffenberg evaded personal income taxes by causing his personal expenses to be paid by Professional Business Brokers, a corporation Hoffenberg owned. Some of the personal items that Professional Business Brokers paid included: Hoffenberg's rent and his stepdaughter's rent, salaries for personal servants, furniture and antiques for his residence, personal automobiles and maintenance, and maintenance for his personal residences. The additional tax due and owing for each year is as follows: 1987: $7,230; 1988: $31,068; 1989: $43,606; 1990: $199,674; 1991: $386,702.

In March 1993, after the SEC had filed a lawsuit against Towers, Towers declared bankruptcy. The loss to the Noteholders and Bondholders, the victims of Hoffenberg's fraud, was enormous. At the time of the Towers bankruptcy, Noteholders and Bondholders (as well as victims such as vendors and collections clients) filed petitions with the Bankruptcy Court to support their loss claims. As of April 1996, the Bankruptcy Court has already determined the following Noteholder and Bondholder claims to be valid claims: the Bondholders filed valid claims of $196,948,864; the Noteholders filed valid claims of $258,244,618; and a second class of Noteholders' filed valid claims of $19,963,858. The total of those claims equals a loss of $475,157,340. This figure represents the approximate losses resulting from the Towers fraud only and does not include losses resulting from the Illinois insurance company fraud, which totalled between $3 million and $4 million. The total losses attributable to Hoffenberg's conduct are $478,157,340.

*The Agreement and the Guilty Plea* [FN1]

> FN1. The prior proceedings in this action are fully set forth in several prior Opinions of the Court, familiarity with which is assumed. *See United States v. Hoffenberg,* 859 F.Supp. 698 (S.D.N.Y.1994); *United States v. Hoffenberg,* 1995 WL 10840 (S.D.N.Y. Jan.12, 1994); *United States v. Hoffenberg,* 908 F.Supp. 1265 (S.D.N.Y.1995); *United States v. Hoffenberg,* --- F.Supp. ---- (S.D.N.Y.1996).

*7 As a result of its investigation, on February 8, 1993, the SEC filed an action in this District against Hoffenberg and others. On February 17, 1993, Hoffenberg and certain other defendants agreed to a preliminary injunction issued by the Honorable Whitman Knapp which, among other things, enjoined Hoffenberg and "each of his controlled, related, or affiliated entities ... to hold and retain within their control, and otherwise prevent any withdrawal, transfer, pledge, encumbrance, assignment, dissipation, concealment, or other disposal of any funds, or other properties."

In 1993, the United States Attorney for the Southern District of New York began a criminal investigation of Hoffenberg and others for conspiracy to obstruct the SEC's investigation during 1991 and 1992, and for various other criminal violations of the securities laws.

In March of 1993, Hoffenberg, through counsel, initiated a number of proffer sessions with the United States Attorneys office which culminated in an oral understanding. Pursuant to that understanding, Hoffenberg agreed to talk to representatives of the United States Attorney's Office for the Southern District of New York and the Northern District of Illinois, the FBI, and the SEC (collectively, the "Government"). In return, the Government agreed to grant Hoffenberg limited immunity. On September 24, 1993, Hoffenberg and the Government entered into a plea agreement, dated September 23, 1993 (the "Agreement"). Discussions with Hoffenberg continued.

The Agreement provided, among other things, that upon performance of the Agreement, Hoffenberg would plead to the four counts specified in the Agreement and the Government would advise the sentencing judge of Hoffenberg's cooperation through the issuance of a letter, pursuant to § 5K1.1 of the Sentencing Guidelines. The four counts agreed upon were: conspiracy to violate the securities laws by fraudulently selling securities, in violation of 18 U.S.C. § 371; mail fraud, in violation of 18 U.S.C. § § 1341, 1342; conspiracy to obstruct justice, in violation of 18 U.S.C. § 371; (iv) and tax evasion, in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1997 WL 96563 (S.D.N.Y.)
(Cite as: 1997 WL 96563 (S.D.N.Y.))

Page 6

violation of 26 U.S.C. § 7201. On April 20, 1995, Hoffenberg entered a guilty plea to these four counts.

On January 27, 1994, and on February 14, 1994, the Government confronted Hoffenberg with allegations that he had violated his obligations under the Agreement. On February 17, Hoffenberg was advised that the Agreement had been terminated, and he was arrested.

On April 19, 1994, a thirteen-count Indictment, 94 CR 272, was filed in the Northern District of Illinois, charging Hoffenberg with numerous fraud counts, including conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371, and mail fraud, in violation of 18 U.S.C. § 1341, in connection with the misappropriation and misuse of over $3 million worth of funds and assets of United Fire. On April 11, 1995, Indictment 94 CR 272 was transferred to the Southern District of New York, and became 95 CR 321(RWS).

*8 April 20, 1994, Hoffenberg was indicted in the Southern District of New York and charged with the four counts contemplated in the Agreement, as well as six additional counts alleging substantive securities fraud violations in connection with the sale of notes and bonds of Towers, additional violations of the mail fraud statute, and obstruction of justice for disobeying an order of the United States District Court for the Southern District of New York.

Following his indictment, Hoffenberg moved for specific enforcement of the Agreement. By opinion dated July 21, 1994, see *United States v. Hoffenberg*, 859 F.Supp. 698 (S.D.N.Y.1994), Hoffenberg's motion was denied as premature in the absence of a plea. Hoffenberg then moved to reargue that motion and to suppress the statements he had made in reliance upon the Agreement. The motion for reargument and suppression was denied by an opinion rendered on January 11, 1995, again on the grounds that it was premature.

After the filing of the Indictment against him, the Government, nonetheless, permitted Hoffenberg to plead to the four counts specified in the Agreement. On April 13, 1995, the Superseding Information was filed in the Southern District of New York, charging Hoffenberg with (i) conspiracy to violate the securities laws by fraudulently selling securities, in violation of 18 U.S.C. § 371; (ii) mail fraud, in violation of 18 U.S.C. §§ 1341, 1342; (iii) conspiracy to obstruct justice, in violation of 18 U.S.C. § 371; (iv) tax evasion, in violation of 26 U.S.C. § 7201. On April 20, 1995, Hoffenberg entered a guilty plea to these four counts.

Beginning on June 5, 1995, and continuing through June 14, 1995, the Court conducted a hearing on Hoffenberg's renewed motion for specific performance of the Agreement. On September 12, 1995, the Court heard oral argument on that motion. On December 18, 1995, this Court issued an opinion denying Hoffenberg's motion and finding that Hoffenberg had breached the Agreement. *United States v. Hoffenberg*, 908 F.Supp. 1265 (S.D.N.Y.1995).

On July 29, 1996, Hoffenberg filed a motion to withdraw his guilty plea, arguing that the Court violated Rule 11 of the Federal Rules of Criminal Procedure by failing to inquire, at the plea allocution, about the effect of Hoffenberg's mental condition, and the medication he was taking for his mental condition, on his decision to plead guilty. Oral argument on the motion was heard on September 27, 1996, at which time the motion was considered fully submitted. By Opinion dated October 28, 1996, the Court held that the colloquy which occurred at the plea allocution established that Hoffenberg was competent to plead guilty, and that his guilty plea was voluntary. The Court further held that no Rule 11 violation occurred, and the motion was denied. *United States v. Hoffenberg*, 169 F.R.D. 267 (S.D.N.Y.1996).

*Sentence Will Be Imposed on March 7*

Sentencing in this matter has been adjourned several times, always at Hoffenberg's request and as a consequence of motions such as those described above. On June 5, 1995, the sentencing date was adjourned *sina die* in order to allow Hoffenberg the opportunity to move for specific performance of his cooperation agreement with the Government. Following the denial of that motion, the Court set a sentencing date of March 21, 1996. On March 7, 1996, sentencing was adjourned until April 16, 1996, and on March 28, 1996, the sentencing was adjourned again until May 20, 1996--both of these adjournments because Hoffenberg's then-counsel was in the process of withdrawing from his representation, and new counsel had yet to be appointed. Hoffenberg's current counsel, Daniel Meyers, was appointed on April 23, 1996, and sentencing was again adjourned in order for Hoffenberg to move for withdrawal of his April 20, 1995 guilty plea. By Opinion dated October 29, 1996, that motion was denied and sentencing was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
1997 WL 96563 (S.D.N.Y.)  
(Cite as: 1997 WL 96563 (S.D.N.Y.))

Page 7

scheduled for the week of December 9, 1996. At Hoffenberg's request, sentencing was adjourned until January 22, 1997.

*9 On January 15, 1997, Hoffenberg was granted an adjournment from January 22 to March 7, 1997 to enable him to retain additional counsel to assist him upon sentencing in connection with the securities act violations with which he has been charged. On February 20, 1997, that counsel, Michael F. Bachner, sought and obtained relief from his engagement, stating he was unable to complete his assignment within the time provided by the most recent adjournment.

Hoffenberg, continuing his past practice, has directly applied for a further adjournment on the grounds of his dissatisfaction with Daniel Meyers, his third appointed counsel, [FN2] and his fourth counsel, who has been permitted to withdraw. In addition, Hoffenberg has claimed inability to assist in his defense as a consequence of loss of vision in his left eye.

> FN2. His second appointed counsel, Ernest Hammer, was appointed on April 3, 1996 and withdrew on April 16, 1995, being unable to accomplish satisfactory terms for his engagement.

At the time of the appointment of his present counsel in April 1996, Daniel Meyers, Hoffenberg was advised that his dissatisfaction with counsel would not be considered as a grounds for adjournment. Meyers, Hoffenberg's present counsel, has amply demonstrated his capacity as a competent and able criminal lawyer in the submissions and proceedings before the court.

Although Hoffenberg's activities were complex, the criminal charges against him to which he has pled are straightforward. The implications and dimensions of his conduct certainly have been under consideration by Hoffenberg and his various counsel since Hoffenberg was indicted in April 1994. Hoffenberg's current counsel, Meyers, has had the opportunity and possesses the skill to explore the validity of the Governments contentions regarding sentencing. In view of the amount of loss involved and the availability of relevant evidence for nearly three years, a further adjournment of the sentence to assess the effect of Hoffenberg's pre-indictment conduct is not warranted.

Hoffenberg's claim that he requires the assistance of counsel with an expertise in securities law is not only unsupported by the facts, it is flatly inconsistent with applicable law. As the Supreme Court has recognized in a variety of circumstances, "[t]he Sixth Amendment right to choose ones own counsel is circumscribed in several important respects.... [A] defendant may not insist on representation by an attorney he cannot afford or who for other reasons declines to represent the defendant." _Wheat v. United States_, 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1987). Hoffenberg has cited no authority for the proposition that he is entitled to be appointed additional counsel with an expertise in securities law, and the Court is unaware of any such authority.

As to Hoffenberg's alleged physical impairment, it is unsupported by any medical evidence. The opthamologist who examined Hoffenberg found no ocular damage as a result of the incident in which Hoffenberg claims to have been injured. Even accepting Hoffenberg's statement, the alleged loss of vision does not affect his ability to confer with counsel or to direct the presentation of any material which Hoffenberg may wish to present upon sentencing.

*10 The day of reckoning has been set for March 7, 1997 and will not be adjourned.

*Hoffenberg's History*

Hoffenberg is fifty-two years old. After attending New York City Technical College in 1964 and 1965, Hoffenberg was self-employed as a sales agent and manufacturers representative in connection with a series of businesses he operated. Between 1963 and 1971, he operated Steven Hoffenberg Associates, Consultants and Manufacturers Representatives. Between 1969 and 1971, Hoffenberg operated a business in New York City under the name Quality Cord Company, which manufactured automobile accessories and hardware. As set forth above, in 1974 Hoffenberg became chief executive officer, president and chairman of the board of Tower, and remained in those positions until April 1993.

After the SEC filed a civil action against Hoffenberg and Towers declared bankruptcy, Hoffenberg continued to serve as a "consultant" to several debt collection organizations, which were nominally run out of Hoffenberg's offices by his former associates, including Hayley Capital Corporation, Diversified Credit Corporation, and Stratford Credit Corporation.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In early 1993, as the SEC investigation neared completion, Hoffenberg attempted to purchase the then-failing New York Post. Hoffenberg lost control of the paper after running it for less than two months. After the SEC filed a civil action against Hoffenberg and Towers, Towers assets were frozen, and Towers declared bankruptcy, the Bankruptcy court ruled that Hoffenberg's former partner was in a better financial position than Hoffenberg to run the New York Post. Thereafter, Hoffenberg started a new publication, Her New York, which began as a daily newspaper, cut back to a weekly, then closed its doors.

Hoffenberg has one prior conviction for a criminal offense. In 1971, Hoffenberg plead guilty to attempted grand larceny in New York County Supreme Court (Indictment No. 202-70) and was sentenced to five years probation and restitution. Hoffenberg's conviction arose out of the theft of a diamond ring valued at $10,500 from an employee of a jewelry store. Hoffenberg requested the ring be independently appraised, and accompanied the employee to the appraiser. Hoffenberg's co-conspirator then demanded the ring under threat.

Hoffenberg has had a history of mental illness dating back to a hospitalization in 1970, which included electroconvulsive therapy, anti-psychotic medications such as thorazine, and the mood stabilizer lithium. He was diagnosed at that time as manic depressive. According to Hoffenberg, his depression returned in 1994, but he received no further treatment. In March 1995, as the time of his plea approached, he consulted Dr. Eugene Walder, a psychologist ("Dr.Walder"), who referred him to Dr. Joel S. Hoffman ("Dr.Hoffman"), a psychiatrist, for medication. On March 16, 1995, Dr. Walder determined that Hoffenberg was suffering from a major depressive episode.

During March and April of 1995, Hoffenberg was taking homeopathic and herbal medication for his depression, as well as prescription medications. On March 24, 1995, Dr. Hoffman prescribed clonazepan (Klonopin), an anti-anxiety medication. On April 7, 1995, Hoffenberg's dosage of Klonopin was increased, and he was prescribed fluoxereine (Prozac), an anti-depressant, as well. On March 24, 1995, Dr. Hoffman diagnosed Hoffenberg as suffering from a Probable Bipolar II Disorder and a Mixed Personality Disorder, with a global assessment of functioning of 40 out of a scale of 100.

*The Guidelines*

*11 The Presentence Report and Addendum prepared by the U.S. Probation Office grades Hoffenberg's offense conduct under the United States Sentencing Guidelines (the "Guidelines") at a total offense level of 31 and assigns him a Guidelines criminal history category of I, resulting in a Guidelines sentencing range of 188 to 235 months.

The Presentence Report recommends a sentence of 235 months incarceration, followed by a three year term of supervised release. The three year term of probation is to include the following mandatory special conditions: Hoffenberg shall not commit another federal, state or local crime; Hoffenberg shall not illegally possess a controlled substance; and Hoffenberg shall not possess a firearm or destructive device.

The Presentence Report further recommends that the standard conditions of supervision 1 through 13 be imposed. The Presentence Report provides that a fine of between $20,000 and $956,314,680 may be imposed, and restitution of up to $478,157,340 may be ordered.

*The Court Has Discretion to Depart*

In spite of the limitations imposed upon this Court by the Sentencing Guidelines, the "court has an independent power and responsibility to impose the proper sentence in the exercise of discretion." United States v. Agu, 763 F.Supp. 703 (E.D.N.Y.1991) (Weinstein, J.). See also United States v. Hernandez-Santiago, 92 F.3d 97, 100 (2d Cir.1996) (Court of Appeals "will not overturn the courts application of the Guidelines to the facts before it unless we conclude that there has been an abuse of discretion") (quoting United States v. Santiago, 906 F.2d 867, 871 (2d Cir.1990)); Koon v. United States, 518 U.S. 81, 116 S.Ct. 2035, 2046, 135 L.Ed.2d 392 (1996) (under Sentencing Guidelines, "district courts retain much of their traditional sentencing discretion"). Thus the Court must assess whether it has discretion to depart from the Guidelines, and then must determine whether such a departure is warranted by the circumstances.

The Presentence Report notes that numerous factors exist that would support departure from the range provided by the Guidelines. Section 5K2.0 provides, "[u]nder 18 U.S.C. § 3553(b), the sentencing court may impose a sentence outside the range established by the applicable guideline, if the court finds 'that there exists an aggravating or mitigating circumstances of a kind, or to a degree, not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.' " *See also United States v. Moe,* 65 F.3d 245 (2d Cir.1995).

This section continues, "where, for example, the applicable guideline and adjustments do not take into consideration a factor listed in this subpart, departure from the applicable guidelines range is warranted only if the factor is present to a degree substantially in excess of that which ordinarily is involved in the offense."

Section 5K2.5 notes that if the offense caused property damage or loss not taken into account within the guidelines, the court may increase the sentence above the authorized guideline range. Pursuant to § 2F1.1, the highest loss amount considered in this section is $80 million. Hoffenberg is responsible for losses of over half a billion dollars, more than six times the loss figure considered by the guidelines. The Sentencing Guidelines provide that an upward departure may be warranted where the "loss determined ... does not fully capture the harmfulness and seriousness of the conduct." § 2F1.1, App. Note 10. Therefore, an upward departure in sentence would be justified to address this discrepancy. *See United States v. Carrozzella,* slip. op. at 1282-83 (2d Cir. Jan. 15, 1997).

*12 In addition, § 2F1.1, Application Note 10 states that "in cases in which the loss determined under subsection (b)(1) does not fully capture the harmfulness and seriousness of the conduct, an upward departure may be warranted." This section also states that "the extent to which an offense is planned or sophisticated is important in assessing its potential harmfulness and the dangerousness of the offender, independent of the actual harm. A complex scheme or repeated incidents of fraud are indicative of an intention and potential to do considerable harm." Either or both of these sections could be applied to the instant circumstances to justify upward departure.

Moreover, while § 2F1.1(b)(2)(B) addresses the issue of multiple victims, it does not take into account an offense victimizing over 3,000 individuals, companies, trust funds and pension plans. Accordingly, an upward departure to address the number of victims of this offense would be warranted. *See United States v. Barakett,* 994 F.2d 1107 (5th Cir.1993) (affirming upward departure based in part on large number of victims).

Finally, the complex and unique circumstances of the plea agreement, the subsequent decisions relating to its enforcement, and Hoffenberg's cooperation constitute circumstances which were not contemplated by the Guidelines, and which provide justification for departure pursuant to Section 5K2.0 of the Guidelines.

In addition, Hoffenberg's history of mental illness may provide the basis for a downward departure. Section 5K2.13 of the Guidelines provides the following Policy Statement: "[if] the defendant committed a non-violent offense while suffering from significantly reduced mental capacity ... a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense." "This provision establishes that two elements are required for a downward departure: reduced mental capacity and a causal link between that reduced capacity and the commission of the charged offense." *United States v. Piervinanzi,* 23 F.3d 670 (2d Cir.1994) (citing *United States v. Prescott,* 920 F.2d 139, 145-46 (2d Cir.1990)).

Even apart from the Policy Statement addressing diminished capacity at the time of the offense, Hoffenberg's history of mental illness, combined with the lengthy and complex criminal and civil charges he has faced and the agreement reached in connection with those charges, provide grounds for a downward departure. *See United States v. Ekwunoh,* 888 F.Supp. 369, 373-74 (E.D.N.Y.1994) (Weinstein, J.) (finding negative psychological effects of pre-sentence incarceration warrant downward departure); *United States v. Cotto,* 793 F.Supp. 64, 66 (E.D.N.Y.1992) ("A court may take into account mental conditions in granting a motion to depart downward.").

Other grounds are also present that provide the basis for downward departure. Hoffenberg has provided substantial assistance to private parties in their civil suits to recover losses against Towers. He also provided significant assistance to the Government during the period of March 1993 to February 1994, by explaining the circumstances and participants involved in the Towers case.

*Comparative Sentencing of Similar Offenders*

*13 The central offense to which Hoffenberg has plead guilty amounts to a Ponzi scheme, a fraudulent pyramid-type investment scheme which involves

luring small, vulnerable investors into buying high interest notes, and then, in order to create an incentive for further investment, paying large returns to the initial investors with money raised by the sale of the notes to a new group of investors. The "Ponzi scheme" was named after Charles Ponzi, a Boston-based swindler who made a fortune. by inviting investment in his "Ponzi Plan," and then initially paying out 40% interest rates in order to encourage further "investment."

Federal courts have repeatedly recognized the appropriateness of, and indeed the need for, lengthy prison terms to punish those found guilty of implementing Ponzi and other financial schemes that cause devastating economic injury to hundreds of investors. William Kennedy Jr., the head of Western Monetary Consultants, a Colorado firm, was convicted of 17 counts, including racketeering and mail fraud, for his role in a Ponzi scheme which defrauded some 600 investors of approximately $37 million. In January 1994, Kennedy was sentenced by a Denver district court to concurrent 20-year sentences for several of the counts. Theresa Rodriguez, a Houston businesswoman who was convicted of mail fraud and money laundering for cheating 300 investors out of approximately $67 million, was sentenced in June 1995 by a Texas district court to nearly 22 years in prison.

Several executives of First Pension Corporation, an Orange County investment firm, were convicted in 1995 of bilking elderly investors out of over $136 million in retirement savings. William E. Cooper, the founder of First Pension, was sentenced by the district court to ten years in prison, and ordered to repay $73.1 million. Robert Lindley, First Pensions chief financial officer, was sentenced to nine years in prison for his role, and Valerie Jensen, the companys president, was sentenced to 51 months in prison.

*Victim Impact*

The Court has received hundreds of letters detailing the devastating economic, psychological, and even physical effects of Hoffenberg's successful scheme to defraud over 3,000 individuals, companies, trust funds and pension plans. The correspondence received by the Court details again and again the effects on working people, the elderly, the disabled, single parents and their children, and police officers and firefighters whose lives were forever altered when their life savings, retirement and college funds were destroyed as a consequence of Hoffenberg's acts. As indicated above, the losses suffered approximate nearly half a billion dollars.

*The Sentence*

Notwithstanding the effort of the Sentencing Guidelines to create uniformity in sentencing criminal defendants, no sentence in our system of justice should be regarded as routine. Indeed, the Supreme Court has observed that the Sentencing Guidelines do not diminish the continued need for a sentencing judge to consider a broad range of information concerning the offender and the offense in determining the appropriate sentence for a given individual. Witte v. United States, 515 U.S. 389, ----, 115 S.Ct. 2199, 2201, 132 L.Ed.2d 351 (1995) (recognizing that the judges broad factfinding powers date back to the Colonial era). See also United States v. DeRiggi, 893 F.Supp. 171, 17-177 (E.D.N.Y.1995) (Weinstein, J.) (if the sentence were fixed, "any Schoolboye might pronounce it: and then what need of any speciall wisdome, learninge, Courage, zeale or faithfulnesse in a Judge?") (quoting 4 John Winthrop Papers 468-84, *A Defense of Discretionary Justice* (1644), reprinted in Bradley Chapin, *Criminal Justice in Colonial America,* 1606-1660 (1983)).

*14 Whatever the ultimate outcome of the debate over the Sentencing Guidelines and the quest for uniformity, this sentence and this defendant are truly unique and beyond the reach of any attempt to impose uniformity through a system of grids and calculations. As set forth above, the circumstances here are such that departure either above or below the Guideline range could be justified. Accordingly, the Court here properly has the discretion to impose a sentence within the limits set by Congress, just as it did in the sentencing process that existed prior to implementation of the Guidelines.

Section 3553 of Title 18 of the United States Code details the factors the Court must consider at sentencing. The Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" in the statutes. 18 U.S.C. § 3553(a). The primary purposes to be served by sentencing, as enumerated in Section 3553, are deterrence, both specific and general, just punishment reflecting the seriousness of the offense, retribution, incapacitation, rehabilitation and restitution. These purposes reflects the fundamental purpose of criminal law--to maintain social order. That purpose is carried out through the imposition of appropriate punishment upon those who violate the rules that society has agreed upon.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1997 WL 96563 (S.D.N.Y.)
(Cite as: 1997 WL 96563 (S.D.N.Y.))

Page 11

The Court has considered each of these stated purposes, and the proper weight to be given each purpose under these circumstances. The greatest weight must be given to retribution and just punishment. Here, an unstable individual with manic tendencies and a sense of grandiosity violated the law in order to satisfy his own greed and sense of entitlement. His acts resulted in the loss of the savings and investments of thousands of people. Not only must he be punished, he must be effectively barred from causing further damage to the society.

Hoffenberg's ambition and greed have ended tragically for those defrauded by Hoffenberg and for Hoffenberg himself. Such tragedy is hardly unique. The pages of literature and history abound with stories of excessive ambition and self-aggrandizement thwarted by the limits of reality, from Julius Caesar and Napoleon to Charles Ponzi and Michael Milken. Such ambition, when it operates outside the order of society and wreaks havoc on innocent lives, must be punished, both as a matter of retribution and in order to foster respect for the law. That result must be achieved here.

"Encouraging respect for the law requires judges to consider not only the crime and the criminal, but those affected by his or her actions." *United States v. Smith*, 893 F.Supp. 187, 189 (E.D.N.Y.1995) (Weinstein, J.). In *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the Supreme Court held that evidence of victim impact is relevant to the seriousness of an offense, and therefore to the appropriate sentence. As set forth above, the scope and severity of the impact of Hoffenberg's conduct on his victims cannot be overestimated.

*15 Hoffenberg's history of mental illness does not obviate the fact the he is ultimately responsible for his actions and for the consequences of those actions. Hoffenberg has been suffering from a condition that from time to time has limited his ability to perceive reality accurately. As this Court has previously found in denying Hoffenberg's application to be relieved of his plea, it would be impossible to determine on this record exactly when, how and to what degree, Hoffenberg's mental condition affected his criminal conduct. Nonetheless, the facts establish beyond dispute that Hoffenberg's conduct, which presumably resulted in part from his mental condition, well exceeded the limits of reality as well as those of the law. Notwithstanding the role Hoffenberg's mental condition may have played in driving his illegal conduct, in our society and under our system of justice, responsibility remains with the individual.

Hoffenberg has known of his condition since he was first hospitalized in 1970, and has had the resources to manage and cope with it. The responsibility for his failure to do so, and the tragedy that has resulted from that failure, lies squarely on the shoulders of Hoffenberg and his co-conspirators. That responsibility cannot be evaded by a failure or refusal to come to grips with a destabilizing but ultimately treatable condition.

There is no doubt that this sentence will cause suffering for this intelligent and ambitious man, but that suffering is ultimately the result of his own acts, not this sentence. "CONSEQUENCES! Every action produces an equal and opposite reaction. Cause and effect. Cause and effect!" These are the words of a character in *K2*, a play by Patrick Meyers about two men stranded on the ledge of a mountain, facing death and seeking to understand how their prior decisions had brought them to that moment. These words are equally applicable to the sentence Hoffenberg now faces.

It is with these considerations in mind that Hoffenberg will be sentenced to 240 months of incarceration, followed by a three year term of supervised release. As conditions of his supervised release, Hoffenberg shall abide by the Standard Conditions of Supervision 1 through 13, Guidelines § 5B1.4(a). Hoffenberg will be ordered to pay restitution in the amount of $475,157,340. This figure represents the losses, as determined by the Bankruptcy Court, resulting from the Towers fraud. A One Million dollar fine will be imposed on Hoffenberg. An assessment of $250.00 is mandatory. This sentence constitutes an upward departure of one level.

As set forth above, an upward departure is warranted here by the fact that the Guidelines did not contemplate the number of victims impacted and the amount of the loss caused by Hoffenberg's offenses. The instant Opinion, as well as the Presentence Report, serves as "reasonable notice" that the Court intends to depart from the Guidelines sentencing range. *See* Fed. R. Cr. P. 32; Guidelines § 6A1.2, App. Note 1; *United States v. Contractor*, 926 F.2d 128 (2d Cir.1991).

*16 This lengthy term of incarceration is intended to accomplish the purposes discussed above, primarily

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1997 WL 96563 (S.D.N.Y.)
**(Cite as: 1997 WL 96563 (S.D.N.Y.))**

Page 12

that of retribution, and to insure that Hoffenberg remains incapable of any repetition of his criminal conduct. The sentence is imposed with the hope that the threat of a twenty-year prison term, restitution and a one million dollar fine may deter others from engaging in similar conduct in the future.

This sentence is subject to the sentencing hearing now set for March 7, 1997.

It is so ordered.

1997 WL 96563 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 1:95cr00321 (Docket) (Apr. 11, 1995)

• 1:94cr00213 (Docket) (Apr. 20, 1994)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.