

FOCUS - 13 of 369 DOCUMENTS

Copyright 1997 The New York Times Company
The New York Times

March 8, 1997, Saturday, Late Edition - Final

**SECTION:** Section 1; Page 38; Column 4; Business/Financial Desk

**LENGTH:** 394 words

**HEADLINE:** Hoffenberg Gets 20-Year Sentence in Fraud Case

**BYLINE:** By LESLIE EATON

**BODY:**

Despite Steven Hoffenberg's arguments that he did not deserve such a harsh punishment, Judge Robert W. Sweet went ahead with his announced plan yesterday, sentencing Mr. Hoffenberg to 20 years in prison for defrauding thousands of investors in his company, the Towers Financial Corporation.

At the sentencing, in a crowded courtroom in Federal District Court in Manhattan, Judge Sweet also ordered Mr. Hoffenberg to pay a $1 million fine and restitution of $462.6 million. Once a flamboyant debt collector who was briefly the publisher of the The New York Post, Mr. Hoffenberg is now indigent, so it is unlikely investors will receive any of that money.

A key question before the court was whether Mr. Hoffenberg accepted responsibility for the securities fraud to which he pleaded guilty in 1995. Under Federal sentencing guidelines, a person who accepts responsibility for his or her actions may be eligible for a shorter prison term; parole has been eliminated in Federal cases.

Mr. Hoffenberg, who was dressed in blue prison garb and blue sneakers, said that he had accepted responsibility. But he then blamed a variety of people, including lawyers, accountants and the court-appointed trustees who took over Towers for both his troubles and for the hundreds of millions of dollars that investors lost.

"I can't be held accountable for securities violations," Mr. Hoffenberg said. "I know nothing" about securities law.

The judge pounced on this statement, saying that it was "not in any Orwellian, Freudian or any other view of the matter an acceptance of responsibility."

Amy E. Millard, the assistant United States attorney representing the Government, called Mr. Hoffenberg's statement "truly astonishing in its arrogance." The losses of his victims, she added, represent "so much more than money -- it is also the loss of dreams, hope and financial security."

In explaining the severity of the sentence, Judge Sweet also cited the victims, many of whom wrote letters describing the effects of their losses on their lives.

In addition to retirees who had to go back to work and a woman who was worried about paying for her husband's nursing home, there was a single mother who lost the money she had been saving for her children's education, the judge said, adding, "One of the children is selling pizzas at 2 o'clock in the morning."

**LOAD-DATE:** March 8, 1997



Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

11/3/94 WSJ A1
11/3/94 Wall St. J. A1

1994 WL-WSJ 2051318

The Wall Street Journal
Copyright (c) 1994, Dow Jones & Company, Inc.

Thursday, November 3, 1994

Managing Profits: How General Electric Damps Fluctuations In Its Annual Earnings
---
It Offsets One-Time Gains With Write-Offs, Times Asset Purchases and Sales
---
Accounting for RCA Deal
By Wall Street Journal staff reporters Randall Smith, Steven Lipin And Amal Kumar Naj

[Second of two articles]

The debacle at Kidder, Peabody & Co. might ruin the year for most companies.

But the roughly $750 million in losses and after-tax charges that General Electric Co. will incur this year before finally unloading Kidder will barely dent GE's smooth, consistent earnings growth. Despite those losses, some analysts believe, GE may be able to match or top last year's profit of $5.18 billion before accounting changes.

In the past decade, GE's earnings have risen every year, although net income fell in 1991 and 1993 because of accounting changes related to post-retirement benefits. The gains, ranging between 1.7% and 17%, have been fairly steady -- especially for a company in a lot of cyclical businesses. As a result, GE almost seems able to override the business cycle.

How does GE do it? One undeniable explanation is the fundamental growth of its eight industrial businesses and 24 financial-services units. "We're the best company in the world," declares Dennis Dammerman, GE's chief financial officer.

But another way is "earnings management," the orchestrated timing of gains and losses to smooth out bumps and, especially, avoid a decline. Among big companies, GE is "certainly a relatively aggressive practitioner of earnings management," says Martin Sankey, a CS First Boston Inc. analyst.

To smooth out fluctuations, GE frequently offsets one-time gains from big asset sales with restructuring charges; that keeps earnings from rising so high that they can't be topped the following year. GE also times sales of some equity stakes and even acquisitions to produce profit gains when needed.

Asked several times about earnings management, Mr. Dammerman declines to discuss directly whether GE engages in the practice. Asked whether off-setting one-time gains with one-time charges could be considered earnings management, he says, "I've never looked at it in that manner." He also declines to say whether other companies use such tactics.

Most U.S. companies do try to smooth profit growth. Walt Disney Co., for example, can decide when it wants profits from a videocassette re-release of "Snow White." Banks and insurance companies do a lot of smoothing by adjusting the level of their reserves, and many companies time write-offs carefully.

A look at GE illustrates how analysts say one giant corporation manages earnings. They add that few companies have maneuvered so successfully for so long on so large a scale. GE's size and diversity give it an unusual array of opportunities, of course. Moreover, Chairman Jack Welch relentlessly monitors GE's profit growth.

Last April, when announcing that a bond-trading scheme at Kidder had generated false 1993 profits and triggered a $210 million first-quarter charge, Mr. Welch said investors prize GE's ability "to deliver strong, consistent earnings growth in a myriad of global economic conditions. Having this reprehensible scheme . . . break our more-than-decade-long string of 'no surprises' has all of us damn mad."

His dislike of surprises extends beyond what GE's operating executives tell him to what GE tells Wall Street. Russell Leavitt, a Salomon Brothers analyst, says GE executives "give you some guidance" on what other analysts' estimates are and how reasonable they are. The result, says Ben Zacks of Zacks Investment Research, is that analysts' GE estimates fall in a "very, very tight range."

GE especially prizes consistent growth because it has so many different businesses that most analysts can't track them all. For example, GE is followed by electrical-equipment analysts, most of whom have a loose grasp of financial services.

GE's two major parts are an industrial conglomerate and a financial-services conglomerate, and both segments outdo their market peers. According to an analysis of data from Morgan Stanley & Co., industrial conglomerates sold at an average 20% discount to the market as of Sept. 30, based on their multiple of price to next year's anticipated earnings, while financial-services companies -- banks,

finance and insurance -- were at a 35% discount. But partly because of its consistent earnings growth, GE sold at a discount of only 11%.

One financial calculation that helped smooth earnings at GE a few years ago was an increase in the assumed rate of future investment returns on pension funds. In 1991, a weak year at many companies, GE raised its return-rate assumption a full percentage point, to 9.5% from the 8.5% in effect for five years.

That change, by reducing GE's pension costs, helped lift what it terms the profits on its pension fund to $696 million in 1991 from $380 million in 1990, a pretax swing of $316 million. For companies like GE with overfunded pension plans, accounting rules require such changes to be reflected in corporate profits.

How much did GE's overall profit rise in 1991? Just $132 million after tax.

However, GE says the increase in its assumed return on pension assets reflected the lofty investment returns in the 1980s and wasn't any higher than rates assumed by other big companies. It says the change wasn't designed to raise reported 1991 profits.

The clearest way GE manages earnings is through restructuring charges. When GE sells a business at a profit or takes an unusual gain, it generally takes an offsetting restructuring charge of roughly equal size. In six of the years since 1983, GE has taken charges totaling $3.95 billion in this way.

Last year, when GE booked a $1.43 billion pretax gain on the sale of its aerospace business, for example, it took a $1.01 billion charge to cover costs of "closing and downsizing and streamlining of certain production, service and administrative facilities world-wide." After tax, the gain and the charge matched up exactly at $678 million.

And that 1993 charge, by anticipating some specific 1994 expenses such as "asset write-offs, lease terminations and severance benefits," is helping GE report better profits this year. Without the 1993 charge, some of those expenses could have reduced this year's net income. Because some of the expenses eventually would have to be paid anyway, First Boston's Mr. Sankey says, this reporting strategy allows GE to "transmute" one-time gains into future operating income.

One rationale for using this tactic: GE executives believe that many investors ignore one-time gains from asset sales in valuing companies. But clearly, taking an off-setting charge against a big gain prevents GE's earnings from getting too high in any one year; by spreading the gain into future years, the company can more easily report the steady growth that investors prefer.

Mr. Dammerman, the finance chief, says that whenever GE anticipates a gain on an asset sale or a tax or accounting change, its executives "sit down with our businesses and say, 'What are some strategic decisions that you would make to make the business better going forward?'" He says GE's use of such charges is one way it pursues both short-term and long-term goals; without such gains, he adds, some of the spending wouldn't have been planned or would have been timed differently.

Richard Leftwich, an expert in financial-statement analysis at the University of Chicago business school, says analysts and regulators are questioning U.S. corporations' widespread use of restructuring charges. He wonders how companies distinguish between everyday expenses needed to remain competitive and truly extraordinary events. Such use of restructuring charges "raises real issues for how to think about what the future profits mean," he adds, "because the costs are being written off now, but the profits are being reported in the future."

Later this month, accounting rulemakers, under prodding by the Securities and Exchange Commission, are expected to sharply limit such big one-time writeoffs. The new rules would force companies to spread such charges over future years or take them when the relevant expenses are actually paid rather than when planned.

While conceding the SEC "hates" such charges, Mr. Dammerman adds: "It's not like we're creating some big cookie jar" from which GE takes profits at will.

Another way GE manages its earnings is by literally buying them -- by acquiring companies or assets that are immediately profitable because they throw off more income than GE's cost of financing. Much of the growth in GE Capital's earnings in the past few years has been generated by a spate of acquisitions.

"Of course we're buying earnings when we do an acquisition," says James Parke, GE Capital's chief financial officer. The financial-services subsidiary acquired assets totaling $16.9 billion in 1993 alone.

Daniel Porter, GE Capital's North American chief of retailer financial services, says he and his colleagues may hunt for acquisitions if his division might miss its annual earnings target. He says they ask: "Gee, does somebody else have some income? Is there some other deal we can make?"

The danger, of course, is that a headlong rush into acquisitions to book earnings could lead to unwise decisions. Management's ambitious growth targets create GE Capital's biggest business risk, according to Sanjay Sharma, a Moody's Investors Service analyst.

"As growth in the commercial finance sector has become difficult to achieve because of growing bank and nonbank competition, an aggressive strategy in this sector can only be accomplished by paying higher premiums for portfolio acquisitions -- in effect, by taking greater risks," Mr. Sharma says. Already, he notes, the returns on GE Capital's mushrooming trove of assets are slipping, to 1.4% in 1993 from 1.61% in 1989. To keep growing so fast without major gains from operations, GE would have to make more and more acquisitions, possibly compounding the risk.

Isn't it unsound to have earnings-report considerations drive the timing of acquisitions? Mr. Dammerman says that as long as executives keep both long-term and short-term goals in mind, "I see nothing wrong with someone saying, 'Look, I have an earnings objective for the year, and to achieve that earnings objective maybe I need to go make an acquisition.' That's fine if the individual can come up with a good acquisition."

Two former GE Capital executives say GE's financial business contains a wealth of hidden value -- which they call reserves -- that can be tapped to get income as needed. "Are there hidden values there? Absolutely," Mr. Parke says, though they are "impossible to measure."

One way GE stores profits for future use is, ironically, by following fairly conservative accounting practices. In fact, John W. Stanger, GE Capital's president from 1975 to 1984, says those practices would occasionally annoy managers who believed the company was "trying to bury profits" that they had racked up in a stellar year.

GE Capital also has considerable discretion over the timing of sales of warrants or equity kickers obtained in the course of lending and in deciding whether to sell or re-lease aircraft coming off lease. GE Capital has "significant ability to come up with earnings on demand," First Boston's Mr. Sankey says, because of its "diversified portfolio" and "very large amount of flexibility in how you report earnings."

Take the hypothetical example of an aircraft nearing the end of a 15-year lease. GE may have already written off most of the plane's cost, leaving its book value low. GE can potentially book a gain if it then sells the plane, Mr. Sankey says, but not if the jet is re-leased to another airline.

Mr. Parke denies that GE Capital fattens its earnings by selling aircraft. It has some discretion, he says, but this is limited because "you have to have a buyer, and you have to have the right market conditions in order to maximize the value."

The timing of sales of equity interests obtained through warrants -- the equity options that GE often gets for lending on especially risky

buyouts -- also is "very discretionary," Mr. Sankey says. But GE executives say they have only a little discretion because such sales usually depend on when a company goes public. Now holding a potentially valuable 50% stake in Montgomery Ward, however, GE Capital would have considerable say over when the retailer went public.

Such maneuvers are particularly difficult to monitor at GE Capital because the amount of information it discloses is relatively scant compared with the wealth of information about its parent company. GE Capital, for example, doesn't differentiate its income from asset sales.

"You look at their financial reports -- they are pretty skinny. A lot of analysts feel frustrated because it's such a complex organization," says Richard Schmidt of Standard & Poor's Corp., the credit-rating agency. He concedes that many commercial finance companies keep their numbers close to the vest, too.

As an unregulated financial-services company, GE Capital also has more flexibility to defer write-offs than do highly regulated U.S. banks. During the 1990-91 recession, regulators required banks to take write-downs, add reserves and sell assets. But GE Capital contends that it writes off bad assets faster than banks do and that rating agencies and the markets are tougher than bank regulators.

One of GE's most intriguing moves to boost its net income was in its accounting for its $6.4 billion acquisition of RCA Corp. in 1986. Anytime an acquisition is made for a price exceeding the book value of the business, the premium over book value must be recorded on the buyer's books.

In the case of RCA, one former GE executive recalls that GE allocated a disproportionate amount of this so-called goodwill to NBC, increasing the TV network's book value while reducing that of other RCA assets. GE's own annual reports appear to substantiate his recollection. In 1987, the year after the acquisition, GE raised NBC's book value to $3.8 billion from $3.4 billion. The higher book value for NBC and the resulting lower value for other RCA assets raised GE's profits on sales of some of RCA's non-NBC assets.

Among the RCA units sold, GE recorded a $110 million gain on the disposition in 1991 of NBC's interest in an RCA-Columbia home-video joint venture. And the aerospace business was sold in 1993 at a pretax profit of $1.43 billion. That leaves NBC as the last major piece of RCA still on GE's books.

Mr. Dammerman says that boosting gains from future non-NBC asset sales didn't enter into how NBC was valued and that GE didn't know at the time which businesses would be sold. He adds that GE couldn't record profits from some RCA assets sold soon after the acquisition.

However, one consequence of assigning a higher book value to NBC eventually became apparent when GE began considering the sale of the network in the early 1990s. The higher book value raised the price GE would have had to obtain to avoid booking a loss. When GE held talks about selling NBC to Paramount Communications Inc. (now owned by Viacom Inc.), Paramount proposed to structure the sale financing in a way that would help GE avoid an immediate write-down, according to two people familiar with the negotiations. Mr. Dammerman says that although GE wanted to avoid a loss, the proposed transaction wasn't structured with that aim.

Despite some experts' doubts about earnings management, some accountants say it can be helpful as long as corporate executives try to convey a fair picture. "Some people would say maybe smoothing makes sense because it gives the best indication of the future and the long-term trend," says Peter Wilson, who specializes in financial-statement analysis at the Sloan School of Management at Massachusetts Institute of Technology.

But Howard Schilit, an accounting professor at American University in Washington, comments: "Earnings management can be very dangerous for the investor because you are creating something artificial. The numbers should reflect how the company is actually doing."

GE executives differ in how much smoothing they acknowledge. In an initial interview, GE Capital Chairman Gary Wendt said, "We do a little, not a lot." His financial chief, Mr. Parke said, "We have a lot of assets in this business. . . . Obviously, there are timing issues associated with when those assets are sold."

---- INDEX REFERENCES ----

COMPANY (TICKER):   GENERAL ELECTRIC CO. (GE)

NEWS SUBJECT:    Accounting News; Analysts' Comments; Earnings Projections; Corporate Profiles; World Equity Index (ACC ANL ERP PRO WEI)

MARKET SECTOR:    Conglomerates; Financial (CGL FIN)

INDUSTRY:    Conglomerates; Securities (CGL SCR)

GOVERNMENT:    Securities and Exchange Commission (SEC)

REGION:    Connecticut; North America; New York; United States; Eastern U.S. (CT NME NY US USE)