UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. 3:02 CR 264 (AWT) |
| | : | |
| v. | : | |
| | : | |
| WALTER A. FORBES and | : | July 25, 2005 |
| E. KIRK SHELTON. | : | |
| | : | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION OF DEFENDANT E. KIRK SHELTON FOR BAIL PENDING APPEAL

Defendant E. Kirk Shelton, through undersigned counsel, respectfully submits this memorandum of law in support of his motion for bail pending appeal pursuant to 18 U.S.C. § 3143(b).

## STANDARDS FOR BAIL PENDING APPEAL

In *United States v. Randell,* 761 F.2d 122 (2d Cir. 1985), the court summarized the findings that must be made to grant bail pending appeal under 18 U.S.C. § 3143:

(1) the defendant is not likely to flee or pose a danger to the safety of any other person or the community if released;

(2) the appeal is not for purpose of delay;

(3) the appeal raises a substantial question of law or fact that if resolved in the defendant's favor will likely result in a new trial on all counts on which imprisonment has been imposed.

*Randell,* 761 F.2d at 125.

In *Randell,* the court also made clear that for purposes of bail pending appeal, the evaluation of the appellate issues raised by the defendant is a two-part inquiry.

*First*, the court must determine whether any of the issues raised by the defendant are "substantial." *Id.* at 125. The court embraced the Eleventh Circuit's definition of a substantial question as "'one of more substance than would be necessary to a finding that it was not frivolous. It is a close question or one that very well could be decided the other way.'" *Id.*

(quoting *United States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985)); *see also United States v. Tunick,* 2001 U.S. Dist. LEXIS 2911, at *3 (S.D.N.Y. Mar. 21, 2001) ("'substantial' cannot be equated with 'likely to result in reversal or new trial'") (quoting *Randell,* 761 F.2d at 124).

*Second*, if the Court finds that a substantial issue is raised, it then must decide whether, "if that substantial question is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial on all counts on which imprisonment has been imposed." *Randell,* 761 F.2d at 125. *Randell* emphasized that it did not believe Congress, when it enacted § 3143, intended to make bail pending appeal depend on "'the willingness of a trial court to certify'" that it is likely to be reversed. *Id*. at 124-25 (quoting *United States v. Miller*, 753 F.2d 19, 23 (3d Cir. 1985)); *see also Tunick,* 2001 U.S. Dist. LEXIS 2911, at *9 ("[A] court need not conclude that it is 'likely to be reversed' before granting bail pending appeal") (quoting *Randell,* 761 F.2d at 124-25). It is enough that the defendant will raise issues that are substantial; and that if resolved in the appellant's favor on appeal, they will likely result in a new trial on all counts of conviction. *Cf. United States v. Price,* 611 F. Supp. 502, 505 (S.D. Fla. 1985) (granting bail pending appeal even though "this Court firmly believes that it was correct in its rulings and that the Defendant received a fair trial").

## ARGUMENT

### A.   MR. SHELTON IS NOT A FLIGHT RISK OR DANGER TO THE COMMUNITY

Mr. Shelton poses neither a risk of flight nor of danger to the community. He has been free on bail on a $1 million personal recognizance bond since April 5, 2001. In the more than four years that he has been on bail, he has made all court appearances and complied with all terms and conditions of his release. With this court's approval, he has made numerous out-of-state trips during the pendency of this case. According to his probation officer, his conduct under supervision has been exemplary. He was on electronic monitoring for approximately one month following his conviction, until the court ordered the monitoring removed. He has strong family and community ties. He has surrendered his passport to the court. His future appearances

and continued compliance with the terms of his release are assured by the substantial bail in this matter -- $20 million, secured by Mr. Shelton's residences in Connecticut and Colorado. He is strongly committed to pursuing the appeal of his conviction.

Nor is there any suggestion that Mr. Shelton poses a danger to the community. He has never been accused of any crime of violence or other offense that might endanger the community. By the nature of the crimes charged, he does not pose a danger. *See United States v. Munoz-Franco,* 356 F. Supp. 2d 20, 39 (D.P.R. 2005) (no danger posed by defendant convicted of bank fraud). Mr. Shelton's circumstances are thus similar to the defendants in *United States v. Hart,* 906 F. Supp. 102 (N.D.N.Y. 1995) and *United States v. Galanis,* 695 F. Supp. 1565 (S.D.N.Y. 1988), where bail pending appeal was granted because of the defendants' strong family and community ties and their compliance with the terms and conditions of their release pending trial and sentencing.

B.   **THE APPEAL IS NOT FOR PURPOSE OF DELAY**

It cannot be claimed that the appeal here is for purpose of delay. Mr. Shelton has diligently defended this matter on the merits. While the government and Mr. Shelton have litigated this case vigorously and it has been a lengthy process, there has been no pattern of dilatory defense tactics by Mr. Shelton or his counsel during the conduct of the case. Nor is there any extrinsic evidence of any intent to delay. The court has had the opportunity to observe Mr. Shelton over the course of the pretrial, trial, and sentencing phases of the case and is in the best position to judge the sincerity and good faith that underlies his desire for appellate review of the substantial issues identified below.

C.   **THE APPEAL RAISES SUBSTANTIAL QUESTIONS LIKELY TO RESULT IN REVERSAL OR A NEW TRIAL**

By any measure, this was a close case that raised substantial and complex issues of fact and law. Following almost six months of evidence and two weeks of argument, the jury took 32 days to deliberate before returning guilty verdicts against Shelton. Based on the jury's notes, at least the first half of those deliberations appears to have been focuses on Mr. Shelton. Post-trial

motions have consumed hundreds of pages. The government thought the issues sufficiently weighty that it applied to file a sur-reply brief and then filed an additional 30 pages of briefs. It is self-evident that there are substantial issues to be raised on appeal.[1]

1. THE JURY INSTRUCTION ON CONSCIOUS AVOIDANCE PRESENTS A SUBSTANTIAL ISSUE

The Court's decision to instruct the jury on a theory of conscious avoidance raises a substantial issue on appeal. Such an instruction may only be given if (1) the defendant asserts the lack of some specific aspect of knowledge required for conviction and (2) the appropriate factual predicate for the charge exists. *United States v. Ferrarini,* 219 F.3d 145, 154 (2d Cir. 2000). An appropriate factual predicate requires that the evidence permit a rational juror to conclude, beyond a reasonable doubt, that the defendant was aware of a high probability of the fact in dispute and avoided confirming the fact. *Id.*

The government brought charges and introduced evidence against Shelton based on the theory that he directed the fraud and therefore had actual knowledge of it.[2] The case was built around the testimony of government witnesses Corigliano and Pember – testimony that purported to demonstrate Shelton's actual knowledge of and active involvement in the fraud. But evidence of actual knowledge does not provide the necessary predicate for conscious avoidance. As the court stated in *Ferrarini:*

> The fact that a jury can – on the evidence – find actual knowledge does not mean that it can also find conscious avoidance. If conscious avoidance could be found whenever there was evidence of actual

---

[1] Shelton is potentially appealing on all grounds previously raised at trial and in post-trial proceedings, and the grounds set forth herein are not intended to be exhaustive. Grounds not set forth specifically herein are not waived.

[2] For that reason, allowing the jury to convict based on a theory of conscious avoidance when the case was charged, tried, and argued by the government on an actual knowledge theory constituted a constructive amendment to the indictment. "When the trial evidence or the jury charge operates to 'broaden [ ] the possible bases for conviction from that which appeared in the indictment,' the indictment has been constructively amended." *United States v. Milstein,* 401 F.3d 53, 65 (2d Cir. 2005) (citation omitted). A constructive amendment of the indictment is a *per se* violation of the Fifth Amendment's grand jury clause, and reversal is required without any showing of prejudice to defendant. *United States v. Wozniak*, 126 F.3d 105, 109 (2d Cir. 1997).

> knowledge, a jury could be given a conscious avoidance instruction in a case where there was only equivocal evidence that the defendant had actual knowledge and where there was no evidence that the defendant deliberately avoided learning the truth. Under those circumstances, a jury might conclude that no actual knowledge existed but might nonetheless convict, if it believed that the defendant had not tried hard enough to learn the truth … [S]uch a result might constitute reversible error.

219 F.3d at 157.

In this case, the government offered no evidence that Shelton deliberately avoided learning the truth about the fraud. In every instance put forth by the government to justify the charge, the evidence either showed actual knowledge or negligence, but not conscious avoidance. For example, the government argued that the charge was "virtually compelled" because Shelton and Forbes were the two highest ranking executives of the company, had ready access to information that would have revealed the fraud, and could have directed their subordinates to disclose information to them about the fraud. (Gov't Memorandum of Law in Support of Request for "Conscious Avoidance" Instruction at 3). The flaw, however, is that these arguments, if accepted, would establish that Shelton could have or should have discovered the fraud, something far different than showing that he consciously took steps to avoid learning of the fraud. This perfectly illustrates the danger of the conscious avoidance instruction: when the requisite factual predicate is missing, it lowers the government's burden of proving actual knowledge of fraud and encourages conviction based on mere negligence. *See United States v. Pacific Hide & Fur Depot, Inc.,* 768 F.2d 1096, 1098 (9th Cir. 1985) (instruction should rarely be given; not enough to show that defendant was mistaken, recklessly disregarded the truth, or negligently failed to inquire).

Other evidence argued by the government in support of the instruction is no different. The government's contention that Shelton's college transcript or the proximity of his office to Corigliano's somehow supports the instruction defies logic and only shows that the government was substituting negligence for willful blindness.

Similarly, the government cites Shelton's testimony concerning his receipt of a two-page schedule, Government Exhibit 160, at a March 6, 1998 meeting. The government argued that the inclusion of $165 million of cost saves in the revenue line would have put a reader on notice of fraudulent activity. The government argued that although the document shows that the adjustments were arbitrary, Shelton never inquired further into the reason for the different treatment of the $165 million at different parts of the memo. (Gov't Memorandum at 4). But government witnesses Forbes, Monaco, and Menchaca all received the document as well, and each testified that prior to April 1998, they had no suspicions that CUC was engaged in fraudulent accounting. At bottom the government's argument concerning this exhibit is that Shelton was negligent in failing to notice the discrepancy or inquire into the basis for it. Such negligence, however, does not support the instruction at issue.

The same holds true for the other evidence cited by the government in support of the instruction. With respect to the emails, the "cheat sheets," and so on, the government elicited the evidence to prove Shelton's actual knowledge of the fraud, and Shelton presented evidence in rebuttal showing that he had no knowledge of the fraud. But there was no evidence in the record that Shelton, aware of a high probability that a fraud was occurring, chose to deliberately remain blind to it. Absent proof of willful blindness, the instruction allowed the jury to convict without proving Shelton's knowledge of the fraud.

At the jury instruction conference, the court heard extended argument over the propriety of the instruction. (Tr. 16202-16225). At the conference, the court noted that the jury might accept testimony from Corigliano, or Forbes, and reject other testimony, and thereby find a proper basis for conscious avoidance. (Tr. 16213, 16216 ("I can very readily see a jury deciding to credit part of his testimony but not all of it.")) But while the court was undoubtedly correct that a jury could credit some but not all of Corigliano's testimony, the fact remains that for the instruction to have been proper, evidence must have been introduced, from Corigliano or some other witness, that Shelton consciously avoided learning the truth. No witness offered such

evidence. Inclusion of the conscious avoidance instruction in the charge to the jury raises a substantial issue.

Moreover, inclusion of the instruction severely prejudiced Shelton, and was not harmless error. An erroneous conscious avoidance instruction can be deemed harmless where there was overwhelming evidence of actual knowledge. *See Ferrarini,* 219 F.3d at 157. Here, the government's key witnesses, Corigliano and Pember, were repeatedly shown on cross-examination to have testified falsely and were unable to provide credible proof of Shelton's knowledge of and involvement in the fraudulent scheme. For precisely that reason, the government sought the conscious avoidance instruction, in order to improperly lower its burden of proof to a "should have known" or negligence standard. But for the erroneous instruction, the jury would have had to find actual knowledge, a burden the government would not have met given the shaky testimony of its key witnesses. The instruction permitted the jury to convict Shelton even though the government failed to prove an element of each offense. A reviewing court is not likely to find on this record that it was harmless error to give the conscious avoidance instruction.

    2.  CORIGLIANO'S TESTIMONY UNFAIRLY PREJUDICED SHELTON

The court made a series of rulings concerning the testimony of Corigliano that, separately and together, deprived Shelton of a fair trial.

    *a.*  *Expert Testimony*

First, the court allowed Corigliano to repeatedly offer "expert" opinion testimony concerning a number of challenged accounting practices. For example, Corigliano repeatedly opined that various accounting practices were not "legitimate" (Tr. 6536-41, 7538-39); that reporting concerning membership rejects was wrong and impacted earnings (Tr. 6367-68); that

Ideon reserves were overstated by $40-50 million (Tr. 6783); and that various earnings reports were not accurate (Tr. 6405-06, 6474-75).[3]

Testimony based on scientific, technical, or specialized knowledge is expert testimony, and may not be offered under the guise of lay opinion testimony under Fed. R. Evid. 701. Under Rule 701, fact witnesses are permitted to give testimony in the form of opinions or inferences only so long as such testimony is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." It is an abuse of discretion to allow opinion testimony from fact witnesses when the testimony is based on specialized knowledge or training. *See, e.g., United States v. Glenn,* 312 F.3d 58 (2d Cir. 2002) (abuse of discretion to allow lay opinion testimony as to methods of carrying handguns, even though witness observed events). More to the point, in *Wechsler v. Hunt Health Sys.,* 198 F. Supp. 2d 508, 529 (S.D.N.Y. 2002), the court held that a CPA who was "personally involved with the financial statements" of the defendant could not opine on whether the defendant's accounting was proper because he had not been offered as an expert. Lay persons are unfamiliar with what constitutes generally accepted accounting principles, and so whether accounting practices fall within GAAP in a question of fact to be addressed through expert testimony. *See In re Campbell Soup Co. Sec. Litig.,* 145 F. Supp. 2d 574, 593 (D.N.J. 2001); *Danis v. USN Commun., Inc.,* 121 F. Supp. 2d 1183, 1192 (N.D. Ill. 2000).

Admission of this expert testimony violated both the pretrial disclosure requirements for experts (Fed. R. Crim. P. 16(a)(1)(G)) and the admissibility requirements of Fed. R. Evid. 702. Recent amendments to the Federal Rules of Evidence were designed to guard against the practice of offering expert testimony in the guise of lay opinion testimony, thereby subverting the disclosure and discovery requirements of Fed. R. Crim. P. 26 and 16 and the reliability requirements for expert testimony of *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993).

---

[3] Likewise, Pember repeatedly was permitted to offer expert opinion testimony on the propriety of various accounting practices.

Fed R. Evid 701 Adv. Comm. Note to 2000 amendment; *United States v. Peoples,* 250 F.3d 630, 641 (8th Cir. 2001), *cert. dismissed,* ___ U.S. ___, 125 S.Ct. 1239 (2005).

> b. *Forbes' Plane Expense Charge*

Over Shelton's objection, Corigliano was permitted to testify that he raised with Shelton the idea of charging certain airplane expenses incurred by Forbes in 1995 and 1996 to the Cendent merger reserve. (Tr. 7378, Gov't Ex. 388). Admission of the evidence was erroneous and prejudicial. First, the government provided no proof that the accounting for the plane expenses was improper. The only evidence concerning the legitimacy of the accounting came from Prof. Roman Weil, who was called by Shelton and who gave uncontradicted testimony that the accounting for the plane expenses was appropriate and in accordance with GAAP. (Tr. 11275-77). The evidence was highly prejudicial, because it was the only example the government could offer showing Shelton's direct involvement in charging ordinary operating expenses to the merger reserve – a practice that was central to the government's case. Further, evidence relating to the charging of the airplane expenses was outside the scope of the superseding indictment or the government's December 31, 2002 letter providing additional detail concerning the allegations in the superseding indictment. As noted above, the government was required to provide expert testimony concerning the airplane expenses, since specialized knowledge is required to determine whether the method used was appropriate under GAAP, yet the government offered none. Absent proof by a preponderance of the evidence that the act in question is wrongful or illegal, it is error for a court to admit evidence of such other acts. *Huddleston v. United States,* 485 U.S. 681, 690 (1988); *United States v. Gilan,* 967 F.2d 776, 776-82 (2d Cir. 1992).

Because the evidence relating to the airplane expenses was the only evidence allegedly demonstrating Shelton's knowledge that operating expenses were being charged to the merger reserve, or Shelton's involvement therein, the admission of this evidence was highly prejudicial and cannot be deemed harmless error.

*c.     Admission of Pre-1995 Improper Accounting*

Corigliano not only offered inadmissible expert opinion testimony about accounting practices and inadmissible other acts testimony about the airplane expenses, but also offered evidence of allegedly improper accounting prior to January 1995.  The government provided no pretrial disclosure regarding pre-1995 events, notwithstanding numerous requests for a bill of particulars.  The government's experts did not provide any testimony concerning accounting improprieties before 1995.  Nor was there any credible evidence of involvement by Shelton in pre-1995 accounting improprieties.  Moreover, while the indictment specifically alleged that defendants misused the Ideon and Cendent merger reserves, and contained allegations concerning several other specific accounting practices, Corigliano (and to a lesser extent, Pember) testified at length regarding improper accounting at CUC that was not alleged in the indictment, such as misuse of "general reserves" before 1995, profit sharing receivables, GETKO and Essex merger reserves, and more.  Though none of these alleged practices were specified in the indictment, the government argued in summation that the jury should look to them as evidence of guilt of the crimes charged.  (*E.g.,* Tr. 14830-31 (general reserves)).

This variance prejudiced Shelton and constituted a constructive amendment to the indictment.  As noted above, a constructive amendment occurs "[w]hen the trial evidence or the jury charge operates to 'broaden [ ] the possible bases for conviction from that which appeared in the indictment."  *Milstein,* 401 F.3d at 65.  Where, as here, an indictment alleges a criminal scheme with specificity, the government cannot present evidence and arguments concerning acts beyond that scheme, even where the indictment includes more general allegations of wrongdoing.  *Id.* at 64-66.  Where there has been a constructive amendment, reversal is required even absent any showing of prejudice.  *Wozniak,* 126 F.3d at 109.

Nothing in the indictment put Shelton on notice that the government would seek to convict him based on misuse of the GETKO and Essex reserves, general reserves, and profit sharing receivables.  This violation of Shelton's Sixth Amendment right to notice of the charges

-10-

against him was exacerbated by the government's refusal to provide any particulars concerning the pre-1995 conduct.

The prejudice to Shelton regarding Corigliano's testimony about pre-1995 conduct was further exacerbated by the government's refusal to immunize Stuart Bell and the court's refusal to give a missing witness instruction. Had he been immunized, Bell would have offered a vastly different view of the challenged pre-1995 practices. Bell would have testified that he did not engage in financial wrongdoing at CUC, that Corigliano's testimony concerning Bell was false, and that there are legitimate explanations for the accounting done at CUC during Bell's tenure. (*See* Declaration of Barry S. Simon in support of Forbes' Motion for Order Requiring the Government to Confer Immunity on Stuart Bell or for Missing Witness Instruction at ¶ 3). Bell's testimony was critical, exculpatory and not cumulative to any other evidence. Shelton had no other means to obtain the testimony other than immunity. Where the government distorts the fact-finding process by entering into immunity or plea agreements with certain witnesses who implicate a defendant while denying such agreements to witnesses who would exculpate a defendant, the court's refusal to immunize the latter may constitute a denial of due process. *See United States v. Westerdahl,* 945 F.2d 1083, 1087 (9th Cir. 1991).

### d. Cumulative Effect

As a result of these rulings, Corigliano was able to offer testimony against Shelton that went well beyond the allegations in the indictment, that violated Shelton's right to notice of the charges against him, and that impermissibly introduced opinion testimony as to issues of accounting treatment that lay at the heart of the government's case. The government succeeded in preventing Shelton from calling witnesses such as Bell who would have contradicted Corigliano. The correctness of these rulings, individually and collectively, presents a substantial issue on appeal. *See, e.g., United States v. Rahman,* 189 F.3d 88, 145 (2d Cir 1999) (multiple errors in a single trial may cast such doubt on fairness of proceedings that new trial warranted even if no ruling standing alone requires reversal). Given the prejudice to Shelton from each of these rulings, erroneous admission of such testimony would not be deemed harmless.

### 3. ADMISSION OF THE HEARSAY TESTIMONY OF JOHN OLLER PRESENTS A SUBSTANTIAL ISSUE

The admission of John Oller's hearsay testimony of statements attributed to Shelton was erroneous. Oller was the Wilkie, Farr & Gallagher partner who provided past recollection recorded testimony of Shelton's statements in the course of the internal investigation under the direction of the Cendant Board of Directors Audit Committee. Oller testified to statements purportedly made by Shelton during two interviews that related to several key disputed issues at trial, including the March 6, 1998 meeting, Shelton's intention to exercise stock options in April 1998, and reimbursement for Forbes' plane expenses in 1995 and 1996.

The testimony was inadmissible under Fed. R. Evid. 803(5) as past recollection recorded. Under that Rule, the proponent must establish that (1) the witness once had knowledge; (2) the witness now has insufficient recollection to testify fully and accurately; (3) the memorandum was made or adopted by the witness when the matter was fresh in the witness' memory; and (4) the memorandum accurately reflects the witness' knowledge. The rule proceeds on the basic assumption that the statement possesses circumstantial guarantees of trustworthiness. *See* Advisory Committee Notes to Fed. R. Evid. 803.

Oller's testimony concerning the memorandum should not have been admitted as past recollection recorded. The Second Circuit has held that a "third party's characterization of a witness's statement does not constitute a prior statement of that witness unless the witness has subscribed to that characterization" or the third party characterization is a substantially "verbatim transcript of the witness's own words." *United States v. Almonte,* 956 F.2d 27, 29 (2d Cir. 1992) (internal quotation and citation omitted). In *Almonte,* the defendant sought to admit as a prior inconsistent statement handwritten notes from an Assistant U.S. Attorney's conversation with a DEA agent, in order to contradict the agent's testimony at trial. In affirming the trial court's ruling, the Second Circuit held that the notes were inadmissible as a prior inconsistent statement because the notes were merely a summary of what the agent said, and the agent had not subscribed to the characterization of the statement. *Id.* at 30. "The problem, in essence, is one of relevancy. If a third party's notes reflect only that note-taker's summary characterization of a

witness's prior statement, then the notes are irrelevant as an impeaching prior inconsistent statement, and thus inadmissible." *Id.* at 29.

*Almonte* applies to a proponent's effort to introduce a party's statement as an admission under Fed. R. Evid. 801(d)(2)(A). *See Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.,* 168 F. Supp. 2d 57 (S.D.N.Y. 2001). In that case, plaintiffs sought to introduce as an admission an edited, non-verbatim "transcript" of an interview with a party-opponent. The transcript had been edited, but the proponent asserted that the transcript was accurate as to the gist or essence of what the interviewee said. *Id.* at 59. Following *Almonte,* the district court in *Bank Brussels* found that plaintiffs could not meet their burden of showing that the transcript reflected the party-opponents own words and was therefore inadmissible. *Id.* at 60-61.

As with the agent's out-of-court statements in *Almonte* and the party admissions in *Bank Brussels,* here the double hearsay statements attributed to Shelton were never shown to be his words, were not substantially verbatim, and were never adopted by him. More importantly, Oller's past recollection recorded testimony fails to satisfy the threshold requirement of trustworthiness or reliability, for a multitude of reasons. The Wilkie, Farr investigation was conducted in anticipation of litigation. *See Hoffman v. Palmer,* 129 F.2d 976, 991 (2d Cir. 1942) (documents prepared in anticipation of litigation inadmissible under Fed. R. Evid. 803(6) because they are "dripping with motivations to misrepresent"), *aff'd,* 318 U.S. 109, 113-114 (1943). The interviews were deliberately not recorded by any means – video, audio, or stenographic, and Wilkie, Farr instead relied on various note-takers to take down their impressions of what Shelton said. All notes of the interviews and all drafts of the memos were destroyed. Most significantly, the memoranda did not simply reflect Oller's recollection of the interview but instead were an amalgamation of the thoughts and recollections of the numerous Wilkie, Farr and Arthur Anderson participants, so what Oller testified to was not his own memory so much as the collective memory of others. (Tr. 10371). Oller could not be sure that everything in the memos was a statement he heard from Shelton. (Tr. 10380). Oller was neither the main note-taker nor the primary examiner during the interview, he did not write the initial

-14-

drafts, and he could not state with certainty that he was present during the entire interview. (*See* Tr. 10364-10381).

Admission of Oller's testimony would not likely be deemed harmless error. As noted, Oller's testimony covered several critical and disputed issues at trial. The 32 days of jury deliberations shows that this was a close case and jurors were divided. The government, in arguing for the admissibility of Oller's testimony, itself noted that the testimony was critical because, it argued, Shelton gave false denials of involvement in the scheme, evidencing his consciousness of guilt. The government also highlighted Oller's testimony during its rebuttal argument at a number of points, including, for example Shelton's purported statements to Wilkie, Farr that he did not know how Forbes' plane expenses related to the merger. (Tr. 16061-62; 16067-68).

**CONCLUSION**

For the foregoing reasons and those set forth in Motion for a Judgment of Acquittal Pursuant to Fed. R. Crim. P. 29 or for a New Trial Pursuant to Fed. R. Crim. P. 33 (filed on March 7, 2005), defendant E. Kirk Shelton respectfully requests that the Court grant bail pending appeal pursuant to 18 U.S.C. § 3143(b).[4]

DATED: July 25, 2005

        Respectfully submitted,

        DAY, BERRY & HOWARD LLP


        By:_____
        Stanley A. Twardy, Jr. (CT 05096)
        Gary H. Collins (CT 22119)
        City Place 1, 185 Asylum Street
        Hartford, CT  06103
        Tel.: (860) 275-0314
        Fax: (860) 275-0343

        LAW OFFICES OF THOMAS P. PUCCIO
        Thomas P. Puccio (CT 22983)
        230 Park Avenue, Suite 301
        New York, NY  10172
        Tel.: (212) 883-6383
        Fax: (212) 883-6388

        MILBANK, TWEED, HADLEY & McCLOY LLP
        Scott A. Edelman (CT 25268)
        Thomas A. Arena (CT 25269)
        1 Chase Manhattan Plaza
        New York, NY  10005-1413
        Tel.: (212) 530-5000
        Fax: (212) 530-5219

        Attorneys for Defendant E. Kirk Shelton

---

[4] Additional arguments were offered in defendant Shelton's Memorandum of Law in Support of Motion for Judgment of Acquittal Pursuant to Fed. R. Crim. P. 29 or For a New Trial Pursuant to Fed. R. Crim. P. 33, and are not repeated here.  However, Shelton respectfully incorporates by reference such arguments as if fully set forth herein.

## **CERTIFICATION**

      I hereby certify that on July 25, 2005 a copy of the foregoing was served on the following parties via fax and US Mail:

        James McMahon, Esq.
        Richard J. Schechter, Esq.
        United States Attorney's Office
        District of New Jersey
        970 Broad Street, Suite 700
        Newark, NJ  07101

_____
                        Gary H. Collins