UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Criminal Action No. |
| Plaintiff, | : | 3:02 CR 00264 (AWT) |
| v. | : | |
| WALTER A. FORBES and E. KIRK SHELTON, | : | |
| Defendants. | : | NOVEMBER 15, 2005 |

**CENDANT CORPORATION'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR AN ORDER COMPELLING DEFENDANT E. KIRK SHELTON TO COMPLY WITH THE COURT'S AUGUST 12, 2005 RESTITUTION ORDER**

Cendant Corporation ("Cendant"), the victim of the crimes committed by defendant E. Kirk Shelton ("Shelton" or "Defendant"), respectfully submits this Memorandum in Support of its Motion to Compel Shelton's compliance with this Court's August 12, 2005 Order of Restitution (the "Restitution Order").[1]

### Introduction

On January 4, 2005, a jury convicted Shelton on each of the twelve counts of his indictment. Thereafter, on August 12, 2005, this Court, after finding that he perjured himself at trial and sentencing him to 10 years in prison, ordered Shelton to pay restitution in the amount of $3.275 billion to Cendant -- the victim of his criminal fraud -- in order to

---

[1] A true and accurate copy of the Restitution Order, docket entry 1638, is attached at Tab A in the accompanying Appendix (hereafter, "App. Tab ___").

compensate Cendant for the damages it suffered as a result of Shelton's crimes. (See App. at Tab A). The Restitution Order also specifically required Shelton to "make a lump sum payment of $15 million by no later than October 24, 2005," the proceeds of which were to be held by the Clerk of the Court "until such time as the defendant no longer has any right to appeal from the judgment in this case." (Id.) Since Shelton testified at his trial that he had a net worth of $30 million (see App. at Tab B 12623:20-25),[2] he has the ability to meet the $15 million "lump sum" requirement without any hardship.

On October 7, 2005, Shelton, through his counsel, purported to satisfy his $15 million "lump sum" payment obligation by depositing with the Clerk: (i) assignments of three life insurance policies valued by Shelton at $3,583,473; (ii) an assignment of 98,075 shares of Cendant stock valued by Shelton at $1,902,655, or $19.40 per share; and (iii) $9,513,872 in cash.[3] (See App. at Tab C). Shelton made that deposit, which fails to comply with the Restitution Order, three days after attempting to frustrate Cendant's enforcement of the Restitution Order by filing a "Motion for Stay of Sentence Providing for Restitution" (the "Stay Motion").[4] (See App. at Tab D). Because the Stay Motion was nothing more than a pretense to avoid, potentially forever, paying restitution to the victim of his crimes, on October 24, 2005 Cendant simultaneously filed an opposition to the Stay Motion and sent a letter to

---

[2]   The excerpt of Shelton's testimony is attached at Tab B to Appendix.

[3]   The October 7, 2005 letter from Shelton's counsel to the Clerk of the Court and the Clerk's Receipt for Payment are attached at Tab C to Appendix.

[4]   A copy of Shelton's Stay Motion is attached at Tab D to Appendix.

Shelton's counsel informing them that Shelton's October 7, 2005 deposit was not equivalent to the required $15 million and in clear violation of the Restitution Order.[5] (See App. at TabE; App. At Tab F).

Given Shelton's deliberate defiance of the Restitution Order, Cendant seeks the Court's intervention in curing this contemptuous failure to comply with its unambiguous terms. As explained more fully below, despite Shelton's $30 million net worth, accumulated through the crimes of which he has been convicted, Shelton deposited with the Court Clerk assets that he knew were worth less than the value he represented to the Court and continues to defy this Court by doing nothing to cure his deliberate default.

## Argument

**I.     Shelton Has Failed to Deposit With the Clerk a Lump Sum of $15 Million As Required By the Restitution Order**

The Restitution Order explicitly directs Shelton to make a "lump sum" payment of $15 million to the Court Clerk on or before October 24, 2005. There can be no dispute as to the Court's meaning of "lump sum" -- it is a single, complete payment that is <u>no less</u> than $15 million in value. The assets Shelton deposited with the Clerk were worth less than $15 million when he tendered them, as he knew at the time, and he is in direct violation of the Restitution Order, as shown below.

**A.     The Insurance Policies Are Not Worth What Shelton Claims**

---

[5] Cendant's October 24, 2005 opposition to the Stay Motion is attached at Tab E to Appendix and Cendant's October 24, 2005 letter to Hope C. Seeley, Esq. is attached at Tab F to the Appendix.

To comply with the $15 million "lump sum" payment, Shelton assigned three split dollar life insurance policies initially purchased for Shelton by Cendant. Shelton listed the combined value of the three policies at $3,583,473, which he claimed is the current cash surrender value of each policy. As Shelton knows, he does not have the right to receive, and thus does not have the right to assign, a significant portion of the cash surrender value of each policy.[6]

As explained in the accompanying affidavit of Richard S. Meisner, Esq., Senior Vice President -Law of Cendant (App. At Tab G) , as a condition for Cendant to pay the premiums on each of the three policies, Shelton entered into a split dollar policy arrangement with the company. A split-dollar policy arrangement is a contract under which an employer agrees with its employee to pay some or all of the annual premiums on a life insurance policy for the employee in return for splitting the policy benefits. Under the "split dollar" agreement Shelton entered into with Cendant, Cendant is entitled to the return of all policy premiums it paid on

---

[6] In fact, Shelton presently does not have the ability to assign the policies or any portion thereof. Pursuant to a February 1, 1996 Escrow Agreement between Shelton and CUC (now Cendant), the policies are being held in escrow and will only be released once certain conditions have been met (i.e., Shelton receives possession of the policies once he reaches the age of 60, Cendant receives possession of the policies if Shelton breaches his employment agreement). (See Exhibit 9 to the Affidavit of Richard S. Meismer dated November 14, 2005, attached at Tab G to Appendix). Thus, Shelton lacks the necessary possession of the policies and therefore cannot assign the instruments, or his rights (if any) thereunder, to the Court Clerk. In any event, even if Shelton could assign his interests in the policies, the assignment would be net of the premiums advanced by Cendant, as explained below.

his behalf over the years upon Shelton's death or if the policies are surrendered for cash.[7]  That amount is $2,194,627 of the claimed face value of $3,583,473 which Shelton falsely represented to this Court as the "cash surrender value" belonging to him.  The truth is that, after deducting Cendant's portion of the cash surrender value, Shelton's aggregate interest in the three policies, the combined value of these policies legitimately subject to assignment by Shelton, is approximately $1.3 million, which Shelton knew at the time.

Consistent with the deceptive practices that resulted in his conviction for fraud, Shelton is attempting to use $2.2 million of Cendant's own money to satisfy his obligation under the Restitution Order to deposit $15 million with the Clerk of the Court that would be remitted to Cendant after his appeal rights are exhausted.  Of course, Shelton did not mention these facts to the Court, which demonstrates that he has violated knowingly the terms of the Restitution Order at the first opportunity.

The only excuse Shelton can muster for his attempt to convert Cendant's money for his own use is that Cendant, by not continuing to make the insurance premium payments after Shelton was discharged from the company for cause, breached its obligations under Shelton's employment agreement.[8]  According to Shelton, Cendant was required to advance the policy premiums, regardless of whether or not Shelton continued to be employed by the company,

---

[7]  Attached as Exhibit 8 to the accompanying affidavit of Richard S. Meisner, Esq. is a schedule showing the amount of premiums paid by Cendant to date (and the cash surrender value, net of loans against the policies, as of June 30, 2005).

[8]  See Ex. 4 to App. at Tab G, Shelton's May 27, 1997 employment agreement.

until Shelton reached the age of 60 "unless Mr. Shelton breached the non-compete provisions of the Agreement."[9] (See App. at Tab H at 1). Based on this tortured reading of the employment agreement, Shelton concludes that Cendant's purported breach of the premium advancement provision has somehow significantly reduced Cendant's interest in the cash surrender value of the policies.[10] (See Id. at 2).

Shelton is wrong. Cendant was only obligated to continue to make the premium payments for each policy provided Shelton did not breach any of the covenants contained within Section IX of the employment agreement.[11]

Section IX contains the following specific covenant: "[Mr. Shelton] will not make any statement or perform any acts intended to or which may have the effect of . . . injuring the interests of the Company or any of its affiliates." (See App. at Tab G, Meisner Aff. Ex. 4 at Section IX(C)(ii)). Mr. Shelton's conviction of defrauding Cendant and its shareholders, and this Court's determination that Cendant was the victim of Shelton's crimes, is more than a sufficient basis to conclude that Shelton breached this covenant before Cendant ceased

---

[9] Shelton's Reply Memorandum to the Stay Motion is attached at Tab H to the Appendix.

[10] Regardless of whether or not Cendant breached the employment agreement, Shelton admits that Cendant still has an interest in the cash surrender value of each policy, (see App. at Tab H at 2), and, thus, that his $15 million "lump sum" deposit with the Clerk is insufficient.

[11] Shelton's assertion that Section IX is merely a covenant not to compete is belied by a plain reading of that provision. (See App. at Tab G, Meisner Aff. Ex. 4.)

advancing the premiums.[12] Thus, Cendant's interest in the cash surrender values of the three policies remains intact and Shelton's attempt to use this money to satisfy his obligation is tantamount to an illegal conversion of Cendant property.

Alternatively, Shelton also knew that the insurance policies were insufficient assets to use for his lump sum payment because the cash surrender value of each policy fluctuates based on performance of the investments made by the insurer with the policy premium. Amazingly, what Shelton is attempting to do is satisfy his obligation by imposing the risk of a future decline in the value of the cash surrender value of the insurance policies on Cendant. This too violates the terms of the Restitution Order, which requires Shelton to make a "lump sum" payment of $15 million and not a fluctuating one. The Restitution Order clearly contemplated the deposit of stable, or liquid, assets equaling $15 million on or before October 24, 2005. Having deliberately failed to do so, despite having assets to meet his obligation, Shelton should be compelled to do so immediately.

B.    **The Cendant Stock Is Insufficient**

As part of Shelton's purported "lump sum" deposit, he also delivered 98,075 shares of Cendant common stock to the Clerk of the Court and claimed that those shares had a value of $1,902,655, or $19.40 per share. But, like the cash surrender value of the life insurance

---

[12]    In light of Shelton's conviction and pursuant to the February 1, 1996 Escrow Agreement, Cendant now owns all the rights in each policy. (See App. at Tab G, Meisner Aff. Ex. 9 (stating that if Shelton breaches Section IX of his employment agreement, Cendant will be assigned all interests in each insurance policy).) This matter will ultimately be adjudicated in an action now pending in the United States District Court for the District of New Jersey.

policies, Cendant stock fluctuates in price daily and the deposited stock will never be subject to a fixed valuation. At the close of trading on November 14, 2005, Cendant stock traded at $17.68 per share. As a result, the shares deposited by Shelton currently are worth $1,733,966 or $168,689 less than the value ascribed to them by Shelton on October 7, 2005. Accordingly, Shelton should be compelled either to replace this variable asset with one subject to a fixed value or, in the very least, be compelled to supplement his deposit to make up for the loss in value.

## II.     An Order Compelling Shelton to Supplement His Deposit is Imperative

Shelton has been in default of his obligation since October 24, 2005. Every day Shelton is permitted to flout the Restitution Order allows Shelton to squander, transfer or conceal his remaining assets, rendering the Restitution Order a farce. This is not a mere conjecture. Shelton has already depleted his assets. Shelton is entitled to a $45,000 monthly living allowance ($540,000 a year), including luxuries such as domestic help, multiple automobiles, two homes, country club memberships and the like. His co-conspirators Anne Pember and Cosmo Corigliano are permitted $90,000 and $200,000 a year, respectively. Given his deliberate failure to comply with the Restitution Order and his crimes, it is respectfully submitted that an allowance of $540,000 annually should be revisited and reduced.

Apart from a living allowance, eight days after Shelton's first meeting with prosecutors in 1999, he created and funded an irrevocable trust with $7.5 million for the education of his two children. It is obvious that education costs are not nearly this high, and this transfer was to defeat creditors. (See Sentencing Memorandum of the United States at 54 n.21 (Doc. I.D.

1604-1)). Likewise, Shelton recently transferred $2 million to his attorneys as alleged "prepaid legal fees" after being allowed $150,000 the first month after his conviction. (See Id.). Moreover, Shelton has placed his wife as the owner of the management group SCIP even though she has no recent business experience which raises questions of motive and funding. (See Id.). Given Shelton's past history as well as his deliberate deception in complying with the Restitution Order, there are ample grounds to believe that Shelton will continue to take steps to shield his assets from Cendant, his creditor under the Restitution Order.

### III. Shelton Should be Enjoined from Spending or Transferring Any Assets Beyond Ordinary Living Expenses Without Express Approval of the Court After Notice to the Victim, Cendant

In light of the foregoing facts, Shelton should be treated like his co-conspirators, Pember and Corigliano, and be required to seek approval for expenditures beyond normal living expenses. The order compelling Shelton to comply with the Restitution Order should also specifically enjoin Shelton from transferring, dissipating or shielding his assets. Shelton's living expenses should be limited to those of a normal family of four and should not include such luxury items as country club or golf club membership fees or dues; car payments and insurance on more than one vehicle for his family; vacations or other trips not related to the prosecution of his appeal; and the maintenance of non-medical household personnel (including, but not limited to, maid, personal assistant, secretary, etc.). If Shelton wishes to incur an expense beyond his ordinary and necessary living costs, he should be required to submit a proposal for such expenditure to the Court (or the Court's designee), on notice to Cendant and the U.S. Attorney, for approval. Such limitations are necessary to protect Cendant's legitimate

and established interest in Shelton's assets while his appeal is pending. Having been convicted of serious crimes and found to have perjured himself at his trial, Shelton is not entitled to be treated otherwise.

## Conclusion

For all of the foregoing reasons, Cendant's Motion to Compel should be granted and Shelton should be ordered immediately to comply with the terms of the Restitution Order.

Dated: Harford, Connecticut
November 15, 2005

                                    MOVANT - CENDANT CORPORATION

                                    By: _____/s/ Robert E. Kaelin_____
                                          Robert E. Kaelin - ct11631
                                          rkaelin@murthalaw.com

                                          Murtha Cullina LLP
                                          CityPlace I - 185 Asylum Street
                                          Hartford, Connecticut 06103-3469
                                          Telephone:    (860) 240-6000
                                          Facsimile:    (860) 240-6150
                                          Its Attorneys

Of Counsel:

Samuel Kadet - ct07880
skadet@skadden.com
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036-6522
Telephone:    (212) 735-3000
Facsimile:    (212) 735-2000

CERTIFICATE OF SERVICE

      I hereby certify that a copy of the foregoing was mailed, first class, postage prepaid on November 15, 2005 to:

Counsel For The U.S. Government

James McMahon, Esq.
Richard J. Schechter, Esq.
Norman Gross, Esq. (and facsimile)
United States Attorney's Office
District of New Jersey
970 Broad Street, Suite 700
Newark, NJ 07101

Counsel For E. Kirk Shelton

Hope C. Seeley, Esq. (and facsimile)
Hubert Santos, Esq.
Santos & Seeley, PC
51 Russ Street
Hartford, CT 06106

Law Offices of Thomas P. Puccio
Thomas P. Puccio, Esq.  (and facsimile)
230 Park Avenue, Suite 301
New York, NY 10172

Day, Berry & Howard LLP
Stanley A. Twardy, Jr., Esq.
Gary H. Collins, Esq.
CityPlace 1, 185 Asylum Street
Hartford, CT 06103

MilBank, Tweed, Hadley & McCloy, LLP
Scott A. Edelman, Esq.
Thomas A. Arena, Esq.
1 Chase Manhattan Plaza
New York, NY 10005-1413

                                          /s/ Robert E. Kaelin
                                          Robert E. Kaelin