UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:02CR00264 (AWT) |
| | : | |
| v. | : | |
| | : | February 15, 2006 |
| | : | |
| E. KIRK SHELTON | : | |

The United States respectfully submits this Memorandum in Opposition to the Motion of Defendant E. Kirk Shelton for Stay of Sentence Providing for Restitution (the "Stay Motion") (Docket Entry 1786). In addition to allowing the United States and Cendant Corporation ("Cendant"), as restitution victim, to proceed with collection efforts in aid of the Order of Restitution (the "Restitution Order") (Docket Entry 1638), the United States respectfully requests that the Court amend the current conditions of bail applicable to Shelton.

I.      Discussion.

Inherent in Shelton's Stay Motion is an implicit acknowledgment that the Restitution Order may be enforced immediately notwithstanding Shelton's "lump sum payment" into the Registry of the Court in October, 2005. This position is supported by the colloquy on the record of the sentencing hearing where the Court stated that "the fact that [the Court is] entering the restitution order doesn't bar the government from proceeding to try and collect restitution independent of that." (Sentencing Hearing Transcript ("Tr."), at 458.) Shelton's counsel responded directly by stating "we have no objection to that, your honor." (Id.) As discussed

1

below, this position is also supported by federal victims' rights statutes such as the Mandatory Victims Restitution Act of 1996 and the Justice for All Act of 2004.

The need for immediate collection efforts has been highlighted by Shelton's recent financial machinations. Of particular concern are the recent transactions – described in some detail in Shelton's Reply Memorandum dated December 16, 2005 (the "Financial Disclosure Brief")(Docket Entry 2030) – regarding ownership interests in SCIP Partners, L.P. In this filing, Shelton identifies a chain of eleven events involving the leveraging and liquidation of a limited partnership valued by Shelton's appraiser at more than $16 million. (Financial Disclosure Brief, at 3-4.) These events included a loan of nearly $10 million by a limited partnership, Ceniarth Wales Interests, L.P. ("Ceniarth"), whose members are not identified and an attempted repayment of such loan that was aborted due to the fact that "Smith Barney was concerned about wiring the funds to repay Ceniarth." (Id., at 4.)

These transactions are even more troubling against the backdrop of Shelton's disclosure – made for the first time – to Probation Officer Maxwell, during the period between conviction and sentencing, that Shelton transferred approximately $7.5 million in personal assets to a trust account established **during the criminal investigation** "as part of Shelton's overall estate plan." (Shelton Reply Brief, dated November 7, 2005, Docket Entry 1948, at 4.) The government's ability to pursue this fraudulent transfer would be jeopardized by the stay of enforcement proposed by Shelton.

    A.    **Federal Restitution Orders Are Required to be Enforced Fully and Expeditiously.**

The Mandatory Victims Restitution Act of 1996 ("MVRA"), made restitution mandatory

as part of the sentence for many federal crimes and provided for enhanced post-conviction enforcement of such orders by the federal government. 18 U.S.C. §§ 3663A, 3664. Before the MVRA, restitution orders in federal criminal sentences could be enforced by either the crime victim or the United States. 18 U.S.C. § 3663(h) (1994). The MVRA enhanced the United States' enforcement ability by providing that the Attorney General "shall be responsible for collection of an unpaid fine or restitution," including victim restitution, 18 U.S.C. § 3612(c), and directing the Attorney General to promulgate guidelines to ensure that restitution orders are enforced "to the fullest extent of the law." 18 U.S.C. § 3551.

Further, the MVRA empowers the Attorney General to enforce victim restitution orders in the same manner that it collects fines, under 18 U.S.C.§§ 3571-3574 and §§3611-3614, and "by all other available and reasonable means," 18 U.S.C. § 3664(m)(1)(A)(ii). *See also* 18 U.S.C.§ 3613(f) ("all provisions of this section [pertaining to the enforcement of fines] are available to the United States for the enforcement of an order of restitution.") Accordingly, under the Restitution Act, the Attorney General may enforce a restitution order "in accordance with the practices and procedures for the enforcement of a civil judgment under Federal law or State law." 18 U.S.C. § 3613(a) (made applicable to restitution orders by 18 U.S.C. § 3664(m)(1)(A)). The practices and procedures for enforcement of a civil judgment under federal law, in turn, are set forth, inter alia, in the Federal Debt Collection Procedures Act of 1990 ("FDCPA"), 28 U.S.C. § 3001 et seq. Those procedures include the use of Judgment Debtor Examinations. *See* 28 U.S.C. § 3015; Fed. R. Civ. P. 69; A.R.S. § 12-1631.

Congress enacted the Justice for All Act of 2004 on October 30, 2004. Since the Act contains no effective date it is effective upon enactment. <u>Gozlon-Peretz v. United States</u>, 498

U.S. 395, 404 (1991). The act adopts a new section of the Criminal Code, 18 U.S.C. § 3771(a), which provides that a crime victim has the following rights:

§ 3771. Crime victims' rights

    (a) RIGHTS OF CRIME VICTIMS. – A crime victim has the following rights:

        (1)    The right to be reasonably protected from the accused.
        (2)    The right to reasonable, accurate, and timely notice of any public court proceeding, or any parole proceeding, involving the crime or of any release or escape of the accused.
        (3)    The right not to be excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding.
        (4)    The right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding.
        (5)    The reasonable right to confer with the attorney for the Government in the case.
        (6)    **The right to full and timely restitution as provided in law.**
        (7)    The right to proceedings free from unreasonable delay.
        (8)    The right to be treated with fairness and with respect for the victim's dignity and privacy.

18 U.S.C. § 3771 (emphasis supplied).

Federal law had already required that victims receive full restitution. See 18 U.S.C. § 3664(f)(1)(A). The new Act introduces the element of "timely restitution." The Court is required to ensure that the rights of victims are observed. 18 U.S.C. § 3771(b) (the district court "shall ensure that the crime victim is afforded the rights described in subsection (a)").

As the Court will recall, during the sentencing in this matter, the United States requested that the Restitution Order include a provision pursuant to 18 U.S.C. § 3664(m) permitting

Cendant to enforce the Restitution Order. *See*, Tr. at 611-615.[1]  When imposing sentence, the Court expressly stated that "[n]othing in this restitution order shall prevent Cendant Corporation from exercising its rights under 18 U.S.C. § 3664(m)." Id., at 645; *see also*, Restitution Order dated August 12, 2005 at p. 3, Docket Entry 1638.   Shelton was convicted for criminal activity that took place no later than 1998, and Cendant paid billions of dollars years ago to its shareholders as compensation for the financial ruin caused by Shelton's crimes.  The time has come for Cendant to receive restitution.

> B.  **Cendant, as the Named Victim, May Also Pursue Immediate Collection of Restitution.**

The MVRA was enacted to protect victims and not defendants.  *See*, United States v. Ekanem, 383 F.3d 40, 44 (2d Cir. 2004) (the intent and purpose of the MVRA to expand, rather than limit, the restitution remedy.)

Under the MVRA, the victim named in a restitution order has an independent right to enforce it against the offender.  The notion that payment schedules control the relationship between the United States and the defendant is undermined by the strong enforcement tools given to the victim under the MVRA.  The Act permits a victim entitled to restitution under a criminal judgment to obtain an abstract and enforce the debt immediately. Specifically, it states

> (B) At the request of a victim named in a restitution order, the clerk of the court shall issue an abstract of judgment certifying that a judgment has been entered in favor of such victim in the amount specified in the restitution order.  Upon registering, recording, docketing, or indexing such abstract in accordance with the rules and requirements relating to judgments of the court of the State where the

---

[1] As noted above, the Court also acknowledged during the sentencing hearing the right of the United States to collect restitution from Shelton independent of the Court's payment schedule.  Tr. at 458.  The defense expressly noted that it had no objection to the United States enforcing such a right.  Id.

> district court is located, the abstract of judgment shall be a lien on the property of the defendant located in such State in the same manner and to the same extent and under the same conditions as a judgment of a court of general jurisdiction in that State.

18 U.S.C. § 3664(m)(1)(A)(I); *see also*, U.S. v. Bedonie, 317 F. Supp 2d 1285, 1330-31 (D. Utah 2004) ("this provision allows a crime victim to convert immediately the restitution order into a judgment for the full amount of the order, apparently without regard to any payment schedule that the court might set.")

The victim's interest is a property right entitled to constitutional protection. United States v. Perry, 360 F.3d 519, 525 (6th Cir. 2004) (when restitution "judgment liens create property interests . . . the federal constitution prevents the deprivation of [those] property interests without due process.")  The Second Circuit recognized in United States v. Walker, that "[t]he significance of [payment schedules] is diminished . . . by the fact that the victim may convert the restitution order into an abstract of judgment for the full amount of the restitution order, which "shall be a lien on the property of the defendant . . . in the same manner and to the same extent and under the same conditions as a judgment of a court of general jurisdiction in that State." United States v. Walker, 353 F.3d 130, 133 (2d Cir. 2003) (*citing* 18 U.S.C. § 3613(c)); *See also*, United States v. James, 312 F.Supp.2d 802 (E.D.Va. 2004) ("Court-imposed payment schedules are merely one means available to enforce a restitution judgment.")

Accordingly, under the express language and legislative history of these recent federal victims' rights statutes, Cendant may, along with the United States, pursue collection of the Restitution Order.

### C. Shelton's Appeal Should Not Entitle Him To Stop All Restitution Efforts.

The MVRA provides that a restitution order must require the defendant to notify the Court and the Attorney General (through the United States Attorney's Office ("USAO")) of any material change in economic circumstances which might affect his ability to pay restitution. *See*, 18 U.S.C. § 3664(k). Victims and USAOs may also notify the Court of any change in the defendant's economic condition. 18 U.S.C. § 3664(k). After receiving notice of any material change in the defendant's economic circumstances, the USAO must notify all of the victims identified in the Restitution Order of the change in circumstances, and must certify to the Court that the USAO has notified such victims. After receiving this notification, the Court may on its own, or on motion of any party, adjust the repayment schedule. 18 U.S.C. § 3664(k). In addition, if an incarcerated defendant is obligated to pay restitution and receives "substantial resources from any source," the defendant is required to apply the value of the resources to any unpaid restitution or fine. *See*, 18 U.S.C. § 3664(n).

Now that Cendant is seeking to enforce the rights that the Court granted it during the sentencing hearing, Shelton is attempting to deny the victim its rights afforded by statute (18 U.S.C. § 3771(a)(6) and 18 U.S.C. § 3664(m)) as well as the Court's explicit restitution order. His sole reason for seeking to prevent Cendant from enforcing the restitution order is his hope that his conviction will be reversed on appeal. Even assuming **arguendo** that Shelton did have a viable appeal, and this Court has already concluded that he does not, Shelton's request to stay all restitution on the terms he proposes is untenable.

First, unlike a term of imprisonment, a restitution payment can be returned to a defendant

if the conviction is overturned.  Thus, like the $15 million that is currently on deposit with the Clerk of the Court,[2] any restitution that is secured by Cendant or the United States pending the outcome of Shelton's appeal, can be returned to him should he prevail on appeal.  Such a procedure will result in no harm to Shelton since both the United States and Cendant have the financial wherewithal to refund the restitution to Shelton.

Second, this Court has the power to require that Shelton deposit his assets with the Clerk of the Court pending the outcome of his appeal.  If that step is taken, the very real risk that Shelton will continue to dissipate his assets will be substantially lessened.  Pursuant to Rule 38(e), Fed. R. Crim. P., the Court may impose "any terms considered appropriate" when staying an order of restitution.  Rule 38(c) Fed. R. Crim. P., provides guidance to the Court when staying the imposition of **a fine** pending appeal.  These proposed measures (depositing all of the

---

[2] Cendant has already advised the Court that Shelton does not have a $3.3 million interest in the life insurance policies he deposited with the Court.  Shelton should bear the burden to support his contention that he has such an interest, or for that matter, any interest in such policies. 18 U.S.C. § 3664(e).  In any event, as the Court noted during the telephone conference of February 3, 2006, the Court contemplated that the remaining funds would be furnished by check or wire transfer.  Indeed, the agreement reached by the parties and Probation provided for "the remainder by check or appropriate wire transfer."  Tr. at 454.  No mention was made of paying the remainder by stock.  Nor would the Court have accepted such an offer if it had been made given the Court's concern about the "diminution in value" (Tr. at 455-56) of the deposited funds and the need to have the funds earn interest.  Tr. at 453.   Thus, Shelton should be ordered by the Court to substitute the stock he deposited with the Clerk of the Court by providing cash. Shelton's suggestion that he included the stock in his $15 million payment because the PreSentence Report (PSR) listed the stock as an asset in paragraph 145 of the PSR (Shelton Mem. at 2, n. 1) is of no moment.  Paragraph 145 of the PSR listed total assets of $25,177,612 including the stock and other assets such as real estate ($4.1 million), life insurance ($3.3 million), prepaid legal fees ($2.0 million), SCIP Partners ($9.2. million) and bank accounts ($3.5 million).  It was from the total figure of $25 million that Probation determined that Shelton "could make a lump sum payment of $15 million."   There was no mention in the PSR where the $15 million should come from.  It was Shelton who agreed that the $15 million payment would come from the life insurance policies and the "remainder by check or appropriate wire transfer."

fine into the district court's registry, requiring the defendant to post a bond, and requiring the defendant to submit to an examination) are all options that the Court should utilize to ensure that Shelton does not continue to dissipate assets.

Third, the Court also has the power to appoint a receiver to secure Shelton's assets to prevent their dissipation. *See, e.g.*, 18 U.S.C. § 3613(a) (providing for enforcement through, *inter alia*, Federal Debt Collection Procedures Act ("FDCPA"); 18 U.S.C. § 3664(m)(1)(A) (making section 3613 applicable to restitution orders); *and*, 28 U.S.C. § 3103 (FDCPA, providing for pre-judgment receivership which may remain in effect until appeal is final). As the Court will recall, there is currently a receiver in place who has been securing the assets of Shelton's conspirator, Cosmo Corigliano. The Court can certainly appoint a receiver to perform a similar task to secure Shelton's assets. Additionally, Shelton's counsel actually proposed this alternative at the sentencing hearing. *See*, Tr., at 625 ("we ... believe that would be more efficient ... to have the receiver in place to handle this....")

Finally, the Court should require that Shelton agree to toll all applicable statute of limitations concerning the transfer of his assets. Should the Court prevent the United States and Cendant from enforcing the Restitution Order, Shelton may later seek to take advantage of the delay he caused by claiming that his various transfers of assets are not actionable since the statute of limitations governing such fraudulent transfers will run on the two year anniversary of when the transfers were discovered by the United States. 28 U.S.C. § 3306(b)(1).

In short, the Court should permit Cendant and the United States to seek restitution for the losses caused by Shelton's more than ten year old criminal activity.

### D.     Shelton's Recent Actions Require New Bail Conditions.

Shelton is not only attempting to deprive Cendant of its statutory right to enforce an order of restitution, he is dissipating his assets which has the effect of substantially reducing the assets available for restitution.  Shelton's monthly budget of $45,000,[3] more than $500,000 annually, as well as his additional expenditures in connection with his bank transfers, are grounds to change Shelton's bail conditions.

As a convicted felon, Shelton should not be spending more than one half million dollars a year when his entire net worth is owed to his victim in restitution.  Having been convicted of multiple counts of deceptive and fraudulent conduct, and having been found by this Court to have testified perjuriously, Shelton can no longer demand to be coddled like some sort of white collar deity.  Clearly, he should not be spending more money in a month than many hard working Americans make in a  year.  Thus, the Court should substantially lower Shelton's monthly expenditures to bring them in line with the budgets governing his co-conspirators, Corigliano and Pember.

Shelton's suspicious bank transfers, described in the Government's submission dated December 8, 2005, provide another reason to modify Shelton's current bail conditions.  The Court should be made aware that the suspicious bank transfers involved the expenditure of more than $140,000 by Shelton.   Only after the Probation Officer confronted Shelton about the bank transfers did Shelton admit that the $9.8 million wire transfer from Ceniarth Wales cost Shelton

---

[3]The Government did not previously object to the $45,000 allowance because the initial trial team in this case does not recall ever receiving notice of the allowance until this issue was raised in the motions currently before the Court.

$25,000 plus an interest rate of 7.5% - - interest payments of more than $60,000 a month. Since Shelton claimed he borrowed the money for two to three months, Shelton actually spent approximately $150,000 so that he could rearrange his assets and not have to liquidate his hedge fund assets. Since the United States believes that Shelton's good friend, Anthony Petrello, who testified at Shelton's sentencing, is involved with the entity that loaned Shelton the money, Shelton has effectively shielded approximately $150,000 of his assets by providing those funds to his friend's company.

Although Shelton submitted a reply memorandum to the Court on December 16, 2005, Shelton never acknowledged to the Court (and thus, hid from Cendant) the fact that the bank transfers cost Shelton approximately $150,000. Indeed, Shelton's reply memorandum artfully claimed that Probation provided Shelton with permission to sell his SCIP partnership shares. Nowhere in Shelton's reply memorandum does Shelton claim that he received permission to spend approximately $150,000 to rearrange his assets. Nor does Shelton's reply memorandum deny that Ceniarth is connected to Shelton's friend, Anthony Petrello.

Equally suspicious is Shelton's September 9, 2005 transfer of his interest in the Vail condominium to the irrevocable trust he created for the benefit of his two sons. There is no evidence that Shelton received any consideration for this transfer or, if he did, that he reported such income to the Probation Office. As noted previously, Shelton established an Irrevocable Trust in the amount of $7.5 million dollars eight days after first meeting with prosecutors in this case. Shelton's September 2005, transfer of his interest in the condominium to the children's trust effectively prevents Cendant from using the Court's restitution order to execute a lien on the Vail property.

As the Court will recall, the Court released Shelton after his January 2005 conviction on a $20 million bail, secured by the Vail condominium and Shelton's Darien home. This bail was continued by the Court on the day Shelton was sentenced pending his voluntary surrender scheduled for September 2, 2005. Tr. at 647. Shelton filed an application with the Second Circuit seeking bail pending appeal and his surrender date was moved from September 2, 2005 to permit the circuit court to consider Shelton's application.

During the September 13, 2005 oral argument on Shelton's Second Circuit application for bail pending appeal, the Government expressed concern that if Shelton were permitted to remain on bail pending appeal, the bail he had posted in the District Court (the Vail condominium and the Darien home) would need to be sold to enable Shelton to make the October 2005 payment of $15 million. In response to a question from the panel, Shelton's appellate counsel advised the Court of Appeals that the properties would not have to be sold. What Shelton's appellate counsel apparently did not know was that **four days before the oral argument**, Shelton had transferred the Vail condominium out of his name. Shelton, who was present during the Second Circuit oral argument on the bail motion, made no effort to correct his counsel's inaccurate statement.

To prevent Shelton from playing any more games and treating the Court's good graces as an opportunity to "stick it" to the victim one more time, Shelton should be ordered **in the strongest terms possible** not to transfer, sell, move, encumber, or otherwise dispose of any asset in excess of $10,000 without prior approval from the Probation Office after notice to the United States and Cendant.

Furthermore, given Shelton's recent efforts to shield his assets from the United States and his victim, there is now a "material change in the defendant's economic circumstances that might

12

affect the defendant's ability to pay restitution." 18 U.S.C. § 3664(k). The Court is now empowered to adjust Shelton's payment schedule and require additional restitution be made "immediate[ly] . . . as the interests of justice require." At a miminum, the Court should permit both the United States and the victim to take full discovery of Shelton's financial machinations and assets.

E.       **Shelton's Additional Income Should Go to his Victim.**

The Court's restitution order also required that Shelton notify the U.S. Attorney's Office for the Districts of New Jersey and Connecticut ("USAOs") "of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution." Thus, if Shelton intends to accept any type of employment, he is required to notify, and should be ordered to notify, the USAOs about his anticipated compensation.

Moreover, the Court's restitution order provides that "a victim, the government or the offender may petition the court at any time to modify the restitution order, as appropriate, in view of a change in the economic circumstances of the offender." Unless Shelton is ordered to provide his anticipated compensation to the victim and the USAO, the effectiveness of the Restitution Order would be compromised. *See,* 18 U.S.C. § 3664(k).

It should also be noted that the restitution statutes require that a defendant "obligated to provide restitution" who receives additional resources "during a period of incarceration" **shall be** ordered to provide those monies to pay restitution. *See*, 18 U.S.C. § 3664(n). During the period of time that Shelton is out on bail **waiting to be incarcerated**, he should not be permitted to receive additional monies that are unavailable to the victim. Therefore, the United States would request that all monies received by Shelton pending his incarceration, be furnished to the Clerk

13

of the Court to be available to pay his restitution in the event his conviction is affirmed.[4]

    **F.**    **Shelton's Financial Disclosures to Probation Need to be Examined.**

Previously, during the bail hearing on January 5, 2005, the day after the jury's verdict, the United States requested permission from the Court to review the monthly financial submissions that Shelton was ordered to make to Probation. The Court declined this request. In light of Shelton's recent activity, the United States renews its request to review all of the monthly submissions made by Shelton to Probation as well as all other financial submissions made by Shelton to Probation that formed the basis for the Presentence Report.

The Probation Officer can not be expected to verify on his own the veracity of all of the financial information that Shelton has submitted. Rather, the United States has the responsibility and the ability to carefully examine the financial information. With this information, the United States can best ensure that the Court's Restitution Order is properly enforced.

**II.**    **Conclusion.**

For the reasons set forth above, the Government respectfully requests that this Court deny

---

[4] Alternatively, the United States requests that each dollar that Shelton receives as compensation that is not paid into the Clerk's Office be used to offset his monthly allowance. Quite simply, if Shelton is earning money while out on bail, his need to spend his existing assets for monthly expenses will be diminished.

Shelton's Motion for a Stay of Sentence Providing for Restitution.

        Respectfully submitted,

        CHRISTOPHER J. CHRISTIE
        Special Attorney
        U.S. Department of Justice

        /s/ Norman Gross

        By: NORMAN GROSS
        Special Attorney
        U.S. Department of Justice
        Federal Bar No. 24933

        /s/ James McMahon

        By: JAMES MCMAHON
        Special Attorney
        U.S. Department of Justice
        Federal Bar No. 24062

        /s/ Richard J. Schechter

        By: RICHARD J. SCHECHTER
        Special Attorney
        U.S. Department of Justice
        Federal Bar No. 24238

Dated: February 15, 2006
Newark, New Jersey

CERTIFICATE OF SERVICE

    The undersigned certifies that on this day I caused to be served copies of the foregoing upon the following via email:

>Hope C. Seeley, Esq.
>Counsel for E. Kirk Shelton
>hseeley@santos-seeley.net
>
>Thomas P. Puccio, Esq.
>Counsel for E. Kirk Shelton
>tpuccio@lotpp.com
>
>Robert E. Kaelin, Esq.
>Counsel for Cendant Corporation
>rkaelin@murthalaw.com
>
>Samuel Kadet, Esq.
>Counsel for Cendant Corporation
>skadet@skadden.com

                                /s/ John Silbermann
                                JOHN SILBERMANN
                                Assistant U.S. Attorney

Dated: February 15, 2006
       Newark, New Jersey