UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Criminal Action No. |
| | : | |
| Plaintiff, | : | 3:02 CR 00264 (AWT) |
| | : | |
| v. | : | |
| | : | |
| WALTER A. FORBES and | : | |
| E. KIRK SHELTON, | : | |
| | : | |
| Defendants. | : | APRIL 12, 2006 |

APPENDIX TO MEMORANDUM OF CENDANT CORPORATION IN FURTHER
SUPPORT OF MOTION TO COMPEL COMPLIANCE WITH THE RESITUTTION
ORDER AND IN FURTHER OPPOSITION TO DEFENDANT E. KIRK SHELTON'S
MOTION FOR STAY OF SENTENCE PROVIDING FOR RESTITUTION

A.     Restitution Order

B.     Excerpt of Shelton's Trial Testimony

C.     Shelton List of Current Assets (Filed Under Seal)

D.     Copy of February 17, 2006 Hearing Transcript

E.     Shelton November 7, 2005 Reply Memorandum in Support of Motion for Stay

F.     Shelton September 2005 Monthly Report (Filed Under Seal)

G.     Shelton October 2005 Monthly Report (Filed Under Seal)

H.     Shelton January 2006 Monthly Report (Filed Under Seal)

I.     Excerpt of Mr. Puccio's Opening Statement

J.     Shelton Cash Flow Statements (Filed Under Seal)

MOVANT - CENDANT CORPORATION

By: _____/s/ Robert E. Kaelin_____
    Robert E. Kaelin - ct11631
    rkaelin@murthalaw.com

    Murtha Cullina LLP
    CityPlace I - 185 Asylum Street
    Hartford, Connecticut 06103-3469
    Telephone:    (860) 240-6000
    Facsimile:    (860) 240-6150
    Its Attorneys

Of Counsel:

Samuel Kadet - ct07880
skadet@skadden.com
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036-6522
Telephone:    (212) 735-3000
Facsimile:    (212) 735-2000

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing sent on April 12, 2006 via

UPS/Overnight to the following:

Counsel For The U.S. Government

James McMahon, Esq.
Richard J. Schechter, Esq.
Norman Gross, Esq.
John Silbermann, Esq.
United States Attorney's Office
District of New Jersey
970 Broad Street, Suite 700
Newark, NJ 07101

Counsel For E. Kirk Shelton

Hope C. Seeley, Esq.
Hubert Santos, Esq.
Santos & Seeley, PC
51 Russ Street
Hartford, CT 06106

Law Offices of Thomas P. Puccio
Thomas P. Puccio, Esq.
230 Park Avenue, Suite 301
New York, NY 10172

_____/s/ Robert E. Kaelin_____
Robert E. Kaelin

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
------------------------------X
                              :
UNITED STATES OF AMERICA      :
                              :
v.                            :    Crim. No. 3:02CR264(AWT)
                              :
E. KIRK SHELTON               :
                              :
------------------------------X
```

### ORDER OF RESTITUTION

In accordance with the restitution order set forth on the record at the defendant's sentencing on August 3, 2005, the defendant, E. Kirk Shelton, shall pay restitution of $3.275 billion to Cendant Corporation pursuant to 18 U.S.C. §§ 3663 and 3663A.

The defendant shall make a lump sum payment of $15 million by no later than October 24, 2005. The proceeds of that $15 million lump sum payment will be held by the Clerk's Office until such time as the defendant no longer has any right to appeal from the judgment in this case.

As to the balance of the restitution, the defendant shall make monthly payments in the amount of $2,000 on the 15th day of each month during the first 35 months following his release from imprisonment and any unpaid balance of the amount of restitution ordered shall be payable on the 15th day of the 36th month following his release from imprisonment.

APPENDIX A

The defendant shall make checks payable to the order of the "Clerk, U.S. District Court", and checks shall be mailed or delivered to: Clerk's Office, U.S. District Court, 450 Main Street, Hartford, CT, 06103. The defendant shall write the docket number of the case on each check sent to the Clerk's Office.

Once the defendant no longer has any right to appeal from the judgment in this case, the Clerk's Office shall forward monies received to the victim at Cendant Corporation, 9 W. 57th St. New York, New York 10019, Attn: John H. Carley, Senior Vice President for Legal and Regulatory Affairs, or at such other address as may be specified by the U.S. Probation Office.

As required by 18 U.S.C. § 3664, the court arrived at the figure and schedule for restitution payments after considering the amount of the loss sustained by victims as a result of the defendant's offenses; the defendant's financial resources and other assets, including whether any of those assets are jointly controlled; the defendant's projected earnings and other income; and the defendant's financial obligations, including obligations to dependents.

In that the purpose of the restitution provision is to require restitution whenever possible, see United States v. Porter, 41 F.3d 68 (2d Cir. 1994); United States v. Broyd, 22 F.3d 441 (2d Cir. 1994), this restitution order is contingent

upon the defendant's ability to pay, and the defendant shall make full and complete financial disclosure to the United States Probation Office on at least a quarterly basis during the defendant's period of supervised release.

The defendant shall notify the court, the U.S. Attorney's Office for the District of Connecticut, the U.S. Attorney's Office for the District of New Jersey, Attn: Chief of the Civil Division, and the U.S. Probation Office in the District of Connecticut of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution.  The court notes that a victim, the government or the offender may petition the court at any time to modify this restitution order, as appropriate, in view of a change in the economic circumstances of the offender.

Nothing in this restitution order shall prevent Cendant Corporation from exercising its rights under 18 U.S.C. § 3664(m).

It is so ordered.

Dated at Hartford, Connecticut on this 12th day of August 2005.

                                                _____/S/_____
                                                   Alvin W. Thompson
                                    United States District Judge

Page 12429

Vol. LXII

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - x
                                :
UNITED STATES OF AMERICA        :No. 3:02CR264(AWT)
                                :
        vs.                     :
                                :
WALTER A. FORBES,               :
E. KIRK SHELTON,                :
                                :
                                :HARTFORD, CONNECTICUT
        Defendants              :SEPTEMBER 15, 2004
                                :
- - - - - - - - - - - - - - - x


JURY TRIAL

VOLUME LXII


BEFORE:

        HON. ALVIN W. THOMPSON, U.S.D.J.,

             and a Jury of 12


                        Diana Huntington, RMR
                        Corinna Thompson, RPR
                        Melanie G. Collard, RDR
                        Official Court Reporters

Vol. LXII -

Page 12622

1   the victim of a fraud that happened at CUC International
2   and Cendant?
3   A.  Absolutely.
4   Q.  Mr. Shelton, let me ask you a couple of questions.
5       You told the jury that you have a house in Darien,
6   Connecticut?
7   A.  That's where I live, yes.
8   Q.  Is that a nice house?
9   A.  It is a nice house is.
10  Q.  It worth a lot of money?
11  A.  Yes.
12  Q.  What's it worth, Mr. Shelton?
13  A.  We paid a little over a million for it.  It's
14  probably more than doubled in value.
15  Q.  You think it's worth $2 million?
16  A.  I do.
17  Q.  Could it be worth $3 million, Mr. Shelton?
18  A.  I don't believe so, but in this market, anything is
19  possible.
20  Q.  It's worth $2 million, correct?
21  A.  I think it would be a little more than two.
22  Q.  Is that the only house you own, Mr. Shelton?
23  A.  I own a condo as well.
24  Q.  Where is that condo?
25  A.  I own a rental condo, a ski condo in Vail, Colorado.

Page 12624

1   Q.  Now, I take it, Mr. Shelton, you didn't inherit a
2   sizable inheritance, correct?
3   A.  I did not.
4   Q.  And so when you got to CUC International, was it
5   1981?
6   A.  Yes, it was.
7   Q.  You had worked at Durawal before that, correct?
8   A.  Yes.
9   Q.  You had worked with Chris McLeod at Durawal, correct?
10  A.  Yes, I did.
11  Q.  In fact, Mr. McLeod had been a friend of yours since
12  the time you met him at Durawal, actually when you
13  discussed with him whether he should come to Durawal,
14  correct?
15  A.  Actually even before I met him when I was trying to
16  decide if I should go to Durawal.
17  Q.  You've known him for 25 years?
18  A.  Yes, I have.
19  Q.  He's a friend of yours, correct?
20  A.  Yes, he is.
21  Q.  He's still a friend of yours, correct?
22  A.  Correct.
23  Q.  I take it when you became working at
24  CUC International you didn't have a net worth of
25  30 million, did you?

Page 12623

1   Q.  What's that worth, Mr. Shelton?
2   A.  Probably worth a million dollars.
3   Q.  We heard from someone about a Nissan Maxima.  Do you
4   have that car still, Mr. Shelton?
5   A.  No, that car is long gone.
6   Q.  But you do have cars?
7   A.  I do.
8   Q.  How many cars do you have, Mr. Shelton?
9   A.  We own a total of four cars.
10  Q.  What kind of cars do you own?
11  A.  We have two wagons, an Audi and a Mercedes.  And we
12  have an Audi sedan and Lincoln LS sedan.
13  Q.  Total of four cars?
14  A.  Yes.
15  Q.  What about other assets besides the house, condo, and
16  the four cars?  Do you have other assets?
17  A.  I have financial assets.
18  Q.  What are your financial assets?  You have stocks?
19  A.  Yes.
20  Q.  What is the value of your stock holdings?
21  A.  I don't know.  I don't know how it breaks down.  I
22  know roughly how much I have in total.  I have stocks and
23  bonds and some mutual funds.
24  Q.  Total is approximately 30 million?
25  A.  Yes.

Page 12625

1   A.  No, I not.
2   Q.  What was net worth when you joined CUC International
3   in 1981?
4   A.  Almost zero.
5   Q.  So since the time you began working to the time you
6   left April 15th or April 14th, 1998, it was during that
7   period of time that you accumulated the wealth that you
8   had on April 14th, 1998, correct?
9   A.  Yes, it is.
10  Q.  So during the period of 1981 to 1998, is it fair to
11  say that you were able to accumulate approximately
12  $30 million after what happened on April 15th, but
13  $60 million prior to what happened on April 15th, correct?
14  A.  Yes.
15  Q.  So over the course of 17 years, '81 to '98, you were
16  able to accumulate $60 million of net worth, correct?
17  A.  As of April 14th.
18  Q.  And the next day it was still $30 million of net
19  worth, correct?
20  A.  Yes, it was.
21  Q.  Let me in the remaining time, if I may, ask you to
22  take a look at Government Exhibit 549.  Is it in evidence,
23  before we put it up?
24      And Mr. Shelton, we placed on the overhead 549.  Is
25  it difficult for you to read?  Let us know and we'll make

50 (Pages 12622 to 12625)

Appendix C has been filed under seal.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          No. 3:02CR264(AWT)

        vs.

E. KIRK SHELTON,

                              HARTFORD, CONNECTICUT
                Defendant      FEBRUARY 17, 2006

- - - - - - - - - - - - - - - - x

MOTION HEARING

BEFORE:
        HON. ALVIN W. THOMPSON, U.S.D.J

                         Corinna F. Thompson, RPR
                         Official Court Reporter

Page 2

```
1    APPEARANCES:
2
3    FOR THE GOVERNMENT:
4        U.S. DEPARTMENT OF JUSTICE
             970 Broad Street, Suite 700
             Newark, New Jersey 07101
5        BY: RICHARD SCHECHTER, SPECIAL ATTORNEY
             JAMES McMAHON, SPECIAL ATTORNEY
6            JOHN G. SILBERMANN, SPECIAL ATTORNEY
7
     FOR THE DEFENDANT:
8
9        THOMAS P. PUCCIO, ESQUIRE
             230 Park Avenue
             New York, NY  10169
10
11       SANTOS & SEELEY
             51 Russ Street
             Hartford, Connecticut 06106
12       BY: HOPE C. SEELEY, ESQUIRE
13
     FOR CENDANT CORPORATION:
14
15       MURTHA CULLINA LLP
             CityPlace I  185 Asylum Street
             Hartford, Connecticut  06103
16       BY: ROBERT E. KAELIN, ESQUIRE
17       SKADDEN, ARPS, SLATE, MEAGHER & FLOM
             Four Times Square
18           New York, New York  10036
         BY: SAMUEL KADET, ESQUIRE
19
20   ALSO IN ATTENDANCE:
21       Richard Schaeffer
22
23
24
25
```

Page 3

```
1                    10:17 a.m.
2        THE COURT:  Good morning.
3        Could I ask counsel to state their appearances
4    for the record, please.  Counsel for the government and
5    Cendant.
6        MR. SCHECHTER:  Good morning, Your Honor.
7    Special Attorney from the Department of Justice, Richard
8    Schechter.
9        MR. McMAHON:  Good morning, Your Honor.  Jay
10   McMahon, Special Attorney, U.S. Department of Justice.
11       MR. SILBERMANN:  Good morning, Your Honor.  John
12   Silbermann, Special Attorney, Department of Justice.
13       MR. KADET:  Good morning, Judge.  Sam Kadet of
14   Skadden, Arps for Cendant Corporation.
15       MR. KAELIN:  Good morning, Your Honor.  Robert
16   Kaelin, Murtha Cullina on behalf of Cendant Corporation.
17       MR. PUCCIO:  Good morning, Your Honor.  Tom
18   Puccio for Kirk Shelton.
19       MS. SEELEY:  Good morning, Your Honor.  Hope
20   Seeley on behalf of Mr. Shelton.
21       MR. SCHAEFFER:  Good morning, Your Honor.
22   Richard Schaeffer on behalf of Mr. Shelton.
23       THE COURT:  Thank you.
24       I scheduled this hearing to discuss some
25   specific motions, and let me just say what they are for
```

Page 4

```
1    the record.
2        We have Mr. Shelton's motion for stay of
3    sentence providing for restitution.
4        We have Cendant's motion for limited release of
5    defendant E. Kirk Shelton's Presentence Report and
6    quarterly financial progress reports.
7        We have Cendant's motion for order in aid of
8    execution.
9        We have Cendant's motion to compel compliance
10   with restitution order.
11       I believe those are the four motions that are
12   pending.
13       I'm not going to handle this by going through
14   the motions.  I'm going to handle this as a higher level
15   and tell you where we are and, so you won't be arguing in
16   the blind, tell you where I think we ought to be at the
17   end of the day.  And then if we discuss sort of the
18   general principles, then I think how the motions should
19   fall out becomes more apparent, and then we can get to the
20   particulars of the various statutes that people have been
21   citing to.
22       As you know, Mr. Shelton was convicted and
23   sentenced.  Under the mandatory restitution statute, I had
24   no discretion in terms of whether or not to impose
25   restitution in the full amount.  I did have the ability to
```

Page 5

```
1    make some judgments in determining what was the
2    appropriate full amount of the loss to the victim, and I
3    think you all recall that I chose an amount that I thought
4    was completely indisputable.  It happened to be the lowest
5    amount.  It also happened to be well in excess of the
6    defendant's ability to pay, but that's what the statute
7    provides for.
8        I ordered a $15 million lump sum payment.  That
9    was referred to in the Presentence Report.  In making the
10   decision to order that $15 million lump sum -- and I put
11   "lump sum" in quotation marks -- payment, I relied on a
12   discussion we had here in court.
13       And just so it's clear how I view things, I
14   don't think there's an issue as to whether the defendant
15   has complied with the order.  He hasn't complied with the
16   order, period.  Rather, I think the issue is whether I
17   should waive that noncompliance or modify the order.
18       Let me just note a few things for the record.
19       I think on one of our calls there was a
20   reference as to whether there had been a meeting of the
21   minds between the probation officer and defense counsel.
22   The probation officer's mind isn't the one that matters.
23   What matters is the order I entered.  I didn't need an
24   agreement from the defendant to enter the restitution
25   order.  I listened to people's arguments, I looked at the
```

Page 6

1  Presentence Report, the financial condition of the
2  defendant and I concluded that $15 million was a
3  reasonable lump sum payment to order based on what I knew
4  at the time.
5       I will note, just so you all know what I'm
6  looking at, because I looked at the transcript just to
7  confirm my recollection, and I was concerned that the
8  defendant had had an opportunity to read the
9  recommendation in Paragraph 148 of the Presentence Report,
10 and I said I want to make sure he's had an opportunity to
11 read that paragraph. That's at page 452, line 3 of the
12 July 22nd transcript.
13      And we had some discussion about the payment,
14 and there was a reference at page 454, line 23 that other
15 than what was accounted for by Mr. Shelton's interest in
16 certain insurance policies -- that phrase appears at line
17 14 of page 454 -- the remainder would be coming to the
18 Clerk's Office via check or wire transfer. And I note
19 that some of the -- some of what was deposited was shares
20 of stock in Cendant Corporation and I'm not aware of any
21 mechanism for transferring shares of stock by check or
22 wire transfer. So I think you'll understand why it came
23 as a surprise to me to see that shares were deposited.
24      So for that reason I believe the requirement
25 that the $15 million lump sum payment be made has not been

Page 7

1  complied with.
2       And I will also say my understanding, and I
3  think it is reflected by the concern I expressed about the
4  fact that there be no diminution in value with respect to
5  the insurance policies, was that what would be deposited
6  would be clearly Mr. Shelton's interest in insurance
7  policies. And had I been told at the time that there was
8  some dispute about who had what interest in the policies,
9  I would have said that was unacceptable. And to the
10 extent that the policies that have been deposited are not
11 in amounts that constitute his interest, the restitution
12 order requirement of the $15 million lump sum payment has
13 not been complied with.
14      I guess it is my understanding that the
15 condominium in Vail has been transferred, based on what
16 I've read. I guess if that's not true, I would like
17 somebody to tell me now. I read it was transferred
18 September 9th.
19      MR. PUCCIO: He liquidated his interest in order
20 to contribute to the $15 million. That's a matter of
21 public record.
22      THE COURT: There was a bond package -- let me
23 back up.
24      When I set the conditions of bond, the -- let me
25 get this correct.

Page 8

1       MR. PUCCIO: Judge, if I may. The condominium
2  and the residence were both put up, if I recall, as part
3  of bond, and then the lien against both is still in
4  existence so that that has not changed.
5       THE COURT: I know the lien --
6       MR. PUCCIO: So in other words --
7       THE COURT: I guess my first question is there
8  was a letter from the courtroom deputy that went to
9  Mr. Puccio February 17th forwarding the bond package, and
10 I think the instruction was to return the documents to the
11 United States Attorney's Office in Newark.
12      MR. PUCCIO: I'm informed that that was done.
13      THE COURT: Are those documents -- where are
14 those documents now?
15      MR. PUCCIO: Presumably they are with the United
16 States.
17      THE COURT: I was actually asking the question
18 of the U.S. Attorney's Office in Newark.
19      MR. SCHECHTER: Your Honor, we have no knowledge
20 of it. It's possible it's in Newark, but Mr. Silberman,
21 who's in Newark, doesn't know anything about it.
22      MR. PUCCIO: May I approach, Your Honor?
23      THE COURT: I don't need to see them now.
24      MR. PUCCIO: But there is a cover letter dated
25 May 4, 2005, and it's addressed from the firm of

Page 9

1  Santos & Seeley to John J. Carney with full compliance
2  with that directive. It's here if anybody wants to look
3  at it.
4       THE COURT: I don't usually get involved in
5  this. In this district, the U.S. Attorney's Office takes
6  care of it. They have a checklist and I believe it
7  provides for filing the mortgage deed. Whether that's
8  actually done, I just got the package. I don't get
9  involved in the mechanics, but one concern I have is that
10 if the documents have been signed -- and I haven't
11 reviewed these. It's not my job, I don't think. I rule
12 on issues as they are raised. But one concern I have is
13 it's normally the case when you have documents like these,
14 at least when I used to deal with them, that you have
15 restrictions on the transfer of the property, and if the
16 deed was not recorded and there's been a transfer of the
17 property, then I have a concern about priority of the
18 lien.
19      MR. SILBERMANN: Your Honor, if I may?
20      THE COURT: Yes.
21      MR. SILBERMANN: We filed liens, I believe, in
22 Eagle County, Colorado. It took a couple of weeks back
23 and forth with the county clerk out there to get if right
24 with some filing fees and what have you. Turns out, right
25 after our final lien was filed we learned it had been

Page 10

1  transferred prior to that. It's a matter of days or weeks
2  of our filing of the lien vis-a-vis the transfer.
3      THE COURT: So your lien was filed after the
4  transfer?
5      MR. SILBERMANN: Post transfer apparently.
6      THE COURT: That's a problem.
7      MR. SILBERMANN: Yes, sir.
8      If that's an extra copy, if we could have that?
9      MR. PUCCIO: Sure. I could make it available
10  for them to look at.
11      THE COURT: We'll get to that later. We'll get
12  to that later.
13      So that's a problem from my perspective. And I
14  asked Mr. Maxwell -- and this is going to cause me to
15  decide we have to do things differently -- whether -- I
16  believe the amendment to the order setting conditions of
17  release provided that without the prior permission of the
18  Probation Office there would be no transfer in any month
19  of assets in excess of a total of $45,000.
20      Mr. Maxwell is confident that he got a report
21  after the transfer was made, but he cannot recall or find
22  any records as to the prior permission.
23      Do you have anything that would help us pin that
24  point down?
25      MR. PUCCIO: We can look for that, Judge.

Page 11

1      THE COURT: Okay. I'll accept that you have
2  that. I just wanted to clarify that.
3      I think it points out to me a flaw in how this
4  is structured because I really shouldn't have left it as
5  "without the prior permission of the Probation Office."
6  It should have been "without my prior permission," because
7  I would not have permitted the transfer because that
8  property was collateral for the bond.
9      MR. PUCCIO: It still is. It's full collateral
10  for the bond.
11      THE COURT: I would not have permitted it. I
12  don't care what your opinion is.
13      MR. PUCCIO: I understand, Judge.
14      THE COURT: I don't take your opinion on
15  commercial law matters.
16      MR. PUCCIO: I'm not an expert on commercial
17  law.
18      THE COURT: I know.
19      MR. PUCCIO: I know a little bit about real
20  estate.
21      THE COURT: I do, too.
22      MR. PUCCIO: There is a lien on the property.
23      THE COURT: I would not count that twice.
24  That's what that constitutes. It's being counted as
25  collateral for the bond and it's also being used to pay

Page 12

1  the restitution. That wasn't the way I envisioned things
2  working.
3      MR. PUCCIO: Your Honor, I did not give any
4  thought to that.
5      If I were the U.S. Attorney and someone asked me
6  to approve or disapprove it, which is the procedure
7  apparently used, to me it's a no-brainer. If the property
8  is still there and you have the first lien -- it's just
9  like the house in Connecticut. He doesn't own that house
10  either and they have a lien against it.
11      It strikes me as maybe a distinction without a
12  difference, but I'm not quarreling with Your Honor, but
13  the procedure we followed --
14      THE COURT: I think what I'm pointing out is
15  that this points out to me the need for me to be the
16  person who makes the decision as to permission as opposed
17  to leaving it to the Probation Office.
18      MR. PUCCIO: Or the U.S. Attorney.
19      THE COURT: And I make that decision with input
20  and notice to, and input from the government and the
21  victim, i.e., Cendant, the beneficiary of the restitution
22  order, because I think had that been in place, we would
23  not be in a situation where the government's lien was
24  filed subsequent to the transfer.
25      I probably would have asked some questions. And

Page 13

1  I would have asked counsel for the government and the
2  victim to also tell me if they had any questions that
3  should have been asked at that time.
4      MR. PUCCIO: Judge, I wasn't aware of that, but
5  I do know that when we discussed this package, it had to
6  be months before this transaction took place.
7      THE COURT: When we discussed what package?
8      MR. PUCCIO: When the package was discussed, the
9  bond package was discussed with me. I got a note from the
10  court on the bond package and I discussed it with
11  Ms. Seeley and she prepared the package and sent it. It
12  was in May. This transaction did not take place until
13  many months later.
14      THE COURT: I understand it was September.
15      MR. PUCCIO: I would assume that sometime in
16  May, May 5, sometime in May, if not a few days thereafter,
17  all of this would have been liened.
18      THE COURT: Recorded.
19      MR. PUCCIO: Recorded. I didn't do a title
20  search, but --
21      THE COURT: I'm just saying it points out to me
22  a structural flaw from my perspective and I'm going to
23  make adjustments based on that, because I think that with
24  a little more discussion up front, there will be more
25  clarity as to exactly what's going on and the things that

Page 14

1  I think need to be covered will be covered properly.
2      MR. PUCCIO: Judge, just to complete --
3      THE COURT: I want to finish what I'm doing.
4      When I step back and look at this big picture,
5  what I think ought to happen is we ought to have the
6  status quo maintained during the appeal in terms of
7  Mr. Shelton's assets. I don't think things ought to be
8  taken away from him and I don't think he ought to be
9  transferring things away unless it's with the knowledge of
10  everyone and their ability to give me input and my
11  approval.
12      The fact of the matter is that his financial
13  situation is sufficiently complicated that the Probation
14  Office cannot police it. I'm not going to police it. I
15  think Cendant and the government need complete information
16  so that they can be in a position to raise any concerns
17  that they might have, to be resolved by me, as to whether
18  the defendant's assets are being dissipated or put beyond
19  the reach of efforts to collect on the restitution order.
20      I also will say that -- I mean I saw a couple of
21  things that were sort of, in my mind, conflicting in the
22  defendant's papers in terms of the -- I think at one point
23  there was a reference to a request for tolling agreement
24  as to the statute of limitations for claims as to
25  fraudulent conveyances and then a response that said, no,

Page 15

1  you can go ahead and exercise your rights.
2      It seems to me that the victim here and the
3  government, which is authorized, and maybe I should be
4  saying required, to act in terms of collecting
5  restitution, ought not to be taking any risk that the statute
6  of limitation runs, and things must be structured to take
7  care of that.
8      When I say there should be no taking of assets
9  from the defendant, I am carving out one area because I
10  think what I'm hearing from both sides, indirectly at
11  least, at least from their perspective, the defendant's
12  financial situation is not what at least I thought it was
13  on the date I imposed the restitution order.
14      There is a provision for modifications and I
15  think to the extent that it becomes apparent that
16  additional assets can be placed in escrow, that that would
17  be appropriate, to me, because that would safeguard the
18  ability to pay restitution. Particularly so in a case
19  where it seems to me that there's absolutely no way that
20  the full amount of restitution will ever be paid.
21      I guess I want to be clear on exactly what
22  transfers have been made since the date of the posting --
23  the entering of my order as to conditions of release,
24  because that's when I first started placing restrictions
25  on that, and I think to me it seems appropriate that I let

Page 16

1  the government and Cendant do the work on making sure that
2  I have a correct analysis on that. I think you all
3  understand the implications of that in terms of the
4  release of financial information.
5      So here I'm not really dealing with the motion
6  for an order in aid of execution. I'm really dealing with
7  how I structure a situation where I maintain the status
8  quo, and that would be really proceeding under Rule 38(e)
9  as opposed to the other statutes that you all have
10  mentioned. And to the extent we need to get to those
11  other statutes, I think we can.
12      The other things that struck me as I was reading
13  the papers are that I have taken steps so that Mr. Shelton
14  can be employed. That is a significant economic
15  circumstance that needs to be considered. We do have some
16  trusts and we have a monthly budget. I think -- I
17  apologize because I -- well, there's a lot going on, but I
18  was under the impression that the government and parties
19  knew about the amounts that were going into the monthly
20  budget.
21      MR. SCHECHTER: What we understood was when you
22  entered an order in March of 2005 requiring Mr. Shelton to
23  get prior approval from the Probation Office to transfer
24  assets in excess of $45,000. We did not understand, at
25  least I did not understand that that meant that he had a

Page 17

1  budget to spend 45,000.
2      The reason I say that, Your Honor, is because
3  the Presentence Report prior to the time Mr. Shelton was
4  convicted showed that he monthly living expenses of
5  $32,000. So it would not be clear to the government that
6  after he was convicted he would now be allowed to spend,
7  in essence, more money than had he spent prior to that.
8      We read that $45,000 to mean he could transfer
9  $45,000 without notification to Probation, and if he
10  wanted to transfer more than 45, he needed approval. Then
11  we believed that at the end of month Mr. Shelton would
12  report to Probation and give them a monthly summary of how
13  he spent his money. We had asked to see that monthly
14  summary back in January, Your Honor, and at that time Your
15  Honor denied the request.
16      And I take it in light of what I'm hearing, Your
17  Honor is more inclined now to give the government and
18  Cendant access to the financial filings and I think that
19  would help us understand, because we really have no idea
20  how much money he spent because Probation gave him
21  approval beyond 45 -- I'm not suggesting for a moment that
22  Probation did anything wrong -- we didn't get notice of
23  that and we've been operating in the blind, Your Honor.
24      THE COURT: That's very helpful. Thank you,
25  Mr. Schechter.

Page 18

1    I think that the question of the monthly budget
2  is something that the government and Cendant ought to have
3  input on. And in looking at the budget and reading the
4  papers and focusing on the fact that we have these trusts,
5  as to which I have a general impression but not specific
6  detailed knowledge, it occurred to me that one important
7  question is whether there are expenses that are being paid
8  out of the allotment for the monthly budget that really
9  can and should be paid out of the trusts.
10    And then there are some items, looking at the
11  one report that I looked at, that I thought were just -- I
12  had no idea what they were and I think it's appropriate
13  that there be a thoughtful consideration of what an
14  appropriate budget is.
15    And I note that we did have budgets that were
16  put in place for Ms. Pember and Mr. Corigliano. It seemed
17  that everyone thought the budget for Mr. Corigliano was
18  quite generous, and to me, that seems to be an appropriate
19  place for me to at least start thinking in terms of
20  whether Mr. Shelton needs a higher or lower budget than
21  that and what is the justification for it.
22    And then to the extent that there is additional
23  income, I think I made it clear that the reason I was
24  approaching this question in a conference that we had that
25  was under seal in the way I was approaching it was because

Page 19

1  I saw the opportunity for Mr. Shelton to earn additional
2  income as something that inured to the benefit of the
3  beneficiary of the restitution order. And consistent with
4  that, I think that it is not uncommon for that additional
5  asset in the form of income to be looked at as a source
6  for satisfying the restitution order.
7    Coming back to my initial point, all of that
8  said, I think it's appropriate that to the extent that
9  additional funds are ordered to be paid so that we are
10  maintaining the status quo, they be paid into some sort of
11  an escrow account.
12    So that's where I am in my thinking and I
13  suspect Mr. Shelton's counsel probably has a few things
14  they'd like to say, so let me hear you.
15    MR. PUCCIO: First thing I like to say, I don't
16  recall saying Mr. Corigliano's budget was generous. Maybe
17  Mr. Sullivan --
18    THE COURT: You were much more flamboyant in
19  your language. I understated it, along with the, was the
20  phrase, "the estate on the Connecticut River"?
21    MR. PUCCIO: Well, that's not the budget, Judge.
22    THE COURT: No, no.
23    MR. PUCCIO: I would just like to address a
24  couple of things. I appreciate your inviting me up here.
25  I didn't expect to be here until the retrial, but I'm

Page 20

1  here.
2    THE COURT: I was missing you.
3    MR. PUCCIO: Same here, Judge.
4    Let me just say, and I think you may have passed
5  this and I don't know that I should revisit it, but with
6  respect to the compliance issue, just so the record is
7  clear, Your Honor, I do not doubt Your Honor has the
8  authority to call a lump sum we'll call quote/unquote
9  payment; an advance payment.
10    Normally what's done is Your Honor I guess would
11  recognize that there's a payment schedule that usually
12  takes effect after someone is released from custody. But
13  in this case I don't quarrel with Your Honor's approach as
14  being appropriate to order a lump sum payment.
15    You did ask us, as the record indicates, to take
16  special note of that -- you reminded me of that paragraph,
17  the recommendation of Mr. Maxwell was for 15 million, and
18  I think preliminary to Your Honor ordering it, you asked
19  me to make sure that it was something I didn't have
20  something to say about. So what we did do was confer with
21  Mr. Maxwell and confer with my client.
22    The insurance policies were something that -- I
23  think the conference included the government, I'm sure it
24  did -- were something that, at least my recollection were
25  included in the components of that payment.

Page 21

1    However, in the Presentence -- as a result of
2  the Presentence Investigation, and our responses to the
3  report, at page 38 of our objections, which are next to
4  the report, top of the page, we deal with the life
5  insurance issue and we do flag it. We say, "Life
6  insurance: Should be noted that Cendant claims ownership
7  of a life insurance. Mr. Shelton is willing to sign over
8  the policies if Cendant is the rightful owner."
9    No one was hiding the ball here. We did flag
10  for the Court the fact there was some issue as to
11  ownership.
12    We happen to believe and I looked at the
13  documents --
14    THE COURT: You may have flagged it, but you'll
15  recall how many pages of documents I got to read in
16  connection with the sentencing.
17    MR. PUCCIO: Judge, the fact that you may have
18  missed this is not something I'm being critical of.
19    THE COURT: I think if you're going to tell me
20  that it's 3.3 insurance policies and that there's an
21  issue, I would have expected to be reminded of it.
22    MR. PUCCIO: At the time, Judge, to be brutally
23  frank, I'm not sure that I knew that myself.
24    THE COURT: I believe you.
25    MR. PUCCIO: The fact of the matter is, I think

Page 22

1  the better view is that there is 3.3 million. It's part
2  of some litigation somewhere, someplace, maybe New Jersey,
3  that I'm not handling.
4      Mr. Shelton was very forthright in his
5  description. He valued these as zero when he was putting
6  in his net worth statement with the Probation Office.
7      Be that as it may, I just want to tell the Court
8  I believe we acted in good faith.
9      Second thing, with respect to the stock, again,
10  I don't know that I gave it much thought. I did find out
11  and I was very surprised to learn that the Clerk's Office
12  does not have a custody account, because of course you can
13  wire securities into a custody account. It's done all the
14  time. One would think in a district as busy as this one
15  that there would be many situations where securities have
16  to be wired into the court's custody account at a bank and
17  held in that form, but apparently, I'm told by Ms. Seeley,
18  that is not the case. You must post cash.
19      I was not here the day that this was done, but
20  my understanding of what occurred is that this was -- the
21  Clerk of the Court did examine the posting. I'm informed
22  it was discussed with the Court and it took place.
23      Now, again, if someone had said on that day,
24  well, this is not acceptable, then I'm sure I would have
25  been alerted and we would have discussed some other way of

Page 23

1  doing this, perhaps.
2      One of the ways I would suggest you don't
3  approach this, particularly if I were creditor's counsel,
4  is to cause the liquidation of the stock and to pay assets
5  of Mr. Shelton to the U.S. government, which means it's
6  not going to the creditor. So I don't know that I would
7  have handled this by selling the stock.
8      At this point we are where we are. I would ask
9  the Court to consider, in your overall decision-making
10  here, the fact that we acted, Mr. Shelton particularly,
11  acted in good faith and has tried to comply with all the
12  directives of the Court. If we have not complied, you
13  feel there hasn't been compliance, I ask that we be
14  excused for our noncompliance and then so modify the lump
15  sum payment.
16      In any event, that's the big picture.
17      I don't know how much more -- there are a number
18  of inaccuracies in some of the papers. I don't know if
19  they are particularly relevant at this point because some
20  of the inaccuracies can perhaps be the result of exuberant
21  lawyers acting on very little information making
22  assertions that they don't have the facts to back up. For
23  instance, when this trust was created, that's all wrong.
24  It wasn't created a certain amount of days after a meeting
25  with the U.S. Attorney's office. There's documents that

Page 24

1  they can look at that show when it was created.
2      There are a lot of inaccuracies and I don't want
3  to waste your time with that.
4      THE COURT: That's why I really started off with
5  the big picture and where I want to go. I don't want to
6  get mired in that.
7      MR. PUCCIO: Having said that, I don't really
8  know where Your Honor wants to make information available
9  to the creditors, or the creditor in this case and the
10  government, to help fashion some approach to keep the
11  status quo.
12      I would ask the Court to be mindful of the fact
13  that Mr. Shelton does have living expenses and Your Honor
14  is going to take that in consideration in fixing some
15  amount.
16      He does have -- Judge, I was tempted to send a
17  bus down to New York and bring up eight more lawyers so
18  that we have the same number of lawyers as the other side.
19  As you can imagine, there's a tremendous amount of legal
20  expense associated with getting into this. I don't know
21  if I was a creditor I would be so aggressive in a lot of
22  this wheel spinning has cost a lot of money on both sides.
23      THE COURT: Doesn't seem to be you're that badly
24  outnumbered in terms of lawyers.
25      MR. PUCCIO: I take that as a compliment, Judge.

Page 25

1      THE COURT: I'm just looking at the numbers.
2      MR. PUCCIO: In any event, so I would ask you to
3  take that into consideration.
4      Cendant, in its infinite wisdom, decided at some
5  point during the trial to stop paying my fee, but no one
6  was going to run out of here and go to Delaware to try to
7  sue them to get them to reinstate that. I guess after the
8  verdict they have more of a basis to say we don't want to
9  pay for legal fees. If I understand Delaware corporation
10  law, they of course could agree to it but, they of course
11  chose not to.
12      That's a serious consideration considering, I
13  think Mr. Maxwell has an understanding of what the current
14  state of the finances are. And if one were to take into
15  consideration living expenses and legal fees and the
16  amount of time that it's going to take, I suspect, to get
17  to a resolution of this matter, at least in the Second
18  Circuit, there isn't a heck of a lot of money to go
19  around.
20      To summarize, with respect to insurance policies
21  and the stock, I would ask Your Honor to amend your order
22  to accommodate the lack of compliance.
23      We did discuss last evening a possible approach.
24  It would require spending some money. We could purchase a
25  security for $135,000. That would cover us on any drop in

7 (Pages 22 to 25)

1  the Cendant stock. The stock apparently has collapsed
2  somewhat from where it was. We could make that
3  acquisition of that so we would at any point in time put
4  the stock to the holder of that option and get for it what
5  its worth today. But again, that involves an expenditure
6  of money.
7        There are devices and we could obviously discuss
8  this; to the extent that one could discuss this with
9  Cendant, we would be happy to discuss it with Cendant to
10 see if that makes sense to protect us against any further
11 erosion. Of course, the stock could go up and that's
12 another possibility. So that's something that might be
13 considered.
14       Obviously, we'll do whatever we can to work with
15 the Court and Probation and Cendant and the government in
16 trying to keep the status quo.
17       THE COURT: I will say, though, that I'm not
18 going to be placing the burden on Mr. Maxwell to
19 understand and monitor finances of the defendant.
20       MR. PUCCIO: Well --
21       THE COURT: As good as he is, he's got other
22 stuff and it's too time intensive.
23       MR. PUCCIO: We will try to do that and not
24 involve Mr. Maxwell.
25       THE COURT: He'll be kept informed, but I'm

1  going to approach this in a way that I think is most
2  appropriate for this kind of case, which is fairly unique.
3        MR. PUCCIO: And to the extent that we can't
4  agree, Your Honor, obviously we would like to have access
5  to the Court, because I have a feeling, just by the
6  dynamic of this, it's not going to be too easy to reach
7  agreement with Cendant Corporation. They have a very hard
8  view of this case, perhaps fueled by the chief executive
9  of the company feels that he was terribly wronged here,
10 and spending, in my judgment, far beyond legal resources
11 what's necessary and what's sensible. But that's the
12 judgment of the Cendant Corporation. I just want to have
13 access to the Court to resolve these disputes because I'm
14 not terribly optimistic that we are going to be able to
15 reach much accord.
16       THE COURT: I expect to be making decisions
17 after parties have full information and an opportunity to
18 try at least to narrow the areas of disagreement.
19       I should let counsel for the other two also have
20 a few words to state whatever they want to state.
21       MR. KADET: Thank you, Your Honor. Sam Kadet
22 from Skadden Arps firm.
23       Despite what Mr. Puccio's view may be on how
24 Cendant should take a view on this matter, we have
25 carefully considered our position. We think it's

1  critically important that Mr. Shelton comply with
2  Your Honor's restitution order and his failure to do so
3  should in no circumstance be excused.
4        Now, what he's done in terms of the insurance
5  policy, I heard counsel get up and reference a Presentence
6  Report, that we have not had access to, in which
7  apparently there was a reference that the title of the
8  policy is in dispute and it has been for some time. If
9  Cendant is right that Mr. Shelton has no interest in the
10 policy anymore, the $3.5 million doesn't exist. It's a
11 total zero that he's put in.
12       Even if he's right, one thing I didn't hear
13 counsel say is there's no dispute, indeed it's in one of
14 the briefs that Mr. Shelton filed in this application,
15 that Cendant has a right to receive back from the proceeds
16 the premiums it advanced. That's not even in dispute.
17 There's no mention about it. So the $3.5 million that
18 Mr. Shelton's counsel ascribes to that insurance, at a
19 rock bottom minimum, has to be reduced by the amount of
20 the premiums advanced by Cendant less whatever loans have
21 been taken against the policy, because we did stop
22 advancing premiums a long time ago.
23       What I did, Judge, in an effort to give
24 Your Honor more current information, I did have a
25 declaration of someone from the company prepare that

1  brings the insurance data up to date through the end of
2  the year. The data we put in our motion was as of
3  June 30, 2005. I've given this to counsel. With
4  Your Honor's permission, I would offer the Court this.
5        May I approach?
6        THE COURT: I'm not going to be making any
7  decisions today. Are you going to file it with the
8  Clerk's Office?
9        MR. KADET: We will. We understand at some
10 point Your Honor will make a decision and I thought it
11 would be Your Honor would desire as much current
12 information in terms of Mr. Shelton's interest in the
13 policy, which as you'll see in this declaration has to be
14 reduced as of year-end by $920,000. So the 3.5 million
15 value put on the policy for purposes of compliance with
16 the restitution order on the insurance is $920,000 short
17 as of December 31, 2005.
18       We would urge Your Honor, frankly, we don't
19 think these insurance policies belong in this escrow
20 account at all toward satisfaction because we think
21 Mr. Shelton has no interest in them whatsoever. We would,
22 as I point out, there are two grounds for that. I'm not
23 going to reargue the point. One is we think he's breached
24 the covenants and there's a reference, some reference to
25 that in the briefing back and forth.

1    THE COURT: Can I just save you a little bit of
2 time –
3    MR. KADET: Sure.
4    THE COURT: -- and tell you that had I
5 understood there was a dispute, forget whose right, had I
6 understood there was a dispute, I would not accept the
7 insurance policies as a component. And there is a
8 dispute.
9    MR. KADET: We would urge Your Honor not to do
10 that now. These are not clean assignments. Your Honor
11 used the word "clean assignments."
12    THE COURT: I don't intend to accept the
13 insurance policies, and the question will be whether I
14 will modify the order the way that the defendant is asking
15 me to, or I will look at the defendant's other assets and
16 decide that the amount has to be made up some other way.
17    MR. KADET: We certainly believe that the latter
18 approach is more desirable from Cendant's perspective
19 because those policies are ours, that's our money.
20    Second point, Judge, briefly, on the stock.
21    I wasn't here. I read the transcript. I find
22 it amazing that someone can stand up and say wire transfer
23 includes securities and not cash. I think it clearly
24 meant cash.
25    The stock has not performed as well as we like,

1 but the effect of it is that the stock is worth nearly
2 $400,000 less than the value Mr. Shelton ascribed to it
3 last October. It closed yesterday at $15 and I believe 37
4 cents. So it's $4.03 per share under the $19.40 value per
5 share that was ascribed to it when it went into the court
6 registry. That's nearly $400,000. We don't think the
7 stock is proper at all. We think that should be replaced
8 by hard cold cash to insure strict compliance with
9 Your Honor's $15 million requirement.
10    Now, there was also a reference to tax and I
11 heard Mr. Puccio get up and talk about some fancy put/call
12 arrangement. We are not interested in that. The tax
13 issue we don't quite understand -- I'm not a tax lawyer --
14 why Mr. Shelton's allowed to take securities and use them to
15 apparently have unrealized gain in them and use them to
16 discharge an obligation Your Honor has placed on him and
17 yet avoid all tax. This is not a charitable endeavor;
18 taking stock that was stepped up unrealized gain and give
19 it to a charity, take a donation for the full amount and
20 there's no tax due on the unrealized gain. This is not
21 charity. I don't know that he can right the premise of
22 the whole tax position. It may or may not be right, but I
23 think there's at least a question there.
24    We're not happy about the stock. We would like
25 cold cash. We think that's what the Court contemplated

1 and we think he should be ordered to do that.
2    I would like to say a word about the Vail
3 transfer, if I may, Your Honor. We're very disturbed
4 about that. We certainly agree with the Court's
5 observation that there's double-counting going on, and
6 frankly, it's at our expense because what happened here
7 when you cut through all this, Mr. Shelton had a
8 50 percent interest in a condominium in Vail, Colorado.
9 He no longer has that. Now it's owned by his wife and
10 some trust, as I understand it.
11    So at the end of the day, his 50 percent
12 interest is not available for restitution even if it still
13 secures the terms under which he's released on bail. So
14 we agree with the double-counting.
15    What's missing here, Judge, and the question I
16 rose a minute ago to raise, if you look at the deed, it
17 says that he and his wife transferred the entire Vail
18 condominium for $700,000. That's what it says.
19 Mr. Puccio stood up and said he needed that cash to
20 include in the cash he actually did deposit with the
21 court.
22    We understand -- I'm not making a representation
23 of fact, but we'll try and get at this with the mechanism
24 Your Honor gave us -- I understand Your Honor is
25 considering giving us -- that this condominium in Vail was

1 purchased 10 years for $700,000. We do believe real
2 estate values in Vail have appreciated significantly over
3 that period of time. We've heard nothing about an
4 appraisal. What is this property really worth? If it's
5 worth $2 million, purely hypothetical, and Mr. Shelton's
6 half-interest is a million dollars and it's been, in
7 effect, transferred to his family for $350,000, guess who
8 loses out on the $650,000 difference in my hypothetical?
9 My client.
10    We have some very severe problems with the whole
11 circumstances under which this condominium transaction
12 took place immediately after Your Honor imposed the
13 sentence in this matter.
14    We would like to be heard, moving to another
15 topic, on the monthly living allowance. We think $45,000
16 is just beyond the pale from the victim's perspective.
17 That's a king's life-style that's simply not warranted
18 here. We certainly understand Your Honor would start with
19 the allowance given to Mr. Corigliano, but we would like
20 to have input on that as this matter goes forward. That
21 may be substantially more than appropriate under the
22 circumstances.
23    Lastly, Judge, we would like, if Your Honor
24 contemplates going forward that additional assets can be
25 secured and placed in escrow pending appeal, we are

Page 34

1  amenable to that.  We don't want the situation in any way,
2  shape or form the status quo as it exists today
3  necessarily to be preserved.  We subscribe to what I think
4  understood Your Honor to be saying that additional assets
5  can be placed in escrow and made available later for
6  restitution.
7       Thank you, Judge.
8       THE COURT:  Counsel for the government?
9       MR. SCHECHTER:  If I can, just briefly, Your
10  Honor.  Richard Schechter.
11       Just so the record is clear, Mr. Puccio, at the
12  time he surrendered or he spoke of the insurance policies,
13  the Presentence Report has a value for the insurance
14  policies and that value is $3.3 million.  And Your Honor
15  was rather prescient, whether you realized it or not, when
16  you specifically asked:  If there's a diminution in value,
17  what will happen?  And Mr. Puccio said, we'll just add it
18  on the second payment.
19       The whole point of my speaking, Your Honor, is
20  to make certain that at the end, there's no benefit to
21  Mr. Shelton for having not complied with the restitution
22  order and having not complied with the Probation
23  Department.
24       If I can just direct Your Honor to the
25  Presentence Report at page 36, Your Honor will have the

Page 35

1  benefit of this in the transcript.  Mr. Shelton's total
2  assets are listed in the Presentence Report at
3  $25 million, and that includes assets of his dependents as
4  well as assets of his wife.  But it was from that figure,
5  Your Honor, that the $15 million was derived from.
6       The burden is on a defendant to prove to the
7  court that he doesn't have the money.  It's not the burden
8  on the victim or the government to prove that he does.
9  When Mr. Puccio suggests that he would like a new order
10  from Your Honor that let's him out from under the
11  insurance 3.3 million, it's their burden to demonstrate to
12  this Court that Mr. Shelton, who had $25 million in assets
13  at the time of the sentencing, now no longer has any money
14  whatsoever to repay the insurance diminution, if you will,
15  and what I gather from Your Honor, the stock as well.
16       And for having not complied with Probation's
17  order, for having transferred property that was subject to
18  this Court's bail order, at the end, Your Honor, all we're
19  asking, I just want to put on the record now so there is
20  no suggestion later that we didn't object now, that he is
21  no profit from having not complied with Probation and the
22  Court's order.
23       Your Honor, we would reserve our right when we
24  do obtain all the financial information to seek to revoke
25  Mr. Shelton's bail.  I want to reserve that right so

Page 36

1  there's no suggestion that by coming today we've given up
2  that opportunity.  We'll look at the financial
3  information, Your Honor, and if warranted, as Your Honor
4  said, we should come back to Your Honor and we reserve
5  that right to revoke the bail, Your Honor, in light of the
6  circumstances.
7       THE COURT:  Move to revoke the bail.
8       MR. SCHECHTER:  Move to revoke the bail.
9       THE COURT:  Just so we're clear.
10       MR. SCHECHTER:  We still understand that Your
11  Honor would have to rule on that.  I haven't forgotten
12  that part of the law.
13       MR. PUCCIO:  May I respond briefly to a couple
14  points?  I do have a couple of points that I want to make.
15       First of all, the point that was made about the
16  diminution in value of the policies that I addressed at
17  the time of the hearing on this, I'm not sure where that
18  goes, putting the dispute aside.  There was no diminution.
19  There was actually an enhancement of the cash surrender
20  value, sort of the opposite of what happened in the stock
21  situation.
22       So all I was saying then, and I was operating
23  under the assumption that it was a certain amount of
24  millions of dollars at that point.  The question I think
25  Your Honor raised was that going to be the amount at the

Page 37

1  time.
2       THE COURT:  Well, my concern was whether the
3  premiums were paid out of the cash value.
4       MR. PUCCIO:  Right, right.  I think I said at
5  that point, well, if there was any difference, we'll make
6  it up at the time.  Actually, what happened is the amount
7  became greater.
8       With respect to the stock again, I really don't
9  think -- I can understand where the other side is coming
10  from -- that Mr. Shelton should be pilloried over this
11  because again, if this was raised at the time, in my
12  experience, the clerk's normally take collateral --
13       THE COURT:  The clerk did come up and tell me
14  the stock came in, and I was surprised.  And I said, well,
15  I'll wait for the government to file something.  It's been
16  filed.
17       MR. PUCCIO:  All right.
18       THE COURT:  You don't know that because I said
19  that --
20       MR. PUCCIO:  I wasn't here and --
21       THE COURT:  -- I'll wait for the government to
22  file.
23       MR. PUCCIO:  We tried to comply with the order,
24  and everything that Mr. Shelton has been asked to do he's
25  done in terms of getting permission.

Page 38

1    Perhaps I was too kind to Mr. Kadet to let him
2  off the hook on all the mistakes in his papers by
3  suggesting, well, he made the mistakes because he doesn't
4  have the information. He gets up and says no appraisals.
5  Sometimes it's better to keep your mouth shut. We have an
6  appraisal.
7    THE COURT: Mr. Puccio, Mr. Puccio, Mr. Puccio,
8  I think you've been here long enough in Connecticut to
9  know that we don't do that here.
10    MR. PUCCIO: All right. In any event, sometimes
11  I can't resist, Your Honor. I spend some of my time in
12  places other than Connecticut.
13    THE COURT: I'm going to help you.
14    MR. SILBERMANN: Your Honor?
15    THE COURT: Yes, Mr. Silbermann.
16    MR. SILBERMANN: Good morning, Your Honor. I'm
17  new to this proceeding. I'm with the U.S. Attorney's
18  office in New Jersey. I'm in the civil division and I do
19  almost 100 percent of my work collecting restitution
20  orders. This is what my office does. My office in fact
21  has been charged with the responsibility for collecting
22  this restitution order pursuant to the terms thereof and
23  any stays that may be in place. So Your Honor, we have a
24  very keen interest in seeing how the Court rules on these
25  issues.

Page 39

1    To that extent, Your Honor, I would like to
2  mention to the Court the concerns that we have, that I
3  have.
4    THE COURT: Sure.
5    MR. SILBERMANN: I've spoken with Mr. Maxwell on
6  several occasions and he has done a fabulous job in trying
7  to get his arms around this very complex estate that
8  Mr. Shelton has.
9    I believe that Mr. Shelton has made it more
10  complex than would otherwise be because of his
11  lingering -- back then, his then lingering criminal
12  problems. And the Court noted the transfer of the Vail
13  condo just this past fall. That certainly was of concern
14  to us.
15    However, Your Honor, the bigger concern, a much
16  bigger concern, and I hope the Court is aware of this,
17  that the transfer that created the children's trust back
18  in 1999, Your Honor, that is a tremendous asset that was
19  created and funded, I believe, and I'm sure the evidence
20  will bear out at the end of the day, with the full intent
21  to evade his creditors; namely, Cendant Corporation.
22    That statute of limitation, it's eerie, the
23  timing of some of these things. I don't think that
24  Mr. Shelton, he may or may not have been advised on some
25  of the timing of statutes of limitations, but it's eerie

Page 40

1  some of the timing.
2    He made a disclosure to the Probation Office on
3  January 13th of '05. The trust was funded and founded
4  January 15th of 1999, almost exactly six years to the day,
5  Your Honor. That is the statute of limitations under the
6  federal statute. I'm not sure -- I think that Connecticut
7  has adopted Uniform Fraudulent Transfers Act, which would
8  also provide, I hope, for a six-year period.
9    But more importantly is the two-year discovery
10  limitations period. So that you have two years from when
11  you learned or should have learned of the transfer. That
12  period was triggered, I think arguably, might have been
13  triggered by Mr. Shelton's disclosure to Probation about a
14  year ago, now less than a year ago, Your Honor. Eleven
15  months ago.
16    So what we have now is roughly an 11-month clock
17  to get a fraudulent transfer action filed. I foresee,
18  I've looked over all this and I think I have a good lay of
19  the land based on what's been filed, I see that as the
20  biggest collection effort that will be done in this case.
21  It will be that trust, the children's trust.
22    As Your Honor knows from the brief that was
23  filed December 16th by Mr. Shelton, it lays out a string
24  of 11 steps that Mr. Shelton engaged in to help fund this
25  lump sum payment. It's kind of convoluted, but it begs

Page 41

1  several questions, and frankly, what it does to me is it
2  raises many red flags where this trust may not be on such
3  stable ground.
4    Your Honor, we put in our brief and you may have
5  seen yourself that at paragraph numbered 8 on page 4 of
6  this brief, docket entry 2030 --
7    THE COURT: You're talking about Mr. Shelton's
8  brief?
9    MR. SILBERMANN: It's one of the reply
10  memoranda, Your Honor, in the motions that are pending
11  here today. Defendant's reply memorandum to government's
12  opposition to the defendant's motion to travel.
13    THE COURT: I have that.
14    MR. SILBERMANN: In that pleading, Your Honor,
15  Mr. Shelton lays out the string of events leading up to
16  the down payment. He talks about how there were these
17  loans from the Ceniarth Corporation, which we're not quite
18  sure who Ceniarth is, Ceniarth Wales. It's shrouded in
19  mystery, Your Honor, and I'm sure intentionally so.
20    These are the kinds of issues that we need to
21  get discovery on. I would like the Court to know that in
22  pursuing our obligation to enforce this order, what we
23  really have to be doing -- and I think the Court is
24  leaning this way and I hope it is -- is allowing discovery
25  in aid of execution.

1    What we would do immediately, Your Honor, is we
2  would issue subpoenas to third parties; namely in this
3  case, SCIP Management Company, Ceniarth Wales,
4  Merrill Lynch, Smith Barney, all the parties that took
5  place in the funding of this trust, transfers to and from
6  this trust, liquidation of assets within this trust, et
7  cetera, et cetera, Your Honor.
8    We really do have a lot of work ahead of us on
9  this and we've only got 11 months to file. At a minimum
10  we would ask that the Court allow us to engage in this
11  kind of discovery, and I would suggest that prior to us
12  filing that complaint, which I foresee happening, we then
13  report back to the Court and move to lift whatever stay
14  may be in place to allow the filing of that action.
15    THE COURT: Given the fact that there's going to
16  be no agreement as to the tolling, it's my intention to
17  allow the parties to do what they need to do to protect
18  their rights.
19    MR. SILBERMANN: Yes, Your Honor. I can't agree
20  more strongly. And even the tolling agreement I think
21  would be the alternative. The tolling will toll the
22  limitations period, but as to you know, documents
23  disappear, memories are clouded. We need to get on this
24  right away.
25    THE COURT: When I said earlier that Cendant

1  should not be taking a risk with respect to tolling, I was
2  really saying something broader than it may have appeared
3  I was saying. To the extent that it would be
4  disadvantaged by having a tolling agreement, I would not
5  require it to be satisfied with a tolling agreement.
6    MR. SILBERMANN: Thank you.
7    There is one other issue that I would like to
8  raise and it is our relationship with Cendant going
9  forward.
10    We talked about this most recently yesterday
11  afternoon and I think Cendant -- and I can't speak for
12  them -- but I think they are comfortable with this
13  arrangement, which is that the United States Attorney's
14  Office, as special counsel appointed in this case, my
15  office would go forward with discovery and preparing any
16  kind of pleadings for a civil fraudulent transfer action,
17  et cetera, et cetera, collection restitution order,
18  working in cooperation and maybe even coplaintiffs, when
19  it comes to civil litigation, with Cendant Corporation
20  under their rights, Cendant's rights under this 3664(m)
21  provision, Your Honor.
22    The main Justice Department component in
23  Washington that handles financial litigation collection
24  has a keen interest in how we go forward with this
25  victim's enforcement under 3664(m). It's new law. We

1  want to be careful to make sure it's done properly and not
2  have victims out on their own, although presumably that's
3  what the statute allows. We would like to work with them
4  as coplaintiffs. And if their standing as coplaintiff is
5  challenged down the road, that's something we could
6  litigate and get some case law on 3664(m), but meanwhile
7  the United States would be a solid plaintiff to hold the
8  action together, with the glue to hold the action
9  together. So we would work with them, Your Honor, and
10  keep the Court apprised at every turn, Your Honor.
11    Thank you.
12    THE COURT: Okay. I guess where we are at this
13  juncture, from my perspective, I believe the way I want to
14  proceed, the government and Cendant need to be given
15  information, and what I want to focus on at this point is
16  what information I should be authorizing them to get and
17  from whom.
18    Do you all need to caucus about that or do you
19  have a list?
20    MR. SILBERMANN: One thing, Your Honor. Just
21  procedurally, it's very important that the Court not order
22  or allow the Probation Office to provide this information
23  to the victim. I think it's important that the Probation
24  Office is standing as an arm of the court be allowed to
25  maintain its integrity. So that the disclosure of this

1  information, while it's important and we want it and we
2  hope that the Court will order it, rather have it come
3  from the defendant to the victim, Probation Office to the
4  United States we would ask. We believe that there's a
5  common interest between the Probation Office and the
6  United States, and that the United States is allowed to
7  have access to it.
8    But vis-a-vis the victim and the Probation
9  Office, we want to be careful of that, Your Honor.
10    THE COURT: If information is disclosed from the
11  Probation Office to the government -- I'm just trying to
12  remember whether we've done that in the past.
13    Can you recall having done that in the past,
14  Mr. Maxwell?
15    MR. MAXWELL: Typically we get the Court's
16  permission to release the financial information to the
17  Financial Litigation Unit of the U.S. Attorney's Office.
18    THE COURT: I was trying to remember a specific
19  case and nothing was coming to mind.
20    MR. PUCCIO: Judge, if I may --
21    THE COURT: One second, please.
22    If I authorize the Probation Office to release
23  information to the government and the government and
24  Cendant are working on a cooperative basis, how do we have
25  in place a barrier?