Page 46

1  MR. SILBERMANN: We would not disclose it, Your
2  Honor. We believe the Probation Office materials
3  generated by Probation or in the possession of the
4  Probation Office are sacrosanct and that their disclosure
5  to the government is as far as it should go. We will not
6  disclose that to the victim.
7      THE COURT: I just wanted to make that clear.
8      MR. SILBERMANN: The source of that information
9  can be and should be obtained elsewhere through third
10 party discovery, and to that extent it should be a very
11 transparent effort that Cendant would have access to all
12 this information, Your Honor, just not from Probation.
13     MR. KADET: We have a motion pending for release
14 of the portion of the Presentence Report that simply lists
15 assets and then provides all the updates. We have no
16 interest in the rest of it.
17     I think, while we certainly are amenable and
18 happy to work cooperatively with the United States
19 Attorney, it is going to make it cumbersome if there's a
20 bunch of things that they learn from Probation and can't
21 share with us with respect to Mr. Shelton's assets.
22 That's our only interest. We tried to write that motion
23 very narrowly. We just want to find out what assets, what
24 they are, what's happened to them. That's it.
25     THE COURT: I think what Mr. Silbermann is

Page 47

1  saying is that you can get that information through
2  another means.
3      MR. KADET: He's suggesting that. All I'm
4  suggesting in response is that that to some degree
5  undermines the cooperative effort that he alluded to that
6  we support. It means we have to go out and ferret out
7  information on our own. I just see it as creating an
8  unnecessary obstacle, but Your Honor will make a ruling on
9  that point.
10     The other thing I wanted to say for purposes of
11 the record, we learned about the trust that was referenced
12 earlier that past summer when we read reference to it in
13 the government's presentencing memo. Obviously, we didn't
14 know what Mr. Shelton may or may not have told Probation
15 six months before that.
16     The first indication we knew of that was in a
17 footnote to the government's sentencing brief filed mid
18 last year.
19     THE COURT: Mr. Puccio, did you have something
20 you wanted to say?
21     MR. PUCCIO: I'm not sure that I would endorse
22 the notion that the Probation Department has some common
23 interest with the government. The Probation Office is an
24 arm of the court.
25     I do remember arguing a case years ago in

Page 48

1  another circuit where the Court as part of its sentence
2  ordered -- I guess I'll have to find the citation --
3  ordered the defendant who had been sentenced to make
4  reports to the U.S. Attorney's Office and financial
5  reports over a period of time, and that was overturned,
6  probably for the reason that reporting to Probation is one
7  thing, but having to give financial information to the
8  government through the Probation Department is something
9  else quite again.
10     I like to be able to look into this.
11     Here we have a situation where, in effect,
12 you're ordering, if this takes place, Mr. Shelton to
13 report to the U.S. government. There may be another way
14 of doing this that will --
15     THE COURT: Can you say last part again?
16     MR. PUCCIO: Yeah. By ordering this, Probation
17 to turn over information to the government, you have
18 Mr. Shelton reporting to the government post-sentence on
19 his financial affairs. I don't think the Probation
20 Department can be used as a vehicle for doing that.
21     THE COURT: What I was thinking was authorizing
22 the government and Cendant to get the information directly
23 from Mr. Shelton.
24     MR. PUCCIO: That's a totally different story.
25     MR. SILBERMANN: Yes, Your Honor. As part of

Page 49

1  the aid of execution, we would also ask that Mr. Shelton
2  be made available to testify. One of the first things we
3  would do in this case is sit him down--
4      THE COURT: I'm not thinking more in terms of
5  aid of execution. I'm thinking in terms of how I get the
6  information I need to put in place the conditions for the
7  stay. That's where I am.
8      In order to intelligently fashion a stay, I need
9  to have input from the government and Cendant and from the
10 defense as to what conditions should I put in place. I
11 can't get the input from the government or Cendant until
12 they get information concerning Mr. Shelton's finances.
13 So what I want to do is figure out how they get that
14 information concerning Mr. Shelton's finances, because the
15 other option is to say, no stay. That's where we are. We
16 have a stay or no stay. If we have a stay, then we have
17 no tolling and there are the disadvantages of tolling.
18 Then I need to have the two parties here in a position to
19 give me informed input as to what they think I ought to
20 put in place as conditions of the stay.
21     MR. PUCCIO: Well, I thought what we were
22 proposing here was Mr. Shelton would give information to
23 them about his current financial situation. Now I'm
24 hearing depositions and motion practices. Then there's no
25 stay. I thought the idea was to have a stay while the

Page 50

1  appeal is pending to avoid all this litigation.
2      THE COURT: I think what I will do is -- I can
3  anticipate, I believe, that we'll have a production of
4  documents that currently exist and there will be
5  questions. And I suspect if there are, then I will
6  authorize that they are entitled to examine Mr. Shelton.
7  Maybe you're able to work out a cooperative relationship
8  where that's not necessary.
9      MR. PUCCIO: Maybe there'll be peace in the
10 Middle East.
11     THE COURT: I don't think so.
12     MR. PUCCIO: We would like a stay. If we're
13 going to have depositions, as I said, I don't know -- I
14 mean, what are we staying? They want full litigation.
15     THE COURT: You're staying the transfer of
16 assets out of Mr. Shelton's estate to Cendant, which I
17 think is a valuable consideration. That's maintaining the
18 status quo.
19     MR. PUCCIO: We're going to try to work this
20 out, if we can.
21     THE COURT: No, no, no. No, no. You're going
22 to meet with a magistrate judge and talk about it, who's
23 going to report to me and keep me fully informed.
24     MR. PUCCIO: All right. Fine. Well, that's
25 what I meant, Judge, when I --

Page 51

1      THE COURT: Thank you.
2      MR. PUCCIO: -- when I said we were going to try
3  to work this out.
4      THE COURT: Actually, I think Judge Smith is
5  somewhat familiar with at least the case, so I'm going to
6  see if he would be willing to meet with you all.
7      I think in the meantime it would be -- it might
8  help sort of smooth things and make for a more effective
9  working relationship if we just started producing things
10 you think the government and Cendant might want. And if
11 you could tell them what you're expecting, that would also
12 be helpful.
13     I think I'd like to get this done quickly, for a
14 number of reasons, one of which you can probably surmise
15 about since I have an April jury selection date in another
16 case that I have been told is going to proceed, at least
17 it's the government's present intention to proceed.
18     So I'd like -- I guess I'd like documents
19 exchanged -- today is Friday -- by Monday. I'm going to
20 ask Judge Smith to be available any time from Tuesday on.
21     MR. PUCCIO: Monday -- I'm perfectly prepared,
22 Judge, to work, but I think it's a federal holiday and
23 everything is closed.
24     THE COURT: But you all aren't.
25     MR. PUCCIO: Well, I would like to be closed on

Page 52

1  Monday.
2      THE COURT: Sorry. I'm going to be here.
3      MR. PUCCIO: The banks are closed.
4      THE COURT: The banks are closed, yes, but let's
5  get the documents exchanged by Monday.
6      Mr. Kadet?
7      MR. KADET: To be clear, what is Your Honor
8  contemplating taking place by Monday, just so I'm clear?
9      THE COURT: Documents being delivered. You tell
10 them what you're expecting and then I'll ask Judge Smith
11 to be available.
12     MR. KADET: If I might ask Your Honor a
13 question. Would it be consistent or inconsistent with
14 Your Honor's ruling with respect to the portion of the
15 Presentence Report that Your Honor feels my client should
16 not apparently have access to, if Mr. Shelton voluntarily
17 send that over to us, the same information.
18     THE COURT: I would assume you would get the
19 information that's in that report but more current.
20     MR. KADET: I'm sorry?
21     THE COURT: Updated.
22     MR. KADET: Yes. Presumably it will be taken
23 right out of the report and just hand it over.
24     THE COURT: Well, he didn't prepare the report,
25 so I don't think he would be taking it out of the report.

Page 53

1      MR. KAELIN: Your Honor, I would request that we
2  take that five-minute break just to talk amongst
3  ourselves. I don't know how fast you're getting to
4  concluding this.
5      THE COURT: If you want to have five minutes and
6  have me be available in case there are questions.
7      MR. KAELIN: I have a couple of issues running
8  through my mind as a collections attorney and I wanted to
9  talk to Attorney Silbermann.
10     THE COURT: Why don't we recess and I'll come
11 back in if you need me, and I can see what I got in terms
12 of a TRO that was filed this morning.
13     We'll recess.
14         (Whereupon, a recess followed)
15
16     THE COURT: Please be seated everyone.
17     Did the parties have anything they wanted to
18 address?
19     MR. PUCCIO: Your Honor, I'd like to put on the
20 record where I think we are, and I think counsel for
21 Cendant and the government also have something to put on
22 the record.
23     Out of our discussions, the following game plan
24 has emerged:
25     We'll put together, directly from us, a package

Page 54

1  of materials which will resemble, if not be identical, to
2  what was given to Probation. In other words,
3  Mr. Shelton's net worth, his financial statement as of the
4  time of the verdict, his financial statement currently,
5  and information regarding all of the dispositions or
6  transfers between that time and today, so one could see
7  how much he was worth at the time of the verdict and how
8  much he's worth now.
9       We'll do that --
10      THE COURT: Actually, let me tell you that I
11 talked to Judge Smith, who is available to do this, but he
12 cannot meet with you until March 3rd at 10:00.
13      MR. PUCCIO: I'm in court on March 3rd someplace
14 else, Judge, but maybe I can work that out. They may not
15 need me.
16      But in any event --
17      THE COURT: What I was saying is that Monday, we
18 can be flexible in terms of Monday.
19      MR. PUCCIO: They begged off. Everybody is out
20 at the beach on Monday or something. Nobody is available
21 Monday so they're happy.
22      THE COURT: By when?
23      MR. PUCCIO: How about Wednesday because FedEx
24 doesn't work Monday.
25      MR. SILBERMANN: Tuesday, Your Honor.

Page 55

1       MR. PUCCIO: I'll drive over, Judge, to New
2  Jersey. I have nothing to do anyway.
3       The second part of it --
4       THE COURT: I think either I or Mr. Maxwell
5  should get a copy of what's exchanged.
6       MR. PUCCIO: Okay. Who would you like the copy
7  to go to? Or both?
8       MR. SILBERMANN: Your Honor, if it's to insure
9  that it most closely resembles what Mr. Maxwell originally
10 received, we would ask that Mr. Maxwell get a copy.
11      THE COURT: Fine.
12      MR. PUCCIO: That's fine. We'll send
13 Mr. Maxwell a copy.
14      The second part of what we discussed is what
15 comes after that, and what we've discussed is that after
16 they get the materials that we're turning over, if they
17 want something in addition to that, they should present us
18 with a list and we'll get back to them in a timely manner
19 and tell them what we believe they should have and what
20 they shouldn't have.
21      THE COURT: And then I'll resolve any disputes.
22      MR. PUCCIO: That's right. That's what was
23 contemplated, at least from my thinking. That's the plan.
24      THE COURT: Okay.
25      MR. PUCCIO: We also would like to have -- this

Page 56

1  was agreed to -- a confidentiality agreement.
2       THE COURT: Actually, I forgot to mention that
3  but I was assuming that. Do you want to file a proposed
4  order?
5       MR. PUCCIO: We'll work it out, but that was
6  agreed to.
7       THE COURT: Okay.
8       MR. KAELIN: I think some of that is correct,
9  Your Honor. Again, Attorney Kaelin on behalf of Cendant.
10 I speak somewhat for the government, but the government
11 can speak for themselves.
12      I think it's the second phase, Your Honor, that
13 we are most concerned with. We need a snapshot looking
14 back into time as well.
15      What we're prepared to do today is within a day,
16 hopefully, put together a list almost like a document
17 request of the type of documents, financial information
18 documents we believe are relevant and pertinent and what
19 we would like. We would get that list to them by next
20 Tuesday.
21      I'd rather work off dates than reasonable time
22 and timely manner. We'll end up litigating that. By next
23 Tuesday we would get that list.
24      The defendant would have until February 28th, is
25 our proposal, to tell us -- sort of like when you're

Page 57

1  responding to a document request, yes, this is what we'll
2  produce and no, this is what we object to.
3       For those items which they agree they will
4  produce, they would produce that documentation we propose
5  by March 6th. And I will state we haven't agreed to these
6  dates. This is a framework of how we would like to work.
7       For those items they object, we would then try,
8  of course as we are ordinarily obligated to do under
9  discovery, to work it out, or go see Magistrate Smith. So
10 it would be a hybrid. We're going to produce it and you
11 get it by a date and we know when we're getting it. We're
12 going to dispute, we'll get to Magistrate Smith as fast as
13 we can, and that would be probably some time after the
14 week of the 3rd and it sounds like he's available.
15      We would get that list on the 28th, which I
16 believe is a Tuesday, telling us, no, we're not going to
17 produce, for example, tax returns. We could say, Here's
18 why they're relevant; well, we don't think they're
19 relevant and we call Magistrate Smith and have a
20 conference with Magistrate Smith.
21      I will tell you, just so there's no surprise, I
22 would like to put on the record quickly that among the
23 items we're looking for are copies of the defendant's tax
24 returns, state and federal, from 1997 to the present.
25      We would also be looking for -- if some of this

Page 58

1  is what's going to get produced on Tuesday as part of what
2  was sent to Probation, fine, but we're going to be seeking
3  all documents evidencing the $7.5 million Shelton
4  children's trust, all documents evidencing
5  SCIP Partners, LP.
6       We would like to see the documents relating to
7  the $2 million that was provided to legal counsel, which,
8  as you've seen in our papers, we contended was potentially
9  allegedly to shield.
10      And then the classic things, Your Honor,
11 documents regarding bank accounts that have been held in
12 the last so many years, any money market accounts
13 evidencing the transfers of any real property.
14      But clearly, I always see that the tax returns
15 are a great snapshot of what was there or what has been
16 moved.
17      Two other points, Your Honor.
18      The government and Cendant firmly believe that
19 this should not limit us; that after we get this
20 documentation from hopefully a cooperative defendant, that
21 if we see there are third parties in possession of
22 information, we can subpoena those third parties. Many
23 times you will see that assets have been transferred from
24 one mutual fund to another, one brokerage company.
25      The last point, Your Honor, is that -- and I

Page 59

1  think Attorney Silbermann will address this as well -- we
2  want to be clear that we all understand something today
3  and that there's no surprises later, that the government
4  and Cendant is free to proceed with any fraudulent
5  transfer actions against third parties who would not be
6  subject to the stay with one caveat, that typically in
7  those cases we would have to name the defendant to the
8  extent is he in fact a transferor. You typically name the
9  transferor and you name the transferee. He would only be
10 named as a nominal defendant. It would not be the purpose
11 or intent of such action to seek to collect money from the
12 defendant, but you need them typically as a party to such
13 action.
14      You may feel differently about that, but we
15 wanted to be on the record that if we see that
16 information, nothing is staying us from bringing such an
17 action. And I think it was stated in one of their earlier
18 briefs that nothing stops Cendant from bringing a
19 fraudulent transfer action.
20      So I thank you for that, Your Honor.
21      THE COURT: Okay.
22      MR. SCHECHTER: Your Honor, I just had a
23 practical concern regarding the existing bail.
24      I'm not certain if Your Honor wanted everybody
25 to look at all the financial information and then come

Page 60

1  back and then discuss a new bail, or that Your Honor
2  wanted to amend the current bail conditions today.
3       THE COURT: I wanted everybody to look at the
4  information first and then talk about it in the big
5  picture.
6       MR. SCHECHTER: So the record is clear, the
7  existing bail order, if you will, will remain in full
8  force and effect now until such time as Your Honor would
9  modify it?
10      THE COURT: Yes.
11      MR. SCHECHTER: Just so I'm clear then,
12 Probation, Your Honor, is still in the loop regarding the
13 current bail because the current bail permits $45,000 a
14 month expenditures and that after that he seeks the
15 permission of the Probation Department.
16      THE COURT: Well, actually, I think if there's
17 anything above that, I will tell you Mr. Maxwell is going
18 to be consulting with me every month anyway while this is
19 going on.
20      MR. SCHECHTER: The government would reserve the
21 right to come back after we see all the finances to talk
22 about a new modification to this bail order.
23      THE COURT: Correct.
24      MR. SCHECHTER: Just so I can help Your Honor,
25 you put on the record something before about you wanted a

Page 61

1  budget consistent with the budget that the SEC had
2  established for Mr. Corigliano.
3       THE COURT: Actually, I said we've had a lot of
4  discussion about his budget and I would think starting
5  there and then saying should it be more or less to me
6  seemed like a reasonable point to begin the analysis.
7       MR. SCHECHTER: Just to help Your Honor, we went
8  back to the first trial transcript and at page 7995
9  there's a reference to the $233,000 SEC budget regarding
10 Mr. Corigliano. Just to make sure everybody is clear.
11      THE COURT: Yes. And I think -- I don't know
12 which trial this is, but Defendants' Exhibit 400 --
13      MR. SCHECHTER: Is the budget.
14      THE COURT: -- is the budget.
15      MR. SCHECHTER: The other question: Your Honor
16 had also mentioned that you thought -- and the government
17 wholeheartedly agrees -- that any additional income that
18 Mr. Shelton should receive, Your Honor wanted to talk
19 about some type of escrow account.
20      I guess if I can just find out if there can be
21 an agreement until such time as Your Honor revisits the
22 whole issue that any income earned by Mr. Shelton during
23 the period between now and whenever Your Honor is able to
24 revise the bail be held in the escrow account of perhaps
25 Hope Seeley as a lawyer's escrow account so that money

Page 62

1 would at least be available.
2     THE COURT: I guess what I would do is I would
3 look at -- if there is some I think should have been put
4 in, I would treat it all at one time. I would like to see
5 the whole picture as opposed to dealing with pieces of it.
6     MR. SILBERMANN: Your Honor, briefly. There is
7 one issue.
8     I believe Mr. Shelton represented recently that
9 his one remaining asset today is a bank account with
10 two-odd million dollars in it, and I'm not quite sure as
11 to the status of that account.
12     Is that account free to be used for any kind of
13 discretionary income or is it subject to his monthly
14 expenses?
15     THE COURT: It's subject to the monthly
16 expenses.
17     MR. SILBERMANN: So it would be subject to the
18 $45,000, Your Honor?
19     THE COURT: Yes.
20     MR. SILBERMANN: Thank you, Your Honor.
21     MR. PUCCIO: Mr. Maxwell has the correct
22 information. He's in the ballpark, but there may be two
23 or three accounts that has a certain amount of money. All
24 of it is on record. Maybe two and a half million. I'm
25 not sure.

Page 63

1     THE COURT: Sure.
2     Mr. Kaelin gave a schedule and he said it was
3 just his proposal. I don't hear any objection to it.
4     MR. PUCCIO: The schedule sounds fine with me
5 expect for the appearance at court. Maybe that can be
6 worked out with the magistrate. It's after the 3rd anyway
7 so that's solves that problem.
8     THE COURT: I'm going to stay in the loop. I
9 just don't want to have lengthy meetings about you, that's
10 all. No offense intended.
11     Actually, I would have had a more aggressive
12 schedule, but if this one seems to work for you all --
13     MR. PUCCIO: It's good that you didn't decide
14 the schedule.
15     THE COURT: It is. You have a better sense of
16 how long it will take you to do things than I do and I'll
17 honor that.
18     Sounds like we're set for now?
19     Anything else?
20     So you have Judge Smith will see you on
21 March 3rd at 10:00 a.m.
22     MR. PUCCIO: I thought that was changed, wasn't
23 it? Because there's something --
24     THE COURT: That why I'm asking.
25     MR. PUCCIO: I thought the date for Judge Smith

Page 64

1 was left open after the 6th or something.
2     THE COURT: I will find out when he's available
3 after what date?
4     MR. KAELIN: They would have to respond to us by
5 the 28th as to what they would not want to produce or were
6 unwilling to produce. The following week I think is the
7 week of March 3rd. That would be the week we would go in
8 to try to see Magistrate Smith.
9     THE COURT: Actually, I think if there's a
10 dispute over what's going to be produced and what's not
11 going to be produced, I'm going to decide that, so copy me
12 on things and I'll tell you what's produced and what's
13 not.
14     Judge Smith I really have in mind in terms of
15 talking through the details once the information has been
16 exchanged.
17     MR. KAELIN: My sense is we get something in
18 writing on Tuesday the 28th of February, probably the next
19 day we're going to be talking -- that's what I meant by
20 you're supposed to try to cooperate and reconcile
21 amicably -- and it's a day or two thereafter. As soon as
22 we can get in to see you or Magistrate Smith, we're going
23 to want to do that because we do want to get that
24 information sooner.
25     MR. SILBERMANN: Your Honor, I heard no

Page 65

1 objection, but does the Court have a position on third
2 party discovery and third party subpoenas and actions for
3 fraudulent transfer, Your Honor?
4     MR. PUCCIO: If I may. I was about to -- great
5 minds think alike.
6     THE COURT: You only say great minds think alike
7 when somebody agrees with you.
8     MR. PUCCIO: I knew you would catch on to that,
9 Judge.
10     My question is: What is at stake in this stay?
11 What are we talking about?
12     I'm hoping we can give everybody what they want
13 and we won't have any disputes.
14     If there is going to be a stay, what will be
15 stayed I guess is my question?
16     THE COURT: I thought I had sort of indicated
17 earlier that assets won't be taken away from Mr. Shelton.
18     MR. PUCCIO: Okay.
19     MR. KAELIN: Recently, the Connecticut Appellate
20 Court has ruled that while someone is on an appeal of a
21 judgment, it stays the enforcement. I does not stay the
22 discovery of those assets and the preservation of those
23 assets, which is what you were intending.
24     We want to find out where they are and make sure
25 we don't miss anything. We're not trying to take money

Page 66

1 out of a bank account.
2     THE COURT: To be clear, I should ask
3 Judge Smith to tell you what date he is available after
4 what date?
5     MR. KAELIN: I would say the 28th.
6     THE COURT: After the 28th. I'll have him hold
7 March 3rd and have him set aside other dates as well.
8     MR. KAELIN: Thank you, Your Honor.
9     THE COURT: Okay. Thank you very much.
10 We'll recess.
11        (Whereupon, a recess followed)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 67

1
2
3         CERTIFICATE
4
5
6     UNITED STATES v. E. KIRK SHELTON
7         3:02CR264(AWT)
8
9
10     I, Corinna F. Thompson, RPR, Official Court
11 Reporter for the United States District Court for the
12 District of Connecticut, do hereby certify that the
13 foregoing pages are a true and accurate transcription of
14 my shorthand notes taken in the aforementioned matter to
15 the best of my skill and ability.
16
17
18
19
20     _____
        CORINNA F. THOMPSON, RPR
21      Official Court Reporter
        450 Main Street, Room #225
22      Hartford, Connecticut 06103
          (860) 547-0580
23
24
25

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| UNITED STATES OF AMERICA, | : | No. 3:02 CR 264 (AWT) |
|---|---|---|
| v. | : | |
| E. KIRK SHELTON. | : | November 7, 2005 |

### REPLY MEMORANDUM IN SUPPORT OF MOTION FOR STAY OF SENTENCE OF RESTITUTION

Pursuant to D. Conn. L. Civ. Rule 7(d) and D. Conn. L. Crim. Rule 1(c), the Defendant, E. Kirk Shelton, hereby replies to Cendant Corporation's Memorandum of Law in Opposition to Mr. Shelton's Motion For Stay Of Sentence Providing For Restitution.

**I. Mr. Shelton Has Complied With The Court's "Lump Sum" Payment Order.**

On Pages 3 – 5 of Cendant's Memorandum of Law in Opposition to Motion for Stay ("Cendant's Opposition"), Cendant claims that Mr. Shelton has violated the Court's Order requiring a lump sum payment of $15,000,000.00 on or before October 24, 2005. Cendant maintains that Mr. Shelton improperly included three life insurance policies initially purchased for Mr. Shelton by Cendant as a component of the lump sum payment. Cendant argues that because it paid $2,194,627.00 in policy premiums, the premium payments rightfully belong to Cendant. These arguments contain several material misrepresentations of fact.

First, Cendant's rights concerning the insurance policies are set forth in an Agreement dated May 27, 1997, which is attached as Exhibit A. The Agreement specifically provides that Cendant was to make the premium payments unless Mr. Shelton violated the non-compete provisions of the Agreement. See Exhibit A,

APPENDIX E

Agreement, Section XVII(B) at 21. Cendant has breached this Agreement since it has not made any premium payments since *at least* 2000. Pursuant to § XVII (G) of the Agreement, Cendant's right to repayment of premium advanced is reduced by the amount of premium not paid by Cendant, plus 7% per annum. Accordingly, Cendant's interest in the policies has been reduced significantly.

Secondly, the life insurance component of the lump sum payment was included in the presentence report recommendation regarding restitution. See Presentence Report, ¶¶ 145 and 148. The Presentence Report specifically recommended inclusion of these policies in the $15,000,000.00 lump sum payment. Moreover, the Court already approved inclusion of the Life Insurance Policies as a component of the lump sum payment. The following discussion occurred on July 22, 2005, Volume III, at 454:

> **Mr. Puccio:** Your Honor, during the recess we conferred with Mr. Maxwell from the Probation Department and counsel for the government and I think we've reached an agreement on the lump sum payment of $15,000,000.00 which is referred to in the Presentence Report would be provided for in your order.
>
> We've agreed to immediately, or as quickly as the government can prepare the papers, sign over Mr. Shelton's interest in certain insurance policies, which Mr. Maxwell has listed in the Report and placed them in escrow, as Your Honor indicated.
>
> **The Court:** Is that included in the $15,000,000.00 or is that in addition?
>
> **Mr. Puccio:** No, that's one component of it. That would be for $3,300,000.00, approximately.
>
> **The Court:** Okay.
>
> **Mr. Puccio:** Then, we've agreed to make a payment of the remainder by check or appropriate wire transfer within 90 days; to be exact, $11,700,000.00.

-2-

> **The Court:** So the interest in the insurance policy - - this is cash value which is set?
>
> **Mr. Puccio:** As listed here Your Honor we were going by the Presentence Report.
>
> **The Court:** Okay.

Tr.7/22/05, Vol. III, at 454.

Since the Court specifically approved the inclusion of these insurance policies as a component of the $15,000,000.00 lump sum payment, Cendant can hardly complain that Mr. Shelton willfully failed to comply with the Court's order. Indeed, Cendant's representative was present during the discussion in Court concerning the insurance policy and Cendant raised no objection at the proceeding held on July 22, 2005. Moreover, Cendant failed to raise the issue at the continuation of the sentencing hearing on August 3, 2005. Therefore, Cendant should now be precluded from complaining about the inclusion of the life insurance policies in the lump sum payment.

II.  **The Court Should Grant A Stay Because It Has Already Taken The Steps Necessary To Ensure That Shelton Does Not Waste Assets.**

On pages 5-6 of Cendant's Opposition, Cendant argues that the Court should deny a stay because Mr. Shelton may distribute or transfer assets. The Court has already taken the steps necessary to ensure that Shelton will not dissipate or waste assets. The Court has required Shelton to make the lump sum payment of $15,000,000 and to provide monthly financial reports to the United States Probation Office. These requirements ensure Mr. Shelton's continuing ability to provide meaningful restitution while not requiring forfeiture by Mr. Shelton while his appeal is pending before the Court of Appeals for the Second Circuit.

Fed. R. Crim. P. Rule 38(e) provides that the Court may stay an order of restitution on any terms that are considered appropriate. Rule 38(e)(2) also provides that a Court "may issue any order reasonably necessary to ensure compliance with a restitution order ... after disposition of the appeal, including restraining order, injunction or an order requiring deposit of any monetary restitution under the district court's registry or an order requiring the defendant to post a bond." The Court has already taken these steps by ordering Mr. Shelton to deposit a lump sum of $15,000,000.00 and requiring monthly reporting, as well as mandating that Mr. Shelton live within a budget set by the Court. Cendant has presented no argument as to why these safeguards are insufficient.

### III. Time Is Not Of The Essence.

On page 6 of Cendant's Opposition, Cendant argues that time is of the essence because it claims that merely eight days after Mr. Shelton's first meeting with prosecutors he created and funded an irrevocable trust with 7.5 million for the education of his two children. In actuality, Mr. Shelton met with prosecutors after the Trust had already been created. Moreover, the creation of the Trust had been planned for many months as part of Mr. Shelton's overall estate plan. If the Court determines a hearing is necessary on this issue, Mr. Shelton's estate planning attorney is available to testify concerning the timing of the creation of the Trust.

Cendant relies upon United States vs. Stewart, 1999 U.S. Dist. Lexis 10160, *16 (E.D. Pa.1999), to support its claim that time is of the essence. This case may be easily distinguished. Stewart involved the forfeiture of a life insurance company supervised by a court-appointed Trustee. In Stewart, the

evidence showed that value of the life insurance company was rapidly diminishing. Thus, in <u>Stewart</u>, time really was of the essence. Here, Cendant has offered no argument as to how or why any diminishment in the value of Shelton's assets is likely to occur.

## IV. Granting A Stay Does Not Contradict the Purpose Of The Restitution Statutes.

Cendant argues that the restitution statutes are designed to benefit the victims. While this tautology is certainly true, these statutes are not designed to harm a defendant whose conviction is likely to be reversed on appeal. The United States Court of Appeals for the Second Circuit has already determined to grant Shelton bail pending appeal pursuant to 18 U.S.C. § 3143(b)(1). By so holding, the Court of Appeals has found that Shelton's appeal raises a substantial question of law or fact likely to result in either a reversal, an order for new trial, a sentence that does not include a term of imprisonment or a substantially reduced sentence. Under these circumstances, the Court is warranted in exercising its discretion to stay the restitution portion of the sentence.

## V. No Further Injunction Is Necessary.

On pages 8-9 of Cendant's Opposition, Cendant asked the Court for a further injunction prohibiting Mr. Shelton from transferring, dissipating or shielding his assets. The Court has already taken precautions to ensure that Mr. Shelton does not transfer any assets in an inappropriate manner or spend more than is necessary in his ordinary living costs. No further measures are necessary.

Cendant also seeks an injunction tolling the statutes of limitation regarding any claims Cendant may have to set aside fraudulent transfers. Such a tolling

may be beyond the power of this Court. See generally Montanaro v. Gorelick, 2001 WL 357641 *2 (J.D. Fairfield 2001) (unpublished), aff'd on other grounds, 73 Conn. App. 319, 807 A.2d 1083 (2002) ("The court is aware of no authority for a federal bankruptcy court to limit or control a party's right to assert a defense in a state court lawsuit.") (Attached as Exhibit B). Moreover, such an injunction is unnecessary since Cendant may pursue any fraudulent transfer claims it wishes to pursue without further delay. Because Cendant already is a creditor of Mr. Shelton, it may pursue any fraudulent transfer claims it believes that it has, regardless of the resolution of this Motion for Stay.

Finally, Cendant asked the Court to decide its Motion for Order in Aid of Execution and its Motion for Limited Release of Shelton's pre-sentence report and quarterly progress report. The Court has already determined not to consider those Motions until this Motion for Stay is decided. See Court's Order, Docket Entry 1795. Should the Motion for Stay be granted, the Motion for Order in Aid of Execution and the Motion for Limited Release of Mr. Shelton's Presentence Reports and Quarterly Progress Reports should be denied without prejudice until Mr. Shelton's appeal is resolved.

## VI. Conclusion

For the foregoing reasons and for the arguments previously submitted in the Memorandum dated October 4, 2005, as well as for any reasons as may be presented at oral argument on this matter, Mr. Shelton respectfully submits that there is sufficient security to ensure that restitution will be paid should his appeal be unsuccessful. Wherefore, Mr. Shelton respectfully requests that his Motion For Stay Of Sentence Providing For Restitution be granted.

THE DEFENDANT,
E. Kirk Shelton

BY_____
HOPE C. SEELEY
Federal Bar No. ct 4863
SANTOS & SEELEY, P.C.
51 Russ Street
Hartford, CT 06106
Tel: (860) 249-6548
Fax:(860) 724-5533

LAW OFFICES OF THOMAS P. PUCCIO
Thomas P. Puccio, Esq. (CT 22983)
230 Park Avenue, Suite 301
New York, NY 10172
Tel.: (212) 883-6383
Fax: (212) 883-6388

## CERTIFICATION

I hereby certify that on November 7, 2005, a copy of the foregoing Reply Memorandum was served on the following parties by U.S. Mail:

James McMahon, Esq.
Fraud Section
US Department of Justice
1400 New York Ave., NW, 4th Floor
Washington, DC 20005

Richard J. Schechter, Esq.
U.S. Attorney's Office
915 Lafayette Blvd., Rm. 309
Bridgeport, CT 06604
TEL: (203) 696-3000
Fax: (203) 579-5550

Norman Gross, Esq.
United States Attorney's Office
U.S. Courthouse and Federal Building
401 Market Street, 4th Floor
Camden, N.J. 0810-2098
Tel: (856) 968-4930
Fax: (856) 968-4917

Robert E. Kaelin, Esq.
Murtha Cullina LLP
CityPlace I – 85 Asylum Street
Hartford, CT 06103-3469
Tel: (860) 240-6000
Fax: (860) 240-6150

C. Warren Maxwell
Deputy Chief U.S. Probation Officer
United States Probation
157 Church Street, 22nd Floor
New Haven, CT 06510
Tel: (203) 579-5707
Fax: (203) 579-5571

Nicole Owens, USPO
United States Probation Office
United States District Court
915 Lafayette Street
Bridgeport, CT 06604
Tel: (203) 579-5707
Fax: (203) 579-5571

_____
HOPE C. SEELEY

Appendix F has been filed under seal.

Appendix G has been filed under seal.

Appendix H has been filed under seal.

```
                                                           Page 1
                         Vol. I -

              UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF CONNECTICUT


- - - - - - - - - - - - - - - - x
                                 :
UNITED STATES OF AMERICA:        :No. 3:02CR264(AWT)
                                 :
          vs.                    :
                                 :
WALTER A. FORBES,                :
E. KIRK SHELTON,                 :
                                 :HARTFORD, CONNECTICUT
              Defendants         :MAY 10, 2004
                                 :
- - - - - - - - - - - - - - - - x



                       JURY TRIAL

                       VOLUME I


   BEFORE:

       HON. ALVIN W. THOMPSON, U.S.D.J.




                        Diana Huntington, RMR
                        Corinna Thompson, RPR
                        Melanie G. Collard, RDR
                        Official Court Reporters
```

APPENDIX I

Page 146

1 document which contained this new, as Mr. McMahon says,
2 layout for the merger reserve, takedowns each month, and
3 was asked by his accounting people to make this
4 presentation to the HFS representative, and he did so.
5    Does it make sense to you that if he thought that
6 what he was talking about was fraudulent that he would
7 have done that? Well, the answer, the evidence will show
8 and this -- they didn't really get to this point with the
9 government this morning, the answer is it doesn't make any
10 sense for a variety of reasons. And the fact of the
11 matter is the evidence will show that contrary to
12 believing that what Mr. Shelton presented at this March 6
13 meeting amounted to a fraud -- obviously if it an amounted
14 to a fraud, somebody would have called the cops and it all
15 would have been over with. Contrary to believing that
16 this amounted to a fraud, Mr. Silverman and the HFS team
17 came to precisely the opposite conclusion. They asked for
18 the numbers that were presented at that meeting to be
19 studied, for the accounting to be studied, the accounting
20 for the year before to be studied. They asked for Ernst &
21 Young to be brought in and a series of meetings took
22 place, which you weren't told about this morning, after
23 which Ernst & Young stood by the accounting of the
24 company, stood by the merger reserve aspects of the
25 accounting of the company, and Henry Silverman and the HFS

Page 147

1 people at that point were more than prepared and adopted
2 that accounting for the year 1997 and signed the form that
3 was filed with the Securities and Exchange Commission to
4 warrant that.
5    So single most important date in the case? Maybe the
6 government is right. It certainly showed very, very
7 loudly and demonstrated very, very clearly that what
8 Mr. Shelton did at that meeting, his presentation at that
9 meeting, was not inviting someone else to commit a fraud.
10    Now, I want to leave you with a few points.
11    I've tried to, in the last few minutes, well, more
12 than a few minutes, lawyers aren't always the best
13 calculators of how much time it takes to do something. I
14 ask you in advance to forgive us for some of our
15 miscalculations during the case as to how much time things
16 take. Particularly when we get into things that the
17 defense has to do after the government is finished. And
18 I'm hoping you'll bear with us.
19    I just want to briefly again remind you that there
20 are a lot of concepts here, a lot of very complicated
21 accounting principles and a lot of very detailed testimony
22 about merger reserves and accounting irregularities and
23 stock dropping and revenues expenses. A lot of this
24 stuff. But I would like to leave you with the fact that
25 you should never lose sight of the fact that it's a human

Page 148

1 being that you're judging here. There's a person here,
2 Kirk Shelton. And he is a man, not quite 50 years old,
3 who grew up in a good home in Long Island and was brought
4 up to respect the principles of hard work and honesty.
5 Comes from a family where those principles, those ideas
6 were valued. And he's lived his entire life, the evidence
7 will show you, in that way.
8    He's a man who has worked very, very hard his entire
9 life. He's gone to the best schools and he's worked very,
10 very hard to do well at the best schools and places he
11 attended. But he's also worked his way through those
12 schools, working at jobs painting houses, menial jobs,
13 difficult jobs, jobs that he had to accomplish with his
14 hands. He's worked his entire life, the evidence will
15 show You.
16    He's married. This week he will be celebrating his
17 20th year of marriage to his wife Amy. They have two
18 teenage children who they have brought up -- he has
19 brought up to be, with his wife, decent kids.
20    You're not just judging an economic principle here.
21 You're judging a person. And you'll hear he was known
22 that way, throughout the company, and throughout his
23 career. He was audited by the Internal Revenue Service,
24 catch this, and they gave him back the money.
25    He wrote a memo circulated through the company

Page 149

1 admonishing an employee for driving in a limousine and
2 having the company pay for it when it was a personal
3 limousine ride.
4    That is the reputation he had.
5    He was frugal. You hear about executive perks and
6 all the fanciness about the way executives work in fancy
7 corporations. Kirk Shelton traveled the globe, the United
8 States, the Far East, and where ever on behalf of CUC,
9 working day and night, to build the sales of this company
10 which became a very, very successful company. And he
11 often traveled with another person, another person who was
12 an executive in the company. And you'll hear testimony
13 that far from the executive perfection and lavish
14 spending, when they traveled, it was CUC cultures, it was
15 the culture that Kirk Shelton enforced and the culture
16 that they developed in the company. They would stay in
17 the same room. They wouldn't have two separate hotel
18 rooms. They would stay together in the same room.
19    This is a person who carries those traits with him of
20 honesty, of integrity, frugality, hard work. It's not
21 like it was a secret. Everybody knew that about Kirk
22 Shelton.
23    Is he the kind of person that Anne Pember and Cosmo
24 Corigliano was likely to tell they were committing a
25 fraud? I submit to you he's not.

Appendix J has been filed under seal.