# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA, | : | No. 3:02 CR 264 (AWT) |
| | : | |
| v. | : | |
| | : | |
| E. KIRK SHELTON | : | April 13, 2006 |
| | : | |

## MEMORANDUM OF LAW IN SUPPORT OF E. KIRK SHELTON'S CONDITIONAL MOTION TO MODIFY THE ORDER OF RESTITUTION

As has been asserted in previous motions which are pending before this Court, Defendant E. Kirk Shelton ("Mr. Shelton") believes he has thus far complied with the Order of Restitution, dated August 12, 2005 (Docket No. 1638, the "Restitution Order"). In the event that this Court determines, however, that Mr. Shelton's initial payment to the Clerk of the Court on October 7, 2005 was not in compliance with the Restitution Order, Mr. Shelton's non-compliance should be excused. Accordingly, Mr. Shelton submits this memorandum of law in support of the accompanying conditional motion which requests that, if the Court finds that Mr. Shelton did not comply with the "lump sum" payment provision of the Restitution Order, it modify that provision of the Order to deem the amount that Mr. Shelton paid on October 7th an adequate and sufficient "lump sum" payment as referenced therein. It is respectfully submitted that Mr. Shelton's good faith effort to comply with the Restitution Order, coupled with Mr. Shelton's inability to now supplement his initial payment, constitute sufficient ground for the relief requested in Mr. Shelton's conditional motion.

1

**BACKGROUND**

On August 3, 2005, this Court imposed sentence in this matter.  As part of the sentence, the Court ordered Mr. Shelton to pay restitution of $3.275 billion to Cendant Corporation ("Cendant").  The restitution component of Mr. Shelton's sentence was formalized by this Court in a written Order of Restitution, dated August 12, 2005.  The Restitution Order required that Mr. Shelton make a "lump sum" payment of $15 million by October 24, 2005.  Restitution Order at 1.  This initial payment was to be held by the Clerk's Office "until such time as the defendant no longer has any right to appeal from the judgment in this case."  *Id.*

On August 16, 2005, Mr. Shelton filed an Amended Notice of Appeal in which he indicated that he was appealing the Judgment, including his convictions on Counts 1 through 12 of the Superseding Indictment, his sentence on Counts 1 through 12 and the Order of Restitution (Docket No. 1648).  Mr. Shelton also filed a Motion for Bail Pending Appeal which was denied by this Court in an Order dated August 16, 2005. (Order, Docket No. 1647).  On September 13, 2005, the Court of Appeals for the Second Circuit granted Mr. Shelton's motion for bond pending appeal and stayed Mr. Shelton's surrender date.  The Court of Appeals also ordered that the conditions of bond previously imposed should remain in full force and effect and remanded the case for the sole purpose of monitoring the conditions of bond.  *See* Second Circuit Order (Docket No. 1790) at 1.

Since September 16, 2005, Cendant has filed several motions regarding the Court's Restitution Order.  These motions – each of which were opposed by Mr. Shelton – include: (i) a Motion for and Order in Aid of Execution (Docket 1714) in which Cendant sought to set aside certain financial transactions consummated by Mr. Shelton, compel Mr. Shelton to disclose information regarding alleged "asset transfer[s]" and liquidate all of Mr. Shelton's assets in an

attempt to recover the full amount of the $3.275 billion restitution award (*See* Docket No. 1711 at 1); (ii) a Motion for the Limited Release of Defendant E. Kirk Shelton's Pre-Sentence Report and Quarterly Financial Progress Reports (Docket No. 1712); and (iii) a Motion for an Order Compelling Defendant E. Kirk Shelton to Comply with the Court's August 12, 2005 Restitution Order (Docket No. 1990).

On October 4, 2005, Mr. Shelton filed a motion, pursuant to Rule 38(e) of the Federal Rules of Criminal Procedure, requesting that the Court stay the portion of his sentence relating to the Restitution Order (the "Stay Motion," Docket No. 1786). Notably, the Stay Motion did not request that the Court stay his obligation to pay the $15 million, which was due on or before October 24, 2005. Both Cendant (Docket Nos. 1887 and 2055) and the Government (Docket No. 2106) opposed this motion.[1]

On October 7, 2005, Mr. Shelton, through his counsel, made the lump sum payment pursuant to the Restitution Order. This payment (made 17 days before the Court-ordered deadline) consisted of a check, made payable to the Clerk of the Court, in the amount of $9,513,872; the assignment of 98,075 shares of Cendant Corporation, which were then valued at $1,902,655; and, as directed by the Court, the assignment of three insurance policies. *See* Cendant Memo of Law in Support of its Motion for an Order Compelling E. Kirk Shelton to Comply with the Court's August 12, 2005 Restitution Order (Docket No. 1990-6), Exh. C. As of

---

[1]    This Court has stated that it has not yet decided Mr. Shelton's Motion for a Stay of Sentence Providing Restitution and indicated that it sought input from Mr. Shelton's counsel on this issue. *See* March 9, 2006 Tel. Hearing, Tr. 22 (The Court: "[F]rom my perspective[,] I'm focusing on those two points that I mentioned. And it's the defendant's – the defendant can try to make a showing at this point and maybe persuade me and maybe not that I should modify the restitution order with respect to the $15 million and that I should stay the restitution order"). Accordingly Mr. Shelton hereby incorporates by reference Mr. Shelton's Motion for a Stay of Sentence Pending Restitution (Docket No. 1786), the Memorandum of Law in support thereof (Docket No. 1787) and the Reply Memorandum in [Further] Support thereof (Docket No. 1948). As is set forth in those documents (and herein), a Stay of the Restitution Order is necessary to prevent Cendant from undermining: (i) the payment schedule set forth in the Restitution Order, (ii) the Restitution Order's requirement to hold Mr. Shelton's initial payment in escrow pending the outcome of his appeal and (iii) the Court's stated interest in preserving the status quo with respect to Mr. Shelton's assets during his appeal.

the date it was tendered to the Clerk of the Court, the aggregate value of Mr. Shelton's payment was $15 million. *See id.*; *see also* Memorandum of Law in Opposition to Cendant's Motion for Order in Aid of Execution and in Opposition to Cendant's Motion for Limited Release of Defendant's Pre-Sentence Report and Quarterly Financial Progress Reports at 2 (Docket No. 2097).

A hearing on the various motions was held on February 17, 2006.[2]  As a result of that hearing, Mr. Shelton, through his attorneys, produced 129 pages of documents to attorneys for Cendant and the Government.  These documents related to the components of Mr. Shelton's initial restitution payment and his current financial condition.  As a condition of producing other sensitive and confidential documents, Mr. Shelton requested that the Government and Cendant enter into a Confidentiality Stipulation and Protective Order (the "Stipulation").  Because the parties could not agree on the terms of such a Stipulation, Mr. Shelton filed a motion for a Protective Order and Confidentiality Order (Docket Nos. 2113-1 and 2117 (reply)).  On March 7, 2006, Cendant and the Government filed their opposition papers with respect to Mr. Shelton's Motion (Docket Nos. 2116-1 and 2115, respectively).  A telephonic hearing regarding the Confidentiality Order was held on March 9, 2006.  At this hearing, the Court directed the Government to file a motion by the end of March relating to the fruits of the Government's third party discovery.  *See* March 9, 2006 Tel. Hearing, Tr. 41.  The Court also directed that Mr. Shelton file the present motion no later than one day after the Government's submission.  *Id.* at 45.

---

[2]  Although the Court identified each of the motions relating to Mr. Shelton's compliance with the Restitution Order, the Court did not address the substance of each individual motion.  Rather, the Court addressed the "general principles" behind the motions, collectively.  *See* Feb. 17, 2006 Hearing, Tr. 4-5.

To date, the Government has not filed any motion with respect to the fruits of third party discovery.[3]  It is unclear whether the April 12, 2006 Memorandum of Cendant Corporation In Further Support Of Motion to Compel Compliance With The Restitution Order And In Further Opposition To Defendant E. Kirk Shelton's Motion For Stay of Sentence Providing For Restitution or the April 12, 2006 Supplemental Memorandum Of United States Regarding Defendant's Noncompliance With Restitution Order is viewed by Cendant and the Government as the submission the Court directed on the March 9th telephonic hearing.  If so, these recent submissions are both untimely and improper.  The Motion for Stay of Sentencing Providing Restitution and the Motion for an Order Compelling Defendant E. Kirk Shelton to Comply with the Court's August 12, 2005 Restitution Order were already fully briefed and are *sub judice*. Cendant had, in fact, previously filed a surreply in connection with its opposition to Mr. Shelton's Stay Motion.  Furthermore, yesterday's memoranda -- by both Cendant and the Government -- contain no new arguments regarding Mr. Shelton's compliance with the lump sum payment requirement of the Restitution Order.  In sum, the most recent submissions by Cendant and the United States are improper.

## ARGUMENT

### I.    MR. SHELTON HAS MADE A GOOD FAITH EFFORT TO COMPLY WITH THE LUMP SUM PAYMENT AS MANDATED BY THE RESTITUTION ORDER

Mr. Shelton maintains that he has complied with the "lump sum" component of the August 12, 2006 Restitution Order.  *See* Docket No. 2097 at 2.  In the event that this Court determines that Mr. Shelton has not complied with the Restitution Order, however, such non-compliance should be excused in light of Mr. Shelton's good faith effort to satisfy the directives of that Order.

---

[3]    The Government indicated that it would file a motion which would "summarize" the results of third party discovery, including subpoenas which were returnable in early March.  *See* March 9, 2006 Tel. Hearing, Tr. 41.

The Presentence Report concluded that Mr. Shelton had total assets of approximately $25 million and accordingly "could make a lump sum payment of $15 million." *See* Presentence Report ("PSR") at ¶¶ 145, 148. In determining Mr. Shelton's total assets, however, the Presentence Report included assets that were either illiquid (*e.g.*, mortgage loans owed to Mr. Shelton which were not yet due) and assets that were not Mr. Shelton's (*e.g.*, property held solely in the name of Mr. Shelton's wife or assets held in the name of his wife and children. *See* PSR at ¶145, fn.3). In order to raise sufficient capital to make the $15 million payment, Mr. Shelton therefore needed to execute certain financial transactions, each of which was entirely lawful and was fully disclosed to the United States Department of Probation and this Court. While Cendant and the Government have attacked these transactions as potentially "fraudulent," Mr. Shelton has at all times acted properly and in a good faith attempt to comply with the Restitution Order.

### A. Property in Vail, Colorado

Both Cendant and the Government have objected to Mr. Shelton's sale of his fifty percent interest in a residence located in Vail, Colorado for $700,000. *See* Feb. 17, 2006 Hearing, Tr. 32-33; March 9, 2006 Tel. Hearing, Tr. 28. Cendant, for example, has alleged that this sale constituted impermissible "double counting" under the Restitution Order and that Mr. Shelton did not receive fair market value for his interest in the property. *See* Feb. 17, 2006 Hearing, Tr. 32. Any analysis of the sale of the Vail property reveals that Mr. Shelton has acted properly and in accordance with his many disclosures to the Probation Department.

Since Mr. Shelton's first filing with the Probation Department, he has consistently stated that he would need to sell his interest in the Vail property in order to make the initial payment provided for in the Restitution Order. On January 13, 2005 – only 9 days after the verdict was

rendered in this case – at the Probation's Department's request, Mr. Shelton submitted certain financial information to his Probation Officer.  One of the documents submitted to the Probation Department on that date was a Net Worth Statement.  In that Net Worth Statement (Form PROB 48 at 6), Mr. Shelton identified his interest in the Vail property as an asset to be liquidated "to satisfy any criminal monetary penalties that may be imposed."  *See* excerpt of Shelton Jan. 13, 2005 Letter to Probation Department, attached hereto as Exh. A.  Mr. Shelton estimated that his interest in this property was worth $600,000.  Mr. Shelton later provided an updated Net Worth Statement to the Probation Department on May 21, 2005.  In that document, (Form PROB 48 at 6) Mr. Shelton again made clear that he intended to sell his portion of the Vail property and revised his estimate of its value to approximate $600,000 - $700,000.  *See* excerpt of Shelton May 21, 2005 Letter to Probation Department, attached hereto as Exh. B.  On August 10, 2005, following his sentencing, Mr. Shelton spoke with his Probation Officer and received express permission to sell his interest in the Vail property.  Mr. Shelton confirmed this telephonic conversation by way of letter, dated August 10, 2005.  In that letter, Mr. Shelton once again informed the Probation Department of his intention to sell his fifty percent interest in the property for $700,000, the appraised value, and that the proceeds received from the sale "will be part of the restitution payment due on October 24, 2005."  *See* Shelton August 10, 2005 Letter to Probation Department, attached hereto as Exh. C.  Thus, Mr. Shelton has always been forthcoming in his intention to sell his interest in the Vail property as a means to comply with this Court's Restitution Order and, in fact, stated so on four separate occasions.

Moreover, Cendant's allegation that the sale was for less than fair market value is belied by the independent appraisal which Mr. Shelton commissioned, at the request of the Government.  This appraisal reflects that the total value of the property was estimated at $1.425

million.  *See* Jan. 31, 2004 Appraisal Summary Report, attached hereto as Exh. D.  Thus, Mr. Shelton's fifty percent interest of this property (less commissions which would have been deducted had the property been sold through a realtor) approximates $700,000.[4]  Mr. Shelton received precisely this amount – $700,000 – from his sale of his interest in the property to the Shelton Children Irrevocable Trust.  See Sept. 9, 2005 Statement of Settlement, attached hereto as Exh. F.[5]

Cendant's concern regarding alleged "double counting" of the Vail property is also unfounded.  The Restitution Order does not ever address Mr. Shelton's interest in the Vail property.  Nor was Mr. Shelton's ownership interest in the Vail property ever discussed at any of the sentencing hearings.  Thus, neither Mr. Shelton's sentence, nor his bond package, nor the Restitution Order precluded Mr. Shelton from liquidating his interest in the property in order to satisfy the initial October payment ordered by this Court.  Moreover, Cendant's argument that it has somehow been deprived of the value of Mr. Shelton's interest in the Vail property is flatly contradicted by the fact that Mr. Shelton sold the property in order to pay restitution to Cendant; restitution that is now held by the Clerk pending the resolution of Mr. Shelton's appeal.

Finally, it should be noted that the Government's $20 million lien on the property is unaffected by Mr. Shelton's sale of his interest to the trust.  The Government has the same lien on the property today that it held before the sale in September.  *See* American Land Title Association Owner's Policy, Sched. B, bates-stamped KS 000056, attached hereto as Exh. G

---

[4]   It is worth noting that Kirk and Amy Shelton originally purchased the Vail property 10 years ago for $700,000. *See* October 1997 Deed, attached hereto as Exh. E.  Thus, Cendant's lawyer was correct in his belief that "real estate values in [V]ail have appreciated significantly over [the past 10 years]."  Feb. 17, 2006 Hearing, Tr. 32-33.  That increase (a 100% increase, to be precise), is accurately reflected in the independent appraisal obtained by Mr. Shelton.

[5]   The United States has argued that if Mr. Shelton needed money for the October 24th payment, he should have refinanced the property rather than sell it.  *See* March 9, 2005 Tel. Hearing, Tr. 28.  This argument is disingenuous. No bank in America would consider extending a loan to an unemployed felon, facing 10 years of incarceration, with no job prospects, dwindling assets, and liabilities in excess of $3.275 billion – particularly where such loan would be secured only by collateral subject to a $20 million lien by the United States Government.

(excluding from coverage, "a mortgage dated April 15, 2005 from [sic] for the use of the United States of America to secure the sum of $20,000,000.00 and any other amounts payable under the terms thereof, recorded April 22, 2005, under Reception No. 913202").[6]  The Government was comfortable with a lien on the Darien, Connecticut property which is owned by Mrs. Shelton to secure Mr. Shelton's Bond.  The Government in fact, requested that such a lien be imposed on that property.  The United States now also has a similar lien on the Vail, Colorado property.

### B.    Insurance

Cendant and the Government have objected to Mr. Shelton's assignment of certain insurance policies to the Clerk of the Court as a component of the initial payment as provided by the Restitution Order.  It should be noted, however, that, contrary to the assertions in Cendant's most recent submission, Mr. Shelton has never ascribed any value to these policies (*See* excerpt of Jan. 13, 2005 Letter to the Probation Department (Form PROB 48 at 3), attached hereto as Exh. H, and excerpt of May 21, 2005 Letter to the Probation Department (Form PROB 48 at 3), attached as Exh. I) and that Mr. Shelton objected to the inclusion of these policies in the Presentence Report's section on "Financial Condition – Ability to Pay."   Moreover, in Mr. Shelton's Objections to the Presentence Report, it was expressly noted that "Cendant claims ownership" of the life insurance policies referenced in paragraph 145 of the PSR.  *See* Defendant Shelton's Objections to the Presentence Report (attached to the PSR) at 38.  This is consistent with the fact, as noted by the Government, that Mr. Shelton "never once identified these insurance policies as being among his assets in the numerous monthly financial statements he

---

[6]    The Court has also stated that it did not envision the Vail property to be used to pay for the restitution. *See* Feb. 17, 2006 Hearing, Tr. 11-12.  Because there is nothing in the Restitution Order which prevented Mr. Shelton from selling his interest in the property and Mr. Shelton disclosed his intent to sell his interest in the property on four separate occasions, we respectfully submit that Mr. Shelton's sale of his interest in the Vail property is in accord with the Court's sentence and the Restitution Order.

submitted to the Probation Office." *See* April 12 Supplemental Memo of United States Regarding Defendant's Noncompliance With Restitution Order at 1.

The PSR nonetheless included these insurance policies as a component of Mr. Shelton's net assets. The PSR also assigned cash surrender values to those policies that were "obtained independently by the Probation Office." PSR at ¶ 145, fn. 2. Based upon this calculation of Mr. Shelton's total assets – which included the relevant insurance policies – the PSR concluded that Mr. Shelton "could make a lump sum payment of $15 million." PSR at ¶ 148.[7] Furthermore, the inclusion of these policies as a component of the initial payment was discussed in open Court at the July 22, 2005 Sentencing Hearing. The transcript of that hearing reflects the following exchange:

Mr. Puccio:     Your Honor, during the recess, we conferred with Mr. Maxwell from the Probation Department and counsel for the government and I think we've reached an agreement on the lump sum payment of $15 million which is referred to in the Presentence Report and would be provided in your Order.

We've agreed to immediately, or as quickly as the government can prepare the papers, sign over Mr. Shelton's interest in certain insurance policies which Mr. Maxwell has listed in the report and place them in escrow, as Your Honor indicated.

The Court:      Is that included in the $15 million or is that in addition?

Mr. Puccio:     No, that's one component of it. That would be for $3.3 million approximately.

The Court:      Okay.

Mr. Puccio:     Then we've agreed to make a payment for the remainder by check or appropriate wire transfer within 90 days; to be exact $11.7 million.

---

[7]   If this Court were to conclude that the insurance policies are not appropriate for inclusion in the initial payment under the Restitution Order, we respectfully submit that they should not be considered part of Mr. Shelton's assets available to pay the restitution. It would stand to reason that if Mr. Shelton has $3.3 million less than was calculated under the PSR (the value of the policies as calculated therein), his "ability to pay" restitution should be reduced by that same amount. *See* PSR at ¶¶ 145, 148.

The Court:      So the interest in the insurance policy – this is cash value which is set?

Mr. Puccio:     As listed here, Your Honor.  We're going by the Presentence Report.

The Court:      Okay.

July 22, 2005 Sentencing Hearing, Tr. 454-55.

It is telling that Edward Nathan, Esq., the Cendant attorney who was present at the July 22nd sentencing hearing, did not object to the inclusion of the insurance policies as a component of Mr. Shelton's initial payment under the Restitution Order – either on that date or at the continuation of the hearing on August 3rd.  Although Cendant knew in advance that that the initial October 24th payment would be partly comprised of the insurance policies at issue, Cendant never objected until after Mr. Shelton made this payment to the Clerk.[8]  Thus, it is manifest that Mr. Shelton was candid about the contested ownership of the insurance policies and that the policies were included as a component of the $15 million payment at the request of the Probation Department.[9]

---

[8]   As discussed in greater detail in prior submissions on behalf of Mr. Shelton, the verdict in this case does not necessarily mean that Mr. Shelton has breached the section of his employment agreement which would relieve Cendant of its obligation to pay the premiums under the policies at issue.  *See* Memorandum of Law in Opposition for Order Compelling Defendant Shelton to Comply with the Court's August 12, 2005 Restitution Order (Docket No. 2029) at 2 and Reply Memorandum in Support of Motion for Stay of Sentence of Restitution (Docket No. 1948) at 1-2.  Thus, the United States District Court of the District of New Jersey (which has jurisdiction over this issue) could decide that, notwithstanding the verdict in this case, Mr. Shelton still owns the relevant insurance policies and that Cendant – and not Mr. Shelton – breached the employment agreement by failing to continue to pay the premiums of those policies.

[9]   Finally, it should be noted that the Court had expressed its concern that the value of insurance policies might diminish over time.  *See* July 22, 2005 Sentencing hearing, Tr. 455-456 (The Court:  "I just wanted to make sure that the value of [the insurance policies] is not subject to diminution").  In fact, the cash surrender value of the policies has increased by more than $290,000 since the estimate obtained by the Probation Department and included in the PSR.  *See* PSR at ¶ 145; Nov. 23, 2005 Letter from Security Mutual Life to Shelton (attached hereto as Exh. J); Jan. 27, 2006 Letter from Canada Life to Shelton (attached hereto as Exh. K).  This increase, which more than offsets the $258,000 decrease in the value of the Cendant Stock assigned to the Clerk on October 27th, benefits Cendant.

C.    Stock

Cendant has also objected to Mr. Shelton's inclusion of 98, 075 shares of Cendant stock, then worth $1,902,655, as component of the initial payment.[10]   There is nothing in the Restitution Order that precluded Mr. Shelton from including stock as a component of his initial payment.   In addition, the Court became aware of Mr. Shelton's assignment of the Stock on October 7, 2005, the day it was assigned.   The Court did not reject the assignment of stock, but instead, waited for the Government to object.   *See* Feb. 17, 2006 Hearing, Tr. 37 (The Court: "the clerk did come up and tell me the stock came in, and I was surprised.  And I said, well, I'll wait for the government to file something").   Thus, Mr. Shelton submits that he acted properly in assigning approximately $1.9 million worth of Cendant shares to the Clerk as a part of his initial payment.

II.    THE RESTITUTION ORDER SHOULD BE MODIFIED TO REFLECT A CHANGE IN MR. SHELTON'S ECONOMIC CIRCUMSTANCES

As more fully set forth above and in prior memoranda of law submitted on behalf of Mr. Shelton, Mr. Shelton respectfully submits that he has thus far complied with the terms of the Restitution Order.   Should this Court find, however, that Mr. Shelton has not complied with the Restitution Order (specifically the provision of that Order regarding the "lump sum" payment), Mr. Shelton requests that the Court modify the Restitution Order to conform to the amount that he paid to the Clerk on October 7, 2005.[11]   Such relief is warranted not only because Mr. Shelton

---

[10]   Cendant has stated that it did not understand the "tax issue" – the reason that Mr. Shelton assigned the stock to the Clerk of the Court, rather than liquidate it.   *See* Feb. 17, 2006 Hearing, Tr. 31.  The reason is straightforward:  if Mr. Shelton were to sell the stock he would have to pay approximately $300,000 in capital gains taxes.  Mr. Shelton would be unable to recoup this tax payment in the event his conviction is reversed by the Second Circuit.  Thus, the stock was instead assigned to the Clerk to be held in escrow pending Mr. Shelton's appeal.

[11]   There can be no legitimate dispute as to this Court's authority to modify the protective Order.  The Mandatory Victim Restitution Act ("MVRA") expressly grants courts the power to modify orders of restitution when there is a "material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution."  18 U.S.C. § 3664(k).  *See also United States v. Bowles*, 2003 U.S. Dist. LEXIS 10060, 98-CR-1281 (DLC) (S.D.N.Y. June 18, 2003), * 2-3 (modifying restitution order at request of defendant).

has, at all times acted in good faith and in an effort to comply with the Restitution Order, but also because Mr. Shelton's economic circumstances are such that he should not be compelled to augment his initial payment to the Clerk.

********** **FILED UNDER SEAL** ***********

********** **FILED UNDER SEAL** ***********

### III.    MR. SHELTON HAS AT ALL TIMES COMPLIED WITH THE COURT'S DIRECTIVES REGARDING LIVING EXPENSES

After the conditions of Mr. Shelton's bond were set by the Court, the Court established a $45,000 cap on Mr. Shelton's monthly living expenses.  Mr. Shelton has since complied with this directive.   He has, on a monthly basis, furnished to the Probation Department detailed spreadsheets regarding his income and monthly expenditures.  At no point has the Probation Department objected to any of Mr. Shelton's expenditures.  Despite Cendant's insinuations to the contrary, Mr. Shelton has acted in good faith regarding his monthly expenditures.  As is clear from Mr. Shelton's monthly submissions (some of which are attached to Cendant's April 12, 2006 brief at Exh. F, G and H), Mr. Shelton has consistently spent less than the amount that this Court had authorized.

Notwithstanding Mr. Shelton's compliance with the Court's directive regarding his living expenses, Mr. Shelton would not object if this Court were to order a Stay of the Restitution Order and, as a condition to such Stay Order, reasonably modify the terms of Mr. Shelton's monthly allowance.  As indicated above, however, Mr. Shelton has incurred, and will continue to incur, significant legal fees in connection with his appeal and with proceedings before this Court. It is respectfully submitted that Mr. Shelton should be permitted to pay his attorneys the amounts that they are owed without regard to any cap on Mr. Shelton's permitted monthly expenditures.[12]

---

[12]   This would be consistent with the Court's statements made in connection with Mr. Shelton's Bond Hearing:  "I don't like to place restrictions on people's abilities to pay their attorneys, I really don't know what kind of situation Mr. Shelton is in, in terms of having to pay the attorneys."  Jan. 5, 2005 Bond Hearing, Tr. 9.

## <u>CONCLUSION</u>

Wherefore, Mr. Shelton respectfully requests that, if this Court concludes that he has not complied with the Restitution Order, it grant Mr. Shelton's Conditional Motion to Modify the Restitution Order, modify the Restitution Order to deem to the payment that Mr. Shelton made on October 7, 2005 to be adequate and sufficient, stay enforcement of the balance of the Restitution Order and grant such further relief as this Court may deem appropriate.

THE DEFENDANT,
E. Kirk Shelton

BY     _____

LAW OFFICES OF THOMAS P. PUCCIO
Thomas P. Puccio, Esq. (ct 22983)
230 Park Avenue, Suite 301
New York, NY  10172
Tel.: (212) 883-6383
Fax: (212) 883-6388


Hope C. Seeley, Esq. (ct 4863)
SANTOS & SEELEY, P.C.
51 Russ Street
Hartford, CT 06106
Tel: (860) 249-6548
Fax: (860) 724-5533

Of Counsel:

Richard J. Schaeffer, Esq. (phv 0973)
Andrew Kanter, Esq. (phv 0974)
DORNBUSH SCHAEFFER STRONGIN & VENAGLIA, LLP
747 Third Avenue
New York, NY  10017
Tel: (212) 759-3300
Fax: (212) 753-7673

## <u>CERTIFICATION</u>

I hereby certify that on April 13, 2006, a copy of the foregoing Memorandum Of Law was served on the following parties by Telefax and U.S. Mail:

James McMahon, Esq.
Fraud Section
US Department of Justice
1400 New York Ave., NW, 4th Floor
Washington, DC  20005

Richard J. Schechter, Esq.
U.S. Attorney's Office
915 Lafayette Boulevard
Bridgeport, CT  06604
Tel: (203) 696-3000
Fax: (203) 579-5550

Norman Gross, Esq.
United States Attorney's Office
U.S. Courthouse and Federal Building
401 Market Street, 4th Floor
Camden, N.J. 08101-2098
Tel:  (856) 968-4930
Fax: (856) 968-4917

Robert E. Kaelin, Esq.
Murtha Cullina LLP
CityPlace I, 85 Asylum St.
Hartford, CT  06103-3469
Tel: (860) 240-6000
Fax: (860) 240-6150

C. Warren Maxwell
Deputy Chief U.S. Probation Officer
United States Probation
157 Church Street, 22nd Floor
New Haven, CT 06510
Tel: (203) 579-5707
Fax: (203) 579-5571

Nicole Owens, USPO
U.S. Probation Office
U.S. District Court
915 Lafayette Street
Bridgeport, CT  06604
Tel: (203) 579-5707
Fax: (203) 579-5571

Samuel Kadet, Esq.
Skadden, Arps, Slate,
Meagher & Flom
Four Times Square
New York, NY  10036-3897


_____
HOPE C. SEELEY