# EXHIBIT A (PART 2)

Page 26

1 the Cendant stock. The stock apparently has collapsed
2 somewhat from where it was. We could make that
3 acquisition of that so we would at any point in time put
4 the stock to the holder of that option and get for it what
5 its worth today. But again, that involves an expenditure
6 of money.
7     There are devices and we could obviously discuss
8 this; to the extent that one could discuss this with
9 Cendant, we would be happy to discuss it with Cendant to
10 see if that makes sense to protect us against any further
11 erosion. Of course, the stock could go up and that's
12 another possibility. So that's something that might be
13 considered.
14     Obviously, we'll do whatever we can to work with
15 the Court and Probation and Cendant and the government in
16 trying to keep the status quo.
17     THE COURT: I will say, though, that I'm not
18 going to be placing the burden on Mr. Maxwell to
19 understand and monitor finances of the defendant.
20     MR. PUCCIO: Well --
21     THE COURT: As good as he is, he's got other
22 stuff and it's too time intensive.
23     MR. PUCCIO: We will try to do that and not
24 involve Mr. Maxwell.
25     THE COURT: He'll be kept informed, but I'm

Page 27

1 going to approach this in a way that I think is most
2 appropriate for this kind of case, which is fairly unique.
3     MR. PUCCIO: And to the extent that we can't
4 agree, Your Honor, obviously we would like to have access
5 to the Court, because I have a feeling, just by the
6 dynamic of this, it's not going to be too easy to reach
7 agreement with Cendant Corporation. They have a very hard
8 view of this case, perhaps fueled by the chief executive
9 of the company feels that he was terribly wronged here,
10 and spending, in my judgment, far beyond legal resources
11 what's necessary and what's sensible. But that's the
12 judgment of the Cendant Corporation. I just want to have
13 access to the Court to resolve these disputes because I'm
14 not terribly optimistic that we are going to be able to
15 reach much accord.
16     THE COURT: I expect to be making decisions
17 after parties have full information and an opportunity to
18 try at least to narrow the areas of disagreement.
19     I should let counsel for the other two also have
20 a few words to state whatever they want to state.
21     MR. KADET: Thank you, Your Honor. Sam Kadet
22 from Skadden Arps firm.
23     Despite what Mr. Puccio's view may be on how
24 Cendant should take a view on this matter, we have
25 carefully considered our position. We think it's

Page 28

1 critically important that Mr. Shelton comply with
2 Your Honor's restitution order and his failure to do so
3 should in no circumstance be excused.
4     Now, what he's done in terms of the insurance
5 policy, I heard counsel get up and reference a Presentence
6 Report, that we have not had access to, in which
7 apparently there was a reference that the title of the
8 policy is in dispute and it has been for some time. If
9 Cendant is right that Mr. Shelton has no interest in the
10 policy anymore, the $3.5 million doesn't exist. It's a
11 total zero that he's put in.
12     But even if he's right, one thing I didn't hear
13 counsel say is there's no dispute, indeed it's in one of
14 the briefs that Mr. Shelton filed in this application,
15 that Cendant has a right to receive back from the proceeds
16 the premiums it advanced. That's not even in dispute.
17 There's no mention about it. So the $3.5 million that
18 Mr. Shelton's counsel ascribes to that insurance, at a
19 rock bottom minimum, has to be reduced by the amount of
20 the premiums advanced by Cendant less whatever loans have
21 been taken against the policy, because we did stop
22 advancing premiums a long time ago.
23     What I did, Judge, in an effort to give
24 Your Honor more current information, I did have a
25 declaration of someone from the company prepare that

Page 29

1 brings the insurance data up to date through the end of
2 the year. The data we put in our motion was as of
3 June 30, 2005. I've given this to counsel. With
4 Your Honor's permission, I would offer the Court this.
5     May I approach?
6     THE COURT: I'm not going to be making any
7 decisions today. Are you going to file it with the
8 Clerk's Office?
9     MR. KADET: We will. We understand at some
10 point Your Honor will make a decision and I thought it
11 would be Your Honor would desire as much current
12 information in terms of Mr. Shelton's interest in the
13 policy, which as you'll see in this declaration has to be
14 reduced as of year-end by $920,000. So the 3.5 million
15 value put on the policy for purposes of compliance with
16 the restitution order on the insurance is $920,000 short
17 as of December 31, 2005.
18     We would urge Your Honor, frankly, we don't
19 think these insurance policies belong in this escrow
20 account at all toward satisfaction because we think
21 Mr. Shelton has no interest in them whatsoever. We would,
22 as I point out, there are two grounds for that. I'm not
23 going to reargue the point. One is we think he's breached
24 the covenants and there's a reference, some reference to
25 that in the briefing back and forth.

Page 30

1    THE COURT: Can I just save you a little bit of
2 time --
3    MR. KADET: Sure.
4    THE COURT: -- and tell you that had I
5 understood there was a dispute, forget whose right, had I
6 understood there was a dispute, I would not accept the
7 insurance policies as a component. And there is a
8 dispute.
9    MR. KADET: We would urge Your Honor not to do
10 that now. These are not clean assignments. Your Honor
11 used the word "clean assignments."
12    THE COURT: I don't intend to accept the
13 insurance policies, and the question will be whether I
14 will modify the order the way that the defendant is asking
15 me to, or I will look at the defendant's other assets and
16 decide that the amount has to be made up some other way.
17    MR. KADET: We certainly believe that the latter
18 approach is more desirable from Cendant's perspective
19 because those policies are ours, that's our money.
20    Second point, Judge, briefly, on the stock.
21    I wasn't here. I read the transcript. I find
22 it amazing that someone can stand up and say wire transfer
23 includes securities and not cash. I think it clearly
24 meant cash.
25    The stock has not performed as well as we like,

Page 31

1 but the effect of it is that the stock is worth nearly
2 $400,000 less than the value Mr. Shelton ascribed to it
3 last October. It closed yesterday at $15 and I believe 37
4 cents. So it's $4.03 per share under the $19.40 value per
5 share that was ascribed to it when it went into the court
6 registry. That's nearly $400,000. We don't think the
7 stock is proper at all. We think that should be replaced
8 by hard cold cash to insure strict compliance with
9 Your Honor's $15 million requirement.
10    Now, there was also a reference to tax and I
11 heard Mr. Puccio get up and talk about some fancy put/call
12 arrangement. We are not interested in that. The tax
13 issue we don't quite understand -- I'm not a tax lawyer --
14 why Mr. Shelton's allowed to take securities that
15 apparently have unrealized gain in them and use them to
16 discharge an obligation Your Honor has placed on him and
17 yet avoid all tax. This is not a charitable endeavor;
18 taking stock that was stepped up unrealized gain and give
19 it to a charity, take a donation for the full amount and
20 there's no tax due on the unrealized gain. This is not
21 charity. I don't know that he can right the premise of
22 the whole tax position. It may or may not be right, but I
23 think there's at least a question there.
24    We're not happy about the stock. We would like
25 cold cash. We think that's what the Court contemplated

Page 32

1 and we think he should be ordered to do that.
2    I would like to say a word about the Vail
3 transfer, if I may, Your Honor. We're very disturbed
4 about that. We certainly agree with the Court's
5 observation that there's double-counting going on, and
6 frankly, it's at our expense because what happened here
7 when you cut through all this, Mr. Shelton had a
8 50 percent interest in a condominium in Vail, Colorado.
9 He no longer has that. Now it's owned by his wife and
10 some trust, as I understand it.
11    So at the end of the day, his 50 percent
12 interest is not available for restitution even if it still
13 secures the terms under which he's released on bail. So
14 we agree with the double-counting.
15    What's missing here, Judge, and the question I
16 rose a minute ago to raise, if you look at the deed, it
17 says that he and his wife transferred the entire Vail
18 condominium for $700,000. That's what it says.
19 Mr. Puccio stood up and said he needed that cash to
20 include in the cash he actually did deposit with the
21 court.
22    We understand -- I'm not making a representation
23 of fact, but we'll try and get at this with the mechanism
24 Your Honor gave us -- I understand Your Honor is
25 considering giving us -- that this condominium in Vail was

Page 33

1 purchased 10 years for $700,000. We do believe real
2 estate values in Vail have appreciated significantly over
3 that period of time. We've heard nothing about an
4 appraisal. What is this property really worth? If it's
5 worth $2 million, purely hypothetical, and Mr. Shelton's
6 half-interest is a million dollars and it's been, in
7 effect, transferred to his family for $350,000, guess who
8 loses out on the $650,000 difference in my hypothetical?
9 My client.
10    We have some very severe problems with the whole
11 circumstances under which this condominium transaction
12 took place immediately after Your Honor imposed the
13 sentence in this matter.
14    We would like to be heard, moving to another
15 topic, on the monthly living allowance. We think $45,000
16 is just beyond the pale from the victim's perspective.
17 That's a king's life-style that's simply not warranted
18 here. We certainly understand Your Honor would start with
19 the allowance given to Mr. Corigliano, but we would like
20 to have input on that as this matter goes forward. That
21 may be substantially more than appropriate under the
22 circumstances.
23    Lastly, Judge, we would like, if Your Honor
24 contemplates going forward that additional assets can be
25 secured and placed in escrow pending appeal, we are

Page 34

1  amenable to that. We don't want the situation in any way,
2  shape or form the status quo as it exists today
3  necessarily to be preserved. We subscribe to what I think
4  understood Your Honor to be saying that additional assets
5  can be placed in escrow and made available later for
6  restitution.
7       Thank you, Judge.
8       THE COURT: Counsel for the government?
9       MR. SCHECHTER: If I can, just briefly, Your
10 Honor. Richard Schechter.
11      Just so the record is clear, Mr. Puccio, at the
12 time he surrendered or he spoke of the insurance policies,
13 the Presentence Report has a value for the insurance
14 policies and that value is $3.3 million. And Your Honor
15 was rather prescient, whether you realized it or not, when
16 you specifically asked: If there's a diminution in value,
17 what will happen? And Mr. Puccio said, we'll just add it
18 on the second payment.
19      The whole point of my speaking, Your Honor, is
20 to make certain that at the end, there's no benefit to
21 Mr. Shelton for having not complied with the restitution
22 order and having not complied with the Probation
23 Department.
24      If I can just direct Your Honor to the
25 Presentence Report at page 36, Your Honor will have the

Page 35

1  benefit of this in the transcript. Mr. Shelton's total
2  assets are listed in the Presentence Report at
3  $25 million, and that includes assets of his dependents as
4  well as assets of his wife. But it was from that figure,
5  Your Honor, that the $15 million was derived from.
6       The burden is on a defendant to prove to the
7  court that he doesn't have the money. It's not the burden
8  on the victim or the government to prove that he does.
9  When Mr. Puccio suggests that he would like a new order
10 from Your Honor that let's him out from under the
11 insurance 3.3 million, it's their burden to demonstrate to
12 this Court that Mr. Shelton, who had $25 million in assets
13 at the time of the sentencing, now no longer has any money
14 whatsoever to repay the insurance diminution, if you will,
15 and what I gather from Your Honor, the stock as well.
16      And for having not complied with Probation's
17 order, for having transferred property that was subject to
18 this Court's bail order, at the end, Your Honor, all we're
19 asking, I just want to put on the record now so there is
20 no suggestion later that we didn't object now, that he not
21 profit from having not complied with Probation and the
22 Court's order.
23      Your Honor, we would reserve our right when we
24 do obtain all the financial information to seek to revoke
25 Mr. Shelton's bail. I want to reserve that right so

Page 36

1  there's no suggestion that by coming today we've given up
2  that opportunity. We'll look at the financial
3  information, Your Honor, and if warranted, as Your Honor
4  said, we should come back to Your Honor and we reserve
5  that right to revoke the bail, Your Honor, in light of the
6  circumstances.
7       THE COURT: Move to revoke the bail.
8       MR. SCHECHTER: Move to revoke the bail.
9       THE COURT: Just so we're clear.
10      MR. SCHECHTER: We still understand that Your
11 Honor would have to rule on that. I haven't forgotten
12 that part of the law.
13      MR. PUCCIO: May I respond briefly to a couple
14 points? I do have a couple of points that I want to make.
15      First of all, the point that was made about the
16 diminution in value of the policies that I addressed at
17 the time of the hearing on this, I'm not sure where that
18 goes, putting the dispute aside. There was no diminution.
19 There was actually an enhancement of the cash surrender
20 value, sort of the opposite of what happened in the stock
21 situation.
22      So all I was saying then, and I was operating
23 under the assumption that it was a certain amount of
24 millions of dollars at that point. The question I think
25 Your Honor raised was that going to be the amount at the

Page 37

1  time.
2       THE COURT: Well, my concern was whether the
3  premiums were paid out of the cash value.
4       MR. PUCCIO: Right, right. I think I said at
5  that point, well, if there was any difference, we'll make
6  it up at the time. Actually, what happened is the amount
7  became greater.
8       With respect to the stock again, I really don't
9  think -- I can understand where the other side is coming
10 from -- that Mr. Shelton should be pilloried over this
11 because again, if this was raised at the time, in my
12 experience, the clerk's normally take collateral --
13      THE COURT: The clerk did come up and tell me
14 the stock came in, and I was surprised. And I said, well,
15 I'll wait for the government to file something. It's been
16 filed.
17      MR. PUCCIO: All right.
18      THE COURT: You don't know that because I said
19 that --
20      MR. PUCCIO: I wasn't here and --
21      THE COURT: -- I'll wait for the government to
22 file.
23      MR. PUCCIO: We tried to comply with the order,
24 and everything that Mr. Shelton has been asked to do he's
25 done in terms of getting permission.

Page 38

1    Perhaps I was too kind to Mr. Kadet to let him
2  off the hook on all the mistakes in his papers by
3  suggesting, well, he made the mistakes because he doesn't
4  have the information. He gets up and says no appraisals.
5  Sometimes it's better to keep your mouth shut. We have an
6  appraisal.
7    THE COURT: Mr. Puccio, Mr. Puccio, Mr. Puccio,
8  I think you've been here long enough in Connecticut to
9  know that we don't do that here.
10    MR. PUCCIO: All right. In any event, sometimes
11  I can't resist, Your Honor. I spend some of my time in
12  places other than Connecticut.
13    THE COURT: I'm going to help you.
14    MR. SILBERMANN: Your Honor?
15    THE COURT: Yes, Mr. Silbermann.
16    MR. SILBERMANN: Good morning, Your Honor. I'm
17  new to this proceeding. I'm with the U.S. Attorney's
18  office in New Jersey. I'm in the civil division and I do
19  almost 100 percent of my work collecting restitution
20  orders. This is what my office does. My office in fact
21  has been charged with the responsibility for collecting
22  this restitution order pursuant to the terms thereof and
23  any stays that may be in place. So Your Honor, we have a
24  very keen interest in seeing how the Court rules on these
25  issues.

Page 39

1    To that extent, Your Honor, I would like to
2  mention to the Court the concerns that we have, that I
3  have.
4    THE COURT: Sure.
5    MR. SILBERMANN: I've spoken with Mr. Maxwell on
6  several occasions and he has done a fabulous job in trying
7  to get his arms around this very complex estate that
8  Mr. Shelton has.
9    I believe that Mr. Shelton has made it more
10  complex than would otherwise be because of his
11  lingering -- back then, his then lingering criminal
12  problems. And the Court noted the transfer of the Vail
13  condo just this past fall. That certainly was of concern
14  to us.
15    However, Your Honor, the bigger concern, a much
16  bigger concern, and I hope the Court is aware of this,
17  that the transfer that created the children's trust back
18  in 1999, Your Honor, that is a tremendous asset that was
19  created and funded, I believe, and I'm sure the evidence
20  will bear out at the end of the day, with the full intent
21  to evade his creditors; namely, Cendant Corporation.
22    That statute of limitation, it's eerie, the
23  timing of some of these things. I don't think that
24  Mr. Shelton, he may or may not have been advised on some
25  of the timing of statutes of limitations, but it's eerie

Page 40

1  some of the timing.
2    He made a disclosure to the Probation Office on
3  January 13th of '05. The trust was funded and founded
4  January 15th of 1999, almost exactly six years to the day,
5  Your Honor. That is the statute of limitations under the
6  federal statute. I'm not sure -- I think that Connecticut
7  has adopted Uniform Fraudulent Transfers Act, which would
8  also provide, I hope, for a six-year period.
9    But more importantly is the two-year discovery
10  limitations period. So that you have two years from when
11  you learned or should have learned of the transfer. That
12  period was triggered, I think arguably, might have been
13  triggered by Mr. Shelton's disclosure to Probation about a
14  year ago, now less than a year ago, Your Honor. Eleven
15  months ago.
16    So what we have now is roughly an 11-month clock
17  to get a fraudulent transfer action filed. I foresee,
18  I've looked over all this and I think I have a good lay of
19  the land based on what's been filed, I see that as the
20  biggest collection effort that will be done in this case.
21  It will be that trust, the children's trust.
22    As Your Honor knows from the brief that was
23  filed December 16th by Mr. Shelton, it lays out a string
24  of 11 steps that Mr. Shelton engaged in to help fund this
25  lump sum payment. It's kind of convoluted, but it begs

Page 41

1  several questions, and frankly, what it does to me is it
2  raises many red flags where this trust may not be on such
3  stable ground.
4    Your Honor, we put in our brief and you may have
5  seen yourself that at paragraph numbered 8 on page 4 of
6  this brief, docket entry 2030 --
7    THE COURT: You're talking about Mr. Shelton's
8  brief?
9    MR. SILBERMANN: It's one of the reply
10  memoranda, Your Honor, in the motions that are pending
11  here today. Defendant's reply memorandum to government's
12  opposition to the defendant's motion to travel.
13    THE COURT: I have that.
14    MR. SILBERMANN: In that pleading, Your Honor,
15  Mr. Shelton lays out the string of events leading up to
16  the down payment. He talks about how there were these
17  loans from the Ceniarth Corporation, which we're not quite
18  sure who Ceniarth is, Ceniarth Wales. It's shrouded in
19  mystery, Your Honor, and I'm sure intentionally so.
20    These are the kinds of issues that we need to
21  get discovery on. I would like the Court to know that in
22  pursuing our obligation to enforce this order, what we
23  really have to be doing -- and I think the Court is
24  leaning this way and I hope it is -- is allowing discovery
25  in aid of execution.

Page 42

1    What we would do immediately, Your Honor, is we
2 would issue subpoenas to third parties; namely in this
3 case, SCIP Management Company, Ceniarth Wales,
4 Merrill Lynch, Smith Barney, all the parties that took
5 place in the funding of this trust, transfers to and from
6 this trust, liquidation of assets within this trust, et
7 cetera, et cetera, Your Honor.
8    We really do have a lot of work ahead of us on
9 this and we've only got 11 months to file. At a minimum
10 we would ask that the Court allow us to engage in this
11 kind of discovery, and I would suggest that prior to us
12 filing that complaint, which I foresee happening, we then
13 report back to the Court and move to lift whatever stay
14 may be in place to allow the filing of that action.
15    THE COURT: Given the fact that there's going to
16 be no agreement as to the tolling, it's my intention to
17 allow the parties to do what they need to do to protect
18 their rights.
19    MR. SILBERMANN: Yes, Your Honor. I can't agree
20 more strongly. And even the tolling agreement I think
21 would be the alternative. The tolling will toll the
22 limitations period, but as to you know, documents
23 disappear, memories are clouded. We need to get on this
24 right away.
25    THE COURT: When I said earlier that Cendant

Page 43

1 should not be taking a risk with respect to tolling, I was
2 really saying something broader than it may have appeared
3 I was saying. To the extent that it would be
4 disadvantaged by having a tolling agreement, I would not
5 require it to be satisfied with a tolling agreement.
6    MR. SILBERMANN: Thank you.
7    There is one other issue that I would like to
8 raise and it is our relationship with Cendant going
9 forward.
10    We talked about this most recently yesterday
11 afternoon and I think Cendant -- and I can't speak for
12 them -- but I think they are comfortable with this
13 arrangement, which is that the United States Attorney's
14 Office, as special counsel appointed in this case, my
15 office would go forward with discovery and preparing any
16 kind of pleadings for a civil fraudulent transfer action,
17 et cetera, et cetera, collection restitution order,
18 working in cooperation and maybe even coplaintiffs, when
19 it comes to civil litigation, with Cendant Corporation
20 under their rights, Cendant's rights under this 3664(m)
21 provision, Your Honor.
22    The main Justice Department component in
23 Washington that handles financial litigation collection
24 has a keen interest in how we go forward with this
25 victim's enforcement under 3664(m). It's new law. We

Page 44

1 want to be careful to make sure it's done properly and not
2 have victims out on their own, although presumably that's
3 what the statute allows. We would like to work with them
4 as coplaintiffs. And if their standing as coplaintiff is
5 challenged down the road, that's something we could
6 litigate and get some case law on 3664(m), but meanwhile
7 the United States would be a solid plaintiff to hold the
8 action together, with the glue to hold the action
9 together. So we would work with them, Your Honor, and
10 keep the Court apprised at every turn, Your Honor.
11    Thank you.
12    THE COURT: Okay. I guess where we are at this
13 juncture, from my perspective, I believe the way I want to
14 proceed, the government and Cendant need to be given
15 information, and what I want to focus on at this point is
16 what information I should be authorizing them to get and
17 from whom.
18    Do you all need to caucus about that or do you
19 have a list?
20    MR. SILBERMANN: One thing, Your Honor. Just
21 procedurally, it's very important that the Court not order
22 or allow the Probation Office to provide this information
23 to the victim. I think it's important that the Probation
24 Office is standing as an arm of the court be allowed to
25 maintain its integrity. So that the disclosure of this

Page 45

1 information, while it's important and we want it and we
2 hope that the Court will order it, rather have it come
3 from the defendant to the victim, Probation Office to the
4 United States we would ask. We believe that there's a
5 common interest between the Probation Office and the
6 United States, and that the United States is allowed to
7 have access to it.
8    But vis-a-vis the victim and the Probation
9 Office, we want to be careful of that, Your Honor.
10    THE COURT: If information is disclosed from the
11 Probation Office to the government -- I'm just trying to
12 remember whether we've done that in the past.
13    Can you recall having done that in the past,
14 Mr. Maxwell?
15    MR. MAXWELL: Typically we get the Court's
16 permission to release the financial information to the
17 Financial Litigation Unit of the U.S. Attorney's Office.
18    THE COURT: I was trying to remember a specific
19 case and nothing was coming to mind.
20    MR. PUCCIO: Judge, if I may --
21    THE COURT: One second, please.
22    If I authorize the Probation Office to release
23 information to the government and the government and
24 Cendant are working on a cooperative basis, how do we have
25 in place a barrier?

Page 46

1    MR. SILBERMANN: We would not disclose it, Your
2  Honor. We believe the Probation Office materials
3  generated by Probation or in the possession of the
4  Probation Office are sacrosanct and that their disclosure
5  to the government is as far as it should go. We will not
6  disclose that to the victim.
7    THE COURT: I just wanted to make that clear.
8    MR. SILBERMANN: The source of that information
9  can be and should be obtained elsewhere through third
10 party discovery, and to that extent it should be a very
11 transparent effort that Cendant would have access to all
12 this information, Your Honor, just not from Probation.
13   MR. KADET: We have a motion pending for release
14 of the portion of the Presentence Report that simply lists
15 assets and then provides all the updates. We have no
16 interest in the rest of it.
17   I think, while we certainly are amenable and
18 happy to work cooperatively with the United States
19 Attorney, it is going to make it cumbersome if there's a
20 bunch of things that they learn from Probation and can't
21 share with us with respect to Mr. Shelton's assets.
22 That's our only interest. We tried to write that motion
23 very narrowly. We just want to find out what assets, what
24 they are, what's happened to them. That's it.
25   THE COURT: I think what Mr. Silbermann is

Page 47

1  saying is that you can get that information through
2  another means.
3    MR. KADET: He's suggesting that. All I'm
4  suggesting in response is that that to some degree
5  undermines the cooperative effort that he alluded to that
6  we support. It means we have to go out and ferret out
7  information on our own. I just see it as creating an
8  unnecessary obstacle, but Your Honor will make a ruling on
9  that point.
10   The other thing I wanted to say for purposes of
11 the record, we learned about the trust that was referenced
12 earlier that past summer when we read reference to it in
13 the government's presentencing memo. Obviously, we didn't
14 know what Mr. Shelton may or may not have told Probation
15 six months before that.
16   The first indication we knew of that was in a
17 footnote to the government's sentencing brief filed mid
18 last year.
19   THE COURT: Mr. Puccio, did you have something
20 you wanted to say?
21   MR. PUCCIO: I'm not sure that I would endorse
22 the notion that the Probation Department has some common
23 interest with the government. The Probation Office is an
24 arm of the court.
25   I do remember arguing a case years ago in

Page 48

1  another circuit where the Court as part of its sentence
2  ordered -- I guess I'll have to find the citation --
3  ordered the defendant who had been sentenced to make
4  reports to the U.S. Attorney's Office and financial
5  reports over a period of time, and that was overturned,
6  probably for the reason that reporting to Probation is one
7  thing, but having to give financial information to the
8  government through the Probation Department is something
9  else quite again.
10   I like to be able to look into this.
11   Here we have a situation where, in effect,
12 you're ordering, if this takes place, Mr. Shelton to
13 report to the U.S. government. There may be another way
14 of doing this that will --
15   THE COURT: Can you say last part again?
16   MR. PUCCIO: Yeah. By ordering this, Probation
17 to turn over information to the government, you have
18 Mr. Shelton reporting to the government post-sentence on
19 his financial affairs. I don't think the Probation
20 Department can be used as a vehicle for doing that.
21   THE COURT: What I was thinking was authorizing
22 the government and Cendant to get the information directly
23 from Mr. Shelton.
24   MR. PUCCIO: That's a totally different story.
25   MR. SILBERMANN: Yes, Your Honor. As part of

Page 49

1  the aid of execution, we would also ask that Mr. Shelton
2  be made available to testify. One of the first things we
3  would do in this case is sit him down--
4    THE COURT: I'm not thinking more in terms of
5  aid of execution. I'm thinking in terms of how I get the
6  information I need to put in place the conditions for the
7  stay. That's where I am.
8    In order to intelligently fashion a stay, I need
9  to have input from the government and Cendant and from the
10 defense as to what conditions should I put in place. I
11 can't get the input from the government or Cendant until
12 they get information concerning Mr. Shelton's finances.
13 So what I want to do is figure out how they get that
14 information concerning Mr. Shelton's finances, because the
15 other option is to say, no stay. That's where we are. We
16 have a stay or no stay. If we have a stay, then we have
17 no tolling and there are the disadvantages of tolling.
18 Then I need to have the two parties here in a position to
19 give me informed input as to what they think I ought to
20 put in place as conditions of the stay.
21   MR. PUCCIO: Well, I thought what we were
22 proposing here was Mr. Shelton would give information to
23 them about his current financial situation. Now I'm
24 hearing depositions and motion practices. Then there's no
25 stay. I thought the idea was to have a stay while the

Page 50

1  appeal is pending to avoid all this litigation.
2      THE COURT: I think what I will do is -- I can
3  anticipate, I believe, that we'll have a production of
4  documents that currently exist and there will be
5  questions. And I suspect if there are, then I will
6  authorize that they are entitled to examine Mr. Shelton.
7  Maybe you're able to work out a cooperative relationship
8  where that's not necessary.
9      MR. PUCCIO: Maybe there'll be peace in the
10 Middle East.
11     THE COURT: I don't think so.
12     MR. PUCCIO: We would like a stay. If we're
13 going to have depositions, as I said, I don't know -- I
14 mean, what are we staying? They want full litigation.
15     THE COURT: You're staying the transfer of
16 assets out of Mr. Shelton's estate to Cendant, which I
17 think is a valuable consideration. That's maintaining the
18 status quo.
19     MR. PUCCIO: We're going to try to work this
20 out, if we can.
21     THE COURT: No, no, no. No, no. You're going
22 to meet with a magistrate judge and talk about it, who's
23 going to report to me and keep me fully informed.
24     MR. PUCCIO: All right. Fine. Well, that's
25 what I meant, Judge, when I --

Page 51

1      THE COURT: Thank you.
2      MR. PUCCIO: -- when I said we were going to try
3  to work this out.
4      THE COURT: Actually, I think Judge Smith is
5  somewhat familiar with at least the case, so I'm going to
6  see if he would be willing to meet with you all.
7      I think in the meantime it would be -- it might
8  help sort of smooth things and make for a more effective
9  working relationship if we just started producing things
10 you think the government and Cendant might want. And if
11 you could tell them what you're expecting, that would also
12 be helpful.
13     I think I'd like to get this done quickly, for a
14 number of reasons, one of which you can probably surmise
15 about since I have an April jury selection date in another
16 case that I have been told is going to proceed, at least
17 it's the government's present intention to proceed.
18     So I'd like -- I guess I'd like documents
19 exchanged -- today is Friday -- by Monday. I'm going to
20 ask Judge Smith to be available any time from Tuesday on.
21     MR. PUCCIO: Monday -- I'm perfectly prepared,
22 Judge, to work, but I think it's a federal holiday and
23 everything is closed.
24     THE COURT: But you all aren't.
25     MR. PUCCIO: Well, I would like to be closed on

Page 52

1  Monday.
2      THE COURT: Sorry. I'm going to be here.
3      MR. PUCCIO: The banks are closed.
4      THE COURT: The banks are closed, yes, but let's
5  get the documents exchanged by Monday.
6      Mr. Kadet?
7      MR. KADET: To be clear, what is Your Honor
8  contemplating taking place by Monday, just so I'm clear?
9      THE COURT: Documents being delivered. You tell
10 them what you're expecting and then I'll ask Judge Smith
11 to be available.
12     MR. KADET: If I might ask Your Honor a
13 question. Would it be consistent or inconsistent with
14 Your Honor's ruling with respect to the portion of the
15 Presentence Report that Your Honor feels my client should
16 not apparently have access to, if Mr. Shelton voluntarily
17 send that over to us, the same information.
18     THE COURT: I would assume you would get the
19 information that's in that report but more current.
20     MR. KADET: I'm sorry?
21     THE COURT: Updated.
22     MR. KADET: Yes. Presumably it will be taken
23 right out of the report and just hand it over.
24     THE COURT: Well, he didn't prepare the report,
25 so I don't think he would be taking it out of the report.

Page 53

1      MR. KAELIN: Your Honor, I would request that we
2  take that five-minute break just to talk amongst
3  ourselves. I don't know how fast you're getting to
4  concluding this.
5      THE COURT: If you want to have five minutes and
6  have me be available in case there are questions.
7      MR. KAELIN: I have a couple of issues running
8  through my mind as a collections attorney and I wanted to
9  talk to Attorney Silbermann.
10     THE COURT: Why don't we recess and I'll come
11 back in if you need me, and I can see what I got in terms
12 of a TRO that was filed this morning.
13     We'll recess.
14         (Whereupon, a recess followed)
15
16     THE COURT: Please be seated everyone.
17     Did the parties have anything they wanted to
18 address?
19     MR. PUCCIO: Your Honor, I'd like to put on the
20 record where I think we are, and I think counsel for
21 Cendant and the government also have something to put on
22 the record.
23     Out of our discussions, the following game plan
24 has emerged:
25     We'll put together, directly from us, a package

Page 54

1  of materials which will resemble, if not be identical, to
2  what was given to Probation. In other words,
3  Mr. Shelton's net worth, his financial statement as of the
4  time of the verdict, his financial statement currently,
5  and information regarding all of the dispositions or
6  transfers between that time and today, so one could see
7  how much he was worth at the time of the verdict and how
8  much he's worth now.
9       We'll do that --
10      THE COURT: Actually, let me tell you that I
11 talked to Judge Smith, who is available to do this, but he
12 cannot meet with you until March 3rd at 10:00.
13      MR. PUCCIO: I'm in court on March 3rd someplace
14 else, Judge, but maybe I can work that out. They may not
15 need me.
16      But in any event --
17      THE COURT: What I was saying is that Monday, we
18 can be flexible in terms of Monday.
19      MR. PUCCIO: They begged off. Everybody is out
20 at the beach on Monday or something. Nobody is available
21 Monday so they're happy.
22      THE COURT: By when?
23      MR. PUCCIO: How about Wednesday because FedEx
24 doesn't work Monday.
25      MR. SILBERMANN: Tuesday, Your Honor.

Page 55

1       MR. PUCCIO: I'll drive over, Judge, to New
2  Jersey. I have nothing to do anyway.
3       The second part of it --
4       THE COURT: I think either I or Mr. Maxwell
5  should get a copy of what's exchanged.
6       MR. PUCCIO: Okay. Who would you like the copy
7  to go to? Or both?
8       MR. SILBERMANN: Your Honor, if it's to insure
9  that it most closely resembles what Mr. Maxwell originally
10 received, we would ask that Mr. Maxwell get a copy.
11      THE COURT: Fine.
12      MR. PUCCIO: That's fine. We'll send
13 Mr. Maxwell a copy.
14      The second part of what we discussed is what
15 comes after that, and what we've discussed is that after
16 they get the materials that we're turning over, if they
17 want something in addition to that, they should present us
18 with a list and we'll get back to them in a timely manner
19 and tell them what we believe they should have and what
20 they shouldn't have.
21      THE COURT: And then I'll resolve any disputes.
22      MR. PUCCIO: That's right. That's what was
23 contemplated, at least from my thinking. That's the plan.
24      THE COURT: Okay.
25      MR. PUCCIO: We also would like to have -- this

Page 56

1  was agreed to -- a confidentiality agreement.
2       THE COURT: Actually, I forgot to mention that
3  but I was assuming that. Do you want to file a proposed
4  order?
5       MR. PUCCIO: We'll work it out, but that was
6  agreed to.
7       THE COURT: Okay.
8       MR. KAELIN: I think some of that is correct,
9  Your Honor. Again, Attorney Kaelin on behalf of Cendant.
10 I speak somewhat for the government, but the government
11 can speak for themselves.
12      I think it's the second phase, Your Honor, that
13 we are most concerned with. We need a snapshot looking
14 back into time as well.
15      What we're prepared to do today is within a day,
16 hopefully, put together a list almost like a document
17 request of the type of documents, financial information
18 documents we believe are relevant and pertinent and what
19 we would like. We would get that list to them by next
20 Tuesday.
21      I'd rather work off dates than reasonable time
22 and timely manner. We'll end up litigating that. By next
23 Tuesday we would get that list.
24      The defendant would have until February 28th, is
25 our proposal, to tell us -- sort of like when you're

Page 57

1  responding to a document request, yes, this is what we'll
2  produce and no, this is what we object to.
3       For those items which they agree they will
4  produce, they would produce that documentation we propose
5  by March 6th. And I will state we haven't agreed to these
6  dates. This is a framework of how we would like to work.
7       For those items they object, we would then try,
8  of course as we are ordinarily obligated to do under
9  discovery, to work it out, or go see Magistrate Smith. So
10 it would be a hybrid. We're going to produce it and you
11 get it by a date and we know when we're getting it. We're
12 going to dispute, we'll get to Magistrate Smith as fast as
13 we can, and that would be probably some time after the
14 week of the 3rd and it sounds like he's available.
15      We would get that list on the 28th, which I
16 believe is a Tuesday, telling us, no, we're not going to
17 produce, for example, tax returns. We could say, Here's
18 why they're relevant; well, we don't think they're
19 relevant and we call Magistrate Smith and have a
20 conference with Magistrate Smith.
21      I will tell you, just so there's no surprise, I
22 would like to put on the record quickly that among the
23 items we're looking for are copies of the defendant's tax
24 returns, state and federal, from 1997 to the present.
25      We would also be looking for -- if some of this

Page 58

1  is what's going to get produced on Tuesday as part of what
2  was sent to Probation, fine, but we're going to be seeking
3  all documents evidencing the $7.5 million Shelton
4  children's trust, all documents evidencing
5  SCIP Partners, LP.
6      We would like to see the documents relating to
7  the $2 million that was provided to legal counsel, which,
8  as you've seen in our papers, we contended was potentially
9  allegedly to shield.
10      And then the classic things, Your Honor;
11  documents regarding bank accounts that have been held in
12  the last so many years, any money market accounts
13  evidencing the transfers of any real property.
14      But clearly, I always see that the tax returns
15  are a great snapshot of what was there or what has been
16  moved.
17      Two other points, Your Honor.
18      The government and Cendant firmly believe that
19  this should not limit us; that after we get this
20  documentation from hopefully a cooperative defendant, that
21  if we see there are third parties in possession of
22  information, we can subpoena those third parties. Many
23  times you will see that assets have been transferred from
24  one mutual fund to another, one brokerage company.
25      The last point, Your Honor, is that -- and I

Page 59

1  think Attorney Silbermann will address this as well -- we
2  want to be clear that we all understand something today
3  and that there's no surprises later, that the government
4  and Cendant is free to proceed with any fraudulent
5  transfer actions against third parties who would not be
6  subject to the stay with one caveat, that typically in
7  those cases we would have to name the defendant to the
8  extent is he in fact a transferor. You typically name the
9  transferor and you name the transferee. He would only be
10 named as a nominal defendant. It would not be the purpose
11 or intent of such action to seek to collect money from the
12 defendant, but you need them typically as a party to such
13 action.
14      You may feel differently about that, but we
15 wanted to be on the record that if we see that
16 information, nothing is staying us from bringing such an
17 action. And I think it was stated in one of their earlier
18 briefs that nothing stops Cendant from bringing a
19 fraudulent transfer action.
20      So I thank you for that, Your Honor.
21      THE COURT: Okay.
22      MR. SCHECHTER: Your Honor, I just had a
23 practical concern regarding the existing bail.
24      I'm not certain if Your Honor wanted everybody
25 to look at all the financial information and then come

Page 60

1  back and then discuss a new bail, or that Your Honor
2  wanted to amend the current bail conditions today.
3      THE COURT: I wanted everybody to look at the
4  information first and then talk about it in the big
5  picture.
6      MR. SCHECHTER: So the record is clear, the
7  existing bail order, if you will, will remain in full
8  force and effect now until such time as Your Honor would
9  modify it?
10     THE COURT: Yes.
11     MR. SCHECHTER: Just so I'm clear then,
12 Probation, Your Honor, is still in the loop regarding the
13 current bail because the current bail permits $45,000 a
14 month expenditures and that after that he seeks the
15 permission of the Probation Department.
16     THE COURT: Well, actually, I think if there's
17 anything above that, I will tell you Mr. Maxwell is going
18 to be consulting with me every month anyway while this is
19 going on.
20     MR. SCHECHTER: The government would reserve the
21 right to come back after we see all the finances to talk
22 about a new modification to this bail order.
23     THE COURT: Correct.
24     MR. SCHECHTER: Just so I can help Your Honor,
25 you put on the record something before about you wanted a

Page 61

1  budget consistent with the budget that the SEC had
2  established for Mr. Corigliano.
3      THE COURT: Actually, I said we've had a lot of
4  discussion about his budget and I would think starting
5  there and then saying should it be more or less to me
6  seemed like a reasonable point to begin the analysis.
7      MR. SCHECHTER: Just to help Your Honor, we went
8  back to the first trial transcript and at page 7995
9  there's a reference to the $233,000 SEC budget regarding
10 Mr. Corigliano. Just to make sure everybody is clear.
11     THE COURT: Yes. And I think -- I don't know
12 which trial this is, but Defendants' Exhibit 400 --
13     MR. SCHECHTER: Is the budget.
14     THE COURT: -- is the budget.
15     MR. SCHECHTER: The other question: Your Honor
16 had also mentioned that you thought -- and the government
17 wholeheartedly agrees -- that any additional income that
18 Mr. Shelton should receive, Your Honor wanted to talk
19 about some type of escrow account.
20     I guess if I can just find out if there can be
21 an agreement until such time as Your Honor revisits the
22 whole issue that any income earned by Mr. Shelton during
23 the period between now and whenever Your Honor is able to
24 revise the bail be held in the escrow account of perhaps
25 Hope Seeley as a lawyer's escrow account so that money

Page 62

1  would at least be available.
2  THE COURT: I guess what I would do is I would
3  look at -- if there is some I think should have been put
4  in, I would treat it all at one time. I would like to see
5  the whole picture as opposed to dealing with pieces of it.
6  MR. SILBERMANN: Your Honor, briefly. There is
7  one issue.
8  I believe Mr. Shelton represented recently that
9  his one remaining asset today is a bank account with
10  two-odd million dollars in it, and I'm not quite sure as
11  to the status of that account.
12  Is that account free to be used for any kind of
13  discretionary income or is it subject to his monthly
14  expenses?
15  THE COURT: It's subject to the monthly
16  expenses.
17  MR. SILBERMANN: So it would be subject to the
18  $45,000, Your Honor?
19  THE COURT: Yes.
20  MR. SILBERMANN: Thank you, Your Honor.
21  MR. PUCCIO: Mr. Maxwell has the correct
22  information. He's in the ballpark, but there may be two
23  or three accounts that has a certain amount of money. All
24  of it is on record. Maybe two and a half million. I'm
25  not sure.

Page 63

1  THE COURT: Sure.
2  Mr. Kaelin gave a schedule and he said it was
3  just his proposal. I don't hear any objection to it.
4  MR. PUCCIO: The schedule sounds fine with me
5  expect for the appearance at court. Maybe that can be
6  worked out with the magistrate. It's after the 3rd anyway
7  so that's solves that problem.
8  THE COURT: I'm going to stay in the loop. I
9  just don't want to have lengthy meetings about you, that's
10  all. No offense intended.
11  Actually, I would have had a more aggressive
12  schedule, but if this one seems to work for you all --
13  MR. PUCCIO: It's good that you didn't decide
14  the schedule.
15  THE COURT: It is. You have a better sense of
16  how long it will take you to do things than I do and I'll
17  honor that.
18  Sounds like we're set for now?
19  Anything else?
20  So you have Judge Smith will see you on
21  March 3rd at 10:00 a.m.
22  MR. PUCCIO: I thought that was changed, wasn't
23  it? Because there's something --
24  THE COURT: That why I'm asking.
25  MR. PUCCIO: I thought the date for Judge Smith

Page 64

1  was left open after the 6th or something.
2  THE COURT: I will find out when he's available
3  after what date?
4  MR. KAELIN: They would have to respond to us by
5  the 28th as to what they would not want to produce or were
6  unwilling to produce. The following week I think is the
7  week of March 3rd. That would be the week we would go in
8  to try to see Magistrate Smith.
9  THE COURT: Actually, I think if there's a
10  dispute over what's going to be produced and what's not
11  going to be produced, I'm going to decide that, so copy me
12  on things and I'll tell you what's produced and what's
13  not.
14  Judge Smith I really have in mind in terms of
15  talking through the details once the information has been
16  exchanged.
17  MR. KAELIN: My sense is we get something in
18  writing on Tuesday the 28th of February, probably the next
19  day we're going to be talking -- that's what I meant by
20  you're supposed to try to cooperate and reconcile
21  amicably -- and it's a day or two thereafter. As soon as
22  we can get in to see you or Magistrate Smith, we're going
23  to want to do that because we do want to get that
24  information sooner.
25  MR. SILBERMANN: Your Honor, I heard no

Page 65

1  objection, but does the Court have a position on third
2  party discovery and third party subpoenas and actions for
3  fraudulent transfer, Your Honor?
4  MR. PUCCIO: If I may. I was about to -- great
5  minds think alike.
6  THE COURT: You only say great minds think alike
7  when somebody agrees with you.
8  MR. PUCCIO: I knew you would catch on to that,
9  Judge.
10  My question is: What is at stake in this stay?
11  What are we talking about?
12  I'm hoping we can give everybody what they want
13  and we won't have any disputes.
14  If there is going to be a stay, what will be
15  stayed I guess is my question?
16  THE COURT: I thought I had sort of indicated
17  earlier that assets won't be taken away from Mr. Shelton.
18  MR. PUCCIO: Okay.
19  MR. KAELIN: Recently, the Connecticut Appellate
20  Court has ruled that while someone is on an appeal of a
21  judgment, it stays the enforcement. I does not stay the
22  discovery of those assets and the preservation of those
23  assets, which is what you were intending.
24  We want to find out where they are and make sure
25  we don't miss anything. We're not trying to take money

Page 66

1  out of a bank account.
2          THE COURT: To be clear, I should ask
3  Judge Smith to tell you what date he is available after
4  what date?
5          MR. KAELIN: I would say the 28th.
6          THE COURT: After the 28th. I'll have him hold
7  March 3rd and have him set aside other dates as well.
8          MR. KAELIN: Thank you, Your Honor.
9          THE COURT: Okay. Thank you very much.
10         We'll recess.
11             (Whereupon, a recess followed)

Page 67

CERTIFICATE

UNITED STATES v. E. KIRK SHELTON
       3:02CR264(AWT)

    I, Corinna F. Thompson, RPR, Official Court
Reporter for the United States District Court for the
District of Connecticut, do hereby certify that the
foregoing pages are a true and accurate transcription of
my shorthand notes taken in the aforementioned matter to
the best of my skill and ability.

_____
   CORINNA F. THOMPSON, RPR
     Official Court Reporter
     450 Main Street, Room #225
     Hartford, Connecticut 06103
         (860) 547-0580